UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

| | | |
|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, solely in its capacity as indenture trustee of Windstream Services, LLC's 6 3/8% Senior Notes due 2023, | : : : : : | |
| Plaintiff, | : : | No. 17 Civ. _____ |
| vs. | : : | **COMPLAINT** |
| WINDSTREAM SERVICES, LLC, | : : | |
| Defendant. | : | |

-------------------------------------------------------x

For its Complaint against defendant, plaintiff, by and through its undersigned

counsel, alleges, upon personal knowledge as to its own acts and upon information and belief as

to all other acts, as follows:

### Nature of the Action

1.      Plaintiff U.S. Bank National Association, solely in its capacity as indenture

trustee (in such capacity, the "**Trustee**") under the terms of that certain indenture dated as of

January 23, 2013 (as amended from time to time, the "**Indenture**"), by and between it as trustee

and defendant Windstream Services, LLC (the "**Company**") as issuer of its 6 3/8% Senior Notes

due 2023 (the "**Notes**"), brings this action on behalf of Noteholders to obtain a declaratory

judgment that: (i) two defaults relating to a sale and leaseback transaction (the "**Defaults**") have

occurred and are continuing under the Indenture, (ii) a notice of default sent by a Noteholder to

the Company in accordance with the Indenture on September 21, 2017 (the "**Default Notice**") is

effective with respect to the Defaults, and (iii) in consequence of the foregoing, Events of

Default will result 60 days after the notice in the absence of a cure by the Company within that

period.  A true and correct copy of the Indenture is attached hereto as Exhibit A, and capitalized

terms not otherwise defined herein shall have the meanings ascribed to them in the Indenture.

2.      The primary Default is a violation of Indenture Section 4.19, which is intended to

protect Noteholders by prohibiting the Company from entering, or permitting any of its

Restricted Subsidiaries from entering, into a "Sale and Leaseback Transaction" – defined as a

transaction in which a person sells or transfers assets it owns and then or thereafter leases them  –

unless three conditions are each met.  Those conditions are designed to preserve assets and cash

flow needed for repayment of the Notes' principal and interest by ensuring that (i) the

transferring entity receives cash proceeds at least equal to the fair market value of the transferred

assets, (ii) those proceeds are applied only in certain, specified ways, and (iii) the Company is

not left with excessive financial liabilities.

3.      On April 24, 2015, dozens of the Company's Restricted Subsidiaries, most or all

of which are regulated providers of telecommunication services, including landline phone and

Internet services (the "**Transferor Subsidiaries**"), transferred to a company called

Communications Sales & Leasing, Inc. (together, with its subsidiaries, "**CSL**") billions of

dollars' worth of their telecommunications network assets that are critical to providing service to

their customers, including hundreds of thousands of miles of copper wires and fiber optic cables

that connect them to their customers.

4.      Then or thereafter, the Transferor Subsidiaries leased back the very assets they

had just transferred to CSL.  In seeking approvals from state utilities regulators that were

required for the transfers, the Transferor Subsidiaries repeatedly represented that, after

transferring the assets to CSL, the Transferor Subsidiaries would "lease them back on an

exclusive, long-term basis" and would "continue to have long term access to and control over the

facilities used to provide regulated services," including the right to "sublease access to the system"—a right they could not have unless they were leasing back those assets themselves.

5.     CSL expressly agreed as lessor of the assets acquired from the Transferor Subsidiaries that the Transferor Subsidiaries would have the right to use and operate the transferred assets and to pay all rent and perform all other lessee obligations under the master lease.  While the Company's parent Windstream Holdings, Inc. ("**Holdings**"), a holding company that is not an obligor on the Notes or Indenture or a regulated telecommunications provider, was made the signatory on a master lease with CSL as lessor, Windstream's CFO explained to regulators that this would be done "just for administrative ease in terms of transacting."  Moreover, various references in the master lease to "Tenant" could only be applicable to the Transferor Subsidiaries, not to Holdings.  In addition, the master lease requires that the transferred assets be used continuously for their "Primary Intended Use" of providing telecommunications services, which was their prior use and a requirement that only the regulated Transferor Subsidiaries were in a position to fulfill before or after the transaction.

6.     Following the transfers of the their assets, the Transferor Subsidiaries have continuously used and controlled the transferred assets as they did before the transfers— including by subleasing access to third parties; have borne the rent, maintenance, tax, utilities, and insurance obligations owed under the terms of the master lease; and have made hundreds of millions of dollars of capital improvements to the leased property.  Moreover, in the Company's published financial statements, the rent obligations are reported as "long-term lease obligations" of its subsidiaries, and the rent payments are reported as "payments under long-term lease obligations" by its subsidiaries.

7.      In its response to the Default Notice made in public filings, the Company has admitted that the Transferor Subsidiaries transferred assets to CSL; has admitted that, post-transfer, the Transferor Subsidiaries are using the assets; and has admitted that the subsidiaries fund the rent payments to CSL.  The Company, nonetheless, contends that there is no Sale and Leaseback Transaction because Holdings, rather than the Transferor Subsidiaries, signed the master lease with CSL.  As noted above, however, Windstream's CFO explained to regulators that Holdings would be the signatory on the master lease "just for administrative ease in terms of transacting."  The Company further contends that the Transferor Subsidiaries do not lease or sublease the assets, but the Transferor Subsidiaries assured the regulators that, after the transfers, they would be leasing back the transferred assets.  And, regardless of whether there is a written lease or sublease signed by the Transferor Subsidiaries, the facts establish that they are leasing or subleasing the assets that they transferred.

8.      The resulting Sale and Leaseback Transaction failed to satisfy one or more of the required conditions in Indenture Section 4.19.  For example, although the Company put the fair market value of these assets at $7 billion to $8 billion, the cash portion of the purchase price, required by Section 4.19(ii) to equal the fair market value of the transferred assets, was only $1 billion.  Other conditions in Section 4.19 of the Indenture were also not satisfied.  In response to the Default Notice, the Company has not claimed that any of the conditions in Section 4.19 were met if the transaction is a Sale and Leaseback Transaction.

9.      The Default Notice also cites Indenture Section 4.07(a)(A), which prohibits the Company from making certain "Restricted Payments" (such as distributions to the Company's parent, Holdings) while any Default exists under the terms of the Indenture.  Based upon the Section 4.19 Default alleged above, that provision was violated when the Company made

4

Restricted Payments while the foregoing Default existed.  By making Restricted Payments in breach of Section 4.07(a)(A) while the Section 4.19 Default was continuing, the Company exacerbated the prejudice to the Noteholders caused by the prohibited sale and leaseback by further depleting the assets available to pay the Notes.[1]

10.     By this Complaint, the Trustee seeks a declaratory judgment (set forth more fully in the Prayer for Relief below) that

(a)   the Company failed to comply with the Indenture covenants restricting Sale and Leaseback Transactions and prohibiting Restricted Payments while in Default,

(b)   those breaches constitute Defaults as defined in the Indenture, and

(c)   the Default Notice given to the Company by a holder of more than 25% in aggregate principal amount of the outstanding notes at issue, was and is valid and effective to trigger commencement of the 60-day cure period for Defaults provided in the Indenture.

## The Parties

11.     Plaintiff U.S. Bank National Association is a national banking association formed under the laws of the United States with its main office in Cincinnati, Ohio.  Plaintiff appears in this action solely in its capacity as Trustee under the Indenture.

12.     Defendant Windstream Services, LLC ("**Services**" or the "**Company**") is a Delaware limited liability company with its principal place of business in Little Rock, Arkansas. Through subsidiaries holding the required authorization and licensure from the Federal

---

[1] The Default Notice also alleges a Default in respect of a covenant in Indenture Section 4.07(c) requiring the Company to report certain transactions to the Trustee.  The Trustee understands that the Section 4.07(c) allegation was made based on a miscommunication between the Trustee and the Noteholder that sent the Default Notice.  The Trustee makes no allegation regarding that alleged Default in this Complaint, but reserves all rights with respect to whether Section 4.07(c) was violated, including the right to amend this Complaint in that regard if circumstances warrant.

