AARON H. MARKS
JOSHUA M. GREENBLATT
STEPHEN E. HESSLER, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Attorneys for Windstream Services, LLC

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, as Indenture Trustee,<br><br>        Plaintiff and<br>        Counterclaim-<br>        Defendant,<br><br>  - against -<br><br>WINDSTREAM SERVICES, LLC,<br><br>        Defendant and<br>        Counterclaim-<br>        Plaintiff,<br><br>  - against -<br><br>AURELIUS CAPITAL MASTER, LTD.<br><br>        Counterclaim-<br>        Defendant. | CASE NO. 1:17-cv-07857 |

**VERIFIED COUNTERCLAIMS, ANSWER, AND AFFIRMATIVE DEFENSES**

Defendant and Counterclaim-Plaintiff Windstream Services, LLC ("Services" or the "Company"), by and through its undersigned counsel, for its Counterclaims against Plaintiff and Counterclaim-Defendant U.S. Bank National Association ("US Bank NA" or the "Trustee") and Counterclaim-Defendant Aurelius Capital Master, Ltd. ("Aurelius"), alleges as follows:

## PRELIMINARY STATEMENT

1.      On September 21, 2017, Services initiated an action against US Bank NA in Delaware Chancery Court (*Windstream Services, LLC v. U.S. Bank National Association*, C.A. No. 2017-0693 (Del. Ch.)) (the "Delaware Action").  The Delaware Action involved the same facts and circumstances as the claims in this action, and Services sought the same relief in the Delaware Action that it seeks here -- a declaration that Aurelius's attempt to manufacture an Event of Default, and to roil the Company, is baseless and meritless.  As pure gamesmanship, US Bank NA (directed by Aurelius) has moved to dismiss the Delaware Action based on a purported lack of personal jurisdiction, and now brings this action, which is simply a mirror image of the claims asserted by Services in the Delaware Action.

2.      Services is not interested in games, but rather in receiving a definitive declaration that there has been and is no continuing Default, and there will be no Event of Default, and bringing a swift end to the exploitative efforts to destroy Services' business.  Accordingly, Services will be, simultaneous with the assertion of its counterclaims here, dismissing the Delaware Action, and will be seeking forthwith expedited relief from this Court to prevent US Bank NA and Aurelius from improperly declaring an Event of Default and causing immediate and irreparable harm to the Company and all of its stakeholders.

## NATURE OF THE COUNTERCLAIMS

3.      This matter arises due to the opportunistic and improper actions of an activist hedge fund, Aurelius, which purported to call a default *more than two years after the transactions* related to Services' spin-off in April 2015 of approximately 80% of the then-outstanding common stock of Uniti Group Inc. ("Uniti")[1] (the "Spin-Off").  In the 29 months following those transactions, the Company never received any suggestion that the Spin-Off caused the Company to be in default of any provision of an Indenture dated January 23, 2013 between Windstream Corporation[2] and US Bank NA, as amended and supplemented (the "Indenture").  But now, years after the Spin-Off, Aurelius has acquired a position in the Company's 6 3/8% Senior Notes due 2023 (the "Notes"), and alleges that the Company has been in default of the Indenture since April 2015.  Upon information and belief, Aurelius acquired its position in the Notes for the sole purpose of seeking to manufacture this alleged default, and declare that a credit event has occurred or is occurring, in order to collect a credit default swap payoff.[3]  Contrary to Aurelius's assertions, the Company is in compliance with the provisions of the Indenture.

---

[1]   Communications Sales & Leasing, Inc. changed its name to Uniti Group Inc. in 2016 and is referred to in this Complaint for convenience as "Uniti".  Uniti is a publicly-traded REIT.

[2]   Windstream Corporation converted to a limited liability company and changed its name to Windstream Services, LLC in 2015.

[3]   There are numerous rumors circulating in the debt markets regarding various positions that Aurelius has taken regarding the Company's debt, the equity of Windstream Holdings, Inc., the publicly-traded parent company of Services, and even the debt and equity of Uniti. While the Company cannot yet confirm all positions Aurelius may hold, suffice to say that Aurelius appears to be actively manipulating this situation and impacting debt and equity prices to the detriment of Windstream.

4. Services faces imminent, irreparable harm because Aurelius sent a letter dated September 21, 2017 (the "Letter" or the "September 21, 2017 Letter"), which purports to constitute a written notice of default. Under the Indenture, a notice of default would trigger a 60-day grace or cure period after which the Trustee or holders of at least 25% in aggregate principal amount of outstanding Notes could declare the principal amount of all outstanding Notes to be immediately due and payable.

5. Because Services has issued approximately $3 billion outstanding in bonds under the Indenture and other indentures with covenants identical in all material respects to the provisions of the Indenture allegedly violated, an Event of Default (as defined in the Indenture) and any acceleration of debt would threaten the very existence of the Company. An Event of Default and acceleration of debt would likely force the Company into bankruptcy, resulting in harm both to the customers receiving necessary communications services from the Company and its subsidiaries and to the Company's approximately 13,000 employees. An Event of Default and any acceleration of debt would further irreparably harm the Company by, among other things, preventing the Company from accessing the capital markets, increasing the Company's borrowing costs, damaging the Company's relationships with vendors, bondholders, and other lenders, damaging the Company's credibility with customers, and impeding the Company's ability to run its business in the ordinary course and implement its strategic business plans.

6. By these counterclaims, Services seeks relief against Aurelius and US Bank NA, in its capacity as Trustee under the Indenture. Services seeks relief in the form of: (i) an order declaring that Services is not in default of the Indenture; and (ii) an order enjoining US Bank NA, as well as Aurelius from (a) declaring an Event of Default (on its own behalf or at the

request of any holder), or (b) taking any action in furtherance of the September 21, 2017 Letter.[4] (A true and correct copy of the Indenture has been filed at Dkt. 1-1; a true and correct copy of the September 21, 2017 Letter has been filed at Dkt. 1-6).

