# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

Aaron H. Marks
To Call Writer Directly:
(212) 446-4856
aaron.marks@kirkland.com

601 Lexington Avenue
New York, NY 10022

(212) 446-4800

www.kirkland.com

Facsimile:
(212) 446-4900

October 20, 2017

**VIA ECF**

The Honorable Jesse M. Furman
United States District Court
Southern District of New York
40 Centre Street, Room 2202
New York, New York 10007

Re:  *U.S. Bank National Association v. Windstream Services, LLC*,
17-CV-07857 (S.D.N.Y.)

Dear Judge Furman:

We represent defendant and counterclaim-plaintiff Windstream Services, LLC ("Services" or the "Company") and write pursuant to Your Honor's direction to provide support for the Court's authority to stay the cure period consistent with the expedited discovery schedule contemplated in this action. We also write to apprise the Court of a development -- the launching of debt exchange offers and consent solicitations late in the evening on October 18 -- that potentially could have an impact on this case.

**I.      A Stay Of The Cure Period Is Necessary And Appropriate**

In compliance with Your Honor's direction during the October 18 conference (the "October 18 Conference") in this matter, Services has since provided plaintiff and counterclaim-defendant U.S. Bank National Association ("US Bank NA") with various requested written representations to make clear various undisputed factual matters here, and Services has also begun to produce on a rolling basis various categories of requested documents. Services has further offered tentative dates for certain of the Company's executives to be deposed during the week of October 30. As of this writing, Services anticipates -- notwithstanding its view that virtually all of this discovery is unnecessary, as there are no material issues of fact in dispute here -- that discovery will be completed by November 3, per the tentative expedited schedule that Your Honor laid out during the October 18 Conference.

As the Court recognized during the conference, however, in order for the tentative expedited schedule to be of utility in resolving this case, the Court must also order a stay of the

## KIRKLAND & ELLIS LLP

Hon. Jesse M. Furman
October 20, 2017
Page 2

cure period until after the Court is able to finally adjudicate the dispute (following the anticipated December 5 trial). As discussed below, the law is clear that the Court is empowered to order such a stay of the cure period, and further, it is plainly appropriate to do so here.

The Court indisputably has the authority to stay the cure period pending discovery and an adjudication on the merits. Indeed, the Second Circuit unequivocally held in *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 891 (2d Cir. 1990), where "discovery is warranted, the court should exercise its inherent power to limit and expedite it . . . [and] may, in order to protect both the right of the lender to obtain admissible evidence of default and the right of the borrower to use the full cure period to secure an adjudication, ***stay the running of the cure period for such time as the lender needs for discovery***." *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 891 (2d Cir. 1990) (emphasis added). *Met Life* remains good law and there is no reason why a stay of the cure period should not be ordered here.[1]

And, contrary to the arguments made by counsel to US Bank NA during the October 18 Conference, there is no requirement in *Met Life* that the Court conduct a preliminary injunction analysis in order to grant a stay of the cure period. In fact, the overriding premise of the *Met Life* decision is that a preliminary injunction was not appropriate in that case. There is no mention of injunction analysis when the Second Circuit gives guidance on staying the cure period to facilitate a lender's discovery. *Id.*

In any event, it is very clear that a stay of the cure period is necessary here. To the extent a decision on the merits will not be rendered before November 20, a stay of the cure period is required to prevent real and imminent irreparable harm to the Company. For instance, even if neither US Bank NA nor counterclaim-defendant Aurelius Capital Master, Ltd. ("Aurelius," and together with US Bank NA, the "Counterclaim-Defendants") serves a notice of acceleration, the purported Notice of Default ripens into an Event of Default under the indenture at issue, which will cause an event of default under the Company's senior credit agreement, which includes a revolving credit facility that is a primary source of liquidity for the Company. An Event of Default under the indenture at issue will also constitute an automatic event of default under the Master Lease. Moreover, without a stay of the cure period, the Company will be on the precipice of bankruptcy with its fate in the hands of Aurelius -- an activist and opportunistic hedge fund that

---

[1] In *Met Life*, the Second Circuit offered guidance on what it means for expedited discovery -- such as that sought by US Bank NA here -- to be "warranted": "We can envision scenarios in which the lender would have no real need for discovery, as when the facts and events are stipulated and the only question is whether those events constitute a default within the meaning of the indenture, or where the notice of default has no plausible basis. In such instances, the district court may simply deny the discovery request." *Id.* That the discovery being conducted by the Counterclaim-Defendants will likely prove to be unwarranted is all the more reason for the Court to stay the cure period here.

# KIRKLAND & ELLIS LLP

Hon. Jesse M. Furman
October 20, 2017
Page 3

belatedly forced the Company into this situation based on its credit default swap gamble. And, the Company would lose access to its revolving credit facility, the ability of the Company to access the capital markets would be significantly restricted, if not shut off, and the Company's ability to continue to do business with vendors will be subject to severe risk.

