AARON H. MARKS
JOSHUA M. GREENBLATT
STEPHEN E. HESSLER, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Attorneys for Windstream Services, LLC

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, solely in its capacity as indenture trustee of Windstream Services, LLC's 6 3/8% Senior Notes due 2023, | Case No.: 1:17-cv-07857 (JMF) |
|             Plaintiff and             Counterclaim-Defendant, | |
|    - against - | |
| WINDSTREAM SERVICES, LLC, | |
|             Defendant, Counterclaim-Plaintiff and             Counterclaim-Defendant, | |
|    - against - | |
| AURELIUS CAPITAL MASTER, LTD. | |
|             Counterclaim-Defendant and Counterclaim-Plaintiff. | |

**<u>VERIFIED AMENDED COUNTERCLAIMS</u>**

Defendant, Counterclaim-Plaintiff and Counterclaim-Defendant Windstream Services,

LLC ("Services" or the "Company"), by and through its undersigned counsel, for its Amended

Counterclaims against Plaintiff and Counterclaim-Defendant U.S. Bank National Association

("US Bank" or the "Trustee") and Counterclaim-Defendant and Counterclaim-Plaintiff Aurelius

Capital Master, Ltd. ("Aurelius"), alleges as follows:[1]

## PRELIMINARY STATEMENT

1.    On September 29, 2017, Services initiated an action against US Bank in Delaware

Chancery Court (*Windstream Services, LLC v. U.S. Bank National Association*, C.A. No. 2017-

0693 (Del. Ch.)) (the "Delaware Action").  The Delaware Action involved the same facts and

circumstances as the claims in this action, and Services sought the same relief in the Delaware

Action that it seeks here -- a declaration that Aurelius's attempt to manufacture an Event of

Default, and to roil the Company, is baseless and meritless.  As pure gamesmanship, US Bank

(directed by Aurelius) moved to dismiss the Delaware Action based on a purported lack of

personal jurisdiction, and then brought this action, which is simply a mirror image of the claims

asserted by Services in the Delaware Action.

2.    Services is not interested in games, but rather in bringing a swift end to the

exploitative efforts to destroy Services' business.  Accordingly, Services, simultaneous with the

assertion of its counterclaims here, dismissed the Delaware Action, and sought expedited relief

from this Court to prevent US Bank and Aurelius from improperly declaring an Event of Default

---

[1]    Services filed these Amended Counterclaims as part of an exhibit (Dkt. 67-4) to its motion
for leave to amend its answer (Dkt. 65).  Out of an abundance of caution, Services is filing
the Amended Counterclaims as a standalone document to ensure that it is filed on the docket
within the time permitted by Federal Rule of Civil Procedure 15(a)(1)(B).

and causing immediate and irreparable harm to the Company and all of its stakeholders. However, the need for expedited relief, as discussed below, terminated as of November 7, 2017, when waivers of the purported Default became effective.

3.      Services must now address US Bank's disregard of the will of the majority of noteholders and its breach of the Indenture.  On October 18, in order to proactively seek resolution of the issues involved in this litigation and to counteract Aurelius's specious allegations (and to extend the Company's debt maturity profile), Services launched two separate, yet related transactions, debt exchanges (the "Exchange Offer") and consent solicitations (the "Consent Solicitations") with respect to the Company's senior notes, including the 6 3/8% senior notes due 2023 (the "6 3/8% Notes" or the "Notes") that are the subject of this matter.  Each Consent Solicitation with respect to a series of notes required consent from holders representing at least a majority of the outstanding principal amount of that series, and once effective, would waive the Default alleged in the purported notice of default issued by Aurelius on September 21. On October 31, the Company learned that based on tenders of notes in the Exchange Offers and consents delivered in the Consent Solicitation for the Notes, upon early settlement of the Exchange Offers, holders representing the requisite percentage of the Notes needed to waive the defaults alleged in the purported notice of default would deliver consents.  And, following the successful Exchange Offers and Consent Solicitation for the Notes, US Bank, as Trustee, on November 6, authenticated and issued the New Notes, and Services and US Bank executed the third supplemental indenture (the "Supplemental Indenture"), which gave effect to the waivers and consents for the 6 3/8% Notes and is binding on all noteholders.

4.    As a direct consequence of the waivers and execution of the Supplemental Indenture, US Bank's claims here are mooted, and as Trustee, US Bank no longer has standing to assert claims that were unequivocally waived by the Supplemental Indenture.  Nonetheless, US Bank is willfully breaching the Indenture and Supplemental Indenture by continuing to prosecute this action.  As such, US Bank's claims must be dismissed and US Bank must now be liable for damages that flow from its breach of the Indenture.

5.    US Bank originally brought this action at the direction of noteholder Aurelius, which purported to be a holder of more than 25% of the Notes.  With the advent of the waivers and execution of the Supplemental Indenture, Aurelius's direction is now void and the alleged Default is now, per the Supplemental Indenture executed by US Bank, deemed to be non-existent.  Yet, US Bank refuses to dismiss its claim for which it has no contractual authority to maintain.  US Bank is accordingly in stark breach of its obligations under the Indenture.

6.    Both US Bank and Aurelius were well aware that US Bank's claims would be mooted, and US Bank would no longer have standing to bring its claims, well before the Supplemental Indenture was executed and the waivers became effective.  Rather than come into court and seek injunctive relief, which it had ample opportunity to pursue, Aurelius instead disseminated false letters to other noteholders in an effort to dissuade them from consenting to the Default waivers.  This effort by Aurelius failed and it lost the vote.  Yet, nevertheless, US Bank continues to follow Aurelius's instruction and has refused Services' demand that it dismiss its claims.

## NATURE OF THE COUNTERCLAIMS

7.      This matter arises due to the opportunistic and improper actions of an activist hedge fund, Aurelius, which purported to call a default *more than two years after the transactions* related to Services' spin-off in April 2015 of approximately 80% of the then-outstanding common stock of Uniti Group Inc. ("Uniti"[2], and collectively the "Spin-Off").  In the 29 months following those transactions, the Company never received any suggestion that the Spin-Off caused the Company to be in default of any provision of the Indenture.  But now, years after the Spin-Off, Aurelius has acquired a position in the Company's 6 3/8% Notes, and alleges that the Company has been in default of the Indenture since April 2015.  Upon information and belief, Aurelius acquired its position in the 6 3/8% Notes for the sole purpose of seeking to manufacture this alleged default, and declare that a credit event has occurred or is occurring, in order to collect a credit default swap payoff.[3]  Contrary to Aurelius's assertions, the Company is in compliance with the provisions of the Indenture.

