# EXHIBIT 2

SECOND SUPPLEMENT TO OFFERING MEMORANDUM                STRICTLY CONFIDENTIAL



### Offers to Exchange outstanding Senior Notes

### for

### New 6 3/8% Senior Notes due 2023

EACH EXCHANGE OFFER (AS DEFINED HEREIN) TO ELIGIBLE HOLDERS (AS DEFINED HEREIN) WILL EXPIRE AT 11:59 P.M., NEW YORK CITY TIME, ON NOVEMBER 14, 2017, UNLESS EXTENDED (SUCH TIME AND DATE WITH RESPECT TO AN EXCHANGE OFFER, AS IT MAY BE EXTENDED FOR SUCH EXCHANGE OFFER, THE "**EXPIRATION DATE**"). TO BE ELIGIBLE TO RECEIVE THE APPLICABLE EARLY EXCHANGE CONSIDERATION (AS DEFINED HEREIN), ELIGIBLE HOLDERS MUST TENDER THEIR OLD NOTES (AS DEFINED HEREIN) AT OR PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON OCTOBER 31, 2017, UNLESS EXTENDED (SUCH TIME AND DATE WITH RESPECT TO AN EXCHANGE OFFER, AS IT MAY BE EXTENDED FOR SUCH EXCHANGE OFFER, THE "**EARLY TENDER DATE**"). RIGHTS TO WITHDRAW TENDERED OLD NOTES TERMINATE AT 5:00 P.M., NEW YORK CITY TIME, ON OCTOBER 31, 2017, UNLESS EXTENDED (SUCH TIME AND DATE WITH RESPECT TO AN EXCHANGE OFFER, AS IT MAY BE EXTENDED FOR SUCH EXCHANGE OFFER, THE "**WITHDRAWAL DEADLINE**"), EXCEPT FOR CERTAIN LIMITED CIRCUMSTANCES WHERE ADDITIONAL WITHDRAWAL RIGHTS ARE REQUIRED BY LAW. THE EARLY TENDER DATE WITH RESPECT TO AN EXCHANGE OFFER CAN BE EXTENDED INDEPENDENTLY OF THE WITHDRAWAL DEADLINE FOR SUCH EXCHANGE OFFER AND OF THE EARLY TENDER DATE OR WITHDRAWAL DATE WITH RESPECT TO ANY OTHER EXCHANGE OFFER.

This Second Supplement, dated as of October 31, 2017 (this "**Supplement**"), amends and restates in its entirety the Offering Memorandum dated October 18, 2017, as amended and supplemented by the first supplement, dated October 23, 2017, the press release dated October 24, 2017 and the press release dated October 30, 2017 (as it may be further supplemented and amended from time to time, this "**Offering Memorandum**") relating to the offering by Windstream Services, LLC (the "**Issuer**") and Windstream Finance Corp. (the "**Co-Issuer**" and, together with the Issuer, "**we**," "**Windstream**" "**us**," "**our**" or the "**Company**") pursuant to the Offering Memorandum, as amended and restated by this Supplement, and the related letter of transmittal (as it may be supplemented and amended from time to time, the "**Letter of Transmittal**") to all Eligible Holders to exchange new 6 3/8% Senior Notes due 2023 (the "**New Notes**") to be issued by the Issuer and the Co-Issuer, as issuer and co-issuer, respectively, for validly tendered (and not validly withdrawn) outstanding senior notes issued by the Company listed in the table below (the "**Old Notes**"). The New Notes offered hereby will be issued under the indenture dated January 23, 2013 (as supplemented and amended from time to time, the "**2013 Indenture**") governing the Company's existing 6 3/8% Senior Notes due 2023 (the "**Existing 6 3/8% Notes**" and, together with the New Notes, the "**6 3/8% Notes**") as Additional Notes (as defined in the 2013 Indenture). The information contained in this Supplement updates, modifies and, to the extent inconsistent with, supersedes other statements contained in the Offering Memorandum.

The New Notes and the Existing 6 3/8% Notes will be treated as a single class for all purposes under the 2013 Indenture, including, without limitation, waivers, amendments and offers to purchase. However, the New Notes will not be fungible with the Existing 6 3/8% Notes for U.S. federal income tax purposes and, as a result, will have CUSIPs and ISINs that will differ from the CUSIPs and ISINs of the Existing 6 3/8% Notes. See "Risk Factors—Risks Related to the New Notes and our Indebtedness— The New Notes will have a different CUSIP and ISIN number than the Existing 6 3/8% Notes, and liquidity of the Old Notes that are not exchanged will be reduced." Additionally, see "Risk Factors—Risks Related to the New Notes and our Indebtedness—If New Notes issued on the Final Settlement Date are considered not fungible with New Notes of the same series issued on the Early Settlement Date for U.S. federal income tax purposes, then such New Notes will be assigned a different CUSIP and ISIN number from the New Notes of the same series issued on the Early Settlement Date, and any such New Notes may have less liquidity, lower market prices and more price volatility than the New Notes of the same series issued on the Early Settlement Date."

Holders tendering Old Notes in any of the Exchange Offers may elect, at the time of tendering such Old Notes, to also direct their participant in The Depository Trust Company ("**DTC**") to consent to certain proposed waivers and amendments pursuant to the 6 3/8% Senior Notes Consent Solicitation (as defined herein) with respect to the New Notes to be issued pursuant to the Exchange Offers. Any such consent may be given by the tender of such New Notes in accordance with the procedures described under "Procedures for Tendering Old Notes—Tendering New Notes in the 6 3/8% Senior Notes Consent Solicitation," but shall be given pursuant to and in accordance with the terms of the consent solicitation statement for the 6 3/8% Senior Notes Consent Solicitation. No such consent with respect to any New Notes to be delivered pursuant to an Exchange Offer will be effective unless settlement of the applicable Exchange Offer occurs prior to expiration of the 6 3/8% Senior Notes Consent Solicitation. As a result, Holders tendering Old Notes pursuant to an Exchange Offer will not be eligible to deliver consents or receive any consent payment pursuant to the 6 3/8% Senior Notes Consent Solicitation unless either (i) such Old Notes are validly tendered (and not validly withdrawn) prior to the Early Tender Date and accepted for exchange by us, and we elect (in our sole discretion) to have an Early Settlement Date (as defined herein) prior to expiration of the 6 3/8% Senior Notes Consent Solicitation, or (ii) we elect (in our sole discretion) to extend the expiration date of the 6 3/8% Senior Notes Consent Solicitation pursuant to the terms thereof to a date that falls on or after the applicable Settlement Date for such Exchange Offer. Holders tendering Old Notes in any of the Exchange Offers and electing to direct their participant in DTC to consent will be eligible to receive only the late consent payment of $2.00 per $1,000 principal amount of New Notes specified under the terms of the 6 3/8% Senior Notes Consent Solicitation, and will not be eligible to receive the early consent payment of $2.50 per

$1,000 principal amount of New Notes specified under the terms of the 6 3/8% Senior Notes Consent Solicitation, unless we elect (in our sole discretion) to amend the terms of the 6 3/8% Senior Notes Consent Solicitation. New Notes issued in the Exchange Offers to tendering holders that elect to direct their participant in DTC to consent will be blocked and cannot be sold or transferred from the applicable Settlement Date until the earlier of (i) the expiration of the 6 3/8% Senior Notes Consent Solicitation, (ii) the date on which the DTC Participant revokes its consent in accordance with the terms of the 6 3/8% Senior Notes Consent Solicitation, and (iii) the date on which the 6 3/8% Notes Consent Solicitation is terminated.

Holders tendering Old Notes in any of the Exchange Offers who do not elect to direct their participant in DTC to consent pursuant to the 6 3/8% Senior Notes Consent Solicitation may not be able to deliver consents with respect to the New Notes pursuant to the 6 3/8% Senior Notes Consent Solicitation because the expiration date of the 6 3/8% Senior Notes Consent Solicitation is expected to occur shortly after the Early Settlement Date (if we elect, in our sole discretion, to have an Early Settlement Date), unless such expiration date of the 6 3/8% Senior Notes Consent Solicitation is extended by the Company in accordance with the terms of the 6 3/8% Senior Notes Consent Solicitation. Moreover, all Holders tendering Old Notes may not be able to deliver consents with respect to the New Notes if we do not we elect (in our sole discretion) to have an Early Settlement Date prior to expiration of the 6 3/8% Senior Notes Consent Solicitation.

We are making two separate offers to Eligible Holders of Old Notes to exchange (each, an "**Exchange Offer**" and, collectively, the "**Exchange Offers**" or the "**2022/2023 Exchange Offers**") New Notes for (i) any and all of our outstanding 7.50% Senior Notes due 2022 (the "**2022 Notes**"), and (ii) any and all of our outstanding 7.50% Senior Notes due 2023 (the "**2023 Notes**"). The 2022 Notes and the 2023 Notes are referred to herein collectively as the "**Old Notes**." The Exchange Offers are conditioned upon the Minimum Issuance Condition and the Consent Condition (each as defined herein). See "Summary—The Concurrent Transactions." The Exchange Offers may be amended, extended, terminated or withdrawn, either as a whole, or with respect to one or more series of Old Notes.

*You are encouraged to carefully consider all the information in this Offering Memorandum in its entirety, and in particular the "Risk Factors" beginning on page 19 of this Offering Memorandum.*

**The New Notes and the offering thereof have not been registered with the Securities and Exchange Commission (the "SEC") under the Securities Act of 1933, as amended (the "Securities Act"), or any state or foreign securities laws. The New Notes may not be offered or sold in the United States or to any U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. See "Transfer Restrictions." The Exchange Offers will only be made, and the New Notes are only being offered and will only be issued, (1) to "qualified institutional buyers" as defined in Rule 144A under the Securities Act ("QIBs") and (2) outside the United States to persons other than "U.S. persons" as defined in Rule 902 under the Securities Act in offshore transactions in compliance with Regulation S under the Securities Act ("Regulation S") (such holders, the "Eligible Holders"). Only Eligible Holders who have completed and returned the eligibility letter are authorized to receive or review this Offering Memorandum or to participate in the Exchange Offers.**

*Dealer Manager*

# Citigroup

*The date of this Supplement is October* 31, 2017.

Subject to the tender acceptance procedures described herein: (i) for each $1,000 principal amount of Old Notes tendered at or prior to the Early Tender Date, accepted for exchange and not validly withdrawn, Eligible Holders of Old Notes will be eligible to receive the applicable early exchange consideration set forth in the table below (the "**Early Exchange Consideration**"); and (ii) for each $1,000 principal amount of Old Notes tendered after the Early Tender Date and accepted for exchange, Eligible Holders of Old Notes will be eligible to receive the applicable late exchange consideration set forth in such table (the "**Late Exchange Consideration**"). We sometimes refer to the "Early Exchange Consideration" and the "Late Exchange Consideration" to herein as the "**Exchange Consideration**."

In addition to the consideration, we will pay in cash accrued and unpaid interest on the Old Notes accepted in the Exchange Offers from the applicable latest interest payment date to, but not including, the applicable Settlement Date. Interest on the New Notes will accrue from the date of first issuance of New Notes and, as described herein, we may elect, in our sole discretion, to settle on the Early Settlement Date the Exchange Offers for any or all series of Old Notes and issue New Notes with respect to such Old Notes validly tendered prior to the Early Tender Date (and not validly withdrawn). If we elect to have an Early Settlement Date, any New Notes issued on the Final Settlement Date will be issued with accrued interest up to, but not including, the Final Settlement Date. The amount of such accrued interest will not be deducted from the accrued and unpaid interest on the applicable Old Notes otherwise payable by us in respect of such Old Notes accepted for exchange.

The consideration offered in the Exchange Offers is summarized below.

| Title of Series of Old Notes | CUSIP No. / ISIN | Aggregate Outstanding Principal Amount | Early Exchange Consideration, if tendered and not withdrawn prior to the Early Tender Date(1) | Late Exchange Consideration, if tendered after the Early Tender Date and prior to the Expiration Date(1) |
|---|---|---|---|---|
| 7.50% Senior Notes due 2022 | 97381WAX2; US97381WAX20 | $441,151,000 | $1,080 | $1,030 |
| 7.50% Senior Notes due 2023 | 97381WAU8; US97381WAU80 | $343,457,000 | $1,075 | $1,025 |

(1)   Total principal amount of New Notes for each $1,000 principal amount of Old Notes.

We will not accept any tender of Old Notes that would result in the issuance of less than $2,000 principal amount of New Notes. If, under the terms of the Exchange Offers, a tendering holder is entitled to receive New Notes in a principal amount that is not an integral multiple of $1,000, we will round downward such principal amount of New Notes to the nearest integral multiple of $1,000. This rounded amount will be the principal amount of New Notes you will receive, and no additional cash will be paid in lieu of any principal amount of New Notes not received as a result of rounding down.

Upon the terms and subject to the conditions of the Exchange Offers, the settlement date for the Exchange Offers will occur promptly after the Expiration Date (the "**Final Settlement Date**") and is expected to occur on November 17, 2017. We may elect, in our sole discretion, to settle an Exchange Offer for any or all series of Old Notes and issue the New Notes with respect to such Old Notes validly tendered prior to the Early Tender Date (and not validly withdrawn) at any time after the Early Tender Date and prior to the Expiration Date (the "**Early Settlement Date**"). Such Early Settlement Date will be determined at our option and, if we elect to have an Early Settlement Date, we expect that it would occur on or after November 2, 2017, subject to all conditions to the Exchange Offers having been satisfied or waived by us. We sometimes refer to the Early Settlement Date and the Final Settlement Date as the "**Settlement Date**." See "General Terms of the Exchange Offers—Settlement Date."

Each Exchange Offer for any series of Old Notes is being made independently of the other Exchange Offers for any other series of Old Notes. The Exchange Offers are subject to the satisfaction or waiver of certain conditions set forth in this Offering Memorandum, including without limitation, the Minimum Issuance Condition and the Consent Conditions. In addition, the Company reserves the right, subject to applicable law, to terminate, withdraw, amend or extend each Exchange Offer without also terminating, withdrawing, amending or extending any of the other Exchange Offers. Each Exchange Offer is subject to the satisfaction or waiver of certain conditions set forth in this Offering Memorandum. Subject to applicable law, the Company may terminate such Exchange Offer if any of the conditions described under "Conditions of the Exchange Offers" are not satisfied or waived by the Expiration Date (or the Early Settlement Date, as the case may be).

Tenders of Old Notes of a series pursuant to the applicable Exchange Offer may be validly withdrawn at any time prior to the Withdrawal Deadline with respect to such Exchange Offer but not thereafter.

If you do not tender your Old Notes or if you tender Old Notes that are not accepted for exchange, they will remain outstanding. If we consummate the Exchange Offers, the applicable trading market for the Old Notes may be significantly more limited. For a discussion of this and other risks, see "Risk Factors."

From time to time after completion of the Exchange Offers, the Company and its affiliates may purchase additional outstanding Old Notes in the open market, in privately negotiated transactions, through tender offers, exchange offers or otherwise, or the Company may redeem Old Notes that are able to be redeemed, pursuant to their terms. Any future purchases, exchanges or redemptions may be on the same terms or on terms that are more or less favorable to holders of Old Notes than the terms of the Exchange Offers. Any future purchases, exchanges or redemptions by the Company and its affiliates will depend on various factors existing at that time. There can be no assurance as to which, if any, of these alternatives (or combinations thereof) the Company and its affiliates may choose to pursue in the future.

**This Offering Memorandum has not been filed with, reviewed, approved or disapproved by the SEC or any state securities commission, nor has the SEC or any state or foreign securities commission passed upon the fairness or merits of this transaction or upon the accuracy or adequacy of the information contained in, or incorporated by reference into, this Offering Memorandum or any related documents. Any representation to the contrary is a criminal offense. This Offering Memorandum does not constitute an offer to exchange Old Notes in any jurisdiction in which it is unlawful to make such an offer under applicable securities law or blue sky laws.**

----

**None of the Company, the Dealer Manager (as defined herein), the Exchange Agent (as defined herein), the Information Agent (as defined herein), the trustees with respect to the Old Notes or the trustee under the 2013 Indenture or any affiliate of any of them makes any recommendation as to whether any holder of Old Notes should tender or refrain from tendering all or any portion of the principal amount of such holder's Old Notes for New Notes in the Exchange Offers. No one has been authorized by any of them to make such a recommendation. You must make your own decision whether to tender Old Notes in the Exchange Offers and, if so, the amount of Old Notes as to which action is to be taken.**

## TABLE OF CONTENTS

**Page**

IMPORTANT INFORMATION ........................................................................................................i
NOTICE TO INVESTORS ...........................................................................................................iii
CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS...........................vii
IMPORTANT DATES ..................................................................................................................x
SUMMARY ..................................................................................................................................1
SUMMARY OF THE TERMS OF THE EXCHANGE OFFERS .....................................................9
RISK FACTORS ..........................................................................................................................19
USE OF PROCEEDS ..................................................................................................................32
CAPITALIZATION .....................................................................................................................33
GENERAL TERMS OF THE EXCHANGE OFFERS ...................................................................35
ACCEPTANCE OF OLD NOTES; ACCRUAL OF INTEREST ....................................................38
PROCEDURES FOR TENDERING OLD NOTES ........................................................................40
WITHDRAWAL OF TENDERS ...................................................................................................46
CONDITIONS OF THE EXCHANGE OFFERS............................................................................47
DEALER MANAGER, EXCHANGE AGENT AND INFORMATION AGENT .............................49
DESCRIPTION OF OTHER INDEBTEDNESS ...........................................................................51
DESCRIPTION OF THE NEW NOTES........................................................................................57
TRANSFER RESTRICTIONS.....................................................................................................100
MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS .............................................104
CERTAIN ERISA CONSIDERATIONS ......................................................................................112
LEGAL MATTERS .....................................................................................................................114
INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ...............................................114
WHERE YOU CAN FIND MORE INFORMATION ....................................................................114

## IMPORTANT INFORMATION

You should read this Offering Memorandum and the additional information described under the heading "Where You Can Find More Information" and incorporated by reference herein.

Only registered holders are entitled to tender Old Notes. A beneficial owner whose Old Notes are registered in the name of a custodian must contact such custodian if such beneficial owner desires to tender Old Notes so registered. Beneficial owners should be aware that their broker, dealer, commercial bank, trust company or other nominee or custodian may establish its own earlier deadlines for participation in the Exchange Offers. Accordingly, beneficial owners wishing to participate in the Exchange Offers should contact their broker, dealer, commercial bank, trust company or other nominee or custodian as soon as possible in order to determine the times by which such beneficial owner must take action in order to participate in the Exchange Offers. See "Procedures for Tendering Old Notes."

We have engaged Citigroup Global Markets Inc. (the "**Dealer Manager**") to act as dealer manager of the Exchange Offers. We have also engaged Global Bondholder Services Corporation to act as the exchange agent (the "**Exchange Agent**") and the information agent (the "**Information Agent**") for the Exchange Offers.

Any questions or requests for assistance relating to the terms and conditions of the Exchange Offers may be directed to the Dealer Manager at the addresses and telephone numbers on the back cover of this Offering Memorandum. Questions concerning exchange procedures and requests for additional copies of this Offering Memorandum and the Letter of Transmittal may be directed to the Information Agent at its address and telephone numbers on the back cover of this Offering Memorandum. Beneficial owners of the Old Notes should also contact their nominees or custodians for assistance regarding the Exchange Offers.

There are no guaranteed delivery provisions provided for in conjunction with the Exchange Offers under the terms of this Offering Memorandum and the Letter of Transmittal. Tendering holders must tender their Old Notes in accordance with the procedures set forth under "Procedures for Tendering Old Notes."

**We have not authorized anyone to provide any information or to make any representations other than those contained or incorporated by reference in this Offering Memorandum or the Letter of Transmittal. Neither we nor the Dealer Manager is responsible for, and can provide no assurance as to the reliability of, any other information that others may give you. We are not, and the Dealer Manager is not, making an offer to exchange securities in any jurisdiction where an offer or exchange is not permitted. Unless expressly stated otherwise, you should not assume that the information contained in this Offering Memorandum or any information we have incorporated by reference herein is accurate as of any date other than the date of such documents. Our business, financial condition, results of operations and prospects may have changed since such dates.**

The Dealer Manager makes no representation or warranty, express or implied, as to the accuracy or completeness of the information contained in, or incorporated by reference into, this Offering Memorandum. Nothing contained in this Offering Memorandum is, or should be relied upon as, a promise or representation by the Dealer Manager as to the past or future.

The Exchange Offers are being made on the basis of and are subject to the terms and conditions described in this Offering Memorandum and the Letter of Transmittal. Any decision to participate in the Exchange Offers must be based on the information included in this Offering Memorandum. In making an investment decision, prospective investors must rely on their own examination of the Company and the terms of the Exchange Offers and the New Notes, including the merits and risks involved. Investors should not construe anything in this Offering Memorandum or the Letter of Transmittal as legal, investment, business or tax advice. Each investor should consult its advisors as needed to make its investment decision and to determine whether it is legally permitted to participate in the Exchange Offers under applicable laws or regulations.

This Offering Memorandum contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents themselves for complete information. All such summaries are qualified in their entirety by such reference.

You should not rely on or assume the accuracy of any representation or warranty in any agreement that we have filed as an exhibit to any document that we have publicly filed or that we may otherwise publicly file in the future because such representation or warranty may be subject to exceptions and qualifications contained in separate disclosure schedules, may have been included in such agreement for the purpose of allocating risk between the parties to the particular transaction, and may no longer continue to be true as of any given date.

We have submitted this Offering Memorandum confidentially to a limited number of institutional investors that are reasonably believed to be Eligible Holders based on information provided by them so that they can consider participating in the Exchange Offers. We have not authorized its use for any other purpose. This Offering Memorandum may not be copied or reproduced in whole or in part. It may be distributed and its contents disclosed only to the prospective investors to whom it is provided by the Company or the Dealer Manager or their authorized representatives.

By accepting delivery of this Offering Memorandum, you agree to these restrictions. By accepting delivery, you also acknowledge that this Offering Memorandum contains confidential information and you agree that the use of this information for any purpose other than considering an exchange for the New Notes is strictly prohibited. These undertakings and prohibitions are intended for our benefit and may be enforced by us.

The federal securities laws prohibit trading in our securities while in possession of material nonpublic information with respect to us.

**NOTICE TO INVESTORS**

THE NEW NOTES AND THE OFFERING THEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR ANY STATE OR FOREIGN SECURITIES LAWS, AND MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES OR TO ANY U.S. PERSONS EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. SEE "TRANSFER RESTRICTIONS." ONLY HOLDERS OF OLD NOTES WHO CERTIFY IN WRITING THAT THEY ARE ELIGIBLE HOLDERS ARE AUTHORIZED TO PARTICIPATE IN THE EXCHANGE OFFERS.

This Offering Memorandum does not constitute an offer of, or an invitation to participate in, the Exchange Offers to any person in any jurisdiction in which it would be unlawful to make such offer or invitation or exchange offer under applicable securities law or blue sky laws. Each holder must comply with all applicable laws and regulations in force in any jurisdiction in which it purchases, exchanges, offers or sells New Notes or Old Notes or possesses or distributes this Offering Memorandum and must obtain any consent, approval or permission required by it for the purchase, exchange, offer or sale by it of New Notes and Old Notes, as the case may be, in connection with the Exchange Offers under the laws and regulations in force in any jurisdiction to which it is subject or in which it makes such purchases, exchanges, offers or sales in connection with the Exchange Offers, and none of the Company or the Dealer Manager or any of our or its representatives shall have any responsibility therefor.

Each person receiving this Offering Memorandum acknowledges that (1) it is an Eligible Holder, (2) it has been afforded an opportunity to request and to review, and it has received, all additional information considered by it to be necessary to verify the accuracy of or to supplement the information contained in, or incorporated by reference into, this Offering Memorandum, (3) it has not relied upon the Dealer Manager or any person affiliated with the Dealer Manager in connection with its investigation of the accuracy of such information or its investment decision, (4) this Offering Memorandum relates to the Exchange Offers, which are exempt from or not subject to registration under the Securities Act, and therefore may not comply in important respects with the rules that would apply to an offering document relating to a public offering of securities registered under the Securities Act, and (5) no person has been authorized to give information or to make any representation concerning the Company, the Exchange Offers or the New Notes, other than as contained in, or incorporated by reference into, this Offering Memorandum in connection with an investor's examination or consideration of the Company and the terms of the Exchange Offers.

---

**Notice to Investors in Canada**

The New Notes have not been nor will they be qualified for sale to the public under applicable Canadian securities laws and, accordingly, the distribution of the New Notes in Canada may be made only on a private placement basis exempt from the requirement that the Company prepare and file a prospectus with the applicable Canadian securities regulatory authorities.

The New Notes may be distributed only to investors acquiring, or deemed to be acquiring, as principal that are "accredited investors", as defined in National Instrument 45-106 Prospectus Exemptions or subsection 73.3(1) of the *Securities Act* (Ontario), and are "permitted clients", as defined in National Instrument 31-103 *Registration Requirements, Exemptions and Ongoing Registrant Obligations*. Prospective investors in Canada will be required to complete and return the eligibility certification for Canadian investors, including a certification that the holder is an "accredited investor" and "permitted client" as defined above, rather than the eligibility certification for qualified institutional buyers. This eligibility certification for Canadian investors is available from the information agent.

Any resale of the New Notes must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable Canadian securities laws, which vary depending on the province and territory. **An investor acquiring New Notes should seek legal advice prior to any resale of the New Notes.**

Securities legislation in certain provinces or territories of Canada may provide an investor with remedies for rescission or damages if this Offering Memorandum (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the investor within the time limit prescribed by the securities legislation of the investor's province or territory. **An investor acquiring New Notes should refer to any applicable provisions of the securities legislation of the investor's province or territory for particulars of these rights or consult with a legal advisor.**

Pursuant to section 3A.3 of National Instrument 33-105 *Underwriting Conflicts* ("NI 33-105"), the Dealer Manager is not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

**Investors acquiring New Notes should consult their own legal and tax advisors with respect to the tax consequences of an investment in the New Notes in their particular circumstances and about the eligibility of the New Notes for investment by the investor under relevant Canadian legislation.**

**Notice to prospective investors in the EEA**

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "**Relevant Member State**"), with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "**Relevant Implementation Date**"), there shall be no offer of the New Notes to the public in that Relevant Member State prior to the publication of a prospectus in relation to the New Notes that has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that, with effect from and including the Relevant Implementation Date, an offer of New Notes may be made to the public in that Relevant Member State at any time:

(i) to any legal entity which is a qualified investor as defined in the Prospectus Directive;

(ii) to 150 natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the Dealer Manager for any such offer; or

(iii) in any other circumstances which do not require the publication by an issuer or any guarantor of a prospectus pursuant to Article 3(2) of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of notes to the public" in relation to any of the New Notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the New Notes to be offered so as to enable an investor to decide to purchase or subscribe for the New Notes, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State and the expression "Prospectus Directive" means Directive 2003/71/EC (and amendments thereto, including the PD Amending Directive, to the extent implemented in the Relevant Member State), and includes any relevant implementing measure in each Relevant Member State and the expression "**PD Amending Directive**" means Directive 2010/73/EU.

**Notice to prospective investors in the United Kingdom**

The Dealer Manager represents, warrants and agrees as follows:

(i) it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of section 21 of the Financial Services and Markets Act of 2000 (the "FSMA")) to persons who have professional experience in matters relating to investments falling within Article 19(5) of the FSMA (Financial Promotion) Order 2005 or in circumstances in which section 21 of the FSMA does not apply to the Company; and

(ii)  it has complied with, and will comply with, all applicable provisions of the FSMA with respect to anything done by them in relation to the New Notes in, from or otherwise involving the United Kingdom.

**Notice to prospective investors in Switzerland**

This Offering Memorandum does not constitute an issue prospectus pursuant to Article 652a or Article 1156 of the Swiss Code of Obligations and the New Notes will not be listed on the SIX Swiss Exchange. Therefore, this Offering Memorandum may not comply with the disclosure standards of the listing rules (including any additional listing rules or prospectus schemes) of the SIX Swiss Exchange. Accordingly, the New Notes may not be offered to the public in or from Switzerland, but only to a selected and limited circle of investors who do not subscribe to the New Notes with a view to distribution. Any such investors will be individually approached by the Dealer Manager from time to time.

**Notice to prospective investors in the Dubai International Financial Centre**

This document relates to an exempt offer in accordance with the Offered Securities Rules of the Dubai Financial Services Authority. This document is intended for distribution only to persons of a type specified in those rules. It must not be delivered to, or relied on by, any other person. The Dubai Financial Services Authority has no responsibility for reviewing or verifying any documents in connection with exempt offers. The Dubai Financial Services Authority has not approved this document nor taken steps to verify the information set out in it, and has no responsibility for it. The New Notes which are the subject of the offering contemplated by this Offering Memorandum may be illiquid and/or subject to restrictions on their resale. Prospective purchasers of the New Notes offered should conduct their own due diligence on the New Notes. If you do not understand the contents of this document you should consult an authorized financial adviser.

**Notice to prospective investors in Hong Kong**

This Offering Memorandum has not been approved by or registered with the Securities and Futures Commission of Hong Kong or the Registrar of Companies of Hong Kong. The securities to be sold under this Offering Memorandum may not be offered or sold by means of any document other than (a) to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made under that Ordinance; or (b) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong); or (c) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (Cap. 32, Laws of Hong Kong), and no advertisement, invitation or document relating to the securities may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public of Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to securities which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made under that Ordinance.

**Notice to prospective investors in Singapore**

This Offering Memorandum has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this Offering Memorandum and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the New Notes have not been and may not be circulated or distributed, nor may the New Notes be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289, of Singapore (the "**SFA**"), (ii) to a relevant person pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions specified in Section 275 of the SFA, or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the securities are subscribed or purchased under Section 275 of the SFA by a relevant person which is: (a) a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)), the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or (b) a trust (where the trustee is not an accredited investor) whose sole purpose is

to hold investments and each beneficiary is an accredited investor; then securities (as defined in Section 239(1) of the SFA) of that corporation or the beneficiaries' rights and interest in that trust will not be transferable for 6 months after that corporation or that trust has acquired the securities under Section 275 of the SFA except: (i) to an institutional investor under Section 274 of the SFA, or to a relevant person under Section 275(2) of the SFA, or any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA; (ii) where no consideration is given for the transfer; (iii) by operation of law; or (iv) as specified in Section 276(7) of the SFA.

**Notice to prospective investors in Japan**

The New Notes have not been and will not be registered under the Financial Instruments and Exchange Act of Japan (Law No. 25 of 1948, as amended) (the "**FIEA**") and disclosure under the FIEA has not been and will not be made with respect to the New Notes. Accordingly, the New Notes may not be offered or sold, directly or indirectly, in Japan, or to, or for the benefit of, any Japanese Person or to others for re-offering or resale, directly or indirectly, in Japan or to, or for the benefit of, any Japanese Person, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the FIEA and other relevant laws, regulations and ministerial guidelines promulgated by relevant Japanese governmental or regulatory authorities in effect at the relevant time. For the purposes of this paragraph, "Japanese Person" shall mean any person resident in Japan, including any corporation or other entity organized under the laws of Japan.

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Offering Memorandum and the documents incorporated by reference herein include "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"). Forward-looking statements are subject to uncertainties that could cause actual future events and results to differ materially from those expressed in the forward-looking statements. Forward-looking statements include, but are not limited to, statements regarding the anticipated benefits of the merger with EarthLink and Broadview, including future financial and operating results, projected synergies in operating and capital expenditures and the timing of achieving the synergies reduction in net leverage, and improvement in our ability to compete; our expectations regarding our recently revised capital allocation strategy and the suspension of our dividend; expectations regarding our network investments to improve financial performance and increase market share; expectations regarding revenue trends, sales opportunities, improving margins in, and the directional outlook of, our business segments; network cost optimization; stability and growth in adjusted operating income before depreciation and amortization or OIBDA; expected levels of support from universal service funds or other government programs; expected rates of loss of consumer households served or inter-carrier compensation; expected increases in high-speed Internet and business data connections, including increasing availability of higher Internet speeds and services utilizing next generation technology for customers; expectations regarding expanding enhanced services related to Internet speeds, IPTV and 1 Gbps services to more locations and expanding our fiber network; our expected ability to fund operations; expected required contributions to our pension plan and our ability to make contributions utilizing our common stock; the completion and benefits from network investments related to the Connect America Fund to fund the deployment of broadband services and capital expenditure amounts related to these investments; anticipated benefits of Project Excel to improve network capabilities and offer premium Internet speeds; anticipated capital expenditures and certain debt maturities from cash flows from operations; improving our debt profile and reducing interest costs; and expected effective federal income tax rates. These and other forward-looking statements are based on estimates, projections, beliefs, and assumptions that we believe are reasonable but are not guarantees of future events and results. Actual future events and our results may differ materially from those expressed in these forward-looking statements as a result of a number of important factors.

Factors that could cause actual results to differ materially from those contemplated in our forward-looking statements include, among others:

- the cost savings and expected synergies from the mergers with EarthLink and Broadview may not be fully realized or may take longer to realize than expected;

- the integration of Windstream and EarthLink and Broadview may not be successful, may cause disruption in relationships with customers, vendors and suppliers and may divert attention of management and key personnel;

- our capital allocation practices, including our recently revised capital allocation strategy comprised of our stock repurchase program and debt reduction initiatives, may be changed at any time at the discretion of our board of directors;

- the benefits of our recently revised capital allocation strategy and cost reduction activities may not be fully realized or may take longer to realize than expected, or the implementation of these initiatives may adversely affect our sales and operational activities or otherwise disrupt our business and personnel;

- the impact of the Federal Communications Commission's comprehensive business data services reforms that may result in greater capital investments and customer and revenue churn because of possible price increases by our ILEC suppliers for certain services we use to serve customer locations where we do not have facilities;

- the outcome of claims made by a certain bondholder and by the trustee under one of our indentures relating to one or more alleged covenant defaults under our outstanding senior unsecured notes;

- further adverse changes in economic conditions in the markets served by us;

- the timing and outcome of the consent solicitations and exchange offers described under "Summary—The Concurrent Transactions" that we are conducting concurrently with the Exchange Offers;

- the extent, timing and overall effects of competition in the communications business;

- our election to accept state-wide offers under the FCC's Connect America Fund, Phase II, and the impact of such election on our future receipt of federal universal service funds and capital expenditures, and any return of support received pursuant to the program;

- the potential for incumbent carriers to impose monetary penalties for failure to meet specific volume and term commitments under their special access pricing and tariff plans, which Windstream uses to lease last-mile connections to serve its retail business data service customers, without FCC action;

- the impact of new, emerging or competing technologies and our ability to utilize these technologies to provide services to our customers;

- for certain operations where we lease facilities from other carriers, adverse effects on the availability, quality of service, price of facilities and services provided by other carriers on which our services depend;

- unfavorable rulings by state public service commissions in current and further proceedings regarding universal service funds, inter-carrier compensation or other matters that could reduce revenues or increase expenses;

- material changes in the communications industry that could adversely affect vendor relationships with equipment and network suppliers and customer relationships with wholesale customers;

- our ability to make rent payments under the master lease to Uniti, which may be affected by results of operations, changes in our cash requirements, cash tax payment obligations, or overall financial position;

- unanticipated increases or other changes in our future cash requirements, whether caused by unanticipated increases in capital expenditures, increases in pension funding requirements, or otherwise;

- the availability and cost of financing in the corporate debt markets;

- the potential for adverse changes in the ratings given to our debt securities by nationally accredited ratings organizations;

- earnings on pension plan investments significantly below our expected long term rate of return for plan assets or a significant change in the discount rate or other actuarial assumptions;

- unfavorable results of litigation or intellectual property infringement claims asserted against us;

- the risks associated with non-compliance by us with regulations or statutes applicable to government programs under which we receive material amounts of end user revenue and government subsidies, or non-compliance by us, our partners, or our subcontractors with any terms of our government contracts;

- the effects of federal and state legislation, and rules and regulations, and changes thereto, governing the communications industry;

- continued loss of consumer households served and consumer high-speed Internet customers;

- the impact of equipment failure, natural disasters or terrorist acts;

- the effects of work stoppages by our employees or employees of other communications companies on whom we rely for service; and

- those additional factors under "Risk Factors" in this Offering Memorandum and in Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2016 and our Quarterly Report on Form 10-Q for the quarter ended June 30, 2017, each of which is incorporated by reference herein, and in subsequent filings with the SEC (to the extent incorporated by reference herein).

In addition to these factors, actual future performance, outcomes and results may differ materially because of more general factors including, among others, general industry and market conditions and growth rates, economic conditions, and governmental and public policy changes.

We undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. The foregoing review of factors that could cause our actual results to differ materially from those contemplated in the forward-looking statements should be considered in connection with information regarding risks and uncertainties that may affect our future results included in this Offering Memorandum and in our other filings with the SEC at www.sec.gov.

**IMPORTANT DATES**

Eligible Holders should note the following dates and times relating to the Exchange Offers, unless extended:

| Event | Date and Time | Event Description |
|---|---|---|
| Launch Date...................................... | October 18, 2017 | Commencement of the Exchange Offers. |
| Early Tender Date............................ | 5:00 P.M., New York City time, on October 31, 2017 | The last time and date for you to validly tender Old Notes to qualify for payment of the applicable Early Exchange Consideration. |
| Withdrawal Deadline........................ | 5:00 P.M., New York City time, on October 31, 2017 | The last time and date for you to validly withdraw tenders of Old Notes. If your tenders are validly withdrawn, you will no longer receive the applicable consideration on the Early Settlement Date (unless you validly retender such Old Notes at or before the Expiration Date). |
| Early Settlement Date....................... | At the Company's sole election, any time after the Early Tender Date and prior to the Final Settlement Date<br><br>Expected to occur on or after November 2, 2017 | For Old Notes validly tendered (and not withdrawn) prior to the Early Tender Date, and accepted for exchange, payment of the Early Exchange Consideration, plus the payment in cash of accrued and unpaid interest on Old Notes accepted for exchange from the applicable last interest payment date to, but not including, the Early Settlement Date. |
| Expiration Date................................. | 11:59 P.M., New York City Time, on November 14, 2017 | The last time and date for you to validly tender Old Notes to qualify for the payment of the applicable Late Exchange Consideration payable in respect of Old Notes tendered after the Early Tender Date. |
| Final Settlement Date ....................... | Promptly after the Expiration Date Expected to be on November 17, 2017 | For Old Notes validly tendered (and not withdrawn) and accepted for exchange payment of the Early Exchange Consideration (if not paid on an Early Settlement Date) and the Late Exchange Consideration, plus the payment in cash of accrued and unpaid interest on Old Notes accepted for exchange from the applicable last interest payment date to, but not including, the Final |

Settlement Date.

## SUMMARY

*This summary highlights information included or incorporated by reference in this Offering Memorandum. It is not complete and does not contain all of the information you should consider before making an investment decision. We urge you to read this entire Offering Memorandum as well as the documents incorporated by reference, including the historical financial statements and notes thereto incorporated by reference, to understand fully the terms of the New Notes and other considerations that may be important to you in making your investment decision. See "Risk Factors" in this Offering Memorandum and in our Annual Report on Form 10-K for the year ended December 31, 2016 and our Quarterly Report on Form 10-Q for the period ended June 30, 2017.*

*The Exchange Offers are being made only to Eligible Holders that have properly completed and returned an executed eligibility letter to the Information Agent. Eligible Holders participating in the Exchange Offers must make the investment representations set forth in the Letter of Transmittal and will be deemed to make such representations pursuant to a valid electronic acceptance instruction.*

### Our Company

The Company is a leading provider of advanced network communications and technology solutions for consumers, businesses, enterprise organizations and wholesale customers across the United States. The Company provides data, cloud solutions, unified communications and managed services to small business and enterprise clients. The Company also offers bundled services, including broadband, security solutions, voice and digital television to consumers. Including network assets related to our 2017 acquisitions, the Company supplies core transport solutions on a local and long-haul fiber network spanning approximately 150,000 miles.

Consumer service revenues are generated from the provisioning of high-speed Internet, voice and video services to consumers. Business service revenues include revenues from integrated voice and data services, advanced data and traditional voice and long-distance services provided to enterprise and small business customers. Wholesale revenues include revenues from other communications services providers for special access circuits and fiber connections, voice and data transport services, and revenues from the reselling of our services. Regulatory revenues include switched access revenues, federal and state Universal Service Fund ("**USF**") revenues and amounts received from Connect America Fund - Phase II. Other service revenues include revenues from USF surcharges and other miscellaneous services.

We differentiate our business customers between enterprise and small business generally based on the monthly recurring revenue generated by the customer. Enterprise customers consist of those relationships that have the propensity now or in the future to generate at least $1,500 or more in monthly recurring revenue. Business customers not meeting this criterion are classified as small business. In classifying our business customers, we consider the maximum potential revenue to be generated from the customer relationship for both our existing customer base and any new customers in determining which business unit can best support the customer. Accordingly, over time, we may prospectively change the classification of a particular business customer between enterprise and small business. Our consumer and small business customer base is further disaggregated between those customers located in service areas in which we are the incumbent local exchange carrier ("**ILEC**") and provide services over network facilities operated by us and those customers located in services areas in which we are a competitive local exchange carrier ("**CLEC**") and provide services over network facilities primarily leased from other carriers. Under this organizational structure, we have combined our ILEC Consumer and Small Business operations into one segment and we have combined into a separate segment our CLEC Consumer and Small Business operations due to similarities with respect to product and service offerings, marketing strategies and customer service delivery.

### The Spin-Off Transactions

Pursuant to an Agreement and Plan of Merger (the "**Merger Agreement**"), dated August 29, 2013, by and among the Issuer, Windstream Holdings, Inc. ("**Windstream Parent**") and WIN Merger Sub, Inc. ("Merger Sub"), the Issuer created a new holding company organizational structure whereby the Issuer became a wholly-owned subsidiary of Windstream Parent. Under the Merger Agreement, the Issuer assigned to Windstream Parent, and

Windstream Parent assumed and agreed to perform, all obligations of the Issuer pursuant to certain agreements identified in the Merger Agreement.

On or prior to April 24, 2015, the Issuer (or the Issuer's subsidiaries) contributed to Uniti Group, Inc. ("Uniti") the assets then owned by the Issuer and its subsidiaries constituting the Distribution Systems and the Consumer CLEC Business and related liabilities in exchange for: (i) the issuance to the Issuer of Uniti common stock; (ii) the transfer from Uniti to the Issuer of approximately $1.035 billion, which the Issuer used to fund the Note Redemptions described below; and (iii) the transfer from Uniti to the Issuer of approximately $2.5 billion of Uniti debt securities, which the Issuer exchanged for outstanding Issuer debt in the Debt-for-Debt Exchange, as described below.

On April 24, 2015, the Issuer distributed approximately 80.4 percent of the outstanding shares of Uniti common stock to Windstream Parent (the "**Distribution**") and the Issuer retained the remaining shares of Uniti common stock. Concurrently, Windstream Parent distributed approximately 80.4 percent of the outstanding shares of Uniti common stock pro rata to holders of Windstream Parent common stock (the "**Spin-Off**"). Windstream Parent made a cash dividend of $0.0659 per share (equivalent to a pro-rated $0.25 per share quarterly dividend) and the Issuer made a cash distribution to Windstream Parent to fund such pro rata cash dividend.

In connection with the Spin-Off, the Issuer entered into an exchange agreement (the "**Exchange Agreement**"), under which the Issuer agreed to transfer $2.5 billion of Uniti debt securities and cash to J.P. Morgan Securities Inc. and Merrill Lynch, Pierce, Fenner & Smith Inc. (the "**Investment Banks**"), in exchange for the transfer by the Investment Banks to the Issuer and cancellation of certain debt of the Issuer consisting of borrowings outstanding under the Issuer's senior credit facility and borrowings outstanding under the revolving line of credit held by the Investment Banks (the "**Debt-for-Debt Exchange**").

On May 27, 2015, the Issuer redeemed $400 million outstanding aggregate principal amount of its 8.125% Senior Notes due 2018 pursuant to a notice of redemption dated April 24, 2015. On May 27, 2015, PAETEC Holding, LLC, a wholly-owned subsidiary of the Issuer, redeemed approximately $450 million outstanding aggregate principal amount of its 9 7/8% Senior Notes due 2018 pursuant to a notice of redemption dated April 24, 2015. These redemptions are collectively referred to as the "**Notes Redemptions**."

On June 15, 2016, the Issuer disposed of approximately 14,703,993 shares of Uniti common stock to creditors of the Issuer in exchange for the satisfaction of certain of its outstanding debt. Following this, these shares were sold pursuant to private placements (the "**First Debt-for-Equity Exchange**").

On June 24, 2016, the Issuer disposed of approximately 14,681,071 shares of Uniti common stock to Issuer creditors in exchange for the satisfaction of certain of its outstanding debt. Following this, these shares were sold in an SEC-registered offering (the "**Second Debt-for-Equity Exchange**").

Immediately after the Spin-Off, Windstream Parent entered into a long-term triple-net master lease with certain subsidiaries of Uniti to lease certain telecommunications network assets from such subsidiaries of Uniti (the "**Master Lease**"). The Issuer and its subsidiaries do not lease the assets subject to the Master Lease, are not parties to the Master Lease and have no obligations under the Master Lease, but use such assets as permitted by the terms of the Master Lease. The Master Lease was accounted for as a "failed sale leaseback transaction," which requires the long term lease obligations associated with the Master Lease to be reflected on the financial statements of the Issuer.

In connection with and following the Spin-Off, the Issuer made Restricted Payments under the 2013 Indenture, including cash distributions to Windstream Parent to fund lease payments by Windstream Parent under the Master Lease and to fund dividends by Windstream Parent to its stockholders (the "**Spin-Off and Subsequent Restricted Payments**").

The transactions described under "—Spin-Off Transactions," including Distribution, the Spin-Off, the Note Redemptions, the Debt-for-Debt Exchange, the First Debt-for-Equity Exchange, the Second Debt-for-Equity Exchange, the entry into and performance of the obligations under Master Lease and the Spin-Off and Subsequent Restricted Payments are collectively referred to as the "**Spin-Off Transactions**."

### Recent Developments

**Purported Default Notice**

On September 22, 2017, the Company received a purported notice of default dated September 21, 2017 (the "*Letter*") from Aurelius Capital Master, Ltd. ("**Aurelius**"), which alleged that the Company had breached certain covenants under the 2013 Indenture governing the Existing 6 3/8% Notes. In particular, Aurelius has claimed that (i) transfers of certain assets and the subsequent leases of those assets by the Company and certain of its restricted subsidiaries made in or about April 2015 constituted a Sale and Leaseback Transaction (as defined in the 2013 Indenture) which were not in compliance with Section 4.19 of the 2013 Indenture, (ii) the Company failed to deliver to the trustee an Officers' Certificate (as defined in the 2013 Indenture) in compliance with Section 4.07(c) of the 2013 Indenture and (iii) in connection with the Spin-Off, the Company made a Restricted Payment (as defined in the 2013 Indenture) pursuant to Section 4.07(a)(A) during the pendency of the aforementioned defaults.

The Company believes that the allegations in the Letter are without merit and that the Company is in compliance with all of the covenants under the 2013 Indenture. On September 29, 2017, the Company filed a complaint against U.S. Bank National Association, as trustee under the 2013 Indenture (the "**2013 Indenture Trustee**"), seeking injunctive relief and a declaratory judgment with the Court of Chancery in the State of Delaware. On October 4, 2017, the 2013 Indenture Trustee filed a notice of removal of the action to the United States District Court for the District of Delaware, and filed a motion to dismiss the complaint for lack of personal jurisdiction. The Company voluntarily dismissed this action on October 13, 2017. On October 12, 2017, the 2013 Indenture Trustee filed a complaint against the Company in the United States District Court for the Southern District of New York also alleging that the Company had breached certain covenants under the 2013 Indenture and seeking a declaration that a default has occurred under the 2013 Indenture, and the Company filed an answer and counterclaim in response on October 13, 2017. Discovery is currently underway, and trial is scheduled for November 28, 2017, with a possible adjournment to December 5, 2017 or a later date.

If the alleged default claimed by Aurelius is not cured by the end of a 60 day cure period after the date the Letter was received or waived by Holders representing a majority of the aggregate principal amount of the 6 3/8% Notes, the 2013 Indenture Trustee or Holders representing at least 25% in aggregate principal amount of the 6 3/8% Notes outstanding may allege that an Event of Default has occurred under the 2013 Indenture. The occurrence of an Event of Default under the 2013 Indenture would permit the 2013 Indenture Trustee or holders of at least 25% in aggregate principal amount of outstanding 6 3/8% Notes to declare the principal amount of all outstanding 6 3/8% Notes to be immediately due and payable. The 60-day cure period has been tolled pursuant to the legal proceedings described above for a period of sixteen days and, as a result, the first day on which the principal amount of all outstanding 6 3/8% Notes may be declared immediately due and payable is December 7, 2017.

In addition, if an Event of Default has occurred under the 2013 Indenture, then such Event of Default would also constitute an Event of Default under the Sixth Amended and Restated Credit Agreement, originally dated as of July 17, 2006, and as amended and restated as of April 24, 2015 (the "*Credit Agreement*"), among the Company, as borrower, the lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent. Also, if the 6 3/8% Notes are accelerated, an Event of Default will also be deemed to have occurred under the indentures governing all other series of the Company's outstanding notes which would permit the trustee or holders of at least 25% in aggregate principal amount of each other series of outstanding notes issued by the Company to declare the principal amount of such series of outstanding notes to be immediately due and payable.

Substantially concurrently with the Exchange Offers, the Company is seeking consents to certain waivers and amendments with respect to each series of the Company's outstanding notes (the "**Proposed Waivers and Amendments**"), including each series of Old Notes and the 6 3/8% Notes, as described under "—The Concurrent Transactions" below, in order to allow the Company to address allegations in the Letter from a business perspective, in addition to pursuing and preserving its legal remedies.

**Other Financing Transactions**

At June 30, 2017, the amount available for borrowing under our revolving line of credit was $477.2 million, after taking into account the total amount of outstanding under letters of credit of $25.4 million. Subsequent

to June 30, 2017, we borrowed an additional $272.8 million under our revolving line of credit, which consisted of (i) an additional $227.5 million to fund the acquisition of Broadview Networks Holdings, Inc. in July 2017, and (ii) $45.3 million to purchase approximately $49.1 million aggregate principal amount of our 7.75% Senior Notes due 2020 (the "**2020 Notes**") in open market purchases, including accrued interest thereon (collectively, the "**Other Financing Transactions**").   Any reference in this Offering Memorandum to "after giving effect to the Other Financing Transactions" or words of similar gives effect to the Other Financing Transactions as if they had been consummated on June 30, 2017.

**Certain Amendments to the 2013 Indenture governing the 6 3/8% Notes**

In connection with the Exchange Offers and the 2021 Exchange Offer, the Company, the co-issuer and each guarantor will execute a supplemental indenture to the 2013 Indenture. The supplemental indenture will be executed and effective upon consummation of such exchange offers and will apply to all 6 3/8% Notes. The supplemental indenture will provide for the following amendments to the 2013 Indenture and will be executed without the consent of holders of the Existing 6 3/8% Notes pursuant to Section 9.01(a)(iv) of the 2013 Indenture to provide additional rights or benefits to Holders of the 6 3/8% Notes:

- The principal amount of indebtedness under Credit Facilities (as defined in the 2013 Indenture) permitted pursuant to Section 4.09(b)(i) will be reduced from $4.0 billion to $2.8 billion.

- The principal amount of indebtedness that may be incurred under Sections 4.09(b)(v) and 4.09(b)(xv) will be reduced by an amount equal to the aggregate indebtedness incurred prior to the date of the 2013 Indenture under an equivalent provision in any other indenture governing the Company's currently outstanding senior notes (for the avoidance of doubt, without any duplication of indebtedness incurred such equivalent provisions in more than one such indenture), to the extent such indebtedness remains (i) outstanding and (ii) incurred under an equivalent provision in any other indenture governing the Company's currently outstanding senior notes, in each case as of the date of execution of the supplemental indenture.

- The amount of Restricted Payments permitted by Section 4.07(b)(12) will be reduced from $100.0 million to $50.0 million.

- Clause (13) of the definition of "Permitted Investments" will be deleted.

- Clause (iv) of Section of 10.05(a) will be deleted.

**The Concurrent Transactions**

**Consent Solicitation with respect to our 6 3/8% Notes**

Substantially concurrently with the commencement of the Exchange Offers, we commenced a consent solicitation with respect to our Existing 6 3/8% Notes and the New Notes to be issued in connection with the Exchange Offers (the "**6 3/8% Senior Notes Consent Solicitation**") as described in the consent solicitation statement dated October 18, 2017, as amended and supplemented (the "**6 3/8% Senior Notes Consent Solicitation Statement**") pursuant to which we are soliciting consents to the Proposed Waivers and Amendments with respect to the 6 3/8% Notes.

The Proposed Waivers and Amendments would waive (1) any Default or Event of Default (as such terms are defined in the applicable indenture) under the applicable indenture that is alleged to have, has or may have arisen under the  applicable indenture in connection with, related to or as a result of the consummation or performance of the Spin-Off Transactions and (2) any Default or Event of Default under the  applicable indenture that is alleged to have, has or may have arisen under the applicable indenture as a result of a Default or Event of Default described in the foregoing clause (1).

In addition, the Proposed Waivers and Amendments would consent to the following amendments to the applicable indenture:

- The applicable indenture would be amended to provide that, notwithstanding any other provision of the applicable indenture, each Spin-Off Transaction, any series of Spin-Off Transactions or the Spin-Off Transactions as a whole are permitted under and not prohibited by the applicable indenture and shall be deemed not to have resulted in any Default or Event of Default under the applicable indenture.

- The applicable indenture would also be amended to provide that, for the avoidance of doubt, each Spin-Off Transaction, any series of Spin-Off Transactions or the Spin-Off Transactions as a whole, including the entry into and performance of the Master Lease, shall not constitute a Sale and Leaseback Transaction (as defined in the applicable indenture) and any payment or other obligations with respect to the Master Lease shall not constitute Attributable Debt (as defined in the applicable indenture) or Indebtedness (as defined in the applicable indenture).

- The applicable indenture would be amended to provide that, for the avoidance of doubt, each of the Distribution and the Spin-Off and Subsequent Restricted Payments, individually or as a whole, constituted Restricted Payments (as defined in the applicable indenture) permitted by Section 4.07 of the applicable indenture and did not constitute Asset Sales (as defined in the applicable indenture ).

The Proposed Waivers and Amendments will become effective with respect to the 6 3/8% Notes upon receipt of consents from holders representing a majority of the outstanding aggregate principal amount of the 6 3/8% Notes, including both Existing 6 3/8% Notes and any New Notes issued pursuant to the Exchange Offers and the 2021 Exchange Offer. Holders of the 6 3/8% Notes who validly deliver (and do not validly revoke) their consents prior to 5:00 p.m., New York City time, on October 31, 2017 will receive a consent payment of $2.50 per $1,000 principal amount of 6 3/8% Notes, and Holders of the 6 3/8% Notes who validly deliver (and do not validly revoke) their consents after 5:00 p.m., New York City time, on October 31, 2017 but prior to 5:00 p.m., New York City time, on November 2, 2017 will receive a consent payment of $2.00 per $1,000 principal amount of 6 3/8% Notes. The expiration date for the 6 3/8% Senior Notes Consent Solicitation is 5:00 p.m., New York City time, November 2, 2017, unless extended or earlier terminated by us.

Eligible Holders electing to participate in the Exchange Offers may, when tendering their Old Notes, also direct their DTC participant to transmit their consent to the Proposed Waivers and Amendments pursuant to the 6 3/8% Senior Notes Consent Solicitation with respect to the New Notes to be issued pursuant to the Exchange Offers through ATOP, for which the transaction will be eligible. Holders tendering Old Notes in the Exchange Offers and electing to direct their participant in DTC to consent will be eligible to receive only the late consent payment of $2.00 per $1,000 principal amount of New Notes specified under the terms of the 6 3/8% Senior Notes Consent Solicitation, and will not be eligible to receive the early consent payment of $2.50 per $1,000 principal amount of New Notes specified under the terms of the 6 3/8% Senior Notes Consent Solicitation, unless we elect (in our sole discretion) to amend the terms of the 6 3/8% Senior Notes Consent Solicitation.  See "Procedures for Tendering Old Notes."

If and to the extent that we receive the requisite consents with respect to the 6 3/8% Senior Notes Consent Solicitation such that the Proposed Waivers and Amendments become effective with respect to the 6 3/8% Notes, the New Notes that you will receive in connection with the Exchange Offers will be subject to, and you will be bound by, the terms of the Proposed Waivers and Amendments with respect to the New Notes. The Proposed Waivers and Amendments will become operative with respect to the 6 3/8% Notes upon the Proposed Waivers and Amendments with respect to each series of notes subject to the Other Senior Notes Consent Solicitations (as defined below) becoming effective.

**Consent Solicitation with respect to our Old Notes and other Senior Notes**

Substantially concurrently with the commencement of the Exchange Offers, we commenced consent solicitations with respect to our 2020 Notes, 7.75% Senior Notes due 2021 (the "**2021 Notes**") and our Old Notes (the "**Other Senior Notes Consent Solicitations**" and, together with the 6 3/8% Notes Consent Solicitation, the "**Consent Solicitations**"). Pursuant to the Other Senior Notes Consent Solicitations, the Company is soliciting consents to the Proposed Waivers and Amendments with respect to each of the applicable indentures governing the Old Notes, the 2020 Notes and the 2021 Notes as described in the consent solicitation statement dated October 18,

2017, as amended and supplemented. Such Proposed Waivers and Amendments will become effective upon receipt of consents from holders representing a majority of the outstanding aggregate principal amount of each applicable series of outstanding notes. We will pay holders that validly deliver (and do not validly revoke) their consents prior to the applicable expiration date a consent payment in cash of $2.50 per $1,000 principal amount of applicable notes with respect to the Other Senior Notes Consent Solicitations. The expiration date for the Other Senior Notes Consent Solicitations is 5:00 p.m., New York City time, on October 31, 2017, unless extended or earlier terminated by us.

If and to the extent that we receive the requisite consents with respect to the Other Senior Notes Consent Solicitations for any series of Old Notes such that the Proposed Waivers and Amendments become effective with respect to such series of Old Notes, the Old Notes of such series that you hold will be subject to, and you will be bound by, the terms of the Proposed Waivers and Amendments with respect to such Old Notes. The Proposed Waivers and Amendments relating to a series of applicable notes with respect to which the requisite consents have been received will become operative upon the later of (1) the Proposed Waivers and Amendments for each other series of applicable notes becoming effective and (2) receipt of the requisite consents pursuant to the 6 3/8% Senior Notes Consent Solicitation and the Proposed Waivers and Amendments with respect to the 6 3/8% Notes becoming effective.

**2020 Exchange Offer**

Substantially concurrently with the commencement of the Exchange Offers, we commenced an offer to exchange (the "**2020 Exchange Offer**") our 2020 Notes for up to $50.0 million in aggregate principal amount of new 8.625% Senior First Lien Notes due 2025 (the "**New 2025 Notes**" or the "**First Lien Notes**"), in accordance with the terms set forth in an exchange offer memorandum dated October 18, 2017 and the related letter of transmittal, each as amended and supplemented. The exchange consideration for each $1,000 principal amount of the 2020 Notes validly tendered (and not validly withdrawn) on or prior to the applicable early participation date (i.e., 5:00 p.m., New York City time, on October 31, 2017) and accepted for exchange is $950 principal amount of New 2025 Notes, plus accrued and unpaid interest. The late exchange consideration for holders who validly tender after the applicable early tender date and on or prior to the applicable expiration date is, for each $1,000 principal amount of 2020 Notes, $900, plus accrued and unpaid interest. The early participation date for the 2020 Exchange Offer is 5:00 p.m., New York City time, on October 31, 2017, and the 2020 Exchange Offer will expire at 11:59 p.m., New York City time, on November 14, 2017, in each case unless extended or earlier terminated by us.

The maximum exchange amount of $50.0 million aggregate principal amount of New 2025 Notes that may be issued in the 2020 Exchange Offer may be increased by the Company in its sole discretion in accordance with the terms of the 2020 Exchange Offer, subject to compliance with applicable law and the terms of our outstanding indebtedness. The Company may amend the terms of the New 2025 Notes to be issued pursuant to the 2020 Exchange Offer to match the terms of the New 2025 Notes, if any, to be issued in the New Secured Notes Offering (as defined below), in accordance with the terms of the 2020 Exchange Offer.

Any New 2025 Notes issued pursuant to the 2020 Exchange Offer will be issued under the new First Lien Notes Indenture and will be treated as a single class with any New 2025 Notes issued pursuant to the 2021 Exchange Offer or the New Secured Notes Offering.

This Offering Memorandum is not an offer to sell, or a solicitation of an offer to buy, any New 2025 Notes. The New 2025 Notes will not be registered under the Securities Act and may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements.

**2021 Exchange Offer**

Substantially concurrently with the commencement of the Consent Solicitations, we commenced an offer to exchange (the "**2021 Exchange Offer**") our 2021 Notes for (i) any and all New Notes or (ii) up to $50.0 million in aggregate principal amount of New 2025 Notes (the "**Maximum Exchange Amount**"), in accordance with the terms set forth in an exchange offer memorandum dated October 18, 2017 and the related letter of transmittal, each as amended and supplemented. The exchange consideration for each $1,000 principal amount of the 2021 Notes validly tendered (and not validly withdrawn) on or prior to the applicable early tender date and accepted for exchange is $1,100 principal amount of New Notes or $950 principal amount of New 2025 Notes, in each case plus

accrued and unpaid interest. The late exchange consideration for holders who validly tender after the applicable early tender date and on or prior to the applicable expiration date is, for each $1,000 principal amount of 2020 Notes, $1,050 principal amount of New Notes or $900 principal amount of New 2025 Notes, in each case plus accrued and unpaid interest. The early participation date for the 2021 Exchange Offer is 5:00 p.m., New York City time, on October 31, 2017, and the 2021 Exchange Offer will expire at 5:00 pm on November 14, 2017, in each case unless extended or earlier terminated by us.

Holders can elect, to the extent the Maximum Exchange Amount of New 2025 Notes has been issued, to receive (i) the applicable amount of New Notes or (ii) the amount of New Notes up to an aggregate principal amount of $247.0 million of New Notes to be issued pursuant to the Concurrent Transactions and to receive the remaining 2021 Notes not accepted for exchange. The maximum exchange amount of $50.0 million aggregate principal amount of New 2025 Notes and maximum exchange amount of $247.0 million of New 6 3/8% Notes that may be issued in the 2021 Exchange Offer may be increased by the Company in its sole discretion in accordance with the terms of the 2021 Exchange Offer, subject to compliance with applicable law and the terms of our outstanding indebtedness. The Company may amend the terms of the New 2025 Notes to be issued pursuant to the 2021 Exchange Offer to match the terms of the New 2025 Notes, if any, to be issued in the New Secured Notes Offering (as defined below), in accordance with the terms of the 2021 Exchange Offer.

Any New 2025 Notes issued pursuant to the 2021 Exchange Offer will be issued under the new First Lien Notes Indenture and will be treated as a single class with any New 2025 Notes issued pursuant to the New Secured Notes Offering or the 2020 Exchange Offer.

This Offering Memorandum is not an offer to sell, or a solicitation of an offer to buy, any New 2025 Notes. The New 2025 Notes will not be registered under the Securities Act and may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements.

**New Secured Notes Offering**

In connection with the foregoing transactions, we anticipate that we will also offer, subject to market and other conditions, approximately $250.0 million in aggregate principal amount of New 2025 Notes to qualified institutional buyers in reliance on Rule 144A and outside the United States to non-U.S. persons in reliance on Regulation S (the "**New Secured Notes Offering**"). We expect to use proceeds from the New Secured Notes Offering to refinance a portion of the outstanding amounts under our senior secured revolving credit facility.

Any New 2025 Notes issued pursuant to any New Secured Notes Offering will be issued under the same indenture as any First Lien Notes issued pursuant to the 2020 Exchange Offer or the 2021 Exchange Offer. Any New 2025 Notes issued pursuant to any New Secured Notes Offering will be treated as a single class with the New 2025 Notes issued pursuant to the 2020 Exchange Offer or the 2021 Exchange Offer.

This Offering Memorandum is not an offer to sell, or a solicitation of an offer to buy, any New 2025 Notes. The New 2025 Notes will not be registered under the Securities Act and may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements.

**Conditionality of Exchange Offers and Concurrent Transactions**

There can be no assurance that the requisite consents pursuant to any of the Consent Solicitations will be obtained, or that the conditions to such consents becoming effective and/or operative will be satisfied (whether because there is an action or proceeding, threatened or pending, that could affect implementation of such consents or otherwise, including in connection with the purported notice of default described above). In addition, there can be no assurance that the conditions to consummation of the Exchange Offers, the 2021 Exchange Offer or the 2020 Exchange Offer (collectively, the "**Concurrent Exchange Offers**") will be satisfied, whether because any trustee under any of the applicable indentures objects in any respect to the completion thereof as a result of the purported notice of default described above or otherwise. As a result, there can be no assurance that the Exchange Offers, or any of the Concurrent Exchange Offers, Consent Solicitations or the New Secured Notes Offering (collectively, the "**Concurrent Transactions**"), will be consummated on the terms or within the timeframes described herein, or at all.

The Exchange Offers are conditioned upon (i) (A) the valid tender (without valid withdrawal), on or prior to the Early Tender Date, of 2021 Notes, 2022 Notes and 2023 Notes in the Exchange Offers and the 2021 Exchange Offer in an amount that would result in the issuance of in excess of $247.0 million aggregate principal amount of New Notes pursuant to the Exchange Offers and the 2021 Exchange Offer, and (B) obtaining, on or prior to the applicable Settlement Date, including substantially concurrently with or as a result of settlement on such date, the requisite consents from holders representing a majority of the outstanding aggregate principal amount of the 6 3/8% Notes and the effectiveness of the Proposed Waivers and Amendments pursuant to the 6 3/8% Notes Consent Solicitation (collectively, the "**Minimum Issuance Condition**") and (ii) obtaining, on or prior to the applicable Settlement Date, including substantially concurrently with or as a result of settlement on such date, the requisite consents from holders representing a majority of the outstanding aggregate principal amount of each series of notes to, and the effectiveness of, the Proposed Waivers and Amendments pursuant to each of the Other Senior Notes Consent Solicitations (the "**Consent Condition**"). We reserve the right, but are not obligated, to change or waive the Minimum Issuance Condition or the Consent Condition. The Exchange Offers are not conditioned upon the announcement or consummation of the New Secured Notes Offering. The 2020 Exchange Offer and the 2021 Exchange Offer contain substantially the same Minimum Issuance Condition and the Consent Condition. The Minimum Issuance Condition and the Consent Condition can be waived at any time at the Company's discretion.

**Basis of Presentation**

Any reference in this Offering Memorandum to "after giving pro forma effect to the Exchange Offers and the Concurrent Transactions" or words of similar import assumes (i) the maximum exchange amount of $50.0 million aggregate principal amount of New 2025 Notes are issued in exchange for $52.6 million aggregate principal amount of 2021 Notes pursuant to the terms of the 2021 Exchange Offer, and the remaining $756.7 million of 2021 Notes are issued in exchange for $832.4 million of New Notes at a rate of $1,100 principal amount of New Notes for each $1,000 principal amount of 2021 Notes, (ii) the maximum exchange amount of $50.0 million aggregate principal amount of New 2025 Notes are issued in exchange for $52.6 million aggregate principal amount of 2020 Notes pursuant to the terms of the 2020 Exchange Offer, (iii) $845.8 million aggregate principal amount of New Notes are issued in exchange for all of the outstanding 2022 Notes and 2023 Notes pursuant to the 2022/2023 Exchange Offers and (iv) $250.0 million aggregate principal amount of New 2025 Notes are issued pursuant to the New Secured Notes Offering. We expect to utilize the proceeds we receive from the New Secured Notes Offering to refinance a portion of the outstanding amounts under our revolving credit facility.

There can be no assurance as to (i) the aggregate principal amount of outstanding notes that will be tendered or accepted for exchange pursuant to the Exchange Offers or the Concurrent Exchange Offers, (ii) the aggregate principal amount of outstanding notes in respect of which consents will be delivered pursuant to the Consent Solicitations, or (iii) the aggregate principal amount of New Notes or New 2025 Notes issued by us pursuant to the Exchange Offers, the Concurrent Exchange Offers, and the New Secured Notes Offering. As a result, such amounts may be significantly more than, or significantly less than, the assumed amounts described above. In addition, there can be no assurance as to the aggregate amount of consent payments and accrued interest paid by us in cash pursuant to the Exchange Offers, the Concurrent Exchange Offers or the Consent Solicitations.

## SUMMARY OF THE TERMS OF THE EXCHANGE OFFERS

| | |
|---|---|
| **Exchange Offers**............................................................ | Upon the terms and subject to the conditions of the Exchange Offers set forth in this Offering Memorandum and the Letter of Transmittal, the Company is offering to Eligible Holders the New Notes for Old Notes. Old Notes validly tendered (and not validly withdrawn) will be accepted as further described herein. |
| | Each Exchange Offer for any series of Old Notes is being made independently of the other Exchange Offers for any other series of Old Notes and is not conditioned upon the completion of any of the other Exchange Offers. In addition, the Company reserves the right, subject to applicable law, to terminate, withdraw, amend or extend each Exchange Offer without also terminating, withdrawing, amending or extending any of the other Exchange Offers. See "General Terms of the Exchange Offers—General." |
| | You may tender all, some or none of your Old Notes, subject to the conditions and acceptance structure described in this Offering Memorandum. |
| **Old Notes** ...................................................................... | 7.50% Senior Notes due 2022 and 7.50% Senior Notes due 2023. |
| **Holders Eligible to Participate in the Exchange Offers**............................................................ | The Exchange Offers are being made only to Eligible Holders that have properly completed and returned an executed eligibility letter to the Information Agent. Eligible Holders participating in the Exchange Offers must make the investment representations set forth in the Letter of Transmittal and will be deemed to make such representations pursuant to a valid electronic acceptance instruction. Eligible Holders of Old Notes are persons (i) in the United States, who are "qualified institutional buyers" as defined in Rule 144A under the Securities Act or (ii) outside the United States, who are persons other than "U.S. persons" as defined in Rule 902 under the Securities Act that will receive New Notes in offshore transactions in compliance with Regulation S under the Securities Act. |
| | **Persons who are not Eligible Holders may not receive and review this Offering Memorandum or participate in the Exchange Offers.** |
| | **Only Eligible Holders who have properly completed and returned the eligibility certification, which is available from the Information Agent, are authorized to receive and review this Offering Memorandum and to participate in the Exchange Offers.** |
| **Consideration Offered in the Exchange Offers**....... | Eligible Holders whose Old Notes are tendered prior to the Early Tender Date, not validly withdrawn and |

accepted for exchange will receive, per $1,000 principal amount of such Old Notes, the Early Exchange Consideration set forth in the table on the front cover of this Offering Memorandum.

Eligible Holders whose Old Notes are tendered after the Early Tender Date and accepted for exchange will receive, per $1,000 principal amount of such Old Notes, the Late Exchange Consideration set forth in the table on the front cover of this Offering Memorandum.

**Accrued and Unpaid Interest** ..................................  In addition to the consideration, we will pay in cash accrued and unpaid interest on the Old Notes accepted in the Exchange Offers from the applicable latest interest payment date to, but not including, the applicable Settlement Date. Interest on the New Notes will accrue from the date of first issuance of New Notes and, as described herein, we may elect, in our sole discretion, to settle on the Early Settlement Date the Exchange Offers for any or all series of Old Notes and issue New Notes with respect to such Old Notes validly tendered prior to the Early Tender Date (and not validly withdrawn). If we elect to have an Early Settlement Date, any New Notes issued on the Final Settlement Date will be issued with accrued interest up to, but not including, the Final Settlement Date. The amount of such accrued interest will not be deducted from the accrued and unpaid interest on the applicable Old Notes otherwise payable by us in respect of such Old Notes accepted for exchange.

**Denominations; Rounding** ........................................  Pursuant to the Exchange Offers, Old Notes may be tendered only in principal amounts equal to the authorized denominations for such Old Notes. No alternative, conditional or contingent tenders will be accepted. A holder who tenders less than all of the Old Notes of a series held by such holder must continue to hold such Old Notes in an authorized denomination for such series.

We will not accept any tender of Old Notes that would result in the issuance of less than $2,000 principal amount of New Notes. If, under the terms of the Exchange Offers, a tendering holder is entitled to receive New Notes in a principal amount that is not an integral multiple of $1,000, we will round downward such principal amount of New Notes to the nearest integral multiple of $1,000. This rounded amount will be the principal amount of New Notes you will receive, and no additional cash will be paid in lieu of any principal amount of New Notes not received as a result of rounding down.

**Early Tender Date** ....................................................  To be eligible to receive the Early Exchange Consideration, holders must tender their Old Notes at or prior to 5:00 p.m., New York City time, on October 31,

2017, unless extended by the Company.

**Expiration Date**............................................... 11:59 p.m., New York City time, on November 14 2017, unless extended by the Company.

**Settlement Date**................................................ Subject to the terms and conditions of an Exchange Offer, the Final Settlement Date for such Exchange Offer will occur promptly after the Expiration Date for such Exchange Offer and is expected to occur on November 17, 2017. We may elect, in our sole discretion, to settle the Exchange Offers for any or all series of Old Notes and issue the New Notes with respect to such Old Notes validly tendered prior to the Early Tender Date (and not validly withdrawn) at any time after the Early Tender Date and prior to the Final Settlement Date. Such Early Settlement Date will be determined at our option and, if we elect to have an Early Settlement Date, we expect that it would occur on or after November 2, 2017, subject to all conditions to the Exchange Offers having been satisfied or waived by us. If the earlier issuance of any New Notes does not occur within 13 days of the Final Settlement Date (including the date of such first issuance), the New Notes issued earlier and the New Notes issued on the Final Settlement Date may not be fungible for U.S. federal income tax purposes and could have separate CUSIP and ISIN numbers.

**Conditions** ...................................................... The Exchange Offers and the Company's obligation to accept Old Notes are subject to the satisfaction or waiver of a number of conditions as set forth in this Offering Memorandum, including, without limitation, the Minimum Issuance Condition and the Consent Condition. Subject to applicable law, the Company expressly reserves the right, in its sole discretion, to amend any or all of the Exchange Offers in any respect and to terminate any of the Exchange Offers if the conditions to such Exchange Offer are not satisfied by the Expiration Date (or the Early Settlement Date, as the case may be). If any of the Exchange Offers is terminated at any time with respect to the Old Notes of a given series, the Old Notes of such series tendered pursuant to such Exchange Offer will be promptly returned to the tendering holders. The Company may, at any time prior to the Expiration Date (or the Early Settlement Date, as the case may be), waive any condition to any or all of the Exchange Offers in its sole discretion, subject to applicable law. See "Conditions of the Exchange Offers."

**Extensions, Termination or Amendments** ............... We may extend, in our sole discretion, the Early Tender Date, the Withdrawal Deadline, the Early Settlement Date or the Expiration Date with respect to any or all of the Exchange Offers, subject to applicable law. We reserve the right, in our sole discretion and with respect to any or all of the Exchange Offers, subject to applicable law, to (i) delay accepting any Old Notes, extend the applicable Exchange Offer or terminate such Exchange

Offer and not accept any Old Notes pursuant thereto; (ii) extend the applicable Early Tender Date without extending the applicable Withdrawal Deadline and vice versa; and (iii) amend, modify or waive in part or whole, at any time, or from time to time, the terms of such Exchange Offer in any respect, including waiver of any conditions to consummation of such Exchange Offer, in each case subject to applicable law. In the event that an Exchange Offer is terminated or otherwise not completed prior to its Expiration Date, no consideration will be paid or become payable to holders who have tendered their Old Notes pursuant to such Exchange Offer. In any such event, Old Notes previously tendered pursuant to such Exchange Offer will be promptly returned to the tendering holders. See "General Terms of the Exchange Offers—Early Tender Date; Expiration Date; Extensions; Amendments; Termination."

**Procedures for Participating in the Exchange Offers.............................................**   If you are an Eligible Holder and wish to participate in the Exchange Offers and your Old Notes are held by a custodial entity, such as a commercial bank, broker, dealer, trust company or other nominee, you must instruct that custodial entity to tender your Old Notes on your behalf pursuant to the procedures of that custodial entity. Please ensure that you contact your custodial entity as soon as possible to give them sufficient time to meet your requested deadline. Beneficial owners are urged to appropriately instruct their commercial bank, broker, custodian or other nominee at least five business days prior to the Early Tender Date or the Expiration Date, as applicable, in order to allow adequate processing time for their instruction.

If you are an Eligible Holder and your Old Notes are registered in your name, you must complete, sign and date the accompanying Letter of Transmittal, or a facsimile of the Letter of Transmittal, according to the instructions contained in this Offering Memorandum and the Letter of Transmittal. You must also mail or otherwise deliver the Letter of Transmittal, or a manually executed facsimile of the Letter of Transmittal, together with the Old Notes and any other required documents, to the Exchange Agent at its address listed on the back cover page of the Letter of Transmittal. Custodial entities that are participants in The Depository Trust Company ("**DTC**") must tender Old Notes through ATOP maintained by DTC, by which the custodial entity and the beneficial owner on whose behalf the custodial entity is acting agree to be bound by the Letter of Transmittal. We have not provided guaranteed delivery procedures in conjunction with the Exchange Offers.

**Any tender through ATOP must comply with the deadlines and requirements in this Offering Memorandum, as it may be supplemented or amended by the Company; provided a Letter of**

**Transmittal need not accompany tenders effected through ATOP.** See "Procedures for Tendering Old Notes" and the Letter of Transmittal.

**Tenders made in compliance with procedures or instructions that are inconsistent with those stated in this Offering Memorandum, regardless of who provides such procedures or instructions, will not be deemed valid tenders (unless we waive such compliance in our sole discretion).**

**Procedures for Tendering New Notes in the 6 3/8 Senior Notes Consent Solicitation ...........................**

Holders tendering Old Notes in any of the Exchange Offers may elect, at the time of tendering such Old Notes, to also direct their participant in DTC to consent to certain proposed waivers and amendments pursuant to the 6 3/8% Senior Notes Consent Solicitation (as defined herein) with respect to the New Notes to be issued pursuant to the Exchange Offers. Any such consent may be given by the tender of such New Notes in accordance with the procedures described under "Procedures for Tendering Old Notes—Tendering New Notes in the 6 3/8% Senior Notes Consent Solicitation," but shall be given pursuant to and in accordance with the terms of the consent solicitation statement for the 6 3/8% Senior Notes Consent Solicitation.

No such consent with respect to any New Notes to be delivered pursuant to an Exchange Offer will be effective unless settlement of the applicable Exchange Offer occurs prior to expiration of the 6 3/8% Senior Notes Consent Solicitation. As a result, Holders tendering Old Notes pursuant to an Exchange Offer will not be eligible to deliver consents or receive any consent payment pursuant to the 6 3/8% Senior Notes Consent Solicitation unless either (i) such Old Notes are validly tendered (and not validly withdrawn) prior to the Early Tender Date and accepted for exchange by us, and we elect (in our sole discretion) to have an Early Settlement Date prior to expiration of the 6 3/8% Senior Notes Consent Solicitation, or (ii) we elect (in our sole discretion) to extend the expiration date of the 6 3/8% Senior Notes Consent Solicitation pursuant to the terms thereof to a date that falls on or after the applicable Settlement Date for such Exchange Offer.

Holders tendering Old Notes in the Exchange Offers and electing to direct their participant in DTC to consent will be eligible to receive only the late consent payment of $2.00 per $1,000 principal amount of New Notes specified under the terms of the 6 3/8% Senior Notes Consent Solicitation, and will not be eligible to receive the early consent payment of $2.50 per $1,000 principal amount of New Notes specified under the terms of the 6 3/8% Senior Notes Consent Solicitation, unless we elect (in our sole discretion) to amend the terms of the 6 3/8% Senior Notes Consent Solicitation.

| | |
|---|---|
| **Withdrawal** .................................................... | Tenders of Old Notes of a series pursuant to the applicable Exchange Offer may be validly withdrawn at any time prior to 5:00 p.m., New York City time, on October 31, 2017, unless extended by the Company, by following the procedures described herein. Any Old Notes tendered prior to the applicable Withdrawal Deadline and that are not validly withdrawn prior to such Withdrawal Deadline may not be withdrawn thereafter, except as otherwise provided by law. Old Notes tendered in such Exchange Offers after the Withdrawal Deadline may not be withdrawn, except in the limited circumstances where additional withdrawal rights are required by law. See "Withdrawal of Tenders" and "General Terms of the Exchange Offers—Early Tender Date; Expiration Date; Extensions; Amendments; Termination." |
| **Material U.S. Federal Income Tax Considerations**.................................... | For a summary of the material U.S. federal income tax consequences of the Exchange Offers, see "Material U.S. Federal Income Tax Considerations." |
| **Consequences of Not Exchanging Old Notes**........... | Old Notes acquired in the Exchange Offers will be retired and cancelled. Old Notes not acquired in the Exchange Offers will remain outstanding obligations of the Company. |
| | To the extent that any Old Notes remain outstanding after completion of the Exchange Offers, any existing trading market for the remaining Old Notes may become further limited. The smaller outstanding principal amount may make the trading prices of the remaining Old Notes more volatile. Consequently, the liquidity, market value and price volatility of the Old Notes that remain outstanding may be materially and adversely affected. |
| | Any Old Notes remaining outstanding following the completion of the Exchange Offers will be effectively subordinated to claims with respect to any New 2025 Notes issued in the Concurrent Transactions to the extent of the value of the collateral securing such New 2025 Notes. |
| | For a description of other consequences of failing to tender your Old Notes pursuant to the Exchange Offers, see "Risk Factors—Risks Related to the Exchange Offers—The liquidity of the Old Notes that are not exchanged will be reduced." |
| **Purpose of the Exchange Offers** ............................. | The purpose of the Exchange Offers is to extend the maturity date of some of our near-term maturities. |
| **Use of Proceeds** .......................................... | We will not receive any cash proceeds from the Exchange Offers. |

14

| | |
|---|---|
| **Dealer Manager, Exchange Agent and Information Agent** ..................................................... | Citigroup Global Markets Inc. is serving as the Dealer Manager for the Exchange Offers. |
| | Global Bondholder Services Corporation has been appointed the Exchange Agent and the Information Agent for the Exchange Offers. |
| | The addresses and the facsimile and telephone numbers of the Dealer Manager, the Exchange Agent and the Information Agent appear on the back cover of this Offering Memorandum. |
| | We have other business relationships with the Dealer Manager, as described in "Dealer Manager, Exchange Agent and Information Agent." |
| **Brokerage Fees and Commissions** ............................ | No brokerage fees or commission are payable by the holders of the Old Notes to the Dealer Manager, the Exchange Agent, the Information Agent or the Company in connection with the Exchange Offers. If a tendering holder handles the transaction through its broker, dealer, commercial bank, trust company or other institution, that holder may be required to pay brokerage fees or commissions. |
| **No Recommendation** ..................................................... | None of the Company, the Dealer Manager, the Exchange Agent, the Information Agent, the trustees with respect to the Old Notes or the New Notes or any affiliate of any of them makes any recommendation as to whether any holder of Old Notes should tender or refrain from tendering all or any portion of the principal amount of such holder's Old Notes for New Notes in the Exchange Offers. No one has been authorized by any of them to make such a recommendation. |
| **Risk Factors** ................................................................. | For descriptions of risks related to the Exchange Offers, an investment in the New Notes and our business, see the section entitled "Risk Factors" in this Offering Memorandum, as well as those risk factors and other information provided in our Annual Report on Form 10-K for the year ended December 31, 2016 and our Quarterly Report on Form 10-Q for the quarter ended June 30, 2017, each of which is incorporated by reference herein. |
| **Further Information** .................................................... | Questions or requests for assistance related to the Exchange Offers or for additional copies of this Offering Memorandum and the Letter of Transmittal may be directed to the Information Agent at its telephone numbers and address listed on the back cover page of this Offering Memorandum. You should also contact your broker, dealer, commercial bank, trust company or other nominee for assistance concerning the Exchange Offers. The contact information for the Dealer Manager and the Exchange Agent is set forth on the back cover page of |

this Offering Memorandum. See "Where You Can Find
More Information."

### SUMMARY OF THE NEW NOTES

| | |
|---|---|
| **Issuers** ........................................................ | Windstream Services, LLC, a Delaware limited liability company as issuer, and Windstream Finance Corp., a Delaware corporation as co-issuer. |
| **New Notes Offered** ...................................... | 6 3/8% Senior Notes due 2023. The New Notes offered hereby will be issued as Additional Notes under the 2013 Indenture and will be treated with the Existing 2023 Notes as a single class of notes for all purposes under the 2013 Indenture. However, the New Notes will not be fungible with the Existing 6 3/8% Notes for U.S. federal income tax purposes and, as a result, will have CUSIPs and ISINs that will differ from the CUSIPs and ISINs of the Existing 6 3/8% Notes. |
| **Maturity Date** .............................................. | The New Notes will mature on August 1, 2023. |
| **Interest Rate** ................................................ | 6 3/8% per year. |
| **Original Issue Discount** ............................... | The New Notes are expected to be treated as having been issued with original issue discount for U.S. federal income tax purposes. See "Material U.S. Federal Income Tax Considerations." |
| **Interest Payment Dates** ............................... | Each February 1 and August 1, beginning on February 1, 2018. Interest on New Notes will accrue from the Early Settlement Date. |
| **Guarantees** ................................................... | Same as the Existing 2023 Notes. |
| **Ranking** ........................................................ | Same as the Existing 2023 Notes. |
| **Optional Redemption** ................................... | Same as the Existing 2023 Notes. |
| **Equity Offering Optional Redemption** ................... | Same as the Existing 2023 Notes. |
| **Change of Control** ........................................ | Same as the Existing 2023 Notes. |
| **Certain Covenants** ........................................ | Same as the Existing 2023 Notes, except as described under "Recent Developments—Certain Amendments to the 2013 Indenture governing the 6 3/8% Notes." |
| **Transfer Restrictions; No Registration Rights** .............................. | We have not registered the New Notes or the offering thereof under the Securities Act or any state or other securities laws. The New Notes are subject to restrictions on transfer and resale. The New Notes may not be offered or sold, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws and the securities laws of any other jurisdiction. We do not intend to register such resales or offer to exchange the New Notes for New Notes registered under the Securities Act or the securities laws of any other jurisdiction. See "Transfer Restrictions." |

| | |
|---|---|
| **Absence of Established Market for the New Notes**.................................................... | The New Notes will not be listed on any securities exchange or included in any automated quotation system. Accordingly, we cannot assure you as to the development or liquidity of any market for the New Notes. The Dealer Manager has advised us that it currently intends to make a market in the New Notes. However, it is not obligated to do so, and it may discontinue any market making with respect to the New Notes without notice. |
| **Denominations; Form of New Notes** ........................ | The New Notes will be issued in denominations of $2,000 and integral multiples of $1,000 in excess thereof. We will issue the New Notes in the form of one or more global notes in definitive, fully registered, book-entry form. The global notes will be deposited with or on behalf of DTC. |
| **Ratio of Earnings to Fixed Charges** ......................... | Our ratio of earnings to fixed charges for the six months ended June 30, 2017 and 2016 and the years ended December 31, 2016, 2015, 2014, 2013 and 2012 were 0.4, 0.4, 0.4, 1.1, 0.9, 1.5 and 1.4, respectively. See "Ratio of Earnings to Fixed Charges." |
| **Risk Factors** ............................................................. | You should carefully consider the risk factors set forth under the caption "Risk Factors" in this Offering Memorandum and in our Annual Report on Form 10-K for the year ended December 31, 2016, our Quarterly Report on Form 10-Q for the period ended June 30, 2017, and the other information included in this Offering Memorandum or incorporated by reference herein. |

For additional information regarding the New Notes, see "Description of the New Notes."

## RISK FACTORS

*Any investment in the notes involves a high degree of risk. You should carefully consider the risks described below before deciding whether to purchase the notes. In addition, you should carefully consider, among other things, the matters discussed under "Risk Factors" in our Form 10-K for the year ended December 31, 2016 and Quarterly Report on Form 10-Q for the period ended June 30, 2017, and in other documents that we subsequently file with the Securities and Exchange Commission, all of which are incorporated by reference into this offering memorandum. The risks and uncertainties described below are not the only risks and uncertainties we face. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also impair our business operations. If any of the following risks actually occur, our business, financial condition and results of operations would suffer. The risks discussed below also include forward-looking statements and our actual results may differ substantially from those discussed in these forward-looking statements. See "Cautionary Note Regarding Forward-Looking Statements."*

## Risks Related to the Exchange Offers

### *One of the Company's bondholders has claimed that the transactions related to the spin-off of Uniti resulted in one or more defaults of certain covenants under the 2013 Indenture.*

On September 22, 2017, we received a purported notice of default from one of the holders of our Existing 6 3/8% Notes issued under the 2013 Indenture, which alleged that we had breached certain covenants under the 2013 Indenture. We do not believe that any such default under the 2013 Indenture has occurred as a result of the Transactions and, furthermore, we believe that we are in compliance with all of our indentures governing our notes.

On September 29, 2017, we filed a complaint against U.S. Bank National Association, as trustee under the 2013 Indenture seeking injunctive relief and a declaratory judgment with the Court of Chancery in the State of Delaware. On October 4, 2017, the trustee filed a notice of removal of the action to the United States District Court for the District of Delaware, and filed a motion to dismiss the complaint for lack of personal jurisdiction. The Company voluntarily dismissed this action on October 13, 2017. On October 12, 2017, the trustee filed a complaint against us in the United States District Court for the Southern District of New York also alleging that we had breached certain covenants under the 2013 Indenture and seeking a declaration that a default has occurred under the 2013 Indenture, and we filed an answer and counterclaim in response on October 13, 2017. Discovery is underway and trial is scheduled for November 28, 2017, with a possible adjournment to December 5, 2017 or a later date. See "Summary—Recent Developments—Purported Default Notice."

Although we do not believe that any such default under the 2013 Indenture has occurred and that these allegations are without merit, there can be no assurance that the bondholder or the trustee making such allegations will not be successful. In particular, there can be no assurance that the trustee under the 2013 Indenture will not be successful in obtaining declaratory judgment that a default has occurred under the 2013 Indenture.  If we are not successful in defeating these claims, that bondholder or the trustee could elect to declare the principal amount of the 6 3/8% Notes issued under the 2013 Indenture due and payable, together with accrued interest, if the alleged default is not cured by the end of a 60 day cure period following the date of the purported notice of default.  The 60-day cure period has been tolled pursuant to the legal proceedings described above for a period of sixteen days and, as a result, the first day on which the principal amount of all outstanding 6 3/8% Notes may be declared immediately due and payable is December 7, 2017. Moreover, the covenants in our other series of outstanding notes are substantially the same as the covenants under the 2013 Indenture. As a result, holders of our other outstanding series of notes, and trustees under the applicable indentures, could also make similar or other allegations and seek to declare an event of default and accelerate our other series of notes. Any such acceleration of a series of our outstanding notes could also allow lenders under our senior secured credit facilities to declare all funds borrowed to be due and payable, and such lenders could also elect to terminate their commitments thereunder, cease making further loans, and institute foreclosure proceedings against their collateral. Also, if the 6 3/8% Notes are accelerated, an Event of Default will also be deemed to have occurred under the indentures governing all other series of our outstanding notes which would permit the trustee or holders of at least 25% in aggregate principal amount of each other series of notes issued by us to declare the principal amount of each such series of notes to be immediately due and payable. The Consent Solicitations and the 6 3/8% Senior Notes Consent Solicitations may not be completed and, as a result, may not be successful in waiving the alleged defaults or making clarifying amendments under the 2013 Indenture or under the

indentures governing any other series of our outstanding notes.  Moreover, it is possible that any of our bondholders or trustees under our indentures may pursue other remedies or litigation against us based on similar or additional allegations with respect to the Transactions, the Consent Solicitations and the Concurrent Transactions or otherwise, whether or not any of the Consent Solicitations and the 6 3/8% Senior Notes Consent Solicitations are successful.

Any such actions, claims or litigation may result in an outcome that could have a material adverse impact on our business, operations and financial condition, as well as our stakeholders, including Holders of the 6 3/8% Notes. For example, any declaration that any of our indebtedness is immediately due and payable, or, any other such actions, could result in the acceleration of any Old Notes you hold as well as any New 6 3/8% Notes issued in the Exchange Offers, and could also force us into bankruptcy or liquidation. Even if we are successful in defending against such claims, we may expend significant management time and attention and funds to defend against such claims.

**The Exchange Offers may be cancelled, delayed or changed.**

The Exchange Offers are subject to the satisfaction or waiver of a number of conditions as set forth in this Offering Memorandum, including, without limitation, the Minimum Issuance Condition and the Consent Condition. See "Conditions of the Exchange Offers." The Company may amend any one or more of the Exchange Offers, including the conditions thereto. Depending on the materiality of the change, the Company may not be required to extend the Early Tender Date, the Expiration Date or the Withdrawal Deadline with respect to any Exchange Offer following the announcement of such change. In addition, the Company may terminate any one or more of the Exchange Offers if any of the conditions described under the "Conditions of the Exchange Offers" are not satisfied or waived by the Expiration Date (or the Early Settlement Date, as the case may be), including if the trustee under an indenture for any Old Notes or for the 6 3/8% 2023 Notes shall object in any respect to the completion of any Exchange Offer as a result of the purported notice of default described above or otherwise. If one of the Exchange Offers is not completed or is delayed, the market price of the series of Existing Notes in such Exchange Offer may decline to the extent that the current market price reflects an assumption that such Exchange Offer has been or will be completed.  Even if the Exchange Offers are completed, they may not be completed on the schedule described in this Offering Memorandum. Accordingly, holders participating in the Exchange Offers may have to wait longer than expected to receive their New Notes during which time those holders of the Old Notes will not be able to effect transfers of their Old Notes tendered for exchange (and not validly withdrawn).

**You should not tender any Old Notes that you do not wish to have accepted for exchange by us.**

Old Notes of a series tendered in the applicable Exchange Offer may be validly withdrawn at any time prior to the applicable Withdrawal Deadline with respect to such Exchange Offer (5:00 p.m., New York City time, on October 31, 2017, unless extended in our sole discretion), but not thereafter. After the applicable Withdrawal Deadline, Old Notes tendered prior to the Expiration Date (whether tendered prior to, at, or after the Withdrawal Deadline, will be irrevocable, except where additional withdrawal rights are required by law.

**Any Old Notes that are not exchanged in the Exchange Offers, and any New Notes you receive in the Exchange Offers, will be subject to the Proposed Waivers and Amendments if we obtain the requisite consents pursuant to the Consent Solicitations.**

Substantially concurrently with the commencement of the Exchange Offers, we commenced the Consent Solicitations pursuant to which we are soliciting consents to the Proposed Waivers and Amendments with respect to each series of Old Notes and with respect to each other series of our outstanding senior notes, including the 6 3/8% Notes.  See "Summary—The Concurrent Transactions."  The Proposed Waivers and Amendments waive certain alleged defaults and make certain clarifying amendments to the applicable indentures  that govern such notes as described under "Summary—The Concurrent Transactions."

If any of the Other Senior Notes Consent Solicitations are successfully completed and the Proposed Waivers and Amendments are effected with respect to any series of Old Notes that you hold, those Old Notes will be subject to, and you will be bound by, the Proposed Waivers and Amendments with respect to those Old Notes, whether or not you elect to consent to the Proposed Waivers and Amendments.  Similarly, if the 6 3/8% Senior Notes Consent Solicitation is successfully completed and the Proposed Waivers and Amendments are effected with

respect to the 6 3/8% Notes, the 6 3/8% Notes will be subject to, and you will be bound by, the Proposed Waivers and Amendments with respect to any New Notes that you receive in the Exchange Offers, whether or not you elect to consent to the Proposed Waivers and Amendments.  As a result, the alleged defaults described under "Recent Developments—Purposed Default Notice" would not constitute "Defaults" or "Events of Default" under the applicable indenture governing those Old Notes or the New Notes, as the case may be, and you would not have any claim that the relevant transactions described under "Summary—The Spin-Off Transactions" are not permitted under the applicable indenture governing those Old Notes or the New Notes, as the case may be.

***The liquidity of the Old Notes that are not exchanged will be reduced.***

The current trading market for the Old Notes is limited. Upon consummation of the Exchange Offers, the trading market for unexchanged Old Notes will become even more limited and could cease to exist due to the reduction in the amount of such Old Notes outstanding. A more limited trading market might adversely affect the liquidity, market price and price volatility of these securities. If a market for unexchanged Old Notes exists or develops, these securities may trade at a discount to the price at which the securities would trade if the amount outstanding were not reduced, depending on prevailing interest rates, the market for similar securities and other factors. However, there can be no assurance that an active market in the unexchanged Old Notes will exist, develop or be maintained or as to the prices at which the unexchanged Old Notes may be traded.

***Your decision to tender your Old Notes with maturity dates prior to the maturity date of the New Notes may expose you to the risk of nonpayment for a longer period of time.***

The New Notes will mature in 2023. If, following the maturity date of your Old Notes but prior to the maturity date of the New Notes, we were to become subject to a bankruptcy or similar proceeding, the holders of such Old Notes who did not exchange such Old Notes could be paid in full while holders of Old Notes who exchanged such Old Notes for New Notes may not be paid in full, if at all. Your decision to tender such Old Notes should be made with the understanding that the lengthened maturity of the New Notes exposes you to the risk of nonpayment for a longer period of time.

We may repurchase any Old Notes that are not tendered in the Exchange Offers in future transactions on terms that are more favorable to the holders of the Old Notes than the terms of the applicable Exchange Offer, and we may incur additional secured indebtedness to finance such repurchases.

We may, to the extent permitted by applicable law, and to the extent permitted by certain restrictive covenants governing our indebtedness, after the Expiration Date of the Exchange Offers, purchase Old Notes in the open market, in privately negotiated transactions, through subsequent tender or exchange offers or otherwise. Any such purchases may be made on the same terms or on terms that are more or less favorable to holders than the terms of the Exchange Offers. In addition, we may issue additional New Notes or incur secured indebtedness in connection with the financing of such transactions.

***You may not receive New Notes in the Exchange Offers if the procedures for the Exchange Offers are not followed.***

Subject to the terms and conditions of the Exchange Offers, the Company will issue New Notes in exchange for your Old Notes only if you validly tender the Old Notes and deliver a properly completed and duly executed Letter of Transmittal, or an Agent's Message (as defined under "Acceptance of Old Notes; Accrual of Interest") in lieu thereof, and any other required documents before the Expiration Date (or the Early Tender Date, as the case may be). Eligible Holders of Old Notes are responsible for complying with all the procedures of the Exchange Offers. Tenders made in compliance with procedures or instructions that are inconsistent with those stated in this Offering Memorandum (or a supplement or amendment thereto provided by the Company), regardless of who provides such procedures or instructions, will not be deemed valid tenders (unless we waive such compliance in our sole discretion). Eligible Holders of Old Notes who wish to exchange them for New Notes should allow sufficient time for timely completion of the exchange procedures. The Company is not obligated to extend any or all of the Exchange Offers. None of the Exchange Agent, the Information Agent, the Dealer Manager or the Company are under any duty to give notification of defects or irregularities with respect to the tenders of Old Notes for exchange or to extend any of the applicable deadlines.

If you are the beneficial owner of Old Notes that are held through DTC, in the name of your broker, dealer, commercial bank, trust company or other nominee or custodian, and you wish to tender in the Exchange Offers, you should promptly contact the person in whose name your Old Notes are held and instruct that person to tender your Old Notes on your behalf. Beneficial owners should be aware that their broker, dealer, commercial bank, trust company or other nominee or custodian may establish their own earlier deadlines for participation in the Exchange Offers. Accordingly, beneficial owners wishing to participate in the Exchange Offers should contact their broker, dealer, commercial bank, trust company or other nominee or custodian as soon as possible in order to determine the times by which such owner must take action in order to participate in the Exchange Offers.

***If we consummate the Exchange Offers, existing ratings for our senior notes remaining outstanding following completion of the Exchange Offers may not be maintained.***

We cannot assure you that, as a result of the Exchange Offers, the rating agencies will not downgrade or negatively comment upon the ratings for our senior notes remaining outstanding following completion of the Exchange Offers. Any downgrade or negative comment would likely adversely affect the market price of the Old Notes and the New Notes and may adversely impact our ability to access the debt capital markets or obtain loans.

***You must validly tender your Old Notes at or prior to the Early Tender Date in order to be eligible to receive the Early Exchange Consideration.***

You must validly tender your Old Notes at or prior to the Early Tender Date in order to be eligible to receive the applicable Early Exchange Consideration. If you validly tender your outstanding Old Notes after the Early Tender Date but at or prior to the Expiration Date, you will only be eligible to receive the applicable Late Exchange Consideration, which is less than the Early Exchange Consideration.

***You may not receive the Consent Payment for the 6 3/8% Senior Notes Consent Solicitation even if you elect to consent when you tender Old Notes in the Exchange Offers.***

Eligible Holders that tender their Old Notes in the Exchange Offers may elect to consent to the Proposed Waivers and Amendments with respect to any New Notes that they receive in the Exchange Offers as described under "Procedures for Tendering Old Notes—Tendering New Notes in the 6 3/8% Senior Notes Consent Solicitation." Any such consent will be subject to the terms and conditions described in the 6 3/8% Senior Notes Consent Solicitation Statement. However, Eligible Holders that elect to consent to the Proposed Waivers and Amendments pursuant to the 6 3/8% Senior Notes Consent Solicitation will only be eligible to deliver such consents and receive the applicable consent payment if either (i) such Old Notes are validly tendered (and not validly withdrawn) prior to the Early Tender Date and accepted for exchange by us, and we elect (in our sole discretion) to have an Early Settlement Date prior to expiration of the 6 3/8% Senior Notes Consent Solicitation, or (ii) we elect (in our sole discretion) to extend the expiration date of the 6 3/8% Senior Notes Consent Solicitation pursuant to the terms thereof to a date that falls on or after the applicable Settlement Date for such Exchange Offer. Accordingly, there can be no assurance that any such Eligible Holder will be eligible to deliver such consent or to receive any consent payment pursuant to the 6 3/8% Senior Notes Consent Solicitation.

***New Notes for which consents are delivered will be blocked from trading until the earliest of the expiration date for the 6 3/8% Senior Notes Consent Solicitation, the date on which Holders revoke such consents and the date on which the 6 3/8% Senior Notes Consent Solicitation is terminated.***

New Notes issued in the Exchange Offers to tendering holders that elect to direct their participant in DTC to consent will be blocked, and such tendering Holder's position will be held under one or more temporary CUSIP numbers (i.e., Contra CUSIP) and cannot be sold or transferred, from the applicable Settlement Date until the earlier of (i) the expiration of the 6 3/8% Senior Notes Consent Solicitation, (ii) the date on which the DTC Participant revokes its consent in accordance with the terms of the 6 3/8% Senior Notes Consent Solicitation, and (iii) the date on which the 6 3/8% Notes Consent Solicitation is terminated. Subsequent to the date on which the New Notes are no longer blocked from trading, Holders may transfer the 6 3/8% Notes in accordance with the terms thereof and in accordance with the procedures of DTC. However, the right to receive the consent payment pursuant to the 6 3/8% Senior Notes Consent Solicitation is not transferable with any New Notes. The consent payment will only be made to the Holder that provided and did not validly revoke its consent prior to the expiration date for the 6 3/8% Senior

Notes Consent Solicitation. No subsequent Holder of the New Notes will be entitled to receive any consent payment. In the period of time during which New Notes are blocked pursuant to the foregoing procedures, Holders may be unable to promptly liquidate their New Notes or timely react to adverse trading conditions and could suffer losses as a result of these restrictions on transferability.

***The Concurrent Transactions may not occur, or may occur on different terms or timelines to those described in this Offering Memorandum.***

Substantially concurrently with the commencement of the Exchange Offers, we also commenced the Consent Solicitations, the 2021 Exchange Offer and the 2020 Exchange Offer, and we also anticipate announcing the New Secured Notes Offering in connection with these transactions.  You should not assume that any of the Concurrent Transactions will be consummated on the terms or the timelines described under "Summary—The Concurrent Transactions" or at all, even if one or more of the Exchange Offers is consummated.

***We may repurchase any outstanding Old Notes that are not accepted for exchange in the offers in future transactions on terms that are more favorable to the holders of the outstanding notes than the terms of the applicable Exchange Offer.***

We and our affiliates may, from time to time after completion of the Exchange Offers, purchase additional outstanding Old Notes in the open market, in privately negotiated transactions, through tender offers, exchange offers or otherwise or we may redeem the outstanding Old Notes that are able to be redeemed, pursuant to their terms. Any future purchases, exchanges or redemptions may be on the same terms or on terms that are more or less favorable to holders of outstanding Old Notes than the terms of the offers. Any future purchases, exchanges or redemptions by us and our affiliates will depend on various factors existing at that time. There can be no assurance as to which, if any, of these alternatives (or combinations thereof) we and our affiliates may choose to pursue in the future.

***We may recognize cancellation of indebtedness ("COD") income as a result of the consummation of the Exchange Offers.***

The exchange of Old Notes for New Notes pursuant to the Exchange Offers is expected to result in COD income to the Company for U.S. federal income tax purposes. Because the amount of COD income to be recognized by the Company depends in part on the fair market value and/or issue price of the New Notes to be issued on the date of the exchange, the precise amount of COD income, if any, resulting from the Exchange Offers cannot be determined prior to the date of the exchange. However, the Company generally anticipates that any COD income that it recognizes in the Exchange Offers will be offset, at least in part, by its existing net operating losses ("**NOLs**") and certain other tax attributes. To the extent that existing NOLs and other tax attributes of the Company are not sufficient to offset fully any COD income, and such COD is not otherwise excluded from income, the Company may incur a cash tax liability from such COD income.

**Risks Related to the New Notes and our Indebtedness**

***Our substantial debt could adversely affect our cash flow and prevent us from fulfilling our obligations under the New Notes.***

After giving pro forma effect to the Exchange Offers, the Concurrent Transactions and the Other Financing Transactions, we would have had approximately $6,000.1 million of consolidated indebtedness as of June 30, 2017.

Our substantial amount of debt could have important consequences to you. For example, it could:

- make it more difficult for us to satisfy our obligations under the New Notes;
- increase our vulnerability to general adverse economic and industry conditions;
- require us to dedicate a substantial portion of our cash flow from operations to make interest and principal payments on our debt, thereby limiting the availability of our cash flow to fund future capital expenditures, working capital and other general corporate requirements;

- limit our flexibility in planning for, or reacting to, changes in our business and the telecommunications industry;
- place us at a competitive disadvantage compared with competitors that have less debt; and
- limit our ability to borrow additional funds, even when necessary to maintain adequate liquidity.

Further, a substantial portion of our debt, including borrowings under our Credit Agreement, bears interest at variable rates. If market interest rates increase, variable-rate debt will create higher debt service requirements, which could adversely affect our cash flow. While we may enter into agreements limiting our exposure to higher interest rates, any such agreements may not offer complete protection from this risk.

In addition to our debt, we have significant contractual obligations, as discussed in "Management's Discussion and Analysis of Financial Condition and Results of Operations" incorporated by reference herein.

***Despite our substantial debt, we or our subsidiaries may still be able to incur significantly more debt. This could further exacerbate the risks associated with our substantial debt.***

We or our subsidiaries may be able to incur additional debt in the future. The terms of our Credit Agreement, the indenture governing the New Notes and the agreements governing our other debt will allow us to incur substantial amounts of additional debt (including additional secured debt), subject to certain limitations. If additional debt is added to our current debt levels, the related risks we could face would be magnified.

***The agreements governing our debt, including the New Notes and our Credit Agreement, contain various covenants that impose restrictions on us that may affect our ability to operate our business and to make payments on the New Notes.***

The agreements governing our Credit Agreement, the indenture governing the New Notes and the agreements governing our other debt each impose operating and financial restrictions on our activities. These restrictions include compliance with or maintenance of certain financial tests and ratios, including minimum interest coverage ratio and maximum leverage ratio, and limit or prohibit our ability to, among other things:

- incur additional debt and issue preferred stock;

- permit liens;

- redeem and/or prepay certain debt;

- pay dividends on our stock or repurchase stock;

- make certain investments;

- engage in specified sales of assets;

- enter into transactions with affiliates;

- enter new lines of business;

- engage in consolidation, mergers and acquisitions;

- make certain capital expenditures; and

- pay dividends and make other distributions.

These restrictions on our ability to operate our business could seriously harm our business by, among other things, limiting our ability to take advantage of financing, merger and acquisition and other corporate opportunities.

Various risks, uncertainties and events beyond our control could affect our ability to comply with these covenants and maintain these financial tests and ratios. Failure to comply with any of the covenants in our existing

or future financing agreements would result in a default under those agreements and under other agreements containing cross-default provisions. A default would permit debt holders to accelerate the maturity for the debt under these agreements, to foreclose upon any collateral securing the debt and to and to terminate any commitments to lend. Under these circumstances, we might have insufficient funds or other resources to satisfy all our obligations, including our obligations under the New Notes. In addition, the limitations imposed by financing agreements on our ability to incur additional debt and to take other actions might significantly impair our ability to obtain other financing.

***We may enter into significant transactions that, although permitted by the 2013 Indenture governing the New Notes, could adversely affect our credit ratings and the value of the New Notes.***

The 2013 Indenture will contain numerous restrictive covenants for the benefit of noteholders, but such covenants are subject to exceptions, some of which may be significant. In particular, while the 2013 Indenture governing the New Notes limits our ability to make restricted payments, including dividends and other distributions and stock repurchases, as of the issue date it will afford us the capacity to make restricted payments in amounts of up to $3 billion in the aggregate, provided that we remain in compliance with a specified consolidated leverage ratio. Therefore, we could, in the future, enter into certain transactions, including acquisitions, reorganizations, spin-offs, re-financings or other recapitalizations, that may increase our indebtedness and/or decrease the amount of assets available to our creditors and thereby increase our leverage relative to our assets and earnings. Consistent with our strategy of seeking to enhance shareholder value, we have in the past and intend to continue to regularly evaluate and consider such potential transactions so long as they would be permitted under the indenture governing the New Notes and the other documents governing our outstanding indebtedness. While such transactions could potentially enhance the value of the equity in our company, they could also negatively affect our credit ratings and the value of the New Notes.

***The New Notes will mature after a substantial portion of our other debt.***

The New Notes will mature on August 1, 2023. After giving effect to the Exchange Offers and the Concurrent Transactions, approximately $2,687.9 million of outstanding term loan indebtedness under our Credit Agreement will mature between April 24, 2020 (which maturity date may be extended to March 29, 2021 if the maturity of our revolving credit facility is extended prior to April 24, 2020 and if our existing 7.75% Senior Notes due 2020 have been repaid or refinanced prior to July 15, 2020) and February 17, 2024, and $598.3 million aggregate principal amount of our existing senior notes will mature between October 15, 2020 and July 31, 2023. As of June 30, 2017, after giving pro forma effect to the Exchange Offers, the Concurrent Transactions and the Other Financing Transactions, we have $772.8 million of outstanding indebtedness under the revolving facility under our Credit Agreement, and this revolving facility will mature on April 24, 2020 (unless extended by revolving lenders in their discretion or as described above). Therefore, in the absence of certain change of control or other transactions pursuant to which we are required to offer to repurchase the New Notes or our election to redeem the New Notes, we will be required to repay lenders under our Credit Agreement and the holders of a significant portion of our existing senior notes before we are required to repay a portion of the interest due on, and the principal of, the New Notes. As a result, we may not have sufficient cash to repay all amounts owing on the New Notes at maturity. There can be no assurance that we will have the ability to borrow or otherwise raise the amounts necessary to repay or refinance such amounts.

***The New Notes will be effectively subordinated to our secured debt and that of the guarantors.***

The New Notes, and each guarantee of the New Notes, are unsecured and therefore will be effectively subordinated to any of our secured debt and that of the guarantors to the extent of the assets securing such debt. In the event of a bankruptcy or similar proceeding, the assets which serve as collateral for any secured debt will be available to satisfy the obligations under the secured debt before any payments are made on the New Notes. As of June 30, 2017, after giving pro forma effect to the Exchange Offers, the Concurrent Transactions and the Other Financing Transactions, we had approximately $3,137.9 million of secured debt outstanding.

In addition, as of June 30, 2017, after giving pro forma effect to the Exchange Offers, the Concurrent Transactions and the Other Financing Transactions, we had approximately $477.2 million of availability under our senior secured revolving credit facility and can request additional commitments, loans or other extensions of credit (*provided* that the secured leverage ratio does not exceed 2.25 to 1.00 on a pro forma basis) under the Credit

Agreement. The New Notes will be effectively subordinated to any borrowings under our Credit Agreement and certain of our existing notes. The indenture governing the New Notes and the terms of our Credit Agreement will allow us to incur a substantial amount of additional secured debt in certain circumstances.

***Not all of our subsidiaries will be required to guarantee the New Notes, and the assets of any non-guarantor subsidiaries may not be available to make payments on the New Notes as your claims in respect of the New Notes will be effectively subordinated to all of the liabilities of any of our subsidiaries that is not a guarantor.***

On the issue date of the New Notes, subsidiaries of the Issuer that currently guarantee our Credit Agreement will also guarantee the New Notes. However, most of our regulated subsidiaries do not guarantee the Credit Agreement and those subsidiaries will not guarantee the New Notes.  For the six months ended June 30, 2017 and the year ended December 31, 2016, our non-guarantor subsidiaries represented approximately 80% and 80%, respectively, of our revenue, and 90%, and 74%, respectively, of our operating income.  As of June 30, 2017, after giving pro forma effect to the Exchange Offers, the Concurrent Transactions and the Other Financing, our non-guarantor subsidiaries held approximately $9,162.5 million of our total assets and $4,873.7 million of our total liabilities. All of our future unrestricted subsidiaries, and any of our future restricted subsidiaries that do not guarantee our Credit Agreement, will not be required to guarantee the New Notes, and under certain circumstances the guarantees of a note may be released. See "Description of the new notes—Certain covenants—Guarantees." For more information on the guarantor and non-guarantor subsidiaries, please see footnote 16 to our consolidated financial statements for the fiscal year ended December 31, 2016 and footnote 16 to our consolidated financial statements for the six months ended June 30, 2017.

In the event that any of our non-guarantor subsidiaries becomes insolvent, liquidates, reorganizes, dissolves or otherwise winds up, holders of the debt and trade creditors of such non-guarantor subsidiaries will be entitled to payment on their claims from the assets of that subsidiary before any of those assets are made available to us or any guarantors. Consequently, your claims in respect of the New Notes will be structurally subordinated to all of the liabilities of any of our subsidiaries that is not a guarantor, including trade payables. In addition, the 2013 Indenture, subject to certain limitations, permits our subsidiaries to incur additional indebtedness (including additional secured indebtedness) and does not contain any limitation on the amount of certain other liabilities, such as trade payables, that our subsidiaries may incur.

***To service our debt and meet our other cash needs, we will require a significant amount of cash, which may not be available.***

Our ability to make payments on, or repay or refinance, our debt, including the New Notes, and to fund planned capital expenditures, dividends and other cash needs will depend largely upon our future operating performance. Our future performance, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. In addition, our ability to borrow funds in the future to make payments on our debt will depend on the satisfaction of the covenants in our Credit Agreement and our agreements governing our other debt, including the indenture governing the New Notes, and other agreements we may enter into in the future. Specifically, we will need to maintain specified financial ratios and satisfy financial condition tests. We cannot assure you that our business will generate sufficient cash flow from operations or that future borrowings will be available to us under our Credit Agreement or from other sources in an amount sufficient to enable us to pay our debt, including the New Notes, or to fund our liquidity needs.

If we are unable to meet our debt service obligations or to fund our other liquidity needs, we will need to restructure or refinance all or a portion of our debt, including the New Notes, which could cause us to default on our debt obligations and impair our liquidity. Our ability to restructure or refinance our debt will depend on the condition of the capital markets and our financial condition at such time. Any refinancing of our indebtedness could be at higher interest rates and may require us to comply with more onerous covenants that could further restrict our business operations.

Moreover, in the event of a default, the holders of our indebtedness, including the New Notes, could elect to declare all the funds borrowed to be due and payable, together with accrued and unpaid interest. The lenders under our revolving credit facility could also elect to terminate their commitments thereunder and cease making further loans and institute foreclosure proceedings against their collateral, and we could be forced into bankruptcy or

liquidation. If we breach our covenants under our Credit Agreement, we would be in default thereunder. The lenders could exercise their rights, as described above, and we could be forced into bankruptcy or liquidation.

***We are dependent upon dividends from our subsidiaries to meet our debt service obligations.***

We are a holding company and conduct all of our operations through our subsidiaries. Our ability to meet our debt service obligations will be dependent on receipt of dividends from our direct and indirect subsidiaries. Subject to the restrictions contained in our indentures, future borrowings by our subsidiaries may contain restrictions or prohibitions on the payment of dividends by our subsidiaries to us. See "Description of the new notes—Certain covenants." In addition, federal and state regulations governing our regulated subsidiaries and applicable state corporate law may limit the ability of our subsidiaries to pay dividends to us. We cannot assure you that the agreements governing the current and future indebtedness of our subsidiaries, applicable laws or state regulation will permit our subsidiaries to provide us with sufficient dividends, distributions or loans to fund payments on these New Notes when due.

***The New Notes and/or the guarantees may be voided, subordinated, or face other adverse consequences pursuant to applicable fraudulent conveyance and preference laws.***

The issuance of the New Notes and guarantees may be subject to review under federal bankruptcy law or relevant state fraudulent conveyance laws if litigation is commenced by or on behalf of our creditors. Under these laws, if in such litigation a court were to find that, at the time the New Notes are issued:

- we or any guarantor incurred this debt or the guarantees with the intent of hindering, delaying or defrauding current or future creditors; or

- we or any guarantor received less than reasonably equivalent value or fair consideration for incurring this debt, and we or such guarantor:

  - was insolvent or was rendered insolvent by reason of the related financing transactions;

  - was engaged, or about to engage, in a business or transaction for which its remaining assets constituted unreasonably small capital to carry on its business; or

  - intended to incur, or believed that it would incur, debts beyond its ability to pay these debts as they mature, as all of the foregoing terms are defined in or interpreted under the relevant fraudulent transfer or conveyance statutes;

then the court could void the New Notes or applicable guarantees or subordinate the New Notes or such guarantees to our presently existing or future debt or take other actions detrimental to you.

The measure of insolvency for purposes of the foregoing considerations will vary depending upon the law of the jurisdiction that is being applied in any such proceeding. Generally, an entity would be considered insolvent if, at the time it incurred the debt:

- it could not pay its debts or contingent liabilities as they become due;

- the sum of its debts, including contingent liabilities, is greater than its assets, at fair valuation; or

- the present fair saleable value of its assets is less than the amount required to pay the probable liabilities on its total existing debts and liabilities, including contingent liabilities, as they become absolute and mature.

We cannot assure you as to what standard a court would apply in order to determine whether we were "insolvent" as of the date the New Notes were issued, and we cannot assure you that, regardless of the method of valuation, a court would not determine that we were insolvent on that date. Nor can we assure you that a court would not determine, regardless of whether we were insolvent on the date the New Notes were issued, that the payments constituted fraudulent transfers on another ground. We also cannot assure you as to what standard a court would apply in order to determine whether we received less than reasonably equivalent value in connection with the

issuance of the New Notes.  We will not receive any cash proceeds from the Exchange Offers and participants in the Exchange Offers will receive New Notes with face amount greater than that of the Old Notes.  Accordingly, a court may find that the tender of the Old Notes does not constitute reasonably equivalent value or fair consideration for the New Notes.

In addition, as discussed herein, the Exchange Offers and issuance of the New Notes are being consummated contemporaneously with certain other actions by us affecting our existing indebtedness and capital structure, including the 6 3/8% Senior Notes Consent Solicitation, the Other Senior Notes Consent Solicitation and the 2020 Exchange Offer.  A court may "collapse" these steps into a single set of integrated transactions to determine whether such transactions overall effected a fraudulent conveyance.

Further, if we were to become a debtor in a case under the United States Bankruptcy Code within 90 days after we consummate the Exchange Offers (or, with respect to any insiders, as defined in the United States Bankruptcy Code, within one year after consummation of the Exchange Offers), and the court determines that we were insolvent at the time of the Exchange Offers (for preference purposes, we would be presumed to have been insolvent on and during the 90 days immediately preceding the date of filing of any bankruptcy petition), the court could find that the issuance of the New Notes involved a preferential transfer.  If the court made such a determination, then such preferential transfer may be avoided, in whole or in part, and to the extent avoided, the value of any consideration holders received with respect to such New Notes could be recovered from such holders and possibly from subsequent transferees.

Our obligations under the New Notes are guaranteed by all of our existing subsidiaries that are currently guarantors under our Credit Agreement, and the guarantees may also be subject to review under various laws for the protection of creditors. The analysis set forth above would generally apply, except that the guarantees could also be subject to the claim that, since the guarantees were incurred for our benefit, and only indirectly for the benefit of the guarantors, the obligations of the guarantors thereunder were incurred for less than reasonably equivalent value or fair consideration. A court could void a guarantor's obligation under its guarantee, subordinate the guarantee to the other indebtedness of a guarantor, direct that holders of the New Notes return any amounts paid under a guarantee to the relevant guarantor or to a fund for the benefit of its creditors, or take other action detrimental to the holders of the New Notes. In addition, the liability of each guarantor under the indenture will be limited to the amount that will result in its guarantee not constituting a fraudulent conveyance, and there can be no assurance as to what standard a court would apply in making a determination as to what would be the maximum liability of each guarantor or whether a court would give effect to such limitation. In the event that a court declares the guarantees to be void, or in the event that the guarantees must be limited or voided in accordance with their terms, any claim you may make against us for amounts payable on the New Notes would be effectively subordinated to the obligations of our subsidiaries, including trade payables and other liabilities that constitute indebtedness.

***Because each guarantor's liability under its guarantees may be reduced to zero, voided or released under certain circumstances, holders of New Notes may not receive any payments from some or all of the guarantors.***

Holders of the New Notes will have the benefit of the guarantees of the guarantors. However, the guarantees by the guarantors are limited to the maximum amount that the guarantors are permitted to guarantee under applicable law. As a result, a guarantor's liability under its guarantee could be reduced to zero, depending upon the amount of other obligations of such guarantor. Further, under the circumstances discussed more fully above, a court under federal and state fraudulent conveyance and transfer statutes could void the obligations under a guarantee or further subordinate it to all other obligations of the guarantor. See "—The New Notes and/or the guarantees may be voided, subordinated, or face other adverse consequences pursuant to applicable fraudulent conveyance and preference laws." In addition, you will lose the benefit of a particular guarantee if it is released under certain circumstances described under "Description of the new notes—Note guarantees."

***We may be unable to make a change of control offer required by the indenture governing the New Notes which would cause defaults under the indenture governing the New Notes, our Credit Agreement and our other financing arrangements.***

The terms of the indenture governing the New Notes will require us to make an offer to repurchase the New Notes upon the occurrence of a change of control at a purchase price equal to 101% of the principal amount of the New Notes, plus accrued interest to the date of the purchase. The terms of our Credit Agreement will require, and

other financing arrangements may require, repayment of amounts outstanding in the event of a change of control and limit our ability to fund the repurchase of the New Notes in certain circumstances. It is possible that we will not have sufficient funds at the time of the change of control to make the required repurchase of the New Notes or that restrictions in our Credit Agreement and other financing arrangements will not allow the repurchases. See "Description of the new notes—Repurchase at the option of holders—Change of control."

***Holders of the New Notes may not be able to determine when a change of control triggering event giving rise to their right to have the New Notes repurchased has occurred following a sale of "substantially all" of our assets.***

The definition of change of control in the 2013 Indenture governing the New Notes includes a phrase relating to the sale of "all or substantially all" of our assets. There is no precise established definition of the phrase "substantially all" under applicable law. Accordingly, the ability of a holder of the New Notes to require us to repurchase its New Notes as a result of a sale of less than all our assets to another person may be uncertain. See "— Description of the new notes—Repurchase at the option of holders—Change of control."

***An active, public market may not develop for the New Notes, which may hinder your ability to liquidate your investment.***

The New Notes are a new issue of securities with no established trading market, and we do not intend to list the New Notes on any securities exchange. The Dealer Manager has informed us that it intends to make a market in the New Notes after the completion of this offering. However, the Dealer Manager is not obligated to do so and may cease its market-making at any time. In addition, the liquidity of the trading market in the New Notes, and the market price quoted for the New Notes, may be adversely affected by changes in the overall market for fixed income securities and by changes in our financial performance or prospects or in the prospects for companies in our industry in general. As a result, we cannot assure you that an active trading market will develop for the New Notes. If no active trading market develops, you may not be able to resell your New Notes at their fair market value or at all.

***There are restrictions on your ability to transfer or resell the New Notes.***

The New Notes are being offered and sold pursuant to an exemption from registration under U.S. federal and applicable state securities laws. We do not intend to issue registered notes in exchange for the New Notes to be privately placed in this offering and the absence of registration rights may adversely impact the transferability of the New Notes.  Specifically, you may transfer or resell the New Notes in the United States only in a transaction exempt from the registration requirements of U.S. federal and applicable state securities laws or pursuant to an effective registration statement.  As a result, you may be required to bear the risk of your investment for an indefinite period of time.

***If the New Notes are rated investment grade by Moody's and S&P, certain covenants contained in the 2013 Indenture will be terminated, and holders of the New Notes will lose the protection of these covenants.***

The 2013 Indenture that will govern the New Notes contains certain covenants that will be terminated if the New Notes are rated investment grade by Moody's and S&P. These covenants restrict our ability and the ability of its restricted subsidiaries to, among other things:

- incur additional indebtedness or issue preferred stock;

- make distributions or other restricted payments;

- sell capital stock or other assets; and

- engage in transactions with affiliates.

Because these restrictions will not apply once the New Notes are rated investment grade, we will be able to incur additional debt and consummate transactions that may impair our ability to satisfy our obligations with respect to the New Notes. No default or event of default will be deemed to exist under the indentures, the New Notes or the guarantees with respect to the suspended covenants based on any actions taken or events occurring during the period

in which the covenants were suspended that were permitted at such time, regardless of whether such actions or events would have been permitted if the applicable suspended covenants remained in effect during such period.

***Our debt ratings have been downgraded recently. Any adverse rating of the New Notes may cause their trading price to fall.***

Standard & Poor's Rating Services downgraded our credit rating and outlook in September 2017. In addition, Fitch Ratings Inc. placed us on negative watch in connection with the purported default notice described under "Summary—Recent Developments—Purported Default Notice." There can be no assurance that we will be able to maintain our credit ratings, and if there are further downgrades of our credit rating, or notices of potential downgrades, the trading prices of the New Notes could decline. We do not intend to seek a rating on the New Notes. However, if a rating service were to rate the New Notes and if such rating service were to lower its rating on the New Notes below the rating initially assigned to the New Notes or otherwise announces its intention to put the New Notes on credit watch, the trading price of the New Notes could decline.

***The New Notes will have a different CUSIP and ISIN number than the Existing 6 3/8% Notes, and liquidity of the Old Notes that are not exchanged will be reduced.***

The New Notes will be assigned a different CUSIP and ISIN number from the Existing 6 3/8% Notes and thus may have less liquidity, lower market prices and more price volatility than the Existing 6 3/8% Notes of the same series. Because the aggregate principal amount of New Notes with a different CUSIP and ISIN is significantly less than the aggregate principal amount of the Existing 6 3/8% Notes, there may be more limited liquidity with respect to such New Notes and, therefore, the ability of the holders thereof to resell such New Notes may be adversely affected. In addition, a series with a small outstanding principal amount available for trading generally commands a lower price than does a comparable series with a greater principal amount available for trading. Therefore, the value of New Notes issued under a different CUSIP and ISIN with less aggregate principal amount outstanding may be adversely affected, and the trading prices of such New Notes may be more volatile.

***If New Notes issued on the Final Settlement Date are considered not fungible with New Notes of the same series issued on the Early Settlement Date for U.S. federal income tax purposes, then such New Notes will be assigned a different CUSIP and ISIN number from the New Notes of the same series issued on the Early Settlement Date, and any such New Notes may have less liquidity, lower market prices and more price volatility than the New Notes issued on the Early Settlement Date.***

If New Notes issued on the Final Settlement Date are considered to be not fungible with New Notes of the same series issued on the Early Settlement Date for U.S. federal income tax purposes, then such New Notes will be assigned a different CUSIP and ISIN number from the New Notes of the same series issued on the Early Settlement Date. Any such New Notes issued on the Final Settlement Date with a different CUSIP and ISIN number may have less liquidity, lower market prices and more price volatility than the New Notes of the same series issued on the Early Settlement Date. If the aggregate principal amount of New Notes of a series that are issued on the Final Settlement Date with a different CUSIP and ISIN number is significantly less than the aggregate principal amount of the New Notes of the same series issued on the Early Settlement Date, there may be more limited liquidity with respect to such New Notes and, therefore, the ability of the holders thereof to resell such New Notes may be adversely affected. In addition, a series with a small outstanding principal amount available for trading generally commands a lower price than does a comparable series with a greater principal amount available for trading. Therefore, the value of New Notes issued under a different CUSIP and ISIN number with less aggregate principal amount outstanding may be adversely affected, and the trading prices of such New Notes may be more volatile.

***The New Notes are expected to be issued with original issue discount ("OID") for U.S. federal income tax purposes.***

Because the stated principal amount of the New Notes is expected to exceed their issue price by an amount equal to or greater than a statutorily defined threshold, the New Notes are expected to be considered to be issued with OID for U.S. federal income tax purposes. In addition to the stated interest on a New Note, a holder participating in the Exchange Offers that is subject to U.S. federal income taxation generally will be required to include the OID on such New Note in gross income (as ordinary income) as it accrues on a constant yield to

maturity basis for U.S. federal income tax purposes, in advance of the receipt of any cash payments attributable to such gross income and regardless of the holder's regular method of accounting for U.S. federal income tax purposes. See "Material U.S. Federal Income Tax Considerations—Tax Consequences to U.S. Holders—OID."

**We may be unable to deduct OID for United States federal income tax purposes with respect to the New Notes.**

In the event the New Notes are considered to be applicable high yield discount obligations for United States federal income tax purposes, we will not be permitted to deduct for U.S. federal income tax purposes OID accrued on the New Notes until such time as we actually pay such OID in cash or in property other than our stock or our debt (or stock or debt of a person related to us).  Moreover, if the amount of the OID exceeds a certain threshold amount, such amount will not be deductible at any time by us for United States federal income tax purposes (regardless of whether we actually pay such amount in cash or other property).  In the event we are unable to deduct OID for United States federal income tax purposes this may have an adverse effect on our business financial condition or results of operations.

**If a bankruptcy petition were filed by or against us, claims in respect of the New Notes may be allowed in a lesser amount than the face amount thereof.**

If a bankruptcy petition were filed by or against us under the United States Bankruptcy Code after the consummation of the Exchange Offers, the allowed claim of any holder of the New Notes for the principal amount of such indebtedness may be reduced in respect of OID (if any) that constitutes "unmatured interest" for purposes of the United States Bankruptcy Code. Bankruptcy courts have not developed a uniform method for determining the original issue price of indebtedness in an exchange offer. Rather, the facts and circumstances of the particular issuance appear to dictate how the original issue price of indebtedness is determined. As a result, there can be no assurance as to whether a bankruptcy court would find that a portion of the face principal amount of the New Notes constitutes "unmatured interest" for purposes of the United States Bankruptcy Code (including, for example, because the aggregate principal amount of a holder's New Notes exceeds either the aggregate principal amount or the aggregate market value of such holder's tendered Old Notes).

If a bankruptcy court were to find that a portion of the New Notes constitutes unmatured interest, then holders of the New Notes may have their claims allowed in lesser amounts than the face principal amount of their New Notes, even if sufficient funds are available to pay the unamortized portion of any OID as of the bankruptcy filing.

**USE OF PROCEEDS**

We will not receive any cash proceeds from the issuance of the New Notes in connection with the Exchange Offers. The Old Notes acquired in the Exchange Offers will be retired and cancelled.

## CAPITALIZATION

The following table sets forth our capitalization as of June 30, 2017 on an actual basis and as adjusted to give effect to (i) the Exchange Offers and the Concurrent Transactions, based on the assumptions described below and (ii) the Other Financing Transactions, in each case as if they had been consummated on June 30, 2017. This table should be read in conjunction with the consolidated financial statements and the accompanying notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2017, which are incorporated by reference in this offering memorandum.

| (In millions) | As of June 30, 2017 | |
| --- | --- | --- |
| | Actual | Adjusted |
| Cash and cash equivalents(1) | $ 24.7 | $ 24.7 |
| Debt: | | |
| Issued by Windstream Services: | | |
| Senior secured credit facility, Tranche B6 – variable rates, due March 29, 2021 | 1,338.0 | 1,338.0 |
| Senior secured credit facility, Tranche B7 – variable rates, due February 17, 2024 | 577.1 | 577.1 |
| Senior secured credit facility, Revolving line of credit– variable rates, due April 24, 2020(2) | 750.0 | 772.8 |
| New 2025 Notes(3) | — | 350.0 |
| Debentures and notes: | | |
| 2020 Notes – 7.750%, due October 15, 2020(4) | 700.0 | 598.3 |
| 2021 Notes – 7.750%, due October 1, 2021(5) | 809.3 | — |
| 2022 Notes – 7.500%, due June 1, 2022(6) | 441.2 | — |
| 2023 Notes – 7.500%, due April 1, 2023(6) | 343.5 | — |
| 2023 Notes – 6 3/8%, due August 1, 2023(7) | 585.7 | 2,263.9 |
| Issued by subsidiaries of Windstream Services: | | |
| Windstream Holding of the Midwest, Inc. – 6.75%, due April 1, 2028 | 100.0 | 100.0 |
| Total debt(8) | 5,644.8 | 6,000.1 |
| Total shareholders' equity | 630.2 | 630.2 |
| Total capitalization | $ 6,275.0 | $ 6,630.3 |

(1)  As adjusted amount does not reflect (i) the consent payment of any notes that are delivered for consents pursuant to the 6 3/8% Senior Notes Consent Solicitation and the Other Senior Notes Consent Solicitations, (ii) the payment of accrued and unpaid interest on all notes exchanged pursuant to the Exchange Offers and the Concurrent Exchange Offers or (iii) any other transaction fees and expenses payable in connection with the Exchange Offers and Concurrent Transactions.

(2)  At June 30, 2017, after giving pro forma effect to the Exchange Offers, the Concurrent Transactions and the Other Financing Transactions, the amount available for borrowing under the revolving line of credit was $477.2 million, after taking into account the total amount of outstanding under letters of credit of $25.4 million. The as adjusted amount reflects (i) an additional $272.8 million of borrowing under our revolving line of credit after June 30, 2017, which consisted of $227.5 million to fund the acquisition of Broadview Networks Holdings, Inc. in July 2017 and $45.3 million to purchase approximately $49.1 million of 2020 Notes in open market purchases, including accrued interest thereon (the "**Debt Buybacks**") and (ii) the paydown of approximately $250 million with proceeds we anticipate to receive from the New Secured Notes Offering, without taking into account initial purchasers' discount and fees and expenses related thereto. The total amount outstanding under the letters of credit and the indebtedness incurred under the revolving line of credit may not exceed $1.25 billion.

(3)  As adjusted amount assumes that (i) the maximum exchange amount of $50.0 million aggregate principal amount of New 2025 Notes are issued in exchange for $52.6 million aggregate principal amount of our 2020 Notes pursuant to the terms of the 2020 Exchange Offer, (ii) the maximum exchange amount of $50.0 million aggregate principal amount of New 2025 Notes are issued in exchange for $52.6 million aggregate principal amount of 2021 Notes pursuant to the terms of the 2021 Exchange Offer (which amount, in each case of clauses (i) and (ii), may be increased by the Company in its sole discretion in accordance with the terms of the 2020 Exchange Offer or the 2021 Exchange Offer, subject to compliance with applicable law and the terms of our outstanding indebtedness) and (iii) $250.0 million aggregate principal amount of New 2025 Notes are issued pursuant to the New Secured Notes Offering. We expect to utilize the proceeds we receive from the New Secured Notes Offering to refinance a portion of the outstanding amounts under our revolving credit facility. The closing of the Exchange Offers are not conditioned on the announcement or consummation of the New Secured Notes Offering. There can be no assurance

as to the principal amount of 2020 Notes or 2021 Notes that will be tendered or accepted for exchange pursuant to the 2020 Exchange Offer or the 2021 Exchange Offer or the aggregate principal amount of New 2025 Notes, if any, that may be issued in the New Secured Notes Offering and, as a result, the aggregate principal amount of New 2025 Notes issued by us pursuant to the 2020 Exchange Offer or the 2021 Exchange Offer and the New Secured Notes Offering may be significantly more than, or significantly less than the assumed amounts described above. See "Summary—The Concurrent Transactions."

(4)   As adjusted gives effect to the Debt Buybacks and assumes that the maximum exchange amount of $50.0 million aggregate principal amount of New 2025 Notes are issued in exchange for $52.6 million aggregate principal amount of 2020 Notes pursuant to the terms of the 2020 Exchange Offer. There can be no assurance as to the principal amount of 2020 Notes that will be tendered or accepted for exchange pursuant to the 2020 Exchange Offer and, as a result, the 2020 Notes that remain outstanding may be significantly more than the assumed amounts above. See "Summary—The Concurrent Transactions."

(5)   As adjusted amount assumes that (i) the maximum exchange amount of $50.0 million aggregate principal amount of New 2025 Notes are issued in exchange for $52.6 million aggregate principal amount of 2021 Notes pursuant to the terms of the 2021 Exchange Offer and (ii) the remaining $756.7 million of 2021 Notes are issued in exchange for $832.4 million of New Notes at a rate of $1,100 principal amount of New Notes for each $1,000 principal amount of 2021 Notes. There can be no assurance as to the principal amount of 2021 Notes that will be tendered or accepted for exchange pursuant to the 2021 Exchange Offer and, as a result, the aggregate principal amount of 2021 Notes that remain outstanding may be significantly more than the assumed amounts described above. See "Summary—The Concurrent Transactions."

(6)   As adjusted amounts assume that all $441.2 million of 2022 Notes and $343.5 million of 2023 Notes are exchanged at a rate of $1,080 and $1,075 principal amount of New Notes, for each $1,000 principal amount of 2022 Notes and 2023 Notes, respectively, for a total $845.8 million aggregate principal amount of New Notes pursuant to the 2022/2023 Exchange Offers.  There can be no assurance as to the principal amount of 2022 Notes or 2023 Notes that will be tendered or accepted for exchange pursuant to the 2022/2023 Exchange Offers and, as a result, the aggregate principal amount of 2022 Notes and 2023 Notes that remain outstanding may be significantly more than the assumed amounts described above. See "Summary—The Concurrent Transactions."

(7)   As adjusted amount assumes that (i) $756.7 million of 2021 Notes are issued in exchange for $832.4 million of New Notes at a rate of $1,100 principal amount of New Notes for each $1,000 principal amount of 2021 Notes and (ii) all $441.2 million of our 2022 Notes and $343.5 million of our 2023 Notes are exchanged at a rate of $1,080 and $1,075 principal amount of New Notes, for each $1,000 principal amount of 2022 Notes and 2023 Notes, respectively, for a total $845.8 million aggregate principal amount of New Notes. There can be no assurance as to the principal amount of 2021 Notes, 2022 Notes or 2023 Notes that will be tendered or accepted for exchange pursuant to the applicable exchange offers and, as a result, the aggregate principal amount of New Notes issued by us may be significantly less than the assumed amounts described above. See "Summary—The Concurrent Transactions."

(8)   Excludes net discounts on long-term debt, unamortized debt issuance costs, long-term lease obligations, capital lease obligations and other liabilities.

## GENERAL TERMS OF THE EXCHANGE OFFERS

**General**

Upon the terms and subject to the conditions set forth in this Offering Memorandum and the related Letter of Transmittal, the Company is offering to all Eligible Holders to exchange New Notes for validly tendered (and not validly withdrawn) Old Notes.

Upon the terms and subject to the conditions of the Exchange Offers, (i) for each $1,000 principal amount of Old Notes tendered at or prior to the Early Tender Date, accepted for exchange and not validly withdrawn, Eligible Holders of Old Notes will be eligible to receive the applicable Early Exchange Consideration set forth in the cover hereof; and (ii) for each $1,000 principal amount of Old Notes tendered after the Early Tender Date and accepted for exchange, Eligible Holders of Old Notes will be eligible to receive the applicable Late Exchange Consideration set forth in such table.

In addition to the consideration, we will pay in cash accrued and unpaid interest on the Old Notes accepted in the Exchange Offers from the applicable latest interest payment date to, but not including, the applicable Settlement Date. Interest on the New Notes will accrue from the date of first issuance of New Notes and, as described herein, we may elect, in our sole discretion, to settle on the Early Settlement Date the Exchange Offers for any or all series of Old Notes and issue New Notes with respect to such Old Notes validly tendered prior to the Early Tender Date (and not validly withdrawn). If we elect to have an Early Settlement Date, any New Notes issued on the Final Settlement Date will be issued with accrued interest up to, but not including, the Final Settlement Date; the amount of such accrued interest will not be deducted from the accrued and unpaid interest on the applicable Old Notes otherwise payable by us in respect of such Old Notes accepted for exchange.

The Company's obligation to accept Old Notes that are validly tendered is subject to the satisfaction or waiver of the conditions described under "Conditions of the Exchange Offers."

Each Exchange Offer with respect to a series of Old Notes will expire at 11:59 p.m., New York City time, on November 14, 2017, unless extended by the Company.

Holders may withdraw tendered Old Notes at any time prior to 5:00 p.m., New York City time, on October 31, 2017, unless extended by the Company. Any Old Notes tendered prior to the applicable Withdrawal Deadline that are not validly withdrawn prior to such Withdrawal Deadline may not be withdrawn thereafter. Old Notes tendered in the Exchange Offers after such Withdrawal Deadline may not be withdrawn except in the limited circumstances where additional withdrawal rights are required by law.

Pursuant to the Exchange Offers, Old Notes may be tendered only in principal amounts equal to the authorized denominations for such Old Notes. No alternative, conditional or contingent tenders will be accepted. A holder who tenders less than all of the Old Notes of a series held by such holder must continue to hold such Old Notes in an authorized denomination for such series. We will not accept any tender of Old Notes that would result in the issuance of less than $2,000 principal amount of New Notes. If, under the terms of the Exchange Offers, a tendering holder is entitled to receive New Notes in a principal amount that is not an integral multiple of $1,000, we will round downward such principal amount of New Notes to the nearest integral multiple of $1,000. This rounded amount will be the principal amount of New Notes you will receive, and no additional cash will be paid in lieu of any principal amount of New Notes not received as a result of rounding down.

**Early Tender Date; Expiration Date; Extensions; Amendments; Termination**

The Early Tender Date for each Exchange Offer is 5:00 p.m., New York City time, on October 31, 2017, subject to the Company's right to extend that time and date for any Exchange Offer in the Company's sole discretion (which right is subject to applicable law), in which case the Early Tender Date for such Exchange Offer means the latest time and date to which such Early Tender Date is extended. The Expiration Date for each Exchange Offer is 11:59 p.m., New York City time, on November 14, 2017, subject to the Company's right to extend that time and date for any Exchange Offer in the Company's sole discretion (which right is subject to applicable law), in which

case the Expiration Date for such Exchange Offer means the latest time and date to which such Exchange Offer is extended. To extend an Early Tender Date or the Expiration Date, the Company will notify the Exchange Agent and will make a public announcement thereof before 9:00 a.m., New York City time, on the next business day after the previously scheduled Early Tender Date or Expiration Date, as applicable. During any extension of the Early Tender Date or the Expiration Date for an Exchange Offer, all Old Notes of the applicable series previously tendered in the applicable extended Exchange Offer will remain subject to such Exchange Offer and, subject to compliance with the terms of such Exchange Offer and applicable law, may be accepted for exchange by the Company.

Subject to applicable law, the Company expressly reserves the right, in its sole discretion and with respect to any or all of the Exchange Offers, to:

- delay accepting any Old Notes, to extend the Exchange Offers or to terminate the Exchange Offers and not accept any Old Notes;

- extend the Early Tender Date without extending the Withdrawal Deadline and vice versa; and

- amend, modify or waive in part or whole, at any time, or from time to time, the terms of the Exchange Offers in any manner not prohibited by law, including waiver of any conditions, including the Minimum Issuance Condition and the Consent Condition, to consummation of the Exchange Offer.

If the Company exercises any such rights, it will give written notice thereof to the Exchange Agent and will make a public announcement thereof as promptly as practicable to the extent required by applicable law. Without limiting the manner in which the Company may choose to make a public announcement of any extension, amendment or termination of any or all of the Exchange Offers, the Company will not be obligated to publish, advertise or otherwise communicate any such public announcement, other than by making a timely press release to the extent required by applicable law. The minimum period during which any or all of the Exchange Offers will remain open following material changes in the terms of such Exchange Offer or in the information concerning such Exchange Offer will depend upon the facts and circumstances of such change, including the relative materiality of the changes. In accordance with Rule 14e-1 under the Exchange Act, if the Company elects to change the consideration offered or the percentage of Old Notes sought, the applicable Exchange Offer will remain open for a minimum ten business-day period following the date that the notice of such change is first published or sent to Eligible Holders. If the terms of any or all of the Exchange Offers are amended in a manner determined by the Company to constitute a material change adversely affecting any Eligible Holder, the Company will promptly disclose any such amendment in a manner reasonably calculated to inform Eligible Holders of such amendment, and the Company will extend any or all of the Exchange Offers for a time period that it deems appropriate, depending upon the significance of the amendment, the manner of disclosure to Eligible Holders and the requirements of applicable law, if any or all of the Exchange Offers would otherwise expire during such time period. Any extension, amendment, waiver or change of an Exchange Offer will not result in the reinstatement of any withdrawal or revocation rights if those rights had previously expired, except as required by applicable law.

**Settlement Date**

Subject to the terms and conditions of an Exchange Offer, the Final Settlement Date for such Exchange Offer will occur promptly after the Expiration Date for such Exchange Offer and is expected to occur on November 17, 2017. We may elect, in our sole discretion, to settle an Exchange Offer for any or all series of Old Notes and issue the New Notes with respect to such Old Notes validly tendered prior to the Early Tender Date (and not validly withdrawn) at any time after the Early Tender Date and prior to the Final Settlement Date. Such Early Settlement Date will be determined at our option and, if we elect to have an Early Settlement Date, we expect that it would occur on or after November 2, 2017, subject to all conditions to the Exchange Offers having been satisfied or waived by us.

The Company will not be obligated to deliver New Notes unless the applicable Exchange Offer is consummated.

**Holders Eligible to Participate in the Exchange Offers**

The Company will conduct the Exchange Offers in accordance with the applicable requirements of the Securities Act and the Exchange Act and the rules and regulations of the SEC thereunder. Prior to the distribution of this Offering Memorandum, the Company distributed to certain holders of Old Notes a letter requesting a certification that each such holder is either a QIB as defined in Rule 144A or a person that is not a "U.S. person" within the meaning of Regulation S.

Only Eligible Holders of Old Notes who have properly completed and returned the eligibility certification, which is also available from the Information Agent, are authorized to receive and review this Offering Memorandum and to participate in the Exchange Offers.

**Certain Matters Relating to Compliance with Securities Law in Non-U.S. Jurisdictions**

Countries outside the United States may have their own legal requirements that govern securities offerings made to persons resident in those countries and may impose requirements about the form, content and process of offers made to the general public. We have not to date taken any action under such non-U.S. regulations. Non-U. S. holders should consult their advisors in considering whether they may participate in the Exchange Offers in accordance with the laws of their home countries and, if they do participate, whether there are any restrictions or limitations on transactions in the New Notes that may apply in their home countries or if the participation would result in a requirement for us to make any deliveries, filings or registrations. We and the Dealer Manager cannot provide any assurance about whether such limitations may exist. The Dealer Manager is only acting as dealer manager for the Exchange Offers in the United States and, if eligible, in Canada. In addition, in some non-U.S. jurisdictions there may be restrictions on the ability of a holder to transfer New Notes received in the Exchange Offers. By signing or being deemed to sign the Letter of Transmittal, you are representing that if you are located outside the United States, the offer to you and your acceptance of it does not contravene the applicable laws where you are located and that your participation in the Exchange Offers will not impose on us any requirement to make any deliveries, filings or registrations. See "Transfer Restrictions."

**Compliance with the 'Short Tendering' Rule**

It is a violation of Rule 14e-4 under the Exchange Act for a person, directly or indirectly, to tender Old Notes for his or her own account unless the person so tendering (a) has a net long position equal to or greater than the aggregate principal amount of the Old Notes being tendered and (b) will cause the Old Notes to be delivered in accordance with the terms of the Exchange Offers. Rule 14e-4 provides a similar restriction applicable to the tender or guarantee of a tender on behalf of another person.

A tender of Old Notes in an Exchange Offer will constitute a binding agreement between the tendering holder and us with respect to such Exchange Offer upon the terms and subject to the conditions of such Exchange Offer, including the tendering holder's acceptance of the terms and conditions of such Exchange Offer, as well as the tendering holder's representation and warranty that (a) such holder has a net long position equal to or greater than the aggregate principal amount of the Old Notes being tendered within the meaning of Rule 14e-4 under the Exchange Act and (b) the tender of such Old Notes complies with Rule 14e-4.

### ACCEPTANCE OF OLD NOTES; ACCRUAL OF INTEREST

If the conditions to the applicable Exchange Offer are satisfied or waived, and the Company otherwise does not terminate such Exchange Offer for any reason, the Company will accept for exchange at the applicable Settlement Date, after it receives validly completed and duly executed Letters of Transmittal or Agent's Messages, as the case may be, with respect to any and all of the Old Notes accepted pursuant to such Exchange Offer, the Old Notes to be exchanged by notifying the Exchange Agent of the Company's acceptance thereof. The notice of such acceptance may be oral if the Company promptly confirms such notice in writing. The Company expressly reserves the right, in its sole discretion, to delay exchange of, or delay acceptance for exchange of, the Old Notes tendered pursuant to any or all of the Exchange Offers (subject to Rule 14e-1(c) under the Exchange Act, which requires that we issue the offered consideration or return the Old Notes deposited thereunder promptly after termination of the applicable Exchange Offer), or to terminate such Exchange Offers and not accept for exchange any Old Notes tendered pursuant to such Exchange Offers, (1) if any of the conditions to such Exchange Offers shall not have been satisfied or waived by us, or (2) in order to comply in whole or in part with any applicable law.

In all cases, the consideration for Old Notes accepted for exchange pursuant to the Exchange Offers will be made only after timely receipt by the Exchange Agent of (1) certificates representing the Old Notes, or timely confirmation of a book-entry transfer (a "**Book-Entry Confirmation**") of the Old Notes into the Exchange Agent's account, (2) the properly completed and duly executed Letter of Transmittal (or a facsimile thereof) or an Agent's Message in lieu thereof and (3) any other documents required by the Letter of Transmittal.

The Company will have accepted validly tendered (and not validly withdrawn) Old Notes, if, as and when the Company gives oral or written notice to the Exchange Agent of its acceptance of the Old Notes for exchange pursuant to the applicable Exchange Offer. In all cases, exchange of Old Notes pursuant to the Exchange Offers will be made by the deposit of the New Notes and any accrued and unpaid interest payable with the Exchange Agent (or, upon its instruction, DTC), which will act as your agent for the purposes of receiving New Notes and cash payments from the Company, and delivering New Notes and transmitting cash payments to you. If, for any reason whatsoever, acceptance for exchange of, or the exchange of, any Old Notes validly tendered (and not validly withdrawn) pursuant to an Exchange Offer is delayed (whether before or after the Company's acceptance of the Old Notes) or the Company extends an Exchange Offer or is unable to accept the Old Notes tendered pursuant to an Exchange Offer, then, without prejudice to the Company's rights set forth herein, the Company may instruct the Exchange Agent to retain any Old Notes tendered pursuant to such Exchange Offer, and those Old Notes may not be withdrawn, subject to the limited circumstances described in "Withdrawal of Tenders."

If any tendered Old Notes are not accepted for exchange for any reason pursuant to the terms and conditions of the applicable Exchange Offer, or if certificates are submitted evidencing more Old Notes than those that were validly tendered (and not validly withdrawn), certificates evidencing the unexchanged Old Notes will be returned, without expense, to the tendering holder (or, in the case of any Old Notes tendered by book-entry transfer into the Exchange Agent's account pursuant to the procedures set forth under "Procedures for Tendering Old Notes—Book-Entry Transfer," such Old Notes will be credited to the account from which such Old Notes were delivered), promptly following the Expiration Date or the termination of such Exchange Offer.

### Denominations; Rounding

Old Notes may be tendered only in principal amounts equal to permitted denominations for such Old Notes, which are minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof. No alternative, conditional or contingent tenders will be accepted. Holders who tender less than all of their Notes must continue to hold Notes in at least the minimum authorized denomination of $2,000 principal amount. The Company will not accept any tender of Old Notes that would result in the issuance of less than $2,000 principal amount of New Notes. If, under the terms of the Exchange Offers, a tendering holder is entitled to receive New Notes in a principal amount that is not an integral multiple of $1,000, we will round downward such principal amount of New Notes to the nearest integral multiple of $1,000. This rounded amount will be the principal amount of New Notes you will receive, and no additional cash will be paid in lieu of any principal amount of New Notes not received as a result of rounding down.

**Accrued and Unpaid Interest**

In addition to the consideration, we will pay in cash accrued and unpaid interest on the Old Notes accepted in the Exchange Offers from the applicable latest interest payment date to, but not including, the applicable Settlement Date. Interest on the New Notes will accrue from the date of first issuance of New Notes and, as described herein, we may elect, in our sole discretion, to settle on the Early Settlement Date the Exchange Offers for any or all series of Old Notes and issue New Notes with respect to such Old Notes validly tendered prior to the Early Tender Date (and not validly withdrawn). If we elect to have an Early Settlement Date, any New Notes issued on the Final Settlement Date will be issued with accrued interest up to, but not including, the Final Settlement Date; the amount of such accrued interest will not be deducted from the accrued and unpaid interest on the applicable Old Notes otherwise payable by us in respect of such Old Notes accepted for exchange.

Under no circumstances will any additional interest be payable because of any delay in the delivery or transmission of New Notes or funds to any holder of Old Notes as a result in any delay in delivery or transmission by the Exchange Agent, DTC or any holder's nominee.

**Payment of Transfer Taxes, Fees and Expenses**

The Company will pay or cause to be paid all transfer taxes with respect to the valid tender of any Old Notes. If payment is to be made to, or if Old Notes not tendered or exchanged are to be registered in the name of, any persons other than the registered holder, or if tendered Old Notes are registered in the name of any persons other than the persons signing the Letter of Transmittal, the amount of any transfer taxes (whether imposed on the registered holder or such other person) payable on account of the transfer to such other person will be deducted from the payment unless satisfactory evidence of the payment of such taxes or exemption therefrom is submitted.

Tendering Eligible Holders of Old Notes accepted in the Exchange Offers will not be obligated to pay brokerage commissions or fees to the Company, the Dealer Manager, the Exchange Agent or the Information Agent. If, however, a tendering Eligible Holder handles the transaction through its broker, dealer, commercial bank, trust company or other institution that Eligible Holder may be required to pay brokerage fees or commissions.

## PROCEDURES FOR TENDERING OLD NOTES

**General**

In order to participate in the Exchange Offers, you must validly tender (and not validly withdraw) your Old Notes to the Exchange Agent as further described below. It is your responsibility to validly tender your Old Notes. The Company has the right to waive any defects. However, the Company is not required to waive defects and is not required to notify you of defects in your tender or delivery.

The method of delivery of the Old Notes, the Letter of Transmittal and all other required documents to the Exchange Agent is at the election and risk of the holder. Unless they are tendering through the ATOP procedures, holders should use an overnight or hand delivery service, properly insured. In all cases, sufficient time should be allowed to assure delivery to and receipt by the Exchange Agent prior to the Expiration Date (or the Early Tender Date, as the case may be). Do not send the Letter of Transmittal or any Old Notes to anyone other than the Exchange Agent.

If you have any questions or need help in tendering your Old Notes, please contact the Exchange Agent whose addresses and telephone numbers are listed on the back cover of this Offering Memorandum or your broker, dealer, commercial bank, trust company or other nominee or custodian through which your Old Notes are held.

**Valid Tender of Old Notes**

For a holder to validly tender Old Notes pursuant to the Exchange Offers, a properly completed and duly executed Letter of Transmittal (or a facsimile thereof) together with any signature guarantees and any other documents required by the Instructions to the Letter of Transmittal or an Agent's Message in lieu thereof, must be received by the Exchange Agent at the address or facsimile number set forth on the back cover of this Offering Memorandum prior to the Expiration Date (or the Early Tender Date, as the case may be), and either (1) certificates representing the Old Notes must be received by the Exchange Agent at such address, or (2) the Old Notes must be transferred pursuant to the procedures for book-entry transfer described below and a Book-Entry Confirmation must be received by the Exchange Agent, in each case prior to the Expiration Date (or the Early Tender Date, as the case may be). Old Notes may be tendered and accepted for exchange only in principal amounts equal to minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof. No alternative, conditional or contingent tenders will be accepted. Holders who tender less than all of their Old Notes must continue to hold Old Notes in at least the minimum authorized denomination of $2,000 principal amount.

In all cases, exchange of Old Notes validly tendered (and not validly withdrawn) pursuant to the Exchange Offers will be made only after receipt by the Exchange Agent prior to the Expiration Date (or the Early Tender Date, as the case may be) of:

- certificates representing such Old Notes or a Book-Entry Confirmation with respect to such Old Notes;

- the Letter of Transmittal (or a facsimile thereof) properly completed and duly executed or an Agent's Message in lieu thereof; and

- any required signature guarantees and other documents required by the Letter of Transmittal.

The Company has not provided guaranteed delivery procedures in connection with the Exchange Offers or under any of the Exchange Offer documents or other Exchange Offer materials provided therewith. Holders must timely tender their Old Notes in accordance with the procedures set forth in the Exchange Offer documents.

**Tendering New Notes in the 6 3/8% Senior Notes Consent Solicitation**

Holders tendering Old Notes in any of the Exchange Offers may elect, at the time of tendering such Old Notes, to also direct their participant in DTC to consent to certain proposed waivers and amendments pursuant to the

6 3/8% Senior Notes Consent Solicitation (as defined herein) with respect to the New Notes to be issued pursuant to the Exchange Offers. Any such consent with respect to such New Notes may be given by electing to have such New Notes (upon issuance) immediately and automatically tendered in the 6 3/8% Senior Notes Consent Solicitation pursuant to and in accordance with the terms contained in the consent solicitation statement for the 6 3/8% Senior Notes Consent Solicitation. Any such consent with respect to New Notes may be delivered by making the appropriate election in the Letter of Transmittal delivered by such holder, or in the instruction delivered through ATOP in lieu thereof. Any such consent would not be delivered under the 6 3/8% Senior Notes Consent Solicitation if the relevant Old Notes are withdrawn from the applicable Exchange Offer in accordance with the procedures described under "Withdrawal of Tenders."

No such consent with respect to New Notes to be delivered pursuant to an Exchange Offer will be effective unless settlement of the applicable Exchange Offer occurs prior to expiration of the 6 3/8% Senior Notes Consent Solicitation. As a result, Holders tendering Old Notes pursuant to an Exchange Offer will not be eligible to deliver consents or receive any consent payment pursuant to the 6 3/8% Senior Notes Consent Solicitation unless either (i) such Old Notes are validly tendered (and not validly withdrawn) prior to the Early Tender Date and accepted for exchange by us, and we elect (in our sole discretion) to have an Early Settlement Date prior to expiration of the 6 3/8% Senior Notes Consent Solicitation, or (ii) we elect (in our sole discretion) to extend the expiration date of the 6 3/8% Senior Notes Consent Solicitation pursuant to the terms thereof to a date that falls on or after the applicable Settlement Date for such Exchange Offer.

The consents delivered by Holders tendering Old Notes in the Exchange Offers and electing to direct their participant in DTC to consent pursuant to the 6 3/8% Senior Notes Consent Solicitation will not be delivered until the applicable Settlement Date for the exchange of those Old Notes pursuant to the terms of the Offering Memorandum, which, under the current terms of the 6 3/8% Senior Notes Consent Solicitation, is expected to occur after the early consent payment date specified under the terms of the 6 3/8% Senior Notes Consent Solicitation. As a result, Holders tendering Old Notes in the Exchange Offers and electing to direct their participant in DTC to consent will be eligible to receive only the late consent payment of $2.00 per $1,000 principal amount of New Notes specified under the terms of the 6 3/8% Senior Notes Consent Solicitation, and will not be eligible to receive the early consent payment of $2.50 per $1,000 principal amount of New Notes specified under the terms of the 6 3/8% Senior Notes Consent Solicitation, unless we elect (in our sole discretion) to amend the terms of the 6 3/8% Senior Notes Consent Solicitation.

New Notes issued in the Exchange Offers to tendering holders that elect to direct their participant in DTC to consent will be blocked, and such tendering Holder's position will be held under one or more temporary CUSIP numbers (i.e., Contra CUSIP) and cannot be sold or transferred, from the applicable Settlement Date under the Offering Memorandum until the earlier of (i) the expiration of the 6 3/8% Senior Notes Consent Solicitation, (ii) the date on which the DTC Participant revokes its consent in accordance with the terms of the 6 3/8% Senior Notes Consent Solicitation, and (iii) the date on which the 6 3/8% Notes Consent Solicitation is terminated. The information and tabulation agent for the 6 3/8% Senior Notes Consent Solicitation will instruct DTC to release the positions as soon as practicable but no later than three business days after either the expiration date for the 6 3/8% Notes Consent Solicitation or subsequent date following such expiration date and not exceeding forty-five calendar days from the date of the consent solicitation statement for the 6 3/8% Senior Notes Consent Solicitation. The Company will pay the consent payment promptly after the expiration date for the 6 3/8% Notes Consent Solicitation in the event the proposed waivers and amendments under the 6 3/8% Notes Consent Solicitation become effective and operative. In the period of time during which 6 3/8% Notes are blocked pursuant to the foregoing procedures, Holders may be unable to promptly liquidate their New Notes or timely react to adverse trading conditions and could suffer losses as a result of these restrictions on transferability.

Holders tendering Old Notes in the Exchange Offers who do not elect to direct their participant in DTC to consent pursuant to the 6 3/8% Senior Notes Consent Solicitation may not be able to deliver consents with respect to the New Notes pursuant to the 6 3/8% Senior Notes Consent Solicitation because the expiration date of the 6 3/8% Senior Notes Consent Solicitation is expected to occur shortly after the Early Settlement Date (if we elect, in our sole discretion, to have an Early Settlement Date), unless such expiration date of the 6 3/8% Senior Notes Consent Solicitation is extended by the Company in accordance with the terms of the 6 3/8% Senior Notes Consent Solicitation. Moreover, all Holders tendering Old Notes may not be able to deliver consents with respect to the New

Notes if we do not we elect (in our sole discretion) to have an Early Settlement Date prior to expiration of the 6 3/8% Senior Notes Consent Solicitation.

**Tendering with Respect to Old Notes Held through a Nominee or Custodian**

Any holder whose Old Notes are held by a broker, dealer, commercial bank, trust company or other nominee or custodian and who wishes to tender Old Notes should contact such nominee or custodian promptly and instruct such entity to tender the Old Notes on such holder's behalf. **A nominee or custodian cannot tender Old Notes on behalf of a holder of Old Notes without such holder's instructions**.

Holders whose Old Notes are held by a broker, dealer, commercial bank, trust company or other nominee or custodian should be aware that such nominee or custodian may have deadlines earlier than the Expiration Date (or Early Tender Date, as the case may be) to be advised of the action that you may wish for them to take with respect to your Old Notes and, accordingly, such holders are urged to contact any broker, dealer, commercial bank, trust company or other nominee or custodian through which they hold their Old Notes as soon as possible in order to learn of the applicable deadlines of such entities.

You will not be required to pay any fees or commissions to the Company, the Dealer Manager, the Exchange Agent or the Information Agent in connection with the Exchange Offers. If you are an Eligible Holder and your Old Notes are held through a broker, dealer, commercial bank, trust company or other nominee or custodian that tenders your Old Notes on your behalf, any of them may charge you for doing so. You should consult with them to determine whether any charges will apply.

The Company will pay brokerage houses and other custodians, nominees and fiduciaries the reasonable out-of-pocket expenses incurred by them in forwarding copies of this Offering Memorandum and related documents to the beneficial owners of the Old Notes. The Company will not make any payment to brokers, dealers or others soliciting acceptances of the Exchange Offers other than the Dealer Manager, as described herein.

**Book-Entry Transfer**

The Exchange Agent has or will establish an account with respect to the Old Notes at DTC for purposes of the Exchange Offers, and any financial institution that is a participant in the DTC system and whose name appears on a security position listing as the record owner of the Old Notes may make book-entry delivery of Old Notes by causing DTC to transfer the Old Notes into the Exchange Agent's account at DTC in accordance with DTC's procedure for transfer. Although delivery of Old Notes may be effected through book-entry transfer into the Exchange Agent's account at DTC, either an Agent's Message or a Letter of Transmittal (or a facsimile thereof) properly completed and duly executed, along with any required signature guarantees and any other required documents, must be transmitted to and received by the Exchange Agent at one of the addresses set forth on the back cover of this Offering Memorandum prior to the Expiration Date (or the Early Tender Date, as the case may be).

**Procedures for Tendering Old Notes through ATOP**

In lieu of physically completing and signing the Letter of Transmittal and delivering it to the Exchange Agent, DTC participants may electronically transmit their acceptance of the Exchange Offers, and, if they so elect, after issuance of the New Notes their consent with respect to the New Notes to be issued pursuant to the Exchange Offers to the Proposed Waivers and Amendments pursuant to the 6 3/8% Senior Notes Consent Solicitation, through ATOP, for which the transaction will be eligible. In accordance with ATOP procedures, DTC will then verify the acceptance of the Exchange Offers, and send an Agent's Message to the Exchange Agent for its acceptance.

An "**Agent's Message**" is a message transmitted by DTC, received by the Exchange Agent and forming part of the Book-Entry Confirmation, which states that DTC has received an express acknowledgement from you that you have received the Exchange Offer documents and agree to be bound by the terms of the Letter of Transmittal, and that the Company may enforce such agreement against you.

If a holder of Old Notes transmits its acceptance through ATOP, delivery of such tendered Old Notes must be made to the Exchange Agent (either physically or pursuant to the book-entry delivery procedures set forth herein). Unless such holder delivers (either physically or by book-entry delivery) the Old Notes being tendered to the Exchange Agent, the Company may, at its option, treat such tender as defective for purposes of delivery of acceptance for exchange, and for the right to receive New Notes and cash for accrued and unpaid interest. Delivery of documents to DTC (physically or by electronic means) does not constitute delivery to the Exchange Agent. If you desire to tender your Old Notes on the day that the Early Tender Date or the Expiration Date occurs, you must allow sufficient time for completion of the ATOP procedures during the normal business hours of DTC on such date. The Company will have the right, which may be waived, to reject the defective tender of Old Notes as invalid and ineffective.

Any tender through ATOP must comply with the deadlines and requirements in this Offering Memorandum, as it may be supplemented or amended by the Company. Holders whose Old Notes are held by DTC should be aware that DTC may have deadlines earlier, but no later, than the Early Tender Date or the Expiration Date for DTC to be advised of the action that you may wish for DTC to take with respect to your Old Notes and, accordingly, such holders are urged to contact DTC as soon as possible in order to learn of DTC's applicable deadlines.

Tenders made in compliance with procedures or instructions that are inconsistent with those stated in this Offering Memorandum, regardless of who provides such procedures or instructions, will not be deemed valid tenders (unless we waive such compliance in our sole discretion).

**Effect of Letter of Transmittal**

Upon the submission of the Letter of Transmittal, or the agreement to the terms of the Letter of Transmittal pursuant to an Agent's Message, a tendering holder, or the beneficial holder of Old Notes on behalf of which the holder has tendered, will, subject to that holder's ability to withdraw its tender, and subject to the terms and conditions of the Exchange Offers generally, be deemed, among other things, to:

- irrevocably sell, assign and transfer to or upon the Company's order or the order of the Company's nominee all right, title and interest in and to, and any and all claims in respect of or arising or having arisen as a result of the holder's status as a holder of, all Old Notes tendered thereby, such that thereafter the holder shall have no contractual or other rights or claims in law or equity against any fiduciary, trustee, fiscal agent or other person connected with the Old Notes arising under, from or in connection with those Old Notes;

- waive any and all rights with respect to the Old Notes tendered thereby, including, without limitation, any existing or past defaults and their consequences in respect of those Old Notes; and

- release and discharge the Company and the trustees with respect to the indentures governing the Old Notes from any and all claims that the holder may have, now or in the future, arising out of or related to the Old Notes tendered thereby, including, without limitation, any claims that the holder is entitled to receive additional principal or interest payments with respect to the Old Notes tendered thereby, other than accrued and unpaid interest on the Old Notes or as otherwise expressly provided in this Offering Memorandum and in the Letter of Transmittal, or to participate in any redemption or defeasance of the Old Notes tendered thereby.

In addition, each holder of Old Notes tendered in the Exchange Offers upon the submission of the Letter of Transmittal will be deemed to represent, warrant and agree that:

- it is the beneficial owner of, or a duly authorized representative of one or more beneficial owners of, the Old Notes tendered thereby, and it has full power and authority to execute and deliver the Letter of Transmittal;

- the Old Notes being tendered thereby were owned as of the date of tender, free and clear of any liens, charges, claims, encumbrances, interests and restrictions of any kind, and the Company will acquire good, indefeasible and unencumbered title to those Old Notes, free and clear of all liens, charges, claims, encumbrances, interests and restrictions of any kind, when the Company accepts the same;

- it will not sell, pledge, hypothecate or otherwise encumber or transfer any Old Notes tendered thereby from the date of the Letter of Transmittal, and any purported sale, pledge, hypothecation or other encumbrance or transfer will be void and of no effect; and

- the tender of Old Notes shall constitute an undertaking to execute any further documents and give any further assurances that may be required in connection with any of the foregoing, in each case on and subject to the terms and conditions described or referred to in this Offering Memorandum.

Each holder of Old Notes that submits a Letter of Transmittal, or agrees to the terms of a Letter of Transmittal pursuant to an Agent's Message, will also be deemed to represent, warrant and agree to the terms described under "Transfer Restrictions."

The agreement between the Company and a holder set forth in a Letter of Transmittal (and any Agent's Message in lieu thereof) will be governed by, and construed in accordance with, the laws of the State of New York.

**Signature Guarantees**

Signatures on all Letters of Transmittal must be guaranteed by a recognized participant in the Securities Transfer Agents Medallion Program, the New York Stock Exchange, Inc. Medallion Signature Program or the Stock Exchange Medallion Program (each, a "**Medallion Signature Guarantor**"), unless the Old Notes tendered thereby are tendered for the account of a member firm of a registered national securities exchange, a member of the Financial Industry Regulatory Authority, Inc. ("**FINRA**") or a commercial bank or trust company having an office or correspondent in the United States. If the Old Notes not accepted for exchange are to be returned to a person other than the registered holder, then the signatures on the Letters of Transmittal accompanying the tendered Old Notes must be guaranteed by a Medallion Signature Guarantor as described above.

**No Guaranteed Delivery**

We have not provided guaranteed delivery procedures in conjunction with the Exchange Offers.

**Determination of Validity**

All questions as to the validity, form, eligibility (including time of receipt) and acceptance of any tendered Old Notes pursuant to any of the procedures described above, and the form and validity (including time of receipt of notices of withdrawal) of all documents will be determined, as applicable, by the Company in its sole discretion, which determination will be final and binding absent a finding to the contrary by a court of competent jurisdiction. The Company reserves the absolute right to reject any or all tenders of any Old Notes determined by the Company not to be in proper form, or if the acceptance of or exchange of such Old Notes may, in the opinion of the Company's counsel, be unlawful or result in a breach of contract. A waiver of any defect or irregularity with respect to the tender of one Old Note shall not constitute a waiver of the same or any other defect or irregularity with respect to the tender of any other Old Note. The Company also reserves the right to waive any conditions to any or all of the Exchange Offers that the Company is legally permitted to waive.

Your tender of Old Notes will not be deemed to have been validly made until all defects or irregularities in your tender and delivery have been cured or waived. None of the Company, the Dealer Manager, the Exchange Agent, the Information Agent or any other person or entity is under any duty to give notification of any defects or irregularities in any tender or withdrawal of any Old Notes, or will incur any liability for failure to give any such notification.

44

**Please send all materials to the Exchange Agent and not to the Company, the Dealer Manager, the Information Agent or any trustee.**

## WITHDRAWAL OF TENDERS

Tenders of Old Notes of a series pursuant to the applicable Exchange Offer may be validly withdrawn at any time prior to the Withdrawal Deadline for such Exchange Offer by following the procedures described herein. We may extend, in our sole discretion, the Early Tender Date, the Withdrawal Deadline, the Early Settlement Date or the Expiration Date with respect to any or all of the Exchange Offers, subject to applicable law.

Any election made in connection with a valid tender of Old Notes to deliver a consent pursuant to the 6 3/8% Senior Notes Consent Solicitation will not be delivered, and you will not be entitled to any consent payment, if such Old Notes are validly withdrawn from the applicable Exchange Offer.

Any Old Notes tendered prior to the Withdrawal Deadline and that are not validly withdrawn prior to the Withdrawal Deadline may not be withdrawn thereafter, except in the limited circumstances where additional withdrawal rights are required by law. Old Notes tendered in the Exchange Offers after the Withdrawal Deadline may not be withdrawn, except as otherwise provided by law.

For a withdrawal of a tender of Old Notes to be effective, if your Old Notes were tendered pursuant to a Letter of Transmittal, then a written or facsimile transmission notice of withdrawal of Old Notes must be received by the Exchange Agent prior to the Withdrawal Deadline, by mail, fax or hand delivery or, if your Old Notes were tendered through ATOP, then your transmission notice of withdrawal of Old Notes must be effected prior to the Withdrawal Deadline by a properly transmitted "Request Message" through ATOP. Any such notice of withdrawal must (a) specify the name of the person who tendered Old Notes to be withdrawn, the name in which those Old Notes are registered (or, if tendered by a book-entry transfer, the name of the participant in DTC whose name appears on the security position listing as the owner of such Old Notes), if different from that of the person who deposited Old Notes, (b) contain the description of Old Notes to be withdrawn, the certificate number or numbers of such Old Notes, unless such Old Notes were tendered by book-entry delivery, and the aggregate principal amount represented by such Old Notes, (c) unless transmitted through ATOP, be signed by the participating holder thereof in the same manner as the original signature on the Letter of Transmittal, including any required signature guarantee(s), or be accompanied by documents of transfer sufficient to have the trustee register the transfer of Old Notes into the name of the person withdrawing such Old Notes and (d) if the Letter of Transmittal was executed by a person other than the registered participating holder, be accompanied by a properly completed irrevocable proxy that authorized such person to effect such withdrawal on behalf of such participating holder.

Withdrawal of Old Notes can only be accomplished in accordance with the foregoing procedures.

Old Notes tendered and validly withdrawn prior to the Withdrawal Deadline may thereafter be re-tendered at any time prior to the Expiration Date by following the procedures described under "Procedures for Tendering Old Notes."

All questions as to the form and validity (including time of receipt) of any notice of withdrawal of a tender will be determined by the Company, whose determination will be final and binding. The Company reserves the right to waive defects with respect to any attempted withdrawal of Old Notes, and any such waivers will relate only to particular Old Notes unless the Company expressly provides otherwise. None of the Company, the Exchange Agent, the Information Agent, the Dealer Manager or any other person will be under any duty to give notification of any defect or irregularity in any notice of withdrawal of a tender or incur any liability for failure to give any such notification.

## CONDITIONS OF THE EXCHANGE OFFERS

The Company's obligation to accept for exchange Old Notes validly tendered pursuant to the Exchange Offer is subject to the New 2025 Notes Maximum Exchange Amount, the 6 3/8% Notes Maximum Exchange Amount, the Minimum Issuance Condition and the Consent Condition.  We reserve the right, but are not obligated, to change or waive the Minimum Issuance Condition or the Consent Condition.

Notwithstanding any other provisions of the Exchange Offers, the Company will not be required to accept for exchange or to exchange Old Notes validly tendered (and not validly withdrawn) pursuant to the Exchange Offers, and may, in its sole discretion, terminate, amend or extend any or all of the Exchange Offers or delay or refrain from accepting for exchange or exchanging any of the Old Notes if any of the following "**Conditions**" shall occur:

- there shall have been instituted, threatened or be pending any action, proceeding, application, claim counterclaim or investigation (whether formal or informal) (or there shall have been any material adverse development to any action, application, claim, counterclaim or proceeding currently instituted, threatened or pending) before or by any court, governmental, regulatory or administrative agency or instrumentality, domestic or foreign, or by any other person, domestic or foreign, in connection with an Exchange Offer that, in the Company's reasonable judgment, either (a) is, or is reasonably likely to be, materially adverse to the business, operations, properties, condition (financial or otherwise), income, assets, liabilities or prospects of the Company and its subsidiaries, (b) would or might prohibit, prevent, restrict or delay completion of such Exchange Offer or (c) would materially impair the contemplated benefits of such Exchange to the Company or its subsidiaries or be material to holders in deciding whether to participate in such Exchange Offer;

- an order, statute, rule, regulation, executive order, stay, decree, judgment or injunction shall have been proposed, enacted, entered, issued, promulgated, enforced or deemed applicable by any court or governmental, regulatory or administrative agency or instrumentality that, in the Company's reasonable judgment, either (a) would or might prohibit, prevent, restrict or delay completion of such Exchange Offer or (b) is, or is reasonably likely to be, materially adverse to the business, operations, properties, condition (financial or otherwise), income, assets, liabilities or prospects of the Company and its subsidiaries;

- there shall have occurred or be likely to occur any event or condition affecting the Company or its subsidiaries' business or financial affairs that, in the Company's reasonable judgment, either (a) is, or is reasonably likely to be, materially adverse to the business, operations, properties, condition (financial or otherwise), income, assets, liabilities or prospects of the Company and its subsidiaries, (b) would or might prohibit, prevent, restrict or delay completion of such Exchange Offer or (c) would materially impair the contemplated benefits of such Exchange Offer to the Company or its subsidiaries or be material to holders in deciding whether to participate in such Exchange Offer;

- a trustee under an indenture governing the Old Notes or the 6 3/8% Notes shall have objected in any respect to or taken action that could, in the Company's reasonable judgment, adversely affect the completion of such Exchange Offer or shall have taken any action that challenges the validity or effectiveness of the procedures used by the Company in the making of such Exchange Offer or the acceptance of some or all of the Old Notes or the 6 3/8% Notes pursuant to such Exchange Offer;

- there exists, in the Company's reasonable judgment, any actual or threatened legal impediment to the acceptance for exchange or exchange of the Old Notes tendered pursuant to such Exchange Offer; or

- there has occurred (a) any general suspension of, or limitation on prices for, trading in securities in the U.S. securities or financial markets, (b) any significant adverse change in the market price of the Old Notes or the New Notes, (c) a material impairment in the trading market for debt securities in the United States or other major securities or financial markets, (d) a declaration of a banking moratorium or any suspension of payments in respect to banks in the United States or other major financial markets, (e) any limitation (whether or not mandatory) by any government or governmental, administrative or regulatory authority or agency, domestic or foreign, or other event that, in the Company's reasonable judgment, might affect the extension of credit by banks or other lending institutions, (f) a commencement of a war, armed hostilities, terrorist acts or other national or international calamity directly or indirectly involving the United States or (g) in the case of any of the foregoing existing on the date hereof, a material acceleration or worsening thereof.

These Conditions are for the Company's sole benefit and may be asserted by the Company or may be waived by the Company, including any action or inaction by the Company giving rise to any Condition, in whole or in part at any time and from time to time prior to the Expiration Date (or the Early Settlement Date, as the case may be), in its sole discretion. Under the Exchange Offers, if any of these events occur, the Company may, to the extent permitted or not prohibited by law (i) return Old Notes tendered thereunder to you, (ii) waive all unsatisfied conditions and accept for payment and purchase all Old Notes that are validly tendered prior to the Expiration Date (or the Early Tender Date, as the case may be), (iii) extend any or all of the Exchange Offers and retain all tendered Old Notes until the expiration of the extended Exchange Offers (subject to the limited withdrawal rights described herein) or (iv) amend any or all of the Exchange Offers in any respect by giving oral or written notice of such amendment to the Exchange Agent and making public disclosure of such amendment to the extent required by law.

The Company has not made a decision as to what circumstances would lead the Company to waive any Condition, and any such waiver would depend on circumstances prevailing at the time of such waiver. Although the Company has no present plans or arrangements to do so, the Company reserves the right to amend, at any time, the terms of any one or more of the Exchange Offers. The Company will give holders notice of such amendments as may be required by applicable law.

The failure by the Company at any time to exercise any of the foregoing rights will not be deemed a waiver of any other right and each right will be deemed an ongoing right that may be asserted at any time and from time to time. Any determination made by the Company concerning an event, development or circumstance described or referred to above will be final and binding on all parties.

## DEALER MANAGER, EXCHANGE AGENT AND INFORMATION AGENT

**Dealer Manager**

In connection with the Exchange Offers, the Company has retained Citigroup Global Markets Inc. to act as the dealer manager for the Exchange Offers. The Company has agreed to pay the Dealer Manager customary fees and to reimburse the Dealer Manager for its reasonable out-of-pocket expenses and to indemnify it against certain liabilities, including liabilities under federal securities laws, and to contribute to payments that it may be required to make in respect thereof. No fees or commissions have been or will be paid by the Company to any broker or dealer, other than the Dealer Manager, in connection with the Exchange Offers. The customary mailing and handling expenses incurred by brokers, dealers, banks, depositories, trust companies and other nominees or custodians forwarding material to their customers will be paid by the Company. The obligations of the Dealer Manager to perform such function are subject to certain conditions. Requests for assistance relating to the Exchange Offers may be directed to the Dealer Manager at its address and telephone number set forth on the back cover of this Offering Memorandum.

The Dealer Manager and its affiliates are full service financial institutions engaged in various activities, and have from time to time provided and are currently providing certain commercial banking, financial advisory and investment banking services to the Company and its subsidiaries and affiliates for which they have received customary fees. In addition, an affiliate of the Dealer Manager is a lender under our Credit Agreement. The Dealer Manager has acted and may in the future act as a sales agent in connection with the Company's at-the-market equity offering program and as an agent under the Company's share repurchase program. The Dealer Manager is also acting as sole solicitation agent for the Consent Solicitations, as sole dealer manager for the 2020 Exchange Offer, and also may act as an initial purchaser in the Company's anticipated New Secured Notes Offering, for which it has received or will receive customary fees.

In the ordinary course of their business, the Dealer Manager or its affiliates may at any time hold long or short positions, and may trade for its own account or the accounts of customers, in debt or equity securities issued or guaranteed by the Company or its subsidiaries and affiliates, including the Old Notes and the New Notes and, to the extent that the Dealer Manager or its affiliates own Old Notes during the Exchange Offers, they may tender such Old Notes pursuant to the terms of the Exchange Offers. The Dealer Manager and its affiliates may from time to time in the future engage in future transactions with the Company and its subsidiaries and affiliates and provide services to them in the ordinary course of their respective businesses.

In connection with the Exchange Offers or otherwise, the Dealer Manager may purchase and sell the Old Notes and the New Notes in the open market to the extent permitted by applicable law. Any such transactions may include covering transactions and stabilizing transactions. The Dealer Manager or its affiliates have a lending relationship with us, and it or its affiliates may routinely hedge or have hedged their credit exposure to us consistent with their customary risk management policies. Typically, the Dealer Manager and its affiliates would hedge such exposure by entering into transactions which consist of either the purchase of credit default swaps or the creation of short positions in our securities, including potentially the New Notes offered hereby. Any such credit default swaps or short positions could adversely affect future trading prices of the New Notes offered hereby. Any of these transactions may have the effect of preventing or retarding a decline in the market prices of the Old Notes or the New Notes. Any such transactions may also cause the prices of the Old Notes or the New Notes to be higher than the prices that otherwise would exist in the open market in the absence of these transactions. The Dealer Manager may conduct these transactions in the over-the-counter market or otherwise. If the Dealer Manager commences any of these transactions, it may discontinue them at any time. The Dealer Manager is only acting as dealer manager for the Exchange Offers in the United States and, if eligible, in Canada.

**Exchange Agent and Information Agent**

Global Bondholder Services Corporation has been appointed the Exchange Agent and the Information Agent for the Exchange Offers. Letters of Transmittal and all correspondence in connection with the Exchange Offers should be sent or delivered by each holder of Old Notes, or a beneficial owner's bank, depositary, broker, dealer, trust company or other nominee or custodian, to the Information Agent at the address and telephone numbers set forth on the back cover of this Offering Memorandum. The Company will pay the Exchange Agent and the

Information Agent reasonable compensation for its services and will reimburse it for certain reasonable expenses in connection therewith. The Company has agreed to indemnify the Exchange Agent and the Information Agent against certain liabilities, including liabilities arising under the federal securities laws.

## DESCRIPTION OF OTHER INDEBTEDNESS

Set forth below is a list of all indebtedness, other than the New Notes that may be issued in the Exchange Offers or the Concurrent Transactions, of Windstream (or any of its subsidiaries) that is currently outstanding. The following descriptions do not purport to be complete and are qualified in their entirety by reference to their respective governing documents.

### Indebtedness issued directly by Windstream

#### *Senior credit facilities*

As of June 30, 2017, after giving pro forma effect to the Exchange Offers, the Concurrent Transactions and the Other Financing Transactions, Windstream's existing senior credit facilities consist of the following:

- a senior secured revolving credit facility with aggregate commitments of $1,250 million, of which approximately $477.2 million remains available to be drawn as of June 30, 2017; and

- senior secured term loan facilities in the aggregate amount of approximately $1,915.1 million as of June 30, 2017 consisting of subfacilities in the following amounts:

  (a)     Tranche B-6 term loans (the "Tranche B-6 Term Loans")—approximately $1,338.0 million; and

  (b)     Tranche B-7 term loans (the "Tranche B-7 Term Loans")—approximately $577.1 million.

*Maturity*.  Under our senior credit facilities, as of June 30, 2017, (i) all of the revolving commitments will mature on April 24, 2020 (the "**Revolving Commitments**"), (ii) the Tranche B-6 Term Loans will mature on March 29, 2021 (which maturity date will be subject to a springing maturity date of (A) April 24, 2020, if our revolving credit facility has not had its maturity extended (or been refinanced) by April 24, 2020 so that the revolving credit facility (or refinancing thereof) matures no earlier than March 29, 2021 or (B) July 15, 2020 if our existing 7.75% Senior Notes due 2020 have not been repaid or refinanced prior to July 15, 2020 with indebtedness having a maturity date no earlier than March 29, 2021), and (iii) the Tranche B-7 Term Loans will mature on February 17, 2024.

*Amortization*.  The Tranche B-6 Term Loans amortize quarterly on the last day of each quarter prior to the maturity date thereof in an aggregate principal amount equal to 0.25% of the initial principal amount of the Tranche B-6 Term Loans.  The Tranche B-7 Term Loans amortize quarterly on the last day of each quarter prior to the maturity date thereof in an aggregate principal amount equal to 0.25% of the initial principal amount of the Tranche B-7 Term Loans.  The outstanding principal balance of each tranche of senior secured term loans will be due on the respective maturity dates thereof.

*Interest rate and fees*.  At the commencement of each borrowing period, Windstream may elect an Alternate Base Rate loan ("ABR Loan") or a Eurodollar loan ("Eurodollar Loan") for each of the subfacilities and revolving credit facility.  The below table provides the interest rate applicable to an ABR Loan and an Eurodollar Loan for the senior secured term loans.  Windstream has currently elected the LIBOR based rates applicable to the Eurodollar Loans for borrowings under the credit facilities.

| | | |
|---|---|---|
| Tranche B-6 Term Loans | ABR plus 3.00% | LIBOR plus 4.00% |
| Tranche B-7 Term Loans | ABR plus 2.25% | LIBOR plus 3.25% |

The interest rates for the Revolving Commitments change depending on Windstream's leverage ratio and can vary from ABR plus 0.25% to ABR plus 1.00%, or from LIBOR plus 1.25% to LIBOR plus 2.00%, depending upon whether we elect an ABR loan or a Eurodollar loan for the Revolving Commitments.  The commitment fee on the average daily amount of unused Revolving Commitments is 0.50% (subject to a step-down to 0.40% based on the Company's leverage ratio).  We pay certain additional fees with respect to the revolving credit facility, including (i) participation fees on letters of credit issued under the revolving credit facility at a rate equal to the LIBOR margin

51

applicable to revolving loans of each applicable lender, (ii) fronting fees at a rate of 0.25% per annum on letters of credit issued under the revolving credit facility and (iii) customary annual administration fees.

*Mandatory prepayments*.  Subject to certain conditions and exceptions, our credit facilities require us to prepay outstanding term loans in an amount equal to 100% of the net proceeds from dispositions of assets and casualty insurance condemnation awards and similar recoveries in each case which are not reinvested within one year (such period may be extended to 18 months if we commit to reinvest the proceeds within one year).

*Voluntary prepayments*.  The credit facilities provide for voluntary commitment reductions and prepayments of loans, subject to certain conditions and restrictions.

*Covenants*.  Our credit facilities contain affirmative and negative covenants that, among other things, limit or restrict our ability (as well as those of our subsidiaries) to: incur liens and encumbrances; incur debt; merge, dissolve, liquidate or consolidate; make acquisitions and investments; dispose of or transfer assets; pay dividends or make other payments in respect of our capital stock; amend material documents; change the nature of our business; make certain payments of debt; engage in certain transactions with affiliates; and enter into sale/ leaseback or hedging transactions.  In particular, our credit agreement permits us to issue senior secured notes on a *pari passu* basis with the security interests supporting the senior secured credit facilities so long as the senior secured debt leverage ratio is not more than 2.25 to 1.00 on a pro forma basis at the time of incurring such indebtedness, and subject to certain other conditions.

In addition, the financial covenants under our credit facilities require us to maintain certain ratios, including a minimum interest coverage ratio of 2.75 to 1.0 and a maximum leverage ratio of 4.50 to 1.0.

*Guarantees and collateral*.  Our obligations under the credit facilities are guaranteed by all of our current and future wholly-owned domestic subsidiaries, except any subsidiaries with total assets of not more than $10 million (subject to an aggregate limit for all such subsidiaries of $35 million) and any subsidiaries for which state regulatory approval is required or would be required for any guarantee, which include, without limitation, our incumbent local exchange carrier subsidiaries that operate in Florida, Georgia, Kentucky, Mississippi, Missouri, Nebraska, New York, North Carolina, Ohio and Pennsylvania as well as Windstream Communications, Inc., which holds certain of our long distance and CLEC licenses.  In addition, our obligations under the credit facilities are guaranteed by any other subsidiaries that guarantee any other debt obligations of any loan party.  Subject to certain exclusions, our obligations and each guarantee are secured by substantially all of the tangible and intangible personal property assets of us or the applicable guarantor.  We have also pledged the capital stock in certain of our subsidiaries to secure our obligations under the credit facilities.

*Events of default*.  The credit facilities contain customary events of default such as nonpayment of obligations under the credit facilities, violation of affirmative and negative covenants, material inaccuracy of representations, defaults under other material debt, bankruptcy, ERISA and judgment defaults, loss of material regulatory licenses, change of control and loss of lien perfection or priority or unenforceability of guarantees.

### Existing 6 3/8% Senior Notes due 2023

*General*.  We issued $700.0 million aggregate principal amount of Existing 6 3/8% Notes on January 23, 2013. As of June 30, 2017, we had $585.7 million aggregate principal amount of Existing 6 3/8% Notes outstanding.

*Guarantees*.  The Existing 6 3/8% Notes are guaranteed by all of our subsidiaries that guarantee our credit facilities or our other debt obligations.

*Ranking*.  The Existing 6 3/8% Notes are senior unsecured obligations of the Company ranking equally with our unsecured unsubordinated debt.

*Optional redemption*.  We may redeem some or all of the Existing 6 3/8% Notes at any time prior to February 1, 2018 at a redemption price equal to 100% of their principal amount, plus a make-whole premium,

together with accrued and unpaid interest.  We may redeem some or all of the Existing 6 3/8% Notes at any time on or after February 1, 2018 upon payment of a premium that declines ratably over time.  In addition, at any time prior to February 1, 2016, we may use the proceeds of certain equity offerings to redeem up to 35% of the aggregate principal amount of the Existing 6 3/8% Notes at a redemption price equal to 106.375% of the principal amount.

*Mandatory redemption*.  We will not be required to make mandatory redemption or sinking fund payments with respect to the Existing 6 3/8% Notes.

*Change of control*.  If there is a change of control that is accompanied or followed by a downgrade in the ratings of the Existing 6 3/8% Notes (and the rating of the Existing 6 3/8% Notes is below the lower of the rating in effect immediately preceding the change of control and the rating in effect when the Existing 6 3/8% Notes were initially issued), a holder has the right to require us to buy such holder's notes at 101% of their principal amount, plus accrued and unpaid interest and additional interest, if any.

*Covenants*.  The 2013 Indenture governing the Existing 6 3/8% Notes contains covenants substantially similar to the covenants governing the notes offered hereby (without regard to the amendments to the 6 3/8% Notes described under "Summary—Recent Developments—Certain Amendments to the 2013 Indenture governing the 6 3/8% Notes").

*Events of default*.  The 2013 Indenture governing the Existing 6 3/8% Notes is the same indenture that will govern the New Notes and contains the same events of default as the New Notes.

### 7.50% Senior Notes due 2023

*General*.  We issued $600.0 million aggregate principal amount of 7.50% senior notes due 2023 on March 16, 2011.  As of June 30, 2017, we had $343.5 million aggregate principal amount of 2023 Notes outstanding.

*Guarantees*.  The 2023 notes are guaranteed by all of our subsidiaries that guarantee our credit facilities or our other debt obligations.

*Ranking*.  The 2023 notes are senior unsecured obligations of the Company ranking equally with our unsecured unsubordinated debt.

*Optional redemption*.  We may redeem some or all of the 2023 notes at any time on or after April 1, 2016 upon payment of a premium that declines ratably over time.

*Mandatory redemption*.  We will not be required to make mandatory redemption or sinking fund payments with respect to the 2023 notes.

*Change of control*.  If there is a change of control that is accompanied or followed by a downgrade in the ratings of the 2023 notes (and the rating of the 2023 notes is below the lower of the rating in effect immediately preceding the change of control and the rating in effect when the 2023 notes were initially issued), a holder has the right to require us to buy such holder's notes at 101% of their principal amount, plus accrued and unpaid interest and additional interest, if any.

*Covenants*.  The indenture governing the 2023 notes contains covenants substantially similar to the covenants in the 2013 Indenture governing the New Notes (without regard to the amendments to the 6 3/8% Notes described under "Summary—Recent Developments—Certain Amendments to the 2013 Indenture governing the 6 3/8% Notes").

*Events of default*.  The indenture governing the 2023 notes contains events of default substantially similar to the events of default applicable to the New Notes.

**7.50% Senior Notes due 2022**

*General*.  We issued $500.0 million aggregate principal amount of 7.50% senior notes due 2022 on November 22, 2011. As of June 30, 2017, we had $441.2 million aggregate principal amount of 2022 Notes outstanding.

*Guarantees*.  The 2022 notes are guaranteed by all of our subsidiaries that guarantee our credit facilities or our other debt obligations.

*Ranking*.  The 2022 notes are senior unsecured obligations of the Company ranking equally with our unsecured unsubordinated debt.

*Optional redemption*.  We may redeem some or all of the 2022 notes at any time on or after June 1, 2017 upon payment of a premium that declines ratably over time.

*Mandatory redemption*.  We will not be required to make mandatory redemption or sinking fund payments with respect to the 2022 notes.

*Change of control*.  If there is a change of control that is accompanied or followed by a downgrade in the ratings of the 2022 notes (and the rating of the 2022 notes is below the lower of the rating in effect immediately preceding the change of control and the rating in effect when the 2022 notes were initially issued), a holder has the right to require us to buy such holder's notes at 101% of their principal amount, plus accrued and unpaid interest and additional interest, if any.

*Covenants*.  The indenture governing the 2022 notes contains covenants substantially similar to the covenants in the 2013 Indenture governing the New Notes (without regard to the amendments to the 6 3/8% Notes described under "Summary—Recent Developments—Certain Amendments to the 2013 Indenture governing the 6 3/8% Notes").

*Events of default*.  The indenture governing the 2022 notes contains events of default substantially similar to the events of default applicable to the New Notes.

**7.75% Senior Notes due 2021**

*General*.  We issued $450.0 million aggregate principal amount of 7.75% senior notes due 2021 on March 28, 2011. As of June 30, 2017, we had $809.3 million aggregate principal amount of 2021 Notes outstanding.

*Guarantees*.  The 2021 notes are guaranteed by all of our subsidiaries that guarantee our credit facilities or our other debt obligations.

*Ranking*.  The 2021 notes are senior unsecured obligations of the Company ranking equally with our unsecured unsubordinated debt.

*Optional redemption*.  We may redeem some or all of the 2021 notes at any time on or after October 1, 2016 upon payment of a premium that declines ratably over time.

*Mandatory redemption*.  We will not be required to make mandatory redemption or sinking fund payments with respect to the 2021 notes.

*Change of control*.  If there is a change of control that is accompanied or followed by a downgrade in the ratings of the 2021 notes (and the rating of the 2021 notes is below the lower of the rating in effect immediately preceding the change of control and the rating in effect when the 2021 notes were initially issued), a holder has the right to require us to buy such holder's notes at 101% of their principal amount, plus accrued and unpaid interest and additional interest, if any.

*Covenants*.  The indenture governing the 2021 notes contains covenants substantially similar to the covenants in the 2013 Indenture governing the New Notes (without regard to the amendments to the 6 3/8% Notes described under "Summary—Recent Developments—Certain Amendments to the 2013 Indenture governing the 6 3/8% Notes").

*Events of default*.  The indenture governing the 2021 notes contains events of default substantially similar to the events of default applicable to the New Notes.

### 7.75% Senior Notes due 2020

*General*.  We issued $500.0 million aggregate principal amount of 7.75% senior notes due 2020 on March 28, 2011. As of June 30, 2017, we had $700.0 million aggregate principal amount of 2020 Notes outstanding.

*Guarantees*.  The 2020 notes are guaranteed by all of our subsidiaries that guarantee our credit facilities or our other debt obligations.

*Ranking*.  The 2020 notes are senior unsecured obligations of the Company ranking equally with our unsecured unsubordinated debt.

*Optional redemption*.  We may redeem some or all of the 2020 notes at any time on or after October 1, 2015 upon payment of a premium that declines ratably over time.

*Mandatory redemption*.  We will not be required to make mandatory redemption or sinking fund payments with respect to the 2021 notes.

*Change of control*.  If there is a change of control that is accompanied or followed by a downgrade in the ratings of the 2020 notes (and the rating of the 2020 notes is below the lower of the rating in effect immediately preceding the change of control and the rating in effect when the 2020 notes were initially issued), a holder has the right to require us to buy such holder's notes at 101% of their principal amount, plus accrued and unpaid interest and additional interest, if any.

*Covenants*.  The indenture governing the 2020 notes contains covenants substantially similar to the covenants in the 2013 Indenture governing the notes offered hereby (without regard to the amendments to the 6 3/8% Notes described under "Summary—Recent Developments—Certain Amendments to the 2013 Indenture governing the 6 3/8% Notes").

*Events of default*.  The indenture governing the 2020 notes contains events of default substantially similar to the events of default applicable to the notes offered hereby.

### Other Windstream indebtedness

In addition to our credit facilities and notes issued directly by us, Windstream has the following additional indebtedness issued by our subsidiaries:

### 6.75% Notes due 2028

*General*.  Windstream Holding of the Midwest, Inc. (formerly known as Alltel Communications Holding of the Midwest, Inc.) ("Windstream Midwest") issued $100.0 million in aggregate principal amount of the 6.75% notes due 2028, all of which are currently outstanding.

*Ranking*.  The 6.75% notes are senior secured obligations ranking equally with our senior secured credit facilities and the notes offered hereby to the extent of Windstream Midwest's assets securing the credit facilities and the 6.75% notes.  The New Notes will be effectively subordinated to the 6.75% notes to the extent of the assets securing the 6.75% notes.

*Optional redemption*.   We may redeem all or a part of the 6.75% notes upon not less than 30 nor more than 60 days' notice, at the redemption price equal to the greater of (i) 100% of the principal amount of the notes to be redeemed or (ii) the sum of the present values of the remaining scheduled payments thereon discounted to the redemption date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the treasury rate plus 12.5 basis points, together in either case with accrued interest to the date of redemption.

*Mandatory redemption*.   We will not be required to make mandatory redemption or sinking fund payments with respect to the 6.75% notes.

*Covenants*.   The indenture governing the 6.75% notes contains affirmative and negative covenants, that, among other things, require Windstream Midwest to secure the 6.75% notes in the event Windstream Midwest or any of its restricted subsidiaries were to incur secured debt and restricts the ability of Windstream Midwest and its restricted subsidiaries to enter into sale and leaseback transactions or to merge, consolidate or sell all or substantially all of its assets.   These covenants are subject to a number of important exceptions.

*Events of default*.   The 6.75% notes specify certain events of default including failure to pay principal and interest on the 6.75% notes, failure to make a sinking fund deposit, failure to comply with covenants and certain bankruptcy, insolvency or reorganization events.

## DESCRIPTION OF THE NEW NOTES

### General

In this description (1) the term "*Windstream*" refers to Windstream Services, LLC, a Delaware limited liability company (as successor to Windstream Corporation) and not to any of its Subsidiaries or Affiliates; (2) the term "*Co-Issuer*" refers to Windstream Finance Corp., a Delaware corporation, a direct wholly-owned Subsidiary of Windstream, and not to any of its Subsidiaries or Affiliates; (3) the term "*Issuers*" refers, collectively, to Windstream and the Co-Issuer; (4) the term "*Windstream Parent*" refers to Windstream Holdings, Inc., a Delaware corporation, the direct parent of Windstream, and not to any of its Subsidiaries or Affiliates; and (5) the terms "*we*," "*our*" and "*us*" each refer to Windstream and its consolidated Subsidiaries.

Windstream will issue 6 3/8% Senior Notes due 2023 in exchange for Old Notes validly tendered and accepted by us for exchange pursuant to the Exchange Offers, as well as any 6 3/8% Senior Notes due 2023 in exchange for notes validly tendered and accepted by us for exchange pursuant to the 2021 Exchange Offer (collectively, the "*New 6 3/8% Notes*") as Additional Notes (as defined below) under the indenture dated January 23, 2013 among Windstream, the guarantors named therein, and U.S. Bank National Association, as trustee, as supplemented by the First Supplemental Indenture (as defined below) and a second supplemental indenture to be dated as of the Early Settlement Date (as so amended and supplemented, the "*Indenture*").  Pursuant to a first supplemental indenture dated March 2, 2015 among Windstream, the Co-Issuer, the guarantors party thereto and the trustee, the Co-Issuer agreed to become a co-obligor of the Notes and to incur all of the obligations of Windstream, on a joint and several basis, under the Indenture and the Notes as a co-obligor of the Notes and as a "Restricted Subsidiary" of Windstream.

The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended. The following description is a summary of the material provisions of the Indenture. It does not restate those agreements in their entirety. We urge you to read the Indenture because it, and not this description, defines your rights as holders of the Notes. Anyone who receives this offering memorandum may obtain a copy of the Indenture without charge by writing to the address set forth under "Where you can find additional information."

On January 23, 2013, Windstream issued $700,000,000 aggregate principal amount of 6⅜% Senior Notes due 2023 (the "*Existing 6 3/8% Notes*") under the Indenture. The New 6 3/8% Notes and the Existing 6 3/8% Notes (together, the "*Notes*") will be treated as a single class for all purposes under the Indenture, including, without limitation, waivers, amendments and offers to purchase. However, the New 6 3/8% Notes will not be fungible with the Existing 6 3/8% Notes for U.S. federal income tax purposes and, as a result, will have separate CUSIP and ISIN numbers to the Existing 6 3/8% Notes.

Substantially concurrently with the commencement of the Exchange Offers, we commenced the 6 3/8% Senior Notes Consent Solicitation as described under "Summary—The Concurrent Transactions."  To the extent that the requisite number of consents under the 6 3/8% Senior Notes Consent Solicitation are received, any New 6 3/8% Notes that you receive in connection with the Exchange Offers will be subject to, and you will be bound by, the terms of the Proposed Waivers and Amendments with respect to the New 6 3/8% Notes.  This description does not reflect the Proposed Waivers and Amendments, which will be contained in a supplemental indenture to the Indenture. For more information about the Proposed Waivers and Amendments, see  "Summary—The Concurrent Transactions—Consent Solicitation with respect to our 6 3/8% Notes" elsewhere in this offering memorandum.  In addition, this description does not reflect the additional amendments described under "Summary—Recent Developments—Certain Amendments to the 2013 Indenture governing the 6 3/8% Notes," which will be contained in a supplemental indenture to the Indenture.

You can find the definitions of some of the terms used in this description below under the caption "— Certain definitions." The defined terms used in this description but not defined below under the caption "— Certain definitions" have the meanings assigned to them in the Indenture.

**Brief description of the Notes**

The Notes:

- will be general unsecured obligations of Windstream;

- will be effectively subordinated to all existing and future secured Indebtedness of Windstream, including Indebtedness under the Credit Agreement, to the extent of the value of the assets securing such Indebtedness, and to all existing and future liabilities of Windstream's subsidiaries that are not Guarantors, to the extent of the value of the assets of such subsidiaries;

- will be *pari passu* in right of payment with all existing and future unsecured, unsubordinated Indebtedness of Windstream;

- will be senior in right of payment to any future subordinated Indebtedness of Windstream; and

- will be guaranteed by the Guarantors.

As of June 30, 2017, after giving pro forma effect to the Exchange Offers, the Concurrent Transactions and the Other Financing Transactions, Windstream and the Guarantors would have had approximately $6,000.1 million of consolidated indebtedness outstanding, approximately $3,137.9 million of which was secured indebtedness.

Currently, all of Windstream's subsidiaries are "Restricted Subsidiaries." However, under the circumstances described below under the caption "— Certain covenants — Designation of restricted and unrestricted subsidiaries," Windstream will be permitted to designate certain of its subsidiaries as "Unrestricted Subsidiaries." Any Unrestricted Subsidiaries will not be subject to any of the restrictive covenants in the Indenture and will not guarantee the notes. Only those Restricted Subsidiaries of Windstream that guarantee any Indebtedness under the Credit Agreement will be Guarantors.

**Principal, maturity and interest**

The Indenture provides for the issuance of Notes in an unlimited principal amount. We may issue additional Notes (the "*Additional Notes*") from time to time. Any offering of Additional Notes is subject to the covenant described below under the caption "— Certain covenants — Incurrence of indebtedness." The Notes and any Additional Notes subsequently issued under the Indenture would be treated as a single class for all purposes under the Indenture, including, without limitation, waivers, amendments, redemptions and offers to purchase; *provided* that the Additional Notes may be issued at different prices from the issue price of the Notes issued in this offering; *provided further* that, if the Additional Notes are not fungible with the Notes for U.S. federal income tax purposes, the Additional Notes will have separate CUSIP and ISIN numbers. The Notes will be issued in denominations of $2,000 and integral multiples of $1,000 in excess of $2,000. The Notes will mature on August 1, 2023.

Interest on the New 6 3/8% Notes will accrue at the applicable rate set forth on the cover page of this offering memorandum and be payable semi-annually in arrears on February 1 and August 1, commencing on February 1, 2018, to the Holders of record on the immediately preceding January 15 and July 15, respectively.

Interest on the New 6 3/8% Notes will accrue from the Early Settlement Date or, if interest has already been paid, from the date it was most recently paid.  Interest will be computed on the basis of a 360-day year comprised of twelve 30- day months.

**Methods of receiving payments on the Notes**

If a Holder has given wire transfer instructions to Windstream, Windstream will pay all principal, interest and premium, on that Holder's Notes in accordance with those instructions. All other payments on Notes will be made at the office or agency of the Paying Agent and Registrar within the United States of America unless Windstream elects to make interest payments by check mailed to the Holders at their addresses set forth in the register of Holders.

**Paying agent and registrar for the Notes**

The Trustee will initially act as Paying Agent and Registrar. Windstream may change the Paying Agent or Registrar without prior notice to the Holders, and Windstream or any of its Subsidiaries may act as Paying Agent or Registrar.

**Transfer and exchange**

A Holder may transfer or exchange Notes in accordance with the Indenture and the procedures described in "Transfer Restrictions." The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and Windstream may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. Windstream is not required to transfer or exchange any Note selected for redemption. Also, Windstream is not required to transfer or exchange any Note for a period of 15 days before the mailing of a notice of redemption of Notes to be redeemed.

The registered Holder of a Note will be treated as the owner of it for all purposes.

**Note guarantees**

The Notes will initially be guaranteed, jointly and severally, by each Restricted Subsidiary of Windstream (other than the Co-Issuer) that guarantees any Indebtedness under the Credit Agreement. Many of our regulated Subsidiaries will not Guarantee Indebtedness under the Credit Agreement. Each Note Guarantee:

- will be a general unsecured obligation of the Guarantor;

- will be effectively subordinated to all existing and future secured Indebtedness of the Guarantor, including the Guarantee of the Guarantor under the Credit Agreement;

- will be *pari passu* in right of payment with all existing and future unsecured, unsubordinated Indebtedness of the Guarantor; and

- will be senior in right of payment to any future subordinated Indebtedness of the Guarantor.

The obligations of each Guarantor under its Note Guarantee will be limited as necessary to prevent that Note Guarantee from constituting a fraudulent conveyance under applicable law, but it is uncertain whether such provision would be effective to prevent a Note Guarantee from constituting a fraudulent conveyance under applicable law. Fraudulent conveyance laws may void the Notes and/or the guarantees or subordinate the Notes and/or the guarantees. See "Risk Factors — Risks Related to the New Notes and our Indebtedness."

In the event that any of Windstream's Restricted Subsidiaries that is not a Guarantor guarantees certain other debt, it will be required to guarantee the Notes. See "— Certain covenants — Guarantees."

**Optional redemption**

At any time prior to February 1, 2018, Windstream may redeem all or part of the Notes upon not less than 30 nor more than 60 days' prior notice at a redemption price equal to the sum of (i) 100% of the principal amount thereof, plus (ii) the Applicable Premium as of the date of redemption, plus (iii) accrued and unpaid interest to the date of redemption.

At any time on or after February 1, 2018, Windstream may redeem all or a part of the Notes upon not less than 30 nor more than 60 days' prior notice, at the redemption prices (expressed as percentages of principal amount) set forth below plus accrued and unpaid interest thereon to the applicable redemption date, if redeemed during the twelve-month period beginning on February 1 of the years indicated below:

| Year | Percentage |
|---|---|
| 2018 | 103.188% |
| 2019 | 102.125% |
| 2020 | 101.063% |

59

| Year | Percentage |
|------|-----------|
| 2021 and thereafter ............................................................................................................... | 100.000% |

*Selection and Notice*

If less than all of the Notes are to be redeemed at any time, the Trustee will select Notes for redemption as follows:

(i)   if the Notes are listed on any national securities exchange, in compliance with the requirements of such principal national securities exchange; or

(ii)  if the Notes are not so listed, on a pro rata basis, by lot or by such method as the Trustee deems fair and appropriate.

No Notes of $2,000 or less will be redeemed in part. Notices of redemption will be mailed by first class mail at least 30 but not more than 60 days before the redemption date to each Holder of Notes to be redeemed at its registered address. Notices of redemption may not be conditional.

If any Note is to be redeemed in part only, the notice of redemption that relates to that Note will state the portion of the principal amount thereof to be redeemed. A new Note in principal amount equal to the unredeemed portion of the original Note will be issued in the name of the Holder thereof upon cancellation of the original Note. Notes called for redemption become due on the date fixed for redemption. On and after the redemption date, interest ceases to accrue on Notes or portions of them called for redemption.

**Mandatory redemption**

Windstream is not required to make mandatory redemption or sinking fund payments with respect to the Notes.

**Repurchase at the option of holders**

*Change of control*

If a Change of Control Triggering Event occurs, each Holder of Notes will have the right to require Windstream to repurchase all or any part (equal to $2,000 or an integral multiple of $1,000 in excess of $2,000) of that Holder's Notes pursuant to an offer (a "Change of Control Offer") on the terms set forth in the Indenture. In the Change of Control Offer, Windstream will offer payment (a "Change of Control Payment") in cash equal to not less than 101% of the aggregate principal amount of Notes repurchased plus accrued and unpaid interest thereon, to the date of repurchase (the "Change of Control Payment Date"). No later than 30 days following any Change of Control Triggering Event (unless Windstream has exercised its right to redeem the Notes as described under "— Optional redemption"), Windstream will mail a notice to each Holder describing the transaction or transactions that constitute the Change of Control and offering to repurchase Notes on the Change of Control Payment Date specified in such notice, which date will be no earlier than 30 days and no later than 60 days from the date such notice is mailed, pursuant to the procedures required by the Indenture and described in such notice. Windstream will comply with the requirements of Rule 14e-1 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Change of Control Triggering Event. To the extent that the provisions of any securities laws or regulations conflict with the Change of Control provisions of the Indenture, Windstream will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under the Change of Control provisions of the Indenture by virtue of such compliance.

On the Change of Control Payment Date, Windstream will, to the extent lawful:

(i)   accept for payment all Notes or portions thereof properly tendered pursuant to the Change of Control Offer;

(ii)  deposit with the Paying Agent an amount equal to the Change of Control Payment in respect of all Notes or portions thereof so tendered; and

(iii) deliver or cause to be delivered to the Trustee the Notes so accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions thereof being purchased by Windstream.

The Paying Agent will promptly mail or wire transfer to each Holder of Notes so tendered the Change of Control Payment for such Notes, and the Trustee will promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any, provided that each such new Note will be in a principal amount of $2,000 or an integral multiple of $1,000 in excess of $2,000.

Windstream will publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

The Credit Agreement limits Windstream's ability to purchase any Notes, and also provides that certain change of control events with respect to Windstream would constitute a default under the Credit Agreement. Windstream's existing notes also provide that certain change of control events will require the notes to be repurchased. Any future credit agreements or other similar agreements to which Windstream or its subsidiaries become party may contain similar restrictions and provisions. In the event a Change of Control Triggering Event occurs at a time when Windstream is prohibited from purchasing Notes, Windstream could seek the consent of its lenders to the purchase of Notes or could attempt to refinance the borrowings that contain such prohibition. If Windstream does not obtain such a consent or repay such borrowings, Windstream will remain prohibited from purchasing Notes. In such case, Windstream's failure to purchase tendered Notes would constitute an Event of Default under the Indenture which would, in turn, constitute a default under such other agreements.

The provisions described above that require Windstream to make a Change of Control Offer following a Change of Control Triggering Event will be applicable regardless of whether any other provisions of the Indenture are applicable. Except as described above with respect to a Change of Control Triggering Event, the Indenture does not contain provisions that permit the Holders of the Notes to require that Windstream repurchase or redeem the Notes in the event of a takeover, recapitalization or similar transaction.

Windstream will not be required to make a Change of Control Offer upon a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the Indenture applicable to a Change of Control Offer made by Windstream and purchases all Notes validly tendered and not withdrawn under such Change of Control Offer.

The definition of Change of Control Triggering Event includes a phrase relating to the direct or indirect sale, transfer, conveyance or other disposition of "all or substantially all" of the properties or assets of Windstream and its Restricted Subsidiaries taken as a whole. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, the ability of a Holder of Notes to require Windstream to repurchase such Notes as a result of a sale, transfer, conveyance or other disposition of less than all of the assets of Windstream and its Restricted Subsidiaries taken as a whole to another Person or group may be uncertain.

***Asset sales***

Windstream will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(1)   Windstream (or the Restricted Subsidiary, as the case may be) receives consideration at the time of such Asset Sale at least equal to the Fair Market Value of the assets or Equity Interests issued or sold or otherwise disposed of; and

(2)   at least 75% of the consideration therefor received by Windstream or such Restricted Subsidiary is in the form of cash, Cash Equivalents or Replacement Assets or a combination of both. For purposes of this provision, each of the following will be deemed to be cash:

(a)   any liabilities (as shown on Windstream's or such Restricted Subsidiary's most recent balance sheet) of Windstream or any Restricted Subsidiary (other than contingent liabilities, Indebtedness that is by

its terms subordinated to the Notes or any Note Guarantee and liabilities to the extent owed to Windstream or any Subsidiary of Windstream) that are assumed by the transferee of any such assets or Equity Interests pursuant to a written assignment and assumption agreement that releases Windstream or such Restricted Subsidiary from further liability therefor;

(b)   any securities, notes or other obligations received by Windstream or any such Restricted Subsidiary from such transferee that are converted by Windstream or such Restricted Subsidiary into Cash Equivalents or Replacement Assets within 180 days of the receipt thereof (to the extent of the Cash Equivalents or Replacement Assets received in that conversion); or

(c)   any Designated Noncash Consideration received by Windstream or any of its Restricted Subsidiaries in such Asset Sale having an aggregate Fair Market Value, taken together with all other Designated Noncash Consideration received pursuant to this clause (c) that is at that time outstanding, not to exceed the greater of (x) 1.5% of Total Assets and (y) $100.0 million (with the Fair Market Value of each item of Designated Noncash Consideration being measured at the time received and without giving effect to subsequent changes in value).

Within 365 days after the receipt by Windstream or any of its Restricted Subsidiaries of any Net Proceeds from an Asset Sale, Windstream or such Restricted Subsidiary may apply such Net Proceeds at its option:

(1)   to repay (x) Indebtedness secured by assets of Windstream or its Restricted Subsidiaries (to the extent of the value of the assets securing such Indebtedness), (y) Obligations under the Credit Agreement or (z) Indebtedness of a Restricted Subsidiary of Windstream that is not a Guarantor (to the extent of the value of the assets of such Restricted Subsidiary); or

(2)   to purchase Replacement Assets.

Pending the final application of any such Net Proceeds, Windstream or such Restricted Subsidiary may temporarily reduce revolving credit borrowings or otherwise invest such Net Proceeds in any manner that is not prohibited by the Indenture.

On the 366th day after an Asset Sale or such earlier date, if any, as Windstream determines not to apply the Net Proceeds relating to such Asset Sale as set forth in the preceding paragraph (each such date being referred as an "Excess Proceeds Trigger Date"), such aggregate amount of Net Proceeds that has not been applied on or before the Excess Proceeds Trigger Date as permitted in the preceding paragraph ("Excess Proceeds") will be applied by Windstream to make an offer (an "Asset Sale Offer") to all Holders of Notes and all holders of other Indebtedness that is *pari passu* with the Notes or any Note Guarantee containing provisions similar to those set forth in the Indenture with respect to offers to purchase with the proceeds of sales of assets, to purchase the maximum principal amount of Notes and such other *pari passu* Indebtedness that may be purchased out of the Excess Proceeds. The offer price in any Asset Sale Offer will be equal to 100% of the principal amount of the Notes and such other *pari passu* Indebtedness plus accrued and unpaid interest to the date of purchase, and will be payable in cash.

Windstream may defer the Asset Sale Offer until there are aggregate unutilized Excess Proceeds equal to or in excess of $30.0 million resulting from one or more Asset Sales, at which time the entire unutilized amount of Excess Proceeds (not only the amount in excess of $30.0 million) will be applied as provided in the preceding paragraph. If any Excess Proceeds remain after consummation of an Asset Sale Offer, Windstream and its Restricted Subsidiaries may use such Excess Proceeds for any purpose not otherwise prohibited by the Indenture. If the aggregate principal amount of Notes and such other *pari passu* Indebtedness tendered into such Asset Sale Offer exceeds the amount of Excess Proceeds, the Notes and such other *pari passu* Indebtedness will be purchased on a pro rata basis based on the principal amount of Notes and such other *pari passu* Indebtedness tendered. Upon completion of each Asset Sale Offer, the Excess Proceeds subject to such Asset Sale will no longer be deemed to be Excess Proceeds.

Windstream will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable in connection with each repurchase of Notes pursuant to an Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the Asset Sales provisions of the Indenture, Windstream will comply with the applicable

securities laws and regulations and will not be deemed to have breached their obligations under the Asset Sale provisions of the Indenture by virtue of such compliance.

The Credit Agreement limits Windstream's ability to purchase any Notes, and also provides that certain asset sale events with respect to Windstream would constitute a default under the Credit Agreement. Any future credit agreements or other similar agreements to which Windstream becomes party may contain similar restrictions and provisions. In the event an Asset Sale occurs at a time when Windstream is prohibited from purchasing Notes, Windstream could seek the consent of its lenders to the purchase of Notes or could attempt to refinance the borrowings that contain such prohibition. If Windstream does not obtain such a consent or repay such borrowings, Windstream will remain prohibited from purchasing Notes. In such case, Windstream's failure to purchase tendered Notes would constitute an Event of Default under the Indenture which would, in turn, constitute a default under such other agreements.

## Certain covenants

### *Restricted payments*

(A)  Windstream will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(1)    declare or pay (without duplication) any dividend or make any other payment or distribution on account of Windstream's or any of its Restricted Subsidiaries' Equity Interests (including, without limitation, any payment in connection with any merger or consolidation involving Windstream or any of its Restricted Subsidiaries) or to the direct or indirect holders of Windstream's or any of its Restricted Subsidiaries' Equity Interests in their capacity as such (other than dividends, payments or distributions (x) payable in Equity Interests (other than Disqualified Stock) of Windstream or (y) to Windstream or a Restricted Subsidiary of Windstream);

(2)    purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any merger or consolidation involving Windstream or any of its Restricted Subsidiaries) any Equity Interests of Windstream or any Restricted Subsidiary thereof held by Persons other than Windstream or any of its Restricted Subsidiaries;

(3)    make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value any Subordinated Debt, except (a) a payment of interest or principal at the Stated Maturity thereof or (b) the purchase, repurchase or other acquisition of any such Indebtedness in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such purchase, repurchase or other acquisition; or

(4)    make any Restricted Investment (all such payments and other actions set forth in clauses (1) through (4) above being collectively referred to as "Restricted Payments"),

unless, at the time of and after giving effect to such Restricted Payment:

(1)    no Default or Event of Default will have occurred and be continuing or would occur as a consequence thereof;

(2)    Windstream would, after giving pro forma effect to such Restricted Payment as if such Restricted Payment had been made at the beginning of the applicable four-quarter period, have been permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Consolidated Leverage Ratio test set forth in the first paragraph of the covenant described below under the caption "— Incurrence of indebtedness;" and

(3)    such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by Windstream and its Restricted Subsidiaries on or after July 17, 2006 (excluding Restricted Payments permitted by clauses (2), (3), (4), (5), (6), (8), (9) (only in connection with any calculation made for purposes of making a Restricted Payment on or prior to July 17, 2007; any payments made under such clause (9), even prior to such date, will be included as Restricted Payments for purposes of making any calculation after such date), (10) and (11) of the next succeeding paragraph (B)), is less than the sum, without duplication, of:

(a)    an amount equal to Windstream's Consolidated Cash Flow for the period (taken as one accounting period) from October 1, 2006 to the end of Windstream's most recently ended fiscal quarter for which internal financial statements are available (the "Basket Period") less 1.4 times Windstream's Fixed Charges for the Basket Period, *plus*

(b)    100% of the aggregate net cash proceeds received by Windstream after July 17, 2006 as a contribution to its common equity capital or from the issue or sale of Equity Interests (other than Disqualified Stock) of Windstream or from the Incurrence of Indebtedness (including the issuance of Disqualified Stock) of Windstream or any of its Restricted Subsidiaries that has been converted into or exchanged for such Equity Interests (other than Equity Interests sold to, or Indebtedness held by, a Subsidiary of Windstream and except to the extent converted into or exchanged for Disqualified Stock), plus

(c)    with respect to Restricted Investments made by Windstream and its Restricted Subsidiaries after July 17, 2006 pursuant to this paragraph (A), (i) the aggregate amount of cash equal to the return from such Restricted Investments in any Person resulting from repayments of loans or advances, or other transfers of assets, in each case to Windstream or any Restricted Subsidiary or from the net proceeds received in cash, from the sale of any such Restricted Investment (except, in each case, to the extent any such payment or proceeds are included in the calculation of Consolidated Net Income) or (ii) in the case of redesignations of Unrestricted Subsidiaries as Restricted Subsidiaries, the Fair Market Value of the Restricted Investments therein at the time of such redesignation.

(B)   The preceding provisions will not prohibit, so long as, in the case of clauses (5), (7) and (8) below, no Default has occurred and is continuing or would be caused thereby:

(1)    the payment of any dividend within 60 days after the date of declaration thereof, if at said date of declaration such payment would have complied with the provisions of the Indenture;

(2)    the payment of any dividend or other distribution by a Restricted Subsidiary of Windstream to the holders of its Equity Interests on a pro rata basis;

(3)    the making of any Restricted Payment in exchange for, or out of the net cash proceeds of a contribution to the common equity of Windstream or a substantially concurrent sale (other than to a Subsidiary of Windstream) of, Equity Interests (other than Disqualified Stock) of Windstream; provided that the amount of any such net cash proceeds that are utilized for any such Restricted Payment will be excluded from clause (3)(b) of the preceding paragraph (A);

(4)    the defeasance, redemption, repurchase or other acquisition of Indebtedness subordinated to the Notes or the Note Guarantees with the net cash proceeds from an Incurrence of Permitted Refinancing Indebtedness;

(5)    the declaration and payment of dividends or distributions to holders of any class or series of Disqualified Stock of Windstream or any Preferred Stock of its Restricted Subsidiaries issued or incurred in accordance with the covenant entitled "— Incurrence of indebtedness";

(6)    the repurchase of Equity Interests deemed to occur upon the exercise of options or warrants to the extent that such Equity Interests represent all or a portion of the exercise price thereof;

(7)    the repurchase of Equity Interests of Windstream constituting fractional shares in an aggregate amount since July 17, 2006 not to exceed $300,000;

(8)    the repurchase, redemption or other acquisition or retirement for value of any Equity Interests of Windstream or any of its Restricted Subsidiaries held by any current or former employee, consultant or director of Windstream or any of its Restricted Subsidiaries pursuant to the terms of any employee equity subscription agreement, stock option agreement or similar agreement; *provided* that the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests in any fiscal year will not exceed the sum of:

(a)   $20.0 million, with unused amounts pursuant to this subclause (a) being carried over to succeeding fiscal years; *plus*

(b)   the aggregate net cash proceeds received by Windstream since July 17, 2006 as a contribution to its common equity capital or from the issue or sale of Equity Interests (other than Disqualified Stock) of Windstream to any current or former employee, consultant or director of Windstream or any of its Restricted Subsidiaries; *provided* that the amount of any such net cash proceeds that are used to permit a repurchase, redemption or other acquisition under this subclause (b) will be excluded from clause (3)(b) of the preceding paragraph (A);

(9)   dividends paid by Windstream on its Common Stock in an amount not to exceed $237.5 million in the aggregate for the first two quarterly dividend payments immediately following July 17, 2006 and any dividend declared by Valor Communications Group, Inc. prior to July 17, 2006 and paid thereafter;

(10)   the repurchase of any Subordinated Debt at a purchase price not greater than 101% of the principal amount thereof in the event of (x) a change of control pursuant to a provision no more favorable to the holders thereof than the provision described under the caption of "— Repurchase at the option of holders — Change of control" or (y) an Asset Sale pursuant to a provision no more favorable to the holders thereof than the provision described under the caption of "— Repurchase at the option of holders — Asset sales," provided that, in each case, prior to the repurchase, Windstream has made a Change of Control Offer or Asset Sale Offer, as the case may be, and repurchased all Notes issued under the Indenture that were validly tendered for payment in connection therewith;

(11)   Restricted Payments made on July 17, 2006 as part of the Transactions, as described in the offering memorandum dated June 28, 2006; and

(12)   other Restricted Payments in an aggregate amount not to exceed $100.0 million.

The amount of all Restricted Payments (other than cash) will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued to or by Windstream or such Subsidiary, as the case may be, pursuant to the Restricted Payment. Not later than the date of making any Restricted Payment, Windstream will deliver to the Trustee an Officers' Certificate stating that such Restricted Payment is permitted and setting forth the basis upon which the calculations required by this "Restricted Payments" covenant were computed, together with a copy of any opinion or appraisal required by the Indenture.

For the purposes of this covenant, any payment made on or after July 17, 2006, but prior to the Original Issue Date, shall be deemed to be a "Restricted Payment" to the extent that such payment would have been a Restricted Payment had the Indenture been in effect at the time of such payment (and, to the extent that such Restricted Payment was permitted by clauses (1) through (12) above, such Restricted Payment may be deemed by Windstream to have been made pursuant to such clause).

### *Incurrence of indebtedness*

Windstream will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness; *provided*, *however*, that Windstream or any of its Restricted Subsidiaries that are Guarantors may Incur Indebtedness, if Windstream's Consolidated Leverage Ratio at the time of the Incurrence of such additional Indebtedness, and after giving effect thereto, is less than 4.50 to 1.

The first paragraph of this covenant will not prohibit the Incurrence of any of the following items of Indebtedness (collectively, "Permitted Debt"):

(1)   the Incurrence by Windstream or any of its Restricted Subsidiaries of Indebtedness under Credit Facilities in an aggregate principal amount at any one time outstanding pursuant to this clause (1) not to exceed $4.0 billion, less the aggregate amount of all Net Proceeds of Asset Sales applied by Windstream or any Restricted Subsidiary thereof to permanently repay any such Indebtedness pursuant to the covenant described above under the caption "— Repurchase at the option of holders — Asset sales";

(2)    the Incurrence of Existing Indebtedness;

(3)    the Incurrence by Windstream of Indebtedness represented by the Notes issued on the Original Issue Date and Guarantees of Notes (including Additional Notes) by the Guarantors;

(4)    the Incurrence by Windstream or any Restricted Subsidiary thereof of Indebtedness represented by Capital Lease Obligations, mortgage financings or purchase money obligations, in each case, Incurred for the purpose of financing all or any part of the purchase price or cost of construction or improvement of property (real or personal), plant or equipment used in the business of Windstream or such Restricted Subsidiary (whether through the direct acquisition of such assets or the acquisition of Equity Interests of any Person owning such assets), in an aggregate principal amount at any time outstanding, including all Permitted Refinancing Indebtedness Incurred to refund, refinance or replace any Indebtedness Incurred pursuant to this clause (4), not to exceed the greater of (x) 3.0% of Total Assets and (y) $250.0 million;

(5)    the Incurrence by Windstream or any Restricted Subsidiary thereof of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to refund, refinance or replace Indebtedness (other than intercompany Indebtedness) that was permitted by the Indenture to be Incurred under the first paragraph of this covenant or clauses (2), (3), (4), (5), (14) or (15) of this paragraph;

(6)    the Incurrence by Windstream or any of its Restricted Subsidiaries of intercompany Indebtedness owing to and held by Windstream or any of its Restricted Subsidiaries; *provided*, *however*, that (i) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than Windstream or a Restricted Subsidiary thereof and (ii) any sale or other transfer of any such Indebtedness to a Person that is not either Windstream or a Restricted Subsidiary thereof, will be deemed, in each case, to constitute an Incurrence of such Indebtedness by Windstream or such Restricted Subsidiary, as the case may be, that was not permitted by this clause (6);

(7)    the Guarantee by Windstream or any of its Restricted Subsidiaries of Indebtedness of Windstream or a Restricted Subsidiary thereof that was permitted to be Incurred by another provision of this covenant;

(8)    the Incurrence by Windstream or any of its Restricted Subsidiaries of Hedging Obligations that are Incurred for the purpose of fixing, hedging or swapping interest rate, commodity price or foreign currency exchange rate risk (or to reverse or amend any such agreements previously made for such purposes), and not for speculative purposes;

(9)    the Incurrence by Windstream or any of its Restricted Subsidiaries of Indebtedness arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, or Guarantees or letters of credit, surety bonds or performance bonds securing any obligations of Windstream or any of its Restricted Subsidiaries pursuant to such agreements, in any case Incurred in connection with the disposition of any business, assets or Restricted Subsidiary (other than Guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or Restricted Subsidiary for the purpose of financing such acquisition), so long as the principal amount does not exceed the gross proceeds actually received by Windstream or any Restricted Subsidiary thereof in connection with such disposition;

(10)    the Incurrence by Windstream or any of its Restricted Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, *provided*, *however*, that such Indebtedness is extinguished within five Business Days of its Incurrence;

(11)    the Incurrence by Windstream or any of its Restricted Subsidiaries of Indebtedness constituting reimbursement obligations with respect to letters of credit in respect of workers' compensation claims or self-insurance obligations or bid, performance, appeal or surety bonds (in each case other than for an obligation for borrowed money);

(12)    the Incurrence by Windstream or any of its Restricted Subsidiaries of Indebtedness constituting reimbursement obligations with respect to letters of credit issued in the ordinary course of business; provided

that, upon the drawing of such letters of credit or the Incurrence of such Indebtedness, such obligations are reimbursed within 30 days following such drawing or Incurrence;

(13)  the Incurrence by Windstream or any Guarantor of Indebtedness to the extent that the net proceeds thereof are promptly deposited to defease or to satisfy and discharge the Notes;

(14)  the Incurrence of Acquired Debt, *provided* that after giving effect to the Incurrence thereof, Windstream could Incur at least $1.00 of Indebtedness under the Consolidated Leverage Ratio set forth in the first paragraph above; and

(15)  the Incurrence by Windstream or any of its Restricted Subsidiaries of additional Indebtedness in an aggregate principal amount at any time outstanding, including all Permitted Refinancing Indebtedness Incurred to refund, refinance or replace any Indebtedness Incurred pursuant to this clause (15), not to exceed $250.0 million.

For purposes of determining compliance with this covenant, in the event that any proposed Indebtedness meets the criteria of more than one of the categories of Permitted Debt described in clauses (1) through (15) above, or is entitled to be Incurred pursuant to the first paragraph of this covenant, Windstream will be permitted to classify such item of Indebtedness at the time of its Incurrence in any manner that complies with this covenant; *provided* that any refinancing (a "Credit Facility Refinancing") of amounts Incurred in reliance on the exception provided by clause (1) of the definition of Permitted Debt will be deemed to have been Incurred in reliance on such clause (1). Indebtedness under the Credit Agreement outstanding on the Original Issue Date will be deemed to have been Incurred on such date in reliance on the exception provided by clause (1) of the definition of Permitted Debt. Additionally, all or any portion of any item of Indebtedness (other than Indebtedness under the Credit Agreement Incurred on the Original Issue Date and Credit Facility Refinancings, which at all times shall be deemed to have been Incurred under clause (1) above) may later be reclassified as having been Incurred pursuant to the first paragraph of this covenant or under any clause of Permitted Debt so long as such Indebtedness is permitted to be Incurred pursuant to such provision at the time of reclassification.

Notwithstanding any other provision of this covenant, the maximum amount of Indebtedness that may be Incurred pursuant to this covenant will not be deemed to be exceeded with respect to any outstanding Indebtedness due solely to the result of fluctuations in the exchange rates of currencies.

Windstream will not Incur any Indebtedness that is contractually subordinate in right of payment to any other Indebtedness of Windstream unless it is contractually subordinate in right of payment to the Notes to the same extent. No Guarantor will Incur any Indebtedness that is contractually subordinate in right of payment to any other Indebtedness of such Guarantor unless it is contractually subordinate in right of payment to such Guarantor's Note Guarantee to the same extent. For purposes of the foregoing, no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness of Windstream or any Guarantor, as applicable, solely by reason of any Liens or Guarantees arising or created in respect thereof or by virtue of the fact that the holders of any secured Indebtedness have entered into intercreditor agreements giving one or more of such holders priority over the other holders in the collateral held by them.

*Liens*

Windstream will not, and will not permit any of its Restricted Subsidiaries to, create, incur, assume or otherwise cause or suffer to exist or become effective any Lien of any kind securing Indebtedness (other than Permitted Liens) upon any of their property or assets, now owned or hereafter acquired, unless all payments due under the Indenture and the Notes are secured on an equal and ratable basis with the obligations so secured (or, in the case of Indebtedness subordinated to the Notes or the related Note Guarantees, prior or senior thereto, with the same relative priority as the Notes will have with respect to such subordinated Indebtedness) until such time as such obligations are no longer secured by a Lien.

***Dividend and other payment restrictions affecting Restricted Subsidiaries***

Windstream will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(a)   pay dividends or make any other distributions on its Capital Stock (or with respect to any other interest or participation in, or measured by, its profits) to Windstream or any of its Restricted Subsidiaries or pay any liabilities owed to Windstream or any of its Restricted Subsidiaries;

(b)   make loans or advances to Windstream or any of its Restricted Subsidiaries; or

(c)   transfer any of its properties or assets to Windstream or any of its Restricted Subsidiaries.

However, the preceding restrictions will not apply to encumbrances or restrictions:

(1)   existing under, by reason of or with respect to the Credit Agreement, Existing Indebtedness or any other agreements in effect on the Original Issue Date and any amendments, modifications, restatements, renewals, extensions, supplements, refundings, replacements or refinancings thereof, *provided* that the encumbrances and restrictions in any such amendments, modifications, restatements, renewals, extensions, supplements, refundings, replacement or refinancings are, in the good faith judgment of Windstream's Board of Directors, no more restrictive, taken as a whole, than those contained in the Credit Agreement, Existing Indebtedness or such other agreements, as the case may be, as in effect on the Original Issue Date;

(2)   set forth in the Indenture, the Notes and the Note Guarantees;

(3)   existing under, by reason of or with respect to applicable law, rule regulation or order;

(4)   with respect to any Person or the property or assets of a Person acquired by Windstream or any of its Restricted Subsidiaries existing at the time of such acquisition and not incurred in connection with or in contemplation of such acquisition, which encumbrance or restriction is not applicable to any Person or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired and any amendments, modifications, restatements, renewals, extensions, supplements, refundings, replacements or refinancings thereof, *provided* that the encumbrances and restrictions in any such amendments, modifications, restatements, renewals, extensions, supplements, refundings, replacement or refinancings are no more restrictive, taken as a whole, than those in effect on the date of the acquisition;

(5)   in the case of clause (c) of the first paragraph of this covenant:

(a)   that restrict in a customary manner the subletting, assignment or transfer of any property or asset that is a lease, license, conveyance or contract or similar property or asset,

(b)   existing by virtue of any transfer of, agreement to transfer, option or right with respect to, or Lien on, any property or assets of Windstream or any Restricted Subsidiary thereof not otherwise prohibited by the Indenture,

(c)   purchase money obligations for property acquired in the ordinary course of business that impose restrictions on the property so acquired, or

(d)   arising or agreed to in the ordinary course of business, not relating to any Indebtedness, and that do not, individually or in the aggregate, detract from the value of property or assets of Windstream or any Restricted Subsidiary thereof in any manner material to Windstream or any Restricted Subsidiary thereof;

(6)   existing under, by reason of or with respect to any agreement for the sale or other disposition of all or substantially all of the Capital Stock of, or property and assets of, a Restricted Subsidiary that restrict distributions by that Restricted Subsidiary pending such sale or other disposition;

68

(7)   on cash or other deposits or net worth imposed by customers or required by insurance, surety or bonding companies, in each case, under contracts entered into in the ordinary course of business;

(8)   existing under, by reason of or with respect to Permitted Refinancing Indebtedness; *provided* that the restrictions contained in the agreements governing such Permitted Refinancing Indebtedness are no more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced;

(9)   existing under, by reason of or with respect to provisions with respect to the disposition or distribution of assets or property, in each case contained in joint venture agreements, limited liability company agreements and other similar agreements and which Windstream's Board of Directors determines will not adversely affect Windstream's ability to make payments of principal or interest payments on the Notes; and

(10)   existing under, by reason of or with respect to Indebtedness of any Guarantor; provided that Windstream's Board of Directors determines in good faith at the time such encumbrances or restrictions are created that they do not adversely affect Windstream's ability to make payments of principal or interest payments on the Notes.

***Merger, consolidation or sale of assets***

Windstream will not, directly or indirectly: (1) consolidate or merge with or into another Person (whether or not Windstream is the surviving Person) or (2) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties and assets of Windstream and its Restricted Subsidiaries taken as a whole, in one or more related transactions, to another Person, unless:

(1)   either: (a) Windstream is the surviving corporation; or (b) the Person formed by or surviving any such consolidation or merger (if other than Windstream) or to which such sale, assignment, transfer, conveyance or other disposition will have been made (i) is a corporation or limited liability company organized or existing under the laws of the United States, any state thereof or the District of Columbia (provided that, if the Person formed by or surviving such consolidation or merger, or the transferee of such properties or assets, is a limited liability company, then there shall be a Restricted Subsidiary of such Person which shall be a corporation organized in the jurisdictions permitted by this clause (1) and a co-obligor of the Notes) and (ii) assumes all the obligations of Windstream under the Notes and the Indenture pursuant to agreements reasonably satisfactory to the Trustee;

(2)   immediately after giving effect to such transaction, no Default or Event of Default exists;

(3)   immediately after giving effect to such transaction on a pro forma basis, Windstream or the Person formed by or surviving any such consolidation or merger (if other than Windstream), or to which such sale, assignment, transfer, conveyance or other disposition will have been made, will either (x) be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Consolidated Leverage Ratio test set forth in the first paragraph of the covenant described above under the caption "— Incurrence of Indebtedness" or (y) have a Consolidated Leverage Ratio that is lower than the Consolidated Leverage Ratio of Windstream immediately prior to such transaction; and

(4)   each Guarantor, unless such Guarantor is the Person with which Windstream has entered into a transaction under this covenant, will have by amendment to its Note Guarantee confirmed that its Note Guarantee will apply to the obligations of Windstream or the surviving Person in accordance with the Notes and the Indenture.

Upon any consolidation or merger, or any sale, assignment, transfer, conveyance or other disposition of all or substantially all of the assets of Windstream in accordance with this covenant, the successor Person formed by such consolidation or into or with which Windstream is merged or to which such sale, assignment, transfer, conveyance or other disposition is made will succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, assignment, conveyance or other disposition, the provisions of the Indenture referring to Windstream will refer instead to the successor person and not to Windstream), and may exercise every right and power of, Windstream under the Indenture with the same effect as if such successor Person had been named as

Windstream in the Indenture. In the event of any such transfer (other than any transfer by way of lease), the predecessor will be released and discharged from all liabilities and obligations in respect of the Notes and the Indenture and the predecessor may be dissolved, wound up or liquidated at any time thereafter.

In addition, Windstream and its Restricted Subsidiaries may not, directly or indirectly, lease all or substantially all of the properties or assets of Windstream and its Restricted Subsidiaries considered as one enterprise, in one or more related transactions, to any other Person.

Clauses (2) and (3) above of this covenant will not apply to:

- any merger, consolidation or sale, assignment, transfer, conveyance or other disposition of assets between or among Windstream and any of its Restricted Subsidiaries; or

- any transaction if, in the good faith determination of the Board of Directors of Windstream, the sole purpose of the transaction is to reincorporate Windstream in another state of the United States.

*Transactions with affiliates*

Windstream will not, and will not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into, make, amend, renew or extend any transaction, contract, agreement, understanding, loan, advance or Guarantee with, or for the benefit of, any Affiliate (each, an "Affiliate Transaction"), unless:

(1)   such Affiliate Transaction is on terms that are no less favorable to Windstream or the relevant Restricted Subsidiary than those that would have been obtained in a comparable arm's-length transaction by Windstream or such Restricted Subsidiary with a Person that is not an Affiliate of Windstream or any of its Restricted Subsidiaries; and

(2)   Windstream delivers to the Trustee:

(a)   with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $25.0 million, a Board Resolution set forth in an Officers' Certificate certifying that such Affiliate Transaction or series of related Affiliate Transactions complies with this covenant and that such Affiliate Transaction or series of related Affiliate Transactions has been approved by a majority of the disinterested members of the Board of Directors of Windstream (if any); and

(b)   with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $100.0 million, an opinion as to the fairness to Windstream or such Restricted Subsidiary of such Affiliate Transaction or series of related Affiliate Transactions from a financial point of view issued by an independent accounting, appraisal or investment banking firm of national standing.

The following items will not be deemed to be Affiliate Transactions and, therefore, will not be subject to the provisions of the prior paragraph:

(1)   transactions between or among Windstream and/or its Restricted Subsidiaries or any Person that will become a Restricted Subsidiary as part of any such transactions (but excluding any such transaction to the extent that any payments thereunder made by Windstream or any of its Restricted Subsidiaries to such Person are substantially concurrently paid by such Person to any other Affiliate of Windstream, except to the extent that any such transaction would not be prohibited by this covenant);

(2)   payment of reasonable and customary fees to, and reasonable and customary indemnification and similar payments on behalf of, directors of Windstream;

(3)   Permitted Investments and Restricted Payments that are permitted by the provisions of the Indenture described above under the caption "— Restricted payments;"

(4)   any sale of Equity Interests (other than Disqualified Stock) of Windstream;

(5)   transactions pursuant to agreements or arrangements in effect on the Original Issue Date, or any amendment, modification, or supplement thereto or replacement thereof, as long as such agreement or arrangement, as so amended, modified, supplemented or replaced, taken as a whole, is not more disadvantageous to Windstream and its Restricted Subsidiaries than the original agreement or arrangement in existence on the Original Issue Date;

(6)   any employment, consulting, service or termination agreement, or reasonable and customary indemnification arrangements, entered into by Windstream or any of its Restricted Subsidiaries with officers and employees of Windstream or any of its Restricted Subsidiaries and the payment of compensation to officers and employees of Windstream or any of its Restricted Subsidiaries (including amounts paid pursuant to employee benefit plans, employee stock option or similar plans), so long as such agreement or payment has been approved by a majority of the disinterested members of the Board of Directors of Windstream;

(7)   payments or loans to employees or consultants in the ordinary course of business which are approved by a majority of the disinterested members of the Board of Directors of Windstream in good faith;

(8)   transactions with a Person that is an Affiliate of Windstream solely because Windstream, directly or indirectly, owns Equity Interests in, or controls, such Person; and

(9)   transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of the Indenture, which are fair to Windstream and its Restricted Subsidiaries in the determination of a majority of the disinterested members of the Board of Directors or the senior management of Windstream, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party.

### *Designation of restricted and unrestricted subsidiaries*

The Board of Directors of Windstream may designate any Restricted Subsidiary of Windstream to be an Unrestricted Subsidiary; *provided* that:

(1)   any Guarantee by Windstream or any Restricted Subsidiary thereof of any Indebtedness of the Subsidiary being so designated will be deemed to be an Incurrence of Indebtedness by Windstream or such Restricted Subsidiary (or both, if applicable) at the time of such designation, and such Incurrence of Indebtedness would be permitted under the covenant described above under the caption "— Incurrence of indebtedness";

(2)   the aggregate Fair Market Value of all outstanding Investments owned by Windstream and its Restricted Subsidiaries in the Subsidiary being so designated (including any Guarantee by Windstream or any Restricted Subsidiary thereof of any Indebtedness of such Subsidiary) will be deemed to be a Restricted Investment made as of the time of such designation and that such Investment would be permitted under the covenant described above under the caption "— Restricted payments";

(3)   the Subsidiary being so designated:

(a)   is not party to any agreement, contract, arrangement or understanding with Windstream or any Restricted Subsidiary thereof unless either (i) such agreement, contract, arrangement or understanding is with customers, clients, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of the Indenture, which are fair to Windstream and its Restricted Subsidiaries in the determination of a majority of the disinterested members of the Board of Directors or the senior management of Windstream, or (ii) the terms of any such agreement, contract, arrangement or understanding are no less favorable to Windstream or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of Windstream;

(b)   is a Person with respect to which neither Windstream nor any of its Restricted Subsidiaries has any direct or indirect obligation (i) to subscribe for additional Equity Interests or (ii) to maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results; and

(c)   has not Guaranteed or otherwise directly or indirectly provided credit support for any Indebtedness of Windstream or any of its Restricted Subsidiaries, except (i) to the extent such Guarantee or credit support would be released upon such designation or (ii) a pledge of the Equity Interests of the Unrestricted Subsidiary that is the obligor thereunder; and

(4)   no Default or Event of Default would be in existence following such designation.

Any designation of a Restricted Subsidiary of Windstream as an Unrestricted Subsidiary will be evidenced to the Trustee by filing with the Trustee the Board Resolution giving effect to such designation and an Officers' Certificate certifying that such designation complied with the preceding conditions and was permitted by the Indenture. If, at any time, any Unrestricted Subsidiary would fail to meet any of the preceding requirements described in clause (3) above, it will thereafter cease to be an Unrestricted Subsidiary for purposes of the Indenture and any Indebtedness, Investments, or Liens on the property, of such Subsidiary will be deemed to be Incurred or made by a Restricted Subsidiary of Windstream as of such date and, if such Indebtedness, Investments or Liens are not permitted to be Incurred or made as of such date under the Indenture, Windstream will be in default under the Indenture.

The Board of Directors of Windstream may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that:

(1)   such designation will be deemed to be an Incurrence of Indebtedness by a Restricted Subsidiary of Windstream of any outstanding Indebtedness (including any Non-Recourse Debt) of such Unrestricted Subsidiary and such designation will only be permitted if such Indebtedness is permitted under the covenant described under the caption "— Incurrence of indebtedness;"

(2)   all outstanding Investments owned by such Unrestricted Subsidiary will be deemed to be made as of the time of such designation and such designation will only be permitted if such Investments would be permitted under the covenant described above under the caption "— Restricted payments;"

(3)   all Liens upon property or assets of such Unrestricted Subsidiary existing at the time of such designation would be permitted under the caption "— Liens;" and

(4)   no Default or Event of Default would be in existence following such designation.

*Sale and leaseback transactions*

Windstream will not, and will not permit any of its Restricted Subsidiaries to, enter into any Sale and Leaseback Transaction; provided that Windstream or any Restricted Subsidiary thereof may enter into a Sale and Leaseback Transaction if:

(1)   Windstream or such Restricted Subsidiary, as applicable, could have (a) Incurred Indebtedness in an amount equal to the Attributable Debt relating to such Sale and Leaseback Transaction pursuant to the covenant described above under the caption "— Certain covenants — Incurrence of indebtedness" and (b) incurred a Lien to secure such Indebtedness pursuant to the covenant described above under the caption "— Certain covenants — Liens" in which case such Indebtedness and Liens shall be deemed to have been so incurred;

(2)   the gross cash proceeds of that Sale and Leaseback Transaction are at least equal to the Fair Market Value of the property that is the subject of that Sale and Leaseback Transaction; and

(3)   the transfer of assets in that Sale and Leaseback Transaction is permitted by, and Windstream applies the proceeds of such transaction in compliance with, the covenant described above under the caption "— Repurchase at the option of holders — Asset sales."

*Guarantees*

Windstream will not permit any of its Restricted Subsidiaries (other than any Insignificant Subsidiary), directly or indirectly, to Guarantee or pledge any assets to secure the payment of any other Indebtedness of Windstream or any Domestic Restricted Subsidiary unless such Restricted Subsidiary is a Guarantor or simultaneously executes and

delivers to the Trustee an Opinion of Counsel and a supplemental indenture providing for the Guarantee of the payment of the Notes by such Restricted Subsidiary, which Guarantee will be senior to or *pari passu* with such Subsidiary's Guarantee of such other Indebtedness.

A Guarantor may not sell or otherwise dispose of all or substantially all of its assets to, or consolidate with or merge with or into (whether or not such Guarantor is the surviving Person), another Person, other than Windstream or another Guarantor, unless:

(1)   immediately after giving effect to that transaction, no Default or Event of Default exists; and

(2)   either:

(a)   the Person acquiring the property in any such sale or disposition or the Person formed by or surviving any such consolidation or merger (if other than the Guarantor) is organized or existing under the laws of the United States, any state thereof or the District of Columbia and assumes all the obligations of that Guarantor under the Indenture and its Note Guarantee pursuant to a supplemental indenture satisfactory to the Trustee; or

(b)   such sale or other disposition or consolidation or merger complies with the covenant described above under the caption "— Repurchase at the option of holders — Asset sales."

The Note Guarantee of a Guarantor will be released:

(1)   in connection with any transaction permitted by the Indenture after which such Guarantor would no longer constitute a Restricted Subsidiary of Windstream, if the sale of Capital Stock, if any, complies with the covenant described above under the caption "— Repurchase at the option of holders — Asset sales;"

(2)   if Windstream properly designates any Restricted Subsidiary that is a Guarantor as an Unrestricted Subsidiary under the Indenture;

(3)   upon satisfaction and discharge of the Notes as set forth under "— Satisfaction and discharge" or upon defeasance of the Notes as set forth under "— Legal defeasance and Covenant defeasance;" or

(4)   solely in the case of a Note Guarantee created pursuant to the first paragraph of this covenant, upon the release or discharge of the Guarantee which resulted in the creation of such Note Guarantee pursuant to this covenant, except a discharge or release by or as a result of payment under such Guarantee.

### Business activities

Windstream will not, and will not permit any Restricted Subsidiary thereof to, engage in any business other than Permitted Businesses, except to such extent as would not be material to Windstream and its Restricted Subsidiaries taken as a whole.

### Payments for consent

Windstream will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any Holder of Notes for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of the Indenture or the Notes unless such consideration is offered to be paid and is paid to all Holders of the Notes that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.

### Reports

Windstream will furnish to the Trustee and, upon request, to beneficial owners and prospective investors a copy of all of the information and reports referred to in clauses (1) and (2) below within the time periods specified in the SEC's rules and regulations:

(1)   all quarterly and annual financial information that is required to be contained in a filing with the SEC on Forms 10-Q and 10-K, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" and, with respect to the annual information only, a report on the annual financial statements by Windstream's certified independent accountants; and

(2)   all current reports that are required to be filed with the SEC on Form 8-K.

Whether or not required by the SEC, Windstream will comply with the periodic reporting requirements of the Exchange Act and will file the reports specified in the preceding paragraph with the SEC within the time periods specified above unless the SEC will not accept such a filing. Windstream agrees that it will not take any action for the purpose of causing the SEC not to accept any such filings. If, notwithstanding the foregoing, the SEC will not accept Windstream's filings for any reason, Windstream will post the reports referred to in the preceding paragraph on its website within the time periods that would apply if Windstream were required to file those reports with the SEC.

If Windstream has designated any of its Subsidiaries as Unrestricted Subsidiaries, then the quarterly and annual financial information required by this covenant will include a reasonably detailed presentation, either on the face of the financial statements or in the footnotes thereto, and in "Management's Discussion and Analysis of Financial Condition and Results of Operations," of the financial condition and results of operations of Windstream and its Restricted Subsidiaries separate from the financial condition and results of operations of Windstream's Unrestricted Subsidiaries.

In addition, Windstream and the Guarantors have agreed that, for so long as any Notes remain outstanding, they will furnish to the Holders and to prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

### Termination of applicability of certain covenants if notes rated investment grade

Notwithstanding the foregoing, Windstream's and its Restricted Subsidiaries' obligations to comply with the provisions of the Indenture described above under the captions "— Repurchase at the option of holders — Asset sales" and "— Certain covenants" (except for the covenants described under the caption "— Certain covenants — Liens," "— Certain covenants — Merger, consolidation or sale of assets" (only clause (3) of the first paragraph thereof shall be terminated), "— Certain covenants — Sale and leaseback transactions," "— Certain covenants — Guarantees" and "— Certain covenants — Reports") will terminate with respect to the Notes and cease to have any further effect from and after the first date when the Notes are rated Investment Grade.

### Events of default and remedies

Each of the following is an Event of Default with respect to the Notes:

(1)   default for 30 days in the payment when due of interest on the Notes;

(2)   default in payment when due (whether at maturity, upon acceleration, redemption, required repurchase or otherwise) of the principal of, or premium, if any, on the Notes;

(3)   failure by Windstream or any of its Restricted Subsidiaries to comply with the provisions described under the caption "— Certain covenants — Merger, consolidation or sale of assets;"

(4)   failure by Windstream or any of its Restricted Subsidiaries for 30 days after written notice by the Trustee or Holders representing 25% or more of the aggregate principal amount of Notes then outstanding to comply with the provisions described under the captions "— Repurchase at the option of holders — Change of control" or "— Repurchase at the option of holders — Asset sales" (other than a failure to purchase Notes in connection therewith, which shall constitute an Event of Default under clause (2) above);

(5)   failure by Windstream or any of its Restricted Subsidiaries for 60 days after written notice by the Trustee or Holders representing 25% or more of the aggregate principal amount of Notes then outstanding to comply with any of the other agreements in the Indenture;

(6)    default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness by Windstream or any of its Restricted Subsidiaries (or the payment of which is Guaranteed by Windstream or any of its Restricted Subsidiaries) whether such Indebtedness or Guarantee now exists, or is created after the Original Issue Date, if that default:

(a)    is caused by a failure to make any principal payment when due at the final maturity of such Indebtedness and prior to the expiration of any grace period provided in such Indebtedness on the date of such default (a "Payment Default"); or

(b)    results in the acceleration of such Indebtedness prior to its express maturity,

and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a Payment Default or the maturity of which has been so accelerated, aggregates $100.0 million or more;

(7)    failure by Windstream or any of its Restricted Subsidiaries to pay final judgments (to the extent such judgments are not paid or covered by insurance provided by a reputable carrier that has the ability to perform) aggregating in excess of $100.0 million, which judgments are not paid, discharged or stayed for a period of 60 days;

(8)    except as permitted by the Indenture, any Note Guarantee with respect to the Notes will be held in any judicial proceeding to be unenforceable or invalid or will cease for any reason to be in full force and effect or any Guarantor, or any Person acting on behalf of any Guarantor, will deny or disaffirm its obligations under its Note Guarantee with respect to the Notes; and

(9)    certain events of bankruptcy or insolvency with respect to (i) Windstream or (ii) any Significant Subsidiary of Windstream (or any Restricted Subsidiaries that together would constitute a Significant Subsidiary).

In the case of an Event of Default arising from certain events of bankruptcy or insolvency with respect to (i) Windstream or (ii) any Significant Subsidiary of Windstream (or any Restricted Subsidiaries that together would constitute a Significant Subsidiary), all outstanding Notes will become due and payable immediately without further action or notice. If any other Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the then outstanding Notes may declare all the Notes to be due and payable immediately by notice in writing to Windstream specifying the Event of Default. Upon such declaration, the Notes, together with accrued and unpaid interest, shall become due and payable immediately.

In the event of a declaration of acceleration of the Notes because an Event of Default has occurred and is continuing as a result of the acceleration of any Indebtedness described in clause (6) above, the declaration of acceleration of the Notes will be automatically annulled if the holders of all Indebtedness described in clause (6) above have rescinded the declaration of acceleration in respect of such Indebtedness within 30 Business Days of the date of such declaration, and if the annulment of the acceleration of the Notes would not conflict with any judgment or decree of a court of competent jurisdiction, and all existing Events of Default, except non-payment of principal or interest on the Notes that became due solely because of the acceleration of the Notes, have been cured or waived. Holders of the Notes may not enforce the Indenture or the Notes except as provided in the Indenture. Subject to certain limitations, Holders of a majority in principal amount of the then outstanding Notes may direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Holders of the Notes notice of any Default or Event of Default (except a Default or Event of Default relating to the payment of principal or interest) if it determines that withholding notice is in their interest.

The Holders of a majority in aggregate principal amount of the Notes then outstanding by notice to the Trustee may on behalf of the Holders of all of the Notes waive any existing Default or Event of Default and its consequences under the Indenture except a continuing Default or Event of Default in the payment of interest on, or the principal of, the Notes. The Holders of a majority in principal amount of the then outstanding Notes will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee with respect to the Notes. However, the Trustee may refuse to follow any direction that conflicts with law or the Indenture, that may involve the Trustee in personal liability, or that the Trustee determines in good faith may be

unduly prejudicial to the rights of Holders of Notes not joining in the giving of such direction and may take any other action it deems proper that is not inconsistent with any such direction received from Holders of Notes. A Holder may not pursue any remedy with respect to the Indenture or the Notes unless:

(1)   the Holder gives the Trustee written notice of a continuing Event of Default;

(2)   the Holders of at least 25% in aggregate principal amount of outstanding Notes make a written request to the Trustee to pursue the remedy;

(3)   such Holder or Holders offer the Trustee indemnity satisfactory to the Trustee against any costs, liability or expense;

(4)   the Trustee does not comply with the request within 60 days after receipt of the request and the offer of indemnity; and

(5)   during such 60-day period, the Holders of a majority in aggregate principal amount of the outstanding Notes do not give the Trustee a direction that is inconsistent with the request.

However, such limitations do not apply to the right of any Holder of a Note to receive payment of the principal of, premium or interest on, such Note or to bring suit for the enforcement of any such payment, on or after the due date expressed in the Notes, which right will not be impaired or affected without the consent of the Holder.

In the case of any Event of Default occurring by reason of any willful action or inaction taken or not taken by or on behalf of Windstream or any of its Restricted Subsidiaries with the intention of avoiding payment of the premium that Windstream would have had to pay if Windstream then had elected to redeem the Notes pursuant to the optional redemption provisions of the Indenture, an equivalent premium will also become and be immediately due and payable to the extent permitted by law upon the acceleration of the Notes.

Windstream is required to deliver to the Trustee annually within 120 days after the end of each fiscal year a statement regarding compliance with the Indenture. Upon becoming aware of any Default or Event of Default, Windstream is required to deliver to the Trustee, within 30 days after the occurrence thereof, a statement specifying such Default or Event of Default.

**No personal liability of directors, officers, employees and stockholders**

No director, officer, employee, incorporator, stockholder, member, manager or partner of Windstream or any Guarantor, as such, will have any liability for any obligations of Windstream or the Guarantors under the Notes, the Indenture, the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. The waiver may not be effective to waive liabilities under the federal securities laws.

**Legal Defeasance and Covenant Defeasance**

Windstream may, at its option and at any time, elect to have all of its obligations discharged with respect to the outstanding Notes and all obligations of the Guarantors discharged with respect to their Note Guarantees related to the Notes ("Legal Defeasance") except for:

(1)   the rights of Holders of outstanding Notes to receive payments in respect of the principal of, or interest or premium, if any, on such Notes when such payments are due from the trust referred to below;

(2)   Windstream's obligations with respect to the Notes concerning issuing temporary Notes, registration of Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payment and money for security payments held in trust;

(3)   the rights, powers, trusts, duties and immunities of the Trustee, and Windstream's and the Guarantors' obligations in connection therewith; and

(4)   the Legal Defeasance provisions of the Indenture.

In addition, Windstream may, at its option and at any time, elect to have the obligations of Windstream and the Guarantors released with respect to certain covenants that are described in the Indenture ("Covenant Defeasance") and thereafter any omission to comply with those covenants will not constitute a Default or Event of Default with respect to the Notes. In the event Covenant Defeasance occurs, certain events (not including non-payment, bankruptcy, receivership, rehabilitation and insolvency events) described under "Events of Default" will no longer constitute Events of Default with respect to the Notes.

In order to exercise either Legal Defeasance or Covenant Defeasance:

(1)   Windstream must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders of the Notes, cash in U.S. dollars, non-callable Government Securities, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal of, or interest and premium, if any, on the outstanding Notes on the Stated Maturity or on the applicable redemption date, as the case may be, and Windstream must specify whether the Notes are being defeased to maturity or to a particular redemption date;

(2)   in the case of Legal Defeasance, Windstream will have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that (a) Windstream has received from, or there has been published by, the Internal Revenue Service a ruling or (b) since the Original Issue Date, there has been a change in the applicable federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel will confirm that, the Holders of the outstanding Notes will not recognize income, gain or loss for federal income tax purposes as a result of such Legal Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)   in the case of Covenant Defeasance, Windstream will have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that the Holders of the outstanding Notes will not recognize income, gain or loss for federal income tax purposes as a result of such Covenant Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)   no Default or Event of Default will have occurred and be continuing either: (a) on the date of such deposit; or (b) insofar as Events of Default from bankruptcy or insolvency events are concerned, at any time in the period ending on the 123rd day after the date of deposit;

(5)   such Legal Defeasance or Covenant Defeasance will not result in a breach or violation of, or constitute a default under any material agreement or instrument to which Windstream or any of its Restricted Subsidiaries is a party or by which Windstream or any of its Restricted Subsidiaries is bound;

(6)   Windstream must have delivered to the Trustee an Opinion of Counsel to the effect that, assuming no intervening bankruptcy of Windstream or any Guarantor between the date of deposit and the 123rd day following the deposit and assuming that no Holder is an "insider" of Windstream under applicable bankruptcy law, after the 123rd day following the deposit, the trust funds will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally, including Section 547 of the United States Bankruptcy Code and Section 15 of the New York Debtor and Creditor Law;

(7)   Windstream must deliver to the Trustee an Officers' Certificate stating that the deposit was not made by Windstream with the intent of preferring the Holders over the other creditors of Windstream with the intent of defeating, hindering, delaying or defrauding creditors of Windstream or others;

(8)   if the Notes are to be redeemed prior to their Stated Maturity, Windstream must deliver to the Trustee irrevocable instructions to redeem all of the Notes on the specified redemption date; and

(9)   Windstream must deliver to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent (other than the expiration of the 123-day period referred to above) relating to the Legal Defeasance or the Covenant Defeasance have been complied with.

### Amendment, supplement and waiver

Except as provided in the next two succeeding paragraphs, the Indenture or the Notes may be amended or supplemented with the consent of the Holders of at least a majority in principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes), and any existing default or compliance with any provision of the Indenture or the Notes may be waived with the consent of the Holders of a majority in principal amount of the then outstanding Notes (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes).

Without the consent of each Holder affected, an amendment or waiver may not (with respect to any Notes held by a non-consenting Holder):

(1)   reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

(2)   reduce the principal of or change the fixed maturity of any Note or alter the provisions, or waive any payment, with respect to the redemption of the Notes (other than the provisions relating to the covenants described under the caption "— Repurchase at the option of holders");

(3)   reduce the rate of or change the time for payment of interest on any Note;

(4)   waive a Default or Event of Default in the payment of principal of, or interest, or premium, if any, on, the Notes (except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the Notes and a waiver of the payment default that resulted from such acceleration);

(5)   make any Note payable in money other than U.S. dollars;

(6)   make any change in the provisions of the Indenture relating to waivers of past Defaults or the rights of Holders of Notes to receive payments of principal of, or interest or premium, if any, on, the Notes;

(7)   release any Guarantor from any of its obligations under its Note Guarantee or the Indenture, except in accordance with the terms of the Indenture;

(8)   impair the right to institute suit for the enforcement of any payment on or with respect to the Notes or the Note Guarantees;

(9)   amend, change or modify the obligation of Windstream to make and consummate an Asset Sale Offer with respect to any Asset Sale in accordance with the covenant described under the caption "Repurchase at the option of holders — Asset sales" after the obligation to make such Asset Sale Offer has arisen, or the obligation of Windstream to make and consummate a Change of Control Offer in the event of a Change of Control Triggering Event in accordance with the covenant described under the caption "Repurchase at the option of holders — Change of control" after such Change of Control Triggering Event has occurred, including, in each case, amending, changing or modifying any definition relating thereto;

(10)   except as otherwise permitted under the covenants described under the captions "— Certain covenants — Merger, consolidation or sale of assets" and "— Certain covenants — Guarantees," consent to the assignment or transfer by Windstream or any Guarantor of any of their rights or obligations under the Indenture;

(11)   amend or modify any of the provisions of the Indenture or the related definitions affecting the ranking of the Notes or any Note Guarantee in any manner adverse to the Holders of the Notes or any Note Guarantee; or

(12)   make any change in the preceding amendment and waiver provisions.

Notwithstanding the preceding, without the consent of any Holder of Notes, Windstream, the Guarantors and the Trustee may amend or supplement the Indenture or the Notes:

(1)   to cure any ambiguity, defect or inconsistency;

(2)   to provide for uncertificated Notes in addition to or in place of certificated Notes;

(3)   to provide for the assumption of Windstream's or any Guarantor's obligations to Holders of Notes in the case of a merger or consolidation or sale of all or substantially all of Windstream's or such Guarantor's assets;

(4)   to make any change that would provide any additional rights or benefits to the Holders of Notes or that does not materially adversely affect the legal rights under the Indenture of any such Holder;

(5)   to comply with requirements of the SEC in order to effect or maintain the qualification of the Indenture under the Trust Indenture Act;

(6)   to comply with the provisions described under "— Certain covenants — Guarantees;"

(7)   to evidence and provide for the acceptance of appointment by a successor Trustee;

(8)   to provide for the issuance of Additional Notes in accordance with the Indenture; or

(9)   to conform the text of the Indenture or the Notes to any provision of this "Description of the new notes" to the extent that such provision of the Indenture or the Notes was intended to conform to the text of this "Description of the new notes."

### Satisfaction and discharge

The Indenture will be discharged and will cease to be of further effect as to all Notes issued thereunder, when:

(1)   either:

(a)   all Notes that have been authenticated (except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust and thereafter repaid to Windstream) have been delivered to the Trustee for cancellation; or

(b)   all Notes that have not been delivered to the Trustee for cancellation have become due and payable by reason of the mailing of a notice of redemption or otherwise or will become due and payable within one year and Windstream or any Guarantor has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders, cash in U.S. dollars, non-callable Government Securities, or a combination thereof, in such amounts as will be sufficient without consideration of any reinvestment of interest, to pay and discharge the entire indebtedness on the Notes not delivered to the Trustee for cancellation for principal, premium , if any, and accrued interest to the date of maturity or redemption;

(2)   no Default or Event of Default will have occurred and be continuing on the date of such deposit or will occur as a result of such deposit and such deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which Windstream or any Guarantor is a party or by which Windstream or any Guarantor is bound;

(3)   Windstream or any Guarantor has paid or caused to be paid all sums payable by it under the Indenture; and

(4)   Windstream has delivered irrevocable instructions to the Trustee under the Indenture to apply the deposited money toward the payment of the Notes at maturity or the redemption date, as the case may be.

In addition, Windstream must deliver an Officers' Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

## Concerning the trustee

If the Trustee becomes a creditor of Windstream or any Guarantor, the Indenture and the Trust Indenture Act limit its right to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claim as security or otherwise. The Trustee will be permitted to engage in other transactions; however, if it acquires any conflicting interest it must eliminate such conflict within 90 days, apply to the SEC for permission to continue or resign.

The Indenture provides that in case an Event of Default will occur and be continuing, the Trustee will be required, in the exercise of its power, to use the degree of care of a prudent man in the conduct of his own affairs. Subject to such provisions, the Trustee will be under no obligation to exercise any of its rights or powers under the Indenture at the request of any Holder of Notes, unless such Holder will have offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

## Book-entry, delivery and form

The Notes are being offered and sold to qualified institutional buyers in reliance on Rule 144A ("Rule 144A Notes"). Notes also may be offered and sold in offshore transactions in reliance on Regulation S ("Regulation S Notes"). Except as set forth below, Notes will be issued in registered, global form in minimum denominations of $2,000 and integral multiples of $1,000 in excess of $2,000. Notes will be issued at the closing of this offering only against payment in immediately available funds.

Rule 144A Notes initially will be represented by one or more Notes in registered, global form without interest coupons (collectively, the "Rule 144A Global Notes"). Regulation S Notes initially will be represented by one or more Notes in registered, global form without interest coupons (collectively, the "Regulation S Global Notes" and, together with the Rule 144A Global Notes, the "Global Notes"). The Global Notes will be deposited upon issuance with the Trustee as custodian for The Depository Trust Company ("DTC"), in New York, New York, and registered in the name of DTC or its nominee, in each case for credit to an account of a direct or indirect participant in DTC as described below. Through and including the 40th day after the later of the commencement of this offering and the closing of this offering (such period through and including such 40th day, the "Restricted Period"), beneficial interests in the Regulation S Global Notes may be held only through Euroclear Bank, S.A./N.V. as operator of the Euroclear System ("Euroclear") and Clearstream Banking, S.A. ("Clearstream") (as indirect participants in DTC), unless transferred to a person that takes delivery through a Rule 144A Global Note in accordance with the certification requirements described below. Beneficial interests in the Rule 144A Global Notes may not be exchanged for beneficial interests in the Regulation S Global Notes at any time except in the limited circumstances described below. See "— Exchanges between Regulation S Notes and Rule 144A Notes."

Except as set forth below, the Global Notes may be transferred, in whole and not in part, only to another nominee of DTC or to a successor of DTC or its nominee. Beneficial interests in the Global Notes may not be exchanged for Notes in certificated form, except in the circumstances described below. See "— Exchange of global notes for certificated notes."

Rule 144A Notes (including beneficial interests in the Rule 144A Global Notes) will be subject to certain restrictions on transfer and will bear a restrictive legend as described under "Transfer Restrictions." Regulation S Notes will also bear the legend as described under "Transfer Restrictions." In addition, transfers of beneficial interests in the Global Notes will be subject to the applicable rules and procedures of DTC and its direct or indirect participants (including, if applicable, those of Euroclear and Clearstream), which may change from time to time.

Promptly following the end of the applicable Resale Restriction Period for the Rule 144A Notes and the Regulation S Notes, the Issuers will remove the restricted legends on the New 6 3/8% Notes and cause an unrestricted CUSIP number to be assigned to the New 6 3/8% Notes, subject to applicable law and compliance with any requirements of the Trustee and DTC.

**Depositary procedures**

The following description of the operations and procedures of DTC, Euroclear and Clearstream are provided solely as a matter of convenience. These operations and procedures are solely within the control of the respective settlement systems and are subject to changes by them. Windstream takes no responsibility for these operations and procedures and urges investors to contact the system or their participants directly to discuss these matters.

DTC has advised Windstream that DTC is a limited-purpose trust company created to hold securities for its participating organizations (collectively, the "Participants") and to facilitate the clearance and settlement of transactions in those securities between Participants through electronic book-entry changes in accounts of its Participants. The Participants include securities brokers and dealers (including the Dealer Manager, banks, trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly (collectively, the "Indirect Participants"). Persons who are not Participants may beneficially own securities held by or on behalf of DTC only through the Participants or the Indirect Participants. The ownership interests in, and transfers of ownership interests in, each security held by or on behalf of DTC are recorded on the records of the Participants and Indirect Participants.

DTC has also advised Windstream that, pursuant to procedures established by it:

(1)   upon deposit of the Global Notes, DTC will credit the accounts of Participants designated by the Dealer Manager with portions of the principal amount of the Global Notes; and

(2)   ownership of these interests in the Global Notes will be shown on, and the transfer of ownership thereof will be effected only through, records maintained by DTC (with respect to the Participants) or by the Participants and the Indirect Participants (with respect to other owners of beneficial interest in the Global Notes).

Investors in the Rule 144A Global Notes who are Participants in DTC's system may hold their interests therein directly through DTC. Investors in the Rule 144A Global Notes who are not Participants may hold their interests therein indirectly through organizations (including Euroclear and Clearstream) which are Participants in such system. Investors in the Regulation S Global Notes may hold their interests therein through Euroclear, Clearstream or DTC, if they are participants in such systems, or indirectly through organizations that are participants in such systems. However, upon issuance we intend to settle by delivering interests in the Regulation S Global Note solely through Euroclear or Clearstream. Euroclear and Clearstream will hold interests in the Regulation S Global Notes on behalf of their participants through customers' securities accounts in their respective names on the books of their respective depositories, which are Euroclear Bank, S.A./N.V., as operator of Euroclear, and Citibank, N.A., as operator of Clearstream. All interests in a Global Note, including those held through Euroclear or Clearstream, may be subject to the procedures and requirements of DTC. Those interests held through Euroclear or Clearstream may also be subject to the procedures and requirements of such systems.

**Except as described below, owners of interests in the Global Notes will not have Notes registered in their names, will not receive physical delivery of Notes in certificated form and will not be considered the registered owners or "Holders" thereof under the Indenture for any purpose.**

Payments in respect of the principal of, and interest and premium, if any, on a Global Note registered in the name of DTC or its nominee will be payable to DTC in its capacity as the registered Holder under the Indenture. Under the terms of the Indenture, Windstream and the Trustee will treat the Persons in whose names the Notes, including the Global Notes, are registered as the owners thereof for the purpose of receiving payments and for all other purposes. Consequently, neither Windstream, the Trustee nor any agent of Windstream or the Trustee has or will have any responsibility or liability for:

(1)   any aspect of DTC's records or any Participant's or Indirect Participant's records relating to or payments made on account of beneficial ownership interest in the Global Notes or for maintaining, supervising or reviewing any of DTC's records or any Participant's or Indirect Participant's records relating to the beneficial ownership interests in the Global Notes; or

(2)   any other matter relating to the actions and practices of DTC or any of its Participants or Indirect Participants.

DTC has advised Windstream that its current practice, upon receipt of any payment in respect of securities such as the Notes (including principal and interest), is to credit the accounts of the relevant Participants with the payment on the payment date unless DTC has reason to believe it will not receive payment on such payment date. Each relevant Participant is credited with an amount proportionate to its beneficial ownership of an interest in the principal amount of the relevant security as shown on the records of DTC. Payments by the Participants and the Indirect Participants to the beneficial owners of Notes will be governed by standing instructions and customary practices and will be the responsibility of the Participants or the Indirect Participants and will not be the responsibility of DTC, the Trustee or Windstream. Neither Windstream nor the Trustee will be liable for any delay by DTC or any of its Participants in identifying the beneficial owners of the Notes, and Windstream and the Trustee may conclusively rely on and will be protected in relying on instructions from DTC or its nominee for all purposes.

Subject to the transfer restrictions set forth under "Transfer Restrictions," transfers between Participants in DTC will be effected in accordance with DTC's procedures, and will be settled in same-day funds, and transfers between participants in Euroclear and Clearstream will be effected in accordance with their respective rules and operating procedures.

Subject to compliance with the transfer restrictions applicable to the Notes described herein, cross- market transfers between the Participants in DTC, on the one hand, and Euroclear or Clearstream participants, on the other hand, will be effected through DTC in accordance with DTC's rules on behalf of Euroclear or Clearstream, as the case may be, by its respective depositary; however, such cross-market transactions will require delivery of instructions to Euroclear or Clearstream, as the case may be, by the counterparty in such system in accordance with the rules and procedures and within the established deadlines (Brussels time) of such system. Euroclear or Clearstream, as the case may be, will, if the transaction meets its settlement requirements, deliver instructions to its respective depositary to take action to effect final settlement on its behalf by delivering or receiving interests in the relevant Global Note in DTC, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. Euroclear participants and Clearstream participants may not deliver instructions directly to the depositories for Euroclear or Clearstream.

DTC has advised Windstream that it will take any action permitted to be taken by a Holder of Notes only at the direction of one or more Participants to whose account DTC has credited the interests in the Global Notes and only in respect of such portion of the aggregate principal amount of the Notes as to which such Participant or Participants has or have given such direction. However, if there is an Event of Default under the Notes, DTC reserves the right to exchange the Global Notes for legended Notes in certificated form, and to distribute such Notes to its Participants.

Although DTC, Euroclear and Clearstream have agreed to the foregoing procedures to facilitate transfers of interests in the Rule 144A Global Notes and the Regulation S Global Notes among participants in DTC, Euroclear and Clearstream, they are under no obligation to perform or to continue to perform such procedures, and may discontinue such procedures at any time. Neither Windstream nor the Trustee nor any of their respective agents will have any responsibility for the performance by DTC, Euroclear or Clearstream or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

### Exchange of global notes for certificated notes

A Global Note is exchangeable for definitive Notes in registered certificated form ("Certificated Notes"), if:

(1)   DTC (a) notifies Windstream that it is unwilling or unable to continue as depositary for the Global Notes or (b) has ceased to be a clearing agency registered under the Exchange Act, and in each case Windstream fails to appoint a successor depositary;

(2)   Windstream, at its option, notifies the Trustee in writing that it elects to cause the issuance of Certificated Notes (DTC has advised Windstream that, in such event, under its current practices, DTC would notify its participants of Windstream's request, but will only withdraw beneficial interests from a Global Note at the request of each DTC participant); or

(3)   there will have occurred and be continuing a Default or Event of Default with respect to the Notes.

In addition, beneficial interests in a Global Note may be exchanged for Certificated Notes upon prior written notice given to the Trustee by or on behalf of DTC in accordance with the Indenture. In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests in Global Notes will be registered in the names, and issued in any approved denominations, requested by or on behalf of the depositary (in accordance with its customary procedures) and will bear the applicable restrictive legend referred to in "Transfer Restrictions," unless that legend is not required by applicable law.

### Exchange of Certificated Notes for Global Notes

Certificated Notes may not be exchanged for beneficial interests in any Global Note unless the transferor first delivers to the Trustee a written certificate (in the form provided in the Indenture) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Notes. See "Transfer Restrictions."

### Exchanges between Regulation S Notes and Rule 144A Notes

Prior to the expiration of the Restricted Period, beneficial interests in the Regulation S Global Note may be exchanged for beneficial interests in the Rule 144A Global Note only if the transferor first delivers to the Trustee a written certificate (in the form provided in the Indenture) to the effect that:

(1)   the transfer of Notes is being made in accordance with Rule 144A; and

(2)   the Notes are being transferred to a Person:

(a)   who the transferor reasonably believes to be a qualified institutional buyer within the meaning of Rule 144A purchasing for its own account or the account of a qualified institutional buyer in a transaction meeting the requirements of Rule 144A; and

(b)   in accordance with all applicable securities laws of the states of the United States.

Beneficial interests in a Rule 144A Global Note may be transferred to a Person who takes delivery in the form of an interest in the Regulation S Global Note, whether before or after the expiration of the Restricted Period, only if the transferor first delivers to the Trustee a written certificate (in the form provided in the Indenture) to the effect that such transfer is being made in accordance with Rule 903 or 904 of Regulation S or Rule 144 (if available). If such transfer occurs prior to the expiration of the Restricted Period, the interest transferred will be held immediately thereafter through Euroclear or Clearstream.

Transfers involving exchanges of beneficial interests between the Regulation S Global Notes and the Rule 144A Global Notes will be effected in DTC by means of an instruction originated by the Trustee through the DTC Deposit/Withdraw at Custodian system. Accordingly, in connection with any such transfer, appropriate adjustments will be made to reflect a decrease in the principal amount of the Regulation S Global Note and a corresponding increase in the principal amount of the Rule 144A Global Note or vice versa, as applicable. Any beneficial interest in one of the Global Notes that is transferred to a Person who takes delivery in the form of an interest in the other Global Note will, upon transfer, cease to be an interest in such Global Note and will become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interest in such other Global Note for so long as it remains such an interest. The policies and practices of DTC may prohibit transfers of beneficial interests in the Regulation S Global Note prior to the expiration of the Restricted Period.

### Same day settlement and payment

Windstream will make payments in respect of the Notes represented by the Global Notes (including principal, premium, if any, and interest) by wire transfer of immediately available funds to the accounts specified by the Global Note Holder. Windstream will make all payments of principal, interest and premium, if any, with respect to Certificated Notes by wire transfer of immediately available funds to the accounts specified by the Holders thereof or, if no such account is specified, by mailing a check to each such Holder's registered address. The Notes represented by the Global Notes are expected to trade in DTC's Same-Day Funds Settlement System, and any

permitted secondary market trading activity in such Notes will, therefore, be required by DTC to be settled in immediately available funds. Windstream expects that secondary trading in any Certificated Notes will also be settled in immediately available funds.

Because of time zone differences, the securities account of a Euroclear or Clearstream participant purchasing an interest in a Global Note from a Participant in DTC will be credited, and any such crediting will be reported to the relevant Euroclear or Clearstream participant, during the securities settlement processing day (which must be a business day for Euroclear and Clearstream) immediately following the settlement date of DTC. DTC has advised Windstream that cash received in Euroclear or Clearstream as a result of sales of interests in a Global Note by or through a Euroclear or Clearstream participant to a Participant in DTC will be received with value on the settlement date of DTC but will be available in the relevant Euroclear or Clearstream cash account only as of the business day for Euroclear or Clearstream following DTC's settlement date.

**Certain definitions**

Set forth below are certain defined terms used in the Indenture. Reference is made to the Indenture for a full disclosure of all such terms, as well as any other capitalized terms used herein for which no definition is provided.

"*Acquired Debt*" means Indebtedness of a Person existing at the time such Person merges with or into or becomes a Restricted Subsidiary and not Incurred in connection with, or in contemplation of, such Person merging with or into or becoming a Restricted Subsidiary.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, will mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" will have correlative meanings.

"*Applicable Premium*" means, at any date of redemption, the greater of (i) 1.0% of the principal amount of such Note and (ii) the excess of (A) the present value at such date of redemption of (1) the principal amount of such Note plus the premium thereon as set out in the table under "Optional Redemption" on February 1, 2018, plus (2) all remaining required interest payments due on such Note through February 1, 2018 (excluding accrued but unpaid interest to the date of redemption), computed using a discount rate equal to the Treasury Rate plus 50 basis points, over (B) the principal amount of such Note.

"*Asset Sale*" means:

(1)   the sale, lease, conveyance or other disposition of any assets, other than a transaction governed by the provisions of the Indenture described above under the caption "— Repurchase at the option of holders — Change of control" and/or the provisions described above under the caption "— Certain covenants — Merger, consolidation or sale of assets;" and

(2)   the issuance of Equity Interests by any of Windstream's Restricted Subsidiaries or the sale by Windstream or any Restricted Subsidiary thereof of Equity Interests in any of its Subsidiaries (other than directors' qualifying shares and shares issued to foreign nationals to the extent required by applicable law).

Notwithstanding the preceding, the following items will be deemed not to be Asset Sales:

(1)   any single transaction or series of related transactions that involves assets or Equity Interests having a Fair Market Value of less than $25.0 million;

(2)   a transfer of assets or Equity Interests between or among Windstream and its Restricted Subsidiaries;

(3)   an issuance of Equity Interests by a Restricted Subsidiary of Windstream to Windstream or to another Restricted Subsidiary thereof;

84

(4)   the sale or lease of equipment, inventory, accounts receivable or other assets in the ordinary course of business;

(5)   the sale or other disposition of Cash Equivalents;

(6)   dispositions of accounts receivable in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings;

(7)   a Restricted Payment that is permitted by the covenant described above under the caption "— Certain covenants — Restricted payments" and any Permitted Investment;

(8)   any sale or disposition of any property or equipment that has become damaged, worn out or obsolete;

(9)   the creation of a Lien not prohibited by the Indenture;

(10)   any sale of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary;

(11)   licenses of intellectual property;

(12)   any disposition of Designated Noncash Consideration; *provided* that such disposition increases the amount of Net Proceeds of the Asset Sale that resulted in such Designated Noncash Consideration; and

(13)   any foreclosure upon any assets of Windstream or any of its Restricted Subsidiaries pursuant to the terms of a Lien not prohibited by the terms of the Indenture; *provided* that such foreclosure does not otherwise constitute a Default under the Indenture.

"*Attributable Debt*" in respect of a Sale and Leaseback Transaction means, at the time of determination, the present value of the obligation of the lessee for net rental payments during the remaining term of the lease included in such Sale and Leaseback Transaction, including any period for which such lease has been extended or may, at the option of the lessor, be extended. Such present value will be calculated using a discount rate equal to the rate of interest implicit in such transaction, determined in accordance with GAAP.

"*Beneficial Owner*" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition. The terms "Beneficially Owns" and "Beneficially Owned" will have a corresponding meaning.

"*Board of Directors*" means:

(1)   with respect to a corporation, the board of directors of the corporation or, except in the context of the definitions of "Change of Control" and "Continuing Directors," a duly authorized committee thereof;

(2)   with respect to a partnership, the Board of Directors of the general partner of the partnership; and

(3)   with respect to any other Person, the board or committee of such Person serving a similar function.

"*Board Resolution*" means a resolution certified by the Secretary or an Assistant Secretary of Windstream to have been duly adopted by the Board of Directors of Windstream and to be in full force and effect on the date of such certification.

"*Business Day*" means any day other than a Legal Holiday.

"*Capital Lease Obligation*" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet in accordance with GAAP.

"*Capital Stock*" means:

(1)   in the case of a corporation, corporate stock;

(2)   in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)   in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)   any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"*Cash Equivalents*" means:

(1)   U.S. dollars and foreign currency received in the ordinary course of business or exchanged into U.S. dollars within 180 days;

(2)   securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof), maturing, unless such securities are deposited to defease any Indebtedness, not more than one year from the date of acquisition;

(3)   certificates of deposit and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case, with any lender party under the Credit Agreement or any domestic commercial bank having capital and surplus in excess of $500.0 million and a rating at the time of acquisition thereof of P-1 or better from Moody's or A-1 or better from S&P;

(4)   repurchase obligations for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)   commercial paper issued by a corporation (other than an Affiliate of Windstream) rated at least "A-2" or higher from Moody's or S&P and in each case maturing within one year after the date of acquisition;

(6)   securities issued and fully guaranteed by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, rated at least "A" by Moody's or S&P and having maturities of not more than one year from the date of acquisition; and

(7)   money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (1) through (6) of this definition.

"*Change of Control*" means the occurrence of any of the following:

(1)   the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of Windstream and its Restricted Subsidiaries, taken as a whole, to any "person" (as that term is used in Section 13(d)(3) of the Exchange Act);

(2)   the adoption of a plan relating to the liquidation or dissolution of Windstream;

(3)   any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) becomes the Beneficial Owner, directly or indirectly, of 50% or more of the voting power of the Voting Stock of Windstream;

(4)   the first day on which a majority of the members of the Board of Directors of Windstream are not Continuing Directors; or

(5)   Windstream consolidates with, or merges with or into, any Person, or any Person consolidates with, or merges with or into Windstream or a Subsidiary of Windstream, in any such event pursuant to a transaction in which any of the outstanding Voting Stock of Windstream or such other Person is converted into or exchanged for cash, securities or other property, other than any such transaction where (A) the Voting Stock of Windstream outstanding immediately prior to such transaction continues as, or is converted into or exchanged for Voting Stock (other than Disqualified Stock) of the surviving or transferee Person constituting a majority of the outstanding shares of such Voting Stock of such surviving or transferee Person (immediately after giving effect to such issuance) and (B) immediately after such transaction, no "person" or "group" (as such terms are used in Section 13(d) and 14(d) of the Exchange Act) becomes, directly or indirectly, the Beneficial Owner of 50% or more of the voting power of the Voting Stock of the surviving or transferee Person.

"*Change of Control Triggering Event*" means the occurrence of a Change of Control (x) that is accompanied or followed by a downgrade of the Notes within the Ratings Decline Period by each of Moody's and S&P or, if either S&P and Moody's is not providing a rating on the Notes at any time for reasons outside the control of Windstream, the equivalent of such ratings by another nationally recognized statistical ratings organization selected by Windstream (as certified by a resolution of the Board of Directors of Windstream), and (y) the rating of the Notes on any day during such Ratings Decline Period is below the lower of the rating by such nationally recognized statistical ratings organization in effect (i) immediately preceding the first public announcement of the Change of Control (or occurrence thereof if such Change of Control occurs prior to public announcement) and (ii) on the Original Issue Date.

"*Common Stock*" means, with respect to any Person, any Capital Stock (other than Preferred Stock) of such Person, whether outstanding on the Original Issue Date or issued thereafter.

"*Consolidated Cash Flow*" means, with respect to any specified Person for any period, the Consolidated Net Income of such Person for such period *plus*, without duplication:

(1)   provision for taxes based on income or profits of such Person and its Restricted Subsidiaries for such period, to the extent that such provision for taxes was deducted in computing such Consolidated Net Income; *plus*

(2)   Fixed Charges of such Person and its Restricted Subsidiaries for such period, to the extent that any such Fixed Charges were deducted in computing such Consolidated Net Income; *plus*

(3)   depreciation, amortization (including amortization of intangibles but excluding amortization of prepaid cash expenses that were paid in a prior period), goodwill impairment charges and other non-cash expenses (excluding any such non-cash expense to the extent that it represents an accrual of or reserve for cash expenses in any future period or amortization of a prepaid cash expense that was paid in a prior period) of such Person and its Restricted Subsidiaries for such period to the extent that such depreciation, amortization and other non-cash charges or expenses were deducted in computing such Consolidated Net Income; *plus*

(4)   the amount of any minority interest expense deducted in computing such Consolidated Net Income; *plus*

(5)   any non-cash compensation charge arising from any grant of stock, stock options or other equity-based awards, to the extent deducted in computing such Consolidated Net Income; *plus*

(6)   any non-cash SFAS 133 income (or loss) related to hedging activities, to the extent deducted in computing such Consolidated Net Income; *minus*

(7)   non-cash items increasing such Consolidated Net Income for such period, other than (a) the accrual of revenue consistent with past practice and (b) the reversal in such period of an accrual of, or cash reserve for, cash expenses in a prior period, to the extent such accrual or reserve did not increase Consolidated Cash Flow in a prior period;

in each case, on a consolidated basis and determined in accordance with GAAP.

Notwithstanding the preceding, the provision for taxes based on the income or profits of, the Fixed Charges of and the depreciation and amortization and other non-cash expenses of, a Restricted Subsidiary of Windstream will be added to Consolidated Net Income to compute Consolidated Cash Flow of Windstream (A) in the same proportion that the Net Income of such Restricted Subsidiary was added to compute such Consolidated Net Income of Windstream and (B) only to the extent that a corresponding amount would be permitted at the date of determination to be dividended or distributed to Windstream by such Restricted Subsidiary without direct or indirect restriction pursuant to the terms of its charter and all agreements and instruments, applicable to that Subsidiary or its stockholders.

"*Consolidated Leverage Ratio*" means, as of any date of determination, the ratio of:

(1)   the aggregate outstanding amount of Indebtedness of Windstream and its Restricted Subsidiaries as of such date of determination on a consolidated basis (subject to the terms described in the paragraph below) after giving pro forma effect to the incurrence of the Indebtedness giving rise to the need to make such calculation (including a pro forma application of the use of proceeds therefrom) on such date, to

(2)   the Consolidated Cash Flow of Windstream for the most recent four full fiscal quarters for which internal financial statements are available immediately prior to such date of determination. For purposes of this definition:

(a)   Consolidated Cash Flow shall be calculated on a pro forma basis after giving effect to (A) the incurrence of the Indebtedness of Windstream and its Restricted Subsidiaries (and the application of the proceeds therefrom) giving rise to the need to make such calculation and any incurrence (and the application of the proceeds therefrom) or repayment of other Indebtedness on the date of determination, and (B) any acquisition or disposition of a Person, division or line of business (including, without limitation, any acquisition giving rise to the need to make such calculation as a result of Windstream or one of its Restricted Subsidiaries (including any Person that becomes a Restricted Subsidiary as a result of such acquisition) incurring, assuming or otherwise becoming liable for Indebtedness) at any time on or subsequent to the first day of the applicable four-quarter period specified in clause (2) of the preceding paragraph and on or prior to the date of determination, as if such acquisition or disposition (including the incurrence or assumption of any such Indebtedness and also including any Consolidated Cash Flow associated with such acquisition or disposition) occurred on the first day of such four-quarter period; and

(b)   pro forma calculations shall be made in good faith by a responsible financial or accounting officer of Windstream.

"*Consolidated Net Income*" means, with respect to any specified Person for any period, the aggregate of the Net Income of such Person and its Subsidiaries for such period, on a consolidated basis, determined in accordance with GAAP; *provided* that:

(1)   the Net Income of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting will be included only to the extent of the amount of dividends or distributions paid in cash to the specified Person or a Restricted Subsidiary thereof (and the net loss of any such Person will be included only to the extent that such loss is funded in cash by the specified Person or a Restricted Subsidiary thereof);

(2)   the Net Income of any Restricted Subsidiary will be excluded to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that Net Income is not at the date of determination permitted directly or indirectly, by operation of the terms of its charter or any agreement or instrument, applicable to that Restricted Subsidiary or its equityholders;

(3)   the Net Income of any Person acquired during the specified period for any period prior to the date of such acquisition will be excluded;

(4)   the cumulative effect of a change in accounting principles will be excluded; and

(5)    notwithstanding clause (1) above, the Net Income or loss of any Unrestricted Subsidiary will be excluded, whether or not distributed to the specified Person or one of its Subsidiaries.

"*Continuing Directors*" means, as of any date of determination, any member of the Board of Directors of Windstream who:

(1)    was a member of such Board of Directors on the Original Issue Date; or

(2)    was nominated for election or elected to such Board of Directors with the approval of a majority of the Continuing Directors who were members of such Board of Directors at the time of such nomination or election.

"*Credit Agreement*" means that certain Fourth Amended and Restated Credit Agreement, as amended and restated on August 8, 2012, among Windstream, certain lenders party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent, including any related notes, Guarantees, collateral documents, instruments and agreements executed in connection therewith, and in each case as amended, restated, modified, renewed, refunded, replaced or refinanced from time to time after the Original Issue Date (including increases in the amounts available for borrowing thereunder), regardless of whether such amendment, restatement, modification, renewal, refunding, replacement or refinancing is with the same financial institutions or otherwise.

"*Credit Facilities*" means one or more debt facilities (including, without limitation, the Credit Agreement and indentures or debt securities) or commercial paper facilities, in each case with banks or other institutional lenders providing for revolving credit loans, term debt, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables) or letters of credit, in each case, as amended, restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time, including any refunding, replacement or refinancing thereof through the issuance of debt securities.

"*Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"*Designated Noncash Consideration*" means the Fair Market Value of noncash consideration received by Windstream or one of its Restricted Subsidiaries in connection with an Asset Sale that is so designated as Designated Noncash Consideration pursuant to an Officers' Certificate, setting forth the basis of such valuation, less the amount of Cash Equivalents received in connection with a subsequent sale of such Designated Noncash Consideration.

"*Disqualified Stock*" means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is 123 days after the date on which the Notes mature; *provided*, *however*, that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such dates shall be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Capital Stock that would constitute Disqualified Stock solely because the holders thereof have the right to require Windstream to repurchase such Capital Stock upon the occurrence of a change of control or an asset sale will not constitute Disqualified Stock if the terms of such Capital Stock provide that Windstream may not repurchase or redeem any such Capital Stock pursuant to such provisions unless such repurchase or redemption complies with the covenant described above under the caption "— Certain covenants — Restricted payments." The term "Disqualified Stock" will also include any options, warrants or other rights that are convertible into Disqualified Stock or that are redeemable at the option of the holder, or required to be redeemed, prior to the date that is 123 days after the date on which the Notes mature.

"*Domestic Restricted Subsidiary*" means any Restricted Subsidiary of Windstream other than a Restricted Subsidiary that is (1) a "controlled foreign corporation" under Section 957 of the Internal Revenue Code (a) whose primary operating assets are located outside the United States and (b) that is not subject to tax under Section 882(a)

of the Internal Revenue Code because of a trade or business within the United States or (2) a Subsidiary of an entity described in the preceding clause (1).

"*Earn-out Obligation*" means any contingent consideration based on future operating performance of the acquired entity or assets or other purchase price adjustment or indemnification obligation, payable following the consummation of an acquisition based on criteria set forth in the documentation governing or relating to such acquisition.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"*Equity Offering*" means any public or private placement of Capital Stock (other than Disqualified Stock) of Windstream to any Person (other than (i) to any Subsidiary thereof and (ii) issuances of equity securities pursuant to a registration statement on Form S-8 or otherwise relating to equity securities issuable under any employee benefit plan of Windstream).

"*Existing Indebtedness*" means the aggregate principal amount of Indebtedness of Windstream and its Restricted Subsidiaries (other than Indebtedness under the Credit Agreement or under the Notes and the related Note Guarantees) in existence on the Original Issue Date after giving effect to the application of the proceeds of the Notes, until such amounts are repaid.

"*Fair Market Value*" means the price that would be paid in an arm's-length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy, as determined in good faith by a responsible officer of Windstream, whose determination, unless otherwise specified below, will be conclusive if evidenced by an Officers' Certificate. Notwithstanding the foregoing, the responsible officer's determination of Fair Market Value must be evidenced by an Officers' Certificate delivered to the Trustee if the Fair Market Value exceeds $25.0 million.

"*Fixed Charges*" means, with respect to any specified Person for any period, the sum, without duplication, of:

(1)   the consolidated interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, including, without limitation, original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, imputed interest with respect to Attributable Debt, commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings, and net of the effect of all payments made or received pursuant to Hedging Obligations, but excluding the amortization or write-off of debt issuance costs; plus

(2)   the consolidated interest of such Person and its Restricted Subsidiaries that was capitalized during such period; plus

(3)   any interest expense on Indebtedness of another Person that is Guaranteed by such Person or one of its Restricted Subsidiaries or secured by a Lien on assets of such Person or one of its Restricted Subsidiaries (other than a pledge of Equity Interests of an Unrestricted Subsidiary to secure Non-Recourse Debt of such Unrestricted Subsidiary), whether or not such Guarantee or Lien is called upon; *plus*

(4)   the product of (a) all dividends, whether paid or accrued (but, in the case of accrued, only in the case of (x) Preferred Stock of any Restricted Subsidiary of such Person that is not a Guarantor or (y) Disqualified Stock of such Person or of any of its Restricted Subsidiaries) and whether or not in cash, on any series of Disqualified Stock of such Person or on any series of Preferred Stock of such Person's Restricted Subsidiaries, other than dividends on Equity Interests payable solely in Equity Interests (other than Disqualified Stock) of such Person or to such Person or to a Restricted Subsidiary of such Person, times (b) a fraction, the numerator of which is one and the denominator of which is one minus the then current combined federal, state and local statutory tax rate of such Person, expressed as a decimal,

in each case, on a consolidated basis and in accordance with GAAP.

"*GAAP*" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants, the opinions and pronouncements of the Public Company Accounting Oversight Board and in the statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect on July 17, 2006.

"*Government Securities*" means securities that are direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged.

"*Guarantee*" means, as to any Person, a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness of another Person.

"*Guarantors*" means:

(1)   each direct and indirect Restricted Subsidiary of Windstream that Guarantees any Indebtedness under the Credit Agreement on the Original Issue Date; and

(2)   any other Subsidiary of Windstream that executes a Note Guarantee in accordance with the provisions of the Indenture;

and their respective successors and assigns until released from their obligations under their Note Guarantees and the Indenture in accordance with the terms of the Indenture.

"*Hedging Obligations*" means, with respect to any specified Person, the obligations of such Person under:

(1)   interest rate swap agreements, interest rate cap agreements, interest rate collar agreements and other agreements or arrangements with respect to interest rates;

(2)   commodity swap agreements, commodity option agreements, forward contracts and other agreements or arrangements with respect to commodity prices; and

(3)   foreign exchange contracts, currency swap agreements and other agreements or arrangements with respect to foreign currency exchange rates.

"*Holder*" means a Person in whose name a Note is registered.

"*Incur*" means, with respect to any Indebtedness, to incur, create, issue, assume, Guarantee or otherwise become directly or indirectly liable for or with respect to, or become responsible for, the payment of, contingently or otherwise, such Indebtedness (and "*Incurrence*" and "*Incurred*" will have meanings correlative to the foregoing); *provided* that (1) any Indebtedness of a Person existing at the time such Person becomes a Restricted Subsidiary of Windstream will be deemed to be Incurred by such Restricted Subsidiary at the time it becomes a Restricted Subsidiary of Windstream and (2) neither the accrual of interest nor the accretion of original issue discount nor the payment of interest in the form of additional Indebtedness with the same terms and the payment of dividends on Disqualified Stock or Preferred Stock in the form of additional shares of the same class of Disqualified Stock or Preferred Stock (to the extent provided for when the Indebtedness or Disqualified Stock or Preferred Stock on which such interest or dividend is paid was originally issued) will be considered an Incurrence of Indebtedness; *provided* that in each case the amount thereof is for all other purposes included in the Fixed Charges and Indebtedness of Windstream or its Restricted Subsidiary as accrued.

"*Indebtedness*" means, with respect to any specified Person, any indebtedness of such Person, whether or not contingent:

(1)   in respect of borrowed money;

(2)   evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof);

(3)   in respect of banker's acceptances;

(4)   in respect of Capital Lease Obligations and Attributable Debt;

(5)   in respect of the balance deferred and unpaid of the purchase price of any property or services, except any such balance that constitutes an accrued expense or trade payable; *provided* that Indebtedness shall not include any Earn-out Obligation or obligation in respect of purchase price adjustment, except to the extent that the contingent consideration relating thereto is not paid within 15 Business Days after the contingency relating thereto is resolved;

(6)   representing Hedging Obligations;

(7)   representing Disqualified Stock valued at the greater of its voluntary or involuntary maximum fixed repurchase price plus accrued dividends; or

(8)   in the case of a Subsidiary of such Person, representing Preferred Stock valued at the greater of its voluntary or involuntary maximum fixed repurchase price plus accrued dividends, if and to the extent any of the preceding items (other than letters of credit and other than clauses (4), (5), (6), (7) or (8)) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP. In addition, the term "Indebtedness" includes (x) all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) other than a pledge of Equity Interests of an Unrestricted Subsidiary to secure Non-Recourse Debt of such Unrestricted Subsidiary, provided that the amount of such Indebtedness will be the lesser of (A) the Fair Market Value of such asset at such date of determination and (B) the amount of such Indebtedness, and (y) to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person, *provided*, *further*, that any obligation of Windstream or any Restricted Subsidiary in respect of minimum guaranteed commissions, or other similar payments, to clients, minimum returns to clients or stop loss limits in favor of clients or indemnification obligations to clients, in each case pursuant to contracts to provide services to clients entered into in the ordinary course of business, shall be deemed not to constitute Indebtedness. For purposes hereof, the "maximum fixed repurchase price" of any Disqualified Stock or Preferred Stock which does not have a fixed repurchase price will be calculated in accordance with the terms of such Disqualified Stock or Preferred Stock, as applicable, as if such Disqualified Stock or Preferred Stock were repurchased on any date on which Indebtedness will be required to be determined pursuant to the Indenture.

The amount of any Indebtedness outstanding as of any date will be the outstanding balance at such date of all unconditional obligations as described above and, with respect to contingent obligations, the maximum liability upon the occurrence of the contingency giving rise to the obligation, and will be:

(1)   the accreted value thereof, in the case of any Indebtedness issued with original issue discount; and

(2)   the principal amount thereof, together with any interest thereon that is more than 30 days past due, in the case of any other Indebtedness.

"*Insignificant Subsidiary*" means any Subsidiary of Windstream that has total assets of not more than $1.0 million and that is designated by Windstream as an "Insignificant Subsidiary," provided that the total assets of all Subsidiaries that are so designated, as reflected on Windstream's most recent consolidating balance sheet prepared in accordance with GAAP, may not in the aggregate at any time exceed $10.0 million.

"*Investment Grade*" means both BBB- or higher by S&P and Baa3 or higher by Moody's, or the equivalent of such ratings by S&P or Moody's, or, if either S&P and Moody's is not providing a rating on the Notes at any time, the equivalent of such rating by another nationally recognized statistical ratings organization.

"*Investments*" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the form of loans or other extensions of credit (including Guarantees), advances, capital contributions (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), purchases or other acquisitions for consideration of Indebtedness, Equity

Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

If Windstream or any of its Restricted Subsidiaries sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary of Windstream such that, after giving effect to any such sale or disposition, such Person is no longer a Restricted Subsidiary of Windstream, Windstream will be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of the Investment in such Subsidiary not sold or disposed of. The acquisition by Windstream or any of its Restricted Subsidiaries of a Person that holds an Investment in a third Person will be deemed to be an Investment by Windstream or such Restricted Subsidiary in such third Person in an amount equal to the Fair Market Value of the Investment held by the acquired Person in such third Person.

"*Issue Date*" means the date of original issuance of the New 6 3/8% Notes under the Indenture.

"*Legal Holiday*" means a Saturday, a Sunday or a day on which banking institutions in The City of New York or at a place of payment are authorized or required by law, regulation or executive order to remain closed.

"*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction.

"*Moody's*" means Moody's Investors Service, Inc.

"*Net Income*" means, with respect to any specified Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends, excluding, however:

(1)   any gain or loss, together with any related provision for taxes on such gain or loss, realized in connection with: (a) any sale of assets outside the ordinary course of business of such Person; or (b) the disposition of any securities by such Person or any of its Restricted Subsidiaries or the extinguishment of any Indebtedness of such Person or any of its Restricted Subsidiaries; and

(2)   any extraordinary or non-recurring gain, loss, expense or charge (including any one-time expenses related to the Transactions), together with any related provision for taxes.

"*Net Proceeds*" means the aggregate cash proceeds, including payments in respect of deferred payment obligations (to the extent corresponding to the principal, but not the interest component, thereof) received by Windstream or any of its Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of (1) the direct costs relating to such Asset Sale and the sale or other disposition of any such non-cash consideration, including, without limitation, legal, accounting, investment banking and brokerage fees, and sales commissions, and any relocation expenses incurred as a result thereof, (2) taxes paid or payable as a result thereof, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, (3) amounts required to be applied to the repayment of Indebtedness or other liabilities secured by a Lien on the asset or assets that were the subject of such Asset Sale or required to be paid as a result of such sale, (4) any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP, (5) in the case of any Asset Sale by a Restricted Subsidiary of Windstream, payments to holders of Equity Interests in such Restricted Subsidiary in such capacity (other than such Equity Interests held by Windstream or any Restricted Subsidiary thereof) to the extent that such payment is required to permit the distribution of such proceeds in respect of the Equity Interests in such Restricted Subsidiary held by Windstream or any Restricted Subsidiary thereof and (6) appropriate amounts to be provided by Windstream or its Restricted Subsidiaries as a reserve against liabilities associated with such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as determined in accordance with GAAP; *provided* that (a) excess amounts set aside for payment of taxes pursuant to clause (2) above remaining after such taxes have been paid in full or the statute of limitations therefor has expired

and (b) amounts initially held in reserve pursuant to clause (6) no longer so held, will, in the case of each of subclause (a) and (b), at that time become Net Proceeds. "Non-Recourse Debt" means Indebtedness:

(1)   as to which neither Windstream nor any of its Restricted Subsidiaries (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness) other than a pledge of the Equity Interests of the Unrestricted Subsidiary that is the obligor thereunder, (b) is directly or indirectly liable as a guarantor or otherwise, or (c) constitutes the lender;

(2)   no default with respect to which (including any rights that the holders thereof may have to take enforcement action against an Unrestricted Subsidiary) would permit upon notice, lapse of time or both any holder of any other Indebtedness (other than the Notes) of Windstream or any of its Restricted Subsidiaries to declare a default on such other Indebtedness or cause the payment thereof to be accelerated or payable prior to its stated maturity; and

(3)   as to which either (a) the explicit terms provide that there is no recourse against any of the assets of Windstream or any Restricted Subsidiary thereof or (b) the lenders have been notified in writing that they will not have any recourse to the stock or assets of Windstream or any of its Restricted Subsidiaries, in each case other than recourse against the Equity Interests of the Unrestricted Subsidiary that is the obligor thereunder.

"*Note Guarantee*" means a Guarantee of the Notes pursuant to the Indenture.

"*Obligations*" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"*Officer*" means, with respect to any Person, the Chairman of the Board, the President, the Chief Financial Officer, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of such Person.

"*Officers' Certificate*" means a certificate signed on behalf of Windstream by at least two Officers of Windstream, one of whom must be the principal executive officer, the principal financial officer or the principal accounting officer of Windstream, that meets the requirements of the Indenture.

"*Opinion of Counsel*" means an opinion from legal counsel who is reasonably acceptable to the Trustee (who may be counsel to or an employee of Windstream) that meets the requirements of the Indenture.

"*Original Issue Date*" means January 23, 2013.

"*Permitted Business*" means any business conducted or proposed to be conducted (as described in this offering memorandum) by Windstream and its Restricted Subsidiaries on the Original Issue Date and other businesses reasonably related thereto or a reasonable extension or expansion thereof.

"*Permitted Investments*" means:

(1)   any Investment in Windstream or in a Restricted Subsidiary of Windstream;

(2)   any Investment in Cash Equivalents;

(3)   any Investment by Windstream or any Restricted Subsidiary of Windstream in a Person, if as a result of such Investment:

(a)   such Person becomes a Restricted Subsidiary of Windstream; or

(b)   such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, Windstream or a Restricted Subsidiary of Windstream;

(4)   any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with the covenant described above under the caption "— Repurchase at the option of holders — Asset sales;"

(5)   Hedging Obligations that are Incurred for the purpose of fixing, hedging or swapping interest rate, commodity price or foreign currency exchange rate risk (or to reverse or amend any such agreements previously made for such purposes), and not for speculative purposes;

(6)   any Investment acquired by Windstream or any of its Restricted Subsidiaries (a) in exchange for any other Investment or accounts receivable held by Windstream or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable or (b) as a result of a foreclosure by Windstream or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7)   advances to customers or suppliers in the ordinary course of business that are, in conformity with GAAP, recorded as accounts receivable, prepaid expenses or deposits on the balance sheet of Windstream or its Restricted Subsidiaries and endorsements for collection or deposit arising in the ordinary course of business;

(8)   Investments consisting of purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of intellectual property, in each case in the ordinary course of business;

(9)   advances to employees not in excess of $5.0 million outstanding at any one time in the aggregate;

(10)   commission, payroll, travel and similar advances to officers and employees of Windstream or any of its Restricted Subsidiaries that are expected at the time of such advance ultimately to be recorded as an expense in conformity with GAAP;

(11)   Investments consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(12)   other Investments in any Person other than any Unrestricted Subsidiary of Windstream (provided that any such Person is either (i) not an Affiliate of Windstream or (ii) is an Affiliate of Windstream solely because Windstream, directly or indirectly, owns Equity Interests in, or controls, such Person or engaged in bona fide business operations and is an Affiliate solely because it is under common control with Windstream) having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (12) since July 17, 2006 and then outstanding, not to exceed the greater of (x) 5.0% of Total Assets and (y) $375.0 million at the time of such Investment; *provided*, *however*, that if an Investment pursuant to this clause (12) is made in any Person that is not a Restricted Subsidiary of Windstream at the date of the making of the Investment and such Person becomes a Restricted Subsidiary of Windstream after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above, and shall cease to have been made pursuant to this clause (12); and

(13)   Investments in Unrestricted Subsidiaries having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (13) since July 17, 2006, not to exceed $25.0 million (but, to the extent that any Investment made pursuant to this clause (13) since July 17, 2006 is sold or otherwise liquidated for cash or designated as a Restricted Subsidiary, minus the lesser of (a) the cash return of capital with respect to such Investment (less the cost of disposition, if any) or the Fair Market Value of such Unrestricted Subsidiary at the time of redesignation, as applicable and (b) the initial amount of such Investment).

"*Permitted Liens*" means:

(1)   Liens securing obligations in an amount when created or Incurred, together with the amount of all other obligations secured by a Lien under this clause (1) at that time outstanding (and any Permitted Refinancing Indebtedness Incurred in respect thereof) and (in the case of clause (B) only) any Liens securing obligations in respect of the 6.75% Notes due 2028 of Windstream Midwest, not to exceed the greater of (A) the sum of (i) the amount of Indebtedness Incurred and outstanding at such time under clauses (1), (4) and (15) of

the second paragraph of the covenant described under the caption "Certain Covenants — Incurrence of Indebtedness" plus (ii) the amount of Indebtedness available for Incurrence at such time under clauses (1), (4) and (15) of the second paragraph of the covenant described under the caption "Certain Covenants — Incurrence of Indebtedness" and (B) the product of (x) 2.50 and (y) Windstream's Consolidated Cash Flow for the most recent four fiscal quarters for which internal financial statements are available at such time, which Consolidated Cash Flow shall be calculated on a pro forma basis in the manner set out in clause (a) of the definition of "Consolidated Leverage Ratio";

(2)   Liens in favor of Windstream or any Guarantor;

(3)   Liens on property of a Person existing at the time such Person is merged with or into or consolidated with Windstream or any Restricted Subsidiary thereof; *provided* that such Liens were in existence prior to the contemplation of such merger or consolidation and do not extend to any assets other than those of the Person merged into or consolidated with Windstream or the Restricted Subsidiary;

(4)   Liens on property existing at the time of acquisition thereof by Windstream or any Restricted Subsidiary thereof; *provided* that such Liens were in existence prior to the contemplation of such acquisition and do not extend to any property other than the property so acquired by Windstream or the Restricted Subsidiary;

(5)   Liens securing the Notes and the Note Guarantees in respect thereof;

(6)   Liens existing on the Original Issue Date (excluding any such Liens securing Indebtedness under the Credit Agreement);

(7)   Liens securing Permitted Refinancing Indebtedness; *provided* that such Liens do not extend to any property or assets other than the property or assets that secure the Indebtedness being refinanced;

(8)   pledges of Equity Interests of an Unrestricted Subsidiary securing Non-Recourse Debt of such Unrestricted Subsidiary;

(9)   Liens on cash or Cash Equivalents securing Hedging Obligations of Windstream or any of its Restricted Subsidiaries (a) that are Incurred for the purpose of fixing, hedging or swapping interest rate, commodity price or foreign currency exchange rate risk (or to reverse or amend any such agreements previously made for such purposes), and not for speculative purposes, or (b) securing letters of credit that support such Hedging Obligations;

(10)  Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other social security obligations;

(11)  Liens, deposits or pledges to secure the performance of bids, tenders, contracts (other than contracts for the payment of Indebtedness), leases, or other similar obligations arising in the ordinary course of business;

(12)  survey exceptions, encumbrances, easements or reservations of, or rights of others for, rights of way, zoning or other restrictions as to the use of properties, and defects in title which, in the case of any of the foregoing, were not incurred or created to secure the payment of Indebtedness, and which in the aggregate do not materially adversely affect the value of such properties or materially impair the use for the purposes of which such properties are held by Windstream or any of its Restricted Subsidiaries;

(13)  judgment and attachment Liens not giving rise to an Event of Default and notices of *lis pendens* and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(14)  Liens, deposits or pledges to secure public or statutory obligations, surety, stay, appeal, indemnity, performance or other similar bonds or obligations; and Liens, deposits or pledges in lieu of such bonds or obligations, or to secure such bonds or obligations, or to secure letters of credit in lieu of or supporting the payment of such bonds or obligations;

(15)  Liens in favor of collecting or payor banks having a right of setoff, revocation, refund or chargeback with respect to money or instruments of Windstream or any Subsidiary thereof on deposit with or in possession of such bank;

(16)  any interest or title of a lessor, licensor or sublicensor in the property subject to any lease, license or sublicense (other than any property that is the subject of a Sale Leaseback Transaction);

(17)  Liens for taxes, assessments and governmental charges not yet delinquent or being contested in good faith and for which adequate reserves have been established to the extent required by GAAP;

(18)  Liens arising from precautionary UCC financing statements regarding operating leases or consignments; and

(19)  Liens securing obligations that do not exceed $15.0 million at any one time outstanding.

"*Permitted Refinancing Indebtedness*" means any Indebtedness of Windstream or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund other Indebtedness of Windstream or any of its Restricted Subsidiaries (other than intercompany Indebtedness); *provided* that:

(1)  the amount of such Permitted Refinancing Indebtedness does not exceed the amount of the Indebtedness so extended, refinanced, renewed, replaced, defeased or refunded (plus all accrued and unpaid interest thereon and the amount of any reasonably determined premium necessary to accomplish such refinancing and such reasonable expenses incurred in connection therewith);

(2)  such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded;

(3)  if the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded is subordinated in right of payment to the Notes or the Note Guarantees, such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of the Notes and is subordinated in right of payment to the Notes or the Note Guarantees, as applicable, on terms at least as favorable, taken as a whole, to the Holders of Notes as those contained in the documentation governing the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded;

(4)  if the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded is pari passu in right of payment with the Notes or any Note Guarantees, such Permitted Refinancing Indebtedness is pari passu with, or subordinated in right of payment to, the Notes or such Note Guarantees;

(5)  such Indebtedness is Incurred either (a) by Windstream or any Guarantor or (b) by the Restricted Subsidiary that is the obligor on the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"*Preferred Stock*" means, with respect to any Person, any Capital Stock of such Person that has preferential rights to any other Capital Stock of such Person with respect to dividends or redemptions upon liquidation.

"*Ratings Decline Period*" means the period that (i) begins on the earlier of (a) the date of the first public announcement of the occurrence of a Change of Control or of the intention by Windstream or a shareholder of Windstream, as applicable, to effect a Change of Control or (b) the occurrence thereof and (ii) ends 60 days following consummation of such Change of Control; *provided* that such period shall be extended for so long as the rating of the Notes, as noted by the applicable rating agency, is under publicly announced consideration for downgrade by the applicable rating agency.

"*Registration Rights Agreement*" means with respect to the Existing 6 3/8% Notes issued on the Original Issue Date, the Registration Rights Agreement dated as of the Original Issue Date, among Windstream, the Guarantors and Wells Fargo Securities, LLC, as representative of the several initial purchasers named therein.

"*Replacement Assets*" means (1) non-current assets (including any such assets acquired by capital expenditures) that will be used or useful in a Permitted Business or (2) substantially all the assets of a Permitted Business or the Voting Stock of any Person engaged in a Permitted Business that is or will become on the date of acquisition thereof a Restricted Subsidiary of Windstream.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Subsidiary*" of a Person means any Subsidiary of such Person that is not an Unrestricted Subsidiary.

"*S&P*" means Standard & Poor's Ratings Services.

"*Sale and Leaseback Transaction*" means, with respect to any Person, any transaction involving any of the assets or properties of such Person whether now owned or hereafter acquired, whereby such Person sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred.

"*Significant Subsidiary*" means any Restricted Subsidiary that would constitute a "significant subsidiary" within the meaning of Article 1 of Regulation S-X of the Securities Act.

"*Stated Maturity*" means, with respect to any installment of interest or principal on any series of Indebtedness, the date on which such payment of interest or principal was scheduled to be paid in the original documentation governing such Indebtedness, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

"*Subordinated Debt*" means any Indebtedness of Windstream or any Guarantor which is subordinated in right of payment to the Notes or the related Note Guarantees, as applicable, pursuant to a written agreement to that effect.

"*Subsidiary*" means, with respect to any specified Person:

    (1)   any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

    (2)   any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (b) the only general partners of which are such Person or one or more Subsidiaries of such Person (or any combination thereof).

"*Total Assets*" means the total assets of Windstream and its Restricted Subsidiaries on a consolidated basis, as shown on the most recent balance sheet of Windstream prepared in conformity with GAAP but excluding the value of any outstanding Restricted Investments or Investments made under clause (12) of the definition of Permitted Investments.

"*Transactions*" means the contribution of all of Alltel's wireline assets to Windstream in exchange for senior notes and all of the stock of Windstream, the distribution of such stock to Alltel's shareholders and exchange of the notes for other debt securities of Alltel, the merger of Windstream with and into Valor Communications Group, Inc., and the entry into the Credit Agreement and the borrowings thereunder on June 17, 2006 and the offering of such notes, each as described in the offering memorandum dated June 28, 2006 under "Description of the Transactions."

"*Treasury Rate*" means the yield to maturity at the time of computation of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) which has become publicly available at least two Business Days prior to the date fixed for prepayment (or, if such Statistical Release is no longer published, any publicly available source for similar market data)) most nearly

equal to the then remaining term of the Notes to February 1, 2018; *provided*, *however*, that if the then remaining term of the Notes to February 1, 2018, is not equal to the constant maturity of a United States Treasury security for which a weekly average yield is given, the Treasury Rate will be obtained by linear interpolation (calculated to the nearest one-twelfth of a year) from the weekly average yields of United States Treasury securities for which such yields are given, except that if the then remaining term of the Notes to February 1, 2018, is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"*Unrestricted Subsidiary*" means any Subsidiary of Windstream that is designated by the Board of Directors of Windstream as an Unrestricted Subsidiary pursuant to a Board Resolution in compliance with the covenant described under the caption "— Certain covenants — Designation of restricted and unrestricted subsidiaries," and any Subsidiary of such Subsidiary.

"*Voting Stock*" of any Person as of any date means the Capital Stock of such Person that is ordinarily entitled to vote in the election of the Board of Directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

    (1)   the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by

(2)   the then outstanding principal amount of such Indebtedness.

## TRANSFER RESTRICTIONS

***Eligible Holders are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of the New Notes.***

The New Notes and the offering thereof have not been registered under the Securities Act or any securities laws of any other jurisdiction, and the New Notes may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. Accordingly, the New Notes are being offered for exchange only (i) to "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) and (ii) outside the United States to persons other than "U.S. persons" as defined in Rule 902 under the Securities Act in offshore transactions in compliance with Regulation S.

Terms used in this "Transfer Restrictions" section that are defined in Rule 144A or Regulation S have the meanings specified in those rules.

Each Eligible Holder that submits a Letter of Transmittal, or agrees to the terms of a Letter of Transmittal by transmitting an Agent's Message, will be deemed to represent, warrant, and agree as follows:

(1)    It understands and acknowledges that the New Notes and the guarantees thereof have not been registered under the Securities Act or any applicable state securities law, are being offered for sale in transactions not requiring registration under the Securities Act or any state securities law, and may not be offered, sold or otherwise transferred except in compliance with the registration requirements of the Securities Act or any applicable state securities law, pursuant to an exemption therefrom or in any transaction not subject thereto and in each case in compliance with the conditions for transfer set out in paragraphs (6) and (7) below.

(2)    It acknowledges that this Offering Memorandum relates to an offering that is exempt from registration under the Securities Act and may not comply in important respects with SEC rules that would apply to an offering document relating to a public offering of securities.

(3)    It is either:

    (a)    A "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) ("**QIB**") and the acquisition of the New Notes will be for its own account or for the account of another QIB; or

    (b)    not a "U.S. person" (as defined in Rule 902 under the Securities Act) or acquiring the New Notes or benefit of a U.S. person, other than a distributor, and it is acquiring the New Notes outside the U.S. in an offshore transaction in accordance with Regulation S.

(4)    It acknowledges that none of the Company, the co-issuer, any guarantor of the New Notes, nor the Dealer Manager, nor any of our or their representatives, nor any person acting on behalf of any of the foregoing have made any statement, representation or warranty, express or implied, to it with respect to the Company, the co-issuer, the guarantors of the New Notes or the offering or sale of the New Notes, other than the information contained in this Offering Memorandum, which Offering Memorandum has been delivered to it and upon which it is relying in making its investment decision with respect to the New Notes. It has had access to such financial and other information concerning us and the New Notes as it has deemed necessary in connection with its decision to purchase any of the New Notes, including an opportunity to ask questions of, and request information from, the Company and such information has been made available to it.

(5)    It is exchanging the New Notes for its own account, or for one or more investor accounts for which it is acting as a fiduciary or agent, in each case for investment and not with a view to, or for offer or sale in connection with, any distribution thereof in violation of the Securities Act or any

state securities laws, subject to any requirement of law that the disposal of its property or the property of such investor account or accounts be at all times within its or their control and subject to its or their ability to resell such New Notes pursuant to Rule 144A, Regulation S or any other exemption from registration available under the Securities Act.

(6) Each Eligible Holder also acknowledges that:

 (a) the above restrictions on resale will apply from the Final Settlement Date until the date that is one year (in the case of Rule 144A notes) or 40 days (in the case of Regulation S notes) after the later of the Final Settlement Date and the last date that we or any of our affiliates was the owner of the New Notes or any predecessor of the New Notes (the "**Resale Restriction Period**"), and will not apply after the applicable Resale Restriction Period ends;

 (b) we and the Trustee reserve the right to require in connection with any offer, sale or other transfer of notes under (5) above, (i) the delivery of an opinion of counsel, certifications and/or other information satisfactory to us and the Trustee, and (ii) in each of the foregoing cases, to require that a certificate of transfer in the form appearing on the reverse of the notes or in the indenture is completed and delivered by the transferor to the trustee; and

 (c) each New Note will contain a legend substantially to the following effect:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE (THE "RESALE RESTRICTION TERMINATION DATE") THAT IS ONE YEAR (OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THEREUNDER) AFTER THE LATER OF THE FINAL SETTLEMENT DATE AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY), ONLY (A) TO THE ISSUERS OR ANY SUBSIDIARY OF THE ISSUERS, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO OFFERS AND SALES TO NON-U.S. PERSONS THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, OR (E) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUERS' AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (D) OR (E) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/ OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM. THIS LEGEND WILL BE REMOVED UPON THE

REQUEST OF THE HOLDER OR THE ISSUER ON OR AFTER THE RESALE
RESTRICTION TERMINATION DATE.

(7)     Each Eligible Holder represents that either (i) no portion of the assets used by it to acquire or hold
the New Notes constitutes assets of any employee benefit plan that is subject to Title I of the
United States Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), any
plan, individual retirement account or other arrangement that is subject to Section 4975 of the
United States Internal Revenue Code of 1986, as amended (the "**Code**") or provision under any
federal, state, local, non-U.S. or other laws, rules or regulations that are similar to such provisions
or ERISA or the Code (collectively, "**Similar Laws**") or entity whose underlying assets are
considered to include "plan assets" of any such plan, account or arrangement or (ii) the purchase
and holding of the New Notes will not constitute a non-exempt prohibited transaction under
Section 406 of ERISA or Section 4975 of the Code or a violation under any applicable Similar
Laws.

(8)     Each Eligible Holder acknowledge that we, the Dealer Manager and others will rely upon the truth
and accuracy of the above acknowledgments, representations and agreements. Each Eligible
Holder agrees that if any of the acknowledgments, representations or agreements it is deemed to
have made by your purchase of notes is no longer accurate, it will promptly notify us and the
Dealer Manager. If an Eligible Holder is purchasing any notes as a fiduciary or agent for one or
more investor accounts, it represents that it have sole investment discretion with respect to each of
those accounts and that it has full power to make the above acknowledgments, representations and
agreements on behalf of each account.

(9)     The New Notes will be available initially only in book-entry form. The New Notes will be issued
in the form of one or more global notes bearing legends substantially similar to those set forth
above.

(10)    It agrees that it will give to each person to whom it transfers the New Notes, notice of any
restrictions on transfer of the New Notes.

(11)    If it is an acquirer in a transaction that occurs outside the U.S. within the meaning of Regulations
S, it acknowledges that until the expiration of the applicable 40-day Resale Restriction Period
described in paragraph (6)(a) above, any offer or sale of the New Notes within the U.S. by a dealer
(whether or not participating in the offering) may violate the registration requirements of the
Securities Act if such offer or sale is made otherwise than in accordance with Rule 144A.

(12)    It acknowledges that the transfer agent will not be required to accept for registration of transfer
any New Notes except upon presentation of evidence satisfactory to us and the trustee that the
restrictions set out therein have been complied with.

(13)    It understands that no action has been taken in any jurisdiction in the U.S. or elsewhere by the
Company, the co-issuer, the guarantors of the New Notes or the Dealer Manager that would result
in a public offering of the New Notes or the possession, circulation or distribution of this Offering
Memorandum or any other material relating to us or the New Notes in any jurisdiction where
action for such purpose is required. Consequently, any transfer of the New Notes will be subject to
the transfer restrictions set forth under this "Transfer Restrictions" section.

(14)    It acknowledges that the Company, the guarantors of the New Notes, the Dealer Manager and
others will rely upon the truth and accuracy of the foregoing acknowledgements, representations,
warranties and agreements and agrees that if any of the acknowledgements, representations,
warranties and agreements deemed to have been made by its purchase of the New Notes are no
longer accurate, it shall promptly notify the Company and the Dealer Manager. If it is acquiring
any New Notes as a fiduciary or agent for one or more investor accounts, it represents that it has
sole investment discretion with respect to each such investor account and that it has full power to

make the foregoing acknowledgements, representations and agreements on behalf of each such investor account.

(15)     It (a) is able to act on its own behalf in the transactions contemplated by this Offering Memorandum, (b) has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its prospective investment in the New Notes and its prospective participation in the Exchange Offers and (c) (or the account for which it is acting) has the ability to bear the economic risks of its prospective investment in the New Notes and its prospective participation in the Exchange Offers, and can afford the complete loss of such investment.

### MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS

The following is a summary of certain U.S. federal income tax considerations relating to the Exchange Offers but does not purport to be a complete analysis of all potential tax considerations. This summary is based on the provisions of the United States Internal Revenue Code of 1986, as amended (the "**Code**"), the Treasury regulations promulgated thereunder, judicial authority, published administrative positions of the IRS and other applicable authorities, all as in effect as of the date of this document, and all of which are subject to change. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the United States federal income tax considerations discussed below. We have not obtained, nor do we intend to obtain, a ruling from the U.S. Internal Revenue Service (the "**IRS**") with respect to the statements made and the conclusions reached in the following summary, and there can be no assurance that the IRS will not challenge any of the conclusions set forth herein.

This summary assumes that holders hold their Old Notes as "capital assets" within the meaning of section 1221 of the Code (generally, property held for investment). This summary is general in nature and does not purport to deal with all aspects of United States federal income taxation or other tax considerations that might be relevant to particular holders in light of their personal investment circumstances or status, nor does it address tax considerations applicable to holders that may be subject to special tax rules, such as certain financial institutions, individual retirement and other tax-deferred accounts, tax-exempt organizations, S corporations, partnerships or other pass-through entities for United States federal income tax purposes or investors in such entities, insurance companies, regulated investment companies, real estate investment trusts, broker-dealers, dealers or traders in currencies or securities that use a mark-to-market method of tax accounting, certain former citizens or residents of the United States, governments and their controlled entities, persons subject to the personal holding company or accumulated earnings rules, taxpayers subject to the anti-inversion rules, and taxpayers subject to the alternative minimum tax. This summary also does not discuss notes held as part of a hedge, straddle, synthetic security or other integrated transaction, or situations in which the "functional currency" of a U.S. Holder (as defined below) is not the United States dollar. Moreover, this summary also does not discuss any consequences resulting from the Medicare tax on net investment income or the effect of any applicable federal estate or gift, state, local or non-United States tax laws.

In the case of notes held by an entity that is classified as a partnership for United States federal income tax purposes, the tax treatment of the notes to a partner in the partnership generally will depend upon the tax status of the partner and the activities of the partner and the partnership. If you are a partnership or a partner in a partnership holding notes, then you (and your partners) should consult your own tax advisors regarding the tax consequences relating to the Exchange Offers.

**THE FOLLOWING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE APPLICATION OF THE U.S. FEDERAL INCOME TAX LAWS TO THE EXCHANGE OFFERS IN LIGHT OF THEIR PARTICULAR SITUATIONS, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER OTHER U.S. FEDERAL TAX LAWS OR THE LAWS OF ANY STATE, LOCAL OR NON-UNITED STATES TAXING JURISDICTION OR UNDER ANY APPLICABLE TAX TREATY.**

### Effect of Certain Contingencies on the New Notes

In certain circumstances (e.g., in the case of a change in control) we may be obligated to pay amounts in excess of stated interest or principal on the New Notes. Our obligation to pay such excess amounts may implicate the provisions of the Treasury regulations relating to "contingent payment debt obligations," in which case the timing and amount of income inclusions and the character of income recognized may be different from the consequences described herein. Under these regulations, however, one or more contingencies will not cause a debt instrument to be treated as a contingent payment debt instrument if, as of the issue date, such contingencies in the aggregate are considered "remote" or "incidental."

Although the issue is not free from doubt, we believe and intend to take the position that the foregoing contingencies should be treated as remote and/or incidental. Our position is binding on a holder, unless the holder discloses in the proper manner to the IRS that it is taking a different position. However, this determination is

inherently factual and we can give you no assurance that our position would be sustained if challenged by the IRS. A successful challenge of this position by the IRS could adversely affect the timing and amount of a holder's income with respect to the New Notes and could cause any gain from the sale or other disposition of a New Note to be treated as ordinary income, rather than capital gain. This summary assumes that the New Notes will not be considered contingent payment debt instruments. Holders are urged to consult their own tax advisors regarding the potential application to the New Notes of the contingent payment debt regulations and the consequences thereof.

**Tax Consequences to U.S. Holders**

For purposes of this discussion, a "**U.S. Holder**" is a beneficial owner of a Note that is for U.S. federal income tax purposes:

- an individual citizen or resident of the United States;

- a corporation created or organized under the laws of the United States or of any political subdivision thereof;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if (i) a court within the United States is able to exercise primary jurisdiction over its administration and one or more United States persons has the authority to control all of its substantial decisions, or (ii) a valid election is in place under applicable U.S. Treasury regulations to treat such trust as a domestic trust.

*Tax Consequences to U.S. Holders Who Do Not Participate in the Exchange Offers*

The Exchange Offers will not be a taxable event to a U.S. Holder for U.S. federal income tax purposes if such holder does not exchange any Old Notes in the Exchange Offers. Upon consummation of the Exchange Offers, such U.S. Holder will have the same adjusted tax basis and accrued market discount (if any) in, and holding period for, the Old Notes held by such holder as such holder had immediately prior to the Exchange Offers.

*Tax Consequences to U.S. Holders Who Participate in the Exchange Offers*

The U.S. federal income tax consequences of the exchange will depend in part on whether the differences in the terms of the New Notes as compared to the Old Notes being exchanged therefor constitute a "significant modification" of the outstanding notes for U.S. federal income tax purposes. Under applicable Treasury regulations, the modification of a debt instrument (including any exchange of debt instruments) generally is a significant modification if, based on the facts and circumstances and taking into account all modifications of the debt instrument collectively, the legal rights or obligations that are altered and the degree to which they are altered are "economically significant." Notwithstanding this general rule, the Treasury regulations provide that a modification that results in an increase in the yield of a debt instrument that is greater than a specified threshold is a significant modification. Based on the change of yield, we expect the exchange to be treated as a significant modification.

A U.S. Holder will generally recognize gain or loss upon the exchange of the Old Notes for the New Notes unless the exchange qualifies as a recapitalization for U.S. federal income tax purposes. If the exchange fails to qualify as a recapitalization, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between the amount realized on the exchange and the U.S. Holder's adjusted tax basis in the Old Notes. The amount realized will be equal to the issue price of the New Notes (as discussed below in "Ownership of the New Notes—Issue Price"). For these purposes, the amount realized does not include any amount attributable to accrued interest on the Old Notes that has not previously been included in income. A U.S. Holder's holding period for its New Notes would commence on the date immediately following the date of the exchange. The U.S. Holder's initial tax basis in its New Notes would be the issue price of the New Notes received. Any such gain (except to the extent treated as ordinary income under the market discount rules) generally would be capital gain and would be long-term capital gain if the U.S. Holder has held the Old Notes for more than one year on the date of the exchange. If the exchange is treated as a wash sale within the meaning of section 1091 of the Code, a U.S. Holder would not be allowed to

currently recognize any loss resulting from the exchange. Instead, such loss would be deferred, and would be reflected as an increase in the basis of the New Notes. U.S. Holders should consult their own advisers regarding whether any such exchange may be subject to the wash sale rules.

The exchange will qualify as a recapitalization for U.S. federal income tax purposes if both the Old Notes and the New Notes are treated as "securities" for purposes of the provisions of the Code governing reorganizations. Neither the Code nor the Treasury regulations defines the term "security" and whether the Old Notes or the New Notes qualify as "securities" will depend on the terms and conditions of, and other facts and circumstances relating to the Old Notes and the New Notes and upon the application of numerous judicial decisions. Most authorities have held that the term to maturity of a debt instrument is one of the most significant factors. In this regard, debt instruments with a term of ten years or more generally have qualified as securities, whereas debt instruments with a term of less than five years generally have not qualified as securities. Certain authorities suggest that, for purposes of determining whether a debt instrument issued pursuant to a significant modification qualifies as a security, the term to maturity such newly issued debt instrument may be determined by reference to the issue date of the exchanged debt (rather than the issue date of the newly issued debt) as long as such newly issued debt has substantially the same terms as the exchanged debt. Although the issue is not free from doubt, we intend to take the position that all of the Old Notes and New Notes will be treated as securities for U.S. federal income tax purposes, and that the exchange of the Old Notes for the New Notes will thus be treated as a recapitalization.

If the exchange is treated as a recapitalization, then a U.S. Holder may recognize gain (but not loss) with respect to the exchange. Any such recognized gain will generally equal the lesser of (i) the amount of gain realized on the exchange (computed in the manner described above with respect to the treatment of the exchange if such exchange fails to qualify as a recapitalization) and (ii) an amount equal to the fair market value of the excess of (a) the principal amount of the New Notes over (b) the principal amount of the Old Notes exchanged therefor (such amount, the "**excess principal amount**") (excluding any amounts attributable to accrued and unpaid interest on the Old Notes). In general, a U.S. Holder would obtain a tax basis for the portion of its New Notes received that corresponds to the excess principal amount received equal to the fair market value of such notes and a tax basis for the remainder of the New Notes received equal to its adjusted tax basis in the Old Notes surrendered, increased by the gain recognized on the exchange and decreased by the excess principal amount (excluding any amounts attributable to accrued and unpaid interest on the outstanding notes). A U.S. Holder's holding period for the portion of such New Notes that corresponds to the excess principal amount received would commence on the date immediately following the date of the exchange and such holder's holding period for the remainder of the New Notes received would include the holding period of the Old Notes exchanged therefor. In addition, any accrued market discount on such Old Notes that was not previously included in income will generally carry over to the New Notes and the New Notes received would also be treated as acquired at a market discount if the stated principal amount of the New Notes exceeds the U.S. Holder's initial tax basis for such New Notes by more than a *de minimis* amount. See "Ownership of the New Notes by U.S. Holders—Market Discount," below. U.S. Holders who acquired their Old Notes other than at original issuance should consult their tax advisors regarding the possible application of the market discount rules to an exchange of Old Notes pursuant to the Exchange Offers.

*Ownership of the New Notes by U.S. Holders*

Issue Price. If there has been a significant modification of the Old Notes, the "issue price" of the New Notes will be the fair market value of the New Notes on the date of the exchange (reduced by the amount of any pre-acquisition accrued interest, as described under "Pre-Acquisition Accrued Interest," below) if such New Notes are considered to be "traded on an established market" within the meaning of the applicable Treasury regulations. It is expected that the New Notes will be considered traded on an established market for U.S. federal income tax purposes.

Payments of Interest. Stated interest paid on the New Notes (other than any portion of the first interest payment treated as a return of pre-acquisition accrued interest, as described under "Pre-Acquisition Accrued Interest," below) will be taxable to a U.S. Holder as ordinary interest income at the time it accrues or is received in accordance with the U.S. Holder's method of accounting for U.S. federal income tax purposes.

Pre-Acquisition Accrued Interest. If a U.S. Holder receives New Notes, a portion of the New Notes received may be allocable to interest that accrued prior to the date such New Notes are received (the "**pre-**

**acquisition accrued interest**"). A U.S. Holder may take the position that, on the first interest payment date, a portion of the interest received on the New Notes in an amount equal to the pre-acquisition accrued interest should be treated as a return of the pre-acquisition accrued interest and not as a payment of interest on the New Notes. Amounts treated as a return of pre-acquisition accrued interest should not be taxable when received. It is not clear in such instance whether to exclude the amount attributable to pre-acquisition accrued interest from a U.S. Holder's basis, or to reduce a U.S. Holder's basis by the amount of pre-acquisition accrued interest when it is received.

OID. If, as is expected, the issue price of the New Notes is less than the stated principal amount of the New Notes by an amount equal to or greater than a statutorily-defined de minimis amount, then the New Notes will be treated as issued with "original issue discount" ("**OID**"). If the New Notes are treated as issued with OID, then, subject to the discussion of amortizable bond premium below, a U.S. Holder of such New Notes would be required to include such OID in gross income as ordinary income as such OID accrues on a constant yield basis over the term of the New Notes, in advance of the receipt of cash payments attributable to such gross income and regardless of the U.S. Holder's regular method of tax accounting. U.S. Holders are urged to consult their tax advisers with regard to OID and the consequences of New Notes being treated as issued with OID in their particular situations.

A U.S. Holder may make an election to include in income all interest that accrues on the New Notes (including stated interest, acquisition discount, OID, *de minimis* OID, market discount, *de minimis* market discount, and unstated interest, as adjusted by any amortizable bond premium or acquisition premium) in accordance with a constant-yield method based on the compounding of interest.

Applicable High Yield Discount Obligation. The New Notes may be considered "applicable high yield discount obligations" for U.S. federal income tax purposes. In such case, we will not be permitted to deduct for U.S. federal income tax purposes OID accrued on the notes until such time as we actually pay such OID in cash or in property other than our stock or our debt (or stock or debt of a person related to us). Moreover, if the amount of the OID exceeds a certain threshold amount, such amount (the "**dividend-equivalent amount**") will not be deductible by us for U.S. federal income tax purposes at any time (regardless of whether we actually pay such amount in cash or other property).  Subject to limitations, a corporate U.S. Holder would be eligible for the dividends received deduction for the portion of the dividend-equivalent amount that would have been treated as a dividend had it been distributed by us with respect to our stock.

Market Discount. If a U.S. Holder's tax basis in the New Notes received in the exchange is less than the issue price of the New Notes, the amount of the difference will be treated as market discount for U.S. federal income tax purposes, unless this difference is less than a specified *de minimis* amount.

If the New Notes have market discount, a U.S. Holder generally will be required to treat any principal payment, any payment that is not stated interest or any gain on the sale or other taxable disposition of a New Note as ordinary income to the extent of the market discount accrued on the New Note at the time of the payment or disposition unless the U.S. Holder has previously included this market discount in income. If a U.S. Holder disposes of New Notes with respect to which there is market discount in one of certain nontaxable transactions, accrued market discount will be includible as ordinary income as if the U.S. Holder had sold such New Notes in a taxable transaction at their then fair market value.  In addition, a U.S. Holder may be required to defer, until the maturity of the New Notes or their earlier disposition (including in one of certain nontaxable transactions), the deduction of all or a portion of the interest expense on any indebtedness incurred or maintained to purchase or carry the New Notes.

Acquisition Premium. If a U.S. Holder's tax basis in the New Notes received in the exchange is greater than the issue price of the New Notes but less than or equal to the principal amount of the New Notes, the holder will be considered to have acquired the New Notes at an "acquisition premium." Under the acquisition premium rules, the amount of OID that the holder must include in gross income with respect to such New Notes for any taxable year will be reduced by the portion of acquisition premium properly allocable to that year.

Amortizable Bond Premium.  If, immediately after the exchange, a U.S. Holder has an adjusted tax basis in the New Notes in excess of the principal amount of such New Notes, such New Notes will be treated as issued with "bond premium." In this case, such holder would not be required to include any original issue discount in gross income in respect of the New Notes. In addition, subject to the limitation noted below, such U.S. Holder generally may elect to amortize such bond premium as an offset to cash interest on the New Note, using a constant yield

method prescribed under applicable Treasury regulations, over the remaining term of the New Notes. Because of the optional redemption feature of the New Notes, the value of the amortizable bond premium may be adversely affected. U.S. Holders should consult their tax advisors regarding the availability of an election to amortize bond premium for U.S. federal income tax purposes and the extent to which any amortization deductions may be deferred or limited because of our right to call the New Notes at a premium to their stated principal amount.

If a U.S. Holder elects to amortize bond premium, such holder must reduce its basis in the New Notes by the amount of the premium amortized. Once such holder makes an election to amortize bond premium for one taxable premium bond, the election applies to all taxable premium bonds owned by such holder during that tax year and all subsequent tax years. If a U.S. Holder makes a constant-yield election (as described under "OID," above) for New Notes with amortizable bond premium, that election will result in a deemed election to amortize bond premium for all of the U.S. Holder's debt instruments with amortizable bond premium, and may be revoked only with the permission of the IRS with respect to debt instruments acquired after revocation.

<u>Sale, Exchange or other Taxable Disposition of the New Notes.</u>  Upon the disposition of New Notes by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder will generally recognize taxable gain or loss equal to the difference between (i) the amount realized on the disposition (other than any amounts attributable to accrued but unpaid cash interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (ii) the U.S. Holder's adjusted tax basis in the New Notes immediately before the disposition. A U.S. Holder's adjusted tax basis generally will be equal to the holder's initial tax basis in the New Notes, increased by any market discount and OID previously included in such holder's gross income and decreased by any bond premium amortized by such holder with respect to the New Notes. Except to the extent of any accrued market discount on the New Notes (or carried over from the Old Notes) as described above under "Tax Consequences to U.S. Holders Who Participate in the Exchange Offers" and "Ownership of the New Notes by U.S. Holders—Market Discount," with respect to which any gain will be treated as ordinary income, a U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss to the extent the U.S. Holder's holding period for such New Note (including the holding period for the Old Notes exchanged therefor, in the case of that portion of the New Notes for which the holding period includes the holding period for the Old Notes) is more than one year. Such capital gain or loss will be short-term capital gain or loss to the extent the U.S. Holder's holding period for such New Note is one year or less. Certain non-corporate U.S. Holders are generally subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

*Information Reporting and Backup Withholding*

In general, information reporting will apply to the payment of stated interest and payments of the proceeds of the sale or other taxable disposition (including a retirement or redemption) of a note, as well as any OID, to U.S. Holders other than exempt recipients. Additionally, the payor of such payments (which may be us or an intermediate payor) may be required to impose backup withholding on such payments at a rate of 28% unless such U.S. Holder (i) is a corporation or comes within certain other exempt categories and demonstrates this fact, or (ii) provides a correct taxpayer identification number, certifies as to no loss of exemption from backup withholding and otherwise complies with applicable requirements of the backup withholding rules. Each U.S. Holder may provide its correct taxpayer identification number and certify that such U.S Holder is not subject to backup withholding by completing IRS Form W-9. Backup withholding is not an additional tax, the amount of any backup withholding from such payments may be allowed as a credit against such U.S. Holder's U.S. federal income tax liability and may entitle such U.S. Holder to a refund, provided that the required information is timely furnished to the IRS.

**Tax Consequences to Non-U.S. Holders**

For purposes of this discussion, the term "**Non-U.S. Holder**" means a beneficial owner of a note that is an individual, corporation, estate or trust and that is not a U.S. Holder.

*Tax Consequences to Non-U.S. Holders Who Do Not Participate in the Exchange Offers*

The Exchange Offers will not be a taxable event for U.S. federal income tax purposes to a Non-U.S. Holder that does not exchange any Old Notes in the Exchange Offers.

108

*Tax Consequences to Non-U.S. Holders Who Participate in the Exchange Offers*

A Non-U.S. Holder will generally not be subject to tax on any gain recognized on the exchange of Old Notes for New Notes except to the extent described below under "Ownership of the New Notes by Non-U.S. Holders—Sale, Exchange or Other Taxable Disposition of the New Notes," treating the reference therein to the New Notes as a reference to the Old Notes. Amounts attributable to accrued but unpaid interest on the Old Notes will be treated as ordinary interest income and will generally be subject to the rules described below under "Ownership of the New Notes by Non-U.S. Holders—Payments on the New Notes," treating the reference therein to the New Notes as a reference to the Old Notes.

*Ownership of the New Notes by Non-U.S. Holders*

Payments on the New Notes. Subject to the discussions of backup withholding and FATCA below, payments of principal and interest (including OID) to a Non-U.S. Holder that are not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax, provided that, in the case of interest (including OID):

- the Non-U.S. Holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of our stock entitled to vote;

- the Non-U.S. Holder is not a "controlled foreign corporation" related to us, actually or constructively through stock ownership;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the Non-U.S. Holder provides an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If a Non-U.S. Holder does not qualify for an exemption from withholding tax under the preceding paragraph, interest (including OID) on the New Notes paid to a Non-U.S. Holder, which interest (including OID) is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder, will generally be subject to withholding of U.S. federal income tax at a 30% rate unless reduced under an applicable income tax treaty and the Non-U.S. Holder claims the benefit of that treaty by providing an applicable IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.

If interest (including OID) paid to a Non-U.S. Holder on a New Note, or any gain recognized by a Non-U.S. Holder on an exchange of the New Notes, is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment in the United States to which such amounts are attributable), then the Non-U.S. Holder will be subject to U.S. federal income tax on such amounts generally in the same manner as if such Non-U.S. Holder were a U.S. Holder. In addition, if the Non-U.S. Holder is treated as a corporation for U.S. federal income tax purposes, the Non-U.S. Holder may be subject to a branch profits tax on its effectively connected earnings and profits, subject to adjustments, at a rate of 30% (or such lower rate specified by an applicable income tax treaty).

Sale, Exchange or Other Taxable Disposition of the New Notes. Subject to the discussions of backup withholding and FATCA below, a Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption or other taxable disposition of New Notes (other than any amount representing accrued but unpaid interest on the New Note, which is subject to the rules discussed above under "Ownership of the New Notes by Non-U.S. Holders—Payments on the New Notes") unless:

- the gain is effectively connected with the conduct of a trade or business within the U.S. by the Non-U.S. Holder, or

- in the case of a Non-U.S. Holder who is a nonresident alien individual, such holder is present in the United States for 183 or more days in the taxable year and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, then unless an applicable income tax treaty provides otherwise, the holder will be taxed on the net gain derived from the disposition of the New Notes under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above.

If an individual Non-U.S. Holder falls under the second of these exceptions, the holder generally will be subject to U.S. federal income tax at a rate of 30% (unless a lower applicable treaty rate applies) on the amount by which the gain derived from the disposition exceeds such holder's capital losses allocable to sources within the United States for the taxable year of the sale or disposition.

*Information Reporting and Backup Withholding*

The amount of interest on a New Note paid to a Non-U.S. Holder and the amount of tax, if any, withheld from such payment generally must be reported annually to the Non-U.S. Holder and to the IRS. The IRS may make this information available under the provisions of an applicable income tax treaty to the tax authorities in the country in which the Non-U.S. Holder is resident.

Provided that a Non-U.S. Holder has complied with certain reporting procedures (usually satisfied by providing an applicable properly completed IRS Form W-8BEN or IRS Form W-8BEN-E) or otherwise establishes an exemption, the Non-U.S. Holder generally will not be subject to backup withholding tax with respect to interest payments on, and the proceeds from a disposition of, a New Note, unless we or our paying agent know or have reason to know that the holder is a U.S. person. Rules relating to information reporting requirements and backup withholding with respect to the payment of proceeds from the taxable disposition (including a redemption or retirement) of a New Note are as follows:

- If the proceeds are paid to or through the United States office of a broker, a Non-U.S. Holder generally will be subject to backup withholding and information reporting unless the Non-U.S. Holder certifies under penalties of perjury that it is not a U.S. person (usually on an IRS Form W-8BEN or W-8BEN-E) or otherwise establishes an exemption.

- If the proceeds are paid to or through a non-U.S. office of a broker that is not a U.S. person and does not have certain specified U.S. connections (a "**U.S. Related Person**"), a Non-U.S. Holder will not be subject to backup withholding or information reporting.

- If the proceeds are paid to or through a non-U.S. office of a broker that is a U.S. person or a U.S. Related Person, a Non-U.S. Holder generally will be subject to information reporting (but generally not backup withholding) unless the Non-U.S. Holder certifies under penalties of perjury that it is not a U.S. person (usually on an IRS Form W-8BEN or W-8BEN-E) or otherwise establishes an exemption.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability, if any, and may entitle the Non-U.S. Holder to a refund, provided that the required information is timely furnished to the IRS. Non-U.S. Holders should consult their own tax advisors regarding the application of the backup withholding rules in their particular circumstances and the availability of, and procedure for, obtaining an exemption from backup withholding under current Treasury regulations.

# FATCA

Under sections 1471 to 1474 of the Code (commonly referred to as "**FATCA**"), U.S. federal withholding tax of 30% is generally imposed on interest income (including any OID) paid on a debt obligation issued by a United States corporation and, on or after January 1, 2019, on the gross proceeds paid from the sale or other disposition of such a debt obligation, to (i) a foreign financial institution (as the beneficial owner or as an intermediary for the beneficial owner), unless such institution (a) enters into, and is in compliance with, a withholding and information reporting agreement with the U.S. government to collect and provide to the U.S. tax authorities substantial information regarding U.S. account holders of such institution (which would include certain

equity and debt holders of such institution, as well as certain account holders that are foreign entities with U.S. owners) or (b) is a resident in a country that has entered into an intergovernmental agreement with the United States in relation to such withholding and information reporting and the financial institution complies with the related information reporting requirements of such country or (ii) a foreign entity that is not a financial institution (as the beneficial owner or as an intermediary for the beneficial owner), unless such entity provides the withholding agent with a certification identifying the substantial United States owners of the entity, which generally includes any United States person who directly or indirectly owns more than 10% of the entity, or such entity otherwise qualifies for an exemption from these rules. An intergovernmental agreement between the United States and the applicable foreign country, or future U.S. Treasury regulations or other guidance, may modify these requirements.

Under applicable U.S. Treasury regulations, this withholding tax generally does not apply to a debt obligation outstanding on July 1, 2014 (a "**grandfathered obligation**"), unless such debt obligation undergoes a significant modification on or after such date. Because the Old Notes were outstanding on July 1, 2014, the Company intends to take the position that the Old Notes are grandfathered obligations for purposes of FATCA and therefore that withholding tax under FATCA will not apply to payments of accrued but unpaid interest on the Old Notes in connection with the Exchange Offers.

Withholding under FATCA generally will apply to payments of interest (including OID) on a New Note regardless of when such payments are made. However, withholding under FATCA generally will only apply to payments of gross proceeds from the sale or other disposition of a New Note if such sale or other disposition occurs on or after January 1, 2019. Holders should consult with their own tax advisors regarding the application of FATCA to their investment in the New Notes.

## CERTAIN ERISA CONSIDERATIONS

The following is a summary of certain considerations associated with the acquisition of the New Notes by employee benefit plans that are subject to Title I of the U.S. Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), plans, individual retirement accounts and other arrangements that are subject to Section 4975 of the Code or provisions under any federal, state, local, non-U.S. or other laws or regulations that are similar to such provisions of the Code or ERISA (collectively, "**Similar Laws**"), and entities whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each, a "**Plan**").

### General Fiduciary Matters

ERISA and the Code impose certain duties on persons who are fiduciaries of a Plan subject to Title I of ERISA or Section 4975 of the Code (an "**ERISA Plan**") and prohibit certain transactions involving the assets of an ERISA Plan and its fiduciaries or other interested parties. Under ERISA and the Code, any person who exercises any discretionary authority or control over the administration of such an ERISA Plan or the management or disposition of the assets of such an ERISA Plan, or who renders investment advice for a fee or other compensation to such an ERISA Plan, is generally considered to be a fiduciary of the ERISA Plan.

In considering an exchange of and the acquisition and/or holding of a portion of the assets of any Plan, a fiduciary should determine whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA, the Code or any Similar Law relating to a fiduciary's duties to the Plan including, without limitation, the prudence, diversification, delegation of control and prohibited transaction provisions of ERISA, the Code and any other applicable Similar Laws.

### Prohibited Transaction Issues

Section 406 of ERISA and Section 4975 of the Code prohibit ERISA Plans from engaging in specified transactions involving "plan assets" with persons or entities who are "parties in interest," within the meaning of ERISA, or "disqualified persons," within the meaning of Section 4975 of the Code, unless an exemption is available. A party in interest or disqualified person who engaged in a non-exempt prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code. In addition, the fiduciary of the ERISA Plan that engaged in such a non-exempt prohibited transaction may be subject to penalties and liabilities under ERISA and the Code. The acquisition and/or holding of New Notes by an ERISA Plan with respect to which the Company, the guarantors of the New Notes or the Dealer Manager is considered a party in interest or a disqualified person may constitute or result in a direct or indirect prohibited transaction under Section 406 of ERISA and/or Section 4975 of the Code, unless the investment is acquired and is held in accordance with an applicable statutory, class or individual prohibited transaction exemption. In this regard, the U.S. Department of Labor has issued prohibited transaction class exemptions, or "**PTCEs**," that may apply to the acquisition and holding of the New Notes. These class exemptions include, without limitation, PTCE 84-14 respecting transactions determined by independent qualified professional asset managers, PTCE 90-1 respecting insurance company pooled separate accounts, PTCE 91-38 respecting bank collective investment funds, PTCE 95-60 respecting life insurance company general accounts and PTCE 96-23 respecting transactions determined by in-house asset managers. In addition, Section 408(b)(17) of ERISA and Section 4975(d)(20) of the Code provide relief from the prohibited transaction provisions of ERISA and Section 4975 of the Code for certain transactions, provided that neither the issuer of the securities nor any of its affiliates (directly or indirectly) have or exercise any discretionary authority or control or render any investment advice with respect to the assets of any ERISA Plan involved in the transaction and provided further that the ERISA Plan pays no more than adequate consideration in connection with the transaction. Each of the above-noted exemptions contains conditions and limitations on its application. Fiduciaries of ERISA Plans considering acquiring and/or holding the New Notes in reliance of these or any other exemption should carefully review the exemption to assure it is applicable. There can be no assurance that all of the conditions of any such exemptions will be satisfied.

The foregoing discussion is general in nature and is not intended to be all inclusive. Due to the complexity of these rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is particularly important that fiduciaries, or other persons considering acquiring the New Notes on behalf of, or with the assets of, any Plan, consult with their counsel regarding the potential applicability of ERISA, Section 4975 of the

Code and any Similar Laws to such investment and whether an exemption would be applicable to the acquisition, transfer and holding of the New Notes.

Because of the foregoing, the New Notes should not be acquired, transferred to or held by any person investing "plan assets" of any Plan, unless such acquisition, transfer and holding will not constitute a non-exempt prohibited transaction under ERISA and the Code or a similar violation of any applicable Similar Laws.

**Representation**

By acceptance of a New Note (or an interest therein), each Eligible Holder and subsequent transferee of a New Note will be deemed to have represented and warranted that either (i) no portion of the assets used by it to acquire or hold the New Notes constitutes assets of any employee benefit plan that is subject to Title I of ERISA, any plan, individual retirement account or other arrangement that is subject to Section 4975 of the Code or provision under any Similar Laws or entity whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement or (ii) the purchase and holding of the New Notes by such Eligible Holder or transferee will not constitute a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or a violation under any applicable Similar Laws.

## LEGAL MATTERS

Certain legal matters with respect to the New Notes we are offering will be passed upon for us by Kirkland & Ellis LLP, New York, New York. Certain legal matters will be passed upon for the Dealer Manager by Davis Polk & Wardwell LLP, New York, New York.

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The financial statements incorporated in this Offering Memorandum by reference to the Annual Report on Form 10-K for the year ended December 31, 2016, and the effectiveness of internal control over financial reporting as of December 31, 2016 have been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report incorporated herein.

## WHERE YOU CAN FIND MORE INFORMATION

While any of the New Notes are outstanding, we will make available to the holders or prospective purchasers the information required by Rule 144A(d)(4) under the Securities Act during any period we are not subject to Section 13 or 15(d) of the Exchange Act.

Windstream Services, LLC (the "Company") files annual, quarterly and current reports, proxy statements and other information with the SEC. Such reports and other information (including the documents incorporated by reference into this Offering Memorandum) may be inspected and copied at the SEC's Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. The Company's filings with the SEC are also available at www.sec.gov. Except as indicated below, information on this website is not and should not be considered part of this Offering Memorandum and is not incorporated by reference herein.

The following documents have been filed by the Company with the SEC and are incorporated herein by reference (in each case excluding any information furnished but not filed):

- Annual Report on Form 10-K for the fiscal year ended December 31, 2016, as filed on March 1, 2017;

- Quarterly Reports on Form 10-Q for the periods ending March 31, 2017 and June 30, 2017, as filed on May 8, 2017 and August 3, 2017, respectively; and

- Current Reports on Form 8-K or 8-K/A, as applicable, as filed on February 17, 2017, February 27, 2017 (excluding Item 7.01 thereof), March 1, 2017, March 2, 2017, July 28, 2017 (excluding Item 7.01 thereof), and September 1, 2017.

The Company's Current Report on Form 8-K, as filed on October 31, 2017 (including Item 7.01 thereof), is also incorporated by reference herein.

All documents subsequently filed by us with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, prior to the expiration or termination of the Exchange Offers shall be deemed to be incorporated by reference into this Offering Memorandum and to be a part hereof. Any statement contained in this Offering Memorandum or in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of the Exchange Offers to the extent that a statement contained herein or in any other subsequently filed document, which also is, or is deemed to be, incorporated by reference herein, modifies or supersedes any such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Offering Memorandum.

The Information Agent will provide without charge to each Holder to whom this Offering Memorandum is delivered, upon the written or verbal request of such Holder, a copy of any and all documents incorporated by reference into this Offering Memorandum, other than exhibits to such documents (unless such exhibits are

specifically incorporated by reference into such documents).  Requests for such documents should be directed to the Information Agent at its address and telephone number set forth on the back cover of this Offering Memorandum.

---

*The Exchange Agent for the Exchange Offers is:*

# Global Bondholder Services Corporation

*By Regular, Registered or Certified Mail, By Overnight Courier or By Hand*

65 Broadway - Suite 404
New York, New York 10006
Attention: Corporate Actions

By Facsimile
(For Eligible Institutions only)
(212) 430-3775
Attention: Corporate Actions

Banks and Brokers Call:
(212) 430-3774

All Others Call Toll Free:
(866) 807-2200

Any questions or requests for assistance may be directed to the Dealer Manager or the Information Agent at the addresses and telephone numbers set forth below. Requests for additional copies of this Offering Memorandum and the Letter of Transmittal may be directed to the Information Agent. Eligible Holders should also contact their broker, dealer, commercial bank, trust company or other nominee for assistance concerning the Exchange Offers.

*The Information Agent for the Exchange Offers is:*

# Global Bondholder Services Corporation

65 Broadway – Suite 404
New York, New York 10006
Attention: Corporate Actions

Banks and Brokers call: (212) 430-3774
All others call toll free: (866) 807-2200
Email: contact@gbsc-usa.com

By Facsimile
(For Eligible Institutions only)
(212) 430-3775
Attention: Corporate Actions

*The Dealer Manager for the Exchange Offers is:*

**Citigroup Global Markets Inc.**
390 Greenwich Street, 1st Floor
New York, New York 10013
Collect: (212) 723-6106
Toll-Free: (800) 558-3745
Attention: Liability Management Group

115