UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

U.S. BANK NATIONAL ASSOCIATION, solely in its
capacity as indenture trustee of Windstream Services,
LLC's 6 3/8% Senior Notes due 2023,

                    Plaintiff and Counterclaim
                    Defendant,

     vs.

WINDSTREAM SERVICES, LLC,

                    Defendant, Counterclaim Plaintiff,
                    and Counterclaim Defendant,

     vs.

AURELIUS CAPITAL MASTER, LTD.,

                    Counterclaim Defendant and
                    Counterclaim Plaintiff.

------------------------------------------------------------------------x

17 Civ. 7857 (JMF)

**ANSWER OF COUNTERCLAIM DEFENDANT AURELIUS
CAPITAL MASTER, LTD., TO AMENDED COUNTERCLAIMS
OF DEFENDANT WINDSTREAM SERVICES, LLC; AND AMENDED
COUNTERCLAIMS OF AURELIUS CAPITAL MASTER, LTD., AGAINST
<u>WINDSTREAM SERVICES, LLC</u>**

          Counterclaim Defendant and Counterclaim Plaintiff Aurelius Capital Master, Ltd.

("Aurelius"), by and through its undersigned attorneys, for its answer to the Amended

Counterclaims (the "Counterclaims") of Defendant, Counterclaim Plaintiff and Counterclaim

Defendant Windstream Services, LLC ("Services"), states:

<u>PRELIMINARY STATEMENT</u>

          Counterclaim Paragraph 1:    On September 29, 2017, Services initiated an action

against US Bank in Delaware Chancery Court (*Windstream Services, LLC v. U.S. Bank National

Association*, C.A. No. 2017- 0693 (Del. Ch.)) (the "Delaware Action").  The Delaware Action

involved the same facts and circumstances as the claims in this action, and Services sought the same relief in the Delaware Action that it seeks here -- a declaration that Aurelius's attempt to manufacture an Event of Default, and to roil the Company, is baseless and meritless.  As pure gamesmanship, US Bank (directed by Aurelius) moved to dismiss the Delaware Action based on a purported lack of personal jurisdiction, and then brought this action, which is simply a mirror image of the claims asserted by Services in the Delaware Action.

**Answer to Counterclaim Paragraph 1:  Aurelius denies the allegations of Paragraph 1, except admits that on September 29, 2017, Services filed an action against U.S. Bank National Association ("U.S. Bank"), solely in U.S. Bank's capacity as Trustee for Services' 6-3/8% Senior Notes due 2023 ("Notes"), in the Chancery Court of the State of Delaware, titled *Windstream Services, LLC v. U.S. Bank National Association*, C.A. No. 2017-0693 (Del. Ch.) (ITJ) (the "Delaware Action"); that on October 4, 2017, U.S. Bank removed the Delaware Action to the U.S. District Court for the District of Delaware; and that on October 4, 2017, U.S. Bank filed a motion to dismiss the Delaware Action based on the absence of personal jurisdiction over U.S. Bank; and Aurelius respectfully refers the Court to the pleadings and motion papers in the Delaware Action for their full and accurate contents.**

Counterclaim Paragraph 2:  Services is not interested in games, but rather in bringing a swift end to the exploitative efforts to destroy Services' business.  Accordingly, Services, simultaneous with the assertion of its counterclaims here, dismissed the Delaware Action, and sought expedited relief from this Court to prevent US Bank and Aurelius from improperly declaring an Event of Default and causing immediate and irreparable harm to the

Company and all of its stakeholders.  However, the need for expedited relief, as discussed below, terminated as of November 7, 2017, when waivers of the purported Default became effective.

**Answer to Counterclaim Paragraph 2:  Aurelius denies the allegations of Paragraph 2, except admits that Services dismissed the Delaware Action; that Services asserted certain Counterclaims in this action; and that at one time Services purported to seek certain expedited relief.**

Counterclaim Paragraph 3:    Services must now address US Bank's disregard of the will of the majority of noteholders and its breach of the Indenture.  On October 18, in order to proactively seek resolution of the issues involved in this litigation and to counteract Aurelius's specious allegations (and to extend the Company's debt maturity profile), Services launched two separate, yet related transactions, debt exchanges (the "Exchange Offer") and consent solicitations (the "Consent Solicitations") with respect to the Company's senior notes, including the 6 3/8% senior notes due 2023 (the "6 3/8% Notes" or the "Notes") that are the subject of this matter.  Each Consent Solicitation with respect to a series of notes required consent from holders representing at least a majority of the outstanding principal amount of that series, and once effective, would waive the Default alleged in the purported notice of default issued by Aurelius on September 21.  On October 31, the Company learned that based on tenders of notes in the Exchange Offers and consents delivered in the Consent Solicitation for the Notes, upon early settlement of the Exchange Offers, holders representing the requisite percentage of the Notes needed to waive the defaults alleged in the purported notice of default would deliver consents.  And, following the successful Exchange Offers and Consent Solicitation for the Notes, US Bank, as Trustee, on November 6, authenticated and issued the New Notes, and Services and US Bank

executed the third supplemental indenture (the "Supplemental Indenture"), which gave effect to the waivers and consents for the 6 3/8% Notes and is binding on all noteholders.

**Answer to Counterclaim Paragraph 3:  Aurelius denies the allegations of Paragraph 3, except admits that Services launched certain Exchange Offers and Consent Solicitations, and that U.S. Bank authenticated the New Notes and executed the Supplemental Indenture, and Aurelius avers that the purported waivers and consents, and the Exchange Offers, Consent Solicitations, New Notes, and Supplemental Indenture, are not valid, and Aurelius respectfully refers the Court to the Exchange Offers, Consent Solicitations and Supplemental Indenture for their full and accurate contents.**

Counterclaim Paragraph 4:  As a direct consequence of the waivers and execution of the Supplemental Indenture, US Bank's claims here are mooted, and as Trustee, US Bank no longer has standing to assert claims that were unequivocally waived by the Supplemental Indenture.  Nonetheless, US Bank is willfully breaching the Indenture and Supplemental Indenture by continuing to prosecute this action.  As such, US Bank's claims must be dismissed and US Bank must now be liable for damages that flow from its breach of the Indenture.

**Answer to Counterclaim Paragraph 4:  Aurelius denies the allegations of Paragraph 4.**

Counterclaim Paragraph 5:  US Bank originally brought this action at the direction of noteholder Aurelius, which purported to be a holder of more than 25% of the Notes. With the advent of the waivers and execution of the Supplemental Indenture, Aurelius's direction is now void and the alleged Default is now, per the Supplemental Indenture executed by US Bank, deemed to be non-existent.  Yet, US Bank refuses to dismiss its claim for which it

has no contractual authority to maintain.  US Bank is accordingly in stark breach of its obligations under the Indenture.

**Answer to Counterclaim Paragraph 5:  Aurelius denies the allegations of Paragraph 5, except admits that Aurelius has given certain directions to U.S. Bank; that at the times when Aurelius has given directions to U.S. Bank, Aurelius was a holder of at least 25% of the notes; and that U.S. Bank has not dismissed its claims in this action.**

Counterclaim Paragraph 6:    Both US Bank and Aurelius were well aware that US Bank's claims would be mooted, and US Bank would no longer have standing to bring its claims, well before the Supplemental Indenture was executed and the waivers became effective. Rather than come into court and seek injunctive relief, which it had ample opportunity to pursue, Aurelius instead disseminated false letters to other noteholders in an effort to dissuade them from consenting to the Default waivers.  This effort by Aurelius failed and it lost the vote.  Yet, nevertheless, US Bank continues to follow Aurelius's instruction and has refused Services' demand that it dismiss its claims.

**Answer to Counterclaim Paragraph 6:  Aurelius denies the allegations of Paragraph 6, except denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6 concerning U.S. Bank, and Aurelius admits that Services claims that Services has obtained waivers of its default under the sale-leaseback covenant of the Indenture, and Aurelius further admits that U.S. Bank has not dismissed its claims in this action.**

### NATURE OF THE COUNTERCLAIMS

Counterclaim Paragraph 7:    This matter arises due to the opportunistic and improper actions of an activist hedge fund, Aurelius, which purported to call a default *more than*

*two years after the transactions* related to Services' spin-off in April 2015 of approximately 80% of the then- outstanding common stock of Uniti Group Inc. ("Uniti"[1], and collectively the "Spin-Off").   In the 29 months following those transactions, the Company never received any suggestion that the Spin-Off caused the Company to be in default of any provision of the Indenture.  But now, years after the Spin-Off, Aurelius has acquired a position in the Company's 6 3/8% Notes, and alleges that the Company has been in default of the Indenture since April 2015.  Upon information and belief, Aurelius acquired its position in the 6 3/8% Notes for the sole purpose of seeking to manufacture this alleged default, and declare that a credit event has occurred or is occurring, in order to collect a credit default swap payoff.[2]  Contrary to Aurelius's assertions, the Company is in compliance with the provisions of the Indenture.

**Answer to Counterclaim Paragraph 7 (and Footnotes 1 and 2 referenced therein and set forth below):  Aurelius denies the allegations of Paragraph 7 and Footnotes 1 and 2, except denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of the second sentence of Paragraph 7 and the first sentence of Footnote 2, and Aurelius admits that in 2015 Services entered into certain transactions with Communications Sales & Leasing, Inc. ("CSL"); that in 2016 CSL changed its name to Uniti Group Inc. ("Uniti"); that Uniti is a publicly traded REIT; that Aurelius holds certain of Services' 6-3/8% Notes; and that Aurelius delivered a Notice of Default to**

---

[1] Communications Sales & Leasing, Inc. changed its name to Uniti Group Inc. in 2016 and is referred to in this Complaint for convenience as "Uniti".  Uniti is a publicly-traded REIT.

[2] There are numerous rumors circulating in the debt markets regarding various positions that Aurelius has taken regarding the Company's debt, the equity of Windstream Holdings, Inc., the publicly-traded parent company of Services, and even the debt and equity of Uniti. While the Company cannot yet confirm all positions Aurelius may hold, suffice to say that Aurelius appears to be actively manipulating this situation and impacting debt and equity prices to the detriment of Windstream.

**Services on September 21, 2017, and Aurelius respectfully refers the Court to the Notice of Default and the Indenture for their full and accurate contents.**

Counterclaim Paragraph 8:    Services faced imminent, irreparable harm because Aurelius sent a letter dated September 21, 2017 (the "Letter" or the "September 21, 2017 Letter"), which purported to constitute a written notice of default.  Under the Indenture, a notice of default would trigger a 60-day grace or cure period after which the Trustee or holders of at least 25% in aggregate principal amount of outstanding 6 3/8% Notes could declare the principal amount of all outstanding 6 3/8% Notes to be immediately due and payable.

**Answer to Counterclaim Paragraph 8:  Aurelius denies the allegations of the first sentence of Paragraph 8, except admits that on September 21, 2017, Aurelius delivered a Notice of Default to Services.  Aurelius admits the allegations of the second sentence of Paragraph 8, and Aurelius respectfully refers the Court to the Notice of Default and the Indenture for their full and accurate contents.**

Counterclaim Paragraph 9:    Because Services has issued approximately $3 billion outstanding in bonds under the Indenture and other indentures with covenants identical in all material respects to the provisions of the Indenture allegedly violated, an Event of Default (as defined in the Indenture) and any acceleration of debt would threaten the very existence of the Company.  An Event of Default and acceleration of debt would likely force the Company into bankruptcy, resulting in harm both to the customers receiving necessary communications services from the Company and its subsidiaries and to the Company's approximately 13,000 employees.  An Event of Default and any acceleration of debt would further irreparably harm the Company by, among other things, preventing the Company from accessing the capital markets, increasing the Company's borrowing costs, damaging the Company's relationships

with vendors, bondholders, and other lenders, damaging the Company's credibility with customers, and impeding the Company's ability to run its business in the ordinary course and implement its strategic business plans.

**Answer to Counterclaim Paragraph 9:  Aurelius denies the allegations of Paragraph 9, except admits that Services has issued more than $2 billion in bonds under the Indenture and other indentures, and that the Indenture contains provisions concerning the occurrence of Events of Default and acceleration of debt.**

Counterclaim Paragraph 10:  Upon information and belief, Aurelius had bought 6 3/8% Notes to become a beneficial holder of more than 25% in aggregate principal amount of outstanding 6 3/8% Notes.  These acquisitions were undertaken by Aurelius for a single purpose: to profit under a series of credit default swaps Aurelius has also purchased to bet on the Company defaulting under the Indenture.  Even after numerous public filings and the publication of various materials before and since the completion of the Spin-Off, no holder of the 6 3/8% Notes had ever suggested a default for any reason from the time of the Spin-Off until Aurelius sent the Letter.

**Answer to Counterclaim Paragraph 10:  Aurelius denies the allegations of Paragraph 10, except denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of the last sentence of Paragraph 10, and admits that Aurelius is the beneficial holder of more than 25% of the principal amount of the Notes, and that Aurelius delivered a Notice of Default to Services on September 21, 2017.**

Counterclaim Paragraph 11:  Aurelius's September 21 Letter centers on Section 4.19 of the Indenture, which governs whether and when the Company may enter into a "Sale and Leaseback Transaction" (as defined in the Indenture).  Aurelius claims that in conjunction with

the Spin-Off, some of the Company's Restricted Subsidiaries (as defined in the Indenture) "transferred certain of their assets and then or thereafter leased those assets (or some part thereof)." This allegedly constitutes "a Sale and Leaseback Transaction on the part of the Restricted Subsidiaries." Aurelius then asserts that the Sale and Leaseback Transaction failed to comply with the requirements of Section 4.19 of the Indenture.

**Answer to Counterclaim Paragraph 11: Aurelius denies the allegations of Paragraph 11, except admits that the Indenture contains a Section 4.19 which concerns the right of Services to engage in Sale and Leaseback Transactions, as defined in the Indenture; that in the Notice of Default, Aurelius contended, among other things, that Services engaged in a Sale and Leaseback Transaction that failed to comply with the requirements of Section 4.19 of the Indenture; and that Paragraph 11 accurately quotes part of the Notice of Default, and Aurelius respectfully refers the Court to the Notice of Default for its full and accurate contents.**

Counterclaim Paragraph 12: The purported notice of default in the September 21 Letter is defective for a variety of reasons. First and foremost, the Spin-Off was not a Sale and Leaseback Transaction as defined by the Indenture. In contemporaneous transactions, Services and its Restricted Subsidiaries transferred the assets in question to Uniti, distributed approximately 80% of the then outstanding common stock of Uniti to Services' sole equity owner and parent company, Windstream Holdings, Inc. ("Holdings"), and Holdings then distributed the Uniti common stock to its stockholders on a pro rata basis. Each of these transactions was in full compliance with the Indenture.

**Answer to Counterclaim Paragraph 12: Aurelius denies the allegations of Paragraph 12, except admits that in 2015 Services and its restricted subsidiaries entered**

into certain transactions with Uniti and Holdings, which transactions are the subject of Aurelius's Notice of Default, dated September 21, 2017.

Counterclaim Paragraph 13: Following these transactions, *Holdings -- not Services or its Restricted Subsidiaries* -- leased the relevant assets from Uniti. Such an arrangement does not constitute a "Sale and Leaseback Transaction" under the Indenture because the entity that made the transfer (Services or a Restricted Subsidiary of Services) and the entity that leased the relevant assets (Holdings) are different entities. Indeed, Holdings is not subject to the covenants of the Indenture. Therefore, the transactions do not even implicate, let alone breach, Section 4.19 of the Indenture.

**Answer to Counterclaim Paragraph 13: Aurelius denies the allegations of Paragraph 13.**

Counterclaim Paragraph 14: The Indenture is a carefully negotiated document between sophisticated parties represented by experienced counsel, and the Indenture includes a precise definition of what constitutes a Sale and Leaseback Transaction:

> with respect to any Person, any transaction involving any of the assets or properties of such Person whether now owned or hereafter acquired, whereby such Person sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred.

