# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
No. 17 Civ. 7857 (JMF)
----------------------------------)
U.S. BANK NATIONAL ASSOCIATION,
solely in its capacity as indenture
trustee of Windstream Services,
LLC's 6 3/8% Senior Notes due 2023,

                    Plaintiff-Counterclaim
                         Defendant,

        vs.

WINDSTREAM SERVICES, LLC,

                    Defendant-Counterclaimant,

        vs.

AURELIUS CAPITAL MASTER, LTD.,

                    Counterclaim Defendant.

----------------------------------)


        VIDEOTAPED 30(b)(6) DEPOSITION OF
           WINDSTREAM SERVICES, LLC by
                 BOB F. GUNDERMAN
                New York, New York
                November 3, 2017




Reported by:
Linda Salzman
JOB NO. 133132

1
2          November 3, 2017
3          10:08 a.m.
4
5      Videotaped 30(b)(6) Deposition
6 of WINDSTREAM SERVICES, LLC by BOB
7 F. GUNDERMAN, held at the offices of
8 Kirkland & Ellis LLP, 601 Lexington
9 Avenue, New York, New York, pursuant
10 to Notice, before Linda Salzman, a
11 Notary Public of the State of New
12 York.
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2 A P P E A R A N C E S:
3
4    FRIEDMAN KAPLAN SEILER & ADELMAN
5    Attorneys for Plaintiff
6      7 Times Square
7      New York, New York 10036
8    BY:  EDWARD FRIEDMAN, ESQ.
9      CHRISTOPHER COLORADO, ESQ.
10     JEFFREY FOURMAUX, ESQ.
11
12
13   KIRKLAND & ELLIS
14   Attorneys for
15   Defendant-Counterclaimant and the
16   Witness
17     601 Lexington Avenue
18     New York, New York 10022
19   BY:  AARON MARKS, ESQ.
20     RUSH HOWELL, ESQ.
21
22
23
24        (Continued)
25

1
2 A P P E A R A N C E S:  (Continued)
3
4    KRAMER LEVIN NAFTALIS & FRANKEL
5    Attorneys for Counterclaim Defendant
6     1177 Avenue of the Americas
7     New York, New York 10036
8    BY:  ARTHUR AUFSES III, ESQ.
9
10
11   Also Present:
12     MICHAEL C. McCARTHY, Maslon LLP
13     DALE SWINDELL, Videographer
14
15
16
17
18
19
20
21
22
23
24
25

1
2     STIPULATIONS
3     IT IS HEREBY STIPULATED AND
4 AGREED by and among counsel for the
5 respective parties hereto, that the
6 sealing and certification of the
7 within deposition shall be and the
8 same are hereby waived;
9     IT IS FURTHER STIPULATED AND
10 AGREED all objections, except as to
11 the form of the question, shall be
12 reserved to the time of the trial;
13     IT IS FURTHER STIPULATED AND
14 AGREED that the within deposition may
15 be signed before any Notary Public
16 with the same force and effect as if
17 signed and sworn to before the Court.
18
19
20
21
22
23
24
25

1
2      THE VIDEOGRAPHER:  This is the
3  start of media labeled No. 1 of the
4  video-recorded deposition of Bob F.
5  Gunderman in the matter U.S. Bank
6  National Association v. Windstream
7  Services, LLC v. Aurelius Capital
8  Master, Ltd. v. Windstream Services,
9  LLC.
10      This deposition is being held at
11  601 Lexington Avenue, New York, New
12  York, on November 3rd, 2017 at
13  approximately 10:09 a.m.
14      My name is Dale Swindell.  I'm
15  the certified legal video specialist
16  from TSG Reporting, Inc.,
17  headquartered at 747 Third Avenue, New
18  York, New York.  The court reporter is
19  Linda Salzman, in association with TSG
20  Reporting.
21      Will counsel please introduce
22  yourselves?
23      MR. FRIEDMAN:  This is Edward
24  Friedman, with the firm of Friedman
25  Kaplan Seiler & Adelman.  We represent

1
2  Plaintiff U.S. Bank as trustee.  With
3  me is my partner, Chris Colorado.
4      MR. AUFSES:  Arthur Aufses,
5  Kramer Levin Naftalis & Frankel, for
6  Counterclaim Defendant Aurelius
7  Capital Master, Ltd.
8      MR. MARKS:  Aaron Marks,
9  Kirkland & Ellis, for
10  Defendant-Counterclaimant Windstream
11  Services, LLC, and the witness.
12      And with me today is my partner,
13  Rush Howell.
14      THE VIDEOGRAPHER:  Will the
15  court reporter please swear in the
16  witness.
17  B O B  G U N D E R M A N,
18  called as a witness, having been duly
19  sworn by a Notary Public, was examined
20  and testified as follows:
21  EXAMINATION BY
22  MR. FRIEDMAN:
23      Q.  Good morning, Mr. Gunderman.
24      A.  Good morning.
25      Q.  You know that you are testifying

1      B. Gunderman
2  here in response to what is referred to as
3  a Notice of Rule 30(b)(6) Deposition?
4      A.  Yes.
5      Q.  And have you seen the document
6  that is the Notice of Rule 30(b)(6)
7  Deposition?
8      A.  Yes.
9      Q.  I'm going to show you that
10  document.  It has been marked as Exhibit
11  5.  I've opened it to the page that sets
12  forth subject matters.
13      MR. MARKS:  Just for the record,
14  we served written objections to the
15  30(b)(6) Notice.  We stand by and do
16  not waive those stated objections.
17  However, in the interest of time and
18  efficiency, I will not repeat those
19  objections here.
20  BY MR. FRIEDMAN:
21      Q.  You understand, Mr. Gunderman,
22  that you have been designated by
23  Windstream Services to testify on behalf
24  of Windstream Services with respect to
25  subject matter 4 on the 30(b)(6) Notice;

1      B. Gunderman
2  is that correct?
3      A.  Yes.
4      Q.  And that subject matter 4
5  relates to explanation and interpretation
6  of the financial condition and operating
7  performance of Holdings, Services, the
8  transferor subsidiaries as reflected in
9  certain documents.  And I'm not going to
10  read the document numbers.  They're set
11  forth here.
12      Do you know what is meant by the
13  term "transferor subsidiaries"?
14      A.  Yes.
15      Q.  And what is meant by that?
16      A.  Represents the subsidiaries
17  within Windstream Services that
18  transferred assets as part of the spin
19  transaction in 2015.
20      Q.  And those subsidiaries
21  transferred assets to a company then known
22  as CS&L, now known as Uniti; is that
23  correct?
24      A.  Correct.
25      Q.  I'm going to start by showing

                    B. Gunderman
1   you an exhibit that we have marked as
2   Exhibit 13.  It is an e-mail from Tony
3   Thomas to Bob Gunderman and others dated
4   April 15, 2013, document number WIN 20917.
5               (Exhibit 13, 5/15/13 e-mail,
6               Bates stamped WIN 20917, marked for
7               identification, as of this date.)
8               MR. MARKS:  What exhibit are we
9   on?
10              MR. FRIEDMAN:  Exhibit 13.
11          Q.    Have you had an opportunity to
12  read Exhibit 13?
13          A.    Yes.
14          Q.    Is Exhibit 13 an e-mail that you
15  received from Tony Thomas on April 15,
16  2013?
17          A.    I'm on the receiving of this,
18  yes.
19          Q.    So I just need to confirm for
20  the record, did you receive this e-mail?
21          A.    Yes.
22          Q.    On April 15, 2013, correct?
23          A.    Yes.
24          Q.    And who was Tony Thomas at that

                    B. Gunderman
1   time?
2           A.    Tony Thomas at that time was our
3   chief financial officer.
4           Q.    And what was your position at
5   that time?
6           A.    I was the treasurer of
7   Windstream.
8           Q.    What is your position currently?
9           A.    Chief financial officer.
10          Q.    When did you become chief
11  financial officer?
12          A.    December of 2014.
13          Q.    And is Tony Thomas still with
14  the company?
15          A.    He is.
16          Q.    And what's his position?
17          A.    Chief executive officer.
18          Q.    And you have been chief
19  financial officer since 2014, you said,
20  correct?
21          A.    Correct.
22          Q.    And you are the chief financial
23  officer of what company or companies?
24          A.    I'm the chief financial officer

                    B. Gunderman
1   of Windstream Holdings and all of its
2   subsidiaries.
3           Q.    And is Tony Thomas the CEO of
4   Windstream Holdings and all of its
5   subsidiaries?
6           A.    Yes.
7           Q.    In Exhibit 13, you see in the
8   first line of the e-mail after the word
9   Bob, there's a reference to something
10  called Captive.  Do you see that?
11          A.    I see that.
12          Q.    And what is meant by "Captive"?
13          MR. MARKS:  Objection to form.
14          A.    As I read this today, I don't
15  recall the details of the conversations we
16  were having on this matter.  I can only
17  read the words on the page.
18          Q.    Do you have an understanding as
19  you read it what is meant by "Captive"?
20          A.    I can read the words, "Here are
21  some questions I have related to the
22  Captive."  Without more context, I don't
23  know what that means, what context that
24  is.

                    B. Gunderman
1           Q.    Can you tell us, having read the
2   entire document, whether this document
3   relates to the planning process that
4   ultimately led to the spin-off and
5   leaseback transaction in April of 2015?
6           A.    All I can tell you is this is
7   what the document says, which, you know,
8   it simply says that, "We need a capital
9   structure that works with the Indenture;
10  we may be able to use the HoldCo strategy
11  here.  Create HoldCo and put Windstream
12  Financial underneath HoldCo."
13          I don't recall the specifics of
14  what he was meaning at the time.  It's
15  been a number of years since I received
16  this e-mail and I don't know what exactly
17  he was referring to in it.
18          Q.    Do you have any understanding as
19  to what is meant by putting Windstream
20  Financial underneath HoldCo?
21          A.    I don't recall what he was
22  referring to at that time.
23          Q.    Do you see in the second
24  paragraph of the e-mail, the last sentence

B. Gunderman
reads:
            "Remember, the sales --
leaseback provision in the indenture can
be a limited factor here."
            Do you see that?
    A.    I see that.
    Q.    Do you have any understanding as
to what that refers to?
            MR. MARKS:  Objection to form.
    A.    I don't recall what he was
referring to in his e-mail.
    Q.    Can you tell us what your role
was in the planning of the April 2015
transaction?
    A.    Can you be more specific?
    Q.    No.  I mean, I would like to
hear you generally explain what your role
was in the transaction.
    A.    Well, you know, the transaction,
the planning steps of the transaction went
on for multiple months.  Multiple years.
Quarters.  I was the treasurer.  At that
time, my role would have been to
contemplate the capitalization of the

B. Gunderman
NewCo, the new REIT.
            I would have been responsible
for investor relations, which would have
been, you know, think of how we would
communicate the benefits of the
transaction to all of our constituents.
            And also managed financial
planning, which given that role, I would
have been involved in understanding the
financial impacts of any number of, you
know, financial assumptions and outcomes
of whatever was current with Windstream at
the time.
            So in the context of this
transaction, that would have been my
contribution to the project.
    Q.    And as of April 2013, had the
planning for the transaction started?
    A.    I don't recall the exact timing
of the planning of the transaction.  I do
recall that sometime in 2013 we were
approached with a concept of a REIT
spin-off.  I wasn't heavily involved early
on in the planning of the transaction.  As

B. Gunderman
the ideation became more developed, I
became more involved as the project
progressed, but in the initial ideation,
planning, structuring, I wasn't involved
in driving that.
    Q.    You referred in your last answer
to, "We were approached with a concept of
a REIT spin-off."
            Who is the "we" in that
statement?
    A.    The company.
    Q.    And the company at that time was
what?  What was the name of the company?
    A.    Windstream Services.
    Q.    Because there was no Holdings at
that time, correct?
    A.    I forget the exact day of the
establishment of Holdings, but you know,
we put the HoldCo structure in somewhere,
I believe, in 2013.
    Q.    And who approached Windstream
Services?
    A.    My recollection was, is that
Bank of America was the advisor who

B. Gunderman
brought the original idea.
    Q.    And do I understand you
correctly that the idea came from Bank of
America?
    A.    Yes.
    Q.    It wasn't something being
planned and discussed within Windstream
prior to Bank of America?
    A.    Not to my knowledge.
    Q.    And who at Bank of America was
involved in approaching Windstream?
    A.    I don't remember all the
accounting that was responsible.  I think
Amar Mirza might have been a structuring
person who would have presented the idea
at some point, and our lead investment
banking advisor at the time was, I think,
Mark Bush would be the two that I would
have remembered from the account team that
would have approached us.
    Q.    As the planning progressed
through to the time of the actual
transaction in April of 2015, did Bank of
America continue to be involved?

B. Gunderman
1
2   A.   They were.
3       Q.   Any other financial or banking
4   advisors involved in the transaction?
5       A.   Yes.
6       Q.   And who was that?
7       A.   Stephens Inc. and J.P. Morgan.
8       Q.   And what roles were played by
9   Stephens Inc. and J.P. Morgan?
10      A.   How I would describe it is Bank
11  of America initially brought the idea of
12  the structure.  And, you know, because of
13  the complexity of the transaction and the
14  ultimate need to finance the transaction,
15  we sought additional advisors.  J.P.
16  Morgan was brought in to help with those
17  discussions and eventually with the
18  financing alongside Bank of America.  And
19  Stephens was a financial advisor advising
20  on any number of portions of the
21  transaction.  They did not participate in
22  the financing portion of the transaction.
23      Q.   Prior to the planning for this
24  transaction, did Windstream have a
25  relationship with Bank of America?

B. Gunderman
1
2   A.   Yes.
3       Q.   And prior to the planning of
4   this transaction, did Windstream have a
5   relationship with J.P. Morgan?
6       A.   Yes.
7       Q.   And prior to the planning of
8   this transaction, did Windstream have a
9   relationship with Stephens Inc.?
10      A.   Yes.
11      Q.   Who brought in Stephens Inc. and
12  J.P. Morgan?
13      A.   My recollection is it would have
14  been Tony Thomas, who was our chief
15  financial officer at the time.
16      Q.   Who at Stephens Inc. was
17  involved in the transaction?
18      A.   Kenny Gunderman would have been
19  the lead advisor relationship person, and
20  I recall that Matt Dement would have been
21  another key individual.
22      Q.   And at J.P. Morgan?
23      A.   The most senior relationship
24  person that we would have dealt with at
25  J.P. Morgan would have been Fred Turpin.