Communications Commission ("**FCC**") and state regulators, the Company provides telephone exchange services and other telecommunications services in localities throughout the United States.[2]  The Company (as successor to Windstream Corporation[3]) is the issuer of the Notes.

13.     Non-party Windstream Holdings, Inc. ("**Holdings**") is a Delaware corporation with its principal place of business in Little Rock, Arkansas.  Holdings is the sole member of Services, and previously was the sole shareholder of Services' predecessor, Windstream Corporation.  Holdings does not provide telecommunications services in its own right, does not hold authorization or licensure from the FCC or state regulators to do so, and serves only as a holding company for its indirect subsidiaries that do have such authorization and licensure and do provide telecommunications services as regulated and licensed entities.

14.     Holdings, Services, and its direct and indirect subsidiaries (including the Transferor Subsidiaries) are referred to herein collectively as "**Windstream**."

15.     Non-party Communications Sales & Leasing, Inc. (together with its subsidiaries, "**CSL**") is a corporation formed by Services, and then spun-off from Services and Holdings to function as a publicly traded real estate investment trust (REIT).  CSL's principal assets are the assets at issue in this action, which were transferred to CSL by the Transferor Subsidiaries.  In

---

[2] The Company's subsidiaries include both incumbent local exchange carriers ("**ILECs**") and competitive local exchange carriers ("**CLECs**").  ILECs are carriers that historically provided service in a given geographical area before local telephone service was de-monopolized in 1996, while CLECs are carriers that compete with ILECs to provide telephone exchange service, including by purchasing access to the ILEC's network at wholesale rates and/or by constructing their own network.

[3] Prior to February 28, 2015, the Company was organized as a Delaware corporation named Windstream Corporation.  Effective February 28, 2015, the Company converted into a Delaware limited liability company with the name Windstream Services, LLC.  Consistent with the Indenture's definition of "Company," the term "Company" refers herein to Windstream Services, LLC on and after February 28, 2015, and to Windstream Corporation prior to February 28, 2015.

early 2017, CSL changed its name to "Uniti Group Inc.," but is referred to herein by its historical name.

16.     Non-party Aurelius Capital Master, Ltd. ("**Aurelius**") is a beneficial owner of more than 25% of the aggregate principal amount of the outstanding Notes, and gave the Company the Default Notice at issue in this action.

**Jurisdiction and Venue**

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1).  This matter is between citizens of different states, and the amount in controversy exceeds $75,000. The Trustee seeks a declaratory judgment on the existence of one or more Defaults by the Company, which puts into controversy the entire outstanding principal owed on the Notes, namely, $585.7 million.

18.     Venue is proper in this District because in Indenture Section 12.09, the Company agreed that any action arising out of or based on the Indenture could be brought in the federal or state courts located in the City of New York, and irrevocably waived any objection that such a court would be an improper venue or inconvenient forum:

> Any legal suit, action or proceeding arising out of or based upon this Indenture or the transactions contemplated hereby ("Related Proceedings") may be instituted in the federal courts of the United States of America located in the City of New York or the courts of the State of New York in each case located in the City of New York (collectively, the "Specified Courts"), and each party irrevocably submits to the non-exclusive jurisdiction of such courts in any such suit, action or proceeding …  The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or other proceeding in the Specified Courts and irrevocably and unconditionally waive and agree not to plead or claim in any such court has been brought in an inconvenient forum.

In turn, the Notes incorporate the Indenture's jurisdiction and venue provisions.

19.     On September 29, 2017, the Company commenced an action in Delaware state court naming the Trustee as the sole defendant and seeking a declaratory judgment and other relief with respect to the Default Notice.  On October 4, 2017, the Trustee removed the Delaware action to the United States District Court for the District of Delaware, and filed a motion to dismiss that action for lack of personal jurisdiction.  The Trustee has commenced this action before this Court because the Indenture specifically provides that any suit arising out of or based upon the Indenture may be brought before this Court, and the Company and Trustee have consented to the personal jurisdiction of this Court.

**Applicable Law**

20.     The Indenture, at Section 12.08, expressly provides that New York law shall govern, and be used to construe, the Indenture and the Notes.

**Facts**

A.      **The Indenture and the Notes**

21.     On or about January 23, 2013, the Company entered into the Indenture with U.S. Bank National Association as Trustee and with certain of the Company's subsidiaries as guarantors.

22.     Pursuant to the Indenture, the Company issued senior unsecured notes due August 1, 2023 in an original aggregate principal amount of $700 million.  Due to certain repurchases by the Company in 2016, the outstanding principal amount has been reduced to $585.7 million.  The Notes bear interest at 6 3/8% per annum, payable semiannually.  The Notes incorporate by reference the terms of the Indenture, including its choice of New York law.

23.     For the protection of Noteholders, the Indenture contains a number of restrictive covenants intended to insure that the Company will have sufficient free cash flow and assets to carry on its business and pay interest and principal when due on the Notes.  These include

8

covenants specifically restricting and conditioning the ability of the Company and its subsidiaries to sell assets, to incur additional debt and financing obligations, to pay dividends, and — most pertinently to this action — to engage in sale and leaseback transactions.

24.     Section 4.19 of the Indenture prohibits the Company from entering, or permitting any of its Restricted Subsidiaries from entering, into a Sale and Leaseback Transaction unless, among other things, the Attributable Debt (*i.e.*, the present value of the future lease payments) incurred in respect of the leaseback would not cause the Company's Consolidated Leverage Ratio (in essence, its debt-to-EBITDA ratio, which is a measure of the Company's ability, in terms of available cash flow, to service its debt obligations) to exceed 4.50-to-1, and the gross cash proceeds of the transaction are at least equal to the Fair Market Value of the transferred property, and those proceeds are applied to purchase replacement assets or retire other debt that is structurally senior to the Notes:

> Section 4.19.  <u>Sale and Leaseback Transactions</u>.
>
> The Company shall not, and shall not permit any of its Restricted Subsidiaries to, enter into any Sale and Leaseback Transaction; *provided* that the Company or any Restricted Subsidiary thereof may enter into a Sale and Leaseback Transaction if:
>
> > (i) the Company or such Restricted Subsidiary, as applicable, could have (A) Incurred Indebtedness in an amount equal to the Attributable Debt relating to such Sale and Leaseback Transaction pursuant to Section 4.09 and (B) incurred a Lien to secure such Indebtedness pursuant to Section 4.12 in which case such Indebtedness and Lien shall be deemed to have been so Incurred;
> >
> > (ii) the gross cash proceeds of that Sale and Leaseback Transaction are at least equal to the Fair Market Value of the property that is the subject of that Sale and Leaseback Transaction; and
> >
> > (iii) the transfer of assets in that Sale and Leaseback Transaction is permitted by, and the Company applies the proceeds of such transaction in compliance with, Section 4.10.

25.     The Indenture defines "**Restricted Subsidiaries**" to mean any subsidiary of the Company other than a subsidiary that the Company's Board of Directors has designated as an Unrestricted Subsidiary pursuant to a Board Resolution subject to various conditions and requirements in Indenture Section 4.16, including the filing with the Trustee a copy of such Board Resolution and an Officers' Certificate certifying that certain conditions specified in Section 4.16(a) were satisfied.

26.     The Transferor Subsidiaries are all Restricted Subsidiaries, and the prohibition and restrictions on Sale and Leaseback Transactions in Indenture Section 4.19 apply to them.

27.     The Indenture defines a "**Sale and Leaseback Transaction**" to mean, "with respect to any Person, any transaction involving any of the assets or properties of such Person whether now owned or hereafter acquired, whereby such Person sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred."