7.      Upon information and belief, Aurelius has spent the last several months buying Notes to become a beneficial holder of more than 25% in aggregate principal amount of outstanding Notes.  These acquisitions were undertaken by Aurelius for a single purpose:  to profit under a series of credit default swaps Aurelius has also purchased to bet on the Company defaulting under the Indenture.  Even after numerous public filings and the publication of various materials before and since the completion of the Spin-Off, no holder of the Notes had ever suggested a default for any reason from the time of the Spin-Off until Aurelius sent the Letter.

8.      Aurelius's Letter centers on Section 4.19 of the Indenture, which governs whether and when the Company may enter into a "Sale and Leaseback Transaction" (as defined in the Indenture).  Aurelius claims that in conjunction with the Spin-Off, some of the Company's Restricted Subsidiaries (as defined in the Indenture) "transferred certain of their assets and then or thereafter leased those assets (or some part thereof)."  This allegedly constitutes "a Sale and Leaseback Transaction on the part of the Restricted Subsidiaries."  Aurelius then asserts that the Sale and Leaseback Transaction failed to comply with the requirements of Section 4.19 of the Indenture.

9.      The purported notice of default is defective for a variety of reasons.  First and foremost, the Spin-Off was not a Sale and Leaseback Transaction as defined by the Indenture.  In contemporaneous transactions, Services and its Restricted Subsidiaries transferred the assets in

---

[4]      The Company received the purported notice of default on September 22, 2017.

5

question to Uniti, distributed approximately 80% of the then outstanding common stock of Uniti to Services' sole equity owner and parent company, Windstream Holdings, Inc. ("Holdings"), and Holdings then distributed the Uniti common stock to its stockholders on a pro rata basis. Each of these transactions was in full compliance with the Indenture.

10. Following these transactions, *Holdings -- not Services or its Restricted Subsidiaries --* leased the relevant assets from Uniti. Such an arrangement does not constitute a "Sale and Leaseback Transaction" under the Indenture because the entity that made the transfer (Services or a Restricted Subsidiary of Services) and the entity that leased the relevant assets (Holdings) are different entities. Indeed, Holdings is not subject to the covenants of the Indenture. Therefore, the transactions do not even implicate, let alone breach, Section 4.19 of the Indenture.

11. The Indenture is a carefully negotiated document between sophisticated parties represented by experienced counsel, and the Indenture includes a precise definition of what constitutes a Sale and Leaseback Transaction:

> with respect to any Person, any transaction involving any of the assets or properties of such Person whether now owned or hereafter acquired, whereby such Person sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred.

12. Person is defined in the Indenture as "any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated, organization, limited liability company or government or other entity."

13. Critically, the definition of Person does not include parents, subsidiaries, affiliates, or any entities beyond the defined Person. In other words, under the Indenture,

Services is one Person, each of the Restricted Subsidiaries of Services is a different Person, and Holdings is yet another Person. To implicate Section 4.19, a Sale and Lease Transaction must occur which requires that one Person transfer assets and that *same* Person lease assets back. Here, however, Services and its Restricted Subsidiaries transferred assets to Uniti. Holdings, a different Person from either Services or any of the Restricted Subsidiaries of Services, then leased assets from Uniti. That is not a "Sale and Leaseback Transaction" under the Indenture. Thus, Section 4.19 is not relevant.

14. Services' corporate structure and the transaction undertaken in connection with the Spin-Off are common practice, particularly for corporations that are publicly-held and active in debt and equity markets. The negotiation of the Indenture involved parties experienced in the creation and structure of bond offerings, and each party was represented by sophisticated counsel. The parties did not bargain to prohibit the transaction at issue here -- if they had, the Indenture would have plainly prevented it. Instead, US Bank NA needed to file a 40-page Complaint to explain its convoluted arguments as to why this structure should be considered prohibited under the Indenture.

15. Aurelius admits in the Letter that Services is not a signatory to the publicly-filed Master Lease dated April 24, 2015 (the "Master Lease") (Ex. B at p. 2, n. 1.), which governs the lease of the assets at issue. The Master Lease was between Holdings and certain subsidiaries of Uniti. Whether Services and its subsidiaries use the relevant assets is immaterial -- none of them "lease" those assets. In addition, there is no "sub-lease" between Holdings and Services or any of its Restricted Subsidiaries. Had the parties wished for the Sale and Leaseback Transaction definition to include the structure in place, they could have easily done so. For example, the

7

Indenture could have prohibited Services and its Restricted Subsidiaries from leasing "directly or indirectly" (a formulation they used in other contexts in the Indenture), or prohibited corporate affiliates from entering into prohibited transactions (a concept used in other contexts in the Indenture). But the parties -- after thoroughly negotiating the Indenture while represented by experienced counsel -- did not do either.

16.     Aurelius also wrongly alleges that the Company has violated Section 4.07 of the Indenture in two ways. First, Aurelius alleges that the Company failed to deliver to the Trustee an Officers' Certificate in association with certain Restricted Payments (as defined in the Indenture) as required by Section 4.07(c) of the Indenture. The Company delivered all required Officers' Certificates to the Trustee, and the claim in the Letter is simply wrong. Second, Aurelius argues that the Company violated Section 4.07(a)(A), which prohibits the making of a Restricted Payment during the pendency of a Default (as defined in the Indenture). However, the only alleged defaults are the purported Defaults of Sections 4.19 and 4.07 already discussed (which are not actually defaults). Thus, the Company was not in Default at the time it made any Restricted Payments and has not violated Section 4.07(a)(A).