Lastly, the necessity for expedited proceedings here is a situation entirely created by Counterclaim-Defendants. If they had been acting in good faith, rather than rush to issue a Notice of Default and now try to avoid a timely disposition of the matter they have raised, Counterclaim-Defendants would have instead fully investigated the matter by gathering relevant facts and asking the Company for pertinent information before issuing a Notice of Default. In pursuit of winning Aurelius's credit default swap wager, they created exigent circumstances for the Company and its stakeholders by issuing the purported Notice of Default without warning. Now that Services has sought a final adjudication on the merits before the expiration of the cure period, Counterclaim-Defendants are attempting to expire the cure period by seeking unduly broad discovery. The Court should follow the Second Circuit's guidance and use its inherent powers to stay the cure period pending this discovery and an adjudication on the merits.[2]

Accordingly, Services hereby respectfully requests that the Court enter the expedited discovery and trial schedule referenced during the October 18 Conference, and stay the cure period until after the final disposition of this matter.

## II. The Debt Exchange Offers and Consent Solicitations

Late on October 18, several hours after the October 18 Conference ended, the Company launched debt exchange offers and consent solicitations with respect to its senior notes, including the notes at issue in this case (the "Exchange Transactions"). The undersigned did not inform the Court of the potential launch of the Exchange Transactions during the October 18 Conference because the launch was not certain to go forward and the possibility of the launch constituted material non-public information.

---

[2] And, notwithstanding US Bank NA's counsel's disingenuous comments to the contrary, the Company has been diligently pursuing an adjudication of the fallacious Notice of Default for the past four weeks, commencing with the filing of an action for expedited relief in Delaware Chancery Court on September 29. Counterclaim-Defendants, to the contrary, have been, and will continue to be, doing all they can to try to run out the clock before there is a decision on the merits.

## KIRKLAND & ELLIS LLP

Hon. Jesse M. Furman
October 20, 2017
Page 4

The Exchange Transactions include the following:

- Offers to exchange the Company's existing senior notes due 2022 and 2023 for new 6 3/8% senior notes due 2023 (the "6 3/8% Notes") to be issued by the Company.[3]

- An offer to exchange the Company's existing senior notes due 2021 for new senior secured notes due 2025 and/or new 6 3/8% Notes, in each case to be issued by the Company.

- An offer to exchange the Company's existing senior notes due 2020 for new senior secured notes due 2025 to be issued by the Company.

The Exchange Transactions also involve the solicitation of consents from all holders of the Company's senior notes to waivers and amendments relating to potential or alleged defaults with respect to the transaction before this Court -- the spin-off of Uniti Group, Inc. (the "Spin-Off"). The consents would waive the defaults alleged in the Notice of Default. If the consent solicitations are successful, holders who deliver valid consents will receive a consent fee of $2.50 per $1,000 principal amount of notes.[4] The consent solicitations require consent from holders representing at least a majority of the outstanding principal amount of each series of the Company's senior notes. In the case of the consent solicitation relating to the 6 3/8% Notes, holders receiving 6 3/8% Notes in the exchange offers described above will also have the opportunity to deliver consents in the consent solicitation relating to the 6 3/8% Notes (Aurelius is a holder of 6 3/8% Notes). Also, any 6 3/8% Notes issued in the exchange offers before the expiration of the consent solicitation will be included in both the numerator and denominator of outstanding notes when determining whether the requisite consents have been received, as required by the indenture at issue.

The Company believes the Exchange Transactions, if successful, will provide significant benefits to the Company and its investors, including its noteholders.[5] First, the exchange offers will extend the Company's debt maturity profile and enhance its liquidity position over the coming years. The Company does not intend to allow Aurelius's actions to prevent it from undertaking prudent capital management and liquidity transactions in accordance with the terms of its

---

[3] The 6 3/8% Notes to be issued in the exchange offers will be notes of the same series as the notes at issue in this case and will be issued under the same indenture.

[4] In order to incentivize holders of the 6 3/8% Notes to deliver consents, holders of such notes will receive $2.50 per $1,000 principal amount of notes if they deliver valid consents before October 24, 2017. Holders will receive $2.00 if they deliver valid consents after this date.

[5] The consummation of each Exchange Transaction is subject to certain conditions and there can be no assurance any or all of the transactions will be consummated.

## KIRKLAND & ELLIS LLP

Hon. Jesse M. Furman
October 20, 2017
Page 5

indentures and other debt agreements. In addition, while the Company is vigorously defending the defaults alleged in this case and denies that any default has occurred in connection with the Spin-Off, it believes it is prudent and appropriate for the Company to seek consents from its noteholders in accordance with the terms of its indentures to proactively address Aurelius's allegations and to avoid the potentiality of bankruptcy that Aurelius seeks to foist upon the Company and its stakeholders.

Holders' participation in each Exchange Transaction is entirely voluntary and the transactions are being undertaken in compliance with the applicable requirements of the Company's indentures and other debt agreements. The Company believes the opportunistic actions of Aurelius are and, until resolution of the dispute before this Court, will be detrimental to the Company and its investors, including noteholders other than Aurelius. The Exchange Transactions give the Company's noteholders the opportunity to waive Aurelius's allegations quickly and without use of this Court's time and resources, while also improving the Company's capital structure and liquidity.

If successful, the Exchange Transactions could obviate the need for this litigation. That said, the parties will likely not know whether the Exchange Transactions have been successful until early November. In the interim, unless the Counterclaim-Defendants are agreeable to tolling the cure period and staying this litigation while the Exchange Transactions proceed, it remains necessary for the parties to continue to pursue the contemplated expedited discovery and trial schedule, and for the Court to order the cure period stayed until final adjudication.

Respectfully submitted,

/s/ *Aaron H. Marks*

Aaron H. Marks

cc:    All Counsel of Record (via ECF)