8.      Services faced imminent, irreparable harm because Aurelius sent a letter dated September 21, 2017 (the "Letter" or the "September 21, 2017 Letter"), which purported to constitute a written notice of default.  Under the Indenture, a notice of default would trigger a 60-day grace or cure period after which the Trustee or holders of at least 25% in aggregate

---

[2]   Communications Sales & Leasing, Inc. changed its name to Uniti Group Inc. in 2016 and is referred to in this Complaint for convenience as "Uniti".  Uniti is a publicly-traded REIT.

[3]   There are numerous rumors circulating in the debt markets regarding various positions that Aurelius has taken regarding the Company's debt, the equity of Windstream Holdings, Inc., the publicly-traded parent company of Services, and even the debt and equity of Uniti. While the Company cannot yet confirm all positions Aurelius may hold, suffice to say that Aurelius appears to be actively manipulating this situation and impacting debt and equity prices to the detriment of Windstream.

principal amount of outstanding 6 3/8% Notes could declare the principal amount of all outstanding 6 3/8% Notes to be immediately due and payable.

9.     Because Services has issued approximately $3 billion outstanding in bonds under the Indenture and other indentures with covenants identical in all material respects to the provisions of the Indenture allegedly violated, an Event of Default (as defined in the Indenture) and any acceleration of debt would threaten the very existence of the Company.  An Event of Default and acceleration of debt would likely force the Company into bankruptcy, resulting in harm both to the customers receiving necessary communications services from the Company and its subsidiaries and to the Company's approximately 13,000 employees.  An Event of Default and any acceleration of debt would further irreparably harm the Company by, among other things, preventing the Company from accessing the capital markets, increasing the Company's borrowing costs, damaging the Company's relationships with vendors, bondholders, and other lenders, damaging the Company's credibility with customers, and impeding the Company's ability to run its business in the ordinary course and implement its strategic business plans.

10.    Upon information and belief, Aurelius had bought 6 3/8% Notes to become a beneficial holder of more than 25% in aggregate principal amount of outstanding 6 3/8% Notes. These acquisitions were undertaken by Aurelius for a single purpose:  to profit under a series of credit default swaps Aurelius has also purchased to bet on the Company defaulting under the Indenture.  Even after numerous public filings and the publication of various materials before and since the completion of the Spin-Off, no holder of the 6 3/8% Notes had ever suggested a default for any reason from the time of the Spin-Off until Aurelius sent the Letter.

11.     Aurelius's September 21 Letter centers on Section 4.19 of the Indenture, which governs whether and when the Company may enter into a "Sale and Leaseback Transaction" (as defined in the Indenture).  Aurelius claims that in conjunction with the Spin-Off, some of the Company's Restricted Subsidiaries (as defined in the Indenture) "transferred certain of their assets and then or thereafter leased those assets (or some part thereof)."  This allegedly constitutes "a Sale and Leaseback Transaction on the part of the Restricted Subsidiaries."  Aurelius then asserts that the Sale and Leaseback Transaction failed to comply with the requirements of Section 4.19 of the Indenture.

12.     The purported notice of default in the September 21 Letter is defective for a variety of reasons.  First and foremost, the Spin-Off was not a Sale and Leaseback Transaction as defined by the Indenture.  In contemporaneous transactions, Services and its Restricted Subsidiaries transferred the assets in question to Uniti, distributed approximately 80% of the then outstanding common stock of Uniti to Services' sole equity owner and parent company, Windstream Holdings, Inc. ("Holdings"), and Holdings then distributed the Uniti common stock to its stockholders on a pro rata basis.  Each of these transactions was in full compliance with the Indenture.

13.     Following these transactions, *Holdings -- not Services or its Restricted Subsidiaries* -- leased the relevant assets from Uniti.  Such an arrangement does not constitute a "Sale and Leaseback Transaction" under the Indenture because the entity that made the transfer (Services or a Restricted Subsidiary of Services) and the entity that leased the relevant assets (Holdings) are different entities.  Indeed, Holdings is not subject to the covenants of the

Indenture.  Therefore, the transactions do not even implicate, let alone breach, Section 4.19 of

the Indenture.

14.     The Indenture is a carefully negotiated document between sophisticated parties

represented by experienced counsel, and the Indenture includes a precise definition of what

constitutes a Sale and Leaseback Transaction:

> with respect to any Person, any transaction involving any of the assets or properties of
> such Person whether now owned or hereafter acquired, whereby such Person sells or
> otherwise transfers such assets or properties and then or thereafter leases such assets
> or properties or any part thereof or any other assets or properties which such Person
> intends to use for substantially the same purpose or purposes as the assets or
> properties sold or transferred.

15.     Person is defined in the Indenture as "any individual, corporation, partnership,

joint venture, association, joint-stock company, trust, unincorporated, organization, limited

liability company or government or other entity."

16.     Critically, the definition of Person does not include parents, subsidiaries,

affiliates, or any entities beyond the defined Person.  In other words, under the Indenture,

Services is one Person, each of the Restricted Subsidiaries of Services is a different Person, and

Holdings is yet another Person.  To implicate Section 4.19, a Sale and Lease Transaction must

occur which requires that one Person transfer assets and that *same* Person lease assets back.

Here, however, Services and its Restricted Subsidiaries transferred assets to Uniti.  Holdings, a

different Person from either Services or any of the Restricted Subsidiaries of Services, then

leased assets from Uniti.  That is not a "Sale and Leaseback Transaction" under the Indenture.

Thus, Section 4.19 is not relevant.

17.     Services' corporate structure and the transaction undertaken in connection with

the Spin-Off are common practice, particularly for corporations that are publicly-held and active

8

in debt and equity markets.  The negotiation of the Indenture involved parties experienced in the creation and structure of bond offerings, and each party was represented by sophisticated counsel.  The parties did not bargain to prohibit the transaction at issue here -- if they had, the Indenture would have plainly prevented it.  Instead, US Bank needed to file a 40-page Complaint to explain its convoluted arguments as to why this structure should be considered prohibited under the Indenture.