**Answer to Counterclaim Paragraph 14: Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 14, except admits that Paragraph 14 accurately quotes the definition of the term "Sale and Leaseback Transaction" as set forth in Section 1.01 of the Indenture, and Aurelius respectfully refers the Court to the Indenture for its full and accurate contents.**

Counterclaim Paragraph 15: Person is defined in the Indenture as "any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated, organization, limited liability company or government or other entity."

**Answer to Counterclaim Paragraph 15: Aurelius denies the allegations of Paragraph 15, except admits that Paragraph 15 accurately quotes the definition of "Person" as set forth in Section 1.01 of the Indenture, and Aurelius respectfully refers the Court to the Indenture for its full and accurate contents.**

Counterclaim Paragraph 16: Critically, the definition of Person does not include parents, subsidiaries, affiliates, or any entities beyond the defined Person. In other words, under the Indenture, Services is one Person, each of the Restricted Subsidiaries of Services is a different Person, and Holdings is yet another Person. To implicate Section 4.19, a Sale and Lease Transaction must occur which requires that one Person transfer assets and that *same* Person lease assets back. Here, however, Services and its Restricted Subsidiaries transferred assets to Uniti. Holdings, a different Person from either Services or any of the Restricted Subsidiaries of Services, then leased assets from Uniti. That is not a "Sale and Leaseback Transaction" under the Indenture. Thus, Section 4.19 is not relevant.

**Answer to Counterclaim Paragraph 16: Aurelius denies the allegations of Paragraph 16, and respectfully refers the Court to the Indenture for its full and accurate contents.**

Counterclaim Paragraph 17: Services' corporate structure and the transaction undertaken in connection with the Spin-Off are common practice, particularly for corporations that are publicly-held and active in debt and equity markets. The negotiation of the Indenture involved parties experienced in the creation and structure of bond offerings, and each party was

represented by sophisticated counsel.  The parties did not bargain to prohibit the transaction at issue here -- if they had, the Indenture would have plainly prevented it.  Instead, US Bank needed to file a 40-page Complaint to explain its convoluted arguments as to why this structure should be considered prohibited under the Indenture.

**Answer to Counterclaim Paragraph 17:  Aurelius denies the allegations in the first and fourth sentences of Paragraph 17.  Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations in the second and third sentences of Paragraph 17.**

Counterclaim Paragraph 18:  Aurelius admits in the Letter that Services is not a signatory to the publicly-filed Master Lease dated April 24, 2015 (the "Master Lease") (Ex. B at p. 2, n. 1.), which governs the lease of the assets at issue.  The Master Lease was between Holdings and certain subsidiaries of Uniti.  Whether Services and its subsidiaries use the relevant assets is immaterial -- none of them "lease" those assets.  In addition, there is no "sub-lease" between Holdings and Services or any of its Restricted Subsidiaries.  Had the parties wished for the Sale and Leaseback Transaction definition to include the structure in place, they could have easily done so.  For example, the Indenture could have prohibited Services and its Restricted Subsidiaries from leasing "directly or indirectly" (a formulation they used in other contexts in the Indenture), or prohibited corporate affiliates from entering into prohibited transactions (a concept used in other contexts in the Indenture).  But the parties -- after thoroughly negotiating the Indenture while represented by experienced counsel -- did not do either.

**Answer to Counterclaim Paragraph 18:  Aurelius denies the allegations of Paragraph 18, and respectfully refers the Court to the Master Lease and the Notice of Default for their full and accurate contents.**

Counterclaim Paragraph 19:   Aurelius also wrongly alleges that the Company has violated Section 4.07 of the Indenture in two ways.   First, Aurelius alleges that the Company failed to deliver to the Trustee an Officers' Certificate in association with certain Restricted Payments (as defined in the Indenture) as required by Section 4.07(c) of the Indenture.   The Company delivered all required Officers' Certificates to the Trustee, and the claim in the Letter is simply wrong.   Second, Aurelius argues that the Company violated Section 4.07(a)(A), which prohibits the making of a Restricted Payment during the pendency of a Default (as defined in the Indenture).   However, the only alleged defaults are the purported Defaults of Sections 4.19 and 4.07 already discussed (which are not actually defaults).   Thus, the Company was not in Default at the time it made any Restricted Payments and has not violated Section 4.07(a)(A).

**Answer to Counterclaim Paragraph 19:   Aurelius denies the allegations of Paragraph 19, except denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 19, and admits that Aurelius delivered a Notice of Default to Services on September 21, 2017, and that this Notice of Default alleged certain failures by Services to deliver Officers' Certificates to the Trustee, and Aurelius respectfully refers the Court to the Notice of Default for its full and accurate contents.**

Counterclaim Paragraph 20:   While the assertions of purported fact in the Letter are baseless, the Letter nonetheless threatened Services with imminent, irreparable harm.   That is because the Letter purported to constitute a written notice of default under Section 6.01(a)(v) of the Indenture, which would trigger a 60-day grace, or cure, period.   The Company could not "cure" the alleged default claimed by Aurelius, as it would apparently have had to unwind the over two-year old Spin-Off to do so.   Thus, at the end of the grace period, there was a distinct

risk that the Trustee or holders of at least 25% in aggregate principal amount of outstanding 6 3/8% Notes could declare the principal amount of all outstanding 6 3/8% Notes to be immediately due and payable.  Moreover, all of Services' other indentures contain covenants identical in all material respects to Section 4.19 of the Indenture, and thus, Services has approximately $3 billion in bonds subject to the language that Aurelius claims was breached. The uncertainty created by the Letter's incorrect assertions could have impacted all of the Company's bond debt, as an Event of Default under the Indenture and any acceleration of the 6 3/8% Notes by the Trustee or holders of 25% in aggregate principal amount of outstanding 6 3/8% Notes would presumably constitute an event of default under its other indentures.

**Answer to Counterclaim Paragraph 20:  Aurelius denies the allegations of Paragraph 20, except admits that Aurelius delivered a Notice of Default to Services on September 21, 2017, and that Services has not cured the default that Aurelius alleged in the Notice of Default, and Aurelius respectfully refers the Court to the Notice of Default, the Indenture, and the other indentures referred to in Paragraph 20 for their full and accurate contents.**

Counterclaim Paragraph 21:  Moreover, should an Event of Default occur under the Indenture, such Event of Default could also lead to an event of default under the Company's credit facility and the Master Lease.

**Answer to Counterclaim Paragraph 21:   Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 21.**

Counterclaim Paragraph 22:  An Event of Default, any cross default, or any acceleration of debt would threaten the very existence of Services by likely forcing the Company

into bankruptcy and have a drastic negative impact on thousands of customers as well as the Company's approximately 13,000 employees.   Additionally, even the threat of an Event of Default, associated cross defaults and acceleration of debt irreparably harms the Company by, among other things, reducing the Company's access to the capital markets in order to potentially address any attempted debt acceleration, increasing the Company's borrowing costs, damaging the Company's relationships with its vendors, bondholders and other lenders, harming Holdings' equity value, and impeding the Company's ability to run its business in the ordinary course and implement its strategic business plans.

**Answer to Counterclaim Paragraph 22:   Aurelius denies the allegations of Paragraph 22.**

Counterclaim Paragraph 23:   Aurelius waited over two years after the Spin-Off to manufacture alleged defaults.   Aurelius now wields these erroneous assertions in an effort to extort value through simultaneously purchasing credit default swaps to cash in on the very default it is attempting to manufacture.   These actions have significant consequences to Services. Services is a large telecommunications company providing approximately 13,000 jobs across the country and supplying crucial communications services to over 1.5 million consumer and small business customers and approximately 35,000 enterprise business customers.   The near-term acceleration of all of the Company's debt would present massive challenges to the business and its employees.

**Answer to Counterclaim Paragraph 23:   Aurelius denies the allegations of Paragraph 23, except admits that Services and its employees provide telecommunications services to numerous customers.**

Counterclaim Paragraph 24:  In order to proactively seek resolution of the issues involved in this litigation and to counteract Aurelius's specious allegations, on October 18, Services launched two transactions – the Exchange Offers and Consent Solicitations.

**Answer to Counterclaim Paragraph 24:  Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 24, except admits that Services launched certain Exchange Offers and Consent Solicitations, and Aurelius respectfully refers the Court to the Exchange Offers and Consent Solicitations for their full and accurate contents.**

Counterclaim Paragraph 25:  Each Consent Solicitation with respect to a series of notes required consent from holders representing at least a majority of the outstanding principal amount of that series, and once effective, would waive the defaults alleged in the September 21 Letter issued by Aurelius.

**Answer to Counterclaim Paragraph 25:  Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 25, and respectfully refers the Court to the Exchange Offers and Consent Solicitations for their full and accurate contents, and Aurelius avers that the purported waivers and consents are not valid.**

Counterclaim Paragraph 26:  On October 31, 2017, the Company learned that based on tenders of notes in the Exchange Offers and consents delivered in the Consent Solicitation for the Notes, upon early settlement of the Exchange Offers, holders representing the requisite percentage of the Notes needed to waive the defaults alleged in the purported notice of default alleged in the September 21 Letter would deliver consents.  In fact, holders of

approximately 61.35% of the Notes (including New Notes to be issued in the Exchange Offers) delivered consents in the Consent Solicitation relating to such Notes.

**Answer to Counterclaim Paragraph 26:   Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 26, and avers that the Exchange Offers and the New Notes, and the purported waivers and consents, are not valid.**

Counterclaim Paragraph 27:  On November 6, 2017, US Bank, as Trustee, authenticated and issued the New Notes.  That same day, Services and US Bank executed the Supplemental Indenture, which gave effect to the waivers and consents for the 6 3/8% Notes and is binding on all noteholders.

**Answer to Counterclaim Paragraph 27:   Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 27, except admits that U.S. Bank authenticated the New Notes and executed the Supplemental Indenture, and avers that the New Notes, and the purported waivers and consents, are not valid.**

Counterclaim Paragraph 28:  Despite authenticating and issuing the New Notes and executing the Supplemental Indenture – which explicitly waives any supposed default related to the allegations in the September 21, 2017 Letter – US Bank continues to prosecute this action in clear contravention of its duties as Trustee and in blatant violation of the Indenture and Supplemental Indenture.  On November 9, Services requested in a letter to US Bank that it dismiss its claims in this Action.  US Bank has refused that request.

**Answer to Counterclaim Paragraph 28:   Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of**

**Paragraph 28, except admits that U.S. Bank authenticated the New Notes and executed the Supplemental Indenture, and admits that U.S. Bank has not dismissed its claims in this action, and Aurelius avers that the purported waivers, the New Notes, and the Supplemental Indenture are not valid, and Aurelius respectfully refers the Court to the Supplemental Indenture for its full and accurate contents.**

### JURISDICTION AND VENUE

Counterclaim Paragraph 29:  This Court has subject matter jurisdiction over the claims asserted in this Complaint pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds $75,000 and there is no question there is complete diversity of citizenship.  This action is brought by Defendant and Counterclaim-Plaintiff Services, which is incorporated in Delaware and has a principal place of business in Arkansas, against Counterclaim-Defendants U.S. Bank, which is a national bank with principal executive offices in Ohio and a principal place of business in Minnesota, and Aurelius, which is an exempted company with limited liability in the Cayman Islands.

**Answer to Counterclaim Paragraph 29:  Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29, except admits that Aurelius is organized under the laws of the Cayman Islands as an exempted company with limited liability and that this Court possesses subject matter jurisdiction over this action.**

Counterclaim Paragraph 30:  Venue and jurisdiction are proper in the Southern District of New York because a substantial portion of the events or omissions giving rise to the claims occurred in this District.  In the Indenture, U.S. Bank submitted to the jurisdiction of this Court and waived any objection to venue in this Court for any legal suit, action or proceeding arising out of or based on the Indenture or the transactions contemplated in the Indenture.

Moreover, the claims in this lawsuit arise from the September 21 Letter that Aurelius sent to Services in New York.  Through the Letter, Aurelius seeks the benefit of the laws of the State of New York, which governs the Indenture and the 6 3/8% Notes.  In particular, Aurelius alleges violations of the Indenture, which was entered among other things for the benefit of the noteholders.  The Indenture provides that any legal suit, action or proceeding arising out of or based on the Indenture or the transactions contemplated in the Indenture may be instituted in this Court and the parties to the Indenture submitted to the jurisdiction of this Court and waived any objection to venue in this Court.

**Answer to Counterclaim Paragraph 30:  Aurelius denies the allegations of Paragraph 30, except admits that venue and subject matter jurisdiction are proper in the United States District Court for the Southern District of New York.**

### THE PARTIES

Counterclaim Paragraph 31:  Defendant and Counterclaim-Plaintiff Services is a limited liability company organized under the laws of the State of Delaware with its headquarters at 4001 Rodney Parham Road, Little Rock, Arkansas 72212.

**Answer to Counterclaim Paragraph 31:  Upon information and belief, Aurelius admits the allegations of Paragraph 31.**

Counterclaim Paragraph 32:  Upon information and belief, US Bank is a banking corporation and national association organized under the laws of the United States, with its principal executive offices located at 425 Walnut Street, Cincinnati, Ohio 45202 and principal place of business in Minneapolis, Minnesota.

**Answer to Counterclaim Paragraph 32:  Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 32, except admits that U.S. Bank is a national banking association chartered**

**under the laws of the United States that has its main office at 425 Walnut Street, Cincinnati, Ohio 45202, and its principal place of business in Minneapolis, Minnesota.**

Counterclaim Paragraph 33:  US Bank NA, as Trustee under the Indenture is charged with representing the interests of the holders of all 6 3/8% Notes issued and outstanding under the Indenture.  As a result, it is the proper party to give effect to the judgment of this Court and implement any action resulting therefrom.  Therefore, US Bank is a necessary party to the resolution of this action.

**Answer to Counterclaim Paragraph 33:  Aurelius denies the allegations of Paragraph 33, except admits that U.S. Bank is the Trustee under the Indenture, and that U.S. Bank has certain rights and obligations as Trustee pursuant to the Indenture, and Aurelius respectfully refers the Court to the Indenture for its full and accurate contents.**

Counterclaim Paragraph 34:  Upon information and belief, Aurelius is an exempted company with limited liability in the Cayman Islands.  Upon information and belief, Aurelius is the beneficial holder of more than 25% of the outstanding 6 3/8% Notes under the Indenture.  Aurelius may be served with process by serving the New York Secretary of State as statutory agent at the New York Department of State's office at One Commerce Plaza, 99 Washington Avenue, Albany, NY 12231. N.Y. Bus. Corp. Law § 307.  Aurelius is a required party to this action pursuant to Fed. R. Civ. P. 19(a).  Rule 19(a) defines "persons required to be joined if feasible" as any person who (i) is subject to service of process and whose joinder will not deprive the court of subject- matter jurisdiction; (ii) claims an interest relating to the subject of the action; and (iii) is so situated that disposing of the action in the person's absence may "as a practical matter impair or impede the person's ability to protect the interest" or "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent

obligations because of the interest."  Fed. R. Civ. P. 19(a)(1).  Aurelius is subject to service and the Court will maintain subject-matter jurisdiction, as noted above.  And, Aurelius obviously claims an interest that would be impeded by its absence -- it is the driving force behind US Bank NA's Complaint and this baseless attempt at manufacturing an Event of Default, as evidenced by the September 21, 2017 Letter.

**Answer to Counterclaim Paragraph 34:  Aurelius denies the allegations of Paragraph 34, except admits that Aurelius is organized under the laws of the Cayman Islands as an exempted company with limited liability, and that Aurelius is the beneficial holder of more than 25% of the outstanding Notes under the Indenture.**

## FACTUAL BACKGROUND

**I.      WINDSTREAM SERVICES, LLC'S BUSINESS**

Counterclaim Paragraph 35:  Services is headquartered in Little Rock, Arkansas and provides, via its subsidiaries, communications and technology solutions across a range of services including cloud computing, integrated voice and data services, internet security services, and consumer video services.  The Company also provides broadband, voice and video services to consumers primarily in rural markets.  Services was formed in 2004, and previously operated as a corporation called Windstream Corporation.