B. Gunderman
1
2   There were other advisors at the time.
3   The most senior person I remember from a
4   financing advisory standpoint would have
5   been Jessica Kearns.
6       Q.   Is Kenny Gunderman related to
7   you?
8       A.   He is.
9       Q.   What's the relationship?
10      A.   He's my brother.
11      Q.   If your name was Smith, I
12  probably wouldn't have asked the question.
13      You referred a little while ago
14  to your responsibility for investor
15  relations.  Do you recall that?
16      A.   Yes.
17      Q.   And you referred to benefits to
18  all of our constituents.  Do you recall
19  that?
20      A.   Yes.
21      Q.   And when you talk about all of
22  our constituents, who would that include?
23      A.   I would be referencing equity
24  holders, bondholders, loan holders,
25  customers, regulators, employees.  Those

B. Gunderman
1
2   would be the constituents that I would be
3   thinking of.
4       Q.   Do you recall that as the
5   planning of this transaction went forward,
6   one of the concerns and issues to be
7   addressed was the sale and leaseback
8   covenant in the bond indenture?
9       A.   I wasn't involved in the initial
10  structuring, and so I wouldn't have been
11  part of that discussion.
12      Q.   Were you aware that the sale and
13  leaseback covenant in the bond indenture
14  was one of the issues that was being dealt
15  with as the transaction was planned?
16      A.   I was aware that the conclusion
17  was that the issue was not of
18  consideration.
19      Q.   Can you explain what you mean by
20  that?
21      A.   Because the transaction
22  advisory, the individuals as part of the
23  transaction advisory concluded that that
24  was not a consideration.
25      Q.   And who told you that?

B. Gunderman

1  A.   My recollection would be that
2  John Fletcher as our general counsel would
3  have advised us on that.
4  Q.   Just help me out with the
5  timing.  At some point, do I understand
6  you correctly, at some point you were
7  told, in words or substance, the sale and
8  leaseback covenant in the bond indenture
9  is not a problem for this transaction, is
10 that correct?
11 A.   That's, I think that would be
12 how I would characterize it, yes.
13 Q.   And approximately when was that
14 information provided to you?
15 A.   I don't remember the exact
16 timing of when that was provided to me.
17 Q.   At some point prior to that, had
18 anybody mentioned to you that people at
19 Windstream were thinking about the sale
20 and leaseback covenant in the bond
21 indenture?
22 A.   I don't recall that
23 conversation.
24 Q.   Were you aware, in your own

B. Gunderman

1  mind, that the sale and leaseback covenant
2  in the bond indenture could be an issue?
3  A.   I was relying upon our
4  structuring advisors to include our
5  internal and external counsel to advise on
6  that.  And that was my reliance.
7  Q.   So just to be clear, in the
8  planning process, you, as the treasurer
9  and then CFO in 2014, you were aware of
10 the sale and leaseback covenant, that was
11 a potential issue, is that fair?
12 A.   I wouldn't characterize it that
13 way.
14 Q.   How would you characterize it?
15 A.   I would characterize it as I
16 characterized it earlier, which was I was
17 relying upon our internal and external
18 advisors to speak to the structure of the
19 transaction, and I accepted their expert
20 advice on the conclusion that it wasn't an
21 issue.
22 Q.   And when -- approximately how
23 much time elapsed from when you first
24 became aware that the covenant might be an

B. Gunderman

1  issue to the time you heard from the
2  advisors we've decided we can structure
3  without worrying about the issue?
4  MR. MARKS:  Objection to the
5  form of the question.
6  Q.   You may answer.
7  A.   As I testified just a few
8  seconds ago, I did not consider it to be
9  an issue because I was advised per our
10 internal and external counsel that there
11 is no concern.
12 Q.   I'm trying to understand, at
13 some point in time, you, in your own mind,
14 knew that the sale and leaseback covenant
15 at least needed to be considered in
16 connection with structuring the
17 transaction; is that correct?
18 A.   I knew in my own mind that the
19 structuring of the transaction was going
20 to be handled by other experts in our
21 company on advisement with other advisors.
22 And that the scope of the
23 responsibility for that decision and
24 conclusion would be in their hands and not

B. Gunderman

1  my own, and I accepted their analysis and
2  their conclusion.
3  Q.   Well, let me just try to
4  understand, and if you're unable to answer
5  the question, you'll just tell me.
6  At some point prior to the time
7  you heard the conclusions, were you aware,
8  in your own mind, that the sale and
9  leaseback covenant in the indenture was an
10 issue that had to be taken into account in
11 structuring?
12 A.   No.  In my own mind, I did not
13 focus on that.
14 Q.   I didn't ask whether you focused
15 on it.  I asked whether were aware of it.
16 A.   Was I aware of what?
17 Q.   That's a fair question,
18 Mr. Gunderman.  Two things.
19 Were you aware that the bond
20 indenture contained a sale and leaseback
21 covenant?
22 A.   Yes.
23 Q.   And as you heard about the
24 planning of this transaction, were you

B. Gunderman
aware in your own mind that someone would
have to be considering the sale and
leaseback covenant?
   A.   Yes.
   Q.   Okay.  I'm going to show you a
document that we're marking as Exhibit 46.
And this was not marked yesterday.
         (Exhibit 46, 8/6/14 e-mail and
   attachments, Bates WIN 20241 through
   20243; WIN 20340 through 20366, marked
   for identification, as of this date.)
BY MR. FRIEDMAN:
   Q.   Exhibit 46 is an e-mail from
Mary Michaels to various people, with a cc
to Tony Thomas, Bob Gunderman and John
Fletcher, dated August 6, 2014.  The cover
e-mail is August 6, 2014.
         And I will just say for the
record that the cover e-mail refers to
various attachments.  We have included
just one of the attachments.  And that's
why, what I refer to as the cover e-mail,
it seems to go from pages WIN 20241
through 20243.  And then the attachment we

B. Gunderman
have included goes from WIN 20340 through
20366.
         So, Mr. Gunderman, the first
question I have for you is Exhibit 46 an
e-mail with attachments that you received
on August 6, 2014?
   A.   Well, I can only read the e-mail
that's been presented to me, and I don't
recall the e-mail.  But on the first page
of this document, it does show that Mary
Michaels sent an e-mail that I was cc'd
on.
   Q.   And you have no reason to doubt
that you received it?
   A.   I have no reason to doubt that
the first page of this is an e-mail sent
to me.
   Q.   Okay.  And you see that on the
first page of the e-mail, there is a
reference to attachments?
   A.   I would pause by saying this is
about a 30-page document, and I would like
to read it in its entirety.
   Q.   I'm going to give you an

B. Gunderman
opportunity to do whatever you want.
Just --
   A.   I don't know how I can answer
your questions on a document I haven't had
a chance to review.
   Q.   I'm asking you a question about
page 1 of the document.
   A.   Okay.  Can I read page 1 of the
document?
   Q.   I'm going to ask my question and
then you should always feel free to read
whatever you feel you need to read to
answer the question.
   A.   Thank you.
   Q.   So my question is, do you see
the word "attachments" near the top of
page 1 of the e-mail?
   A.   I do.  I see -- I do I see the
word "attachments."
   Q.   And then after the word
"attachments," if you follow along the
first line, you come to, near the end of
the first line:  Project RITE-master Q and
A doc.

B. Gunderman
         Do you see that on the first
page of the e-mail?
   A.   I do see those words.
   Q.   So now I'm going to ask you a
couple of questions about the attachment
that is entitled Project RITE master
question and answer document starting on
page WIN 20340.
         So my first question is, with
reference to the attachment entitled
Project RITE master question and answer
document, can you tell us what that
document is, please?
   A.   Yeah, I'm going to need some
time to read the document.
   Q.   Yes, that's totally fine.
   A.   Thank you.
         (Witness reading document.)
   A.   Can you ask your question again?
   Q.   With reference to the attachment
entitled Project RITE master question and
answer document, can you tell us what that
document is, please?
   A.   As I reviewed the document, what

B. Gunderman

1
2  I believe it is a summary of some of
3  the key question and answer responses for
4  the relevant points for the transaction of
5  Project RITE.
6     Q.   And these would be questions and
7  answers for whom?
8     A.   We would have been preparing
9  ourselves for investor question and
10 answers and also other constituencies
11 whether its employees, regulators, to be
12 prepared to respond to questions around
13 the structuring of the transaction and the
14 impacts of it.
15    Q.   The constituencies would include
16 bondholders?
17    A.   Yes.
18    Q.   Would these also be questions
19 and answers to be used in communications
20 with rating agencies?
21    A.   Yes.
22    Q.   Did you have a role in the
23 preparation of the master question and
24 answer document?
25    A.   I would have been -- I was the

B. Gunderman

1
2  treasurer and head of investor relations,
3  and Mary Michaels, at the time this was
4  prepared, would have been a direct report
5  of mine.  She was the head of investor
6  relations reporting to me.  And so I would
7  have had a role in reviewing this document
8  and giving input.
9     Q.   And this document reflects --
10 well, you've had a chance to read through
11 the entire document, correct?
12    A.   Correct.
13    Q.   Do you find that any of the
14 answers to the questions are in error or
15 otherwise not correct?
16       MR. MARKS:  Objection to the
17 form of the question.
18    A.   I would have to, you know, you
19 would have to ask something more
20 specifically.  I didn't see anything in my
21 review that I would say is incorrect.  But
22 if you have a specific question, I would
23 be happy to answer it.
24    Q.   Just so the record is clear, you
25 did read every page of the document just

B. Gunderman

1
2  now, correct?
3     A.   I did, yes.
4     Q.   Let me ask you, please, to turn
5  to page 350, where you will see question
6  31 at the bottom of the page.
7        Do you see that?
8     A.   I do see that.
9     Q.   And you see at the very bottom
10 of the page the bullet point that reads:
11    "We do not believe that the
12 Windstream indentures require any consents
13 of waivers to effect the transaction (do
14 not go into detail below unless
15 specifically asked on each point)."
16       Do you see that sentence that I
17 just read?
18    A.   I do.
19    Q.   And where it says in the middle
20 of that sentence "consents of waivers," is
21 that just a little typo?  It should be
22 "contents or waivers"?
23    A.   I don't know.  It's been so
24 long.  I can't remember, but I can read
25 the words on the page.

B. Gunderman

1
2     Q.   And you're not able to say
3  whether it is correct with the word "of"
4  or whether the word should be "or"?
5     A.   As I sit here today, I don't
6  know if the word should be "of" or "or."
7     Q.   Do you understand the purpose of
8  the parenthetical that reads "do not go
9  into detail below unless specifically
10 asked on each point"?
11    A.   I can read the words on the
12 page, so I do understand the words on the
13 page.
14    Q.   And what's your understanding of
15 the words on the page?
16    A.   "Do not go into detail below
17 unless specifically asked on each point."
18    Q.   And do you have any
19 understanding as to the purpose for that
20 instruction or direction?
21    A.   It simply says "do not go into
22 the detail below unless specifically asked
23 on each point."
24    Q.   Was that a direction or
25 instruction that came from you to the

B. Gunderman

1  people who reported to you in investor
2  relations?
3      A.   I don't recall what our
4  conversations were three or four years
5  ago.
6      Q.   Turn, please, to the next page
7  of the document, 351.  The third bullet
8  point there reads:
9          "If pressed on sale-leaseback
10  provision:  Given that the lease is being
11  implemented at Windstream Holdings, it
12  does not impact any covenants in the
13  Windstream indentures, including the
14  sale-leaseback provisions."
15         Do you see that bullet point?
16      A.   Yes.
17      Q.   Do you have an understanding
18  about what is meant by that?
19      A.   Can I read the words on the page
20  and understand them?
21      Q.   Okay.  What's your
22  understanding?
23      A.   Given that the lease is being
24  implemented at Windstream Holdings, which

B. Gunderman

1  it was, it does not impact any covenants
2  in the Windstream indentures, including
3  the sale-leaseback provisions.  I
4  understand those words.
5      Q.   Well, do you have an
6  understanding why someone would say that
7  the lease being implemented at Windstream
8  Holdings has something to do with whether
9  the sale and leaseback provision is
10  impacted?
11         MR. MARKS:  Objection to the
12  form.
13      A.   I have an understanding of we
14  were preparing for potential questions on
15  the structuring of the transaction, and
16  this was a potential response to a
17  question on the structure of the
18  transaction.
19      Q.   My question was:  Do you have an
20  understanding why someone preparing this
21  document would say that given that the
22  lease is being implemented at Windstream
23  Holdings, it does not impact the sale and
24  leaseback provision?

B. Gunderman

1      A.   Yes, I understand that.
2      Q.   Okay.  What's your understanding
3  of that?
4      A.   I answered that earlier.
5      Q.   Let me ask the question again.
6         Why would the lease being
7  implemented at Windstream Holdings have
8  something to do with whether the sale and
9  leaseback provision is impacted?
10      A.   The words on the page simply
11  indicate that because the lease is being
12  implemented at Windstream Holdings, it
13  does not impact the covenants in the
14  Windstream indentures, including the sale
15  and leaseback provisions.  That's what it
16  means.
17      Q.   My question to you is:  Why
18  would Windstream Holdings as the lessor
19  have something to do with whether the sale
20  and leaseback covenant is impacted?
21         MR. MARKS:  Objection to form.
22      A.   I don't know how else to answer
23  your question other than the way I
24  answered it.  I've answered it the way I

B. Gunderman

1  understand it.
2      Q.   Do you have an understanding of
3  what the sale and leaseback covenant in
4  the indenture provides?
5      A.   Generally.
6         MR. MARKS:  Objection to form.
7      Q.   What's your general
8  understanding?
9      A.   Generally I understand that the
10  covenant governs the ability to sell
11  assets and lease them back.
12      Q.   Do you have any understanding
13  beyond that?
14      A.   I would have to review the
15  indenture to give you a more detailed
16  understanding of it.
17      Q.   Have you ever reviewed the
18  indenture before?
19      A.   Of course.
20      Q.   When?
21      A.   I can't point to specific times,
22  but I reviewed it over, you know, as
23  needed, over time.
24      Q.   Did you review it in connection

B. Gunderman
with the planning of this transaction?
    A.   I did.
    Q.   Did you review the sale and
leaseback covenant in connection with the
planning of this transaction?
    A.   I did.
    Q.   At the time when this
transaction was being planned, did you
have an understanding of the sale and
leaseback covenant?
    A.   I had an understanding that our
advisors, both internal and external, were
opining on the covenants in the provisions
that related to the structure of the
transaction, and I relied upon their
expert advice around that analysis.
    Q.   My question was:  At the time
the transaction was being planned, did you
have an understanding of the sale and
leaseback covenant in the indenture?
    A.   As a treasurer, I would have
understood the sale and leaseback covenant
in the indenture, yes.
    Q.   Did you have a better

B. Gunderman
understanding at the time this transaction
was being planned than you have now?
        MR. MARKS:  Objection to the
    form.
    A.   I don't know how to answer that
question.  I have an understanding of the
covenant.
    Q.   Do you know why Windstream
Holdings was created?
    A.   Yeah.  We created Windstream
Holdings, I recall, at the time being --
we were one of the companies in
telecommunications in the cable industry,
our peers, but we were in the minority of
companies who did not have a holding
structure, which was, for us, we thought
was potentially something that limited our
strategic flexibility.
        And so, yeah, that's what I
recall.
    Q.   Are you aware, in connection
with the April 2015 transaction, one of
the agreements signed is a master lease?
    A.   I am aware.