28.     Under the Indenture, "**Attributable Debt**," "in respect of a Sale and Leaseback Transaction means, at the time of determination, the present value of the obligation of the lessee for net rental payments during the remaining term of the lease included in such Sale and Leaseback Transaction, including any period for which such lease has been extended or may, at the option of the lessor, be extended.  Such present value shall be calculated using a discount rate equal to the rate of interest implicit in such transaction, determined in accordance with GAAP."

29.     Section 4.09, which is referenced in Section 4.19(i), imposes a cap on the total amount of debt and other financing obligations (including Attributable Debt) that the Company and its subsidiaries may collectively incur.  Specifically, under Section 4.09(a) and subject to

certain exceptions in Section 4.09(b) that are not applicable here, the Company and its subsidiaries are prohibited from incurring such indebtedness in an amount that would cause the Company's Consolidated Leverage Ratio to exceed 4.50-to-1.

30.      The Consolidated Leverage Ratio is a measure of the Company and its subsidiaries' overall debt as compared to their free cash flow, similar to a debt-to-EBITDA ratio. As defined in the Indenture, "**Consolidated Leverage Ratio**" means "as of any date of determination, the ratio of:

> (1) the aggregate outstanding amount of Indebtedness of the Company and its Restricted Subsidiaries as of such date of determination on a consolidated basis (subject to the terms described in paragraph (2) below) after giving pro forma effect to the incurrence of the Indebtedness giving rise to the need to make such calculation (including a pro forma application of the use of proceeds therefrom) on such date, to
>
> (2) the Consolidated Cash Flow of the Company for the most recent four full fiscal quarters for which internal financial statements are available immediately prior to such date of determination."

31.      Under the Indenture, "**Consolidated Cash Flow**" is a measure of adjusted EBITDA defined as

> with respect to any specified Person for any period, the Consolidated Net Income of such Person for such period *plus*, without duplication:
>
> (1) provision for taxes based on income or profits of such Person and its Restricted Subsidiaries for such period, to the extent that such provision for taxes was deducted in computing such Consolidated Net Income; *plus*
>
> (2) Fixed Charges of such Person and its Restricted Subsidiaries for such period, to the extent that any such Fixed Charges were deducted in computing such Consolidated Net Income; *plus*
>
> (3) depreciation, amortization (including amortization of intangibles but excluding amortization of prepaid cash expenses that were paid in a prior period), goodwill impairment charges and other non-cash expenses

(excluding any such non-cash expense to the extent that it represents an accrual of or reserve for cash expenses in any future period or amortization of a prepaid cash expense that was paid in a prior period) of such Person and its Restricted Subsidiaries for such period to the extent that such depreciation, amortization and other non-cash charges or expenses were deducted in computing such Consolidated Net Income; *plus*

(4) the amount of any minority interest expense deducted in computing such Consolidated Net Income; *plus*

(5) any non-cash compensation charge arising from any grant of stock, stock options or other equity-based awards, to the extent deducted in computing such Consolidated Net Income; *plus*

(6) any non-cash SFAS 133 income (or loss) related to hedging activities, to the extent deducted in computing such Consolidated Net Income; *minus*

(7) non-cash items increasing such Consolidated Net Income for such period, other than (a) the accrual of revenue consistent with past practice and (b) the reversal in such period of an accrual of, or cash reserve for, cash expenses in a prior period, to the extent such accrual or reserve did not increase Consolidated Cash Flow in a prior period; in each case, on a consolidated basis and determined in accordance with GAAP.

32.     Section 4.09's limit on the Consolidated Leverage Ratio is not a merely technical requirement. Its purpose is to measure the Company's ability, in terms of available cash flow, to service its debt (including the Notes). That metric is material to bond holders because if an issuer's total debt is too large compared to the cash flow available to service its debt, the issuer's risk of a payment default increases. For that reason, indentures for unsecured bonds often limit the total indebtedness the issuer may incur by imposing a cap on the issuer's debt-to-free cash flow ratio (like that in Section 4.09 here), in order to reduce the risk that the issuer will borrow beyond its means and later default in payment. Investors rely on such covenants in choosing whether to purchase an issuer's bonds and thereby extend credit to the issuer.

33.     By incorporating Section 4.09's limit on indebtedness and applying it to Attributable Debt, Section 4.19(i) recognizes that long-term lease obligations arising from sale and leaseback transactions weaken the issuer's financial position and increase the risk of a payment default just as do liabilities created by issuing bonds or borrowing from banks.

34.     Section 4.19(ii) requires that the gross cash proceeds of a Sale and Leaseback Transaction must be at least equal to the transferred assets' "**Fair Market Value**," which the Indenture defines to mean "the price that would be paid in an arm's-length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy."  Section 4.19(ii) protects Noteholders by ensuring that the Company and its Restricted Subsidiaries receive adequate consideration for the transfer of critical assets and preventing the asset base supporting its obligations on the Notes from being reduced.

35.     Section 4.19(iii) requires that the proceeds of a Sale and Leaseback Transaction be applied in compliance with the conditions set forth in Section 4.10.  Among other things, under Section 4.10(b), within one year after the receipt of proceeds, the proceeds may be applied only (i) to repay secured debt of the Company or its Restricted Subsidiaries, obligations under the Company's credit agreement with certain banks, or debt of Restricted Subsidiaries that are not guarantors of the Notes, or (ii) to purchase replacement assets.  Under Section 4.10(c), any proceeds remaining after one year must be used to make a repurchase offer on the 366th day to all holders of the Notes and other debt of the Company that is *pari passu* with the Notes.

36.     Besides the foregoing covenants, as relevant to this action, the Indenture includes a covenant in Section 4.07(a) that (subject to exceptions in Section 4.09(b) not applicable here) prohibits the Company and its subsidiaries from making certain "Restricted Payments,"

including dividends, repurchases or redemptions of stock or subordinated debt, and certain

specified types of investments, unless, among other things, no Default or Event of Default (as

defined in the Indenture) has occurred and is continuing at the time of the Restricted Payment:

Section 4.07. <u>Restricted Payments</u>.

(a) The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

(i) declare or pay (without duplication) any dividend or make any other payment or distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests . . . or to the direct or indirect holders of the Company's or any of its Restricted Subsidiaries' Equity Interests in their capacity as such (other than dividends, payments or distributions (x) payable in Equity Interests (other than Disqualified Stock) of the Company or (y) to the Company or a Restricted Subsidiary of the Company);

(ii) purchase, redeem or otherwise acquire or retire for value . . . any Equity Interests of the Company or any Restricted Subsidiary thereof held by Persons other than the Company or any of its Restricted Subsidiaries;

(iii) make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value Subordinated Debt, except (a) a payment of interest or principal at the Stated Maturity thereof or (b) the purchase, repurchase or other acquisition of any such Indebtedness in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such purchase, repurchase or other acquisition; or

(iv) make any Restricted Investment

(all such payments and other actions set forth in Section 4.07(a)(i) through (iv) above being collectively referred to as "**Restricted Payments**"),

unless, at the time of and after giving effect to such Restricted Payment:

(A) *no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof*;

(B) the Company would, after giving pro forma effect to such Restricted Payment as if such Restricted Payment had been made at the beginning of the applicable four-quarter period, have been permitted to Incur at least $1.00 of additional

Indebtedness pursuant to the Consolidated Leverage Ratio test set forth in Section 4.09(a); and

(C) such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Company and its Restricted Subsidiaries on or after July 17, 2006 (excluding [certain specified items]), is less than the sum, without duplication, of:

(1) an amount equal to the Company's Consolidated Cash Flow for the period . . . from October 1, 2006 to the end of the Company's most recently ended fiscal quarter for which internal financial statements are available (the " **Basket Period** ") less 1.4 times the Company's Fixed Charges for the Basket Period, *plus*

(2) 100% of the aggregate net cash proceeds received by the Company after July 17, 2006 as a contribution to its common equity capital or from the issue or sale of Equity Interests . . . of the Company or from the Incurrence of Indebtedness . . . that has been converted into or exchanged for such Equity Interests [with certain specified exceptions], *plus*

(3) with respect to Restricted Investments made by the Company and its Restricted Subsidiaries after July 17, 2006 pursuant to this Section 4.07(a), (i) the aggregate amount of cash equal to the return from such Restricted Investments in any Person resulting from repayments of loans or advances, or other transfers of assets, in each case to the Company or any Restricted Subsidiary or from the net proceeds received in cash from the sale of any such Restricted Investment (except [in certain specified circumstances]) or (ii) in the case of redesignations of Unrestricted Subsidiaries as Restricted Subsidiaries, the Fair Market Value of the Restricted Investments therein at the time of such redesignation.