17.     While the assertions of purported fact in the Letter are baseless, the Letter nonetheless threatens Services with imminent, irreparable harm. That is because the Letter purports to constitute a written notice of default under Section 6.01(a)(v) of the Indenture, which would trigger a 60-day grace, or cure, period. The Company cannot "cure" the alleged default claimed by Aurelius, as it would apparently have to unwind the over two-year old Spin-Off to do so. Thus, at the end of the grace period, there is a distinct risk that the Trustee or holders of at least 25% in aggregate principal amount of outstanding Notes could declare the principal amount

8

of all outstanding Notes to be immediately due and payable. Moreover, all of Services' other indentures contain covenants identical in all material respects to Section 4.19 of the Indenture, and thus, Services has approximately $3 billion in bonds subject to the language that Aurelius claims was breached. The uncertainty created by the Letter's incorrect assertions could impact all of the Company's bond debt, as an Event of Default under the Indenture and any acceleration of the Notes by the Trustee or holders of 25% in aggregate principal amount of outstanding Notes would presumably constitute an event of default under its other indentures.

18.     Moreover, should an Event of Default occur under the Indenture, such Event of Default could also lead to an event of default under the Company's credit facility and the Master Lease.

19.     An Event of Default, any cross default, or any acceleration of debt would threaten the very existence of Services by likely forcing the Company into bankruptcy and have a drastic negative impact on thousands of customers as well as the Company's approximately 13,000 employees. Additionally, even the threat of an Event of Default, associated cross defaults and acceleration of debt irreparably harms the Company by, among other things, reducing the Company's access to the capital markets in order to potentially address any attempted debt acceleration, increasing the Company's borrowing costs, damaging the Company's relationships with its vendors, bondholders and other lenders, harming Holdings' equity value, and impeding the Company's ability to run its business in the ordinary course and implement its strategic business plans.

20.     Aurelius waited over two years after the Spin-Off to manufacture alleged defaults. Aurelius now wields these erroneous assertions in an effort to extort value through

simultaneously purchasing credit default swaps to cash in on the very default it is attempting to manufacture. These actions have significant consequences to Services. Services is a large telecommunications company providing approximately 13,000 jobs across the country and supplying crucial communications services to over 1.5 million consumer and small business customers and approximately 35,000 enterprise business customers. The near-term acceleration of all of the Company's debt would present massive challenges to the business and its employees.

21.     Given the importance of these issues and the baseless nature of Aurelius's allegations, the Company asks this Court to declare that the Company is not in breach of Section 4.19 or Section 4.07 of the Indenture. Further, Services asks this Court to enjoin Aurelius and the Trustee, on its own or at the direction of the holders of Notes, from declaring an Event of Default by reason of any of the alleged defaults stated in the Letter, and from taking any action based on any such purported default.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over the claims asserted in this Complaint pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000 and there is no question there is complete diversity of citizenship. This action is brought by Defendant and Counterclaim-Plaintiff Services, which is incorporated in Delaware and has a principal place of business in Arkansas, against Counterclaim-Defendants U.S. Bank, which is a national bank with principal executive offices in Ohio and a principal place of business in Minnesota, and Aurelius, which is an exempted company with limited liability in the Cayman Islands.

23.     Venue and jurisdiction are proper in the Southern District of New York because a substantial portion of the events or omissions giving rise to the claims occurred in this District. In the Indenture, U.S. Bank submitted to the jurisdiction of this Court and waived any objection to venue in this Court for any legal suit, action or proceeding arising out of or based on the Indenture or the transactions contemplated in the Indenture.  Moreover, the claims in this lawsuit arise from the purported notice of default that Aurelius sent to Services in New York.  Through its purported notice, Aurelius seeks the benefit of the laws of the State of New York, which governs the Indenture and the Notes.  In particular, Aurelius alleges violations of the Indenture, which was entered among other things for the benefit of the noteholders.  The Indenture provides that any legal suit, action or proceeding arising out of or based on the Indenture or the transactions contemplated in the Indenture may be instituted in this Court and the parties to the Indenture submitted to the jurisdiction of this Court and waived any objection to venue in this Court.

**THE PARTIES**

24.     Defendant and Counterclaim-Plaintiff Services is a limited liability company organized under the laws of the State of Delaware with its headquarters at 4001 Rodney Parham Road, Little Rock, Arkansas 72212.

25.     Upon information and belief, US Bank NA is a banking corporation and national association organized under the laws of the United States, with its principal executive offices located at 425 Walnut Street, Cincinnati, Ohio 45202 and principal place of business in Minneapolis, Minnesota.

26.     US Bank NA, as Trustee under the Indenture is charged with representing the interests of the holders of all Notes issued and outstanding under the Indenture.  As a result, it is the proper party to give effect to the judgment of this Court and implement any action resulting therefrom.  Therefore, US Bank NA is a necessary party to the resolution of this action.

27.     Upon information and belief, Aurelius is an exempted company with limited liability in the Cayman Islands.  Upon information and belief, Aurelius is the beneficial holder of more than 25% of the outstanding Notes under the Indenture.  Aurelius may be served with process by serving the New York Secretary of State as statutory agent at the New York Department of State's office at One Commerce Plaza, 99 Washington Avenue, Albany, NY 12231.  N.Y. Bus. Corp. Law § 307.  Aurelius is a required party to this action pursuant to Fed. R. Civ. P. 19(a).  Rule 19(a) defines "persons required to be joined if feasible" as any person who (i) is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction; (ii) claims an interest relating to the subject of the action; and (iii) is so situated that disposing of the action in the person's absence may "as a practical matter impair or impede the person's ability to protect the interest" or "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1).  Aurelius is subject to service and the Court will maintain subject-matter jurisdiction, as noted above.  And, Aurelius obviously claims an interest that would be impeded by its absence -- it is the driving force behind US Bank NA's Complaint and this baseless attempt at manufacturing an Event of Default, as evidenced by the September 21, 2017 Letter.

## FACTUAL BACKGROUND

### I.    WINDSTREAM SERVICES, LLC'S BUSINESS

28.    Services is headquartered in Little Rock, Arkansas and provides, via its subsidiaries, communications and technology solutions across a range of services including cloud computing, integrated voice and data services, internet security services, and consumer video services. The Company also provides broadband, voice and video services to consumers primarily in rural markets. Services was formed in 2004, and previously operated as a corporation called Windstream Corporation.