18.     Aurelius admits in the Letter that Services is not a signatory to the publicly-filed Master Lease dated April 24, 2015 (the "Master Lease") (Ex. B at p. 2, n. 1.), which governs the lease of the assets at issue.  The Master Lease was between Holdings and certain subsidiaries of Uniti.  Whether Services and its subsidiaries use the relevant assets is immaterial -- none of them "lease" those assets.  In addition, there is no "sub-lease" between Holdings and Services or any of its Restricted Subsidiaries.  Had the parties wished for the Sale and Leaseback Transaction definition to include the structure in place, they could have easily done so.  For example, the Indenture could have prohibited Services and its Restricted Subsidiaries from leasing "directly or indirectly" (a formulation they used in other contexts in the Indenture), or prohibited corporate affiliates from entering into prohibited transactions (a concept used in other contexts in the Indenture).  But the parties -- after thoroughly negotiating the Indenture while represented by experienced counsel -- did not do either.

19.     Aurelius also wrongly alleges that the Company has violated Section 4.07 of the Indenture in two ways.  First, Aurelius alleges that the Company failed to deliver to the Trustee an Officers' Certificate in association with certain Restricted Payments (as defined in the Indenture) as required by Section 4.07(c) of the Indenture.  The Company delivered all required

Officers' Certificates to the Trustee, and the claim in the Letter is simply wrong. Second, Aurelius argues that the Company violated Section 4.07(a)(A), which prohibits the making of a Restricted Payment during the pendency of a Default (as defined in the Indenture). However, the only alleged defaults are the purported Defaults of Sections 4.19 and 4.07 already discussed (which are not actually defaults). Thus, the Company was not in Default at the time it made any Restricted Payments and has not violated Section 4.07(a)(A).

20.     While the assertions of purported fact in the Letter are baseless, the Letter nonetheless threatened Services with imminent, irreparable harm. That is because the Letter purported to constitute a written notice of default under Section 6.01(a)(v) of the Indenture, which would trigger a 60-day grace, or cure, period. The Company could not "cure" the alleged default claimed by Aurelius, as it would apparently have had to unwind the over two-year old Spin-Off to do so. Thus, at the end of the grace period, there was a distinct risk that the Trustee or holders of at least 25% in aggregate principal amount of outstanding 6 3/8% Notes could declare the principal amount of all outstanding 6 3/8% Notes to be immediately due and payable. Moreover, all of Services' other indentures contain covenants identical in all material respects to Section 4.19 of the Indenture, and thus, Services has approximately $3 billion in bonds subject to the language that Aurelius claims was breached. The uncertainty created by the Letter's incorrect assertions could have impacted all of the Company's bond debt, as an Event of Default under the Indenture and any acceleration of the 6 3/8% Notes by the Trustee or holders of 25% in aggregate principal amount of outstanding 6 3/8% Notes would presumably constitute an event of default under its other indentures.

21.     Moreover, should an Event of Default occur under the Indenture, such Event of Default could also lead to an event of default under the Company's credit facility and the Master Lease.

22.     An Event of Default, any cross default, or any acceleration of debt would threaten the very existence of Services by likely forcing the Company into bankruptcy and have a drastic negative impact on thousands of customers as well as the Company's approximately 13,000 employees.  Additionally, even the threat of an Event of Default, associated cross defaults and acceleration of debt irreparably harms the Company by, among other things, reducing the Company's access to the capital markets in order to potentially address any attempted debt acceleration, increasing the Company's borrowing costs, damaging the Company's relationships with its vendors, bondholders and other lenders, harming Holdings' equity value, and impeding the Company's ability to run its business in the ordinary course and implement its strategic business plans.

23.     Aurelius waited over two years after the Spin-Off to manufacture alleged defaults. Aurelius now wields these erroneous assertions in an effort to extort value through simultaneously purchasing credit default swaps to cash in on the very default it is attempting to manufacture.  These actions have significant consequences to Services.  Services is a large telecommunications company providing approximately 13,000 jobs across the country and supplying crucial communications services to over 1.5 million consumer and small business customers and approximately 35,000 enterprise business customers.  The near-term acceleration of all of the Company's debt would present massive challenges to the business and its employees.

24.     In order to proactively seek resolution of the issues involved in this litigation and to counteract Aurelius's specious allegations, on October 18, Services launched two transactions -- the Exchange Offers and Consent Solicitations.

25.     Each Consent Solicitation with respect to a series of notes required consent from holders representing at least a majority of the outstanding principal amount of that series, and once effective, would waive the defaults alleged in the September 21 Letter issued by Aurelius.

26.     On October 31, 2017, the Company learned that based on tenders of notes in the Exchange Offers and consents delivered in the Consent Solicitation for the Notes, upon early settlement of the Exchange Offers, holders representing the requisite percentage of the Notes needed to waive the defaults alleged in the purported notice of default alleged in the September 21 Letter would deliver consents.  In fact, holders of approximately 61.35% of the Notes (including New Notes to be issued in the Exchange Offers) delivered consents in the Consent Solicitation relating to such Notes.

27.     On November 6, 2017, US Bank, as Trustee, authenticated and issued the New Notes.  That same day, Services and US Bank executed the Supplemental Indenture, which gave effect to the waivers and consents for the 6 3/8% Notes and is binding on all noteholders.

28.     Despite authenticating and issuing the New Notes and executing the Supplemental Indenture -- which explicitly waives any supposed default related to the allegations in the September 21, 2017 Letter -- US Bank continues to prosecute this action in clear contravention of its duties as Trustee and in blatant violation of the Indenture and Supplemental Indenture.  On November 9, Services requested in a letter to US Bank that it dismiss its claims in this Action.  US Bank has refused that request.

12

## JURISDICTION AND VENUE

29.    This Court has subject matter jurisdiction over the claims asserted in this Complaint pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds $75,000 and there is no question there is complete diversity of citizenship.  This action is brought by Defendant and Counterclaim-Plaintiff Services, which is incorporated in Delaware and has a principal place of business in Arkansas, against Counterclaim-Defendants U.S. Bank, which is a national bank with principal executive offices in Ohio and a principal place of business in Minnesota, and Aurelius, which is an exempted company with limited liability in the Cayman Islands.