**Answer to Counterclaim Paragraph 35:  Aurelius admits the allegations of the first two sentences of Paragraph 35, and denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of the third sentence of Paragraph 35.**

Counterclaim Paragraph 36:  In August 2013, Windstream Corporation created a new holding company organization structure whereby Windstream Corporation became a wholly-owned subsidiary of Holdings.

**Answer to Counterclaim Paragraph 36: Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 36, except admits that Services filed a Form 8-K with the Securities and Exchange Commission ("SEC") on August 30, 2013, disclosing, among other things, the formation of Windstream Holdings, Inc. ("Holdings") and that Services had become wholly owned by Holdings, and Aurelius respectfully refers the Court to that Form 8-K for its full and accurate contents.**

Counterclaim Paragraph 37: Holdings filed a current report on Form 8-K with the SEC announcing this new structure on August 30, 2013.

**Answer to Counterclaim Paragraph 37: Aurelius denies the allegations of Paragraph 37, except admits that on August 30, 2013, Services filed a Form 8-K with the SEC disclosing, among other things, the formation of Holdings and that Services had become wholly owned by Holdings, and Aurelius respectfully refers the Court to that Form 8-K for its full and accurate contents.**

Counterclaim Paragraph 38: Holdings is a publicly traded FORTUNE 500 company and a leading provider of advanced network communications and technology solutions for consumers, businesses, enterprise organizations and wholesale customers across the US.

**Answer to Counterclaim Paragraph 38: Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 38, except admits that Holdings is a publicly traded company.**

Counterclaim Paragraph 39: In 2015, Windstream Corporation converted to a limited liability company and changed its name to Windstream Services, LLC.

**Answer to Counterclaim Paragraph 39:  Aurelius admits the allegations of Paragraph 39.**

Counterclaim Paragraph 40:  Services currently maintains approximately 13,000 employees in the United States and Canada.

**Answer to Counterclaim Paragraph 40:   Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 40.**

## II.    2015 SPIN-OFF

Counterclaim Paragraph 41:  In March 2015, Holdings and Services entered into a Separation and Distribution Agreement with Uniti, pursuant to which, among other things, Services and certain of its Restricted Subsidiaries contributed to Uniti certain assets consisting of approximately 66,000 route miles of fiber optic cable lines, 235,000 route miles of copper cable lines, central office land and buildings, beneficial rights to permits, pole agreements and easements, and a small consumer competitive local exchange carrier business owned by Services.  The contribution of assets to Uniti by Services and its Restricted Subsidiaries was made in full compliance with the Indenture.

**Answer to Counterclaim Paragraph 41:  Aurelius denies the allegations of Paragraph 41, except admits that certain subsidiaries of Services transferred certain assets to Uniti, and respectfully refers the Court to the Separation and Distribution Agreement for its full and accurate contents.**

Counterclaim Paragraph 42:  Those assets were exchanged for (i) the issuance of Uniti common stock to Services, (ii) the transfer of approximately $1.035 billion in cash from Uniti to Services, and (iii) the transfer from Uniti to Services of approximately $2.5 billion of Uniti debt, consisting of term loans and secured and unsecured notes.

**Answer to Counterclaim Paragraph 42:   Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 42, except admits that Uniti delivered certain consideration to Services on account of the transfer of assets to Uniti from certain subsidiaries of Services, and respectfully refers the Court to the Separation and Distribution Agreement for its full and accurate contents.**

Counterclaim Paragraph 43:  Services then distributed no less than 80.4% of the outstanding shares in Uniti common stock to its sole equity owner and parent company, Holdings, and Services retained the remaining shares of Uniti common stock.  Again, each transaction was completed in full compliance with the Indenture.

**Answer to Counterclaim Paragraph 43:   Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of Paragraph 43, and Aurelius respectfully refers the Court to the Separation and Distribution Agreement for its full and accurate contents.   Aurelius denies the allegations of the second sentence of Paragraph 43.**

Counterclaim Paragraph 44:  Holdings, in turn, distributed no less than 80.4% of the outstanding shares of Uniti common stock pro rata to holders of Holdings common stock. This distribution (along with the Services distribution to Holdings) constituted the "Spin-Off."

**Answer to Counterclaim Paragraph 44:   Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 44, and Aurelius respectfully refers the Court to the Separation and Distribution Agreement for its full and accurate contents.**

Counterclaim Paragraph 45:  Immediately after the Spin-Off, Holdings and Uniti entered into multiple agreements to implement portions of the Spin-Off and govern the relationship after the Spin-Off.

**Answer to Counterclaim Paragraph 45:  Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 45.**

Counterclaim Paragraph 46:  One such agreement was the Master Lease by and among subsidiaries of Uniti on the one hand, and Holdings on the other hand.  Pursuant to the Master Lease, Holdings leased (and still leases) certain telecommunication network assets, including fiber and copper networks and other real estate, from the Uniti subsidiaries that are party to the Master Lease.

**Answer to Counterclaim Paragraph 46:  Aurelius denies the allegations of Paragraph 46, and Aurelius respectfully refers the Court to the Master Lease for its full and accurate contents.**

Counterclaim Paragraph 47:  Services is not a signatory to the Master Lease and has no obligation to make any payments or perform any obligations under Master Lease, including no obligation to fund Holdings' lease payments under the Master Lease.

**Answer to Counterclaim Paragraph 47:  Aurelius denies the allegations of Paragraph 47, and respectfully refers the Court to the Master Lease for its full and accurate contents.**

Counterclaim Paragraph 48:  The Master Lease and other Spin-Off transactional documents were made publicly available and the details of the Spin-Off were disclosed in the Current Report on Form 8-K filed with the Securities and Exchange Commission (the "SEC") on

April 27, 2015 as well as the Company's and Holdings' other periodic filings under the Securities Exchange Act of 1934, as amended, since then.

**Answer to Counterclaim Paragraph 48:   Aurelius denies the allegations of Paragraph 48, except admits that on April 27, 2015, Services publicly filed a Form 8-K with the SEC and that, from time to time, Services and Uniti have publicly filed additional Forms 8-K with the SEC, and Aurelius respectfully refers the Court to those public filings for their full and accurate contents.**

Counterclaim Paragraph 49:   In   summary,   Services   and   its   Restricted Subsidiaries transferred certain assets to Uniti as part of the Spin-Off.   Immediately following the Spin-Off, Holdings and certain subsidiaries of Uniti entered into the Master Lease pursuant to which *Holdings* leased the assets.

**Answer to Counterclaim Paragraph 49:   Aurelius denies the allegations of Paragraph 49, and Aurelius respectfully refers the Court to the Master Lease for its full and accurate contents.**

Counterclaim Paragraph 50:   While Services is not obligated to fund Holdings' lease payments under the Master Lease, Services has historically made cash distributions to Holdings to fund such payments.   As noted above, Holdings is not a party to, or subject to the covenants in, the Indenture.   Therefore the Indenture contains restrictions on payments by Services to Holdings, but does not contain any restrictions on Holdings.   Specifically, these distributions are subject to the Restricted Payments covenant in the Indenture, which restricts, among other things, distributions by Services to its sole equity owner, Holdings.   Accordingly, Services can only make a distribution to Holdings to fund Holdings' lease payments if it has Restricted Payment "capacity", which is based on, broadly speaking, its cumulative earnings.

26

Services has chosen to use a portion of its Restricted Payments "capacity" to fund Holdings' lease payments and has complied with the applicable conditions.  This reduces the amount of other distributions and other Restricted Payments that Services can make and holders of the 6 3/8% Notes are in no way harmed by these distributions to fund Holdings' lease payments.  The Indenture permits a certain amount of Restricted Payments and Services decides how to use that capacity.

**Answer to Counterclaim Paragraph 50:  Aurelius denies the allegations of Paragraph 50, except admits that the Indenture contains certain provisions relating to payments by Services to Holdings, and Aurelius respectfully refers the Court to the Indenture for its full and accurate contents.**

Counterclaim Paragraph 51: If this arrangement were, in fact, a Sale and Leaseback Transaction by Services as Aurelius has alleged, then any lease payments made by Services would be permitted and would not be subject to the Restricted Payments covenant.  But that is not how the distributions are structured.   Aurelius should not be permitted to recharacterize the arrangement as a Sale and Leaseback Transaction merely because it disputes the way in which Services is choosing to use its Restricted Payments capacity.

**Answer to Counterclaim Paragraph 51:  Aurelius denies the allegations of Paragraph 51.**

Counterclaim Paragraph 52: Neither Services nor any of its Restricted Subsidiaries are parties to the Master Lease for the assets in question.  The transfer of the assets and the subsequent "lease" of the assets involved different parties not subject to the Indenture.

**Answer to Counterclaim Paragraph 52: Aurelius denies the allegations of Paragraph 52, and respectfully refers the Court to the Master Lease for its full and accurate contents.**

## III.   THE LANGUAGE OF THE INDENTURE

Counterclaim Paragraph 53: On January 23, 2013, Windstream Corporation (now known as Services) executed the Indenture governing the 6 3/8% Notes with US Bank as Trustee.

**Answer to Counterclaim Paragraph 53: Aurelius denies the allegations of Paragraph 53, except admits that the Indenture, dated January 23, 2013, was executed by Services, as well as by certain of Services' subsidiaries, and by U.S. Bank, as Trustee, and respectfully refers the Court to the Indenture for its full and accurate contents.**

Counterclaim Paragraph 54: The Indenture is a complex and heavily negotiated document that is the result of arms-length discussions between multiple sophisticated parties and their counsel.

**Answer to Counterclaim Paragraph 54: Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 54, except admits that Services, together with certain of Services' subsidiaries, and U.S. Bank entered into the Indenture, and Aurelius respectfully refers the Court to the Indenture for its full and accurate contents.**

Counterclaim Paragraph 55: Section 4.19 of the Indenture reads, in pertinent part:

> The Company shall not, and shall not permit any of its Restricted Subsidiaries to, enter into any Sale and Leaseback Transaction; *provided* that the Company or any Restricted Subsidiary thereof may enter into a Sale and Leaseback Transaction if: (i) the Company or such Restricted Subsidiary … could have

> (A) Incurred Indebtedness in an amount equal to the Attributable Debt relating to such Sale and Leaseback Transactions … and (B) incurred a Lien to secure such Indebtedness … (ii) the gross cash proceeds of that Sale and Leaseback Transaction are at least equal to the Fair Market Value of the property that is the subject of that Sale and Leaseback Transaction; and (iii) the transfer of assets in that Sale and Leaseback Transaction is permitted by, and the Company applies the proceeds of such transaction in compliance with, Section 4.10.

Ex. A at § 4.19.

**Answer to Counterclaim Paragraph 55: Aurelius denies the allegations of Paragraph 55, except admits that Paragraph 55 accurately quotes a portion of Section 4.19 of the Indenture, and Aurelius respectfully refers the Court to the Indenture for its full and accurate contents.**

Counterclaim Paragraph 56: Critically, "Sale and Leaseback Transaction" is a defined term in the Indenture which means:

> with respect to any Person, any transaction involving any of the assets or properties of such Person whether now owned or hereafter acquired, whereby such Person sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred.

*Id.* at § 1.01.

**Answer to Counterclaim Paragraph 56: Aurelius denies the allegations of Paragraph 56, except admits that Paragraph 56 accurately quotes the definition of the term "Sale and Leaseback Transaction" as set forth in Section 1.01 of the Indenture, and Aurelius respectfully refers the Court to the Indenture for its full and accurate contents.**

Counterclaim Paragraph 57: "Person," in turn, is defined as:

> any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated, organization, limited liability company or government or other entity.

*Id.*

**Answer to Counterclaim Paragraph 57:  Aurelius denies the allegations of Paragraph 57, except admits that Paragraph 57 accurately quotes the definition of the term "Person" as set forth in Section 1.01 of the Indenture, and Aurelius respectfully refers the Court to the Indenture for its full and accurate contents.**

Counterclaim Paragraph 58:  With respect to Aurelius's vague allegation that the Company failed to provide the necessary Officers' Certificates for unspecified Restricted Payments, Section 4.07(c) of the Indenture reads:

> The amount of all Restricted Payments (other than cash) shall be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued to or by the Company or such Subsidiary, as the case may be, pursuant to the Restricted Payment.  Not later than the date of making any Restricted Payment, the Company shall deliver to the Trustee and Officers' Certificate stating that such Restricted Payment is permitted and setting forth the basis upon which the calculations required by this Section 4.07 were computed, together with a copy of any opinion or appraisal required by this Indenture.

*Id.* at § 4.07(c).

**Answer to Counterclaim Paragraph 58:  Aurelius denies the allegations of Paragraph 58, except admits that Paragraph 58 accurately quotes from Section 4.07(c) of the Indenture, and Aurelius respectfully refers the Court to the Indenture for its full and accurate contents.**

Counterclaim Paragraph 59:  Section 6.01(a)(v) of the Indenture specifies actions or events that constitute an "Event of Default," and provides in pertinent part that an Event of Default occurs upon:

> [F]ailure by the Company or any of its Restricted Subsidiaries for 60 days after written notice by the Trustee or Holders representing 25% or more of the aggregate principal amount of Notes then outstanding to comply with any of the other agreements [besides Section 4.10 or Section 4.14] in this Indenture.

*Id.* at § 6.01(a)(v).

**Answer to Counterclaim Paragraph 59:  Aurelius denies the allegations of Paragraph 59, except admits that Paragraph 59 accurately quotes a portion of Section 6.01(a)(v) of the Indenture, and Aurelius respectfully refers the Court to the Indenture for its full and accurate contents.**

Counterclaim Paragraph 60:  Following an Event of Default, Section 6.02 of the Indenture grants the Trustee or, in the alternative, holders of a certain principal amount of the 6 3/8% Notes, the right to accelerate payment of the 6 3/8% Notes:

> If an … Event of Default occurs and is continuing with respect to Notes, the Trustee or the Holders of at least 25% in principal amount of the then outstanding Notes may declare all the Notes to be due and payable immediately by notice in writing to the Company specifying the Event of Default.  Upon such declaration, the Notes, together with accrued and unpaid interest (including Additional Interest), shall become due and payable immediately.

*Id.* at § 6.02.

**Answer to Counterclaim Paragraph 60:  Aurelius denies the allegations of Paragraph 60, except admits that Paragraph 60 accurately quotes a portion of Section 6.02 of the Indenture, and Aurelius respectfully refers the Court to the Indenture for its full and accurate contents.**

Counterclaim Paragraph 61:  Additionally, the Indenture provides a clear mechanism to waive purported Defaults and Events of Default.  Section 6.04 provides:

> Holders of a majority in aggregate principal amount of the Notes then outstanding by notice to the Trustee may on behalf of the

> Holders of all of the Notes waive any existing Default or Event of
> Default and its consequences hereunder.

*Id.* at § 6.04.

**Answer to Counterclaim Paragraph 61:  Aurelius denies the allegations of Paragraph 61, except admits that Paragraph 61 accurately quotes a portion of Section 6.04 of the Indenture, and Aurelius respectfully refers the Court to the Indenture for its full and accurate contents.**

Counterclaim Paragraph 62:  Moreover, Section 9.02 of the Indenture allows Services and the Trustee to amend or supplement the Indenture to give effect to the waivers:

> [T]he Company . . . and the Trustee may amend or supplement this
> Indenture . . . with the consent of the Holders of at least a majority
> in principal amount of the Notes then outstanding . . . and . . . any
> existing Default or Event of Default . . . may be waived with the
> consent of the Holders of a majority in principal amount of the
> then outstanding Notes.

*Id.* at § 9.02(a).

**Answer to Counterclaim Paragraph 62:  Aurelius denies the allegations of Paragraph 62, except admits that Paragraph 62 accurately quotes a portion of Section 9.02 of the Indenture, and Aurelius respectfully refers the Court to the Indenture for its full and accurate contents.**

**IV.    RUMORS OF AURELIUS ACQUIRING NOTES**

Counterclaim Paragraph 63:  In early August 2017, Services became aware of market rumors that Aurelius was buying notes in an effort to obtain a 25% position in one or more of the Company's series of outstanding notes.  Additional market rumors indicated that Aurelius was also buying a significant position in credit default swaps betting on the Company to default.