B. Gunderman
    Q.   And do you know who signed the
master lease?
    A.   I don't know who signed it
actually.
    Q.   I don't mean which individual.
I mean which company.
    A.   Windstream Holdings is the
obligor of the lease.
    Q.   Who is on the other side of the
master lease?
    A.   CS&L.
    Q.   And were you involved in the
decision at Windstream that Windstream
Holdings should be the Windstream entity
that signs the master lease?
    A.   I was not involved in the
original discussions and the ultimate
decision around who would be the obligor
of the master lease.
    Q.   Do you know who made the
decision that Windstream Holdings should
sign the master lease?
    A.   My recollection is that John
Fletcher, as our general counsel at the

B. Gunderman
time, would have been responsible for the
contemplation of the obligor and the
detailed provisions of the master lease.
    Q.   Did you ever obtain an
understanding as to why Windstream
Holdings was the party signing the master
lease?
    A.   I did.
    Q.   And what was the understanding
you obtained as to why Windstream Holdings
was signing the master lease?
    A.   We wanted to make sure that we
preserved maximum flexibility with the
administration of the obligations in the
lease by having the obligation be at the
Holdings company level.  It gave us the
maximum flexibility to do that.
        The second reason was that we
felt like it gave us negotiating leverage
with CS&L on an eventual renegotiation and
extension of the lease, because by
definition, that being at the Holdings
company level, it was subordinate to the
obligations that were set at our Services

1 B. Gunderman
2 group, Windstream Services.
3 Q. And can you explain how having
4 Holdings sign the lease provided more
5 flexibility?
6 A. Well, I mean, the way that we
7 would discharge our obligations, you know,
8 by having it at the senior-most entity
9 level of the company just gave us maximum
10 flexibility on any number of terms going
11 forward.
12 Q. For example, what terms?
13 A. Well, if we worked to renew the
14 lease in 10 or 15 years and we wanted to
15 not renew portions of it, or renew under a
16 different technology, it just gave us more
17 flexibility to have the ability to
18 structure it at the Holdings company level
19 versus at a lower level in the
20 organization.
21 Q. Can you explain how the
22 signatory on the master lease provides
23 that flexibility? More specifically, what
24 would the difference be if the transferor
25 subsidiaries had signed the master lease?

1 B. Gunderman
2 A. I gave you my understanding of
3 the flexibility. At the time, there was
4 no looking forward contemplation of
5 anything specific. We just simply
6 concluded, through the advice of our
7 internal and external transaction counsel,
8 that that would be the legal entity that
9 would give us the most flexibility for
10 strategic opportunities in the future, and
11 I gave you a couple of examples of how I
12 think about that.
13 Q. I'm going to show you a document
14 marked as Exhibit 26.
15 (Exhibit 26, 4/29/14 letter from
16 Moody's Investor Services to Bob
17 Gunderman, Bates stamped WIN 20110 to
18 WIN 20113, marked for identification,
19 as of this date.)
20 BY MR. FRIEDMAN:
21 Q. Here you go, Mr. Gunderman.
22 Actually, before I ask you about
23 Exhibit 26, if you put it down, let me
24 just ask you a question about what you
25 said a moment ago.

1 B. Gunderman
2 A. Sure.
3 Q. You referred to that there would
4 be more leverage on the Windstream side,
5 because having the lease signed at the
6 Holdings level, that meant the obligations
7 under the lease would be subordinate to
8 obligations at Services and Services
9 subsidiaries.
10 Did I understand you correctly?
11 A. I was referring to negotiating
12 leverage.
13 Q. Negotiating leverage. Okay.
14 What did you mean when you said the
15 obligations at the holding level would be
16 subordinate to obligations at the level of
17 Services?
18 A. Well, by definition, the debt
19 obligations and other material obligations
20 of the company set at the Services level
21 or below, and all of the covenant
22 structures of our material debt
23 instruments are at that level, and by
24 definition, that provides a structural
25 seniority to a junior obligation that sits

1 B. Gunderman
2 outside the boundaries of that structure.
3 Q. When you say structural
4 seniority for junior obligation, are you
5 referring to a structural seniority for
6 the debt obligations at the Services
7 level?
8 A. What I simply said was that the
9 obligor, being Holdings, you know, is, in
10 my judgment, is junior to the seniority of
11 what the obligations are at Services.
12 Q. Would you agree with me that as
13 a practical matter, the obligations under
14 the master lease have a priority over the
15 obligations at the Services level?
16 MR. MARKS: Objection to form.
17 Q. Do you understand the question?
18 A. No. I don't understand your
19 question.
20 Q. What would be the consequences
21 for the Windstream companies if payments
22 due were not made under the master lease?
23 A. We would default on the master
24 lease.
25 Q. And then what would happen?

B. Gunderman

1
2   A.   I don't know.  You would have to
3   ask Uniti.
4   Q.   Could Services and its
5   subsidiaries continue in business if Uniti
6   took back the properties as a result of
7   the default?
8   A.   I don't know how to answer a
9   hypothetical question like that.
10  Q.   You just don't know?
11  A.   I don't know.
12  Q.   You don't know.  Okay.
13  So just to be clear, could the
14  subsidiaries of Services engage in their
15  business without the use of the leased
16  property?  That's my question to you.  Can
17  you answer that question?
18  MR. MARKS:  That's beyond the
19  scope of the notice as to what
20  Mr. Gunderman was noticed for.
21  MR. FRIEDMAN:  I'm not -- to the
22  extent I ask Mr. Gunderman questions
23  that go beyond Topic 4, then he's
24  testifying as a witness so, and not as
25  a 30(b)(6) witness.  Okay.

B. Gunderman

1
2   Q.   Do you need the question read
3   back?
4   A.   Sure.
5   Q.   So the question is:  Could the
6   subsidiaries of Services engage in their
7   business without the use leased property?
8   A.   The subsidiaries of Services are
9   express beneficiaries and use the assets
10  that are included in the lease, which is
11  obligated by Holdings, and they use those
12  assets today to operate, you know, their
13  subsidiary businesses.
14  Q.   And the transferor subsidiaries
15  need those assets to operate their
16  businesses, correct?
17  A.   They use it today.
18  Q.   They need it today, correct?
19  A.   Correct.
20  Q.   And if Uniti took action to take
21  back the property, the leased property,
22  could the subsidiaries of Services today
23  continue with their business?
24  MR. MARKS:  Objection to the
25  form of the question.

B. Gunderman

1
2   A.   It's a hypothetical.  I haven't
3   thought about it.
4   Q.   You don't know the answer to
5   that hypothetical question; is that
6   correct?
7   A.   I don't.
8   Q.   I've shown you Exhibit 26.  I'm
9   going to ask you a question about it.  The
10  first question I'm going to ask you is
11  Exhibit 26, which I will identify for the
12  record is a letter from Moody's Investor
13  Services to Bob Gunderman dated April 29,
14  2014.  It is a document that goes from
15  page WIN 20110 through WIN 20113.
16  And my first question to you,
17  Mr. Gunderman, is:  Is this letter that
18  you received from Moody's Investor
19  Services on April 29, 2014?
20  A.   It is addressed to me.
21  Q.   And you received it on April
22  29th, on or about April 29, 2014?
23  A.   I would assume, yes.
24  Q.   Then I have a question for you
25  on page 20112.

B. Gunderman

1
2   A.   Could I have the opportunity to
3   read the document, please?
4   Q.   Yes.
5   A.   Thank you.
6   (Pause.)
7   A.   I've read it.
8   Q.   Have you read the entire
9   document that's Exhibit 26?
10  A.   Yes.
11  Q.   Would you look at the page of
12  the document that is WIN 20112, please?
13  A.   Okay.
14  Q.   And I'd like to call your
15  attention to the paragraph in the middle
16  of the page that begins with the words,
17  "Through this transaction."
18  Please tell me when you have
19  located that paragraph.
20  A.   I've located it.
21  Q.   And if you look at the third
22  sentence in that paragraph that begins at
23  the end of the third line, starting with
24  the word "Although," please tell me when
25  you've located that sentence.

B. Gunderman

A.  I've located that sentence.

Q.  I'm going to read that sentence into the record:

"Although the lease payment will be contractually junior to most other obligations of Windstream and HoldCo, the strategic importance of the lease will effectively make it one of the company's highest priority cash payments."

Do you see that sentence?

A.  Yes.

Q.  Do you understand what Moody's means in writing that sentence?

A.  Yes.  I can read the words on the page and I --

Q.  Obviously not to be sarcastic, Mr. Gunderman, any of us can read the words on the page.  The question for you is:  Do you understand what Moody's means in making the statement that I just read?

A.  Yes.  They mean that the lease payment will be contractually junior to most other obligations of Windstream and HoldCo, and it is, the strategic

B. Gunderman

importance of the lease will effectively make it one of the company's highest priority cash payments.  I do understand that.

Q.  Do you agree with that statement?

A.  I agree that the payment is contractually junior to most other obligations of Windstream and HoldCo, just as I testified to earlier.  I agree that the lease is important.

Q.  Do you agree that the importance of the lease will effectively make the lease obligations one of the company's highest priority cash payments?

A.  It is a high priority cash payment.

Q.  Do you agree it is one of the company's highest priority cash payments?

A.  Yes, I do.

Q.  If you would look down a couple of paragraphs, you see the paragraph that begins, "In the downside"?

A.  Yes, I do.

B. Gunderman

Q.  In that -- well, let me just read that sentence into the record:

"In the downside scenario where revenues and EBITDA continue to erode, the higher level of fixed cost could lead to a higher probability of default and a higher loss, given default, given the reduction and flexibility to reallocate cash flows and the lower asset coverage from the transfer of assets to PropCo."

Do you understand what Moody's is saying in that sentence?

A.  Yes, I do.

Q.  And can you explain what that sentence means, please?

A.  They were indicating that in a downside scenario, which was not defined with any level of specificity, that a higher level of fixed costs could lead to a higher probability of default.  And higher loss, given default, given the reduction in flexibility to reallocate cash flows and the lower asset coverage, so I do understand this statement.

B. Gunderman

Q.  And do you agree with the statement?

A.  I understand the statement.

Q.  And my question is:  Do you agree with the statement?

A.  By definition, if we have much lower revenue and EBITDA, which is not defined here, you know, by definition, a company with lower EBITDA is in a greater probability to default than a company with higher EBITDA, so I agree with that.

Q.  Do you understand what is meant by "higher level of fixed costs" in the first line of the sentence?

A.  Yes, I believe that he is referring to the lease payment as a higher level of fixed cost.

Q.  And where he refers to at the end of the sentence "lower asset coverage from the transfer of assets to PropCo," do you understand what is meant by that?

A.  Yes.  I believe that he's referring to the fact that we sold assets in the transaction, and that would go to

B. Gunderman

his point of having fewer assets for recovery.

Q.    And that would mean that Services and its subsidiaries have fewer assets to cover the liabilities of Services and Services' subsidiaries, correct?

A.    That would be my understanding of his statement.

Q.    And you agree with that?

A.    I think by definition if there are fewer assets owned by Windstream Services, that that would be accurate.

Q.    And do you have an understanding of what is meant by "reduction in flexibility to reallocate cash flows"?

A.    My understanding of this statement is he is referencing the nature of the fixed payment would limit the ability to reallocate a portion of that payment.

Q.    So just to follow-up a little bit, the fixed payment that you refer to is the payment due under the master lease,

B. Gunderman

correct?

I'm referring to your last answer, when you said, "My understanding of this statement is he is referencing the nature of the fixed payment."  When you said that, when you said "fixed payment," were you referring to the payments due under the master lease?

A.    It was.  I answered that in the context of the full opinion document that I read, and so that is my understanding of what he is referencing.

Q.    And would you agree that the fixed payment obligation in the master lease limits the flexibility of the Windstream companies to reallocate cash flows?

A.    I don't agree with that statement in isolation, no.

Q.    Can you explain why you don't agree with it?

A.    I think it's a narrow interpretation of the transaction.  The transaction had many other characteristics

B. Gunderman

to it.  They were not just isolated to a fixed payment.

Q.    Would you agree that given the importance of making that payment to Uniti, that Windstream Holdings, having the obligation to make that payment, limits the flexibility to reallocate cash flows within the Windstream companies?

MR. MARKS:  Objection to the form of the question.

A.    I would agree that it is an obligation of Windstream Holdings, so it is an obligation that we must meet.

Q.    Where does Windstream Holdings get the cash to pay that obligation?

A.    Windstream Holdings, the cash flow of Windstream Holdings is an aggregation -- well, I should say the cash flows of Windstream Services is an aggregation of all cash that is generated and received from its subsidiaries.

And at that point, the cash payments that can leave Windstream Services are governed by all the covenants

B. Gunderman

of our debt agreements, it's governed by restricted payment capacity and the ability to move cash out of Services.

And any cash that leaves Windstream Services must be delivered from Services and it's governed by the parameters in the covenants of Services.

Q.    Services itself does not generate revenue from operations, correct?

A.    Correct.

Q.    Services obtains cash as a result of the operations of its subsidiaries, correct?

A.    Correct.

Q.    So the cash that Windstream Holdings uses to pay Uniti, that cash comes from cash generated by subsidiaries of Services, correct?

A.    The cash, as I testified just a few seconds ago, the cash that is generated by the subsidiaries of Services is aggregated into cash accounts at Services, and under the parameters of our covenants, we are allowed to make

1    B. Gunderman
2  transfers of cash through our peak
3  capacity out of Services to Holdings,
4  which is how we take cash and satisfy --
5  Holdings satisfies its obligation under
6  the master lease with Uniti.
7    Q.   And you understand that the rent
8  obligation under the master lease is
9  approximately $653 million per year?
10    A.   That's approximately correct.
11    Q.   And the $653 million per year
12  that Holdings pays to Uniti comes from
13  cash generated by subsidiaries of
14  Services, correct?
15    A.   The $650 million a year from
16  payment of Holdings to Uniti, cash is
17  generated by the subsidiaries of Services.
18  It is aggregated to the Services level.
19  And that cash is governed by the covenants
20  of Services.  And any cash that is allowed
21  to be part of an RP movement from Services
22  to Holdings is governed by those
23  parameters at Services.
24    Q.   Would you agree that with
25  respect to the cash generated by the

1    B. Gunderman
2  subsidiaries of Services, the need to pay
3  $653 million per year in rent to Uniti
4  limits the flexibility of Services and its
5  subsidiaries to allocate their cash flows?
6    A.   Well, my view is that the
7  subsidiaries of Services are express
8  beneficiaries and use the assets that are
9  the obligation as part of the lease from
10  Holdings to Uniti.  And as express
11  beneficiaries in use of those assets, they
12  use those assets to generate income and
13  cash, which is aggregated to Windstream
14  Services.
15    Q.   Am I correct it's the transferor
16  subsidiaries who use the leased property?
17    A.   The transferor subsidiaries are
18  express beneficiaries of the leased
19  property under the master lease between
20  Windstream Holdings as the obligor and
21  tenant and Uniti.
22    Q.   And do I understand you
23  correctly that it is the transferor
24  subsidiaries who are express beneficiaries
25  who, in fact, use the leased property in

1    B. Gunderman
2  their business?
3    A.   Yes.
4    Q.   And with respect to my question
5  about the cash flows, do I understand you
6  correctly to be saying it is reasonable
7  that the transferor subsidiaries who
8  benefit from the use of the leased
9  property should be paying the costs
10  associated with the use of the leased
11  property?
12    MR. MARKS:  Objection to the
13  form of the question.
14    Q.   Okay.  You may answer.
15    A.   I think I answered that question
16  twice already.  Should I answer it again?
17    Q.   Go ahead, please.
18    A.   The transferor subsidiaries are
19  express beneficiaries of the assets under
20  the master lease between Windstream
21  Holdings and Uniti.  They use those assets
22  in their role as express beneficiaries to
23  generate income.  That income and cash
24  flow is aggregated and consolidated into
25  Windstream Services, and that's the flow

1    B. Gunderman
2  of the cash.
3    MR. MARKS:  Let's take a break.
4    MR. FRIEDMAN:  Of course.
5    THE VIDEOGRAPHER:  The time is
6  11:22.  We're going off the record.
7    (Thereupon, a recess was taken,
8  and then the proceedings continued as
9  follows:)
10    THE VIDEOGRAPHER:  The time is
11  11:35.  We're back on record.
12  BY MR. FRIEDMAN:
13    Q.   Mr. Gunderman, did you have any
14  role in the preparation of rating agency
15  presentations?
16    A.   Can you be more specific?
17    Q.   Yes.  In connection with the
18  April 2015 transaction, during the period
19  of months or years leading up to that
20  transaction, were you involved in the
21  preparation of any presentations to rating
22  agencies relating to that transaction?
23    A.   Yes.
24    Q.   And what was your role and
25  responsibility with respect to such

1                 B. Gunderman
2 presentations?
3     A.  During much of that period I was
4 the treasurer, and so my responsibility as
5 treasurer was to be a senior level
6 executive who would discuss with the
7 rating agencies and present any number of
8 topics, and this would be, the REIT
9 transaction would have been one of those
10 topics.
11     Q.  And did you play a role in
12 preparing written presentations that were
13 submitted to rating agencies?
14     A.  I would have supervised team
15 members who would have done that, and I
16 would have had input and approved whatever
17 presentations we made to those
18 constituents.
19     Q.  Shifting gears for a moment, is
20 rent paid to Uniti on a monthly basis?
21     A.  Holdings pays rent to Uniti on
22 be a monthly basis, yes.
23     Q.  And does Holdings pay the rent
24 by check or by wire transfer or some other
25 means?