37.     Thus, Section 4.07(a)(A) prohibits the Company from making distributions to its

parent company Holdings or making other Restricted Payments if a Default (or Event of Default)

has occurred and is continuing at the time of the distribution or other Restricted Payment.

38.     Under Indenture Section 6.01(a), an Event of Default includes, among other

things, a failure by the Company or any of its subsidiaries to comply with any agreement in the

Indenture, including Sections 4.19 and 4.07, for 60 days after written notice by the Trustee or

Holders of 25% of the aggregate principal amount of the Notes then outstanding:

> Section 6.01. <u>Events of Default</u>.
>
> > (a) Each of the following is an "**Event of Default**" with respect to the Notes:
> >
> > > (i) default for 30 days in the payment when due of interest on, or Additional Interest with respect to, the Notes;
> > >
> > > (ii) default in payment when due (whether at maturity, upon acceleration, redemption, required repurchase or otherwise) of the principal of, or premium, if any, on the Notes;
> > >
> > > (iii) failure by the Company or any of its Restricted Subsidiaries to comply with Article Five;
> > >
> > > (iv) failure by the Company or any of its Restricted Subsidiaries for 30 days after written notice by the Trustee or Holders representing 25% or more of the aggregate principal amount of Notes then outstanding to comply with Section 4.10 or Section 4.14 (other than a failure to purchase Notes in connection therewith, which shall constitute an Event of Default under clause (ii) above);
> > >
> > > (v) *failure by the Company or any of its Restricted Subsidiaries for 60 days after written notice by the Trustee or Holders representing 25% or more of the aggregate principal amount of Notes then outstanding to comply with any of the other agreements in this Indenture*;
> > >
> > > . . . .

39.     As defined in the Indenture, "**Default**" means "any event that is, or with the

passage of time or the giving of notice or both would be, an Event of Default."  Since a failure to

comply with any of the Company's agreements in Indenture Sections 4.19 or 4.07 would, with

the giving of notice and the passage of time (namely, 60 days after such notice), be an Event of

Default under Section 6.01(a)(v), such a failure is a Default under the Indenture.

**B.     The CSL Spin-Off and Leaseback**

40.     In July 2014, Windstream announced that it planned to spin-off certain of its

telecommunications network assets into an independent, publicly traded REIT.  The spin-off and

subsequent leaseback of the assets substantially increased Windstream's long-term financial

liabilities, put assets critical to the Company's business (and its ability to repay the Notes) at risk

of loss for non-payment of rent and other lease obligations, and violated the Indenture covenants

discussed above.

### (1)     The Separation Agreement

41.     In furtherance of the spin-off plan, on March 26, 2015, the Company and

Holdings entered into a Separation and Distribution Agreement with CSL (the "**Separation**

**Agreement**," a true and correct copy of which is attached hereto as Exhibit B).

42.     At that time, the Transferor Subsidiaries owned and operated a substantial portion

of the assets comprising Windstream's telecommunications network, and CSL was a newly-

formed subsidiary of the Company with no assets or operations that was created for the purpose

of effecting the spin-off.

43.     Pursuant to the Separation Agreement, on April 24, 2015, the Company caused

the Transferor Subsidiaries[4] to transfer to CSL substantial and critical parts of their network in

37 states and the District of Columbia—without which they could not deliver services to their

customers in those states—including, among other things, nearly 300,000 route miles of copper

---

[4] The Transferor Subsidiaries include without limitation Cavalier Telephone Mid-Atlantic, LLC, Georgia Windstream, LLC, Intellifiber Networks, Inc., LDMI Telecommunications, Inc., McLeod USA Telecommunications Services, LLC, Network Telephone Corporation, PAETEC Communications, Inc., The Other Phone Company, US LEC Communications, LLC, US LEC of Alabama LLC, US LEC of Georgia, LLC, US LEC of North Carolina, LLC, US LEC of Pennsylvania, LLC, Windstream Accucomm Telecommunications, LLC, Windstream Alabama, LLC, Windstream Communications, Inc., Windstream Concord Telephone, Inc., Windstream D&E Systems, Inc., Windstream Georgia, LLC, Windstream Georgia Communications, LLC, Windstream Georgia Telephone, LLC, Windstream KDL, Inc., Windstream Kentucky East, LLC, Windstream Kentucky West, LLC, Windstream Lexcom Communications, LLC, Windstream Norlight, Inc., Windstream North Carolina, LLC, Windstream NTI, Inc., Windstream NuVox Communications, Inc., Windstream NuVox Ohio, Inc., Windstream NuVox, Inc., Windstream Ohio, Inc., Windstream Standard, LLC, and Windstream Western Reserve, Inc.

and fiber optic cables, telephone poles, underground conduits, and related central office buildings and land (the "**Transferred Assets**").

44.     In exchange, pursuant to the Separation Agreement, on April 24, 2015, CSL issued to the Company (i) 149.8 million shares of CSL's common stock, (ii) approximately $2.448 billion of debt instruments payable by CSL, and (iii) a cash payment of $1.035 billion.

45.     The Fair Market Value of the Transferred Assets was approximately $7 billion to $8 billion, as evidenced by the following facts and admissions, among others:

(a)     The sum of CSL's equity value as indicated by the market price of its shares at the close of trading on the date of the transfers, April 24, 2015 (namely, $4.285 billion = $28.60 per share multiplied by 149.8 million shares outstanding), and its total liabilities at that time (namely, approximately $3.650 billion[5]), was $7.935 billion.  At the time, CSL's assets consisted almost entirely of the Transferred Assets plus $62 million in cash proceeds of borrowings under its credit facility.[6]  Since the value of a company's assets equals its liabilities plus its equity, these figures imply a fair market value for the Transferred Assets of $7.873 billion (*i.e.*, $4.285 billion + $3.650 billion - $0.062 billion).

(b)     The $7 billion to $8 billion valuation of the Transferred Assets is further confirmed by statements of CSL to the Securities and Exchange Commission ("**SEC**") and of Windstream to the Trustee and state regulators concerning the transaction.  For example:

---

[5] Communications Sales & Leasing, Inc., Quarterly Report on Form 10-Q, filed with the SEC on May 13, 2015, at pp. 5-6.

[6] Customer contracts in a particular, tiny segment of Windstream's business (namely, its consumer CLEC business) were also assigned to CSL at the same time, but they generated only miniscule revenue and their value was insubstantial compared to the Transferred Assets.

(i)     In a February 10, 2015 letter responding to comments by the SEC on CSL's Form 10, CSL (through counsel) stated that "management [which at that time meant Windstream's management], working with its independent third party valuation firm, determined that the pool of real property assets that could be transferred to CS&L in the transaction would have an estimated fair value of approximately $7.0 billion to $8.0 billion."

(ii)    In Officers' Certificates delivered to the Trustee referencing the transfer to CSL, the Company indicated that the "FMV of PP&E Transferred" – *i.e.*, the Fair Market Value of the transferred property, plant and equipment – was $7.450 billion.

(iii)   And in sworn testimony before the Kentucky Public Service Commission seeking regulatory approval of the transaction, Windstream's CFO Robert Gunderman stated, in comparing the book value and fair value of the Transferred Assets, that "the fair value is much higher, closer to, I think, the $8 billion figure we talked about earlier."

### (2)     The spin-off

46.     On April 24, 2015, the Company distributed 80.4% of CSL's common stock to Holdings, and Holdings distributed those CSL shares to Holdings' stockholders, at which time CSL's stock became publicly traded.