29.    In August 2013, Windstream Corporation created a new holding company organization structure whereby Windstream Corporation became a wholly-owned subsidiary of Holdings.

30.    Holdings filed a current report on Form 8-K with the SEC announcing this new structure on August 30, 2013.

31.    Holdings is a publicly traded FORTUNE 500 company and a leading provider of advanced network communications and technology solutions for consumers, businesses, enterprise organizations and wholesale customers across the US.

32.    In 2015, Windstream Corporation converted to a limited liability company and changed its name to Windstream Services, LLC.

33.    Services currently maintains approximately 13,000 employees in the United States and Canada.

## II.    2015 SPIN-OFF

34.    In March 2015, Holdings and Services entered into a Separation and Distribution Agreement with Uniti, pursuant to which, among other things, Services and certain of its Restricted Subsidiaries contributed to Uniti certain assets consisting of approximately 66,000 route miles of fiber optic cable lines, 235,000 route miles of copper cable lines, central office land and buildings, beneficial rights to permits, pole agreements and easements, and a small consumer competitive local exchange carrier business owned by Services.  The contribution of assets to Uniti by Services and its Restricted Subsidiaries was made in full compliance with the Indenture.

35.    Those assets were exchanged for (i) the issuance of Uniti common stock to Services, (ii) the transfer of approximately $1.035 billion in cash from Uniti to Services, and (iii) the transfer from Uniti to Services of approximately $2.5 billion of Uniti debt, consisting of term loans and secured and unsecured notes.

36.    Services then distributed no less than 80.4% of the outstanding shares in Uniti common stock to its sole equity owner and parent company, Holdings, and Services retained the remaining shares of Uniti common stock.  Again, each transaction was completed in full compliance with the Indenture.

37.    Holdings, in turn, distributed no less than 80.4% of the outstanding shares of Uniti common stock pro rata to holders of Holdings common stock.  This distribution (along with the Services distribution to Holdings) constituted the "Spin-Off."

38.    Immediately after the Spin-Off, Holdings and Uniti entered into multiple agreements to implement portions of the Spin-Off and govern the relationship after the Spin-Off.

14

39.     One such agreement was the Master Lease by and among subsidiaries of Uniti on the one hand, and Holdings on the other hand.  Pursuant to the Master Lease, Holdings leased (and still leases) certain telecommunication network assets, including fiber and copper networks and other real estate, from the Uniti subsidiaries that are party to the Master Lease.

40.     Services is not a signatory to the Master Lease and has no obligation to make any payments or perform any obligations under Master Lease, including no obligation to fund Holdings' lease payments under the Master Lease.

41.     The Master Lease and other Spin-Off transactional documents were made publicly available and the details of the Spin-Off were disclosed in the Current Report on Form 8-K filed with the Securities and Exchange Commission (the "SEC") on April 27, 2015 as well as the Company's and Holdings' other periodic filings under the Securities Exchange Act of 1934, as amended, since then.

42.     In summary, Services and its Restricted Subsidiaries transferred certain assets to Uniti as part of the Spin-Off.  Immediately following the Spin-Off, Holdings and certain subsidiaries of Uniti entered into the Master Lease pursuant to which *Holdings* leased the assets.

43.     While Services is not obligated to fund Holdings' lease payments under the Master Lease, Services has historically made cash distributions to Holdings to fund such payments.  As noted above, Holdings is not a party to, or subject to the covenants in, the Indenture.  Therefore the Indenture contains restrictions on payments by Services to Holdings, but does not contain any restrictions on Holdings.  Specifically, these distributions are subject to the Restricted Payments covenant in the Indenture, which restricts, among other things, distributions by Services to its sole equity owner, Holdings.  Accordingly, Services can only

15

make a distribution to Holdings to fund Holdings' lease payments if it has Restricted Payment "capacity", which is based on, broadly speaking, its cumulative earnings. Services has chosen to use a portion of its Restricted Payments "capacity" to fund Holdings' lease payments and has complied with the applicable conditions. This reduces the amount of other distributions and other Restricted Payments that Services can make and holders of the Notes are in no way harmed by these distributions to fund Holdings' lease payments. The Indenture permits a certain amount of Restricted Payments and Services decides how to use that capacity.

44.     If this arrangement were, in fact, a Sale and Leaseback Transaction by Services as Aurelius has alleged, then any lease payments made by Services would be permitted and would not be subject to the Restricted Payments covenant. But that is not how the distributions are structured. Aurelius should not be permitted to recharacterize the arrangement as a Sale and Leaseback Transaction merely because it disputes the way in which Services is choosing to use its Restricted Payments capacity.

45.     Neither Services nor any of its Restricted Subsidiaries are parties to the Master Lease for the assets in question. The transfer of the assets and the subsequent "lease" of the assets involved different parties not subject to the Indenture.

## III.   THE LANGUAGE OF THE INDENTURE

46.     On January 23, 2013, Windstream Corporation (now known as Services) executed the Indenture governing the Notes with US Bank NA as Trustee.

47.     The Indenture is a complex and heavily negotiated document that is the result of arms-length discussions between multiple sophisticated parties and their counsel.

48.     Section 4.19 of the Indenture reads, in pertinent part:

The Company shall not, and shall not permit any of its Restricted Subsidiaries to, enter into any Sale and Leaseback Transaction; *provided* that the Company or any Restricted Subsidiary thereof may enter into a Sale and Leaseback Transaction if: (i) the Company or such Restricted Subsidiary … could have (A) Incurred Indebtedness in an amount equal to the Attributable Debt relating to such Sale and Leaseback Transactions … and (B) incurred a Lien to secure such Indebtedness … (ii) the gross cash proceeds of that Sale and Leaseback Transaction are at least equal to the Fair Market Value of the property that is the subject of that Sale and Leaseback Transaction; and (iii) the transfer of assets in that Sale and Leaseback Transaction is permitted by, and the Company applies the proceeds of such transaction in compliance with, Section 4.10.

Ex. A at § 4.19.