30.    Venue and jurisdiction are proper in the Southern District of New York because a substantial portion of the events or omissions giving rise to the claims occurred in this District. In the Indenture, U.S. Bank submitted to the jurisdiction of this Court and waived any objection to venue in this Court for any legal suit, action or proceeding arising out of or based on the Indenture or the transactions contemplated in the Indenture.  Moreover, the claims in this lawsuit arise from the September 21 Letter that Aurelius sent to Services in New York.  Through the Letter, Aurelius seeks the benefit of the laws of the State of New York, which governs the Indenture and the 6 3/8% Notes.  In particular, Aurelius alleges violations of the Indenture, which was entered among other things for the benefit of the noteholders.  The Indenture provides that any legal suit, action or proceeding arising out of or based on the Indenture or the transactions contemplated in the Indenture may be instituted in this Court and the parties to the Indenture submitted to the jurisdiction of this Court and waived any objection to venue in this Court.

13

## THE PARTIES

31.     Defendant and Counterclaim-Plaintiff Services is a limited liability company organized under the laws of the State of Delaware with its headquarters at 4001 Rodney Parham Road, Little Rock, Arkansas 72212.

32.     Upon information and belief, US Bank is a banking corporation and national association organized under the laws of the United States, with its principal executive offices located at 425 Walnut Street, Cincinnati, Ohio 45202 and principal place of business in Minneapolis, Minnesota.

33.     US Bank NA, as Trustee under the Indenture is charged with representing the interests of the holders of all 6 3/8% Notes issued and outstanding under the Indenture.  As a result, it is the proper party to give effect to the judgment of this Court and implement any action resulting therefrom.  Therefore, US Bank is a necessary party to the resolution of this action.

34.     Upon information and belief, Aurelius is an exempted company with limited liability in the Cayman Islands.  Upon information and belief, Aurelius is the beneficial holder of more than 25% of the outstanding 6 3/8% Notes under the Indenture.  Aurelius may be served with process by serving the New York Secretary of State as statutory agent at the New York Department of State's office at One Commerce Plaza, 99 Washington Avenue, Albany, NY 12231.  N.Y. Bus. Corp. Law § 307.  Aurelius is a required party to this action pursuant to Fed. R. Civ. P. 19(a).  Rule 19(a) defines "persons required to be joined if feasible" as any person who (i) is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction; (ii) claims an interest relating to the subject of the action; and (iii) is so situated that disposing of the action in the person's absence may "as a practical matter impair or

14

impede the person's ability to protect the interest" or "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1). Aurelius is subject to service and the Court will maintain subject-matter jurisdiction, as noted above. And, Aurelius obviously claims an interest that would be impeded by its absence -- it is the driving force behind US Bank NA's Complaint and this baseless attempt at manufacturing an Event of Default, as evidenced by the September 21, 2017 Letter.

## FACTUAL BACKGROUND

### I.   WINDSTREAM SERVICES, LLC'S BUSINESS

35.   Services is headquartered in Little Rock, Arkansas and provides, via its subsidiaries, communications and technology solutions across a range of services including cloud computing, integrated voice and data services, internet security services, and consumer video services. The Company also provides broadband, voice and video services to consumers primarily in rural markets. Services was formed in 2004, and previously operated as a corporation called Windstream Corporation.

36.   In August 2013, Windstream Corporation created a new holding company organization structure whereby Windstream Corporation became a wholly-owned subsidiary of Holdings.

37.   Holdings filed a current report on Form 8-K with the SEC announcing this new structure on August 30, 2013.

38.     Holdings is a publicly traded FORTUNE 500 company and a leading provider of advanced network communications and technology solutions for consumers, businesses, enterprise organizations and wholesale customers across the US.

39.     In 2015, Windstream Corporation converted to a limited liability company and changed its name to Windstream Services, LLC.

40.     Services currently maintains approximately 13,000 employees in the United States and Canada.

**II.     2015 SPIN-OFF**

41.     In March 2015, Holdings and Services entered into a Separation and Distribution Agreement with Uniti, pursuant to which, among other things, Services and certain of its Restricted Subsidiaries contributed to Uniti certain assets consisting of approximately 66,000 route miles of fiber optic cable lines, 235,000 route miles of copper cable lines, central office land and buildings, beneficial rights to permits, pole agreements and easements, and a small consumer competitive local exchange carrier business owned by Services.  The contribution of assets to Uniti by Services and its Restricted Subsidiaries was made in full compliance with the Indenture.

42.     Those assets were exchanged for (i) the issuance of Uniti common stock to Services, (ii) the transfer of approximately $1.035 billion in cash from Uniti to Services, and (iii) the transfer from Uniti to Services of approximately $2.5 billion of Uniti debt, consisting of term loans and secured and unsecured notes.

43.     Services then distributed no less than 80.4% of the outstanding shares in Uniti common stock to its sole equity owner and parent company, Holdings, and Services retained the

remaining shares of Uniti common stock.  Again, each transaction was completed in full compliance with the Indenture.

44.     Holdings, in turn, distributed no less than 80.4% of the outstanding shares of Uniti common stock pro rata to holders of Holdings common stock.  This distribution (along with the Services distribution to Holdings) constituted the "Spin-Off."

45.     Immediately after the Spin-Off, Holdings and Uniti entered into multiple agreements to implement portions of the Spin-Off and govern the relationship after the Spin-Off.

46.     One such agreement was the Master Lease by and among subsidiaries of Uniti on the one hand, and Holdings on the other hand.  Pursuant to the Master Lease, Holdings leased (and still leases) certain telecommunication network assets, including fiber and copper networks and other real estate, from the Uniti subsidiaries that are party to the Master Lease.

47.     Services is not a signatory to the Master Lease and has no obligation to make any payments or perform any obligations under Master Lease, including no obligation to fund Holdings' lease payments under the Master Lease.

48.     The Master Lease and other Spin-Off transactional documents were made publicly available and the details of the Spin-Off were disclosed in the Current Report on Form 8-K filed with the Securities and Exchange Commission (the "SEC") on April 27, 2015 as well as the Company's and Holdings' other periodic filings under the Securities Exchange Act of 1934, as amended, since then.