**Answer to Counterclaim Paragraph 63:   Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 63.**

Counterclaim Paragraph 64:  Around the same time, Services became aware that Aurelius was acquiring these notes to attempt to call an Event of Default to profit from its position in the credit default swap market.

**Answer to Counterclaim Paragraph 64:  Aurelius denies the allegations of Paragraph 64, except denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 64 concerning Services' state of awareness.**

Counterclaim Paragraph 65:  Services was (and continues to be) in compliance with all of the provisions of its indentures.

**Answer to Counterclaim Paragraph 65:  Aurelius denies the allegations of Paragraph 65.**

Counterclaim Paragraph 66:  Additional market rumors indicated that Aurelius intended to issue a notice of default related to the Spin-Off.  This was confusing given that the Spin-Off had closed over two years before these market rumors began.  Prior to these 2017 market rumors, Services was unaware of any accusation or allegation that the Spin-Off caused Services to be in breach or default of any covenant in any of its indentures.  No other bondholders have sent the Company a purported notice of default related to the Spin-Off.

**Answer to Counterclaim Paragraph 66:   Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 66.**

## V.        THE PURPORTED NOTICE OF DEFAULT

Counterclaim Paragraph 67:  Aurelius sent the September 21, 2017 Letter indicating that it was the beneficial holder of more than 25% in aggregate principal amount of the 6 3/8% Notes outstanding and claiming that the Letter constituted a notice of default under the Indenture.

**Answer to Counterclaim Paragraph 67:  Aurelius denies the allegations of Paragraph 67, except admits that Aurelius sent to Services a letter dated September 21, 2017, in which letter Aurelius stated that it was the beneficial holder of more than 25% in aggregate principal amount of Services' outstanding 6-3/8% Notes, and that the letter constituted a Notice of Default under the Indenture, and Aurelius respectfully refers the Court to Aurelius's Notice of Default of September 21, 2017, for its full and accurate contents.**

Counterclaim Paragraph 68:  The Letter primarily focused on an alleged default of the Sale and Leaseback Transaction covenant (Section 4.19) of the Indenture.  Yet, as discussed above, the Company has not entered into any Sale and Leaseback Transactions since executing the Indenture.

**Answer to Counterclaim Paragraph 68:  Aurelius denies the allegations of Paragraph 68, except admits that on September 21, 2017, Aurelius delivered a Notice of Default to Services, and Aurelius respectfully refers the Court to this Notice of Default for its full and accurate contents.**

Counterclaim Paragraph 69:  As further evidence that Aurelius is seeking to manufacture a notice of default, the Letter also baselessly asserts that the Company violated Section 4.07 of the Indenture.  As discussed above, the Company has fully complied with Section 4.07.

**Answer to Counterclaim Paragraph 69:   Aurelius denies the allegations of Paragraph 69, except admits that on September 21, 2017, Aurelius delivered a Notice of Default to Services, and Aurelius respectfully refers the Court to this Notice of Default for its full and accurate contents.**

Counterclaim Paragraph 70:   Aurelius claimed that the notice of default was given under Indenture Section 6.01(a)(v), which contemplates a 60-day grace period before an Event of Default could occur.

**Answer to Counterclaim Paragraph 70:   Aurelius denies the allegations of Paragraph 70, except admits that on September 21, 2017, Aurelius delivered a Notice of Default to Services, and Aurelius respectfully refers the Court to this Notice of Default and the Indenture for their full and accurate contents.**

## VI.     THE EXCHANGE OFFERS AND CONSENT SOLICITATIONS

Counterclaim Paragraph 71:  Late in the evening on October 18, 2017, the Company launched debt exchange offers with respect to its senior notes, including the 6 3/8% Notes at issue in this case.

**Answer to Counterclaim Paragraph 71:    Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 71, except admits that on October 18, 2017, Services launched certain Exchange Offers, and Aurelius respectfully refers the Court to the Exchange Offers for their full and accurate contents.**

Counterclaim Paragraph 72: The Company launched the Exchange Offers because they could provide significant benefits to the Company and its stakeholders, including its noteholders.   First, the Exchange Offers were designed to extend the Company's debt maturity profile and enhance its liquidity position over the coming years.   Additionally, the

Exchange Offers and the Consent Solicitations allowed the Company to proactively address Aurelius's specious allegations and avoid the potential of bankruptcy that Aurelius sought to foist upon the Company and its stakeholders.

**Answer to Counterclaim Paragraph 72:  Aurelius denies the allegations of Paragraph 72, except denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 72 concerning Services' reasons for launching the Exchange Offers and Consent Solicitations, and admits that Services launched certain Exchange Offers and Consent Solicitations, and Aurelius respectfully refers the Court to the Exchange Offers and Consent Solicitations for their full and accurate contents.**

Counterclaim Paragraph 73:   The Exchange Offers included the following:

- Offers to exchange the Company's existing senior 7.5% notes due 2022 and 2023 for New 6 3/8% Notes to be issued by the Company.[3]

- An offer to exchange the Company's existing senior notes due 2021 for new senior secured notes due 2025 and/or New 6 3/8% Notes, in each case to be issued by the Company.

- An offer to exchange the Company's existing senior notes due 2020 for new senior secured notes due 2025 to be issued by the Company.

**Answer to Counterclaim Paragraph 73 (and Footnote 3 referenced therein and set forth below):  Aurelius denies the allegations of Paragraph 73 and Footnote 3, except admits that Paragraph 73 contains certain of the terms of the Exchange Offers, and**

---

[3] The New 6 3/8% Notes issued in the Exchange Offers are the same series as the 6 3/8% Notes at issue in this case and were issued under the same Indenture.

**Aurelius respectfully refers the Court to the Exchange Offers for their full and accurate contents.**

Counterclaim Paragraph 74: The New 6 3/8% Notes issued in the Exchange Offers are issued pursuant to Section 2.02 of the Indenture, which permits the Company to issue New 6 3/8% Notes as "Additional Notes" under the Indenture.

**Answer to Counterclaim Paragraph 74: Aurelius denies the allegations of Paragraph 74, and avers that the Exchange Offers and New 6-3/8% Notes are not valid.**

Counterclaim Paragraph 75: Concomitant with the Exchange Offers, pursuant to Sections 6.04 and 9.02 of each indenture governing the Company's senior notes (including the Indenture), the Company launched a separate, yet related transaction, whereby it solicited consents pursuant to the Consent Solicitations from all holders of the Company's senior notes (including the 6 3/8% Notes at issue here) to waivers and amendments relating to potential or alleged defaults with respect to the Spin-Off. The consents, upon becoming effective, waive the defaults alleged in the September 21 Letter.

**Answer to Counterclaim Paragraph 75: Aurelius denies the allegations of Paragraph 75, except admits that Services launched certain Exchange Offers and Consent Solicitations and avers that the Exchange Offers, and the purported waivers and consents, are not valid, and Aurelius respectfully refers the Court to the Exchange Offers and Consent Solicitations for their full and accurate contents.**

Counterclaim Paragraph 76: Each Consent Solicitation with respect to a series of notes required consent from holders representing at least a majority of the outstanding principal amount of that series, and once effective, would waive the defaults alleged in the September 21 Letter issued by Aurelius. In the case of the Consent Solicitation relating to the 6 3/8% Notes,

holders receiving New 6 3/8% Notes in the Exchange Offers also had the ability to direct their participant in the Depositary Trust Company system to deliver consents in the Consent Solicitation relating to the 6 3/8% Notes upon receipt of the New 6 3/8% Notes in the Exchange Offers.  Additionally, the New 6 3/8% Notes are included in both the numerator and denominator of outstanding 6 3/8% Notes when determining whether the requisite consents have been received for the 6 3/8% Notes.

**Answer to Counterclaim Paragraph 76:  Aurelius denies the allegations of the first and third sentences of Paragraph 76, and Aurelius avers that the Consent Solicitations are not valid.  Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of the second sentence of Paragraph 76, and Aurelius respectfully refers the Court to the Consent Solicitations for their full and accurate contents.**

Counterclaim Paragraph 77:  On October 31, 2017, the Company learned that based on tenders of notes in the Exchange Offers and consents delivered in the Consent Solicitation for the 6 3/8% Notes, upon early settlement of the Exchange Offers holders represented the requisite percentage of 6 3/8% Notes needed to waive the defaults alleged in the September 21 Letter would be received.  In fact, holders of approximately 61.35% of the Notes (including New Notes to be issued in the Exchange Offers) delivered consents in the Consent Solicitation relating to such Notes.

**Answer to Counterclaim Paragraph 77:  Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 77, and avers that the Exchange Offers, Consent Solicitations, New Notes, and the purported waivers and consents, are not valid.**

Counterclaim Paragraph 78:  These noteholders, through the consents, explicitly agreed to waive and amend the Indenture to waive any purported default alleged in Aurelius's September 21 Letter.

**Answer to Counterclaim Paragraph 78:  Aurelius denies the allegations of Paragraph 78, and avers that the purported waivers and consents are not valid.**

Counterclaim Paragraph 79:  Section 6.04 of the Indenture provides that "Holders of a majority in aggregate principal amount of the Notes then outstanding by notice to the Trustee may on behalf of the Holders of all of the Notes waive any existing Default or Event of Default and its consequences hereunder . . . ."

**Answer to Counterclaim Paragraph 79:  Aurelius denies the allegations of Paragraph 79, except admits that Paragraph 79 accurately quotes a portion of Section 6.04 of the Indenture, and Aurelius respectfully refers the Court to the Indenture for its full and accurate contents.**

Counterclaim Paragraph 80:  The Indenture further provides that once the requisite consents are obtained from Holders, "[t]he Company shall deliver to the Trustee an Officers' Certificate stating that the requisite percentage of Holders have consented to such waiver and attaching copies of such consents."  Section 6.04.  Thereafter, "the Company, the Trustee and Holders of Notes shall be restored to their former positions and rights hereunder and under the Notes, respectively."  *Id.*

**Answer to Counterclaim Paragraph 80:  Aurelius denies the allegations of Paragraph 80, except admits that Paragraph 80 accurately quotes a portion of Section 6.04 of the Indenture, and Aurelius respectfully refers the Court to the Indenture for its full and accurate contents.**

Counterclaim Paragraph 81:  Here, a majority of holders delivered consents that provided that "[b]y delivering a consent with respect to the 6 3/8% Notes, a Holder authorizes, directs and requests that . . . the Company, the co-issuer, the guarantors, the trustee and each party to the Indenture enter into a Supplemental Indenture with respect to the 6 3/8% Notes . . . and . . . enter into such other documents, and take such other actions necessary or expedient, in order to give effect to, and permit, the Proposed Waivers and Amendments."  And the Company delivered the required Officers' Certificate to the Trustee.

**Answer to Counterclaim Paragraph 81:  Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 81, and avers that the purported waivers and consents, and the Officers' Certificates and the Supplemental Indenture, are not valid.**

## VII.    THE SUPPLEMENTAL INDENTURE

Counterclaim Paragraph 82:  On November 6, 2017, US Bank, as Trustee, authenticated and issued the New Notes.  That same day, Services and US Bank executed the Supplemental Indenture, which gave effect to the waivers and consents for the 6 3/8% Notes and is binding on all noteholders.

**Answer to Counterclaim Paragraph 82:  Aurelius denies the allegations of Paragraph 82, except admits that on November 6, 2017, the Trustee authenticated the New Notes and executed the Supplemental Indenture, and avers that the New Notes and Supplemental Indenture, and the purported waivers and consents, are not valid, and Aurelius respectfully refers the Court to the Supplemental Indenture for its full and accurate contents.**

Counterclaim Paragraph 83:  The Supplemental Indenture waives any purported default related to the allegations contained in the September 21 Letter.  The Supplemental Indenture states, in relevant part:

i.     'Transactions' means the transactions described on Schedule I hereto, including the Distribution, the Note Redemptions, the Spin-Off, the Debt-for-Debt Exchange, the First Debt-for-Equity Exchange, the Second Debt-for-Equity Exchange, the entry into and performance of the obligations under the Master Lease, the Spin-Off and Subsequent Restricted Payments.

ii.    The definition of 'Attributable Debt' in the Indenture shall be amended by adding the following underlined text:  . . . . for the avoidance of doubt, any payment or other obligations with respect to the Master Lease shall not constitute Attributable Debt or Indebtedness.

iii.   The definition of Sale and Leaseback Transaction in the Indenture shall be amended by adding the following underlined text:  . . . . for the avoidance of doubt, each Transaction, any series of Transactions or the Transactions as a whole, including the entry into and performance of the Master Lease, shall not constitute a Sale and Leaseback Transaction.

iv.    The following paragraph shall be added to the end of Section 4.07(d) of the Indenture:  For the avoidance of doubt and notwithstanding any other provision of this Indenture, each of the Distribution and the Spin-Off and Subsequent Restricted Payments, individually and as a whole, constitute Restricted Payments permitted by Section 4.07 of the Indenture and shall not constitute Asset Sales.

v.     The following paragraph shall be added to the end of Section 6.01 of the Indenture:  Notwithstanding any other provision of this Indenture, each Transaction, any series of Transactions and the Transactions as a whole are permitted under and not prohibited by this Indenture and shall be deemed not to have resulted in any Default or Event of Default under this Indenture.

vi.    The Trustee acknowledges that it has received an Officers' Certificate delivered to it by the Issuers, pursuant to Section 6.04 of the Indenture, stating that the Holders representing a majority in aggregate principal amount of the outstanding Notes have waived (1) any Default or Event of Default under the Indenture that is alleged to have, has or may have arisen under the Indenture in connection with, related to or as a result of the consummation or performance of the Transactions, and (2) any Default or Event of Default under the Indenture that is alleged to have, has or may

have arisen under the Indenture as a result of a Default or Event of Default described in clause (1), and attaching evidence of such Waivers.

vii. This Supplemental Indenture is executed as and shall constitute an indenture supplemental to and in implementation of the Indenture, and said Indenture and this Supplemental Indenture shall henceforth be read together.

**Answer to Counterclaim Paragraph 83: Aurelius denies the allegations in the first sentence of Paragraph 83, and avers that the purported waiver in the Supplemental Indenture of the default alleged in Aurelius's Notice of Default of September 21, 2017, is not valid. Aurelius denies possessing knowledge or information sufficient to form a belief as to the truth of the allegations of the second sentence, and the subparts of the second sentence, of Paragraph 83, except admits that Paragraph 83 accurately quotes portions of the Supplemental Indenture, and Aurelius respectfully refers the Court to the Supplemental Indenture for its full and accurate contents.**

Counterclaim Paragraph 84: The purported defaults alleged in the September 21 Letter have accordingly been waived.

**Answer to Counterclaim Paragraph 84: Aurelius denies the allegations of Paragraph 84.**

Counterclaim Paragraph 85: Nevertheless, US Bank continues to press on with this litigation in violation of the Indenture and Supplemental Indentured despite clear direction from over 60% of the 6 3/8% noteholders.

**Answer to Counterclaim Paragraph 85: Aurelius denies the allegations of Paragraph 85, except admits that U.S. Bank has not dismissed its claims in this action.**

Counterclaim Paragraph 86: In fact, US Bank originally initiated this action "solely in its capacity as indenture trustee . . . [because] two defaults relating to [the Spin-Off]

have occurred and are continuing." (Compl. ¶ 1.)  Yet, Section 7.01(a) of the Indenture confers authority on the Trustee to initiate action actions necessary to *cure an Event of Default*. Indenture § 7.01(a) ("*If an Event of Default has occurred and is continuing*, the Trustee shall exercise such of the rights and powers vested in it by this Indenture.") (emphasis added).  Section 7.01(a), however, is no longer implicated by this action because the Supplemental Indenture waived any purported Default alleged in the September 21 Letter.  Thus, US Bank no longer has standing to pursue this action and is breaching the plain language of the Indenture by continuing to do so.