1                 B. Gunderman
2     A.  Wire transfer.
3     Q.  What is the name on the account
4 from which the wire is sent?
5     A.  I don't recall the specific name
6 of the account, as I sit here today.
7     Q.  Is it an account in the name of
8 Windstream Holdings?
9     A.  I don't recall the name of the
10 account today, as I sit here.
11     Q.  Do you have records that would
12 show the name on the account and the
13 confirmation of the wires that were sent?
14     A.  Yes.
15 RQ    MR. FRIEDMAN: And we would
16     request those records, please.
17       MR. MARKS: Noted.
18     Q.  Now, do I understand your
19 earlier testimony correctly, that in order
20 for Holdings to have the cash it needed to
21 pay the rent, Holdings received cash from
22 Services?
23     A.  Correct. It's an RP payment
24 from Services to Holdings.
25     Q.  And when you say an RP payment,

1                 B. Gunderman
2 can you explain what you mean?
3     A.  I'm sorry. It's a restricted
4 payment which is a term under our
5 indenture. It's a covenant under our
6 indenture that governs the cash payments
7 that can be made out of our Windstream
8 Services entities.
9     Q.  Is a restricted payment like a
10 dividend?
11     A.  It's a cash payment.
12     Q.  And in connection with Services
13 making such cash payments to Holdings, are
14 there resolutions of the Services board of
15 directors authorizing or approving such
16 payments?
17     A.  Yes.
18     Q.  And do you have copies of those
19 resolutions or approvals in your office?
20     A.  I don't maintain them in my
21 office, but we have copies that are
22 maintained.
23 RQ    MR. FRIEDMAN: We would request
24     copies of authorizations or approvals
25     by the Services board for payments of

1                 B. Gunderman
2 cash to Holdings, please.
3     Q.  As you were saying earlier --
4 withdrawn.
5     Services receives cash from its
6 subsidiaries, correct?
7     A.  Correct.
8     Q.  And do the subsidiaries have
9 their own boards of directors?
10     A.  They do.
11     Q.  And when the subsidiaries send
12 cash to Services, are there authorizations
13 or approvals by the boards of the
14 subsidiaries for sending such cash and
15 Services?
16     A.  I'm not aware of the detailed
17 steps that occur. That is handled by our
18 chief legal officer or our general
19 counsel, so they administer the detailed,
20 you know, legal steps around that.
21 RQ    MR. FRIEDMAN: If there are any
22     such board authorizations or approvals
23     on the part of the subsidiaries of
24     Services, we would request production
25     of those, please.

B. Gunderman

1  (Exhibit 42, Rating Agency
2  Presentation 2015, marked for
3  identification, as of this date.)
4  Q.  I'm going to show you a document
5  that we marked as Exhibit 42.  It is on
6  the first page, "Rating Agency
7  Presentation 2015."  That's page 20733.
8  And my question to you,
9  Mr. Gunderman, is:  Can you identify this
10  document, please?
11  A.  I would like to have the
12  opportunity to read the document.
13  Q.  Yes.
14  A.  I've reviewed the document.  I
15  haven't read every word, but I reviewed
16  the document.
17  Q.  Let me call your attention to
18  the -- well, first, sorry.  Can you
19  identify the document, please?
20  A.  The title of the document is
21  "Rating Agency Presentation" and it simply
22  says 2015.  It's not more specific as to
23  when it was.
24  Q.  Was this a document prepared by

B. Gunderman

1  you or under your supervision to provide
2  to rating agencies?
3  A.  While I don't remember the
4  specific document.  Without some
5  indication about the context of when it
6  was used, what I can tell you is it would
7  be of the form and construction that would
8  look like a presentation that we might
9  have used to present to the rating
10  agencies.
11  But, again, I'm just getting it
12  for the first time today, so I don't
13  recall the exact document.
14  Q.  On the second page of the
15  document, the heading is "Windstream
16  Participants," and the three individuals
17  listed under that heading are Tony Thomas,
18  Chief Executive Officer; Bob Gunderman,
19  CFO and Treasurer; and Mary Michaels, Vice
20  President Capital Markets and Investor
21  Relations.
22  Do you see that?
23  A.  Yes.
24  Q.  And did you, from time to time,

B. Gunderman

1  participate in rating agency presentations
2  related to the spin and leaseback
3  transaction?
4  A.  Yes.  I participated in
5  presentations to the rating agencies to
6  describe the transaction.
7  Q.  And these would be in-person
8  meetings with the rating agencies?
9  A.  My recollection is that we would
10  have done both.  We sometimes had
11  in-person meetings and we sometimes had
12  telephonic meetings.
13  Q.  And in either case, there would
14  often be a written presentation prepared
15  and provided?
16  A.  There would often be a written
17  presentation provided.
18  Q.  Let me call your attention,
19  please, to page 50 of the document, which
20  is WIN 20782.  And tell me when you are on
21  that page.
22  A.  I'm on that page.
23  Q.  And do you see where there's a
24  box that has the words "Implicit

B. Gunderman

1  priority"?
2  A.  Yes.
3  Q.  And next to that box, there's
4  another box that says, "Continued
5  viability of Win requires timely payment
6  of master lease before any other payments,
7  except requisite operating expenses."
8  Do you see that?
9  A.  I do.
10  Q.  Do you understand what is meant
11  by "implicit priority"?
12  A.  My understanding is that is an
13  implied priority.  It's implied that it's
14  a priority.
15  Q.  Do you understand what is meant
16  by, "Continued viability of Win requires
17  timely payment of master lease before any
18  other payments, except requisite operating
19  expenses"?
20  A.  I can recall -- by reading the
21  document, I can recall that this is a
22  representation of the importance of the
23  payment.  It is an important payment, as I
24  testified earlier.

B. Gunderman

Q.   And the reference to Win in the sentence that I just read, that is a reference to Windstream Services and its subsidiaries, is that correct?

A.   It's not clear to me what Win is referencing in this document.

Q.   Would you agree that the continued viability of Windstream Services and its subsidiaries would require the timely payment of the master lease?

A.   I would agree that the -- given the express beneficiary status of the transferor subs, the use of those subsidiaries using those assets of the master lease with the obligor of Windstream Holdings, that is how they generate income and serve their customers.

So, by that definition I would conclude it is an important -- it is an important payment for Windstream Holdings to make on behalf of its subsidiaries.

Q.   Does Windstream Holdings have any operating expenses?

A.   They're minimal.  I don't recall

B. Gunderman

the exact expenses, but they're published in our external financial statements.

Q.   And am I correct that the subsidiaries of Services, including the transferor subsidiaries, have substantial operating expenses.  Correct?

A.   And I should correct my statement.  Windstream Holdings obviously is an aggregation of the consolidated results of all of Services and its subsidiaries, and that is represented in the financial statements in our regular quarterly and annual reportings.

At the same time, yes, you're correct that Windstream Services and its subsidiaries also have results of operations which are reflected in our external SEC-reported financials.

Q.   Just to be clear, Windstream Holdings, on a standalone basis, has what you described as minimal operating expenses, correct?

A.   Windstream Holdings, as the single entity, yes.  But the presentation

B. Gunderman

of the financials for it is an aggregated view of all of its subsidiaries.

I'm not sure if I'm answering your question specifically, but when we present the results of Windstream Holdings, there's substantial revenues and substantial expenses that are provided in the financial statements of Windstream Holdings.

Q.   Am I correct, and I can look for a document but maybe you can tell me, that in the financial reporting, the reporting does include disclosure of Windstream Holdings' financial results on a standalone basis as well as on a consolidated basis?

A.   Our external reporting shows two sets of financial statements; the Windstream Holdings financial statements and the Windstream Services financial statements.  Those are shown separate within our external financials.

Q.   And do you recall when we look at the external financials, do we see

B. Gunderman

reporting as to Windstream Holdings on a standalone basis, not consolidated with the subsidiaries?

A.   I would have to review our external financial statements to conclude on that note.

Q.   Mr. Gunderman, I'm going to show you a document previously marked as Exhibit 58.  And I'm going to ask you to look at page 37.  I will say for the record Exhibit 58 is the 10-K for Windstream for the year ended 2016 and I'm showing you page 37.

A.   I'm sorry, are you saying F 37 or 37?

Q.   No, 37.  37.

A.   Okay.  I'm at that page.

Q.   Is that page showing the operating statement for Windstream Holdings Inc. the parent company on a standalone basis?

A.   It is.

Q.   And am I interpreting the reporting correctly that the only

1        B. Gunderman
2 operating revenue reported by Windstream
3 Holdings is the leasing income from
4 subsidiaries?
5     A.   That is correct.
6     Q.   And that is $653.6 million a
7 year?
8     A.   That is what is represented for
9 2016.
10    Q.   And that is the amount that
11 Windstream Holdings is obligated to pay in
12 rent to Uniti, correct, per year?
13    A.   That is my recollection of the
14 amount.
15    Q.   Now, what does this financial
16 statement for Windstream Holdings Inc.
17 tell us about operating expenses of
18 Windstream Holdings on a standalone basis?
19    A.   The document shows that the
20 total costs and expenses are $355.7
21 million for 2016, for year 2016.
22    Q.   Of that $355.7 million, almost
23 all of it, i.e. 354 million, is
24 depreciation expense, correct?
25    A.   Correct.

1        B. Gunderman
2    Q.   And would you consider
3 depreciation expense to be part of
4 operating expenses?
5    A.   Yes.
6    Q.   And sort of jumping around a
7 little, we were looking at Exhibit 42,
8 page 50, do you still have that there?
9    A.   Yes.
10    Q.   And the word in the box that we
11 were looking at include -- well, let me
12 just say the words again:  "Continued
13 viability of Win requires timely payment
14 of master lease before any other payments
15 except requisite operating expenses."
16       Do you see that?
17    A.   I do see that.
18    Q.   Now, would you understand the
19 reference to "any other payments except
20 requisite operating expenses," would that
21 include depreciation expense?
22       MR. MARKS:  Objection to the
23 form.
24    Q.   Do you understand the question?
25    A.   I understand your question.  I

1        B. Gunderman
2 don't recall what was meant, sitting here
3 two years removed or more from the
4 presentation.  I can read the words and
5 react to the words, but I don't recall the
6 context of this at the time.
7    Q.   And let me just ask you this.
8 Separate and apart from these documents
9 that we're looking at, do you consider
10 depreciation expense of a company to be a
11 payment that the company is required to
12 make?
13    A.   I consider depreciation expense
14 to be an operating expense that is
15 reflected on a company's financial
16 statements which represents, you know, the
17 expense that is result of prior
18 capital expenditures, which are cash flow
19 item, and the depreciation expense relates
20 to the assets that are created from the
21 results of those capital expenditures and
22 based upon various asset depreciation
23 schedules, you have the result, and
24 depreciation expense appear in the
25 financial statements.  That's my

1        B. Gunderman
2 understanding of it.
3    Q.   Am I correct depreciation is not
4 cash?
5    A.   Depreciation is not cash per se.
6 It is related to a cash transaction
7 through the construction of an asset or
8 the establishment of an asset that was
9 established through spinning of cash.
10    Q.   But when we look at annual
11 financial statements and see depreciation
12 expense, we know that the amount of
13 depreciation expense does not reflect cash
14 expended in that year?
15    A.   I would agree.
16    Q.   Can I take you back for a moment
17 to Exhibit 46, which is the e-mail from
18 Mary Michaels dated 8/6/2014 with a cc to
19 you, Mr. Gunderman.  And you previously
20 read earlier today the attachment, Project
21 RITE master question and answer document.
22       Do you recall that?
23    A.   Yes, I do.
24    Q.   I would appreciate your turning
25 to the last page of the exhibit, which is

1 B. Gunderman
2 WIN 20354?
3 A. 20354. Okay.
4 Q. And there is a question 47. Do
5 you see that?
6 A. I do.
7 Q. And the question reads:
8 "How can you ensure quality and
9 reliability service if two separate
10 entities are responsible for managing
11 different parts of one system?"
12 Do you see that question?
13 A. I do.
14 Q. And do you understand in that
15 question what is meant by two separate
16 entities?
17 A. Based upon the context of the
18 full document, my recollection is that
19 this would be in reference to two separate
20 companies.
21 Q. And those companies would be
22 Holdings and Windstream Services?
23 A. That would not be my
24 recollection.
25 Q. What would be your recollection?