### (3)     The lease

47.     Pursuant to the Separation Agreement, CSL signed a master lease with Holdings on April 24, 2015 (the "**Master Lease**") providing for the leaseback of the Transferred Assets (which the Master Lease defines as the "**Leased Property**").  The Master Lease (a copy of

which is attached hereto as Exhibit C) defines the "Tenant" as Holdings together with its

permitted successors and assigns, and provides that it is

> agreed and acknowledged by Landlord [CSL] that any of Tenant's
> Subsidiaries . . . shall have the right to use, occupy and operate the
> Leased Property subject to and in accordance with the terms of this
> Master Lease and such Subsidiaries shall have the right to
> discharge any or all of Tenant's obligations (maintenance or
> otherwise) hereunder on behalf of Tenant.  (Master Lease § 7.2(a).)

48.    The Master Lease has a minimum term of 15 years, with options for the Tenant to

extend the term up to a total of 35 years.

49.    Consideration for the Master Lease includes obligations on the part of the Tenant

to maintain, repair, and pay for taxes, utilities, and insurance on, the Leased Property, as well as

fixed rent.  Rent was initially set at $650 million per annum (and increased to $653.5 million

during the first year of the lease), payable in monthly installments, with the annual rent to

escalate by 0.5% per year beginning with the fourth year of the term.

50.    Section 7.2(f) of Master Lease requires that the Leased Property must be used

"continuously" for one or more activities constituting the Leased Property's "Primary Intended

Use," defined, in essence, as the provision of telecommunications services.[7]

51.    While Holdings is nominally tenant under the Master Lease, Holdings does not

possess the authorization and licensure required by the FCC and state regulators to provide

---

[7] To be precise, the Master Lease defines "**Primary Intended Use**" as "The provision, routing
and delivery of voice, data, video, data center, cloud computing and other communication
services to businesses, consumers and other users of communication services (including
governmental entities, schools, libraries and nonprofit entities), the colocation activities in the
data center space, the provision of dark or dim fiber services to third parties and/or such other
services and uses required to be or customarily performed or provided under the
Communications Regulations in connection with the foregoing uses consistent, with respect to
each Facility, with its current use as of the Commencement Date or with prevailing
communications industry use at any time (including all ancillary uses consistent with
communications industry practice)."

telecommunications services using the Leased Property.[8]  And Holdings has not used any of the

Leased Property for its Primary Intended Use at any time since executing the Master Lease.

52.     Instead, the Transferor Subsidiaries are the entities that hold the required federal

and state authorization and licensure to use the Leased Property for its Primary Intended Use.

And, they have used the Leased Property for its Primary Intended Use continuously since the

execution of the Master Lease.

53.     The Master Lease contains multiple provisions that make sense only if "Tenant"

includes not just Holdings, but also the Transferor Subsidiaries.  To take a few examples among

others, Master Lease Section 36.4 provides that regulatory "carrier of last resort" obligations (*see*

¶ 58 below) "shall remain obligations solely of Tenant," but it is the Transferor Subsidiaries that

have such regulatory obligations; Holdings is not a carrier and is not subject to such regulatory

obligations.  Section 9.2(d) refers to "Tenant's" obligations under "Pole Agreements" – *i.e.*,

agreements giving third parties access to the telephone poles included in the Leased Property –

but it is only the Transferor Subsidiaries that were or are parties to such agreements, not

Holdings.  And Section 36.1(b) refers to "Tenant" providing services to customers and to

Tenant's "customer relationship[s]", but Holdings is a holding company that does not provide

services and has no customers; it is the Transferor Subsidiaries that provide services and have

customer relationships.

54.     As regulated entities, the Transferor Subsidiaries were required to obtain (and did

obtain) prior approval for the transfer of the Transferred Assets to CSL from the utilities

---

[8] *See, e.g.*, Windstream's Petition for Approval of Transfer of Certain Assets to Communications
Sales and Leasing, Inc., filed with W. Va. Pub. Serv. Comm. on Aug. 29, 2014,  at p. 4
("Windstream [Holdings] does not provide telecommunications services in its own right.") & n.2
("Windstream [Holdings] is not authorized to provide telecommunications services in this state
and is not seeking any authorizations to become a regulated telecommunications carrier or public
utility.").

regulators of numerous states.  The Transferor Subsidiaries' written applications and
supplemental responses, as well as testimony by Windstream officers, contain repeated
assurances that the Transferor Subsidiaries would lease back the assets they transferred to CSL.
For example:

(a)     In every application, the Transferor Subsidiaries represented that they would have
the exclusive, long-term right to use, operate, and control the Leased Property.

(b)     Windstream repeatedly represented to regulators that under the arrangement, the
transferred network assets would be *leased to the Transferor Subsidiaries*, and
Windstream's CFO testified that Holdings would be made the signatory on the
Master Lease "*just for administrative ease in terms of transacting* – transacting
the lease between the entities . . . for the benefit of the operating subsidiaries of
Windstream."

(c)     Thus, in their application to Alabama Public Service Commission, the Transferor
Subsidiaries doing business in Alabama stated that "*the WIN Companies* [defined
as the Alabama Transferor Subsidiaries] *seek to transfer ownership of certain
assets* described in this Application *to CSL* or one of its wholly owned direct or
indirect subsidiaries *and lease them back* on an exclusive, long-term basis."  In
the resulting order approving the transaction, the Commission likewise stated that
"*the WIN Companies[] . . . seek to transfer ownership of certain assets* described
in its Petition (the 'Subject Assets') *to CSL* or one of its wholly owned direct or
indirect subsidiaries *and lease them back* on an exclusive, long-term basis."

(d)     In support of the Kentucky-based Transferor Subsidiaries' application to the
Kentucky Public Service Commission, Windstream's General Counsel John

Fletcher testified that "*the Windstream Kentucky entities will have an exclusive long-term lease* and right – exclusive right to use and occupy all the assets that are within their system today."  Further, in written responses to requests by the Commission, verified under oath by Windstream's CFO, the Kentucky Transferor Subsidiaries represented that "*The assets to be transferred will be leased back to the Applicants* [*i.e.*, the Transferor Subsidiaries, not Holdings] . . . ."  And in written responses to third-party data requests, verified by Mr. Fletcher, those Transferor Subsidiaries stated that "*CSL will lease on a long term exclusive basis all of its real estate assets*, including poles, *to the Operating Companies* [defined as the Kentucky Transferor Subsidiaries]."

(e)     In their application to the North Carolina Utilities Commission, Holdings and the Transferor Subsidiaries doing business in North Carolina stated that "*the WIN Companies* [defined as the North Carolina Transferor Subsidiaries] *seek to effect a transaction in which they would transfer ownership of certain assets* described in this Application *to CSL* or one of its wholly owned direct or indirect subsidiaries *and then lease them back* on an exclusive, long-term basis."  Holdings and the Transferor Subsidiaries further represented that "*CSL* will neither offer to provide service nor provide any service to the public . . . .  Instead, it *will* simply *lease the same assets back to a WIN Company* . . . .  As the Commission will know, ILECs and CL[EC]s routinely lease facilities used in their businesses, and the leasing of these facilities from CSL will be no different."  In the resulting order, the Commission stated its understanding that "*Under* the terms of *the Master Lease*, *the WIN Companies* [*i.e.*, the North Carolina Transferor

Subsidiaries] *will have exclusive rights to the transferred assets . . . ,*" and noted that "the Applicants request that the Commission declare that . . . CSL does not fit the definition of a public utility . . . because it would neither construct nor operate facilities *leased to the WIN Companies*."