49.     Critically, "Sale and Leaseback Transaction" is a defined term in the Indenture

which means:

with respect to any Person, any transaction involving any of the assets or properties of such Person whether now owned or hereafter acquired, whereby such Person sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred.

*Id.* at § 1.01.

50.     "Person," in turn, is defined as:

any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated, organization, limited liability company or government or other entity.

*Id.*

51.     With respect to Aurelius's vague allegation that the Company failed to provide

the necessary Officers' Certificates for unspecified Restricted Payments, Section 4.07(c) of the

Indenture reads:

The amount of all Restricted Payments (other than cash) shall be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued to or by the Company or such Subsidiary, as the case may be, pursuant to the Restricted Payment. Not later than the date of making any Restricted Payment, the Company shall deliver to the Trustee and Officers' Certificate stating that such Restricted Payment is permitted and setting forth the basis upon which the calculations required by this Section 4.07 were computed, together with a copy of any opinion or appraisal required by this Indenture.

*Id.* at § 4.07(c).

52.     Section 6.01(a)(v) of the Indenture specifies actions or events that constitute an

"Event of Default," and provides in pertinent part that an Event of Default occurs upon:

> [F]ailure by the Company or any of its Restricted Subsidiaries for 60 days after written notice by the Trustee or Holders representing 25% or more of the aggregate principal amount of Notes then outstanding to comply with any of the other agreements [besides Section 4.10 or Section 4.14] in this Indenture.

*Id.* at § 6.01(a)(v).

53.     Following an Event of Default, Section 6.02 of the Indenture grants the Trustee

or, in the alternative, holders of a certain principal amount of the Notes, the right to accelerate

payment of the Notes:

> If an … Event of Default occurs and is continuing with respect to Notes, the Trustee or the Holders of at least 25% in principal amount of the then outstanding Notes may declare all the Notes to be due and payable immediately by notice in writing to the Company specifying the Event of Default. Upon such declaration, the Notes, together with accrued and unpaid interest (including Additional Interest), shall become due and payable immediately.

*Id.* at § 6.02.

## IV.     RUMORS OF AURELIUS ACQUIRING NOTES

54.     In early August 2017, Services became aware of market rumors that Aurelius was

buying notes in an effort to obtain a 25% position in one or more of the Company's series of

18

outstanding notes.  Additional market rumors indicated that Aurelius was also buying a significant position in credit default swaps betting on the Company to default.

55.    Around the same time, Services became aware that Aurelius was acquiring these notes to attempt to call an Event of Default to profit from its position in the credit default swap market.

56.    Services was (and continues to be) in compliance with all of the provisions of its indentures.

57.    Additional market rumors indicated that Aurelius intended to issue a notice of default related to the Spin-Off.  This was confusing given that the Spin-Off had closed over two years before these market rumors began.  Prior to these 2017 market rumors, Services was unaware of any accusation or allegation that the Spin-Off caused Services to be in breach or default of any covenant in any of its indentures.  No other bondholders have sent the Company a purported notice of default related to the Spin-Off.

## V.    THE PURPORTED NOTICE OF DEFAULT

58.    Aurelius sent the September 21, 2017 Letter indicating that it was the beneficial holder of more than 25% in aggregate principal amount of the 6 3/8% Senior Notes due 2023 outstanding and claiming that the Letter constituted a notice of default under the Indenture.

59.    The Letter primarily focused on an alleged default of the Sale and Leaseback Transaction covenant (Section 4.19) of the Indenture.  Yet, as discussed above, the Company has not entered into any Sale and Leaseback Transactions since executing the Indenture.

60.     As further evidence that Aurelius is seeking to manufacture a notice of default, the Letter also baselessly asserts that the Company violated Section 4.07 of the Indenture.  As discussed above, the Company has fully complied with Section 4.07.

61.     Aurelius claimed that the notice of default was given under Indenture Section 6.01(a)(v), which contemplates a 60-day grace period before an Event of Default could occur.

### FIRST CAUSE OF ACTION
**(Declaratory Judgment)**

62.     Services repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

63.     Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court is authorized to issue a declaratory judgment.

64.     There is an actual controversy between the parties concerning whether Services has violated Sections 4.07 and 4.19 of the Indenture and whether an Event of Default can occur after the relevant grace period set forth in the Indenture.

65.     Services is entitled to a judicial declaration that Services did not violate Section 4.19 of the Indenture and that Services did not enter into a "Sale and Leaseback Transaction" in the Spin-Off.

66.     Services is entitled to a judicial declaration that Services is not in breach of Section 4.07 of the Indenture.

67.     Services has no adequate remedy at law.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment)

68.     Services repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

69.     Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court is authorized to issue a declaratory judgment.

70.     There is an actual controversy between the parties concerning whether Services has violated Sections 4.07 and 4.19 of the Indenture and whether an Event of Default can occur after the relevant grace period set forth in the Indenture.

71.     Aurelius waited an unreasonable length of time before attempting to declare a default (which they manufactured in order to profit in the credit default swap market).  Services has been prejudiced by this unreasonable delay as they have no ability to cure any alleged default relating to a transaction that closed over 2 years ago.

72.     Services is entitled to a judicial declaration that any breach of Section 4.19 or 4.07, as alleged in the Letter, has been waived by the passage of over two years since the Spin-Off.

73.     Services has no adequate remedy at law.

## THIRD CAUSE OF ACTION
### (Injunctive Relief)

74.     Services repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

75.     Aurelius's Letter wrongfully purports to provide written notice of defaults even though Services has not violated Section 4.07 or Section 4.19 of the Indenture.  The purported

21

notice of default, however, is currently harming and will continue to harm Services. In particular, any further action taken in reliance on or in furtherance of the purported notice of default will cause Services irreparable harm by threatening the very existence of Services by, among other things: likely forcing the Company into bankruptcy, increasing borrowing costs, limiting the Company's access to capital markets, damaging the Company's relationship with its vendors, bondholders and other lenders, harming Holdings' equity value, triggering potential cross-defaults, and hindering the Company's ability to run its business in the ordinary course and implement its strategic business plans.