49.     In summary, Services and its Restricted Subsidiaries transferred certain assets to Uniti as part of the Spin-Off.  Immediately following the Spin-Off, Holdings and certain subsidiaries of Uniti entered into the Master Lease pursuant to which *Holdings* leased the assets.

17

50.     While Services is not obligated to fund Holdings' lease payments under the Master Lease, Services has historically made cash distributions to Holdings to fund such payments.  As noted above, Holdings is not a party to, or subject to the covenants in, the Indenture.  Therefore the Indenture contains restrictions on payments by Services to Holdings, but does not contain any restrictions on Holdings.  Specifically, these distributions are subject to the Restricted Payments covenant in the Indenture, which restricts, among other things, distributions by Services to its sole equity owner, Holdings.  Accordingly, Services can only make a distribution to Holdings to fund Holdings' lease payments if it has Restricted Payment "capacity", which is based on, broadly speaking, its cumulative earnings.  Services has chosen to use a portion of its Restricted Payments "capacity" to fund Holdings' lease payments and has complied with the applicable conditions.  This reduces the amount of other distributions and other Restricted Payments that Services can make and holders of the 6 3/8% Notes are in no way harmed by these distributions to fund Holdings' lease payments.  The Indenture permits a certain amount of Restricted Payments and Services decides how to use that capacity.

51.     If this arrangement were, in fact, a Sale and Leaseback Transaction by Services as Aurelius has alleged, then any lease payments made by Services would be permitted and would not be subject to the Restricted Payments covenant.  But that is not how the distributions are structured.  Aurelius should not be permitted to recharacterize the arrangement as a Sale and Leaseback Transaction merely because it disputes the way in which Services is choosing to use its Restricted Payments capacity.

52.     Neither Services nor any of its Restricted Subsidiaries are parties to the Master Lease for the assets in question.  The transfer of the assets and the subsequent "lease" of the assets involved different parties not subject to the Indenture.

## III.   THE LANGUAGE OF THE INDENTURE

53.     On January 23, 2013, Windstream Corporation (now known as Services) executed the Indenture governing the 6 3/8% Notes with US Bank as Trustee.

54.     The Indenture is a complex and heavily negotiated document that is the result of arms-length discussions between multiple sophisticated parties and their counsel.

55.     Section 4.19 of the Indenture reads, in pertinent part:

> The Company shall not, and shall not permit any of its Restricted Subsidiaries to, enter into any Sale and Leaseback Transaction; *provided* that the Company or any Restricted Subsidiary thereof may enter into a Sale and Leaseback Transaction if: (i) the Company or such Restricted Subsidiary … could have (A) Incurred Indebtedness in an amount equal to the Attributable Debt relating to such Sale and Leaseback Transactions … and (B) incurred a Lien to secure such Indebtedness … (ii) the gross cash proceeds of that Sale and Leaseback Transaction are at least equal to the Fair Market Value of the property that is the subject of that Sale and Leaseback Transaction; and (iii) the transfer of assets in that Sale and Leaseback Transaction is permitted by, and the Company applies the proceeds of such transaction in compliance with, Section 4.10.

Ex. A at § 4.19.

56.     Critically, "Sale and Leaseback Transaction" is a defined term in the Indenture which means:

> with respect to any Person, any transaction involving any of the assets or properties of such Person whether now owned or hereafter acquired, whereby such Person sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred.

19

*Id.* at § 1.01.

57.    "Person," in turn, is defined as:

> any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated, organization, limited liability company or government or other entity.

*Id.*

58.    With respect to Aurelius's vague allegation that the Company failed to provide the necessary Officers' Certificates for unspecified Restricted Payments, Section 4.07(c) of the Indenture reads:

> The amount of all Restricted Payments (other than cash) shall be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued to or by the Company or such Subsidiary, as the case may be, pursuant to the Restricted Payment. Not later than the date of making any Restricted Payment, the Company shall deliver to the Trustee and Officers' Certificate stating that such Restricted Payment is permitted and setting forth the basis upon which the calculations required by this Section 4.07 were computed, together with a copy of any opinion or appraisal required by this Indenture.

*Id.* at § 4.07(c).

59.    Section 6.01(a)(v) of the Indenture specifies actions or events that constitute an "Event of Default," and provides in pertinent part that an Event of Default occurs upon:

> [F]ailure by the Company or any of its Restricted Subsidiaries for 60 days after written notice by the Trustee or Holders representing 25% or more of the aggregate principal amount of Notes then outstanding to comply with any of the other agreements [besides Section 4.10 or Section 4.14] in this Indenture.

*Id.* at § 6.01(a)(v).

60.    Following an Event of Default, Section 6.02 of the Indenture grants the Trustee or, in the alternative, holders of a certain principal amount of the 6 3/8% Notes, the right to accelerate payment of the 6 3/8% Notes:

20

> If an … Event of Default occurs and is continuing with respect to Notes, the Trustee or the Holders of at least 25% in principal amount of the then outstanding Notes may declare all the Notes to be due and payable immediately by notice in writing to the Company specifying the Event of Default.  Upon such declaration, the Notes, together with accrued and unpaid interest (including Additional Interest), shall become due and payable immediately.

*Id.* at § 6.02.

61.     Additionally, the Indenture provides a clear mechanism to waive purported Defaults and Events of Default.  Section 6.04 provides:

> Holders of a majority in aggregate principal amount of the Notes then outstanding by notice to the Trustee may on behalf of the Holders of all of the Notes waive any existing Default or Event of Default and its consequences hereunder.

*Id.* at § 6.04.

62.     Moreover, Section 9.02 of the Indenture allows Services and the Trustee to amend or supplement the Indenture to give effect to the waivers:

> [T]he Company . . . and the Trustee may amend or supplement this Indenture . . . with the consent of the Holders of at least a majority in principal amount of the Notes then outstanding . . . and . . . any existing Default or Event of Default . . . may be waived with the consent of the Holders of a majority in principal amount of the then outstanding Notes.

*Id.* at § 9.02(a).