**Answer to Counterclaim Paragraph 86:  Aurelius denies the allegations of Paragraph 86, except admits that the first sentence of Paragraph 86 accurately quotes a portion of Paragraph 1 of the Trustee's Complaint in this action, and Aurelius respectfully refers the Court to the Trustee's Complaint in this action for its full and accurate contents, and Aurelius further admits that the second sentence of Paragraph 86 accurately quotes a portion of Section 7.01(a) of the Indenture, and Aurelius respectfully refers the Court to the Indenture for its full and accurate contents.**

Counterclaim Paragraph 87:  Moreover, on information and belief, Aurelius directed US Bank to initiate this action pursuant to Section 6.05 of the Indenture, which permits "Holders of a majority in principal amount of the the the then outstanding Notes . . . to direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee with respect to the Notes, or exercising any trust or power conferred upon the Trustee with respect to the Notes." *Id.* at § 6.05.

**Answer to Counterclaim Paragraph 87:  Aurelius denies the allegations of Paragraph 87, except admits that Aurelius has issued certain directions to the Trustee and**

that **Paragraph 87 accurately quotes a portion of Section 6.05 of the Indenture, and Aurelius respectfully refers the Court to Section 6.05 of the Indenture for its full and accurate contents.**

Counterclaim Paragraph 88:  Aurelius is no longer a holder of a majority in principal amount of the outstanding Notes.  Indeed, US Bank's authentication of the New Notes diluted Aurelius's position.  Therefore, US Bank can longer act at Aurelius's behest to the detriment of the Company and other noteholders.  By continuing to act at Aurelius's direction, US Bank is in breach of the Indenture and Supplemental Indenture.

**Answer to Counterclaim Paragraph 88:  Aurelius denies the allegations of Paragraph 88.**

Counterclaim Paragraph 89:  Services must now continue to defend against US Bank's unauthorized claim, even though it has been mooted by the Supplemental Indenture. Services will continue to expend attorneys' fees and associate costs, and have its reputation in the marketplace damaged despite US Bank's issuance of the New Notes and execution of the Supplemental Indenture.

**Answer to Counterclaim Paragraph 89:  Aurelius denies the allegations of Paragraph 89.**

<u>**FIRST CAUSE OF ACTION**</u>
**(Breach of Contract)**

Counterclaim Paragraph 90:  Services repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

**Answer to Counterclaim Paragraph 90:  Aurelius incorporates by reference its answers to the allegations of Paragraphs 1 through 89 as if those answers were fully set forth herein.**

Counterclaim Paragraph 91:  The Indenture and Supplemental Indenture are binding contracts between Services and US Bank.

**Answer to Counterclaim Paragraph 91:   Aurelius denies possession knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 91, and avers that the Supplemental Indenture is not valid.**

Counterclaim Paragraph 92:  Services has substantially performed its obligations under the Indenture and Supplemental Indenture and remains willing and able to perform its remaining obligations.

**Answer to Counterclaim Paragraph 92:  Aurelius denies the allegations of Paragraph 92.**

Counterclaim Paragraph 93:  Despite executing the Supplemental Indenture, which waives any purported default or notice of default alleged in the September 21 Letter, US Bank is in breach of the Indenture and Supplemental Indenture by continuing to prosecute this action to the detriment of the Company and other noteholders.  Specifically, US Bank is in breach of Sections 6.05 and 7.01 of the Indenture because any purported Default has been waived and Aurelius can no longer direct US Bank to pursue the remedies enumerated in the Indenture.

**Answer to Counterclaim Paragraph 93:  Aurelius denies the allegations of Paragraph 93.**

Counterclaim Paragraph 94:  Therefore, Services seeks specific performance of the Indenture and Supplemental Indenture, including an order compelling the Trustee to dismiss its litigation with prejudice.

**Answer to Counterclaim Paragraph 94:  Aurelius denies the allegations in Paragraph 94, except admits that Services purports to seek the relief described in Paragraph 94.**

Counterclaim Paragraph 95:  Services also seeks damages, including attorneys' fees, in an amount to proven at trial, for US Bank's willful breach of the Indenture and Supplemental Indenture.

**Answer to Counterclaim Paragraph 95:  Aurelius denies the allegations in Paragraph 95, except admits that Services purports to seek the relief described in Paragraph 95.**

<u>SECOND CAUSE OF ACTION</u>
**(Declaratory Judgment)**

Counterclaim Paragraph 96:  Services repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

**Answer to Counterclaim Paragraph 96:  Aurelius repeats and incorporates by reference its answers to the allegations in Paragraphs 1 through 95 as if those answers were fully set forth herein.**

Counterclaim Paragraph 97:  Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court is authorized to issue a declaratory judgment.

**Answer to Counterclaim Paragraph 97:  Aurelius admits the allegations of Paragraph 97.**

Counterclaim Paragraph 98:  There is an actual controversy between the parties concerning whether Services has violated Sections 4.07 and 4.19 of the Indenture and whether an Event of Default can occur after the relevant grace period set forth in the Indenture.

**Answer to Counterclaim Paragraph 98:   Aurelius denies the allegations of Paragraph 98, except admits that a controversy exists between the parties concerning whether Services has breached the Indenture.**

Counterclaim Paragraph 99:  Services is entitled to a judicial declaration that Services did not violate Section 4.19 of the Indenture and that Services did not enter into a "Sale and Leaseback Transaction" in the Spin-Off.

**Answer to Counterclaim Paragraph 99:   Aurelius denies the allegations of Paragraph 99.**

Counterclaim Paragraph 100:  Services is entitled to a judicial declaration that Services is not in breach of Section 4.07 of the Indenture.

**Answer to Counterclaim Paragraph 100:   Aurelius denies the allegations of Paragraph 100.**

Counterclaim Paragraph 101:  Services has no adequate remedy at law.

**Answer to Counterclaim Paragraph 101:   Aurelius denies the allegations of Paragraph 101.**

### THIRD CAUSE OF ACTION
#### (Declaratory Judgment)

Counterclaim Paragraph 102:  Services repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

**Answer to Counterclaim Paragraph 102:   Aurelius repeats and incorporates by reference its answers to the allegations in Paragraphs 1 through 101 as if those answers were fully set forth herein.**

Counterclaim Paragraph 103:  Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court is authorized to issue a declaratory judgment.

**Answer to Counterclaim Paragraph 103:  Aurelius admits the allegations of Paragraph 103.**

Counterclaim Paragraph 104: There is an actual controversy between the parties concerning whether Services has violated Sections 4.07 and 4.19 of the Indenture and whether an Event of Default can occur after the relevant grace period set forth in the Indenture.

**Answer to Counterclaim Paragraph 104:  Aurelius denies the allegations of Paragraph 104, except admits that a controversy exists between the parties concerning whether Services has breached the Indenture.**

Counterclaim Paragraph 105: Aurelius waited an unreasonable length of time before attempting to declare a default (which they manufactured in order to profit in the credit default swap market).  Services has been prejudiced by this unreasonable delay as they have no ability to cure any alleged default relating to a transaction that closed over 2 years ago.

**Answer to Counterclaim Paragraph 105:  Aurelius denies the allegations of Paragraph 105, except admits that Services has no ability to cure the default that Aurelius alleged in the Notice of Default, dated September 21, 2017.**

Counterclaim Paragraph 106:  Services is entitled to a judicial declaration that any breach of Section 4.19 or 4.07, as alleged in the Letter, has been waived by the passage of over two years since the Spin- Off.

**Answer to Counterclaim Paragraph 106:  Aurelius denies the allegations of Paragraph 106.**

Counterclaim Paragraph 107:  Services has no adequate remedy at law.

**Answer to Counterclaim Paragraph 107:  Aurelius denies the allegations of Paragraph 107.**

## FOURTH CAUSE OF ACTION
### (Injunctive Relief)

Counterclaim Paragraph 108: Services repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

**Answer to Counterclaim Paragraph 108: Aurelius repeats and incorporates by reference its answers to the allegations in Paragraphs 1 through 107 as if those answers were fully set forth herein.**

Counterclaim Paragraph 109: Aurelius's Letter wrongfully purports to provide written notice of default even though Services has not violated Section 4.07 or Section 4.19 of the Indenture. The purported notice of default alleged in the September 21 Letter, however, is currently harming and will continue to harm Services. In particular, any further action taken in reliance on or in furtherance of the September 21 Letter will cause Services irreparable harm by threatening the very existence of Services by, among other things: likely forcing the Company into bankruptcy, increasing borrowing costs, limiting the Company's access to capital markets, damaging the Company's relationship with its vendors, bondholders and other lenders, harming Holdings' equity value, triggering potential cross-defaults, and hindering the Company's ability to run its business in the ordinary course and implement its strategic business plans.

**Answer to Counterclaim Paragraph 109: Aurelius denies the allegations of Paragraph 109.**

Counterclaim Paragraph 110: Should Aurelius or the Trustee declare an Event of Default or take any action in reliance on or in furtherance of the September 21 Letter, Services would suffer irreparable harm.

**Answer to Counterclaim Paragraph 110: Aurelius denies the allegations of Paragraph 110.**

Counterclaim Paragraph 111: Should Aurelius, the Trustee or any holders of the 6 3/8% Notes representing 25% in aggregate principal amount outstanding accelerate the debt under Section 6.02 of the Indenture, Services would suffer irreparable harm.

**Answer to Counterclaim Paragraph 111:  Aurelius denies the allegations of Paragraph 111.**

Counterclaim Paragraph 112: The harm to Services of allowing Aurelius or the Trustee to declare an Event of Default or take any action in reliance on or in furtherance of the defective notice of default substantially outweighs any harm to the Trustee (or any holders) associated with an injunction being granted.

**Answer to Counterclaim Paragraph 112:  Aurelius denies the allegations of Paragraph 112.**

Counterclaim Paragraph 113: Services has no adequate remedy at law.

**Answer to Counterclaim Paragraph 113:  Aurelius denies the allegations of Paragraph 113.**

Counterclaim Paragraph 114: Accordingly, Services is entitled to an injunction preventing the Trustee, on its own or at the direction of any holder of 6 3/8% Notes, as well as Aurelius (a) from declaring an Event of Default by reason of Aurelius's incorrect and improper Letter alleging breach of Section 4.07 and Section 4.19 of the Indenture, and (b) from taking any action based on any purported breach of Section 4.07 or 4.19 of the Indenture.

**Answer to Counterclaim Paragraph 114:  Aurelius denies the allegations of Paragraph 114.**

## PRAYER FOR RELIEF

**Answer to Prayer for Relief:  Aurelius denies that Services is entitled to any judgment, award, or relief requested in or otherwise with respect to its Counterclaims.**

## AFFIRMATIVE DEFENSES

By characterizing these as "Affirmative Defenses," Aurelius is not taking on any burden of proof beyond that which the law applies to it.  Thus, without admitting or implying that Aurelius bears the burden of proof as to any of them, Aurelius, on information and belief, asserts the following affirmative defenses:

### FIRST DEFENSE

Services' Counterclaims fail to state a claim upon which relief may be granted.

### SECOND DEFENSE

Services' Counterclaims are barred by the doctrines of unclean hands and estoppel.

## RESERVATION OF ADDITIONAL AFFIRMATIVE OR OTHER DEFENSES

Aurelius reserves all rights to rely on any affirmative or other defense that is now or that may become available in this action and further reserves its rights to amend this Answer to the Amended Counterclaims of Services.

WHEREFORE, Counterclaim Defendant and Counterclaim Plaintiff Aurelius Capital Master, Ltd., respectfully requests that judgment be entered (1) dismissing as against Aurelius all of the Amended Counterclaims of Defendant Windstream Services, LLC; (2) awarding to Aurelius the attorney's fees, costs, and other expenses that Aurelius incurs in

defending itself against the Amended Counterclaims; and (3) granting to Aurelius such other and further relief as the Court may deem to be just and proper.

## AMENDED COUNTERCLAIMS OF AURELIUS CAPITAL MASTER, LTD., AGAINST WINDSTREAM SERVICES, LLC

Counterclaim Defendant and Counterclaim Plaintiff Aurelius Capital Master, Ltd. ("Aurelius"), by its undersigned attorneys, for its Counterclaims against Defendant, Counterclaim Plaintiff, and Counterclaim Defendant Windstream Services, LLC ("Services" or the "Company"), alleges, on personal knowledge as to its own acts and on information and belief as to all other acts, as set forth below.  These Counterclaims address the improper authentication and issuance of certain additional 6-3/8% Senior Notes due 2023 (the "New Notes") by Services under an indenture dated January 23, 2013 (the "Indenture").  (All of the 6-3/8% notes due 2023 that have been issued or, in the case of the New Notes, purported to have been issued, are referred to collectively as the "Notes"; the Notes, excluding the New Notes, are referred to collectively as the "Existing Notes.")  As a result of the improper authentication and issuance of the New Notes, and the receipt by the Company of consents from the holders of the New Notes, the Company purports to have waived the defaults, and amended the Indenture to eliminate the defaults, that were noticed by Aurelius.

In addition, these Counterclaims seek judgment for principal and interest on the Notes held by Aurelius.  The Notes held by Aurelius became immediately due and payable on December 7, 2017, when the cure period for the defaults noticed by Aurelius expired and Aurelius declared an acceleration of the Notes. Payment is now past due.

## NATURE OF THE COUNTERCLAIMS

1.     The Indenture contains a provision (the "Sale-Leaseback Covenant") that limits the ability of the Company to carry out sale-leaseback transactions.  The Company entered into a sale-leaseback transaction (the "Sale-Leaseback Transaction") that breached the Sale-Leaseback Covenant, not just under the Indenture for the Notes, but also under indentures for the

Company's other series of notes, which together with the Notes total more than $2.8 billion face amount of Company indebtedness, as of the close of the third quarter of 2017. While Services was in breach of the Sale-Leaseback Covenant, it also made "Restricted Payments" to its parent company, which constituted separate breaches of the Indenture. Aurelius delivered a notice of default to the Company with respect to the Sale-Leaseback Transaction, which initially saddled the Company with over $5 billion of "Attributable Debt" in violation of the Indenture, and the Restricted Payments. When it became clear that Services would have to defend its misconduct on the merits, Services sought to avoid liability for its breaches by engaging in a massive exercise in vote-buying that violated the Indenture.

2.     The Indenture allows holders of a majority of the Notes to waive a default under the Indenture. On October 18, 2017, the Company launched a solicitation of consents from holders of the Existing Notes (the "Consent Solicitation") to waive the defaults and to amend the Indenture to eliminate the defaults. Knowing that it would fail to garner the necessary consents from the Existing Notes, the Company embarked on an elaborate exercise to dilute the voting power of the Existing Notes by offering to exchange certain *other* senior notes of the Company for New Notes (the "Exchange Offers"), and thereby manufacture the necessary majority to waive the defaults and amend the Indenture.

3.     But as with the Sale-Leaseback Transaction, the Company's latest scheme was too clever by half. The Indenture expressly provides that additional notes may not be issued under the Indenture and treated as a single class with the Existing Notes, including for voting purposes, if the issuance would violate applicable law or Article Four of the Indenture. The Consent Solicitation and Exchange Offers violated at least four covenants and/or rules of applicable law.

- First, the New Notes cannot qualify as "Additional Notes," as defined in the Indenture, because the issuance of those notes violated Indenture Section 4.09, which restricts the Company's ability to incur indebtedness.

- Second, the Consent Solicitation that accompanied, and was the purpose of, the Exchange Offers violated Indenture Section 4.17, which requires the Company to offer all holders of Notes equal consideration to induce the consents.

- Third, the $200 million of new 8.625% secured notes due 2025 (the "New Secured Notes") that were issued as part of a concurrent exchange offer for the Company's 7.75% Senior Notes due 2020 (the "2020 Notes") and 7.75% Senior Notes due 2021 (the "2021 Notes") violated Indenture Section 4.12 relating to the incurrence of liens.

- Fourth, the Consent Solicitation and Exchange Offers, with their design to manipulate the processes of Articles Six and Nine of the Indenture for the notice, waiver, and cure of defaults, are a breach of the implied covenant of good faith and fair dealing under the Indenture.