1 B. Gunderman
2 A. If I read this, I would -- let
3 me reread it just one second.
4 Q. I think I understand, but I'm
5 going to let -- I'm confessing error, but
6 I will let you please explain what your
7 understanding is of two companies.
8 A. When I read question 47 and the
9 answer to question 47, I believe that the
10 reference to two separate entities is in
11 reference to Windstream Holdings and CS&L,
12 now Uniti.
13 Q. I understand that. Thank you.
14 And the first bullet point under
15 that question says:
16 "Windstream will retain the
17 day-to-day role serving all customers with
18 advanced network communication services.
19 The transition will be seamless for
20 customers."
21 Do you see that?
22 A. Yes I do.
23 Q. Where it says "Windstream" will
24 retain the day-to-day role, what
25 Windstream entity or entities is being

1 B. Gunderman
2 referred to there?
3 A. My recollection is that this
4 would be in reference to Windstream
5 Holdings.
6 Q. And what role did Windstream
7 Holdings have in the day-to-day serving of
8 customers?
9 A. Well, Windstream Holdings is the
10 parent company of Windstream. And as the
11 obligors of the lease with Uniti had the
12 rights to using the assets and their
13 subsidiaries of Windstream Holdings were
14 express beneficiaries, and Windstream
15 Holdings would discharge its obligations
16 and use of those assets to those
17 subsidiaries and those subsidiaries are
18 the primary, they are the companies who
19 are in the role of serving the customers.
20 Q. And would you look, please, at
21 the last bullet point under question 47?
22 A. Yes.
23 Q. Which reads:
24 "Windstream will be responsible
25 for maintenance, capital expenditures,

1 B. Gunderman
2 property taxes, insurance, and other
3 expenses."
4 Do you see that?
5 A. Yes.
6 Q. And what is the Windstream
7 entity or entities that pays the
8 maintenance capital expenditures, property
9 taxes, insurance and other expenses on the
10 leased property?
11 A. This reference is more broadly
12 written. It's Windstream as the operating
13 companies. But the entities that actually
14 make the payments for these expenses are
15 the transferor subs primarily, which are
16 the express beneficiaries of these assets
17 that are under the lease between Holdings
18 and Uniti.
19 Q. Does Holdings serve any
20 customers?
21 A. Holdings is the parent company
22 of any number of subsidiaries that serves
23 customers.
24 Q. Does Holdings itself use any
25 leased property?

1  B. Gunderman
2  A.  Holdings is the tenant of the
3  leased property and is the primary
4  obligor.  And transferor subs are express
5  beneficiaries of those assets.  And by
6  that definition, Windstream Holdings and
7  its subsidiaries use the assets.
8  Q.  Do you have records breaking
9  down by transferor subsidiary the amount
10 of maintenance paid on the leased
11 property?
12 A.  Could you ask the question
13 again, please?
14 Q.  Yes.  Do you have records broken
15 down by transferor subsidiary the amount
16 of maintenance paid on the leased
17 property?
18 A.  We do maintain financial
19 statements at some level for transferor
20 subsidiaries.  I would have to review the
21 details, but we maintain separate
22 financial statements for our transferor
23 subsidiaries.
24 Q.  So if we wanted to see how much
25 any given transferor subsidiary paid for

1  B. Gunderman
2  maintenance on the leased property in a
3  given year, there would be records that
4  you could locate?
5  A.  We would be able to locate
6  records.  The level of detail and the
7  extent of that detail, as I sit here
8  today, I would have to, you know, we would
9  have to look for that detail.  But I can
10 tell you and stipulate today at this
11 deposition that we do keep detailed
12 records at the transferor subsidiary
13 level.
14 Q.  And those detailed records would
15 include, for each transferor subsidiary,
16 the amount of property taxes paid in
17 respect of the leased property, correct?
18 A.  I would have to review those
19 specific financial statements to
20 affirmatively conclude on that, but it
21 would be my expectation that those
22 financial statements would be reflective
23 of the operating expenses of those
24 transferor subsidiaries.
25 Q.  Which would include property

1  B. Gunderman
2  taxes on the leased property, insurance
3  paid in connection with the use of the
4  leased property, as well as maintenance?
5  A.  That would be my expectation,
6  but it would have to be confirmed.
7  Q.  And the financial records for
8  each transferor subsidiary would also
9  reflect the amount of capital expenditures
10 paid by each transferor subsidiary in
11 respect of the leased property?
12 A.  Yes, the same level of detail
13 that we would maintain for operating
14 expenses we would maintain generally for
15 capital expenditures.
16 Q.  I'm going to show you a document
17 previously -- not previously marked.
18 We're marking it as Exhibit 44.
19  (Exhibit 44, E-mail, marked for
20 identification, as of this date.)
21 BY MR. FRIEDMAN:
22 Q.  Exhibit 44 is an e-mail from
23 Mary Michaels to John Culver at Fitch
24 Ratings with a cc to Bob Gunderman.
25 Subject:  Fitch follow-up questions.

1  B. Gunderman
2  Mr. Gunderman, do you have
3  Exhibit 44?
4  A.  I do.
5  Q.  Is this an e-mail that you
6  received on March 9, 2015?
7  A.  It does appear so, yes.
8  Q.  Can you tell me why -- what was
9  the position of Mary Michaels at this
10 time?
11 A.  March 9, 2015, my recollection
12 is Mary Michaels would have been head of
13 investor relations and a direct report of
14 mine at that time.
15 Q.  And why would she be answering
16 questions for Fitch Ratings?
17 A.  In addition to her role of head
18 of investor relations, she was also
19 responsible for certain treasury
20 management responsibilities as well.  We
21 leveraged her in the position to do other
22 things than just investor relations.  And
23 I would have used her in that capacity to
24 help with analysis and communications in
25 response to rating agencies and other

1  B. Gunderman
2  constituents.
3      Q.   Could I ask you to look at,
4  please, the third page of this exhibit,
5  which is WIN 20238.
6      A.   Could I have a moment to read
7  this?
8      Q.   Of course.
9      A.   Thank you.
10         (Witness reading document.)
11     A.   I've read the document.
12     Q.   I would like to call your
13 attention, please, to page 3 of the
14 document, which is WIN 20238.
15     A.   Okay.
16     Q.   And there's an e-mail on that
17 page dated 2/28/2015, subject:  Re Fitch
18 follow-up questions addressed to John, and
19 it's from Mary.
20         Do you see that?
21     A.   I do see that.
22     Q.   And Mary is Mary Michaels at
23 Windstream and John is John Culver at
24 Fitch Ratings, correct?
25     A.   Correct.

1  B. Gunderman
2      Q.   And one of the statements by
3  Mary Michaels is:
4         "The lease payment is
5  technically subordinated to the Win Corp.
6  debt.  However, as a practical reality, it
7  is clearly a priority payment."
8         Do you see that?
9      A.   I do.
10     Q.   And do you agree with that
11 statement by Mary Michaels?
12     A.   Well, as I testified earlier, I
13 agree that the lease payment at Windstream
14 Holdings is junior in priority to the
15 obligations that, what is now Windstream
16 Services, and I do agree that the lease
17 payment from Windstream Holdings to Uniti
18 is a priority payment given the importance
19 of the use of the leased assets from
20 Windstream Holdings and its subsidiaries.
21     Q.   And the reference to lease
22 payment is a reference to the rent due
23 under the master lease, correct?
24     A.   That is my understanding of the
25 statement.

1  B. Gunderman
2      Q.   And you previously testified
3  today about how cash goes from transferor
4  subsidiaries to Services to Holdings to
5  enable Holdings to pay the rent.  Do you
6  recall that?
7      A.   I previously testified that the
8  transferor subsidiaries as express
9  beneficiaries of and who have use of the
10 assets of the master lease use those
11 assets to create income, that cash from
12 that income is aggregated up to Services,
13 and the ability for Services to move cash,
14 you know, outside of the restricted
15 Services group is governed by our
16 covenants, and one of the uses of cash
17 that we move from Services to Holdings is
18 to make a payment for the master lease
19 with Uniti.
20     Q.   And in the years or
21 two-and-a-half years since the master
22 lease was signed, have the transferor
23 subsidiaries in fact generated enough cash
24 from their operations to fund the payment
25 of rent under the master lease?

1  B. Gunderman
2      A.   Well, the transferor
3  subsidiaries by definition don't make the
4  payments for the master lease.  The
5  transferor subsidiaries generate income.
6  That income is turned into cash, which is
7  aggregated into Services.  That cash is
8  governed by our covenants within Win
9  Services, which we were able to send cash
10 from Services to Holdings, and we pay the
11 master lease with that cash.
12     Q.   And the cash that has been
13 generated month after month by the
14 transferor subsidiaries has been
15 sufficient in amount to enable Services to
16 send enough cash to Holdings, for Holdings
17 to pay the monthly rent every month to
18 Uniti; is that correct?
19     A.   I would answer it a different
20 way.  The aggregate cash generated by
21 Windstream Holdings' subsidiaries in the
22 aggregate, which is more than just
23 transferor subsidiaries, has been more
24 than enough cash to satisfy the
25 obligations that Holdings has to make the

1  B. Gunderman
2  monthly payments to Uniti and has for,
3  since the beginning of the lease.
4      Q.   Do you know whether the cash
5  generated by the transferor subsidiaries
6  has been sufficient to -- sufficient in
7  amount to fund the payment of the rent?
8      A.   As I sit here today, that's a
9  calculation that I have not done.  I have
10  not examined the records of our transferor
11  subsidiaries separate and apart from the
12  rest of our results of operations of
13  Windstream Holdings or Services
14  subsidiaries, and examine that from the
15  standpoint of the question that you're
16  asking.
17      Q.   But we could look at the
18  financial statements of the transferor
19  subsidiaries and make the determination as
20  to whether the cash they generated was
21  sufficient.  Correct?
22      A.   You could look at the transferor
23  subsidiaries' financial statements and
24  determine what their cash and income was
25  generated for whatever period.  I agree

1  B. Gunderman
2  with that statement.
3      Q.   Okay.  And for -- you're the CFO
4  for all the Windstream companies, correct?
5      A.   Correct.
6      Q.   So for purposes of the financial
7  statements and the recordkeeping, am I
8  correct that the amount of the lease
9  payment due every month, every year from
10  Holdings to Uniti, is recorded as a
11  liability on the financial statements of
12  the transferor subsidiaries?
13      A.   The accounting of the obligation
14  for -- which represents the obligation
15  from a GAAP accounting standpoint on our
16  financial statements, and I will describe
17  what I mean by our financial statements,
18  it is represented on multiple financial
19  statements.  The accounting that governs
20  what we have to record is a concept called
21  failed sale-leaseback accounting, which is
22  a GAAP term, which, you know, at the
23  highest level, requires us to record an
24  obligation, a long-term lease obligation
25  on the books of Windstream Holdings and

1  B. Gunderman
2  Services, and through accounting, as you
3  know, our reported entities from an SEC
4  registered standpoint, are Holdings,
5  Services, and we do push down an
6  allocation of that obligation for
7  administrative ease into the transferor
8  subsidiaries' separate books.
9          It's an accounting allocation
10  governed by GAAP.
11      Q.   And the obligation are reflected
12  on the books of the transferor
13  subsidiaries but not on the books of other
14  subsidiaries, correct?
15      A.   It is -- that is my
16  recollection.  It is an allocation of an
17  obligation to the transferor subsidiaries'
18  books.
19          (Exhibit 45, 4/12/15 e-mail and
20      attachments, Bates stamped WIN 20411
21      through WIN 20112; WIN 20420 through
22      WIN 20427, marked for identification,
23      as of this date.)
24      Q.   I'm going to show you a document
25  we are marking as Exhibit 45.  It is an

1  B. Gunderman
2  e-mail from Bob Gunderman to Tony Thomas,
3  April 12, 2015.  Page number WIN 20411
4  through WIN 20427.
5      A.   Can I take a moment to read the
6  document?
7      Q.   Yes, of course, because my first
8  question will be can you identify this
9  document?
10      A.   I recognize the e-mail as being
11  from me to Tony Thomas.  I don't recall
12  the specific e-mail, but I'd be happy to
13  read it.
14      Q.   Oh, and again, I just have to
15  correct what I said about the page
16  numbers.  This is a cover e-mail with
17  multiple attachments.  Pages WIN 20411
18  through WIN 20412 are the cover e-mail.
19  All the attachments are not here.  The
20  attachment that is here is WIN 20420
21  through 20426 -- 20427, I apologize.
22          (Witness reading document.)
23      A.   I familiarized myself with the
24  document without reading every word.
25      Q.   Thank you.  And this is an

B. Gunderman
e-mail that you sent to Tony Thomas on
April 12, 2015 with attachments, correct?

    A.   Correct.

    Q.   And the attachment that is part
of the exhibit is what is referred to as
the QA for lender trip; is that correct?

    A.   Yes.

    Q.   I'm looking at the description
on the first page after the word
"Attachments."  You see where it says, "QA
for lender trip"?

    A.   Yes, I do.

    Q.   And starting with the third page
of the exhibit, which is page 20420, is
that the QA for lender trip?

    A.   That is my recollection after
having read this.

    Q.   Can you tell us, please, what
your role was in preparing the QA for
lender trip?

    A.   Well, in April of, I guess, 2015
I would have been the chief financial
officer and treasurer of Windstream as
noted in the e-mail, and I would have had

B. Gunderman
responsibility for overseeing as the CFO
and treasurer any number of preparedness
on communications that would come up as
part of the financing process and the
capitalization of CS&L.

    And as I read through this
document, it would appear that is what
this document is meant to be.

    Q.   Could you tell us what is meant
by "lender trip"?

    A.   Well, without being refreshed on
the calendar, what it would seem to mean
to me is that it would be a trip where we
were going to raise capital.

    And again, without knowing the
exact timeline, I hadn't refreshed on all
the exact timeline of the events around
the transaction before this deposition,
but that is what it would mean to me.

    Q.   Could you look, please, at the
first page of the Q and A, and I would
like to call your attention to item B, I
guess it's 1B, and tell me when you see
it.

B. Gunderman

    A.   1B on 20420?

    Q.   Correct.

    A.   Yes, I see it.

    Q.   So the word after the letter B
reads:

         "Lease structure well-designed
and ironclad."

    Do you know what is meant by
"ironclad" in this context?

    A.   As I review this now, two-plus
years removed, I don't recall exactly what
we were thinking when we wrote those
words, or whoever wrote the words.

    Q.   Do you recall that one of the
considerations in structuring this
transaction had to do with bankruptcy
considerations?

    A.   I recall that one of the
considerations was that we wanted to be
prepared to speak to anyone's questions
about the remote chance that might occur.
So yes, I recall having some discussion
about that.

    Q.   Was the lease structured so that

B. Gunderman
even in a bankruptcy process the
transferor subsidiaries would be able to
continue using the properties?

    MR. MARKS:  Objection.
Foundation.

    A.   I couldn't speculate on the
construction of the master lease, and as I
sit here today, I wouldn't be prepared to
comment on that.

    Q.   Do you have an understanding as
to what is meant by the reference to the
lease being "impossible to reject" in a
bankruptcy?

    A.   As I sit here today and read
that, I don't have a recollection of what
we were thinking at the time but there are
the words on the page.

    Q.   Would you look down to item C on
page 20420?

    A.   Yes.

    Q.   And item C begins with the
words, "What if Win can't afford to make
the lease payment i.e. default on lease"?

    Do you see that?

B. Gunderman

A.   I do see that.

Q.   And the first bullet point is:

"This is very unlikely, as a default on the lease would likely lead to bankruptcy process given the cross default on Win's credit documents highlighting the importance of the lease payment to Win Services (OpCo)."

Do you understand what that sentence is telling us?

A.   I understand the sentence.  As part of the preparation for this deposition, and routinely, I'm not reviewing our documents with the context of trying to understand this remote scenario, but I do understand the words.

Q.   And is this something you reviewed in preparation for this deposition?

A.   I did not -- I don't recall this particular document.  Is that your question?

Q.   That was my question.

A.   I don't recall reviewing this

B. Gunderman

particular document.