(f)     In their application to the West Virginia Public Service Commission, Holdings and the Transferor Subsidiaries doing business in West Virginia represented that "Windstream [defined as Holdings] is proposing an intra-corporate transaction (the 'Transaction') in which its business will be divided into two independent units:  an operating unit that will continue to provide telecommunications and related services, and a real estate investment trust unit that will hold title to certain distribution plant assets (the 'Subject Assets') and will *lease those assets exclusively to the Windstream Companies* [defined as the West Virginia Transferor Subsidiaries] on a long term basis."  Holdings and the Transferor Subsidiaries further represented that "*CSL will* merely own the Subject Assets and *lease them exclusively to the Windstream Companies* for use in providing services."  As they did again and again in applications in other states, Holdings and the Transferor Subsidiaries assured the regulators that the arrangement would protect the public interest by ensuring "the Windstream Companies continue to have long term access to and control over the facilities used to provide regulated services."

(g)     Consistent with the representations that the Transferor Subsidiaries themselves would lease the Transferred Assets, in their filings in multiple states (including Alabama, Georgia, Indiana, Kentucky, North Carolina, Ohio, and West Virginia), the Transferor Subsidiaries (alone or together with Holdings) repeatedly represented

that, after the transfers, "The [Transferor Subsidiaries'] exclusive usage rights will

include the right to provide communications services *or sublease* access to the

system."

55.     Just as Holdings itself does not have the ability to use the Leased Property to

provide regulated communications services, Holdings itself does not have the ability to pay the

$653.5 million per year rent owed on the Leased Property.  Instead, the subsidiaries remit the

required rent payments to Holdings, which then passes them on to CSL.  As reported in its

financial statements for fiscal years 2015 and 2016, 100% of Holdings' revenue consists of

"leasing income from subsidiaries" paid by the subsidiaries to Holdings on account of the Leased

Property.

56.     If the subsidiaries were to cease funding the rent due on the Master Lease, a

default on the Master Lease would occur, and CSL would be permitted under the terms of the

Master Lease to terminate any right of Holdings or the Transferor Subsidiaries to possess and use

the Leased Property, which would devastate the Transferor Subsidiaries' business and therefore

the Company's ability to repay its debts.  Indeed, Windstream acknowledges in its SEC filings

that one of its "most significant" risk factors is that

> We [defined as Holdings and its subsidiaries] currently lease a
> significant portion of our telecommunications network assets . . .
> under the master lease with CS&L.  Our failure to pay the rent . . .
> of the master lease would result in an event of default regarding the
> master lease . . . .  Upon an event of default, remedies available to
> CS&L include terminating the master lease . . ., dispossessing us
> from the leased assets, . . . and seeking any and all other rights and
> remedies available under law or in equity.  The exercise of such
> remedies could have a material adverse effect on our business,
> financial position, results of operations and liquidity.[9]

---

[9] Windstream Holdings, Inc. and Windstream Services, LLC, Annual Report on Form 10-K, filed
with the SEC on Feb. 25, 2016, at p. 18.

57.     Moreover, as CSL has noted to investors, Windstream has no viable alternative to continuing to lease the Transferred Assets, because:

- Windstream is Substantially Dependent on Network Leased from Uniti for its Business Operations

  - WIN is Dependent on Lease and Access to Uniti's Network to Serve Vast Majority of Customers

  - WIN Replacement Cost to Overbuild the Uniti Leased Network would Exceed Several Billion Dollars

  - Time to Replicate, if Possible, Would be Several Years

  - No other Vendor Could Lease the Identical Network to WIN to Replace Uniti

. . .

- WIN is Obligated as "Carrier of Last Resort" to Provide Service to Customers Under Regulatory Law and requires Access to Uniti's Network to Satisfy State PUC and FCC Obligations[.][10]

58.     With regard to the last point, federal law requires telecommunications carriers that are incumbent local exchange carriers (which includes many of the Transferor Subsidiaries) to provide service to customers within a community even if providing service at prevailing rates to a particular customer is not economically viable.  The intent of the law is to ensure, for the purpose of protecting the safety of life and property, that at least one telephone service provider will always be available to customers who have historically had service.  In sworn testimony seeking approval to transfer network assets to CSL, the Transferor Subsidiaries assured state regulators that the arrangement would have "no impact on Windstream's carrier of last resort obligations."  To meet such "carrier of last resort" obligations, the Transferor Subsidiaries must have continuing use and control over the Transferred Assets.

---

[10] Uniti Group, Presentation for Bank of America Merrill Lynch 2017 Media, Communications & Entertainment Conference, Sept. 7-8, 2017, at page 15.

### (4)   The Transferor Subsidiaries' performance under the lease

59.     From the closing of the transaction on April 24, 2015 through to the present, the Transferor Subsidiaries (not Holdings) have continuously possessed and operated the Leased Property in carrying on their business as regulated telecommunications service providers, including both providing telecommunications service to their customers and granting access to the Leased Property to third parties, including carriers, utilities, and cable TV providers.

60.     Consistent with Windstream's representations to regulators that the Transferor Subsidiaries would have the right to "sublease access to the system" (*see* ¶ 54(g) above), the Transferor Subsidiaries have granted access to the Leased Property to third parties for consideration:

(a)     Local exchange carriers are required under applicable law and regulations to allow other telecommunications carriers to interconnect with their networks.  To facilitate such interconnections, an ILEC is required to permit other telecommunications carriers to place their equipment inside the incumbent carrier's premises on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, pursuant to so-called "collocation agreements."  Master Lease Section 7.2(e) expressly recognizes such collocation agreements as a species of "sublease."  After the asset transfers to CSL, the Transferor Subsidiaries have continued to enter into such collocation agreements with third parties.

(b)     Similarly, under federal and state laws and regulations, utilities that own or control poles are required to provide usable space on the poles to third parties that wish to attach their own lines to the poles for just and reasonable rates.  In certain states, such arrangements are governed by tariffs filed with state public service and utilities commissions.  After transferring ownership of their poles to CSL, the

Transferor Subsidiaries have continued to file such tariffs with state regulators, indicating that they have been "granted . . . exclusive use and control of space upon [the] poles," and listing the prices at which they will make pole space available to third parties.

61.     From the closing of the transaction on April 24, 2015 through to the present, the Transferor Subsidiaries have borne directly, out of their own funds, the entire expense of maintaining the Leased Property, and paying for taxes, utilities, and insurance on it.

62.     From the closing of the transaction on April 24, 2015 through to the present, the Transferor Subsidiaries have funded at least $339 million in capital improvements to the Leased Property.[11]  Under Master Lease Section 10.2(c), such tenant-funded capital improvements become part of the Leased Property owned by CSL.

63.     From the closing of the transaction on April 24, 2015 through to the present, the subsidiaries have funded the monthly rent payments to CSL under the Master Lease.  Holdings simply collects the rent payments from the subsidiaries and then remits them to CSL.

64.     In recognition of the lease arrangement with the Transferor Subsidiaries, Holdings' and the subsidiaries' respective financial statements report the rent payments from the subsidiaries to Holdings as payments on a lease, and the Company's subsidiaries record corresponding long-term lease obligations on their financial statements.  For example:

(a)     In its Annual Report on Form 10-K for the year ended December 31, 2016 (pp. 37, 39), Holdings reported $653.6 million in lease payments to CSL, and "Leasing income from subsidiaries" of $653.6 million.

---

[11] Uniti Group Inc., Quarterly Report on Form 10-Q, filed with the SEC on Aug. 3, 2017, p. 29 (reporting $339 million in tenant-funded capital improvements through June 30, 2017).

(b)     Similarly, at year-end 2016, the Company's subsidiaries collectively reported "Long-term lease obligations" of $4,927.7 million related to the transaction (including both the current and long-term portions thereof) (*id*. at F-67, F-94), and "payments under long-term lease obligations" (*id*. at F-96).

## C.     The Transferor Subsidiaries Entered Into a Sale and Leaseback Transaction as Defined in the Indenture.

65.     The arrangements whereby the Transferor Subsidiaries transferred the Leased Property to CSL, and now pay rent, maintenance, tax, utilities, and insurance obligations on Leased Property in return for exclusive rights to use and control the Leased Property (the "**CSL Sale and Leaseback**") constitute a Sale and Leaseback Transaction by the Transferor Subsidiaries within the meaning of the Indenture.