76. Should Aurelius or the Trustee declare an Event of Default or take any action in reliance on or in furtherance of the purported notice of default, Services would suffer irreparable harm.

77. Should Aurelius, the Trustee or any holders of the Notes representing 25% in aggregate principal amount outstanding accelerate the debt under Section 6.02 of the Indenture, Services would suffer irreparable harm.

78. The harm to Services of allowing Aurelius or the Trustee to declare an Event of Default or take any action in reliance on or in furtherance of the defective notice of default substantially outweighs any harm to the Trustee (or any holders) associated with an injunction being granted.

79. Services has no adequate remedy at law.

80. Accordingly, Services is entitled to an injunction preventing the Trustee, on its own or at the direction of any holder of Notes, as well as Aurelius (a) from declaring an Event of Default by reason of Aurelius's incorrect and improper Letter alleging breach of Section 4.07

and Section 4.19 of the Indenture, and (b) from taking any action based on any purported breach

of Section 4.07 or 4.19 of the Indenture.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendant and Counterclaim-Plaintiff Services respectfully requests that

the Court enter an Order granting the following relief:

a.    Entry of a declaratory judgment order by this Court that Services is not in breach of Section 4.07 and/or Section 4.19 of the Indenture.

b.    Entry of a declaratory judgment order by this Court that Services did not enter into a "Sale and Leaseback Transaction," as defined by the Indenture, as part of the Spin-Off.

c.    Entry of a declaratory judgment order by this Court that any alleged breach of Section 4.07 and/or Section 4.19 of the Indenture associated with the Spin-Off has been waived given the passage of more than two years since such transaction was publicly documented.

d.    Entry of an order enjoining the Trustee, on its own or at the direction of any holder of Notes, as well as Aurelius from (i) declaring an Event of Default by reason of Aurelius's September 21, 2017 Letter, and (ii) taking any action based on any such purported breach.

# ANSWER

Defendant and Counterclaim Plaintiff Windstream Services, LLC ("Services" or the "Company"), for their Answer and Affirmative Defenses to the Complaint of U.S. Bank National Association ("US Bank NA" or the "Trustee"), as indenture trustee, states as follows:

## Nature of the Action

1. Services admits it is a borrower on certain 6 3/8% Senior Notes due 2023; that it received a purported notice of default sent by a Noteholder dated September 21, 2017; states that, to the extent that Paragraph 1 asserts a legal conclusion, no response is required; and otherwise denies the allegations in Paragraph 1.

2. Services refers the Court to the Indenture for its content; states that, to the extent that Paragraph 2 asserts a legal conclusion, no response is required; and otherwise denies the allegations in Paragraph 2.

3. Services admits that Services, and certain of its Restricted Subsidiaries and other subsidiaries, transferred certain telecommunication assets to Uniti, formerly Communications Sales & Leasing, Inc. ("CSL") on April 24, 2015; and otherwise denies the allegations contained in Paragraph 3.

4. Services denies the allegations contained in Paragraph 4.

5. Services admits that Windstream Holdings, Inc. ("Holdings") is not an obligor on the Notes or Indenture; that Holdings is the signatory on a master lease with subsidiaries of CSL (the "Master Lease"); refers the Court to the Master Lease for its content; and otherwise denies the allegations in Paragraph 5.

6.     Services denies the allegations contained in Paragraph 6; and refers the Court to the public documents referenced in Paragraph 6 for their content.

7.     Services denies the allegations contained in Paragraph 7; states that, to the extent that Paragraph 7 asserts a legal conclusion, no response is required; and refers the Court to Services' CFO's statement for its content.

8.     Services denies the allegations contained in Paragraph 8; and states that, to the extent that Paragraph 8 asserts a legal conclusion, no response is required.

9.     Services refers the Court to the Default Notice for its content; and otherwise denies the allegations contained in Paragraph 9.

10.    Services admits that the Trustee seeks a declaratory judgment; and states that, to the extent that Paragraph 10 asserts a legal conclusion, no response is required.

## The Parties

11.    Services denies sufficient knowledge and information to form a belief as the truth of the allegations in Paragraph 11.

12.    Services admits the allegations in Paragraph 12.

13.    Services admits that Holdings is a Delaware corporation with its principal place of business in Little Rock, Arkansas; that it is the sole member of Services; that it was the sole shareholder of Services' predecessor; and otherwise denies the allegations contained in Paragraph 13.

14.    Paragraph 14 contains no allegations that require a response.

15. Services denies sufficient knowledge and information to form a belief as the truth of the allegations in Paragraph 15, except admits that CSL was spun-off on or about April 24, 2015.

16. Services denies sufficient knowledge and information to form a belief as the truth of the allegations in Paragraph 6.

## Jurisdiction and Venue

17. Services states that, to the extent that Paragraph 17 asserts a legal conclusion, no response is required.

18. Services refers the Court to the Indenture of its content; states that, to the extent that Paragraph 18 asserts a legal conclusion, no response is required.

19. Services admits it commenced an action in Delaware state court on September 29, 2017, naming the Trustee as the sole defendant and seeking a declaratory judgment and other relief with respect to the Default Notice; that the Trustee removed the action to the United States District Court for the District of Delaware on October 4, 2017; that the Trustee filed a motion to dismiss the action for lack of personal jurisdiction; and states that, to the extent Paragraph 19 assets a legal conclusion, no response is required.

## Applicable Law

20. Services refers the Court to the Indenture for its content.

## Facts

**A.     The Indenture and the Notes**

21. Services admits the allegations in Paragraph 21.

22. Services admits the allegations in Paragraph 22; and refers the Court to the Indenture for its content.

23. Services states that, to the extent that Paragraph 23 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 23.

24. Services refers the Court to the Indenture for its content; and states that, to the extent that Paragraph 24 asserts a legal conclusion, no response is required.

25. Services refers the Court to the Indenture for its content; and states that, to the extent that Paragraph 25 asserts a legal conclusion, no response is required.