## IV.     RUMORS OF AURELIUS ACQUIRING NOTES

63.     In early August 2017, Services became aware of market rumors that Aurelius was buying notes in an effort to obtain a 25% position in one or more of the Company's series of outstanding notes.  Additional market rumors indicated that Aurelius was also buying a significant position in credit default swaps betting on the Company to default.

21

64.     Around the same time, Services became aware that Aurelius was acquiring these notes to attempt to call an Event of Default to profit from its position in the credit default swap market.

65.     Services was (and continues to be) in compliance with all of the provisions of its indentures.

66.     Additional market rumors indicated that Aurelius intended to issue a notice of default related to the Spin-Off.  This was confusing given that the Spin-Off had closed over two years before these market rumors began.  Prior to these 2017 market rumors, Services was unaware of any accusation or allegation that the Spin-Off caused Services to be in breach or default of any covenant in any of its indentures.  No other bondholders have sent the Company a purported notice of default related to the Spin-Off.

## V.      THE PURPORTED NOTICE OF DEFAULT

67.     Aurelius sent the September 21, 2017 Letter indicating that it was the beneficial holder of more than 25% in aggregate principal amount of the 6 3/8% Notes outstanding and claiming that the Letter constituted a notice of default under the Indenture.

68.     The Letter primarily focused on an alleged default of the Sale and Leaseback Transaction covenant (Section 4.19) of the Indenture.  Yet, as discussed above, the Company has not entered into any Sale and Leaseback Transactions since executing the Indenture.

69.     As further evidence that Aurelius is seeking to manufacture a notice of default, the Letter also baselessly asserts that the Company violated Section 4.07 of the Indenture.  As discussed above, the Company has fully complied with Section 4.07.

70.     Aurelius claimed that the notice of default was given under Indenture Section

6.01(a)(v), which contemplates a 60-day grace period before an Event of Default could occur.

## VI.     THE EXCHANGE OFFERS AND CONSENT SOLICITATIONS

71.     Late in the evening on October 18, 2017, the Company launched debt exchange

offers with respect to its senior notes, including the 6 3/8% Notes at issue in this case.

72.     The Company launched the Exchange Offers because they could provide

significant benefits to the Company and its stakeholders, including its noteholders.  First, the

Exchange Offers were designed to extend the Company's debt maturity profile and enhance its

liquidity position over the coming years.  Additionally, the Exchange Offers and the Consent

Solicitations allowed the Company to proactively address Aurelius's specious allegations and

avoid the potential of bankruptcy that Aurelius sought to foist upon the Company and its

stakeholders.

73.     The Exchange Offers included the following:

- Offers to exchange the Company's existing senior 7.5% notes due 2022 and 2023 for New 6 3/8% Notes to be issued by the Company.[4]

- An offer to exchange the Company's existing senior notes due 2021 for new senior secured notes due 2025 and/or New 6 3/8% Notes, in each case to be issued by the Company.

- An offer to exchange the Company's existing senior notes due 2020 for new senior secured notes due 2025 to be issued by the Company.

---

[4]   The New 6 3/8% Notes issued in the Exchange Offers are the same series as the 6 3/8% Notes at issue in this case and were issued under the same Indenture.

74.     The New 6 3/8% Notes issued in the Exchange Offers are issued pursuant to
Section 2.02 of the Indenture, which permits the Company to issue New 6 3/8% Notes as
"Additional Notes" under the Indenture.

75.     Concomitant with the Exchange Offers, pursuant to Sections 6.04 and 9.02 of
each indenture governing the Company's senior notes (including the Indenture), the Company
launched a separate, yet related transaction, whereby it solicited consents pursuant to the Consent
Solicitations from all holders of the Company's senior notes (including the 6 3/8% Notes at issue
here) to waivers and amendments relating to potential or alleged defaults with respect to the
Spin-Off.  The consents, upon becoming effective, waive the defaults alleged in the September
21 Letter.

76.     Each Consent Solicitation with respect to a series of notes required consent from
holders representing at least a majority of the outstanding principal amount of that series, and
once effective, would waive the defaults alleged in the September 21 Letter issued by Aurelius.
In the case of the Consent Solicitation relating to the 6 3/8% Notes, holders receiving New 6
3/8% Notes in the Exchange Offers also had the ability to direct their participant in the
Depositary Trust Company system to deliver consents in the Consent Solicitation relating to the
6 3/8% Notes upon receipt of the New 6 3/8% Notes in the Exchange Offers.  Additionally, the
New 6 3/8% Notes are included in both the numerator and denominator of outstanding 6 3/8%
Notes when determining whether the requisite consents have been received for the 6 3/8% Notes.

77.     On October 31, 2017, the Company learned that based on tenders of notes in the
Exchange Offers and consents delivered in the Consent Solicitation for the 6 3/8% Notes, upon

early settlement of the Exchange Offers holders represented the requisite percentage of 6 3/8%

Notes needed to waive the defaults alleged in the September 21 Letter would be received.  In

fact, holders of approximately 61.35% of the Notes (including New Notes to be issued in the

Exchange Offers) delivered consents in the Consent Solicitation relating to such Notes.

78.     These noteholders, through the consents, explicitly agreed to waive and amend

the Indenture to waive any purported default alleged in Aurelius's September 21 Letter.

79.     Section 6.04 of the Indenture provides that "Holders of a majority in aggregate

principal amount of the Notes then outstanding by notice to the Trustee may on behalf of the

Holders of all of the Notes waive any existing Default or Event of Default and its consequences

hereunder . . . ."

80.     The Indenture further provides that once the requisite consents are obtained from

Holders, "[t]he Company shall deliver to the Trustee an Officers' Certificate stating that the

requisite percentage of Holders have consented to such waiver and attaching copies of such

consents."  Section 6.04.  Thereafter, "the Company, the Trustee and Holders of Notes shall be

restored to their former positions and rights hereunder and under the Notes, respectively."  *Id.*

81.     Here, a majority of holders delivered consents that provided that "[b]y delivering

a consent with respect to the 6 3/8% Notes, a Holder authorizes, directs and requests that . . . the

Company, the co-issuer, the guarantors, the trustee and each party to the Indenture enter into a

Supplemental Indenture with respect to the 6 3/8% Notes . . . and . . . enter into such other

documents, and take such other actions necessary or expedient, in order to give effect to, and

permit, the Proposed Waivers and Amendments."  And the Company delivered the required

Officers' Certificate to the Trustee.