4.     The Company's scheme was also structurally defective, which renders the New Notes and consents ineffective.  The transaction was structured in a manner whereby the Company could obtain the necessary consents only if the votes of the New Notes were counted. But issuance of the New Notes would violate the Indenture, and as a result the New Notes could not be properly issued and counted, unless the Company obtained the consents from the New Notes.  The Company created a similar circularity by contractually pre-conditioning the Exchange Offers on its receipt of the necessary consents.  Thus, the Company's scheme was flawed and circular, and the purported issuance of the New Notes is therefore null and void as a matter of law.

5.     The Company pursued this scheme instead of curing the defaults arising from the Sale-Leaseback Transaction and Restricted Payments. On December 7, 2017, those uncured defaults matured into Events of Default under the Indenture, and on that date, in accordance with its rights under the Indenture, Aurelius declared all Notes to be due and payable immediately. This payment is now past due.

## PARTIES

6.      Counterclaim Defendant and Counterclaim Plaintiff Aurelius Capital Master, Ltd. is an exempted company with limited liability in the Cayman Islands.  Aurelius is the beneficial holder of more than 50% of the Existing Notes and more than 25% of the outstanding principal amount including the Notes whose validity Aurelius contests.

7.      Defendant, Counterclaim Plaintiff and Counterclaim Defendant Windstream Services, LLC is a Delaware limited liability company with its headquarters at 4001 Rodney Parham Road, Little Rock, Arkansas 72212.  Through subsidiaries holding the required authorization and licensure from the Federal Communications Commission and state regulators, the Company provides telephone exchange services and other telecommunications services in localities throughout the United States.  The Company (as successor to Windstream Corporation) is the issuer of the Notes.

## JURISDICTION

8.      This Court possesses subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).  This matter is between citizens of a state and a foreign state, and the amount in controversy exceeds $75,000.

9.      This Court possesses personal jurisdiction over the Company, and venue is proper in the Southern District of New York, because in Indenture Section 12.09, the Company agreed that any action arising out of or based on the Indenture could be brought in the federal or state courts located in the City of New York, and irrevocably waived any objection that such a court would be an improper venue or inconvenient forum:

> Any legal suit, action or proceeding arising out of or based upon this Indenture or the transactions contemplated hereby ("Related Proceedings") may be instituted in the federal courts of the United States of America located in the City of New York or the courts of the State of New York in each case located in the City of New

> York (collectively, the "Specified Courts"), and each party
> irrevocably submits to the non-exclusive jurisdiction of such courts
> in any such suit, action or proceeding . . . .  The parties irrevocably
> and unconditionally waive any objection to the laying of venue of
> any suit, action or other proceeding in the Specified Courts and
> irrevocably and unconditionally waive and agree not to plead or
> claim in any such court has been brought in an inconvenient forum.

In turn, the Notes incorporate the Indenture's jurisdiction and venue provisions.

## APPLICABLE LAW

10.    Indenture Section 12.08 expressly provides that New York law shall govern, and be used to construe, the Indenture and the Notes.

## FACTUAL BACKGROUND

### A.    The Notice of Default and Pending Legal Proceedings

11.    On September 21, 2017, Aurelius sent a Notice of Default to Services, stating that the Company was in breach of the Indenture in at least two respects.  First, the Company permitted its subsidiaries to enter into the Sale-Leaseback Transaction.  As set forth in the Notice of Default, this was a sale-leaseback transaction conducted in violation of the Indenture (the "Sale-Leaseback Default").

12.    Second, the Notice of Default observed that Indenture Section 4.07(a)(A) prohibited the Company from making "Restricted Payments," as defined by the Indenture, during any period of time in which the Company was in default under another provision of the Indenture.  Such Restricted Payments included distributions by the Company to its parent, Windstream Holdings, Inc. ("Holdings").  The Company made such Restricted Payments while it was in default for its breach of the Sale-Leaseback Covenant, and thus the Company was separately in default under Indenture Section 4.07(a)(A) (the "Restricted Payment Default").  As to both of these defaults (together, the "Defaults"), the Indenture provides Services 60 days in which to cure the Defaults.

13.     In response to an action by Services in the Delaware Court of Chancery, the Trustee commenced this action in this Court on October 12, 2017, to obtain a declaratory judgment that (i) the Defaults had occurred; (ii) the Notice of Default was effective as to the Defaults it identified; and (iii) without a cure within 60 days, certain Events of Default would result.  On October 13, 2017, Services filed its Answer and Counterclaims against the Trustee and Aurelius, seeking a declaratory judgment that the Company did not breach the Indenture and enjoining the Trustee and Aurelius from enforcing an Event of Default.

14.     On October 18, 2017, this Court convened an initial conference in this action.  The Court made clear that it would resolve the Trustee's claims promptly; the Court directed the parties to conduct expedited discovery; and the Court directed the parties to conduct a trial on the merits as early as late November or early December 2017.

15.     As soon as the Company realized that it would have to face expedited discovery and a trial, it launched the Consent Solicitation and Exchange Offers to thwart the Trustee and Aurelius.

**B.     The Windstream Exchange Offers and Related Consent Solicitations**

16.     Prior to the Consent Solicitation and Exchange Offers, the Company had five outstanding series of senior notes:

    i.     $651 million principal amount of the 2020 Notes.

    ii.     $809 million principal amount of the 2021 Notes.

    iii.     $441 million principal amount of the Company's 7.50% Senior Notes due 2022 (the "2022 Notes").

    iv.     $344 million principal amount of the Company's 7.50% Senior Notes due 2023 (the "April 2023 Notes").

    v.     $586 million principal amount of the Existing Notes.

(the 2021 Notes, the 2022 Notes and the April 2023 Notes are referred to collectively as the "Exchange Notes"; and the Exchange Notes together with the 2020 Notes, the "Other Senior Notes"). The indentures governing the Other Senior Notes (the "Other Indentures") have substantially the same terms as the Indenture. In particular, the Company's breach of the Sale-Leaseback Covenant under the Indenture is also a breach of the corresponding covenant under the Other Indentures.

17.     On October 18, 2017, the Company commenced the Exchange Offers and the Consent Solicitation, as well as consent solicitations with respect to each of the Other Senior Notes.

18.     In the consent solicitations, the Company separately sought the consents of the holders of each of the five series of notes, to waive the defaults under each of the respective indentures, and to amend each of the indentures so that the Sale-Leaseback Transaction no longer would constitute a breach.

19.     In the Exchange Offers, the Company offered to exchange:

i.     the 2021 Notes for New Notes, at an exchange ratio of $1,100 principal amount of New Notes for each $1,000 principal amount of 2021 Notes, or a combination of New Notes at that exchange ratio and up to $50 million in New Secured Notes, at an exchange ratio of $950 principal amount of New Secured Notes for each $1,000 principal amount of 2021 Notes;

ii.     the 2022 Notes for New Notes, at an exchange ratio of $1,080 principal amount of New Notes for each $1,000 principal amount of 2022 Notes; and

iii.     the April 2023 Notes for New Notes, at an exchange ratio of $1,075 principal amount of New Notes for each $1,000 principal amount of 2022 Notes.

In addition, the Company offered to exchange the 2020 Notes for up to $150 million of New Secured Notes (as the offer was subsequently amended) at an exchange ratio of $950 principal amount of New Secured Notes for each $1,000 in principal amount of 2020 Notes.

20.     On November 1, 2017, Aurelius issued a press release captioned, "Notice to Prospective Holders of Windstream's Notes due 2023 Being Issued Pursuant to the Pending Exchange Offers."[4]  In the press release, Aurelius stated, among other things:

> Aurelius believes the proposed issuance of New Notes is prohibited by the Indenture.  If the indenture trustee authenticates the New Notes, Aurelius would expect to challenge their validity. In this event, a court may need to resolve any dispute concerning the validity of the New Notes.  Aurelius is issuing this notice solely for the purpose of precluding any future holders of the New Notes (whether acquired in the exchange offers or through subsequent resale) from asserting a defense that they acquired the New Notes in good faith and without notice of any dispute as to the validity of New Notes or defect in their issuance.

21.     Also on November 1, 2017, and as a result of the participation in the Exchange Offers, the Company announced that it would issue $553.7 million of New Notes once the early settlement date occurred, and that this amount of New Notes would be sufficient for the Company to obtain the consent of a majority of the holders of the Notes.

22.     On November 6, 2017, the Company called on the Trustee to authenticate the New Notes on the ground that the issuance of the New Notes was permitted under the Indenture, and the Trustee authenticated the New Notes.

23.     A supplemental indenture, which purported to amend the Indenture such that the Sale-Leaseback Transaction would no longer constitute a default, was also executed by the Company and the Trustee on November 6 (the "Supplemental Indenture").  Language was added to the Supplemental Indenture which states:

---

[4]  *See* Business Wire, "Aurelius Capital Master, Ltd. Issues Following Announcement to Prospective Holders of Windstream's Notes Due 2023 Being Issued Pursuant to the Pending Exchange Offers," available at http://www.businesswire.com/news/home/20171102005830/en/Aurelius-Capital-Master-Ltd.-Issues-Announcement-Prospective.

To the extent the requisite consents of Holders of Notes to any amendment or Waiver effected by or delivered in connection with this Supplemental Indenture, including consents from the Holders of Special Additional Notes, are determined by a court order of competent jurisdiction to have not been validly obtained in accordance with the Indenture or applicable law, such amendment or Waiver shall not be deemed to have occurred.

24.    On November 7, 2017 the Company announced—

i.    that on the previous day, it had completed the early settlement of its Exchange Offers with respect to the 2020 Notes, the 2021 Notes, the 2022 Notes and the April 2023 Notes that had been validly tendered as of October 31, 2017;

ii.    that the Consent Solicitation expired on 5:00 p.m., New York City time, on November 6, 2017;

iii.    that as of the expiration date of the Consent Solicitation, the Company had received consents (counting the New Notes) from holders representing a majority of the outstanding aggregate principal amount of 6-3/8% Notes;

iv.    that the Company and the Trustee under the Indenture had executed the Supplemental Indenture giving effect to the proposed waivers and amendments pursuant to the Consent Solicitation;

v.    that the proposed waivers and amendments are effective and operative and, "as such, are binding on all holders of 6-3/8% Notes"; and

vi.    that the Company also obtained the necessary consents from the 2020 Notes and the 2023 Notes, but had not obtained them from either the 2021 Notes or the 2022 Notes.[5]

25.    The New Notes were purportedly issued by the Company under two CUSIPs:   97381LAA6 and U9701LAA1.   The Existing Notes trade under the CUSIP 97381WAZ7.

---

[5]   *See* Windstream Press Release dated Nov. 7, 2017, "Windstream Announces Early Settlement of Exchange Offers and Updates to Consent Solicitations," available at http://investor.windstream.com/investors/releasedetail.cfm?ReleaseID=1047525.   On November 28, 2017, the Company launched additional consent solicitations with respect to the 2021 Notes and the 2022 Notes, similar to the prior solicitations.   On December 6, 2017, the Company purportedly entered into supplemental indentures with respect to the 2021 Notes and the 2022 Notes giving effect to these consent solicitations.

26.     Ultimately, 61% of the Notes participated in the Consent Solicitation. Less than 30% of the Existing Notes provided consents, but almost 95% of the New Notes purportedly issued in the Exchange Offers furnished consents.  The Company's claim that it "had received consents from holders representing a majority of the outstanding aggregate principal amount of 6 3/8% Notes" rested entirely on the validity of the New Notes and related consents from the New Notes.[6]

27.     The Company's purpose in pursuing the Exchange Offers was not to improve its capital structure.  The Exchange Offers resulted in zero increase in liquidity, a trivial extension of maturities, and an increase in the amount of the Company's debt.

28.     The Company's actual purpose was to prevent the exercise of remedies by holders of the Existing Notes.  Services aimed to issue the New Notes to holders who would execute the requisite consents to waive the Defaults and amend the Indenture so that the breach arising out of the Sale-Leaseback Transaction would be eliminated.

29.     Because the issuance of the New Notes and the Consent Solicitation violate the Indenture, and because the Exchange Offers were structurally defective, the New Notes were not properly issued by the Company or authenticated by the Trustee.

**C.     The New Notes Were Not Validly Authenticated**

30.     The Company's scheme hinges on the New Notes qualifying as Additional Notes under the Indenture.  The significance of this is that validly issued Additional Notes are treated as the same series as the Existing Notes for all Indenture purposes, including voting on

---

[6] On November 28, 2017, the Company announced another offer to exchange April 2023 Notes for New Notes.  The Company disclosed that the conditions for consummating the new offer included a minimum participation condition.  On January 5, 2018, the Company announced that the exchange offer expired without any of the April 2023 Notes having been accepted for exchange because the conditions for consummation of the offer had not been satisfied.

waivers and amendments.  The Company sought to use new Additional Notes to outvote the

holders of the Existing Notes in connection with a waiver of the Defaults.

   31. Indenture Section 1.01 defines "Additional Notes" as follows:

  "**Additional Notes** " means an unlimited maximum aggregate principal amount of Notes (other than the Notes issued on the date hereof) issued under this Indenture *in accordance with Sections 2.02 and 4.09* and having the same terms in all respects as the Notes, or similar in all respects to the Notes, except that interest will accrue on the Additional Notes from their date of issuance.

(emphasis added).

   32. Indenture Section 2.02 provides in relevant part as follows:

  The Company may, *subject to Article Four of this Indenture and applicable law*, issue Additional Notes under this Indenture . . . .

. . . .

  At any time and from time to time after the execution of this Indenture, the Trustee shall, upon receipt of a written order of the Company signed by an Officer of the Company (an "**Authentication Order**"), authenticate Notes for (i) original issue in an aggregate principal amount specified in such Authentication Order and (ii) Additional Notes in such amounts as may be specified from time to time without limit, *so long as such issuance is permitted under Article Four of this Indenture and applicable law.*

(emphasis added).

   33. Under Section 2.02, the Company can issue additional Notes under the

Indenture only if they are "Additional Notes."

   34. The Company is permitted to issue and the Trustee is authorized to

authenticate Additional Notes *only* if such issuance is permitted under applicable law and Article

Four of the Indenture.  As detailed below, the purported New Notes were issued in transactions

that violate Section 4.09,  Section 4.12, and Section 4.17 of the Indenture; the New Notes were

wrongfully authenticated; and the issuance of the New Notes is therefore not permitted under

Article Four of the Indenture.

35.     Because the New Notes were not properly issued or authenticated under the Indenture, the purported issuance of the New Notes is void, and the Consent Solicitation, whose success depended entirely on the validity of the issuance of the New Notes, failed to waive the Defaults or amend the Indenture to eliminate the Defaults.

**D.     The Consent Solicitation Was Structurally Defective**

36.     Under the Exchange Offers, the holders of the Exchange Notes had the right to furnish consents in the Consent Solicitation with respect to the New Notes that they would receive upon consummation of the Exchange Offers.  In order to complete the Consent Solicitation and Exchange Offers, the Company required that holders of the New Notes consent to waivers of the Defaults.  However, the successful completion of the Consent Solicitation was contingent upon inducing holders of the Exchange Notes to participate in the Exchange Offers and provide their advance consents on the New Notes.  But the New Notes would violate the Indenture, and could not be properly issued and counted, unless the Company obtained consents from the New Notes.  Thus, the issuance of the New Notes rested on a flawed circularity.

37.     Similarly, the Exchange Offers contained a "Minimum Issuance Condition," which required that consents be given by holders representing a majority of the outstanding Notes, and that the waivers and amendments to the Indenture eliminating the Defaults be effective.  The Exchange Offers could not be consummated and the New Notes could not be issued unless this condition was satisfied.  But this condition could not be satisfied without the New Notes first having been issued so as to create a majority of Noteholders willing to provide the necessary consents to waive the Defaults and to amend the Indenture.