Q.   Do you have an understanding as to how a default on the master lease could lead to a bankruptcy process?

A.   I did not review those provisions as part of the master lease in preparation for this deposition, and I don't recall what, if any, provisions are in the master lease with regards to that topic.

Q.   Would you turn, please, to page 20422?

A.   Yes.

Q.   Under item 2, "Master lease relationship with Win," there is a Section B, do you see that?

A.   Yes.

Q.   Let me just read Section B:

"What type of protections do we have as a debt investor under the master lease agreement?"

Do you see that?

A.   I do.

Q.   And what is the meaning of the

B. Gunderman

reference to "debt investor"?

A.   Well, as I read this today, more than two years removed, what that seems to infer is either a loan or a bond investor of Windstream.

Q.   And item B continues with the sentence:

"What is the priority of the master lease payments at Win as compared to other obligations at Win interest expense cap X dividends?"

Do you see that?

A.   Yes.

Q.   And there are two bullet points below that in answer to the question.  Do you see that?

A.   Yes.

Q.   And those two bullet points, I will read them one at a time.  First:

"Since the Win Holdings is the obligor on the lease, there is a technical subordination for the lease payment but there is practical seniority as the payment must be made for Win OpCo to have

B. Gunderman

a business and to continue to generate cash flows."

Do you see that?

A.   Yes.

Q.   Do you agree with that statement?

A.   I agree with the comment that because the Win Holdings is the obligor of the lease, there is a technical subordination for the lease payment in reference to, you know, the restrictions that we have at Windstream Services.

I do agree that there is a priority in terms of this payment.  It is an important payment of the company in order to have access to assets, which are used to generate cash flows in the business.

Q.   Question, you would agree that as to the lease payments there is a practical seniority, as stated in this bullet point?

A.   I would agree it's an important payment, and I don't know that I would --

B. Gunderman
as I sit here today and read this in just
one moment, I would not conclude about the
language of practical seniority.  I would
have to think more about that.  My
testimony is I do agree it is an important
payment that is important to Windstream
being able to generate cash flows in the
business.

Q.   And important to the Windstream
transferor subsidiaries being able to
generate cash flows?

A.   Important to Windstream
Holdings, Windstream Services and
Windstream's transferor subsidiaries and
the rest of our subsidiaries.

Q.   Mr. Gunderman, in your answer a
moment ago, you said one thing I wasn't
entirely following.  You noted that
Windstream Holdings is the obligor of the
lease, and then you said something like,
as I heard it, there is a technical
subordination for the lease payment in
reference to the restrictions that we have
at Windstream Services, and I just want to

B. Gunderman
understand what you meant when you were
referring to the restrictions that we have
at Windstream Services?

A.   What I was referring to was
Windstream Services is where our debt
obligations and many of our material
obligations more generally reside.  And
the fact that Windstream Holdings is the
obligor of the lease payment, which is
outside of the Windstream Services
restricted group, in my judgment, that is
an indication of a technical subordination
of that payment.

Q.   Since the inception of the
master lease, am I correct that there have
been restricted payments from Services to
Holding sufficient in amount to fund the
payments of rent under the master lease?

A.   Yes.

Q.   And is there any expectation
that Services will stop making those
restricted payments at any point in time?

MR. MARKS:  Objection to the
form.

B. Gunderman
A.   There is no expectations in my
mind about that.

MR. FRIEDMAN:  Why don't we take
a break for lunch at this point and
then resume.

THE VIDEOGRAPHER:  The time is
12:41, and we are going off the
record.

(Luncheon recess taken at 12:41
p.m.)

B. Gunderman
A F T E R N O O N   S E S S I O N
(Time noted:  1:25 p.m.)

THE VIDEOGRAPHER:  The time is
1:25.  We're back on the record.
BY MR. FRIEDMAN:

Q.   Good afternoon, Mr. Gunderman.
MR. FRIEDMAN:  I will ask the
court reporter to mark as Exhibit 80 a
two-page document.

And I said two pages.  It's four
pages.  Exhibit 80 is WIN 14960
through WIN 14963.  At the top of the
first page, the document is entitled
"Windstream Services, LLC Officers'
Certificate."

(Exhibit 80, Windstream
Services, LLC Officers' Certificate,
Bates stamped WIN 14960 through WIN
14963, marked for identification, as
of this date.)

Q.   My question for you,
Mr. Gunderman, is:  Can you identify this
document?

1    B. Gunderman
2    A.   One moment.  Yes.  This is an
3 officer's certificate which is required
4 for when we make a restricted payment from
5 Services to Holdings.  And this is dated
6 December 7, 2015.  Signed by me as CFO and
7 Christie Grumbos, our treasurer.
8    Q.   So that's your signature right
9 above your name, Robert E. Gunderman; is
10 that correct?
11    A.   Yes.
12    Q.   And the certificate reflects a
13 -- withdrawn.
14        The certificate reflects a
15 dividend payment being made by Windstream
16 Services to Windstream Holdings, correct?
17    A.   Yes.
18    Q.   And the amount of the payment
19 from Windstream Services to Windstream
20 Holdings is $54,166,666.67; is that
21 correct?
22    A.   Yes.
23    Q.   And that amount is the amount of
24 monthly rent to be paid under the master
25 lease at the point in time the certificate

1    B. Gunderman
2 was signed; is that correct?
3    A.   Yes.
4    Q.   And am I correct that
5 certificates like this are signed on a
6 monthly basis?
7    A.   Yes.
8    Q.   Are you the one who has been
9 signing the officer's certificates since
10 the inception of the master lease?
11    A.   I don't know if I've signed
12 every one, but it wouldn't surprised me if
13 I signed most, if not all of them, as CFO
14 and treasurer.
15    Q.   For each officer's certificate,
16 the amount corresponds to the amount of
17 monthly rent that is due to be paid under
18 the master lease, correct?
19    A.   Well this document corresponds
20 to that amount.
21    Q.   And do you know whether
22 generally there is an officer's
23 certificate for each payment of monthly
24 rent that is required under the master
25 lease?

1    B. Gunderman
2    A.   Yes.
3    Q.   So if we go back, we should find
4 in the records for each monthly payment of
5 rent due under the master lease an
6 officer's certificate relating to a
7 restricted payment for that amount,
8 correct?
9    A.   Yes.
10    Q.   And can you confirm, please,
11 that the officer's certificate that you
12 signed and delivered to the trustee is
13 accurate and complete, to the best of your
14 knowledge?
15    A.   It is accurate and complete, to
16 the best of my knowledge.
17    Q.   And that includes the words and
18 the financial data, correct?
19    A.   Correct.
20    Q.   And footnote 9 on page WIN 14962
21 has a reference to fair market value of
22 property plant and equipment transferred 7
23 billion 450 million -- I'm not reading the
24 whole footnote.  I read part of it.  Do
25 you see what I read?

1    B. Gunderman
2    A.   I do see the footnote 9, yes.
3    Q.   I should have asked the
4 questions in this order.
5        FMV is fair market value; is
6 that correct?
7    A.   That is my understanding.
8    Q.   PP&E is property, plant and
9 equipment, correct?
10    A.   Yes.
11    Q.   The reference to PP&E
12 transferred is a reference to the property
13 transferred by the transferor subs to CS&L
14 in the April 2015 transaction, correct?
15    A.   That's my recollection.
16    Q.   And that is the property that,
17 as owned by CS&L or Uniti, is the leased
18 property, correct?
19    A.   That is my recollection, yes.
20    Q.   And the fair market value of the
21 property transferred on April 24, 2015 was
22 $7 billion 450 million; is that correct?
23        MR. MARKS:  Objection to the
24 form of the question.
25    A.   No.  As referenced in the

1    B. Gunderman
2  footnote, the fair market value is
3  represented as a reduction of, or as an RP
4  payment here, is actually calculated as
5  the fair market value of the PP&E
6  transferred of 7.45 billion, less net debt
7  proceeds of 3.550 billion.
8       Q.   Well, maybe my question was not
9  clear.  Let's look at the number up above
10 where footnote 9 is attached.
11      Do you see the number in parens
12 3 billion 900 million?
13      A.   Yes.
14      Q.   And what is that number telling
15 us?
16      A.   That number, as indicated by the
17 description, is a spinoff restricted
18 payment on 4/24.  It is a deduction from
19 our restricted payments basket which is a
20 calculation under our indentures, and it
21 shows a deduction of restricted payments
22 that is reflective of the outflow related
23 to the Uniti spin transaction.
24      Q.   And do I understand you
25 correctly that 3 billion 900 million was

1    B. Gunderman
2  the amount of a restricted payment by
3  Services to Holdings on April 24, 2015?
4       A.   Yes.
5       Q.   And is my arithmetic correct
6  that 3 billion 900 million results from
7  subtracting 3 billion 550 million from 7
8  billion 450 million?
9       A.   Yes.
10      Q.   And can you explain to me why
11 that subtraction is being done?
12      A.   That is the determination of the
13 restricted payment calculation.
14      Q.   Can you elaborate, how is that
15 the determination of the restricted
16 payment calculation?
17      A.   As I sit here today, two
18 years-plus removed from the transaction, I
19 don't recall the exact details of the
20 calculation.
21      But when I read it on the page,
22 that is what it represents to me.
23      Q.   Now, you said something a little
24 while ago where maybe you misunderstood or
25 maybe you misspoke, so I would like to be

1    B. Gunderman
2  clear.
3       Can you tell me, what is the
4  fair market value of the property that was
5  transferred by the transferor subsidiaries
6  to CS&L?
7       MR. MARKS:  Objection to the
8  form.
9       Q.   Do you understand the question?
10      A.   As represented on this document?
11      Q.   Yes.
12      A.   The fair market value of the
13 property, plant and equipment transferred
14 is represented at .45 billion.
15      Q.   And just to be clear, this is
16 where I might have misheard or you might
17 have misspoke.  You are not saying that
18 the fair market value was 7.45 billion
19 minus 3 billion 550 million?
20      MR. MARKS:  Objection to the
21 form.
22      Q.   Could you answer that?
23      A.   I'm saying for calculations on
24 the RP capacity, the deduction related to
25 the RP payment for this restricted payment

1    B. Gunderman
2  is calculated as 7.45 billion, less the
3  net debt proceeds received in the
4  transaction of 3.55 billion.  That is my
5  testimony.
6       Q.   I'm afraid I'm not communicating
7  as clearly as I would like to.  I may have
8  been mistaken.  I thought you said
9  something like the fair market value of
10 the property transferred would be 7.45
11 billion minus 3 billion 550 million.
12      Was that your testimony?
13      A.   My testimony was is the 3.9
14 billion, which is represented as the
15 reduction of our restricted payment
16 related to the spin-off transaction, it's
17 calculated by the calculation of the fair
18 market value of the PP&E transferred of
19 7.45 billion, less the net debt proceeds
20 of 3.55 billion.
21      Q.   Do you know how the fair market
22 value of 7.45 billion was determined?
23      MR. MARKS:  Objection to the
24 form.
25      A.   It's been some time since we

1    B. Gunderman
2 went through this. I didn't refresh
3 before this deposition, but generally we
4 retained an expert advisor to help us with
5 the valuation analysis for the
6 transaction. And this was the
7 determination that we arrived at as the
8 representation of the fair market value of
9 those assets transferred on advice of
10 those advisors.
11    Q.   Was that advisor Ernst & Young?
12    A.   Yes.
13    Q.   And Ernst & Young arrived at
14 7.45 billion as the fair market value of
15 the property being transferred?
16    A.   They had a range valuation, and
17 through our discussions of their analysis,
18 we concluded that was the valuation for
19 this transaction RP payment.
20    Q.   You concluded that the fair
21 market value of the property being
22 transferred was 7 billion 450 million?
23    A.   As required under the RP
24 payment, yes.
25    Q.   What does the RP payment have to

1    B. Gunderman
2 do with the determination of the fair
3 market value of the assets?
4    A.   Again, two-plus years removed,
5 my recollection is that was our
6 determination under the indenture as to
7 what we were required to reflect as a
8 restricted payment for the value
9 transferred of the assets.
10    Q.   And was it necessary to have the
11 fair market value of the property
12 transferred determined for any purpose
13 other than calculating restricted
14 payments?
15    A.   Yes.
16    Q.   What other purposes?
17    A.   We also used the valuation
18 analysis to conclude that the lease
19 transaction, that the lease payment that
20 was established between Windstream
21 Holdings and Uniti was fair market value
22 and an arm's length transaction and that
23 was another purpose.
24    Q.   And in using fair market value
25 for that purpose, the fair market value

1    B. Gunderman
2 determination that was used was the fair
3 market value of 7.45 billion, correct?
4    A.   Yes.
5    Q.   I'm going to show you a
6 document that was previously marked
7 yesterday as Exhibit 38. I'm showing you
8 Exhibit 38. You've read it before?
9    Mr. Gunderman, my question for
10 you is -- well, let me back up before I
11 ask you specifically about the document.
12    You recall that in connection
13 with the transferor subsidiaries' transfer
14 of assets to CS&L, there were proceedings
15 commenced by Windstream companies before
16 various state regulatory authorities?
17    A.   Yes.
18    Q.   Can you tell us, please,
19 generally what your role was in connection
20 with those regulatory proceedings?
21    A.   My role was to be part of the
22 Kentucky proceeding. I was asked to
23 participate in the proceeding. My topics
24 of emphasis for my participation were
25 around the financial benefits of the

1    B. Gunderman
2 transaction, the financial structuring of
3 the transaction, the accounting of the
4 transaction. Those were generally the
5 components that I was brought forth to
6 speak to.
7    Q.   And do I understand you
8 correctly that you had the role you
9 described in the Kentucky proceeding but
10 not in proceedings in other states?
11    A.   I don't recall any other state
12 testimony. I certainly didn't participate
13 in that. I know those deliberations and
14 filings and responses were supervised by
15 our legal team, and that was not under my
16 supervision.
17    Q.   And you do have a recollection
18 of testifying in the Kentucky proceeding?
19    A.   I do at a high level. It's been
20 some time.
21    Q.   Okay. So Exhibit 38 is a cover
22 letter with a transcript attached. The
23 cover letter refers to a transcript of a
24 November 13, 2014 hearing. And the
25 transcript on page 2, which is WIN 3682,

1    B. Gunderman
2  reflects that the transcript includes
3  testimony of Robert E. Gunderman, starting
4  on page 9 and going to about page 145.
5       And I would at this time simply
6  ask you to look a this.  I'm not asking
7  you to read all of it.  Does this document
8  appear to be a transcript of the testimony
9  that you provided in the Kentucky
10  proceeding?
11     A.   Without reading the entire
12  document, it does appear to be based upon
13  the title and description that you've
14  described.  That is the document as
15  presented.
16     Q.   I would like to call your
17  attention, please, to page 26.
18     A.   26 of the document or --
19     Q.   Yes, 26 of the transcript.
20     A.   Okay.
21     Q.   Which is WIN 3706.
22     A.   Okay.
23     Q.   And tell me when you're there,
24  please.
25     A.   I'm there.