66.     Under the Indenture, a "Sale and Leaseback Transaction" means "with respect to any Person, *any transaction involving any of the assets or properties of such Person* whether now owned or hereafter acquired, *whereby such Person* [1] sells or otherwise *transfers such assets or properties and* [2] *then or thereafter leases such assets or properties or any part thereof* or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred" (emphasis added), and that is exactly what happened here.

67.     All elements of the definition of "Sale and Leaseback Transaction" are met with respect to the Transferor Subsidiaries and the Leased Property.  The Transferor Subsidiaries are Persons, and the Leased Property consists of assets and properties of the Transferor Subsidiaries, either owned as of the date of the Indenture or thereafter acquired.  The Transferor Subsidiaries transferred the Leased Property to CSL, and then or thereafter leased the Leased Property or some part thereof.

68.     The Transferor Subsidiaries "lease" the Leased Property within the meaning of the Indenture, either under the Master Lease with CSL or under a sublease with Holdings, as evidenced by the following facts, among others:

- In seeking approval for the asset transfers to CSL, Holdings and the Transferor Subsidiaries repeatedly represented to state regulators that the Transferor Subsidiaries themselves would "lease" back the Leased Property, and that they would have exclusive, long-term rights to use and control the Leased Property, including the right to "sublease." (*See* ¶¶ 54(a)-(g).)  And Windstream's CFO gave sworn testimony to regulators that Holdings would be made the signatory on the Master Lease "just for administrative ease."  Having obtained regulatory approval for the transfers based on those representations, Windstream cannot now disavow them.

- From the time of the asset transfers to the present, the Transferor Subsidiaries have continuously used and controlled the Leased Property, and the Transferor Subsidiaries have paid consideration for their right to use and control the Leased Property by bearing the rent and all other tenant obligations under the Master Lease as well as all regulatory obligations associated with the Leased Property.  (*See* ¶¶ 59-63.)

- Following the asset transfers to CSL, the Transferor Subsidiaries have exercised the right to sublease parts of the Leased Property to third parties, something they could not do unless the Transferor Subsidiaries themselves lease the Leased Property.  (*See* ¶ 60.)

- Following the asset transfers to CSL, the Transferor Subsidiaries have made hundreds of millions of dollars of capital improvements to the Leased Property.  Given that CSL automatically acquires ownership of any such capital improvements made to the Leased Property, the Transferor Subsidiaries would only make investments of that size if they had an ongoing leasehold interest in the Leased Property.  (*See* ¶ 62.)

- In their published financial statements, the subsidiaries recognize "long-term lease obligations" and "payments under long-term lease obligations" on account of the Leased Property.  (*See* ¶ 64(b).)

- While Holdings was made the signatory on the Master Lease, it has neither the regulatory authority to operate the Leased Property nor the financial ability to pay the rent and other tenant obligations under the Master Lease.  (*See* ¶¶ 51-55.)

- Thus, Holdings could not fulfill the Master Lease's requirement that the Leased Property be used "continuously" for its Primary Intended Use, except by leasing the Leased Property to the Transferor Subsidiaries (the only Windstream entities that do have the required regulatory authorization and licensure to use the Leased Property for its Primary Intended Use).  (*See* ¶¶ 47, 50-52.)

- Similarly, numerous other provisions of the Master Lease impose obligations on "Tenant" that only make sense when applied to the Transferor Subsidiaries. (*See* ¶ 53.)

- The Master Lease expressly grants the Transferor Subsidiaries the right to use and operate the Leased Property, and to discharge all of the tenant obligations under the Master Lease, including rent, maintenance, taxes, utilities, and insurance (*see* ¶¶ 47, 49), and that is exactly what the Transferor Subsidiaries have done continuously since the time of the asset transfers (*see* ¶¶ 59-63.)

- Holdings accounts for the arrangement with its subsidiaries as one under which Holdings is leasing the Leased Property to the subsidiaries.   In its published financial statements filed with the SEC, Holdings reports the rent payments it collects from the subsidiaries as "leasing income from subsidiaries."  (*See* ¶ 64(a).)

**D.      The CSL Sale and Leaseback Violated Indenture Section 4.19(i).**

69.      Because the Transferor Subsidiaries are and have been Restricted Subsidiaries at all times (*see* ¶¶ 25-26 above), Section 4.19 prohibited them from entering into the CSL Sale and Leaseback unless, among other things, conditions (A) and (B) set forth in Section 4.19(i) were both met.

**(1)      The CSL Sale and Leaseback violated Indenture Section 4.19(i)(A).**

70.      The Transferor Subsidiaries could not "have Incurred Indebtedness in an amount equal to the Attributable Debt relating to such Sale and Leaseback Transaction pursuant to Section 4.09" of the Indenture, as required by Section 4.19(i)(A).

71.      The term of the Transferor Subsidiaries' lease of the Leased Property for the purposes of calculating Attributable Debt (which includes any period for which the lease could be extended at the option of the lessor) is, at a minimum, 15 years, and the resulting Attributable Debt was no less than $5.1 billion, as confirmed by their representations to state regulators, the terms of the Master Lease, and by the Company and its subsidiaries' financial reporting.

(a)      In seeking approvals for the transfer of their assets to CSL, Holdings and the Transferor Subsidiaries repeatedly represented to the state regulators that

31

Transferor Subsidiaries would have long-term, exclusive use and control over the Transferred Assets, pointing to the 15-year Master Lease.

(b)     In their financial statements as of June 30, 2015, shortly following the inception of the lease on April 24, 2015, the subsidiaries collectively recorded as liabilities "long-term lease obligations" totaling $5.1 billion,[12] calculated in a manner consistent with the definition of Attributable Debt, and expressly based on a 15-year term.  As the Company explained in the notes to the financial statements, the $5.1 billion in "long-term lease obligations" reported on its subsidiaries' balance sheets was calculated as "the sum of the minimum future annual lease payments over the 15-year lease term discounted to the present value."[13]

72.     The Transferor Subsidiaries could not have Incurred Indebtedness in an amount equal to Attributable Debt of $5.1 billion pursuant to Section 4.09 because doing so would have increased the Indebtedness of the Company and its Restricted Subsidiaries to a level that violated the limit on the Company's Consolidated Leverage Ratio.

73.     The CSL Sale and Leaseback therefore did not comply with Indenture Section 4.19(i)(A).

**(2)     The CSL Sale and Leaseback violated Indenture Section 4.19(i)(B).**

74.     As Restricted Subsidiaries, the Transferor Subsidiaries were also prohibited from entering into the CSL Sale and Leaseback because they could not have incurred a Lien to secure "such Indebtedness" — *i.e.*, Indebtedness in an amount equal to the Attributable Debt related to the CSL Sale and Leaseback (namely, at least $5.1 billion) — "pursuant to Section 4.12" of the Indenture, as required by Section 4.19(i)(B).

---

[12] Windstream Services, LLC Form 10-Q for the period ending June 30, 2015, at pp. 21 & 39.

[13] Windstream Services, LLC Form 10-Q for the period ending June 30, 2015, at p. 21.

75.     Section 4.12 prohibits the Company and its Restricted Subsidiaries from incurring any Lien to secure Indebtedness other than a Permitted Lien (as defined in the Indenture), unless all payments due under the Indenture and the Notes are secured on an equal and ratable basis with the obligations so secured.

76.     Here, a Lien to secure the Attributable Debt related to the CSL Sale and Leaseback would not have been a Permitted Lien.  No such Lien would qualify as a Permitted Lien under any of the clauses (2) through (19) of the definition of "Permitted Lien."  Nor would a Lien securing Indebtedness in the amount of the Attributable Debt (*i.e.*, at least $5.1 billion) qualify as a Permitted Lien under clause (1) of the "Permitted Lien" definition because a Lien in such an amount together with the existing Liens of the Company and its Restricted Subsidiaries would exceed the limits on the incurrence of Liens set forth therein.