26. Services refers the Court to the Indenture for its content; and states that, to the extent that Paragraph 26 asserts a legal conclusion, no response is required.

27. Services refers the Court to the Indenture for its content.

28. Services refers the Court to the Indenture for its content.

29. Services refers the Court to the Indenture for its content; and states that, to the extent that Paragraph 29 asserts a legal conclusion, no response is required.

30. Services refers the Court to the Indenture for its content; and states that, to the extent that Paragraph 30 asserts a legal conclusion, no response is required.

31. Services refers the Court to the Indenture for its content.

32. Services refers the Court to the Indenture for its content; states that, to the extent that Paragraph 32 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 32.

33.     Services refers the Court to the Indenture for its content; states that, to the extent that Paragraph 33 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 33.

34.     Services refers the Court to the Indenture for its content; states that, to the extent that Paragraph 34 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 34.

35.     Services refers the Court to the Indenture for its content; and states that, to the extent that Paragraph 35 asserts a legal conclusion, no response is required.

36.     Services refers the Court to the Indenture for its content; states that, to the extent that Paragraph 36 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 36.

37.     Services refers the Court to the Indenture for its content; states that, to the extent that Paragraph 37 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 37.

38.     Services refers the Court to the Indenture for its content; states that, to the extent that Paragraph 38 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 38.

39.     Services refers the Court to the Indenture for its content; states that, to the extent that Paragraph 39 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 39.

**B.     The CSL Spin-Off and Leaseback**

40.     Services admits that in July 2014, its predecessor and its parent company announced plans to spin-off certain telecommunications network assets into an independent, publicly traded REIT; and otherwise denies the allegations contained in Paragraph 40.

**(1)     The Separation Agreement**

41.     Services admits that on March 26, 2015, it and holdings entered into a Separation and Distribution Agreement with CSL (the "Separation Agreement").

42.     Services admits that certain of its subsidiaries owned and operated portions of the assets comprising its telecommunications network; and otherwise denies the allegations contained in Paragraph 42.

43.     Services admits that on or before April 24, 2015, Services and its subsidiaries contributed parts of their telecommunications network to CSL and its subsidiaries; and otherwise denies the allegations contained in Paragraph 43.

44.     Services admits the allegations contained in Paragraph 44.

45.     Services states that, to the extent Paragraph 45 asserts a legal conclusion, no response is required; denies sufficient knowledge and information to form a belief as the truth of the allegations in Paragraph 45; and refers the Court to the documents referenced in Paragraph 45 for their content.

**(2)     The spin-off**

46.     Services admits the allegations contained in Paragraph 46.

### (3)    The lease

47.    Services admits CSL signed the Master Lease with Holdings; and refers the Court to the Master Lease for its content.

48.    Services refers the Court to the Master Lease for its content.

49.    Services refers the Court to the Master Lease for its content.

50.    Services refers the Court to the Master Lease for its content.

51.    Services refers the Court to the Master Lease for its content; states that, to the extent Paragraph 51 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 51.

52.    Services admits that its subsidiaries hold federal and state authorizations to offer telecommunication services to customers; and otherwise denies the allegations contained in Paragraph 52.

53.    Services refers the Court to the Master Lease for its content; states that, to the extent Paragraph 53 asserts a legal conclusion, no response is required; and denies the allegations contained in Paragraph 53.

54.    Services admits that its subsidiaries obtained approval for the transfer of assets to CSL from utilities regulators in numerous states; refers the court to the written applications referenced in Paragraph 54 for their content; and otherwise denies the allegations contained in Paragraph 54.

55.    Services admits that Holdings makes payments to CSL; refers the Court to the financial statements referenced in Paragraph 55 for their content; and otherwise denies the allegations contained in Paragraph 55.

56. Services admits that a default would occur under the Master Lease if rent was not paid to CSL; refers the Court to the financial statements referenced in Paragraph 56 for their content; and otherwise denies the allegations contained in Paragraph 56.

57. Services refers the Court to the presentation referenced in Paragraph 57 for its content; and otherwise denies the allegations contained in Paragraph 57.

58. Services states that, to the extent Paragraph 58 assets a legal conclusion, no response is required; refers the Court to the federal law reference in Paragraph 58 for its content; refers the Court to the sworn testimony referenced in Paragraph 58 for its content; and otherwise denies the allegations contained in Paragraph 58.

59. Services admits that certain of its subsidiaries use the property leased by Holdings to provide telecommunications services to customers; and otherwise denies the allegations contained in Paragraph 59.

60. Services admits that certain of its subsidiaries grant access to the property leased by Holdings in exchange for consideration pursuant to industry standard arrangements and agreements; refers the Court to the referenced agreements for their contents; refers the Court to the Master Lease for its content; refers the Court to the federal and state laws referenced in Paragraph 60; refers the Court to the publicly filed tariffs referenced in Paragraph 60; and otherwise denies the allegations contained in Paragraph 60.

61. Services admits that Services, and certain of its subsidiaries, maintain the property leased by Holdings; and otherwise denies the allegations contained in Paragraph 61.

62. Services refers the Court to the Master Lease and the financial report referenced in Paragraph 62 for their contents.

63.     Services admits that it has made distributions to its sole equity holder, Holdings, and Holdings has made payments to CSL; and otherwise denies the allegations contained in Paragraph 63.

64.     Services refers the Court to the financial documents referenced in Paragraph 64 for their contents.

**C.     The Transferor Subsidiaries Entered into a Sale and Leaseback Transaction as Defined in the Indenture.**

65.     Services states that, to the extent that Paragraph 65 asserts a legal conclusion, no response is required.

66.     Services refers the Court to the Indenture for its content; and states that, to the extent that Paragraph 66 asserts a legal conclusion, no response is required.

67.     Services refers the Court to the Indenture for its content; and states that, to the extent that Paragraph 67 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 67.

68.     Services refers the Court to the Indenture, Master Lease, and the subleases referenced in Paragraph 68 for their contents; states that, to the extent that Paragraph 68 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 68.