## VII.    THE SUPPLEMENTAL INDENTURE

82.     On November 6, 2017, US Bank, as Trustee, authenticated and issued the New

Notes.  That same day, Services and US Bank executed the Supplemental Indenture, which gave

effect to the waivers and consents for the 6 3/8% Notes and is binding on all noteholders.

83.     The Supplemental Indenture waives any purported default related to the

allegations contained in the September 21 Letter.  The Supplemental Indenture states, in relevant

part:

    i.     "'Transactions' means the transactions described on Schedule I hereto, including the Distribution, the Note Redemptions, the Spin-Off, the Debt-for-Debt Exchange, the First Debt-for-Equity Exchange, the Second Debt-for-Equity Exchange, the entry into and performance of the obligations under the Master Lease, the Spin-Off and Subsequent Restricted Payments."

    ii.     "The definition of 'Attributable Debt' in the Indenture shall be amended by adding the following underlined text: . . . . for the avoidance of doubt, any payment or other obligations with respect to the Master Lease shall not constitute Attributable Debt or Indebtedness."

    iii.     "The definition of 'Sale and Leaseback Transaction in the Indenture shall be amended by adding the following underlined text: . . . . for the avoidance of doubt, each Transaction, any series of Transactions or the Transactions as a whole, including the entry into and performance of the Master Lease, shall not constitute a Sale and Leaseback Transaction."

    iv.     "The following paragraph shall be added to the end of Section 4.07(d) of the Indenture: For the avoidance of doubt and notwithstanding any other provision of this Indenture, each of the Distribution and the Spin-Off and Subsequent Restricted Payments, individually and as a whole, constitute Restricted Payments permitted by Section 4.07 of the Indenture and shall not constitute Asset Sales."

    v.     "The following paragraph shall be added to the end of Section 6.01 of the Indenture: Notwithstanding any other provision of this Indenture, each

Transaction, any series of Transactions and the Transactions as a whole are permitted under and not prohibited by this Indenture and shall be deemed not to have resulted in any Default or Event of Default under this Indenture."

vi.     "The Trustee acknowledges that it has received an Officers' Certificate delivered to it by the Issuers, pursuant to Section 6.04 of the Indenture, stating that the Holders representing a majority in aggregate principal amount of the outstanding Notes have waived (1) any Default or Event of Default under the Indenture that is alleged to have, has or may have arisen under the Indenture in connection with, related to or as a result of the consummation or performance of the Transactions, and (2) any Default or Event of Default under the Indenture that is alleged to have, has or may have arisen under the Indenture as a result of a Default or Event of Default described in clause (1), and attaching evidence of such Waivers."

vii.    "This Supplemental Indenture is executed as and shall constitute an indenture supplemental to and in implementation of the Indenture, and said Indenture and this Supplemental Indenture shall henceforth be read together."

84.     The purported defaults alleged in the September 21 Letter have accordingly been waived.

85.     Nevertheless, US Bank continues to press on with this litigation in violation of the Indenture and Supplemental Indentured despite clear direction from over 60% of the 6 3/8% noteholders.

86.     In fact, US Bank originally initiated this action "solely in its capacity as indenture trustee . . . [because] two defaults relating to [the Spin-Off] have occurred and are continuing." (Compl. ¶ 1.)  Yet, Section 7.01(a) of the Indenture confers authority on the Trustee to initiate action actions necessary to ***cure an Event of Default***.  Indenture § 7.01(a) ("***If an Event of Default has occurred and is continuing***, the Trustee shall exercise such of the rights and powers vested in it by this Indenture.") (emphasis added).  Section 7.01(a), however, is no longer implicated by this action because the Supplemental Indenture waived any purported Default

alleged in the September 21 Letter.  Thus, US Bank no longer has standing to pursue this action

and is breaching the plain language of the Indenture by continuing to do so.

87.     Moreover, on information and belief, Aurelius directed US Bank to initiate this

action pursuant to Section 6.05 of the Indenture, which permits "Holders of a majority in

principal amount of the the then outstanding Notes . . . to direct the time, method and place of

conducting any proceeding for exercising any remedy available to the Trustee with respect to the

Notes, or exercising any trust or power conferred upon the Trustee with respect to the Notes."

*Id.* at § 6.05

88.     Aurelius is no longer a holder of a majority in principal amount of the outstanding

Notes.  Indeed, US Bank's authentication of the New Notes diluted Aurelius's position.

Therefore, US Bank can longer act at Aurelius's behest to the detriment of the Company and

other noteholders.  By continuing to act at Aurelius's direction, US Bank is in breach of the

Indenture and Supplemental Indenture.

89.     Services must now continue to defend against US Bank's unauthorized claim,

even though it has been mooted by the Supplemental Indenture.  Services will continue to

expend attorneys' fees and associate costs, and have its reputation in the marketplace damaged

despite US Bank's issuance of the New Notes and execution of the Supplemental Indenture.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

90.     Services repeats the allegations contained in the preceding paragraphs as if fully

set forth herein.

91.     The Indenture and Supplemental Indenture are binding contracts between Services and US Bank.

92.     Services has substantially performed its obligations under the Indenture and Supplemental Indenture and remains willing and able to perform its remaining obligations.

93.     Despite executing the Supplemental Indenture, which waives any purported default or notice of default alleged in the September 21 Letter, US Bank is in breach of the Indenture and Supplemental Indenture by continuing to prosecute this action to the detriment of the Company and other noteholders.  Specifically, US Bank is in breach of Sections 6.05 and 7.01 of the Indenture because any purported Default has been waived and Aurelius can no longer direct US Bank to pursue the remedies enumerated in the Indenture.

94.     Therefore, Services seeks specific performance of the Indenture and Supplemental Indenture, including an order compelling the Trustee to dismiss its litigation with prejudice.

95.     Services also seeks damages, including attorneys' fees, in an amount to proven at trial, for US Bank's willful breach of the Indenture and Supplemental Indenture.

**SECOND CAUSE OF ACTION**
**(Declaratory Judgment)**

96.     Services repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

97.     Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court is authorized to issue a declaratory judgment.