38.     In other words, "X" (issuance of the New Notes) could not occur without the prior occurrence of "Y" (a successful consummation of the Consent Solicitation with the waivers and Indenture amendments also being effective).  But "Y" could not occur unless "X"

had previously occurred.   The only logical outcome is that neither "X" nor "Y" properly occurred and the issuance of the New Notes is a legal nullity.

**E.**      **Violation of Indenture Section 4.09 – Limitation on Indebtedness**

39.      The Indenture restricts the right of Services to issue Additional Notes. Under Section 2.02, the Trustee may authenticate the issuance of Additional Notes only "so long as such issuance is permitted under Article Four of this Indenture and applicable law."

40.      Section 4.09 establishes a test of financial stability and credit-worthiness that Services must satisfy before it can issue Additional Notes.   But Services had no capacity available under Section 4.09 for the issuance of the New Notes.   Accordingly, the issuance of the New Notes was not permitted under Section 4.09, and the New Notes do not qualify as Additional Notes.

41.      Section 4.09 is divided into two parts.   Section 4.09(a) states that the Company may incur additional debt so long as its aggregate outstanding debt is no greater than 4.5 times its Consolidated Cash Flow (as defined in Indenture Section 1.01).   This is known as the "leverage ratio"; the debt incurred within those guidelines is known as "ratio debt"; and the debt that is incurred in accordance with these provisions is said to come from the "ratio basket."

42.      Section 4.09(b) then sets out a series of exceptions to the ratio; these are instances in which Services may incur additional debt beyond the 4.5 times limit.   Only two such exceptions even arguably apply to the issuance of the New Notes.   One is Section 4.09(b)(v), which permits Services to incur "Permitted Refinancing Indebtedness."   In general, this is debt that Services incurs in order to refinance other, existing debt.   But Section 4.09(b)(v) imposes a series of conditions that determine whether any indebtedness is actually "Permitted Refinancing Indebtedness."   Each of those conditions must be satisfied, but in the present case, at least one of these conditions was not.   The second potential exception is in Section 4.09(b)(xv), which grants

Services the right to incur up to $250 million in new debt.  Even if that exception were available here (which it was not[7]), it would not have allowed Services to incur anything close to the amount of New Notes incurred.  Thus, Services had no ability to incur the debt it did in the Exchange Offers, and the resulting issuance of the New Notes was not permitted by Article Four.

### 1.     Issuance of the New Notes Was Not Permitted Under Section 4.09(a)

43.     As described in the complaint in this action, the Company's Sale-Leaseback Transaction imposed on the Company billions of dollars of lease obligations and thus dramatically increased the Company's total indebtedness.  More specifically, the Indenture uses the term "Attributable Debt" to define the amount of indebtedness that is created by any sale-leaseback transaction.  The Company's September 30, 2017 financial statements show that the long-term lease obligation arising from the Sale-Leaseback Transaction, which is a proxy for Attributable Debt under the Indenture, in respect of the Master Lease is at least $4.8 billion.  With Attributable Debt of this magnitude, the Company could not incur any ratio debt under Indenture Section 4.09(a).

44.     An examination of the Company's quarterly financial disclosures from the third quarter of 2017 proves the point.  Total debt is over $10.7 billion.  This includes (a) more than $5.9 billion of long-term debt as of September 30, 2017, representing the Notes, the Other Senior Notes, the Company's credit facility debt, capital leases, and (b) at least $4.8 billion of Attributable Debt associated with the long-term lease obligations arising from the Sale-Leaseback Transaction.  In contrast, Services' Consolidated Cash Flow is less than $2.1 billion.  Thus, the Company's total outstanding indebtedness is much more than 4.5 times its

---

[7]  The Attributable Debt, which substantially exceeds $250 million, fully depleted this basket.

Consolidated Cash Flow.  The additional debt created by the New Notes would only increase the ratio.

45.     Through the consent solicitations, the Company sought to, among other things, amend the Indenture to provide that the Sale-Leaseback Transaction was not prohibited, and that lease obligations under the Sale-Leaseback Transaction did not constitute Attributable Debt and no longer would constitute indebtedness of the Company.

### 2.     The "Refinancing Basket" in Section 4.09(b)(v) Is Not Available to Services

46.     Because the ratio and general baskets are not available to it, the Company may be attempting to rely on the "Refinancing Basket" to incur the indebtedness associated with the New Notes.  Under Indenture Section 1.01, "Permitted Refinancing Indebtedness" is defined as:

> any Indebtedness of the Company or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund other Indebtedness of the Company or any of its Restricted Subsidiaries (other than intercompany Indebtedness);

But there are important qualifications.  Among them, clause (1) of the definition requires that if the Company pays any "premium" in carrying out a refinancing, that premium must be "reasonably determined" and "necessary to accomplish" the refinancing.  Clause (1) states that:

> the amount of such Permitted Refinancing Indebtedness [must] not exceed the amount of the Indebtedness so extended, refinanced, renewed, replaced, defeased or refunded (plus all accrued and unpaid interest thereon and the amount of *any reasonably determined premium necessary to accomplish such refinancing* and such reasonable expenses incurred in connection therewith);

(emphasis added).

47.     The Exchange Offers fail these tests.  First, the Company's claim that these transactions were a refinancing with the purpose of extending the maturities of the

Exchange Notes is false.  The resolution of Services' Board of Directors regarding the "Consent Solicitation and Notes Exchange Matters" states that management recommended the Exchange Offers "to further address the allegations" in Aurelius's Notice of Default.  The resolution says nothing about management's goal being to refinance the debt to extend maturities.  Further, even if management did have such a goal, the maturity of the April 2023 Notes, by far the largest participant in the Exchange Offers, was extended by merely four months.  The reality is that the Exchange Offers were a vote buying exercise.  The premiums paid through the issuance of the New Notes were not for the purpose of effecting a refinancing, but instead were aimed at drawing in enough consenting holders of New Notes to waive the Defaults and amend the Indenture.

48.     The consents of the New Notes were the Company's real objective in the Exchange Offers, but a premium *for consents* does not qualify as an exception under clause (1) of the definition of Permitted Refinancing Indebtedness.  The premium must be for purposes of accomplishing a *refinancing*.  Here, the premium was paid to secure a consent.  For this reason, the basket for refinancing under Indenture Section 4.09(b)(v) was not available for the issuance of the New Notes.

49.     Second, the premiums were not reasonable in amount.  The principal amount of New Notes offered in exchange for $1,000 in principal amount of the Exchange Notes exceeded what would have been necessary to refinance the Exchange Notes, whether based on other refinancing alternatives available to the Company, the call prices of the Exchange Notes, the trading values of the Exchange Notes at the time the Exchange Offers were announced, or any other valid measure of financial reasonableness.  For this reason as well, the basket for

refinancing under Indenture Section 4.09(b)(v) was not available for the issuance of the New Notes.

50.     With no basket available for the issuance of the New Notes, the issuance was not permitted under Indenture Section 2.02 and the consents represented by those Notes cannot be counted.

## F.     Violation of Indenture Section 4.17 – Payments for Consent

51.     Indenture Section 4.17 governs "Payments for Consent."  Its core rule is that if Services offers payments to Noteholders to induce their consents, it must offer to pay, and then actually pay, the same amount to all Noteholders who provide consents.  Section 4.17 states:

> The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any Holder of Notes for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to be paid and is paid to all Holders of the Notes that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.

52.     The Company paid consideration to holders of the Exchange Notes to induce those holders to exchange their notes for New Notes and thereby outvote the Existing Notes.  That consideration (premiums, New Secured Notes, or their economic equivalent) was not offered to the holders of the Existing Notes.  Thus, the Company conducted the Consent Solicitation in violation of Section 4.17.[8]

53.     The Exchange Offers were conditioned on the Company's receiving consents from holders representing a majority of the Notes outstanding.  By the Company's own

---

[8]   The Company or its affiliates may have entered into undisclosed agreements with, or provided undisclosed consideration to, certain holders of the Notes in connection with the Exchange Offers and Consent Solicitation.  The selective payment of this undisclosed consideration to induce participation in the Consent Solicitation would be a further violation of Section 4.17.

design, the Consent Solicitation is part and parcel of the transaction in which the New Notes purport to be issued.   Because the Consent Solicitation violates Indenture Section 4.17, the issuance of the New Notes was not permitted under Section 2.02 and the consents represented by those Notes cannot be counted.

G.   **Violation of Indenture Section 4.12 – Limitation on Liens**

54.   In connection with the Exchange Offers, Services issued approximately $200 million of New Secured Notes.  Services issued $150 million of the New Secured Notes in exchange for 2020 Notes, and $50 million of the New Secured Notes in exchange for 2021 Notes.  In each case, these New Secured Notes were issued at a discount to the notes for which they were being exchanged – that is, $950 (or $900 after the early exchange period) principal amount of the New Secured Notes for each $1,000 principal amount of existing notes.

55.   The issuance of the New Secured Notes violated Indenture Section 4.12 ("Liens").  Section 4.12 provides as follows:

> The Company shall not, and shall not permit any of its Restricted Subsidiaries to, create, incur, assume or otherwise cause or suffer to exist or become effective any Lien of any kind securing Indebtedness (other than Permitted Liens) upon any of their property or assets, now owned or hereafter acquired, unless all payments due under this Indenture and the Notes are secured on an equal and ratable basis with the obligations so secured (or, in the case of Indebtedness subordinated to the Notes or the related Note Guarantees, prior or senior thereto, with the same relative priority as the Notes shall have with respect to such subordinated Indebtedness) until such time as such obligations are no longer secured by a Lien.

That is, unless a lien is a Permitted Lien, the Company cannot incur the lien without equally and ratably securing the Existing Notes.  The only Permitted Lien baskets of possible relevance to the New Secured Notes are clauses (1) and (7) of the definition of "Permitted Liens."   Neither, however, is available to the Company.

56.   The Company cannot rely on clause (7) of the definition of "Permitted Liens," which permits liens created to secure Permitted Refinancing Indebtedness.   Liens are

permitted under that clause only if "such Liens do not extend to any property or assets other than the property or assets that secure the Indebtedness being refinanced." In this case, the 2020 Notes and 2021 Notes, for which the New Secured Notes were exchanged, are unsecured. The exchange of unsecured debt for secured debt does not meet the requirements of clause (7).

57. As long as the Attributable Debt relating to the Sale-Leaseback Transaction is outstanding, clause (1) of the definition of "Permitted Liens," which places limits on the total amount of secured debt that Services may incur under the clause, is also unavailable. That clause permits:

> Liens securing obligations in an amount when created or Incurred, together with the amount of all other obligations secured by a Lien under this clause (1) at that time outstanding (and any Permitted Refinancing Indebtedness Incurred in respect thereof) . . . not to exceed the greater of (A) the sum of (i) the amount of Indebtedness Incurred and outstanding at such time under Section 4.09(b)(i), (iv) and (xv) *plus* (ii) the amount of Indebtedness available for Incurrence at such time under Section 4.09(b)(i), (iv) and (xv) and (B) the product of (x) 2.50 and (y) the Company's Consolidated Cash Flow for the most recent four fiscal quarters for which internal financial statements are available at such time . . . ;

The limiting subclause is (1)(B), which would allow secured debt of up to approximately $5.1 billion, based on the financial results for the Company's trailing four quarters ended September 30, 2017. The Attributable Debt is secured debt, as provided under clause (i)(B) of the Sale-Leaseback Covenant in Section 4.19 and as implied by clause (16) of the definition of "Permitted Liens." The combination of at least $4.8 billion of Attributable Debt, together with the $3.1 billion of secured debt outstanding under the Company's credit facility and the secured notes issued by Windstream Holdings of the Midwest, far exceeds, even before the issuance of the New Secured Notes, the secured debt permitted under clause (1)(B) basket. There is no room under this basket for *any* additional secured debt. Thus, the liens associated with the $200 million of New Secured Notes are not Permitted Liens under the Indenture.

58.     Because it has no Permitted Liens capacity, the Company was required, but failed, to secure the Notes "on an equal and ratable basis" with the New Secured Notes.  The issuance of the New Secured Notes therefore violates Section 4.12.

59.     In addition, the issuance of the New Secured Notes for the 2021 Notes was an integral part of the Exchange Offers.  Because the issuance of these New Secured Notes violated Section 4.12, issuance of the New Notes was not permitted under Section 2.02, and the consents represented by those Notes cannot be counted.

## H.     Violation of Implied Covenant of Good Faith and Fair Dealing

60.     The implied covenant of good faith and fair dealing is implicated whenever a party to a contract acts in a way that deprives another party of material benefits of the agreement, without a contractual basis for doing so.

61.     The Company's issuance of the New Notes and use of them to deny the holders of the Existing Notes their ability to exercise remedies on a default deprives these noteholders of fundamental contractual rights and remedies under Article Six ("Defaults and Remedies") and Article Nine ("Amendment, Supplement and Waiver") of the Indenture.  Through Services' conduct of the Consent Solicitation, whose success rested on the issuance of Additional Notes to tilt the playing field in its favor, and by concealing its true intentions in the process, the Company deprived holders of the Existing Notes of important benefits of the Indenture.

62.     The Company had no basis in the Indenture for depriving the holders of the Existing Notes of their rights and remedies.  As detailed above, the Consent Solicitation, the Exchange Offers, and the purported issuance of the New Notes were structurally defective, and each constituted a material breach of the Indenture.

63.     If Services genuinely believed that the Indenture afforded it the right to override a notice of default by issuing Additional Notes to new holders who would then be incentivized to consent to waivers and amendments, it should have –

- identified this as a risk of ownership of the Notes in the detailed risk factors contained in the prospectus for the registered exchange of restricted for unrestricted Notes that the Company conducted in March 2013; and

- stated that the primary purpose of the Exchange Offers and the issuance of the New Notes was to garner sufficient consents to waive the Defaults under the Indenture.

By not making any such disclosures, the Company effectively conceded that the Indenture, by its terms, does not permit the Company to obtain waivers of defaults and amend the Indenture with this tactic.

64.     The disclosures the Company made in public statements regarding the Consent Solicitation and Exchange Offers actually obfuscated core aspects of the transaction, including as regards the purpose of the Exchange Offers, which was to dilute the voting power of the holders of the Existing Notes; why in the end the Company conditioned the Exchange Offers only on the Consent Solicitation and not the consent solicitations for the Other Senior Notes; the purpose of the conditions of the Exchange Offers (the Consent Condition and the Minimum Issuance Condition), which was to assure that the Company acquired sufficient consents to out-vote Aurelius; and why without explanation the Company decreased the Minimum Issuance Condition subsequent to the commencement of the Exchange Offers.

65.     The Company's failure to make candid disclosure in respect of core aspects of the Consent Solicitation and Exchange Offers further evidences its bad faith.

66.     Because of the Company's violation of the implied covenant of good faith and fair dealing under the Indenture, the Consent Solicitation and the purported issuance of the New Notes should be invalidated.

I.      **The Defaults Noticed by Aurelius on September 21, 2017 Mature into Events of Default and Aurelius Accelerates the Notes**

67.     Under Section 6.01(a)(v) of the Indenture, the Company had 60 days from September 21, 2017, the date of the Notice of Default sent by Aurelius, in which to cure the Defaults. On October 25, 2017, this Court ordered that period extended by 16 days. On December 7, 2017, the extended cure period expired, and the uncured Defaults therefore matured into Events of Default. Under Section 6.02(a) of the Indenture, when an Event of Default occurs and is continuing with respect to Notes, "the Trustee or the Holders of at least 25% in principal amount of the then outstanding Notes may declare all the Notes to be due and payable immediately by notice in writing to the Company specifying the Event of Default. Upon such declaration, the Notes, together with accrued and unpaid interest (including Additional Interest), shall become due and payable immediately."

68.     On December 7, 2017, Aurelius sent a Notice of Acceleration to the Company, stating that the Default noticed by Aurelius on September 21, 2017, had matured into an Event of Default under the Indenture. The Notice of Acceleration further stated that, pursuant to Section 6.02(a) of the Indenture, Aurelius was declaring all Notes due and payable immediately. Thus the Notes, together with accrued and unpaid interest, became due and payable immediately. The Company has not paid the principal and interest due, and thus payment on the Notes is past due.