1    B. Gunderman
2     Q.   And there is a question on line
3  13, and then an answer on line 17 that's
4  interruptive a little on line 22, and then
5  the answer continues onto through line 25.
6       Do you see that?
7     A.   I do.  I can read that.
8     Q.   I'm going to read that much into
9  the record.
10     A.   Okay.
11     Q.   The question starting at line 13
12  is:
13       "And believe me, that's all I
14  know is the name on the chart.  So, now,
15  will there be an agreement between the
16  Kentucky ILECs and that CSL Kentucky
17  subsidiary.
18       "Answer:  The agreement will be
19  between CS&L at the corporate entity level
20  as well as Windstream Holdings, Inc., and
21  it's just for administrative ease in terms
22  of transacting -- transacting the lease
23  between the entities -- "
24       And then the question is:
25       "Okay.  I --"

1    B. Gunderman
2       And then you continue:
3       "For the benefit of the
4  operating subsidiaries of Windstream to
5  include Kentucky East and Kentucky West."
6       Do you see the portion of the
7  transcript I just read?
8     A.   Yes.
9     Q.   And that is testimony that you
10  provided, a portion of the testimony you
11  provided in the Kentucky proceeding,
12  correct?
13     A.   Yes.
14     Q.   And is the answer you gave
15  truthful?
16     A.   Well, as I reflect upon the
17  testimony, I certainly believe I could
18  have been more clear in my answer, but as
19  a reminder, when I gave the testimony, I
20  was primarily engaged to speak to the
21  financial benefits, the financial
22  structuring of the transaction and the
23  accounting of the transaction.
24       When I made the answer to the
25  gentleman's question, I believe I

1    B. Gunderman
2  oversimplified a couple of terms in my
3  answer, which was somewhat confusing.  As
4  I was reviewing this testimony today
5  versus then, what I recall referring to
6  here was that the lease was between
7  Windstream Holdings and CS&L.  And because
8  the transferor subsidiaries were express
9  beneficiaries of the lease, with Holdings
10  being the obligor, I was simply referring
11  to what was mentioned as part of the
12  preparation for this testimony, which was
13  the administrative ease in terms of
14  transacting, I was confusing a concept
15  called the retained title concept, which
16  for me meant, because of the
17  administrative burden of having
18  potentially to go through and retitle
19  thousands and thousands of assets that
20  would be transferred as part of this
21  original transaction, through the
22  administrative ease, which was the point
23  that I was confusing and referring to, we
24  were simply going to transact at the
25  Holdings level and the express

1   B. Gunderman
2  beneficiaries' benefits for the transfer
3  of subs was the concept I was confusing.
4  I could have been more clear within this
5  testimony.
6   Q.   You referred in your answer to
7  the preparation for this testimony.
8  Correct?
9   A.   For the testimony with Kentucky.
10   Q.   Yes.  And with whom did you
11  speak in preparing to provide the Kentucky
12  testimony?
13   A.   Well, I forget the name of the
14  law firm.  It may be on the cover here
15  that advised us at the time.  I don't
16  remember the firm or the name and didn't
17  try to prepare for that in advance of this
18  deposition.
19   I do recall that John Fletcher,
20  who is our general counsel at the time and
21  myself, were the two executives who gave
22  the testimony, and so I'm quite confident
23  he and I would have talked about --
24   MR. MARKS:  You don't have to
25  say what you and he talked about.

1   B. Gunderman
2   A.   I will leave it at that.
3   Q.   In your last answer, you told me
4  part of what had been explained to you in
5  the preparation, correct?
6   A.   I would have heard concepts
7  identified.  And quite frankly, I confused
8  the concepts as part of my testimony.
9  Made that less clear with the way I
10  testified to it.
11   Q.   My question was, you heard
12  concepts explained to you in the process
13  of your preparing for the Kentucky
14  testimony, correct?
15   A.   That's my recollection two or
16  three years removed.
17   Q.   Okay.
18   And is it your best recollection
19  that the concepts you were describing were
20  explained to you by a lawyer?
21   A.   I don't recall who explained it
22  to me.  I just know generally at the time
23  I recall hearing the concepts.
24   Q.   Other than the concept that you
25  explained in your answer just now, is

1   B. Gunderman
2  there anything else that you recall that
3  was explained to you in preparation for
4  your Kentucky testimony?
5   MR. MARKS:  I want to caution
6  the witness that's a yes/no question,
7  and before you start to go into what's
8  possibly attorney-client privileged
9  information.
10   Can you read back the question?
11   Q.   The question was:  Other than
12  the concept that you explained in your
13  answer just now, is there anything else
14  that you recall that was explained to you
15  in preparation for your Kentucky
16  testimony?
17   A.   No.
18   Q.   So as you sit here today, the
19  one thing you remember in your preparation
20  for the Kentucky testimony is that someone
21  explained to you administrative ease with
22  reference to retained title.  Is that
23  correct?
24   A.   Perhaps you will have to expand
25  on your question.  I thought you were

1   B. Gunderman
2  simply asking about that particular
3  clause.
4   Q.   No.
5   A.   Okay.
6   Q.   I'm going to ask my question
7  again.
8   A.   Okay.
9   Q.   Let's step back.  You told me a
10  few minutes ago something that you
11  remembered hearing in connection with your
12  preparation for the Kentucky testimony,
13  correct?
14   A.   Yes.
15   Q.   And my question is:  In addition
16  to what you have described, do you
17  remember hearing anything else in
18  connection with your preparation for the
19  Kentucky testimony?
20   MR. MARKS:  He's answered that
21  question no.
22   MR. FRIEDMAN:  There was some
23  confusion expressed by the witness.  I
24  would like an answer to my question.
25   A.   I will stick with my prior

B. Gunderman

1  answer of no.
2      Q.   So to be clear, with respect to
3  any and all preparation you engaged in for
4  your Kentucky testimony, the only thing
5  you remember is that someone explained the
6  concept of retained title and how that was
7  being handled for administrative ease, and
8  there is nothing else you remember hearing
9  in connection with your preparation for
10 the Kentucky testimony, correct?
11         MR. MARKS:  Objection to form.
12         You can answer.
13     A.   I don't know how you separate
14 the question of preparations.  My
15 assimilation of information over periods
16 of time that prepared me for the testimony
17 was an assimilation of information in
18 dialogues that I had from the construction
19 of the transaction, and that's what
20 prepared me for the testimony.
21         I don't remember anything
22 specific other than what I'm testifying
23 here to today about the particular topic
24 that you just asked about and the retained

B. Gunderman

1  title.
2      Q.   You referred to your preparation
3  for the Kentucky testimony; is that
4  correct?
5      A.   I did.
6      Q.   Did that preparation occur in an
7  in-person meeting?
8      A.   I don't recall how the
9  preparations occurred.  It's been too
10 long.
11     Q.   Do you recall any of the names
12 of the people who were present in
13 connection with preparing for your
14 Kentucky testimony?
15     A.   I don't.
16     Q.   Do you recall how much time you
17 spent preparing for your Kentucky
18 testimony?
19     A.   I don't.
20     Q.   Do I understand you correctly,
21 in your preparation for the Kentucky
22 testimony you recall hearing about
23 retained title?
24     A.   As I said earlier, up to the

B. Gunderman

1  time where I was prepared to give the
2  testimony in the Kentucky, I recall
3  hearing about that concept.
4      So how you define the
5  preparations for the testimony is
6  ambiguous to me as to how you're defining
7  that.
8      Q.   You, Mr. Gunderman, referred to
9  something you heard in your preparation
10 for the Kentucky testimony.  I'm trying to
11 understand what you meant when you said
12 you heard something in connection with
13 your preparation for the Kentucky
14 testimony.
15         Could you explain, please, what
16 you meant?
17         MR. MARKS:  Objection.  Asked
18 and answered.
19     Q.   You may answer.
20     A.   I've answered it.
21     Q.   Well, I would like an answer to
22 the question, please.
23     A.   I answered it earlier, which is
24 to say I had over time assimilated

B. Gunderman

1  information around my understanding of the
2  transaction, and through that time I heard
3  mention of the retained title concept and
4  I confused those issues as part of my
5  testimony and that's my answer.
6      Q.   Is your testimony now that at
7  some point prior to the Kentucky testimony
8  you heard about retained title?
9      A.   That is my recollection.
10     Q.   Do you have a recollection of
11 hearing about retained title in connection
12 with your preparation for the Kentucky
13 testimony?
14         MR. MARKS:  Asked and answered
15 four times.
16         MR. FRIEDMAN:  No, it hasn't.
17     A.   Can you define it?
18     Q.   Mr. Gunderman, I will be happy
19 to define it, and if it's my
20 misunderstanding, you'll tell me.
21         I understood from your testimony
22 that prior to your Kentucky testimony, you
23 engaged in some preparation or meeting, as
24 people often do when they're going to

1    B. Gunderman
2  testify.  Did I misunderstand that?
3    MR. MARKS:  Objection to the
4  form of the question.
5    Q.   You may answer.
6    A.   I don't recall every step of the
7  way of everything that I did to prepare,
8  but I do recall that leading up to the
9  Kentucky testimony, I would have
10 assimilated information over time that
11 prepared me for the discussion.
12   Q.   When you say "over time," do you
13 mean over a period of months and years
14 before you testified?
15   A.   My understanding of the
16 transaction prepared me for the testimony.
17   Q.   So you're referring now to an
18 understanding of the transaction you
19 developed over months or years.  Correct?
20   A.   Yes.
21   Q.   So what I want to understand is
22 before you testified in Kentucky, did you
23 have a meeting or a telephone call with
24 anyone to prepare for that testimony
25 specifically?

1    B. Gunderman
2    A.   I don't recall the exact details
3  of who was at a meeting for preparation,
4  but I do recall that we had preparations.
5  I just don't recall the details of what we
6  went through.
7    Q.   And those preparations would
8  have been within days or a week of the
9  testimony?
10   A.   I don't recall the details of
11 it, so...
12   Q.   But you understand I'm asking
13 about preparation specifically for your
14 Kentucky testimony.  You understand that?
15   A.   I do.
16   Q.   And in those preparations
17 specifically for the Kentucky testimony,
18 did someone tell you about retained title?
19   MR. MARKS:  Objection.  This is
20 the eighth time asking the same
21 question.
22   MR. FRIEDMAN:  The record will
23 reflect what it reflects.
24   Q.   You may answer the question.
25   A.   I don't recall any specific

1    B. Gunderman
2  conversations or sequencing of events that
3  I could elaborate any further than I have
4  the last eight times you asked it.
5    Q.   Just to be clear --
6    MR. MARKS:  Ed, this is becoming
7  harassment.
8    MR. FRIEDMAN:  I'm not
9  harassing.
10   MR. MARKS:  We're done with this
11 question.
12   MR. FRIEDMAN:  We're trying to
13 get through this.
14   MR. MARKS:  We're done with this
15 question.
16 BY MR. FRIEDMAN:
17   Q.   In the preparation you engaged
18 in specifically for the Kentucky
19 testimony, do you have a recollection of
20 anyone explaining to you retained title?
21   A.   Not specifically.
22   Q.   Do you have a recollection of
23 who, at any time, explained retained title
24 to you?
25   You may answer.

1    B. Gunderman
2    MR. MARKS:  You can answer that
3  question.
4    A.   I don't recall specific
5  discussions around it.  I can simply say
6  that, given the structuring of the
7  transaction being led by our general
8  counsel, you know, I wouldn't be surprised
9  if I would have had conversations with him
10 about the topic.
11   Q.   And is it your testimony today
12 that you have a specific recollection of
13 someone using the term "administrative
14 ease" in connection with explaining
15 retained title?
16   MR. MARKS:  Objection to this
17 question.
18   Q.   You may answer the question.
19   MR. MARKS:  Only to the extent
20 it does not --
21   MR. FRIEDMAN:  It's a yes or no
22 question.
23   MR. MARKS:  It's not.  Only to
24 the -- you asked for a content of a
25 conversation.  Only to the extent

1      B. Gunderman
2  you're not revealing a communication
3  had with counsel.
4      Why don't you read back the
5  question?
6      Q.   The question was --
7      MR. MARKS:  Read back the
8  question.
9      (Record was read back by the
10  court reporter as follows:
11      "QUESTION:  And is it your
12  testimony today that you have a
13  specific recollection of someone using
14  the term "administrative ease" in
15  connection with explaining retained
16  title?")
17      A.   I don't have a specific
18  recollection.
19      Q.   Mr. Gunderman, did you review
20  your Kentucky testimony yesterday?
21      A.   I reviewed portions of my
22  Kentucky testimony, as I read the
23  Complaint.  I wanted to review certain
24  sections.
25      Q.   When did you review portions of

1      B. Gunderman
2  your Kentucky testimony?
3      A.   I don't remember the exact times
4  I reviewed it.
5      Q.   Did you review any portion of
6  your Kentucky testimony yesterday or
7  today?
8      A.   I recall reviewing portions of
9  it this week.  I think I may have reviewed
10  something yesterday.
11      Q.   And did the portion you reviewed
12  yesterday include page 26 of your
13  testimony, the page I was asking you
14  about?
15      A.   26 is -- yes, I did.
16      Q.   You did.
17      And are there any other portions
18  you reviewed yesterday?
19      A.   I don't recall specifically what
20  other sections.
21      Q.   Do you know that John Fletcher
22  testified at a deposition yesterday?
23      MR. MARKS:  Objection to the
24  form of the question.
25      Go ahead.

1      B. Gunderman
2      A.   I do.
3      Q.   And did you review any portions
4  of Mr. Fletcher's testimony?
5      A.   No.  From yesterday?
6      MR. MARKS:  Objection to form.
7      Q.   From yesterday, correct.
8      A.   No.
9      Q.   Did anybody tell you what
10  Mr. Fletcher testified to yesterday?
11      A.   No.
12      Q.   I'm going to show you a document
13  previously marked as Exhibit 3.  The first
14  thing I'm going to ask you, Mr. Gunderman,
15  and of course you should feel free to
16  review whatever you want to review, if you
17  look at the very last page of Exhibit 3
18  where your name Bob Gunderman appears, is
19  that your signature?
20      A.   That is my signature on the last
21  page of this exhibit.
22      Q.   And did you sign this
23  verification in front of a notary where it
24  says, "Sworn to before me on this 13th day
25  of October 2017"?

1      B. Gunderman
2      A.   It appears that I did.
3      Q.   And in the verification that's
4  above your signature, you say that you are
5  authorized to make this declaration on
6  behalf of Services.
7      Was that true?
8      A.   Yes.
9      Q.   And the next sentence says:
10      "I have read and know the
11  contents of the foregoing verified
12  counterclaims."
13      Was that true?
14      A.   Yes.
15      MR. MARKS:  Objection to form.
16      Q.   You said -- the verification
17  also says:
18      "The information contained in
19  the verified counterclaims is true and
20  correct to the best of my present
21  knowledge information and belief."
22      MR. MARKS:  Objection to form.
23      Q.   Was that truthful when you
24  signed your name?
25      A.   Yes.