77.     Moreover, no Lien was created securing the Notes on an equal and ratable basis with the Attributable Debt at the time of the CSL Sale and Leaseback Transaction or thereafter.

78.     The CSL Sale and Leaseback therefore did not comply with Indenture Section 4.19(i)(B).

79.     For these reasons, the CSL Sale and Leaseback violated Section 4.19(i) and constitutes a Default under the Indenture.

**E.     The CSL Sale and Leaseback Violated Indenture Section 4.19(ii).**

80.     Section 4.19(ii) imposes an additional and independent condition on Sale and Leaseback Transactions, by requiring that "the gross cash proceeds of that Sale and Leaseback Transaction are at least equal to the Fair Market Value of the property that is the subject of that Sale and Leaseback Transaction."

81.     Here, the gross cash proceeds of the CSL Sale and Leaseback were only $1.035 billion (*see* ¶ 44 above), far short of the $7 billion to $8 billion Fair Market Value of the Transferred Assets that were the subject of that Sale and Leaseback Transaction.  As noted above (¶ 45(b)), Windstream and CSL's management represented to state regulatory authorities, to the SEC, and to the Trustee that the fair value of the Transferred Assets was between $7 billion and $8 billion.

82.     The CSL Sale and Leaseback therefore violated Section 4.19(ii), causing a separate and independent Default under the Indenture.

**F.     The Company Also Violated Indenture Section 4.19(iii)
          in Connection with the CSL Sale and Leaseback.**

83.     Section 4.19(iii) imposes an additional and independent condition on Sale and Leaseback Transactions, by requiring that the proceeds of the transaction be applied in compliance with Indenture Section 4.10.

84.     In turn, Section 4.10(b) provides that, during the first year after receipt of proceeds, the Company and its subsidiaries may use the proceeds only to purchase replacement assets or repay certain categories of debt that are structurally senior to the Notes.  (*See* ¶ 35 above.)  Under Section 4.10(b) as incorporated into Section 4.19(iii), the Company would not be permitted to use any part of the proceeds to repay other unsecured debt except and unless, on the 366th day after receipt, there remained any proceeds not used for the foregoing purposes and the remaining proceeds were, on that date, used to fund a repurchase offer to all holders of Notes as well as all holders of other unsecured debt *pari passu* with the Notes.  (*See id.*).

85.     In violation of Section 4.19(iii), within little over one month after the proceeds of CSL Sale and Leaseback were received, the Company used a portion of the $1.035 billion in cash proceeds to redeem all of the Company's outstanding 8.125% senior unsecured notes due

2018 in an aggregate principal amount of $400 million.  The unsecured notes due 2018 did not fall within the permitted categories of debt repayments enumerated in Section 4.10(b).

86.     The Company's violation of Indenture Section 4.19(iii) in connection with the CSL Sale and Leaseback constitutes a separate and independent Default under the Indenture.

**G.     The Company Has Made Restricted Payments While in Default of Indenture Sections 4.19, Thus Violating Indenture Section 4.07(a)(A) As Well.**

87.     Under Indenture Section 4.07(a)(A), when the Company is in Default, it is prohibited from making Restricted Payments, which, under Section 4.07(a)(i), include distributions by the Company to Holdings.  (*See* ¶¶ 36-37 above.)

88.     As set forth above, the Company has been in Default of Section 4.19 in consequence of the CSL Sale and Leaseback since April 24, 2015.

89.     Despite being in Default of Section 4.19, the Company has made Restricted Payments since April 24, 2015 and up through the second quarter of 2017 in violation of Section 4.07(a)(A).  In particular, the Company has made distributions to Holdings in each quarter from the second quarter of 2015 through the second quarter of 2017, as reported in the Company's publicly filed financial statements.

90.     Such violations of Section 4.07(a)(A) constitute Defaults under the Indenture.

**H.     The Default Notice**

91.     Under Indenture Section 6.01(a)(v), a Holder representing 25% or more of the aggregate principal amount of Notes then outstanding may give written notice of a failure of the Company or any of its Restricted Subsidiaries to comply with Indenture Sections 4.07 or 4.19.  If the Company or the Restricted Subsidiaries, as the case may be, continue in their failure to comply for 60 days after such notice, an Event of Default will occur under Section 6.01(a)(v).

92.     Aurelius is a beneficial owner of more than 25% of the aggregate principal amount of the outstanding Notes.

93.     As defined in the Indenture, a "Holder" means a registered holder of Notes.  The registered holder of the Notes beneficially owned by Aurelius is Cede & Co. ("**Cede**").

94.      Under Indenture Sections 12.14(a) and (f), any notice or other action that could be given or taken by a Holder under the Indenture may be given or taken by the Holder through an agent duly appointed in writing, with regard to all or any part of the principal amount held by the Holder.

95.     By letter dated September 7, 2017, Cede duly appointed Aurelius's prime broker as its agent to exercise any right or remedy that Cede is entitled to take as a Holder under the Indenture (including the right to give notices of default) in respect of the Notes beneficially owned by Aurelius.  Having received such authorization from Cede, Aurelius's prime broker, by letter dated September 11, 2017, duly appointed Aurelius as its agent to exercise any right or remedy that Cede is entitled to take as a Holder under the Indenture (including the right to give notices of default) in respect of the Notes beneficially owned by Aurelius.  True and correct copies of those letters are attached hereto as Exhibits D and E.

96.     By letters dated September 21, 2017, Aurelius gave notice to the Company of the Defaults described herein.  A true and correct copy of the Default Notice is attached hereto as Exhibit F.  The Company has publicly stated, in a Form 8-K filed with the SEC, that it received the Default Notice on September 22, 2017.

## CLAIM FOR RELIEF

### (Declaratory Judgment – 28 U.S.C. § 2201)

97.     Plaintiff repeats and re-alleges the allegations of paragraphs 1 to 96 as if fully set forth herein.

98.     An actual, justiciable controversy exists between the parties as to whether the Company failed to comply with the covenants in Indenture Sections 4.19 and 4.07(a), of sufficient immediacy and reality to warrant issuance of a declaratory judgment under 28 U.S.C. § 2201.

99.     Accordingly, for the reasons set forth in paragraphs 21 to 96, the Trustee is entitled to a declaratory judgment as set forth in the Prayer for Relief below.

## Prayer for Relief

WHEREFORE, Plaintiff requests entry of judgment against Defendant as follows:

A.     Declaring pursuant to 28 U.S.C. § 2201 that

    (1)   In effecting the CSL Sale and Leaseback and thereafter, the Company failed to comply with the covenants on sale and leaseback transactions set forth in Indenture Section 4.19;

    (2)   the Company's breaches of Indenture Sections 4.19 constitute a Default under Indenture Section 6.01(a)(v);

    (3)   the Company also breached Indenture Section 4.07(a)(A) by making distributions to its parent company Holdings, while the foregoing Default (and, where applicable, breaches of Section 4.07(a)(A)) were continuing, and such additional breaches are also Defaults under Indenture Section 6.01(a)(v); and

    (4)   the Default Notice was and is valid and effective to (and did) trigger commencement of the 60-day cure period provided in Indenture Section 6.01(a)(v).

B.     Awarding the Trustee its fees and costs.

C.     Granting such other and further relief as the Court deems proper.

Dated: New York, New York
      October 12, 2017

                Respectfully submitted,

                FRIEDMAN KAPLAN SEILER
                   & ADELMAN LLP

*Edward A. Friedman*

By:   _____
      Edward A. Friedman
      Daniel B. Rapport
      Jeffrey C. Fourmaux
      Christopher M. Colorado

7 Times Square
New York, New York  10036-6516
Tel:  (212) 833-1100
Fax:  (212) 833-1250

*Attorneys for U.S. Bank National Association,*
*solely in its capacity as indenture trustee of*
*Windstream Services, LLC's 6 3/8% Senior*
*Notes due 2023*