**D.     The CSL Sale and Leaseback Violated Section 4.19(i).**

69.     Services refers the Court to the Indenture for its content; states that, to the extent that Paragraph 69 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 69.

**(1)     The CSL Sale and Leaseback Violated Indenture Section 4.19(i)(A)**

70.     Services refers the Court to the Indenture for its content; states that, to the extent that Paragraph 70 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 70.

71.     Services refers the Court to the Indenture and the Master Lease for their contents; refers the Court to the financial statements referenced in Paragraph 71 for their content; states that, to the extent that Paragraph 71 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 71.

72.     Services states that, to the extent that Paragraph 72 asserts a legal conclusion, no response is required.

73.     Services states that, to the extent that Paragraph 73 asserts a legal conclusion, no response is required.

**(2)     The CSL Sale and Leaseback violated Indenture Section 4.19(i)(B)**

74.     Services states that, to the extent that Paragraph 74 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 74.

75.     Services states that, to the extent that Paragraph 75 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 75.

76.     Services states that, to the extent that Paragraph 76 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 76.

77.     Services states that, to the extent that Paragraph 77 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 77.

78. Services states that, to the extent that Paragraph 78 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 78.

79. Services states that, to the extent that Paragraph 79 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 79.

**E. The CSL Sale and Leaseback Violated Indenture Section 4.19(ii).**

80. Services refers the Court to the Indenture for its content; and otherwise denies the allegations contained in Paragraph 80.

81. Services admits that one element of the consideration for the transfer to CSL of certain assets was $1.035 billion in cash; refers the Court to the documents submitted to state regulatory authorities and the SEC referenced in Paragraph 81 for their contents; and otherwise denies the allegations contained in Paragraph 81.

82. Services states that, to the extent that Paragraph 82 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 82.

**F. The Company Also Violated Indenture Section 4.19(iii)
in connection with the CSL Sale and Leaseback.**

83. Services refers the Court to the Indenture for its content; and otherwise denies the allegations contained in Paragraph 83.

84. Services refers the Court to the Indenture for its content; and otherwise denies the allegations contained in Paragraph 83.

85. Services denies it is in violation of Section 4.19(iii); admits it redeemed the Company's outstanding 8.125% senior unsecured notes due 2018 in an aggregate principal amount of $400 million; states that, to the extent that Paragraph 85 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 85.

34

86.     Services states that, to the extent that Paragraph 86 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 86.

**G.     The Company Has Made Restricted Payments While in Default of Indenture Sections 4.19, Thus Violating Indenture Section 4.07(a)(A) as Well.**

87.     Services refers the Court to the Indenture for its content; and otherwise denies the allegations contained in Paragraph 87.

88.     Services denies the allegations contained in Paragraph 88.

89.     Services admits that it has made distributions to Holdings in each quarter from second quarter of 2015 through the second quarter of 2017; and otherwise denies the allegations contained in Paragraph 89.

90.     Services denies the allegations contained in Paragraph 90.

**H.     The Default Notice**

91.     Services refers the Court to the Indenture for its content; and otherwise denies the allegations contained in Paragraph 91.

92.     Services denies sufficient knowledge and information to form a belief as the truth of the allegations in Paragraph 92.

93.     Services refers the Court to the Indenture and the Notes for their contents; and otherwise denies the allegations contained in Paragraph 93.

94.     Services refers the Court to the Indenture for its content.

95.     Services refers to the Court to the letters referenced in Paragraph 95 for their contents.

96.     Services refers the Court to the letter and Form 8-K referenced in Paragraph 96 for their contents.

**CLAIM FOR RELIEF**

**(Declaratory Judgment -- 28 U.S.C. § 2201)**

97.     Services realleges its responses to Paragraphs 1 through 96 herein.

98.     Services states that, to the extent that Paragraph 98 asserts a legal conclusion, no response is required.

99.     Services states that, to the extent that Paragraph 99 asserts a legal conclusion, no response is required; and otherwise denies the allegations contained in Paragraph 99.

**PRAYER FOR RELIEF**

Services denies the allegations in the "Prayer for Relief" section, and avers that Trustee is entitled to no relief whatsoever.

**AFFIRMATIVE DEFENSES**

**FIRST AFFIRMATIVE DEFENSE**

The Complaint fails to state a claim upon which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE**

The Complaint is barred by the equitable doctrines of unclean hands, estoppel, laches, ratification and waiver.

**RESERVATION OF ADDITIONAL AFFIRMATIVE DEFENSES**

Services gives notice that it intends to rely on any affirmative defense that are now or may become available in this action, through discovery or otherwise, and reserves its right to amend this Answer to assert any such defenses.

Dated: October 13, 2017
New York, New York

/s/ Aaron H. Marks

AARON H. MARKS
JOSHUA M. GREENBLATT
STEPHEN E. HESSLER, P.C.

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:      aaron.marks@kirkland.com
            joshua.greenblatt@kirkland.com
            stephen.hessler@kirkland.com

- and -

James H.M. Sprayregen, P.C.
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:      james.sprayregen@kirkland.com

*Counsel to Defendant and Counterclaim-Plaintiff*
*Windstream Services, LLC*

## VERIFICATION

I, Bob Gunderman, declare as follows:

I am the Chief Financial Officer of Windstream Services, LLC ("Services"), the defendant and counterclaim plaintiff in this action, and I am authorized to make this declaration on behalf of Services. I have read and know the contents of the foregoing Verified Counterclaims, which were prepared by counsel for Services. I have relied on the advice of counsel and the information contained in the Verified Counterclaims is true and correct to the best of my present knowledge, information and belief. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Little Rock, Arkansas
       October 13, 2017

Bob Gunderman

Sworn to before me on
this 13th day of October, 2017

Notary Public

COMM. EXP.
11-5-2021
No. 12312345
PULASKI
COUNTY
NOTARY PUBLIC - ARKANSAS
JENNIFER LEE DAVIS