29

98.     There is an actual controversy between the parties concerning whether Services has violated Sections 4.07 and 4.19 of the Indenture and whether an Event of Default can occur after the relevant grace period set forth in the Indenture.

99.     Services is entitled to a judicial declaration that Services did not violate Section 4.19 of the Indenture and that Services did not enter into a "Sale and Leaseback Transaction" in the Spin-Off.

100.    Services is entitled to a judicial declaration that Services is not in breach of Section 4.07 of the Indenture.

101.    Services has no adequate remedy at law.

### THIRD CAUSE OF ACTION
#### (Declaratory Judgment)

102.    Services repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

103.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court is authorized to issue a declaratory judgment.

104.    There is an actual controversy between the parties concerning whether Services has violated Sections 4.07 and 4.19 of the Indenture and whether an Event of Default can occur after the relevant grace period set forth in the Indenture.

105.    Aurelius waited an unreasonable length of time before attempting to declare a default (which they manufactured in order to profit in the credit default swap market). Services has been prejudiced by this unreasonable delay as they have no ability to cure any alleged default relating to a transaction that closed over 2 years ago.

106.     Services is entitled to a judicial declaration that any breach of Section 4.19 or 4.07, as alleged in the Letter, has been waived by the passage of over two years since the Spin-Off.

107.     Services has no adequate remedy at law.

## FOURTH CAUSE OF ACTION
### (Injunctive Relief)

108.     Services repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

109.     Aurelius's Letter wrongfully purports to provide written notice of default even though Services has not violated Section 4.07 or Section 4.19 of the Indenture.  The purported notice of default alleged in the September 21 Letter, however, is currently harming and will continue to harm Services.  In particular, any further action taken in reliance on or in furtherance of the September 21 Letter will cause Services irreparable harm by threatening the very existence of Services by, among other things:  likely forcing the Company into bankruptcy, increasing borrowing costs, limiting the Company's access to capital markets, damaging the Company's relationship with its vendors, bondholders and other lenders, harming Holdings' equity value, triggering potential cross-defaults, and hindering the Company's ability to run its business in the ordinary course and implement its strategic business plans.

110.     Should Aurelius or the Trustee declare an Event of Default or take any action in reliance on or in furtherance of the September 21 Letter, Services would suffer irreparable harm.

111.    Should Aurelius, the Trustee or any holders of the 6 3/8% Notes representing 25% in aggregate principal amount outstanding accelerate the debt under Section 6.02 of the Indenture, Services would suffer irreparable harm.

112.    The harm to Services of allowing Aurelius or the Trustee to declare an Event of Default or take any action in reliance on or in furtherance of the defective notice of default substantially outweighs any harm to the Trustee (or any holders) associated with an injunction being granted.

113.    Services has no adequate remedy at law.

114.    Accordingly, Services is entitled to an injunction preventing the Trustee, on its own or at the direction of any holder of 6 3/8% Notes, as well as Aurelius (a) from declaring an Event of Default by reason of Aurelius's incorrect and improper Letter alleging breach of Section 4.07 and Section 4.19 of the Indenture, and (b) from taking any action based on any purported breach of Section 4.07 or 4.19 of the Indenture.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendant and Counterclaim-Plaintiff Services respectfully requests that the Court enter an Order granting the following relief:

a.    Entry of an order by this Court compelling US Bank to dismiss its complaint with prejudice.

b.    Entry of an order against US Bank for all monetary damages, including attorneys' fees, Services suffered and continues to suffer as a result of US Bank's wrongful conduct alleged herein, in an amount to be determined at trial.

c.    Entry of a declaratory judgment order by this Court that Services is not in breach of Section 4.07 and/or Section 4.19 of the Indenture.

d.   Entry of a declaratory judgment order by this Court that Services did not enter into a "Sale and Leaseback Transaction," as defined by the Indenture, as part of the Spin-Off.

e.   Entry of a declaratory judgment order by this Court that any alleged breach of Section 4.07 and/or Section 4.19 of the Indenture associated with the Spin-Off has been waived given the passage of more than two years since such transaction was publicly documented.

f.   Entry of an order enjoining the Trustee, on its own or at the direction of any holder of 6 3/8% Notes, as well as Aurelius from (i) declaring an Event of Default by reason of Aurelius's September 21, 2017 Letter, and (ii) taking any action based on any such purported breach.

g.   Entry of an order for any further relief the Court may deem just and equitable.

Dated:  November 22, 2017
         New York, New York

                         /s/ Aaron H. Marks
                         AARON H. MARKS
                         JOSHUA M. GREENBLATT
                         STEPHEN E. HESSLER, P.C.

                         **KIRKLAND & ELLIS LLP**

                         601 Lexington Avenue
                         New York, New York 10022
                         Telephone:  (212) 446-4800
                         Facsimile:  (212) 446-4900
                         Email:       aaron.marks@kirkland.com
                                        joshua.greenblatt@kirkland.com
                                        stephen.hessler@kirkland.com

                         - and -

                         James H.M. Sprayregen, P.C.
                         300 North LaSalle Street
                         Chicago, Illinois 60654
                         Telephone:  (312) 862-2000
                         Facsimile:  (312) 862-2200
                         Email:       james.sprayregen@kirkland.com

                         *Counsel to Defendant, Counterclaim-Plaintiff and*
                         *Counterclaim-Defendant Windstream Services, LLC*

## VERIFICATION

I, Bob Gunderman, declare as follows:

I am the Chief Financial Officer of Windstream Services, LLC ("Services"), a defendant, counterclaim-plaintiff and counterclaim-defendant in this action, and I am authorized to make this declaration on behalf of Services. I have read and know the contents of the foregoing Verified Amended Counterclaims, which was prepared by counsel for Services. I have relied on the advice of counsel and the information contained in the Verified Amended Counterclaims is true and correct to the best of my present knowledge, information and belief. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Little Rock, Arkansas
         November 21, 2017


                                                              _____
                                                              Bob Gunderman



Sworn to before me on
this 21st day of November, 2017

_____
Notary Public

JENNIFER LEE DAVIS
COMM. EXP.
11-8-2021
No. 12312345
PULASKI COUNTY
NOTARY PUBLIC - ARKANSAS