J.      **The No-Action Clause**

69.     Section 6.06(a) of the Indenture, the No-Action Clause, provides:

A Holder of a Note may not pursue any remedy with respect to this Indenture or the Notes unless: (i) the Holder gives the Trustee written notice of a continuing Event of Default with respect to Notes; (ii) the Holders of at least 25% in aggregate principal amount of outstanding Notes make a written request to the Trustee to pursue the remedy; (iii) such Holder or Holders offer the Trustee indemnity satisfactory to the Trustee against any costs, liability or expense; (iv) the Trustee does not comply with the request

74

within 60 days after receipt of the request and the offer of indemnity; and (v) during such 60-day period, the Holders of a majority in aggregate principal amount of the outstanding Notes do not give the Trustee a direction that is inconsistent with the request.

70.     Aurelius has complied with the No-Action Clause, as set forth below. Moreover, exemptions from and exceptions to the No-Action Clause apply in this case. Among other things, when compliance with the No-Action Clause would be futile, compliance is excused. Compliance with the No-Action Clause in connection with Aurelius's first claim for relief is futile. Among other things, it cannot reasonably be expected that the Trustee who authenticated the New Notes and entered into the Supplemental Indenture (because the Trustee apparently felt that the Indenture obligated it to do so) will reverse itself to pursue a declaration of invalidity of the New Notes and the Supplemental Indenture – the remedy sought by Aurelius.

71.     With respect to Aurelius's second claim for relief, the Indenture provides that suits for past due payments are not subject to the No-Action Clause. Specifically, Section 6.07 of the Indenture provides, "Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of the principal of, premium or Additional Interest, if any, or interest on, such Note or to bring suit for the enforcement of any such payment, on or after the due date expressed in the Notes, shall not be impaired or affected without the consent of the Holder." When Aurelius issued its Notice of Acceleration, the principal and interest on the Notes held by Aurelius became immediately due and payable, and since it is now after that due date and the Company still has not made the required payment, Section 6.07 applies and the claim for relief by Aurelius on the accelerated debt is not subject to the No-Action Clause.

**K.**   **Aurelius's Directions and Indemnities to the Trustee**

72.     Aurelius is a beneficial owner of more than 50% of the aggregate principal amount of the Existing Notes and more than 25% of the aggregate principal amount including the Notes whose validity Aurelius contests.

73.     As defined in the Indenture, a "Holder" means a registered holder of Notes. The registered holder of the Notes beneficially owned by Aurelius is Cede & Co. ("Cede").

74.     Under Indenture Sections 12.14(a) and (f), any notice or other action that could be given or taken by a Holder under the Indenture may be given or taken by the Holder through an agent duly appointed in writing, with regard to all or any part of the principal amount held by the Holder.

75.     By letters dated September 7, 2017 and November 15, 2017, Cede duly appointed Aurelius's prime broker as its agent to exercise any right or remedy that Cede is entitled to take as a Holder under the Indenture (including the right to give notices of default) in respect of the Notes beneficially owned by Aurelius. Having received such authorization from Cede, Aurelius's prime broker, by letters dated September 11, 2017, and November 16, 2017, duly appointed Aurelius as its agent to exercise any right or remedy that Cede is entitled to take as a Holder under the Indenture (including the right to give notices of default) in respect of the Notes beneficially owned by Aurelius.

76.     By letters (each such letter, an "October Direction & Indemnity Letter"), dated October 3, 2017 and October 12, 2017, Aurelius directed the Trustee to commence an action seeking a declaratory judgment of Default in connection with the Sale-Leaseback Transaction and Restricted Payments.  In both October Direction & Indemnity Letters, Aurelius

offered, and the Trustee found to be satisfactory and accepted, an indemnity against any costs, liability, or expense in connection with the Trustee's prosecution of this action.

77.     Once it became apparent that Services would attempt to consummate the Consent Solicitation on the basis of the  issuance of the New Notes that are being challenged in this action, Aurelius, pursuant to sub-clauses (a)(ii) and (iii) of the No-Action Clause, gave the Trustee an additional direction on November 3, 2017 – that, prior to authenticating any New Notes, the Trustee commence an action in this Court seeking a judicial declaration as to (a) whether issuance of the New Notes would breach one or more of the provisions of the Indentures; (b) whether it would be permissible for the Trustee to authenticate the New Notes; and (c) whether purported waivers of the Sale-Leaseback Default and the Restricted Payment Default that might be delivered by holders of the New Notes would be invalid by virtue of those waivers having been solicited improperly by Services.   In this Direction & Indemnity Letter, Aurelius offered to the Trustee the same indemnity that the Trustee had accepted in connection with the October Direction & Indemnity Letters previously referenced, as well as a third letter of October 30, 2017, in which Aurelius directed the Trustee to appeal a Stay Order issued by this Court.  By letter dated November 6, 2017, the Trustee declined to follow the directions set forth in the Direction & Indemnity Letter of November 3, 2017.

78.     On November 6, 2017, Services purported to consummate the Exchange Offer and Consent Solicitation and to issue the New Notes as Additional Notes under the Indenture.   The Company and the Trustee also entered into the Supplemental Indenture on November 6, 2017, in connection with the issuance of the New Notes, purporting to amend the Indenture to eliminate the Defaults.  The Supplemental Indenture states in part:  "To the extent the requisite consents of Holders of Notes to any amendment or Waiver effected by or delivered

in connection with this Supplemental Indenture, including consents from the Holders of Special Additional Notes, are determined by a court order of competent jurisdiction to have not been validly obtained in accordance with the Indenture or applicable law, such amendment or Waiver shall not be deemed to have occurred."

79.     On November 17, 2017, pursuant to sub-clauses (a)(ii) and (iii) of the No-Action Clause, Aurelius issued to the Trustee a Direction & Indemnity Letter, in which Aurelius directed the Trustee to assert a claim for declaratory judgment as to the invalidity of the New Notes and to seek other relief. Aurelius again offered to the Trustee the same indemnity that the Trustee had accepted in connection with the Direction & Indemnity Letters of October 3, October 12, and October 30, 2017.  By letter dated November 20, 2017, the Trustee declined to follow the directions in the Direction & Indemnity Letter of November 17, 2017 and stated that it had made no determination concerning the adequacy of the indemnity.  The Trustee's decision to decline the direction of Aurelius without regard to whether the offered indemnity was satisfactory underscores the futility of asking the Trustee that authenticated the New Notes to challenge the validity of the New Notes.

80.     On December 7, 2017, pursuant to sub-clause (a)(i) of the No-Action Clause, Aurelius sent to the Trustee a copy of the Notice of Acceleration sent to the Company, thereby notifying the Trustee that the Default noticed by Aurelius on September 21, 2017, had matured into an Event of Default under the Indenture, and that, pursuant to Section 6.02(a) of the Indenture, Aurelius was declaring all Notes due and payable immediately.

81.     On December 21, 2017, Aurelius and the Trustee entered into an agreement reaffirming and augmenting certain provisions of the indemnity established pursuant to the October Direction and Indemnity Letters. As before, the agreement provided that Aurelius

would indemnify the Trustee for any fees, expenses, or losses incurred by the Trustee in connection with the directions given by Aurelius in the October Direction and Indemnity Letters. In addition, Aurelius had previously deposited $500,000 in a dispute reserve for the purpose of providing cash collateral for the indemnity and a backup source of funds for the Trustee's fees and expenses. This reserve was increased to $983,365 pursuant to the December 21, 2017 agreement.

82.     On December 26, 2017, after the Trustee had been given notice on December 7, 2017 of the Company's continuing Event of Default and Aurelius's Notice of Acceleration, Aurelius issued to the Trustee another Direction & Indemnity Letter, pursuant to sub-clauses (a)(ii) and (iii) of the No-Action Clause.  In this letter, Aurelius directed the Trustee to join in the claims set forth in these counterclaims or bring a declaratory judgment action in this District Court seeking a judicial declaration that, among other things, the New Notes, the New Secured Notes, the consents of holders of the New Notes, and the execution of the Supplemental Indenture, were all invalid.  The indemnity offered by Aurelius was identical to that in the October Direction & Indemnity Letters.

83.     On January 12, 2018, pursuant to sub-clause (a)(iii) of the No-Action Clause, Aurelius sent the Trustee a letter with respect to the indemnity provisions in the December 26, 2017 Direction and Indemnity letter. This letter of January 12, 2018 notified the Trustee that, for purposes of the December 26, 2017 letter, Aurelius would increase the dispute reserve to $983,365, just as Aurelius had agreed to do with respect to the October Direction and Indemnity Letters.

84.     Sub-clause (a)(iv) of the No-Action Clause provides as a condition precedent to any Noteholder suit that "the Trustee does not comply with the request [made

pursuant to sub-clause (a)(ii)] within 60 days after receipt of the request and the offer of indemnity." By letter dated January 13, 2018, the Trustee stated that it was declining to follow the directions in the Direction & Indemnity Letter of December 26, 2017. When the Trustee declines to follow the direction in this manner, there is no requirement that the remainder of the 60-day period must elapse in order to satisfy sub-clause (a)(iv). In any event, 60 days have passed since the direction and indemnity first given on November 3, 2017. Either way, sub-clause (a)(iv) has been satisfied.

85.    After declining the directions, the Trustee "acknowledge[d] the augmented offer of indemnity to the Trustee of yesterday's date [January 12, 2018]," and noted that "because it is declining to accept the requests in the Direction Letter, it has not been necessary for it to make any determination regarding the adequacy of the proffered indemnity." The Trustee's decision to decline the direction of Aurelius without regard to whether the offered indemnity was satisfactory underscores the futility of asking the Trustee that authenticated the New Notes to challenge the validity of the New Notes. Furthermore, by virtue of Aurelius's offering the Trustee the same indemnity that the Trustee had found to be satisfactory in connection with Aurelius's prior directions in this action, and by virtue of the Trustee's electing to take no steps to consider  the adequacy of that indemnity in connection with Aurelius's current directions, sub-clause (a)(iii) of the No-Action Clause has been satisfied.

86.    Sub-clause (a)(v) of the No-Action Clause makes it a condition precedent to any Noteholder suit that "the Holders of a majority in aggregate principal amount of the outstanding Notes do not give the Trustee a direction that is inconsistent with the request" by the Noteholder pursuing the remedy. Because Aurelius holds a majority of the Existing Notes, and because the New Notes were not validly issued and authenticated, it is not possible for a majority

of holders of the Notes to give the Trustee a direction that is inconsistent with the written requests of Aurelius dated November 17, 2017 and December 26, 2017. At minimum, any valid direction would require a specific instruction to the Trustee accompanied by satisfactory indemnity, and to the knowledge of Aurelius, no such specific instruction has been given, and no such indemnity has been offered, to the Trustee. To the extent the Company has suggested that the Consent Solicitation constitutes such an inconsistent direction, the Company is in error.

87.     Based on the facts set forth in these Counterclaims, each sub-clause of the No-Action Clause has been satisfied and the No-Action Clause has been complied with in full.

88.     Alternatively, any conditions precedent to the right of Aurelius to assert these Counterclaims are inapplicable or have been excused and/or waived.

## FIRST CLAIM FOR RELIEF
### (Breach Of Indenture)

89.     Aurelius repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

90.     The Indenture is a contract between holders of the Notes and the Company. The Company's Exchange Offers, Consent Solicitation, and purported issuance of the New Notes constitute a material breach by the Company of the Indenture for all of the following reasons:

- The purported issuance and authentication of the New Notes violated Indenture Section 2.02, because the issuance of the New Notes was not permitted under Indenture Article Four.

- The purported issuance of the New Notes violated Indenture Section 4.09, which restricts the Company's ability to incur indebtedness.

- The Consent Solicitation that accompanied, and was the purpose of, the Exchange Offers violated Indenture Section 4.17, which requires the Company to offer all holders of Notes equal consideration to induce the consents.

- The Company failed to secure the Existing Notes on an equal and ratable basis with the New Secured Notes, some of which were issued along with the New Notes in an Exchange Offer, in violation Indenture Section 4.12.

- The Company purported to waive covenant defaults and amend the Indenture in violation of Indenture Article Nine, because the majority consents upon which it relied could not have been given without the issuance of the New Notes, but the New Notes could not have been issued without the waivers and amendments effected by the majority consents, and the delivery of the majority consents was an unwaived pre-condition to the issuance of the New Notes. This is a circularity and a defect in the structure of the transaction that is fatal to the validity of the issuance of the New Notes.

- The coordinated Consent Solicitation and Exchange Offers, with their design to manipulate the processes of Articles Six and Nine of the Indenture for the notice, waiver, and cure of defaults, are a breach of the implied covenant of good faith and fair dealing in the Indenture.

91. Aurelius is being irreparably harmed by the Company's material breach of contract.

92. Aurelius is entitled to a declaration that the New Notes do not constitute Additional Notes under the Indenture, or alternatively, that the issuance of the New Notes is null and void and that such New Notes are not outstanding for any purpose under the Indenture.

93. Aurelius is entitled to a declaration that the Consent Solicitation was not effective to waive the Defaults or to amend the Indenture in any respect, and that the Supplemental Indenture purportedly executed by the Company and the Trustee is null and void.

94. Aurelius is entitled to specific performance of the Company's obligation to secure the Existing Notes equally and ratably with the New Secured Notes.

95. Aurelius is entitled to a permanent injunction against the Company taking any further action to authenticate and/or issue any New Notes or Additional Notes under the Indenture in violation of the provisions of the Indenture.

96. Aurelius is entitled to an award of damages against the Company in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (Judgment on Principal and Interest Due and Payable )

97.     Aurelius repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

98.     Under the terms of the Indenture, an Event of Default occurred on December 7, 2017, and is continuing.

99.     On December 7, 2017, Aurelius exercised its rights under the Indenture to declare all Notes due and payable immediately.

100.    As a result of the declaration of Aurelius, the Notes held by Aurelius, together with accrued and unpaid interest thereon, became due and payable immediately.

101.    The Company has not paid to Aurelius the principal and interest due on the Notes held by Aurelius, and thus payment is past due.

102.    Aurelius is entitled to a judgment for the aggregate principal amount of the Notes held by Aurelius, together with all accrued but unpaid interest thereon to the date of collection.

## PRAYER FOR RELIEF

**WHEREFORE**, Aurelius respectfully requests that the Court enter judgment granting it the following relief:

A.      Declaring that the New Notes do not constitute Additional Notes under the Indenture, or alternatively, invalidating the issuance of the New Notes and the results of the Exchange Offers and the Consent Solicitation;

B.      Invalidating any purported waivers of the Defaults given by holders of the New Notes and related amendments to the Indenture;

C.      Granting specific performance of the Company's obligation to secure the Existing Notes equally and ratably with the New Secured Notes;

D.      Entering a permanent injunction barring the Company from taking any further action to authenticate and/or issue New Notes or Additional Notes under the Indenture in violation of the provisions of the Indenture;

E.      Awarding to plaintiff, as against the Company only, damages in an amount to be determined at trial;

F.      Awarding to plaintiff the attorneys' fees, costs, and disbursements that plaintiff incurs in this action, including legal fees that are not paid by Services;

G.      Declaring that all Notes held by Aurelius are due and payable immediately, and awarding to Aurelius the aggregate principal amount of the Notes held by Aurelius and all accrued but unpaid interest thereon to the date of collection; and

H.      Granting to plaintiff such other relief as this Court deems to be just and proper.

Dated: New York, New York
        January 19, 2018

                                        KRAMER LEVIN NAFTALIS & FRANKEL
                                        LLP


                                         /s/  Arthur H. Aufses III_____
                                        By: Arthur H. Aufses III
                                        1177 Avenue of the Americas
                                        New York, NY 10036
                                        (212) 715-9100
                                        aaufses@kramerlevin.com

                                        *Attorneys for Counterclaim*
                                        *Defendant and Counterclaim Plaintiff,*
                                        *Aurelius Capital Master, Ltd.*