1          B. Gunderman
2    Q.   And the last sentence says:
3    "I declare under penalty of
4   perjury under the laws of the United
5   States of America that the foregoing is
6   true and correct."
7       Do you see that?
8    A.   Yes.
9    Q.   And was the foregoing true and
10  correct?
11    A.   Yes.
12    Q.   Let me ask you, please, to take
13  a look at paragraph 5, which is on page 4
14  of the document.  Tell me when you're
15  there.
16    A.   Page 4, paragraph 5?
17    Q.   Correct.
18    A.   I'm there.
19    Q.   And you understand that a note
20  holder on September 21st served a notice
21  of default with respect to the indenture
22  for the 2023 notes?
23    A.   Yes.
24    Q.   And do you understand the nature
25  of the default asserted in that notice of

1          B. Gunderman
2  default?
3    A.   Yes, I read the original
4  assertions.
5    Q.   And you understand that the
6  notice of default asserted that the April
7  24, 2015 transaction entailed a sale and
8  leaseback in violation of the indenture,
9  correct?
10    A.   I understand that was the
11  assertion, yes.
12    Q.   And did you have a view -- at
13  the time you signed this verification, did
14  you have a view as to whether the April
15  24, 2015 transaction violated or did not
16  violate the indenture?
17       MR. MARKS:  Objection to the
18  form of the question.
19    A.   I had a view that it did not
20  violate the terms of the indenture.
21    Q.   Okay.  And did you discuss your
22  view with anyone at Windstream prior to
23  the time you signed this verification?
24       MR. MARKS:  That's a yes/no
25  question.

1          B. Gunderman
2    A.   Yes.
3    Q.   And who are the people at
4  Windstream with whom you discussed your
5  view?
6    A.   My recollection is I would have
7  discussed this document and my eventual
8  assertions in response here with John
9  Fletcher and Christie Moody.
10    Q.   Am I correct that you saw the
11  notice of default on September 21, 2017 or
12  within a day or two thereafter?
13    A.   I don't remember the exact
14  timing, but I mean, within the time it
15  came, I certainly saw it.
16    Q.   Starting from the time you first
17  saw the notice of default, did you discuss
18  the contents of that notice of default or
19  your views about it with anyone other than
20  John Fletcher or Ms. Moody?
21    A.   I don't recall others,
22  discussing with others.  Could have been
23  others.  I just don't remember.
24    Q.   Do you recall if anyone at
25  Windstream expressed the view that the

1          B. Gunderman
2  assertion in the notice of default was
3  correct?
4    A.   No one made that comment to me.
5    Q.   Are there others at Windstream
6  who have expressed to you the view that
7  there was no default under the indenture
8  by virtue of the April 24, 2015
9  transaction?
10       MR. MARKS:  Objection.  Again,
11  just so long as you're not talking
12  about conversations where counsel --
13  in which counsel was providing advice
14  or there was discussion with counsel
15  about this topic.
16    A.   I relied heavily on advice of
17  counsel for the discussions, and that's
18  the extent of my conversations.
19    Q.   When you saw the notice of
20  default, did you have an understanding of
21  the time periods under the indenture?
22    A.   Can you be more specific?
23    Q.   Yes.
24       When you saw the notice of
25  default, did you have any understanding

1         B. Gunderman
2 with respect to the cure period?
3     A.   I consulted with our counsel
4 about that.
5     Q.   I'm not asking you about what
6 you and your counsel discussed. At the
7 time you signed this verification, did you
8 understand that the indenture contained a
9 60-day cure period?
10     A.   Yes.
11     Q.   And did you understand under the
12 indenture what would happen at the end of
13 that 60-day cure period?
14     MR. MARKS:  Objection to the
15 form.
16     A.   I understood that absent a cure,
17 there could be an event of default.
18     Q.   And did you have an
19 understanding as to what the note holder
20 or the trustee could do upon an event of
21 default?
22     A.   Yes. Generally acceleration of
23 the payment of our debt.
24     Q.   Sending a notice of
25 acceleration?

1         B. Gunderman
2     A.   Yes.
3     Q.   And did you have an
4 understanding as to what would happen if a
5 notice of acceleration was sent to
6 Windstream?
7     MR. MARKS:  Objection to the
8 form of the question.
9     A.   Could you be more specific in
10 what you're --
11     Q.   Yes. You understood there was a
12 possibility that on day 61 a notice of
13 acceleration could be delivered to
14 Windstream?
15     A.   Yes.
16     Q.   And did you consider the
17 possibility that when the notice of
18 acceleration arrived, Windstream would
19 write a check to pay the principal balance
20 of the notes in full?
21     MR. MARKS:  Objection to the
22 extent you're not relying on
23 conversations that you had with
24 counsel, after receiving this notice
25 of default, then you can answer.

1         B. Gunderman
2     Q.   Just to be clear, I'm not asking
3 about legal advice. I'm talking to the
4 chief financial officer, who understood
5 that a notice of acceleration might
6 arrive.
7     And I'm asking you, sir, as
8 chief financial officer, whether you
9 considered the possibility that Windstream
10 would write a check on November 21st to
11 pay the full balance of the 2023 notes?
12     MR. MARKS:  I'm giving you the
13 same instruction that since he's
14 asking about things that happened
15 after the notice of default occurred,
16 if your answer is based on
17 conversations that you had with
18 counsel, I will instruct you not to
19 answer.
20     A.   Yeah, my discussions would have
21 been with counsel, and I would not want to
22 answer that.
23     Q.   Did you discuss with counsel
24 what could be the consequences for
25 Windstream if a notice of acceleration

1         B. Gunderman
2 arrived on day 61?
3     MR. MARKS:  I'm going to
4 instruct him not to answer that
5 question based on attorney-client
6 privilege.
7     Q.   Do you have any knowledge or
8 information about the potential
9 consequences for Windstream upon receipt
10 of a notice of acceleration other than
11 what you discussed with counsel?
12     I will ask the question a
13 different way.
14     MR. MARKS:  Please.
15     Q.   Tell me, Mr. Gunderman, as best
16 you can, your understanding as to the
17 consequences for Windstream if the note
18 holder or the trustee were to send a
19 notice of acceleration on day 61.
20     MR. MARKS:  You can answer that
21 question.
22     A.   I didn't practically consider
23 those hypothetical consequences as I
24 judged them to be irrelevant and remote.
25     Q.   Have you given consideration to

B. Gunderman

1  
2  those consequences any further since you  
3  signed the verification?  
4  　　　　MR. MARKS: Same instruction.  
5  To the extent this involves  
6  communications that you may have had  
7  with counsel, I'm going to instruct  
8  you not to answer.  
9  　　A. Well, then I won't answer then.  
10  　　　　MR. FRIEDMAN: Let's take couple  
11  of minutes.  
12  　　　　MR. MARKS: Sure.  
13  　　　　THE VIDEOGRAPHER: The time is  
14  2:14. We're going off the record.  
15  　　　　(Thereupon, a recess was taken,  
16  and then the proceedings continued as  
17  follows:)  
18  　　　　THE VIDEOGRAPHER: The time is  
19  2:31, and we're back on the record.  
20  BY MR. FRIEDMAN:  
21  　　Q. Mr. Gunderman, you testified  
22  this morning about a cash generated by  
23  subsidiaries of Services. Do you recall  
24  that?  
25  　　A. Yes.

B. Gunderman

1  
2  　　Q. And I know we have financial  
3  statements for the subsidiaries that  
4  enable us to see how much cash is being  
5  generated by each subsidiary, correct?  
6  　　A. We do.  
7  　　Q. And the question I have for you  
8  as CFO, without studying all the financial  
9  statements for all the subsidiaries, do  
10  you have a general sense, when you look at  
11  the total annual cash generated by  
12  Services subsidiaries, what proportion is  
13  generated by the transferor subsidiaries?  
14  　　A. I don't. I don't know the  
15  answer to that. I don't review our  
16  financials or manage our business under  
17  those terms.  
18  　　Q. So you wouldn't know whether the  
19  transferor subsidiaries account for half  
20  the cash, or less than half, or more than  
21  half? You just don't know?  
22  　　A. I don't know. I have not done  
23  the analysis.  
24  　　Q. But anybody could read the  
25  financial statements and determine?

B. Gunderman

1  
2  　　A. Yes, they could.  
3  　　Q. Do you know what a capital lease  
4  is?  
5  　　A. Generally, yes.  
6  　　Q. And what's a capital lease?  
7  　　A. It's a lease, it's a long-term  
8  lease obligation, you know, an agreement  
9  between two parties to lease assets for  
10  consideration. Generally, that's how I  
11  think about the definition.  
12  　　Q. How is a capital lease accounted  
13  for under GAAP?  
14  　　A. I have to review all the rules.  
15  But generally speaking, there's a present  
16  value of the lease payments under the  
17  obligation that are measured to net  
18  present value of dollars and placed on the  
19  balance sheet as an obligation.  
20  　　Q. Am I correct that the assets  
21  that are the subject of the capital lease  
22  remain on the balance sheet as if owned by  
23  the lessee entity?  
24  　　A. I would have to go back and  
25  review all the accounting rules. I didn't

B. Gunderman

1  
2  prepare for that testimony for today.  
3  　　Q. Generally speaking, if the  
4  transaction here had been accounted for as  
5  a capital lease, would the accounting  
6  treatment be different or the same as the  
7  accounting treatment that we actually  
8  have?  
9  　　A. I didn't prepare the analysis or  
10  do the work in advance to answer that  
11  question, and so I'd be speculating  
12  without having done the analysis to answer  
13  that.  
14  　　Q. I'm going to show you -- well,  
15  am I correct that a capital lease is  
16  basically a financing with the assets  
17  staying on the balance sheet of the  
18  entities and the present value of the  
19  liabilities being treated as a liability  
20  on the balance sheet?  
21  　　A. Generally speaking, I think  
22  that's accurate.  
23  　　Q. I'm going to show you a document  
24  that we marked as Exhibit 50. Not  
25  previously marked.

1           B. Gunderman
2      (Exhibit 50, Duff & Phelps
3  opinion, Bates stamped WIN 13984
4  through WIN 14039, marked for
5  identification, as of this date.)
6  BY MR. FRIEDMAN:
7     Q.  Mr. Gunderman, before you look
8  at the document, can I ask you, are you a
9  CPA?
10     A.  I am.  I'm in inactive status,
11  but I am a CPA.
12     Q.  So I handed you Exhibit 50, and
13  Exhibit 50 is WIN 13984 through WIN 14039
14  and my first question is to ask you if
15  this is something you've seen prior to
16  today?
17     A.  If you can give me a second,
18  I'll review this.
19     Q.  Yes.  And when I ask if you've
20  seen this, I would appreciate your telling
21  me if you've seen any part of it.
22     A.  I have reviewed this generally,
23  and so can you repeat your question?
24     Q.  Yes.
25        My first question is whether

1           B. Gunderman
2  prior to today you have seen this document
3  or any part of it?
4     A.  I have not reviewed this
5  recently.  But I do, I recall, if I'm
6  recognizing this properly, this appears to
7  be the opinion that we received from the
8  firm of Duff & Phelps as part of the
9  considerations and approval with going
10  forward with the REIT transaction.  We
11  sought an opinion about the solvency of
12  the transaction.  And we presented that,
13  as I recall -- we presented this to our
14  board.
15     Q.  Were you involved in obtaining a
16  solvency opinion from Duff & Phelps?
17     A.  I was involved in the process.
18  It's been some time since I've been
19  through the opinion, but yes, I was
20  involved in the process.
21     Q.  What was your nature of your
22  involvement in the process?
23     A.  My recollection, generally, is I
24  would have been consulted upon some of the
25  key assumptions on the transactions or the

1           B. Gunderman
2  financial characteristics of the
3  transaction and the abilities of the
4  companies from a, financial projections,
5  and which obviously would be assumptions
6  that Duff & Phelps would have used to
7  construct their analysis, independent
8  analysis, so obviously they took our
9  assumptions and made their own assumptions
10  and prepared an independent analysis for
11  our board.
12     Q.  And you made sure at the time
13  that the information provided to Duff &
14  Phelps was accurate and correct?
15     A.  Well, it was accurate and
16  correct, to the best of our knowledge.
17  Obviously, there was a lot of forecasted
18  information, and forecasts are forecasts,
19  and they are based on lots of assumptions
20  that could change over time.
21     Q.  You understood that the board
22  would have to be satisfied that the Duff &
23  Phelp's opinion was correct as part of the
24  process of approving the transaction?
25     A.  I understood that, yes.

1           B. Gunderman
2     Q.  Let me ask, can you take a look,
3  please, at page WIN 14007, which is the
4  balance sheet analysis within the file
5  Duff & Phelps opinion.
6     A.  WIN 14007?
7     Q.  14007, yes.
8     A.  I'm looking at that page.
9     Q.  The first question I have is, if
10  you look down just prior to the footnotes,
11  the entry says net asset value -- sorry.
12        Go up above that a little bit.
13  Sorry.  You see the box above that where
14  it says, "Net asset value Windstream
15  Services, LLC 1 billion 924 million"?
16     A.  I see the reference.
17     Q.  Okay.  And do you have -- so let
18  me just ask, we have -- if you look up
19  above, you see how Duff & Phelps
20  calculated the net asset value for
21  Windstream Services, LLC?
22     A.  I see the reference on this
23  page, yes.
24     Q.  What we see is that Duff &
25  Phelps has an adjusted enterprise value

B. Gunderman

conclusion of 13 billion 300 million, correct?

A.   I see that, yes.

Q.   And then there are some deductions and additions to arrive at a net asset value; is that correct?

A.   Yes.

Q.   Am I correct that one of the deductions set by Duff & Phelps is capitalize rent $6 billion 300 million; is that correct?

A.   That is what it shows, yes.

Q.   Am I correct that that capitalized rent would be a net present value figure for the rent due under the master lease?

A.   Well, again, I didn't review this presentation in advance of this deposition.  I could only go with what I see on the page, which is a footnote disclosure of, tied to that number, which says it's capitalized at eight times 2015, initial rent of 650 million plus existing leases of 134 million.

B. Gunderman

Q.   And you understand that the 650 million refers to the master lease, correct?

A.   It would be my judgment, as I sit here today, that is likely what is meant there, without reviewing the full presentation in the last two, three minutes.

Q.   And the reference in footnote 3 to 8.0X, that tells you that it is an estimate of the present value of the obligation, correct?

A.   It is my understanding that this is a way to reflect the net present value of an obligation like this.  I've seen it done differently, but this is a way.

Q.   And do you see anything wrong in the methodology and calculations by Duff & Phelps in determining the net asset value of Windstream Services, LLC?

A.   I don't see anything wrong with it.  I think it's a reasoned analysis based on many assumptions, and I think based upon the assumptions that they've

B. Gunderman

made, the analysis is done reasonably.

Q.   And you're not aware of any assumption that is erroneous, correct?

A.   Well, again, I was just handed the exhibit about a few minutes ago, so it would not be correct for me to say I have had enough time to rereview this presentation and offer a comment at this point.

But I'm not aware of any assumption, as I sit here today, but just with the backdrop that I just got it again.

Q.   You did review the Duff & Phelps opinion at the time, correct?

A.   I did.

Q.   And you did not conclude there was something incorrect in here, correct?

A.   Correct.

Q.   And did you recommend that the board of directors accept this?

A.   Yes.

MR. FRIEDMAN:  I have no further questions.  No further questions.

B. Gunderman

Thank you.

MR. MARKS:  Non here.  Thank you.

THE VIDEOGRAPHER:   The time is 2:45.  We're off the record.

(Time noted:  2:45 p.m.)