UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— X

U.S. BANK NATIONAL ASSOCIATION,
solely in its capacity as indenture trustee of
Windstream Services, LLC's 6 3/8% Senior
Notes due 2023,

           Plaintiff and Counterclaim
           Defendant,

    vs.

WINDSTREAM SERVICES, LLC,

           Defendant, Counterclaim
           Plaintiff, and Counterclaim
           Defendant,

    vs.

AURELIUS CAPITAL MASTER, LTD.,

           Counterclaim Defendant and
           Counterclaim Plaintiff.

———————————————————————— X

17 Civ. 7857 (JMF)

## COUNTERCLAIM DEFENDANT AND COUNTERCLAIM PLAINTIFF AURELIUS CAPITAL MASTER, LTD.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Lawrence S. Robbins
William J. Trunk
Daniel N. Lerman (*pro hac vice*)
Brandon L. Arnold (*pro hac vice*)
Wendy Liu
Jeffrey W. Kane (*pro hac vice*)
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
1801 K St. N.W. Suite 411L,
Washington, DC 20006
Tel: (202) 775-4517
Fax: (202) 775-4510

*Attorneys for Counterclaim
Defendant and Counterclaim Plaintiff,
Aurelius Capital Master, Ltd*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................................... iii

INTRODUCTION ...................................................................................................... 1

FINDINGS OF FACT ................................................................................................. 3

I.   AUGUST 3, 2017: THE COMPANY REPORTS POOR EARNINGS AND
     SUSPENDS ITS DIVIDEND .......................................................................... 6

II.  MID-AUGUST 2017: RUMORS EMERGE ABOUT A POSSIBLE DEFAULT .......... 8

III. THE SEPTEMBER 21 NOTICE OF DEFAULT ................................................ 9

IV.  THE COMPANY AND ITS ADVISORS DEVISE A PLAN TO DILUTE
     AURELIUS .................................................................................................. 9

V.   THE COMPANY AND CITI "SOCIALIZE" THE AURELIUS DILUTION
     SOLUTION WITH "FRIENDLY" BONDHOLDERS ........................................ 13

VI.  THE NOVEMBER TRANSACTION ............................................................. 16

     A.   Windstream Launches the November Transaction ............................... 16

     B.   Windstream Amends And Extends The November Transaction .......................... 20

     C.   The November Transaction Settles .................................................... 22

VII. PROCEDURAL HISTORY .......................................................................... 26

CONCLUSIONS OF LAW ......................................................................................... 28

I.   WINDSTREAM'S ISSUANCE OF THE NEW NOTES VIOLATES THE
     INDENTURE ............................................................................................. 28

     A.   The New Notes Were Issued In Violation Of Section 4.09 Of The Indenture
          ...................................................................................................... 29

          i.    The "Amount" Of The New Notes Exceeded The "Amount" Of The
                Old Notes ........................................................................... 29

          ii.   The Company Did Not Pay A "Premium" To Tendering
                Bondholders ....................................................................... 35

          iii.  Even If (Counterfactually) The Company Paid A "Premium," That
                Premium Was Not "Necessary." .............................................. 40

i

**TABLE OF CONTENTS—Continued**

Page

B.    The New Notes Were Issued In Violation Of Section 4.17 Of The Indenture ................................................................................................... 44

C.    Because The November Transaction Breached Section 4.12 Of The Indenture, The New Notes Do Not Qualify As Additional Notes ........................ 50

II.    THE COMPANY FAILED TO COMPLY WITH THE CONDITIONS OF THE 2022/2023 EXCHANGE OFFER, THEREBY RENDERING THE 2022/2023 CONSENTS, AS WELL AS THE THIRD SUPPLEMENTAL INDENTURE (WHICH WAS DEPENDENT ON THOSE CONSENTS), INVALID ......................... 52

III.    BECAUSE THE NEW NOTES DID NOT QUALIFY AS ADDITIONAL NOTES, THE SEPTEMBER 21 NOTICE OF DEFAULT RIPENED INTO AN EVENT OF DEFAULT ............................................................................................. 59

IV.    AURELIUS IS ENTITLED TO A MONEY JUDGMENT FOR THE AGGREGATE PRINCIPAL AMOUNT OF THE NOTES HELD BY AURELIUS PLUS INTEREST (COUNTERCLAIM TWO) ................................................ 59

V.    WINDSTREAM'S COUNTERCLAIMS AGAINST AURELIUS ARE DISMISSED ....................................................................................... 60

A.    The Defaults Under Sections 4.07 And 4.19 Have Not Been Waived By The Passage Of Time (Counterclaim Three) ................................................ 60

B.    The Company's Claim For Injunctive Relief Is Meritless (Counterclaim Four) .......................................................................................... 60

CONCLUSION ...................................................................................... 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bensen v. Am. Ultramar Ltd.*,
  1997 WL 66780 (S.D.N.Y. Feb. 14, 1997) ............................................................. 57

*Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*,
  773 F.3d 110 (2d Cir. 2014) ................................................................................... 37

*Citadel Equity Fund Ltd. v. Aquila, Inc.*,
  371 F. Supp. 2d 510 (S.D.N.Y. 2005) ..................................................................... 57

*Citibank N.A. v. Norske Skogindustrier ASA*,
  No. 16-cv-850 (RJS), 2016 WL 1052888, (S.D.N.Y. Mar. 8, 2016) ......................... 29

*GE Transp. (Shenyang) Co., Ltd. v. A-Power Energy Generation Sys.*, Ltd.,
  No. 15 CIV. 6194 (PAE), 2016 WL 3525358 (S.D.N.Y. June 22, 2016) ................... 61

*Greenfield v. Philles Records, Inc.*,
  98 N.Y.2d 562, 780 N.E.2d 166 (2002) ................................................................... 56

*Guadagno v. Wallack Ader Levithan Assocs.*,
  950 F. Supp. 1258 (S.D.N.Y. 1997) ........................................................................ 36

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995) ................................................................................................ 38

*In re Best Products, Inc.*,
  168 B.R. 35 (Bankr. S.D.N.Y. 1994) ................................................................. 48, 49

*In re Sunbeam Corp.*,
  284 B.R. 355 (Bankr. S.D.N.Y. 2002) ..................................................................... 48

*In re Waterford Wedgwood USA, Inc.*,
  500 B.R. 371 (Bankr. S.D.N.Y. 2013) ..................................................................... 48

*Kass v. Kass*,
  91 N.Y.2d 554 (1998) ............................................................................................. 56

*Maryland Cas. Co. v. W.R. Grace & Co.*,
  128 F.3d 794 (2d Cir. 1997) ................................................................................... 37

*Metropolitan Life Insurance Co. v. RJR Nabisco, Inc.*,
  906 F.2d 884 (2d Cir. 1990) ................................................................................... 59

**TABLE OF AUTHORITIES—Continued**

Page (s)

*Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd.*,
 88 N.Y.2d 347, 668 N.E.2d 404 (1996) ................................................................ 56

*Oak Bee Corp. v. N.E. Blankman & Co.*,
 551 N.Y.S.2d 559 (1990) .................................................................................... 57

*Ognibene v. Parkes*,
 671 F.3d 174 (2d Cir. 2012) ................................................................................ 61

*Olin Corp. v. Am. Home Assur. Co.*,
 704 F.3d 89 (2d Cir. 2012) .................................................................................. 56

*Orr v. Kinderhill Corp.*,
 991 F.2d 31 (2d Cir. 1993) .................................................................................. 48

*PaineWebber Inc. v. Bybyk*,
 81 F.3d 1193 (2d Cir. 1996) ......................................................................... 55, 56

*Praver v. Remsen Assocs.*,
 541 N.Y.S.2d 440 (1989) .................................................................................... 57

*Pujals v. Standard Chartered Bank*,
 533 F. App'x 7 (2d Cir. 2013) ............................................................................. 55

*Roling v. E*Trade Sec., LLC*,
 756 F. Supp. 2d 1179 (N.D. Cal. 2010) ............................................................... 57

*Rothstein v. Am. Int'l Grp., Inc.*,
 837 F.3d 195 (2d Cir. 2016) ................................................................................ 38

*True v. United States*,
 190 F.3d 1165 (10th Cir. 1999) ..................................................................... 48, 49

*Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*,
 919 F.2d 206 (3d Cir. 1990) ................................................................................ 49

*W.W. Assocs., Inc. v. Giancontieri*,
 77 N.Y.2d 157, 566 N.E.2d 639 (1990) ................................................................ 56

*Ward v. TheLadders.com, Inc.*,
 3 F. Supp. 3d 151 (S.D.N.Y. 2014) ...................................................................... 57

*Wechsler v. Hunt Health Sys., Ltd.*,
 No. 94 CIV. 8294 (PKL), 1999 WL 397751 (S.D.N.Y. June 16, 1999) ...................... 36

iv

**TABLE OF AUTHORITIES—Continued**

Page (s)

*Windstream Services, LLC v. U.S. Bank National Association*,
  C.A. No. 2017-0693 (Del. Ch.)............................................................................... 26

**Other Authorities**

BARRON'S DICTIONARY OF FINANCE AND INVESTMENT TERMS (9th ed.) .................................... 37

Black's Law Dictionary (9th ed.).................................................................................. 37

**Treatises**

2 WILLISTON ON CONTRACTS § 32.6 (4th ed. 2007) .................................................... 38

**INTRODUCTION**

1.        On April 24, 2015, certain subsidiaries of Defendant Windstream Services, LLC ("Windstream" or "the Company") transferred billions of dollars' worth of mission-critical telecommunications assets to a newly formed subsidiary—now known as Uniti Group, Inc. ("Uniti")—only to immediately lease back those same assets pursuant to a lease signed by their parent company, Windstream Holdings ("Holdings") (collectively, the "2015 Transaction").

2.        The 2015 Transaction left Windstream in a precarious financial position. ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████; LaRue Aff. ¶¶ 50, 53.

3.        Aurelius Capital Master, Ltd. ("Aurelius")—Counterclaim Plaintiff/Defendant here—is the largest holder of the Company's 6-3/8% Notes due 2023 ("6-3/8% Notes").  On September 21, 2017, Aurelius privately sent the Company and its counsel a notice of default alleging that the 2015 Transaction was an impermissible Sale and Leaseback Transaction within the meaning of the indenture governing the 6-3/8% Notes ("Indenture").  In October 2017, after being sued by Windstream in Delaware Chancery Court, U.S. Bank National Association, in its capacity as indenture trustee ("Trustee") of the 6-3/8% Notes, initiated claims in this Court against the Company challenging the 2015 Transaction on that same basis.

4.        Not content simply to litigate that question (despite telling all who would listen that the claims lacked merit), Windstream opted for a less conventional approach:  On October 18,

2017, the Company announced a series of exchange offers and consent solicitations that, together, were designed to obtain a waiver of the Aurelius-noticed default by diluting the voting interests of Aurelius and other non-consenting holders of the 6-3/8% Notes.   Among other things, the Company offered bondholders in other tranches the opportunity to swap into the 6-3/8% Notes and, upon entering that series, immediately vote to the waive the default.   Bondholders were offered a sweetener to do so:  For every $100 in bonds they exchanged, they received $107.50 - $110.00 in new 6-3/8% Notes.  Once the Company got enough bondholders to agree, it settled on the exchange and consent transactions (issuing more than $560 million of new 6-3/8% Notes), and declared that the default had been waived.    In the process, the Company increased its total indebtedness by $40 million.

5.      Two discrete questions are now before the Court.  First, the Court must determine whether the 2015 Transaction was, in fact, an impermissible Sale and Leaseback Transaction within the meaning of the Indenture.  The Court finds that it was.  *See* Plaintiff-Counterclaim Defendant U.S. Bank National Association's Proposed Findings of Fact and Conclusions of Law (Dkt. 156), ¶ 162.[1]  Consequently, the Court holds that the Company was in default under the Indenture at the time the Trustee commenced this litigation.

6.      The Court must now turn to a separate question:  Was the Company's attempt to waive the default, in an interrelated series of exchange and consent transactions befitting Rube Goldberg, permissible under the Indenture?  In particular, was the Company permitted under the Indenture to increase its indebtedness by $40 million in connection with the transactions?  For the reasons that follow, the Court answers that question in the negative.  Because the exchange and

---

[1] The proposed Findings of Fact and Conclusions of Law submitted by the Trustee are incorporated herein by reference.

consent transactions were impermissible under the Indenture, the new 6-3/8% notes that the Company purportedly issued in those transactions were invalid, and thus the Company's attempt to waive the Aurelius-noticed default was not successful.  Accordingly, the defaults referenced in the September 21 Notice of Default ripened into an Event of Default, the 6-3/8% Notes have been accelerated, and Aurelius is entitled to monetary and declaratory relief as further explained below.

## FINDINGS OF FACT

### Question Presented

7.      The Indenture provides that the Company "may, subject to Article Four of this Indenture and applicable law, issue Additional Notes under this Indenture, including Exchange Notes."  AX-1 at 36 (Indenture § 2.02).  The present dispute therefore turns on a question of law: Did the exchange and consent transactions, in which the Company purported to issue the new 6-3/8% Additional Notes, comply with Article Four of the Indenture?  The answer to that question, in turn, depends on whether the indebtedness incurred by the Company constituted "Permitted Refinancing Indebtedness" under the Indenture.

8.      Section 4.09 of the Indenture generally precludes the Company from incurring indebtedness that would cause the Company to exceed a "Consolidated Leverage Ratio" of 4.5 to 1.  AX-1 at 68.  In view of my conclusion that the 2015 Transaction was indeed a Sale and Leaseback Transaction, and therefore gave rise to more than $6.5 billion in "Attributable Debt," the Company's total indebtedness, even *before* the exchange and consent, was well above the permitted leverage ratio.  *See* LaRue Aff. at ¶¶ 131, 141.  Accordingly, the debt incurred in the exchange and consent transaction was impermissible *unless* it constituted Permitted Refinancing Indebtedness ("PRI"), defined as follows:

> "**Permitted Refinancing Indebtedness**" means any Indebtedness of the Company or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used

3

to extend, refinance, renew, replace, defease or refund other Indebtedness of the Company or any of its Restricted Subsidiaries (other than intercompany Indebtedness); *provided* that:

(1)     the amount of such Permitted Refinancing Indebtedness does not exceed the amount of the Indebtedness so extended, refinanced, renewed, replaced, defeased or refunded (plus all accrued and unpaid interest thereon and the amount of any reasonably determined premium necessary to accomplish such refinancing and such reasonable expenses incurred in connection therewith); . . ..

AX-1 at 29 (Indenture § 1.01).

9.      As the Court explains in more detail in the Conclusions of Law, the plain terms of the definition prescribe that the "amount" of any Permitted Refinancing Indebtedness may not exceed the "amount" of the debt being refinanced, except—as the parenthetical states—to the extent any such incremental debt is incurred on account of (1) "accrued and unpaid interest," (2) "the amount of any reasonably determined premium necessary to accomplish such refinancing," and (3) "such reasonable expenses incurred in connection therewith." *Ibid.*

10.     Significantly, the parties agree that *no* premium was paid as part of the exchange and consent transactions, and that these transactions increased the principal amount of Windstream's indebtedness.  The parties likewise agree that neither accrued interest nor transaction costs (the other two items contained in the parenthetical in the PRI definition) could account for any incremental indebtedness incurred as a result of the transaction.  As the case comes before the Court, then, the disagreement between Windstream and Aurelius is exceedingly narrow: Did the exchange and consent cause the Company to incur a greater "amount" of new debt than the "amount" of debt that was refinanced?  As explained in the Conclusions of Law that follow, the Court agrees with Aurelius that the exchange and consent *did* increase the "amount" of Windstream's indebtedness.  Accordingly, the Court concludes that the new notes issued as a result of the exchange and consent transactions do *not* qualify as Permitted Refinancing Indebtedness,

4

and therefore the New Notes do not qualify as Additional Notes under the Indenture. It follows that the consents purportedly delivered by those notes (including the Third Supplemental Indenture purporting to waive the Sale and Leaseback default) are invalid.

11.     Although the case could be resolved on that point alone, Aurelius has advanced a fallback argument that assumes, *arguendo*, that a premium *was* paid as part of the exchange and consent transaction. In connection with that fallback argument, the parties have submitted competing expert reports bearing on the question whether any such premium was (as the Indenture requires) "reasonably determined" and "necessary to accomplish" the refinancing "of the Indebtedness so … refinanced." Those expert reports, in turn, rest on very different accounts of the causes of the Company's financial distress between August and November 2017: Windstream's experts generally contend that the convergence in the Company's bond prices was the result of the market's perception of a risk of a "technical default" precipitated by the Aurelius notice of default; Aurelius's experts contend that it is the Company's fundamental credit quality that principally accounts for the convergence in the Company's bond prices from August 3 through the end of November.

12.     As I explain in the Conclusions of Law, I need not reach the fallback argument, because (a) Windstream repeatedly abandoned any such alternative claim in its answers to contention interrogatories, and under well-settled legal principles the Company is bound by those answers; and in any event (b) I agree with Aurelius that no "premium" was paid to bondholders in these exchanges.

13.     But even were I to reach the fallback argument framed by the competing experts, my conclusion would not change. Because those expert submissions turn on Windstream's

financial condition prior to the transactions at issue, I begin by setting out my findings on those market conditions prior to the October 18, 2017 launch of the exchange and consent transactions.

## I.   AUGUST 3, 2017: THE COMPANY REPORTS POOR EARNINGS AND SUSPENDS ITS DIVIDEND

14.   The Company's financial condition deteriorated in the years following the 2015 Transaction.  Among other things, investors "were concerned about the [Company's] level of indebtedness" and its high leverage ratio.  Thomas Dep. 19:17-25, 20:3-15; King Dep. 34:1-13.

15.   On August 3, 2017, the Company released its second quarter 2017 earnings, reporting a net loss of $68 million and a decline in operating income.  AX-11 at 8 (8/3/2017 WIN 8-K).  It suspended its stock dividend effective immediately.  *See* AX-10 at 56 (8/3 WIN 10-Q).

16.   The market's reaction was punishing.  The Company's bond prices declined sharply (*see* AX-329 at 14 (TRACE Bond Prices)), ██████████████████████████████
████████████████████████████████

17.   Further, the price differentials (or "spreads") among some of the Company's unsecured bonds converged in the days following the August 3 announcement.  At that time, the Company had five series of unsecured bonds outstanding:

➢ 7.75% senior notes due 2020 ("2020 Notes")

➢ 7.75% senior notes due 2021 ("2021 Notes")

➢ 7.50% senior notes due 2022 ("2022 Notes")

➢ 7.50% senior notes due April 2023 ("April 2023 Notes")

➢ 6-3/8% senior notes due August 2023 ("Existing 6-3/8% Notes")

18.   Despite their differing maturities and coupons, the market prices of the 2021, 2022, April 2023, and Existing 6-3/8% Notes converged sharply.  Within one week of the August 3 announcement, the market prices of these four series were trading virtually on top of one another.

*See* AX-329 at 14 (TRACE Bond Prices).[2]  Notably, however, the prices of the 2020 Notes did not converge with the other series and continued to trade substantially above them.  This strongly suggests that the market principally was concerned with the Company's fundamentals and, in particular, its ability to manage its debt maturities coming due in 2021 and beyond.  *See* AX-7 at 1 (Citi 8/3/ Report); AX-16 at 1 (Citi 8/15 Analyst Report); *accord* Sabry Aff. ¶¶ 141–42, Ex. 39.[3]

19.     In light of its financial situation, the Company began evaluating options for refinancing its 2020 Notes, which had the earliest maturities.  *See* Gunderman Dep. at 49:15-50:20; Moody Dep. at 60:7-61:10; Cheeseman Dep. at 225:19-22.[4]  It had no plans, at this point, to refinance the 2021, 2022, or April 2023 Notes.  *See* AX-29 at 19-23; AX-31; *see also* Moody Dep. 57:3-25.

20.     In August 2017, the Company purchased in the market approximately $49 million of its 2020 Notes.  Because the 2020 Notes (like all the Company's notes) were trading below the principal amount, the Company was able to purchase them at a discount.  *See* King Dep. at 42:2-43:17. ████████████████████████████████████████████████

---

[2] The Court takes judicial notice of Windstream's bonds during the relevant time period. *See* AX-329 (TRACE Bond Prices).

[3] Market analysts expressed concern with the Company's fundamental financial health following the August 3 announcement.  *See*, *e.g.*, AX-16 at 1 (Citi 8/15 Report) ("credit has been under pressure" since August 3); AX-7 at 1 (Citi 8/3 Report) ("credit investors … wonder if the dividend elimination foreshadows worsening fundamentals"); AX-12 at 1 (Goldman 8/4 Report) (noting "deteriorating fundamentals"); *accord* AX-19 at 13 (Goldman 9/5 Report) (similar); AX-15 at 1 (J.P. Morgan 8/4 Report) (similar); AX-14 at 1 (Barclays 8/7 Report) (similar).

Ratings agencies agreed.  In September 2017, Standard & Poor's downgraded the Company and its unsecured bonds based on the Company's "[w]eakening [o]perating [p]erformance" and the fact that the Company's "cash generated from operations will not be sufficient to address debt maturities of approximately $1.5 billion in 2020 … and $2.2 billion in 2021."  AX-25 at 1, 3; *see also* AX-27 at 2.

[4] This document draws upon the deposition testimony of certain witnesses who are expected to testify live at trial.  Those references will be supplemented and/or supplanted in due course.

███████████████████████████████████████████████

████████████████████████████████

## II.    MID-AUGUST 2017:  RUMORS EMERGE ABOUT A POSSIBLE DEFAULT

21.    In mid-August 2017, rumors emerged that one or more bondholders believed that the 2015 Transaction had breached the Indenture.  Christopher King, the Company's Vice President of Investor Relations, first heard those rumors in mid-August 2017.  *See* King Dep. 22:25-23:8.  Kristi Moody, the Company's General Counsel, "started hearing the rumors in late August of 2017."  Moody Dep. 36:4-5, 57:3-25; *accord* Cheeseman Dep. 75:17-24 (testifying that he "probably" did not learn of the rumors until September 2017); Thomas Dep. 15:22-16:5.[5]

22.    "[A]lmost immediately" after hearing these rumors, the Company began evaluating a possible consent solicitation to waive the default arising from the 2015 Transaction.  King Dep. 115:15-117:8.  The Company expected that it would have to couple such a consent solicitation with an exchange offer in order to dilute Aurelius's ownership stake.  King Dep. 118:7-20; *see* Moody Dep. 39:15-40:12.

23.    The Company first needed to figure out which bond series to dilute.  It engaged an outside firm (Ipreo) to identify the position that Aurelius held in its bonds.  *See* AX-20.  Although uncovering Aurelius's ownership position was Ipreo's "primary target," the Company also asked Ipreo to provide a "list of bondholders and percentage ownership" for all its outstanding bonds.  *Id*. at 2.

---

[5] Credit Default Swap ("CDS") pricing tells a similar story.  While one-year CDS prices did not noticeably increase throughout all of July and mid-August 2017—indicating that the market did not anticipate a default within one year—those prices increased dramatically on August 22, nearly tripling in a matter of days.  *See* Sabry Aff. ¶ 30, Ex. 7.  By September 25, 2017, when the Company announced that it had received a Notice of Default from Aurelius, its one-year CDS prices had soared to more than 3,000 basis points—nearly 1,500 basis points (or 93%) more than their highest point of August 2017.  *See* Sabry Aff. ¶ 30 Ex. 7.

### III.      THE SEPTEMBER 21 NOTICE OF DEFAULT

24.      On September 21, 2017, Aurelius sent a notice of default to the Company ("September 21 Notice of Default") stating that the 2015 Transaction violated the Indenture.  *See* AX-28.[6]   Aurelius maintained that the 2015 Transaction constituted a Sale and Leaseback Transaction in violation of Section 4.19 of the Indenture, which forbids Sale and Leaseback Transactions unless three enumerated conditions are satisfied.  *See id*. at 1-2.  Because the 2015 Transaction failed to satisfy those conditions, Aurelius explained, the Company was in default (hereafter, "SLT Default").[7]

25.      The next day, the Company held a Board meeting.  ██████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████

26.      On September 25, 2017, the Company publicly disclosed that it had received the September 21 Notice of Default.  *See* AX-34 at 3 (Sept. 25, 2017 Form 8-K).  It assured investors that the allegations in the Notice were "without merit" and that it would "vigorously defend against these allegations and pursue all appropriate remedies."  *Ibid*.

### IV.      THE COMPANY AND ITS ADVISORS DEVISE A PLAN TO DILUTE AURELIUS

27.      Notwithstanding the Company's proclamations that the Notice of Default was baseless, ████████████████████████████████████████████████████████████

---

[6] The September 21 Notice of Default indicated that Aurelius owned more than 25% of the outstanding principal amount of the Existing 6-3/8% Notes.  AX-28 at 5-6; *see also* AX-311.

[7] The Company has conceded that if the 2015 Transaction was a Sale and Leaseback Transaction, it did not satisfy all of the conditions in Section 4.19.  *See* AX-327 at 3-6, Nos. 3-8.

███████████████████; AX-39 at 6 ; *see also* King Dep. 74:10-15; Thomas Dep. 149:22-150:6; Grumbos Dep. 39:1-40:10, 43:19-44:15; Gunderman Dep. 131:20-132:11.

28.   The Company asked J.P. Morgan, one of its lead bankers, to "figure[] out a way to do [an] exchange" so that the Company could "get a consent" to waive the SLT Default from the holders of the 6-3/8% Notes.   AX-40; *see also* Grumbos Dep. 24:24-26:2 (testifying that J.P. Morgan "was coming up with the potential solutions" "to address the notice of default").

29.   On September 29, 2017, J.P. Morgan proposed terms of a transaction "to neutralize Aurelius" by "quietly exchang[ing] investors out of other bond tranches (with exit consents) into 6.375% notes due 2023 (with entry consents)."   AX-39 at 6; *see also* Grumbos Dep. 43:19-44:15. J.P. Morgan advised that "~$400mm of supporters will need to be imported from other tranches." AX-39 at 6.   That could be achieved, explained J.P. Morgan, by offering "potential 'friendlies'" in the April 2023 series and 2022 series "8.25 and 12.0 points … respectively"—that is, $108.25 principal amount of new 6-3/8% Notes for every $100.00 principal amount of April 2023 Notes, and $112.00 principal amount of new 6-3/8% Notes for every $100.00 principal amount of 2022 Notes.   *Ibid*.  Alternatively, J.P. Morgan advised, the Company could pay "5.0 points of cash" to tendering bondholders—which, unlike the structure ultimately selected by the Company, would not increase the Company's indebtedness.  *See ibid*.; *see also* Grumbos Dep. 53:2-54:8.

30.   Due to a conflict of interest, the Company later hired Citi to replace J.P. Morgan. *See* Thomas Dep. 93:23-94:13.   By that time, the Company was "ready to go in terms of documentation" and had a "view of how they want to sequence and target the notes."  AX-46.  The Company explained to Citi that it wanted to exchange "friendly" holders into the 6-3/8% series to "neutralize the threat posed by Aurelius."   AX-50 at 3.  (As one of the lead Citi bankers would

later testify, this was "not the typical transaction" because of the litigious backdrop of the exchange.  *See* Cheeseman Dep. 12-13, 207.)

31.     Citi, like J.P. Morgan, proposed a par-for-par transaction structure in which the Company would pay exchanging bondholders in cash (rather than additional 6-3/8% Notes) in return for swapping into Aurelius's series.  AX-42 at 7.  Citi estimated that this alternative, which would have avoided increasing the Company's indebtedness, would cost roughly $35 million.  *See ibid*.  Although the Company had ample liquidity to pay that amount, [8]  it declined this option because it "just did not think that [it] was the right use of corporate funds at the time."  Gunderman Dep. 92:11-25; *see also* Thomas Dep. 57:20-58:5 (cash option was rejected to "preserve liquidity").

32.     Citi also recommended that the Company launch a separate transaction in which it exchanged the 2020 Notes into new 8.625% secured notes due 2025 ("New Secured Notes").

████████████████████████████████████████████████████████

████ , Citi identified at least two benefits to the secured exchange.  *First*, unlike the exchange into the 6-3/8% Notes, the secured exchange would meaningfully extend the Company's maturity profile.[9]  *Second*, unlike the exchange into the 6-3/8% Notes, the secured exchange would result in "no incremental debt."  AX-70 at 6.  Rather, because each participating 2020 noteholder would receive only $95 in principal amount of New Secured Notes for every $100 in principal amount of

---

[8] *See* AX-44 at 7 ($56.5 million in cash as of September 30, 2017), 30 ($128.8 million in revolver capacity) [Nov. 9, 2017 WIN 10-Q at 4, 23].  Indeed, not two months later, the Company agreed to make a cash payment of $150 million to holders of the 2021 Notes and 2022 Notes to induce their consents to waive an inchoate and unasserted default in those note series based on the Sale and Leaseback Transaction.  *See infra* ¶ 73.

[9] On a weighted average basis, the exchange into the 6-3/8% Notes extended the Company's maturities by only 1.3 years.  *See* Garcia Aff. at ¶ 27 n. 10; *see also* AX-70 at 6.  The April 2023 Notes, in particular—which had the largest participation in the exchange—were extended by all of four months.  *See* AX-70 at 6.

2020 Notes, the 2020 Exchange Offer would partly counteract the increased indebtedness associated with the exchange into the 6-3/8% Notes.  Cheeseman Dep. 209-210.

     33.     The Company held a Board meeting on October 3, 2017, with Citi in attendance.



. The Company did not consider—at this meeting or at any other—any "exchange offer structure that did not entail diluting Aurelius."  Cheeseman Dep. 99:6-11, 108:4-7; *see* Thomas Dep. 51:20-53:14; 145:6-146:4, 164:24-165:10; Gunderman Dep. 115:19-116:2.  Indeed, Windstream never instructed Citi (or any of its other advisors) to analyze possible transactions that did not involve the issuance of additional 6-3/8% Notes.  AX-315 at 5, No. 13.  Nor did it receive any such analyses from any advisor. *Ibid*. at No. 14.[10]

     34.     The Board met again on October 5 to approve the Aurelius dilution solution.

---

[10] As Citi acknowledged contemporaneously, the Company might well have abandoned the exchange offer altogether if it turned out the Company could secure majority consents in the 6-3/8% Notes without an exchange.  In calculating its fee, which was based in part on the number of notes exchanged, Citi observed that the amount exchanged "could be zero if 51% of 6.375% holders consent."  AX-85 at 3.  And one Citi banker queried whether "the company ha[d] the option to not do the exchanges into the 6.375% notes" if it was able to obtain majority consents in that series without doing the exchange.  AX-84.

███████████████████████████████████████████████████; *see*
*also* Moody Dep. 196:22-197:6, 200:8-22; Grumbos Dep. 99:22-100:25; Gunderman Dep. 180:23-
181:20.  The Company ultimately settled on an exchange ratio of 110%, plus an option for 2021
holders to receive an allocation of New Secured Notes.  *See infra* ¶ 48.  The secured portion of the
exchange consideration was added at the instigation of 2021 holders, who demanded "different
consideration" to exchange into the 6-3/8% Notes.   Gunderman Dep. at 155:12-156:5; *see*
Cheeseman Dep. at 188:2-189:24.

      35.    At the October 5 meeting, ████████████████████████



. That is
scarcely surprising—virtually every contemporaneous document in this case shows that the
dominant, if not only, purpose of the transaction was to obtain a waiver of the SLT Default by
diluting Aurelius.

## V.     THE COMPANY AND CITI "SOCIALIZE" THE AURELIUS DILUTION SOLUTION WITH "FRIENDLY" BONDHOLDERS

      36.    Before publicly announcing the Aurelius dilution strategy, the Company
"socialized" its terms with large "friendly" bondholders.  The Company sought to confirm that
there would be sufficient participation to "waive any potential default . . . [and] block[] Aurelius"
*See* AX-50 at 3; *see* Gunderman Dep. 79:21-24; Thomas Dep. at 189:17-190:1; King Dep. at
110:6-17.  Windstream had a specific number in mind:  Because the 6-3/8% Notes had $586
million in principal outstanding, the Company "[t]arget[ed] [a] minimum amount of $587mm to
ensure over 50% consent" in that series.  AX-70 at 5; *see* Cheeseman Dep. 199:24-200:10.

37.     Citi prepared a draft term sheet to be shared with the friendly bondholders. Consistent with the other contemporaneous evidence, the term sheet described the "Transaction Objectives"—solely—as "allow[ing] the Company to address the purported notice of default … " AX-110 at 3.  Indeed, when the Company's then-Treasurer asked whether Citi should add a bullet to the term sheet noting, as additional goals, "maturity management and improved liquidity," Steve Cheeseman, the lead Citi banker on the deal, responded that "I don't want bond holders to think [the Company] values that benefit [s]o I would prefer to leave that off."  AX-108 at 1.

38.     In its early discussions with bondholders, the Company hoped to ascertain what exchange ratios "would be sufficient to motivate enough bondholders to move into the [6-3/8% Notes] and execute the overall Exchange Transaction . . . ." Thomas Dep. 235:4-19.  The Company expected that bondholders would compare the values they had (the market value of their current notes) with the values they would receive (the market value of the Existing 6-3/8% Notes, multiplied by the exchange ratio).  *See* Cheeseman Dep. 24:2-25:10.  Among other things, bondholders would expect to be compensated for trading into a lower-coupon, longer-dated bond. Cheeseman Dep. 212:6-22.

39.     At his deposition, Citi's Cheeseman explained that the exchange ratios were in fact designed to provide investors with something extra—a "pickup"—to induce participation. Cheeseman Dep. 109:18-110:16.  According to Cheeseman, bondholders needed a value "incentive" to be willing to exchange, and so the Company "tack[ed] on" additional value by offering additional new 6-3/8% notes to give investors a "cushion."  Cheeseman Dep. 30:15-31:5, 111:2-17.

40.     In a presentation to the Company, Citi measured this "investor pickup" by calculating the difference between (i) the market prices of the notes to be exchanged and (ii) the

"Exchange Value" of the new 6-3/8% notes, calculated by multiplying the market price of the existing 6-3/8% notes and the exchange ratio. AX-58 at 5. Citi determined, for example, that a holder of 2021 Notes, which were trading at 76 cents on the dollar, would receive a value of 83 cents on the dollar by exchanging—for a net "pickup" of roughly 7 cents on the dollar. *Ibid.*; *see also* AX-98 at 3 (similar "pickup" analysis). These contemporaneous analyses are consistent with Dr. Sabry's finding that Windstream offered tendering bondholders significant net benefits in the exchange / consent transaction, and that the bondholders in fact received net benefits when that transaction closed on November 6, 2017. *See* Sabry Aff ¶ 82, Ex. 24. Accordingly, the Court finds (contrary to the Company's assertion) that the new 6-3/8% notes were neither mathematically nor economically "equivalent" to the notes for which they were exchanged.

41.     When the Company approached bondholders to "socialize" the transaction, some of the Company's largest bondholders joined forces and retained counsel—Willkie Farr & Gallagher LLP—to negotiate the terms of the transaction. *See* AX-96 at 2. The group also retained Ducera Partners to act as their financial advisor. *See* AX-95.

42.     The bondholder group comprised nine of Windstream's largest non-Aurelius bondholders. *See* AX-91 at 1. At the time, the bondholders in the Willkie Group together held a majority in every series of Windstream notes except for the 6-3/8% Notes. *See* AX-39 at 8, 10. They held roughly 70% of the 2020 Notes, 56% of the 2021 Notes, 62% of the 2022 Notes, 52% of the April 2023 Notes, and 20% of the 6-3/8% Notes. *See ibid.*

43.     Windstream executed non-disclosure agreements with those bondholders and provided them with draft copies of the consent solicitations and exchange offer memoranda. *See* AX-93 at 3-4. Citi also provided the Willkie Group with a summary of the proposed transaction, including the exchange ratios. *See* AX-92 at 22.

44. Those bondholders made clear to Windstream that they "want[ed] to get this [transaction] done" and encouraged the Company to "mitigate[] . . . any challenge against the . . . exchange and consent structure." AX-86 at 1. Accordingly, Windstream and its advisors expected that the friendly bondholders would be supportive and would not notice a new default in any of the 2020, 2021, 2022 or April 2023 series. *See* AX-177; AX-190; AX-158; AX-328 at 1; *see also* Cheeseman Dep. at 68:12-69:11, 263:14-264:18.

## VI.   THE NOVEMBER TRANSACTION

### A.   Windstream Launches the November Transaction

45. On October 18, 2017, Windstream publicly announced offers to exchange certain senior unsecured debt ("November Exchange Offers") and solicitations for consents to waive the SLT Default ("Consent Solicitations") (collectively, the "November Transaction"). AX-115 (10/18 Press Release).

46. The November Exchange Offers consisted of offers to exchange:

> ➢ The 2022 Notes and April 2023 Notes for new 6-3/8% senior notes due August 2023 ("New Notes") (the "2022/2023 Exchange Offer");

> ➢ The 2021 Notes for New Notes, or for a combination of New Notes and New Secured Notes (the "2021 Exchange Offer"); and

> ➢ The 2020 Notes for New Secured Notes (the "2020 Exchange Offer").

AX-115 at 1-3 (10/18 Press Release).

47. ***2022/2023 Exchange Offer***. The 2022/2023 Exchange Offer provided that 2022 Noteholders would receive $108.00 in principal amount of New Notes for every $100.00 in principal amount of tendered 2022 Notes, and April 2023 Noteholders would receive $107.50 in principal amount of New Notes for every $100.00 in principal amount of tendered April 2023 Notes. AX-115 at 1.

16

48.    ***2021 Exchange Offer***.  The 2021 Exchange Offer set forth three exchange options available to holders of the 2021 Notes:

> The first exchange option permitted the 2021 Noteholders to receive $110.00 in principal amount of New Notes for every $100 in principal amount of tendered 2021 Notes.

> The second and third exchange options permitted the 2021 Noteholders to receive a combination of New Secured Notes, until up to $50 million in principal amount of New Secured Notes issued, after which the holders could receive either (i) $110.00 in principal amount of New Notes for every $100 in principal amount of tendered 2021 Notes ("Option 2A"); or (ii) New Notes, at the same exchange ratio as in Option 2A, but only insofar as was necessary to ensure that $587 million in aggregate principal amount of New Notes were issued—*i.e.*, enough to dilute Aurelius ("Option 2B").

*See* AX-115 at 1-2; AX-97 at 285, 344-345; AX-98 at 4.

49.    For convenience, the Court will refer to the 2021, 2022, and April 2023 Notes collectively as the "Old Notes."  The 2021 Exchange Offer and the 2022/2023 Exchange Offer are referred to together as the "New Note Exchange Offers."

50.    ***2020 Exchange Offer***.  The 2020 Exchange Offer provided that the 2020 Noteholders would receive $95.00 in principal amount of New Secured Notes for every $100.00 in principal amount of tendered 2020 Notes up to a cap of $50 million in New Secured Notes.  AX-

115 at 3 (10/18 Press Release).[11]  The Company later increased that cap to $150 million.  AX-187 at 2 (11/1 Press Release).

51.     In conjunction with the November Exchange Offers the Company launched Consent Solicitations for the 2020 Notes, 2021 Notes, 2022 Notes, April 2023 Notes, and the 6-3/8% Notes.  AX-115 at 4-5 (10/18 Press Release).

52.     The Consent Solicitations sought consents to waive the SLT Default and amend the Company's bond indentures to give effect to that waiver.  *Ibid*.  As part of the Consent Solicitations, the Company offered a "consent fee" of 25 basis points (or $2.50 per $1,000 principal amount) as payment for a bondholder's consent.  AX-115 at 3-4 (10/18 Press Release).  Exchanging bondholders could receive that consent payment twice:  Once for their "exit consent" upon leaving the Old Notes, and again for their "entry consent" upon entering the New Notes.  Thomas Dep. 204:19-205:13.

53.     Together, the November Exchange Offers and Consent Solicitations were a mutually reinforcing "liability management strategy" designed to dilute Aurelius.  *See* Moody Dep. at 185:8-186:5, 198:23-200:22; *see also* AX-81 at 7.  Each step in the process was dependent on the other:  Windstream needed enough bondholders to exchange into the 6-3/8% Notes to swamp Aurelius's holdings; otherwise the 6-3/8% Consent Solicitation was doomed to fail.  Thomas Dep. 103:3-9, 170:25-171:14.  And Windstream needed enough bondholders to consent to waive the SLT Default once they exchanged into the 6-3/8% Notes—after all, that was the whole point of the exercise.  That is why the November Exchange Offers and Consent Solicitations needed to occur "concurrently."  *See* Thomas Dep. 95:9-96:4; Grumbos Dep. 76:7-17.

---

[11] Concurrent with the November Exchange Offers, the Company launched a private offering of $250 million of New Secured Notes (later upsized to $400 million).  AX-204 (WIN 11/2 Press Release); AX-250 (11/6 Press Release); *see also* AX-206.

54.     In fact, the November Exchange Offers could not close unless and until the 6-3/8%

Consent Solicitation was successful:  The November Exchange Offers contained a "Minimum

Issuance Condition," which required at least $587 million in New Notes to issue for the November

Exchange Offers to settle.  That number was no accident:  It was precisely the number of New

Notes necessary to achieve a "friendly" majority in the 6-3/8% Notes.  Cheeseman Dep. 199:19-

200:10; Gunderman Dep. 310:2-7.

55.     Perhaps more importantly, the Minimum Issuance Condition also specified that the

November Exchange Offers could not be consummated unless and until the Company received

majority approval in the 6-3/8% Consent Solicitation.  But this presented a problem for the

Company.  The New Notes could not be voted alongside the Existing 6-3/8% Notes until *after*

they were issued by the Company and authenticated by the Trustee.  But the New Notes would not

issue until *after* the Company had the necessary votes.  To attempt to square this circle, the

Company did the following:

56.     *First*, the Company carefully drafted the Minimum Issuance Condition—at least

for the 2021 Exchange Offer[12]—to allow the Company to count votes associated with the New

Notes as part of the 6-3/8% Consent Solicitation, so long as the New Notes were voted

"substantially concurrently with or as a result of" the exchange transaction.  *See* AX-97 at 305.

57.     *Second*, the Company closely tracked the number of tendering bondholders who

expressed their willingness to waive the SLT Default.  *See, e.g.*, AX-154 at 2-3; AX-136 at 1; AX-

---

[12] As explained below, *infra* ¶¶ 143-45, the Minimum Issuance Condition in the 2022/2023 Exchange Offer was materially different.  By its terms, the version of the condition contained in the 2022/2023 Exchange Offer required the Company to obtain a majority consent from *Existing* 6-3/8% Noteholders *before* the exchange offer could settle.  The Company never satisfied that condition precedent.  *See* AX-253 at 3 (only 29.6% of Existing 6-3/8% Noteholders voted to consent); *see also* AX-315 at 7, No. 23 (admitting that Windstream did not obtain a majority consent from the 6-3/8% Notes if the New Notes are not included).

143; AX-174 at 2, 42, 56, 71, 82; AX-229.  Only once the Company had enough favorable votes would it allow the transaction to close.  Then, immediately after the New Notes were issued and authenticated, the Company tabulated the votes for the 6-3/8% Consent Solicitation (including those for the New Notes, which had sprung into existence only moments before).[13]

**B.    Windstream Amends And Extends The November Transaction**

58.     The Company wanted to move quickly.  It was poised to release its third quarter financial statements on November 9, 2017, and the Company knew that earnings would be down.  *See* AX-76 at 2; AX-331; AX-332.  Those lower earnings, in turn, would reduce the amount of secured debt that the Company could issue (by its calculations) consistent with its credit agreement.  *See* Cheeseman Dep. 49:1-6.  It wanted to settle the November Transaction before that fact was revealed to the market.

59.     But moving quickly proved difficult.  The Company could not close on the transaction until it persuaded enough bondholders to exchange into the 6-3/8% Notes and furnish provisional consents to waive the SLT Default.  Accordingly, the Company repeatedly extended the closing date of the transaction until it had the necessary votes in hand.  *See*, *e.g.*, AX-139; AX-156; AX-177 at 1.

60.     On November 1, 2017, Aurelius issued a notice to prospective holders of the New Notes stating that, in its view, the issuance of the New Notes would violate the Indenture in various ways.  *See* AX-18.  Aurelius further informed those holders that it had "urged the indenture trustee not to authenticate" those notes and that Aurelius planned to challenge the validity of the New

---

[13] This "springing vote" concept was achievable only because the Company did not set a record date for the 6-3/8% Consent Solicitation, despite having set record dates for every other Consent Solicitation.  *See* AX-165 at 1; King Dep. 92:2093:12, 93:21-94:10, 96:15-25; AX-102 at 2.

Notes if the Trustee ultimately authenticated them.  *See ibid*.  The stated purpose of the notice was to preclude holders from later asserting certain defenses, including that they were "good faith" purchasers.  *Ibid*.

61.     That same day, the Company issued a press release stating that it had "received consents from holders representing a majority of the outstanding aggregate principal amount of each of the 2020 Notes and [April] 2023 Notes," but not from the 6-3/8% Notes.  AX-188 at 1 [11/1 press release].  Further, the Company expressly waived the "Consent Condition" of the November Exchange Offers—which had previously required the Company to achieve majority consents in all five bond series, otherwise *none* of the exchange offers could settle.  *Id*. at 3.

62.     On November 3, 2017, the Company informed the Court that it had received the requisite consents from the 6-3/8% Notes to close the transaction.  Dkt. 44 at 2.  The Company reported that it expected to settle the exchange offer on November 3.  *Ibid*.

63.     On November 3, 2017, Aurelius sent a direction to the Trustee asking it "to not authenticate the New 6 3/8% Notes unless and until US Bank obtains a declaratory judgment with respect to various issues relating to the validity of the Consent Solicitation and Exchange Offers."  Dkt. 52 at 4; *see also* AX-205 at 1-2.  Aurelius urged, among other things, that issuance of the New Notes would violate the Indenture.  AX-205 at 2.

64.     In response to Aurelius's letter, the Trustee delayed its decision on whether to authenticate the New Notes.  The Company therefore was forced to extend the settlement date, again, from November 3 to November 6.  *See* AX-214 at 1 (WIN 11/3 Press Release); AX-249 at 1 (WIN 11/6 Press Release).  Despite that extension, bondholders were not given an opportunity to withdraw their tenders (which were irrevocable after October 31).  *See* AX-156 at 1 (WIN 10/30

Press Release); AX-186 at 1 (WIN 11/1 Press Release); AX-214 at 1 (WIN 11/3 Press Release); AX-249 at 1 (WIN 11/6 Press Release).

65.     Ultimately, on November 6, the Trustee notified the Company's counsel that it would authenticate the New Notes.  AX-235 at 2.  The Trustee explained that (in its view) it had a mandatory obligation to do so after receiving an authentication order and certain additional documents from Windstream.  *See* AX-247 at 1.  But the Trustee declined to take a position on whether the November Transaction itself violated the Indenture, noting that its action should not be interpreted "as an agreement or admission of any kind."  *Id*. at 2.    In fact, the Third Supplemental Indenture provides that to the extent any of the consents "are determined by a court order of competent jurisdiction to have not been validly obtained in accordance with the Indenture or applicable law," then "such amendment or Waiver shall not be deemed to have occurred."  AX-321 at 6.

### C.     The November Transaction Settles

66.     On November 6, 2017, the November Exchange Offers and Consent Solicitations settled in a whirlwind of activity.  Once the New Notes were purportedly issued and authenticated, the Company directed the information and tabulation agent for the Consent Solicitations (Global Bondholder Services Corporation) to tabulate the "real" votes—*i.e.*, all of the provisional votes that had not been withdrawn.  AX-223 at 2.  This became the official vote tally for purposes of closing the 6-3/8% Consent Solicitation.

67.     In the November Exchange Offers, the Company purported to issue approximately $561,900,000 of New Notes and approximately $200,000,000 of New Secured Notes.  AX-300 at 134.  The results of the November Exchange Offers were as follows:

| | | | | | |
|---|---|---|---|---|---|
| *Results of the November Exchange Offers* | | | | | |
| Debt | Principal as of 9/30/2017 (in Millions) | Principal Exchanged (in Millions) | Participation Rate | Exchange Ratio[1] | Principal to be Issued in Exchange (in Millions) |
| (1) | (2) | (3) | (4) = (3) / (2) | (5) | (6) = (3) * (5) |
| *To 6.375% Senior Notes Due August 1, 2023:* | | | | | |
| 7.750% Senior Notes due October 1, 2021 | $ 809 | $ 128 | 15.9% | 1.100 | $ 141 |
| 7.500% Senior Notes due June 1, 2022 | 441 | 168 | 38.0% | 1.080 | 181 |
| 7.500% Senior Notes due April 1, 2023 | 344 | 223 | 64.9% | 1.075 | 240 |
| Total | | $ 519 | | | $ 562 |
| *To 8.625% Senior Notes due October 31, 2025:* | | | | | |
| 7.750% Senior Notes due October 15, 2020 | $ 651 | $ 158 | 24.3% | 0.950 | $ 150 |
| 7.750% Senior Notes due October 1, 2021 | 809 | 53 | 6.5% | 0.950 | 50 |
| Total | | $ 211 | | | $ 200 |

**Notes and Sources:**
- Data are from Windstream's 2017 10-K filing. Principal as of 9/30/2017 data are from Windstream's 10-Q for the period ending September 30, 2017.

[1] Exchange ratios are based on Offering Memorandums dated October 18, 2017.

*See* AX-300 at 134 (WIN 10-K at F-75); AX-44 at 29 (WIN 10-Q at 22); *see also* Sabry Aff. Ex. 1; AX-256 at 1-2 (results as of November 6 early settlement date).

68.     Ultimately, $699,005,000 in principal amount of 6-3/8% Notes consented to waive the SLT Default.  AX-229 at 1.  More than 75% of those votes ($525,473,000 principal amount) came from purported holders of the New Notes; by contrast, fewer than 30% of Existing 6-3/8% holders voted to waive the SLT Default.  *Ibid*.

69.     That same day, the Company and the Trustee executed the Third Supplemental Indenture, which purported to amend the Indenture to waive the SLT Default.  *See* AX-260 at 2.

70.     On November 7, 2017, the Company declared that it had received consents from holders representing a majority of the outstanding aggregate principal amount of 6-3/8% Notes. AX-256 at 2.  In so concluding, the Company counted votes from the holders of the Existing 6-3/8% Notes and from holders of the New Notes.  *Ibid*.; AX-227 at 1, 14.  Without the New Notes,

the Company did not achieve a majority of consents in the 6-3/8% Notes.  *See* AX-315 at 7, No. 23.  As noted, only 30% of the holders of Existing 6-3/8% Notes consented.  AX-227 at 1, 14.

71.     At that point, however, the Company had not received majority approval in either the 2021 series or 2022 series.  *See* AX-256 at 2, AX-253 at 3.  Once it became apparent that the Company had sufficient participation to dilute Aurelius and achieve majority approval in the 6-3/8% Notes, the dominant bondholders in the 2021 and 2022 series (*i.e.*, the Willkie Group) withheld their consent as leverage to extract better exchange terms, including a cash payment, higher consent fee, and more restrictive covenants.  Thomas Dep. 182:22-184:21, 194:16-195:9, 245:14-246:17, 254:21-255:6; Cheeseman Dep. 70-71, 280-82; Gunderman Dep. 248:14-250:7; *see also* AX-177 at 1; AX-158 at 1.

72.     In the meantime, however, the risk of default had been all but resolved from the Company's perspective.  Indeed, the Company's head of Investor Relations told an investor that once the Company received majority consents "in the tranche that Aurelius owns" (the 6-3/8% Notes), the Company "would ask the judge to dismiss [the] case."  AX-197 at 1.  The 2021 and 2022 series were of little concern:  The Willkie Group held blocking positions in both series, and had no interest in noticing a default or accelerating their bonds in those series—and told the Company as much.  Cheeseman Dep. 68-69.

73.     The Willkie Group ultimately received the bulk of the concessions it sought (even though they had not asserted any default).  On November 28, 2017, the Company announced that it was launching a second series of debt exchanges and consent solicitations (together, the "December Transaction").  AX-286 at 1-2 (11/28 Press Release).  The Company gave the Willkie Group new 8.75% senior notes due 2024 ("New 2024 Notes")—versus the 6-3/8% Notes that were given to participants in the November Transaction—at an exchange ratio of $108.50 in New 2024

Notes for every $100.00 of 2021 and 2022 Notes tendered by the Willkie Group.  *Ibid*. The December Transaction also included a novel provision, which required the Company to redeem $150 million of the notes at 100% of principal amount two months after issuance—whereas participants in the November Transaction had received no cash paydown at all.[14]  *See* AX-288 at 5 (Nov. 29, 2017 WIN 8-K at 4).  The Willkie Group received the same "de minimis" consent fee (25 basis points) that was paid in the November Transaction.  *See* Thomas Dep. 265:14-266:10; Cheeseman Tr. 283-84.  Following the December Transaction, the Company announced that it had received votes in the 2021 series and 2022 series to waive the SLT Default in those bond series. AX-289 at 1 (WIN 12/5 Press Release).

74.     Because the principal amount of the New Notes exceeded the principal amount of the redeemed Old Notes by $40 million, the Company increased its indebtedness (and leverage ratio) for every bondholder who exchanged.[15]  *See* AX-253 at 4; Cheeseman Dep. 152:12-16; Gunderman Dep. 133:24-134:23; Grumbos Dep. 122:11-124:12.   The Company concedes as much.  *See* AX-315 at 6, No. 18; *see also* Cheeseman Dep. 46:24-47:0; King Dep. 172:5-10; Thomas Dep. 141:13-19, 143:11-144:1, 201:15-202:3; Grumbos Dep. 59:16-21, 60:20-25, 122:11-124:12.

---

[14] The Company ultimately issued $834 million in New 2024 Notes, but redeemed $150 million of those notes in February 2018, which Windstream funded by drawing on its revolver. *See* AX-300 at 81 (WIN 2017 10-K at F-26).  Therefore, for all intents and purposes, Windstream actually issued $684,347,000 of New Notes and paid the Willkie Group $150 million in cash.

[15] This $40 million in increased indebtedness includes approximately $2 million in debt savings associated with the New Secured Notes that were issued in the 2021 Exchange Offer.  It does not include an additional $8 million in decreased indebtedness associated with the 2020 Exchange Offer (on account of the fact that 2020 Noteholders received only $95 of New Secured Notes for every $100 of 2020 Notes exchanged).  *See* AX-253 at 4; *see also* Sabry Aff. Exs. 25 (not including 202 Exchange Offer) and 26 (including 2020 Exchange Offer).

## VII.      PROCEDURAL HISTORY

75.      After receiving the September 21 Notice of Default, Windstream commenced a lawsuit in Delaware Chancery Court.  *See Windstream Services, LLC v. U.S. Bank National Association*, C.A. No. 2017-0693 (Del. Ch.); *see also* Compl. (Dkt. 1) ¶ 19.   Windstream subsequently dismissed that action in light of a motion to dismiss filed by U.S. Bank on personal jurisdiction grounds.  *See* Windstream Answer and Counterclaims (Dkt. 10) ¶ 2.

76.      Aurelius directed the Trustee to file suit in this Court against the Company on the ground that the 2015 Transaction had violated the Indenture.  *See* AX-52 at 2-3; AX-89 at 1.  Aurelius offered the Trustee an indemnity.  AX-52 at 3; AX-89 at 1.  The Trustee accepted Aurelius's direction and initiated the instant action on October 12, 2017.  *See* Compl. (Dkt. 1).

77.      On October 13, 2017, the Company brought Aurelius into this suit by asserting counterclaims against both Aurelius and the Trustee.  *See* Dkt. 10 (Windstream's Answer and Counterclaims).  Among other things, the Company sought injunctive relief enjoining the Trustee or Aurelius from declaring an Event of Default under the Indenture or "taking any action" based on any alleged default.  *Id*. ¶ 80.

78.      After the Company launched the November Transaction, Aurelius sent a direction to the Trustee asking it to commence a declaratory judgment action prior to authenticating the New Notes, seeking guidance from this Court regarding the validity of the New Notes, and Aurelius again offered the Trustee an indemnity.  AX-205 at 1-4; *see* AX-315 at 11-12, Nos. 45, 49 (WIN Responses to RFAs).  The Trustee refused.  AX-247 at 1.  After the November Transaction settled, Aurelius again sent a direction to the Trustee asking it to bring an action primarily seeking a declaratory judgment invalidating the New Notes and any purported consents offered by holders

of those notes.  AX-279 at 2, 11; *see* AX-315 at 11-12, Nos. 45-47, 49.  Again, Aurelius offered an indemnity.  AX-279 at 2-4.  And, again, the Trustee refused.  AX-285.[16]

79.     Following the Trustee's second refusal and in response to Windstream's counterclaims, Aurelius asserted counterclaims of its own. *See* Dkt. 64 (Aurelius Answer and Counterclaims).  Aurelius alleged, among other things, that issuance of the New Notes breached the Indenture because the Company had far exceeded its available debt capacity, and the New Notes did not qualify as "Permitted Refinancing Indebtedness" within the meaning of the Indenture. *Id*. at ¶¶ 75-82.  Aurelius sought declarations that, among other things, the New Notes and Third Supplemental Indenture were invalid, and therefore that the SLT Default has not been waived. *Id*. at ¶¶ 78-79.

80.     Windstream filed its own amended counterclaims on November 22, 2017. *See* Dkt. 72 (Windstream's Amended Counterclaims).

81.     On December 7, 2017, Aurelius sent a Notice of Acceleration to the Company. AX-292.  The Notice of Acceleration stated that the Company's cure period had expired and therefore the defaults referenced in the September 21 Notice of Default had matured into an Event of Default under the Indenture. *Ibid*.  Consistent with the Indenture, Aurelius declared the 6-3/8% Notes to be due and payable immediately. *Ibid*.

82.     In December 2017, Aurelius again sent a direction to the Trustee asking it to join in its counterclaims or to bring an action declaring that the New Notes, New Secured Notes, consents from the holders of New Notes, and the Third Supplemental Indenture were invalid.  AX-

---

[16] At all times since September 21, 2017, Aurelius has held more than 25% of the 6-3/8% Notes (even if the New Notes are included). *Compare* AX-311 at 1 (Aurelius holdings), *with* WIN AX-300 at 131 (2017 10-K at F-72) (reporting aggregate principal balance of 6-3/8% Notes and Existing 6-3/8% Notes).

299 at 2; *see* AX-315 at 11-12, Nos. 45-47.  Aurelius offered the Trustee an indemnity, which Aurelius later increased.  AX-299 at 3-5; AX-301; *see* AX-315 at 12, Nos. 49.  The Trustee again declined, expressly stating that the Trustee had taken no position on whether the offered indemnity was satisfactory.  AX-302.

83.     In January 2018, Aurelius filed amended counterclaims.  *See* Dkt. 104 (Aurelius Answer and Amended Counterclaims). They are a mirror image of Windstream's amended counterclaims:  Windstream seeks a declaration that the November Exchange Offers and Consent Solicitations waived the SLT Default, (Dkt. 72, ¶ 93), whereas Aurelius seeks a declaration that those very same transactions were invalid and therefore did <u>not</u> waive the SLT Default, (Dkt. 104, ¶ 93).  Aurelius also seeks money damages (owing to the Notice of Acceleration) and other equitable relief.  (Dkt. 104, ¶¶ 94-102).

## CONCLUSIONS OF LAW

## I.   WINDSTREAM'S ISSUANCE OF THE NEW NOTES VIOLATES THE INDENTURE

84.     A critical step in the November Transaction was for Windstream to issue sufficient New Notes to dilute Aurelius's ownership stake in the 6-3/8% Notes and allow the company to secure a majority vote in that series to waive the SLT Default.  Only if the Company validly issued the New Notes could there be a new and legally valid majority capable of executing a waiver of the SLT Default. *See* AX-315 at 7, Nos. 23, 25.

85.     The validity of those waivers therefore turns on the validity of the New Notes. Windstream concedes that, if the New Notes do not qualify as "Additional Notes" within the meaning of Section 1.01 of the Indenture, then the Third Supplemental Indenture (which purported to waive the SLT Default) is invalid.  *Id.* at 7, No. 25.

28

86.     Section 2.02 of the Indenture provides that Windstream may issue new notes under the Indenture, so long as the notes qualify as "Additional Notes."  AX-1 at 36 (Indenture § 2.02).[17] Additional Notes are treated as the same series as the Existing 6-3/8% Notes for all Indenture purposes, including for purposes of voting on waivers and amendments.  *Ibid*.

87.     Critically, however, any Additional Notes must be issued in compliance with "Article Four of th[e] Indenture and applicable law."  *Ibid*.   The New Notes flunked that requirement.  As explained below, and in multiple respects, the New Notes were issued in violation of Article Four.  Because the New Notes do not qualify as Additional Notes under the Indenture, the purported waivers of the SLT Default therefore were invalid.

**A.      The New Notes Were Issued In Violation Of Section 4.09 Of The Indenture**

   **i.      *The "Amount" Of The New Notes Exceeded The "Amount" Of The Old Notes.***

88.     Like virtually all bond agreements, the Indenture limits the amount of additional indebtedness that Windstream may incur.  Section 4.09 ("Incurrence of Indebtedness") safeguards bondholders by "plac[ing] broad limits on the Company's ability to take on additional debt."  *See Citibank N.A. v. Norske Skogindustrier ASA*, No. 16-cv-850 (RJS), 2016 WL 1052888, at *3 (S.D.N.Y. Mar. 8, 2016).  In particular, Section 4.09(a) of the Indenture states that the Company may not incur additional indebtedness if its "Consolidated Leverage Ratio" is 4.50 to 1 or greater. Simplifying somewhat, that ratio is calculated by taking the Company's debt, including any debt arising from a Sale and Leaseback Transaction, and dividing it by a proxy for the Company's operating cash flows.  *See* LaRue Aff. ¶¶ 132–138.

---

[17] "'Additional Notes' means an unlimited maximum aggregate principal amount of Notes (other than the Notes issued on the date hereof) issued under this Indenture *in accordance with Sections 2.02 and 4.09* and having the same terms in all respects as the Notes, or similar in all respects to the Notes, except that interest will accrue on the Additional Notes from their date of issuance."  AX-1 at 8 (emphasis added) (Indenture § 1.01).

89.    The Court has found that the 2015 Transaction constituted a Sale and Leaseback Transaction within the meaning of the Indenture.  Plaintiff-Counterclaim Defendant U.S. Bank National Association's Proposed Findings of Fact and Conclusions of Law ¶ 162.  Accordingly, that transaction gave rise to $6.530 billion in Attributable Debt that must be included in the numerator when calculating the Company's Consolidated Leverage Ratio.  *See* LaRue Aff. ¶ 131, Ex. 2.  Consequently, the Company's Consolidated Leverage Ratio immediately prior to the November Transaction was at least 5.73 to 1—eclipsing the 4.50 to 1 limit in Section 4.09(a).  *See* AX-308 at 2; *see also* LaRue Aff. ¶ 140.

90.    Because the Company did not have capacity under Section 4.09(a) to issue the New Notes, it was permitted to increase its Indebtedness if, but only if, such additional debt fell within one of the enumerated categories of "Permitted Debt" set forth in Section 4.09(b).  Windstream invokes only one such enumerated category—Section 4.09(b)(v),[18] which allows the Company to incur "Permitted Refinancing Indebtedness" under certain circumstances.  Permitted Refinancing Indebtedness, in turn, is defined as—

> any Indebtedness of the Company or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund other Indebtedness of the Company or any of its Restricted Subsidiaries …

AX-1 at 29 (Indenture § 1.01).

91.    But there is an important qualification.  To qualify as Permitted Refinancing Indebtedness, the Indenture mandates that—

> the amount of such Permitted Refinancing Indebtedness ***does not exceed the amount of the Indebtedness so*** extended, ***refinanced***, renewed, replaced, defeased or refunded (plus all accrued and

---

[18] *See* AX-316 at 6-7 ("The incremental debt incurred as a result of the issuance of the New Notes is Permitted Refinancing Indebtedness under Section 4.09(b)(v) of the Indenture …").

> unpaid interest thereon and the amount of any reasonably determined premium necessary to accomplish such refinancing and such reasonable expenses incurred in connection therewith);

*Ibid*. (emphasis added)

92. In other words, subject to the limited exceptions set forth in the parenthetical (starting with "plus" in the above-quoted provision), the "amount" of any Permitted Refinancing Indebtedness must *not* exceed the "amount" of the indebtedness being refinanced.

93. The Indenture separately provides that "Indebtedness" shall mean, "in respect of borrowed money," the amount of debt reflected "as a liability upon a balance sheet … prepared in accordance with GAAP."[19]   AX-1 at 20-21 (Indenture §1.01).   And the Indenture specifically defines the "***amount*** of any Indebtedness outstanding as of any date" as:

> (1)   the accreted value thereof, in the case of any Indebtedness issued with original issue discount; and
>
> (2)   ***the principal amount thereof***, together with any interest thereon that is more than 30 days past due, in the case of any other Indebtedness.

AX-1 at 21 (emphasis added) (Indenture § 1.01).

94. It is undisputed that clause (1) does not apply here because the New Notes were not issued with original issue discount.  Gunderman Dep. 20:18-24, 231:11-13, 278:6-9, 278:21-25, 295:17-296:17, 298:16-299:18; McCarty Dep. 149:6-150:5.   Accordingly, the "amount" of Indebtedness for purposes of Permitted Refinancing Indebtedness is "the principal amount thereof" (plus any interest more than 30 days past due).

95. It is not disputed that the principal amount of Windstream's indebtedness increased as a result of the November Transaction.  *See* AX-315 at 6, 8, Nos. 18, 30; AX-253 at 4; *see also*

---

[19] The New Notes were booked on Windstream's balance sheet at their principal amounts. Gunderman Dep. 231, 297:20-298:8.  Consequently, the 2021, 2022, and April 2023 exchanges increased the Company's indebtedness by $40 million.

Gunderman Dep. at 17:25-18:5; Grumbos Dep. at 59:16-21; Thomas Dep. at 143:11-144:1.  The principal amount of the refinancing debt (the New Notes) exceeded the principal amount of the refinanced debt (the Old Notes) by $40 million.  *See* AX-253 at 4; *see also* Sabry Aff. ¶ 84 Ex. 25.  Accordingly, Windstream's balance sheet reflects $40 million more in liabilities on account of the New Note Exchange Offers.[20]   That was by design.  Due to the exchange ratios used to induce bondholder participation—110% (for the 2021 Notes), 108% (2022 Notes), and 107.5% (April 2023 Notes)—the Company increased its indebtedness for every bondholder who participated in the exchange offers.  *See* Cheeseman Dep. 152:12-16.[21]

96.     The Company therefore concedes—as it must—that it increased its indebtedness through the New Note Exchange Offers.  AX-315 at 6, No. 18.

97.     Puzzlingly, however, one of the Company's experts (Michiel McCarty) urges that the Company did *not* increase the "amount" of its indebtedness within the meaning of the Indenture, even though it *did* increase its indebtedness for every other worldly purpose.  At his deposition, McCarty asserted that the word "amount" in the definition of Permitted Refinancing Indebtedness "doesn't necessarily mean face" amount.  McCarty Dep. 106:14-20.  Rather, in his view, the word "amount" means "mathematically equivalent" amount.  *Id*. at 107:2-12.  That is, so long as two bonds are of "equivalent" economic values, based on various undefined attributes, then each bond constitutes the same "amount" of indebtedness for Indenture purposes.  *Id*. at 110:22-111:6, 112:23-114:8, 115:2-11.

---

[20] This reflects the amount of incremental indebtedness associated with the New Note Exchange Offers.  *See* Sabry Aff. ¶ 84 Ex. 25.

[21] The Company and its advisors briefly entertained the idea of doing a par-for-par exchange, accompanied by a cash payment to tendering bondholders, to avoid increasing the Company's indebtedness.  They ultimately demurred, however, because they "just did not think that [the cash payment] was the right use of corporate funds at that time."  Gunderman Dep. 92:11-25.

98.     McCarty's proffered definition defies the plain terms of the Indenture.   Indeed, McCarty apparently was operating under the misimpression that the word "amount" in this context is not a defined term.[22]  But it is.  The Indenture unambiguously states that the "amount" of (non-OID) indebtedness is equal to its *principal* amount, plus accrued interest.[23]  Full stop.  That, after all, is the amount that the Company must repay, whether at stated maturity or upon acceleration. It is the amount reflected as a liability on Windstream's balance sheet.[24]  It is the amount of any claim by holders of the New Notes in the event of a Windstream bankruptcy.[25]  And it is the amount that both sides' accounting experts used to calculate the Company's indebtedness following the November Transaction.[26]

99.     Notably, McCarty's reading would lead to absurd results elsewhere in the Indenture.  Take the Consolidated Leverage Ratio:  This formula, a crucial safeguard for creditors, dictates whether and to what extent the Company may incur new debt.  It commands that the Company may not exceed a certain debt ratio—and, importantly, is based on the "aggregate outstanding *amount of Indebtedness* of the Company …"   AX-1 at 14 (emphasis added) (Indenture § 1.01).   If "amount of the Indebtedness" meant "value of the Indebtedness," as McCarty supposes, then no one—not the Company, not creditors—could ascertain the Company's leverage ratio without first valuing (in some undefined manner) the Company's outstanding debt. More troubling still, under McCarty's view, the Company's leverage ratio would actually *decrease*

---

[22] McCarty Dep. 109:8-11 ("Q. It's not defined anywhere in the indenture? / A. I don't believe amount is a defined term here.").

[23] AX-1 at 21 (Indenture § 1.01).

[24] Gunderman Dep. 231:11-13; 20:18–24; AX-300 at 131.

[25] Gunderman Dep. 295:17-296:17; McCarty Dep. 149:12-150:5; AX-131 at 2.

[26] *See generally* Solomon Aff.; LaRue Aff. ¶ 141.

if the Company became distressed—and the values of its bonds decreased—meaning the Company would magically have *more* debt capacity on the brink of insolvency than it would if its bonds were trading at 100% of principal amount.  Such a perverse result would turn Section 4.09, which exists to protect creditors, on its ear.

100.    Moreover, it is the principal amount of the Company's indebtedness (without regard to its "value" at any given time) that is of paramount importance to the Company and creditors.  The Consolidated Leverage Ratio—which, as noted above, is based on the outstanding aggregate "amount" of the Company's indebtedness—is used throughout the Indenture to set various financial metrics within which the Company may operate.  *See, e.g.*, AX-1 at 27-28 (Indenture § 1.01, "Permitted Liens"); *id*. at § 4.07 (Restricted Payments); *id*. at 68 (§ 4.09, "Incurrence of Indebtedness"); *id*. at 79 (§ 5.01, "Merger, Consolidation, or Sale of Assets"). Accordingly, when the Company increases the principal amount of its indebtedness, it has categorical and cascading effects on the Company and creditors alike.  A higher principal amount, regardless how McCarty might value that debt, means less flexibility under these important covenants.

101.    Further, and in any event, the record belies McCarty's claim that the Old Notes and the New Notes were of "mathematically equivalent" value.  In contemporaneous analyses, the Company's own financial advisor calculated the "investor pickup"—*i.e.*, the incremental value given to tendering bondholders—to be between $6.31 and $7.05 for every $100.00 that was exchanged.  *See* AX-98 at 3.[27]  The lead banker advising Windstream admitted at his deposition

---

[27] Dr. Sabry performs a similar calculation using the same methodology employed by Windstream's advisors.  She calculates the net benefits received by tendering bondholders to be between $6.04 and $7.90 for every $100.00 that was exchanged.  Sabry Aff. ¶ 78, Ex. 21.

that tendering bondholders received a value "cushion" above and beyond the point of mathematical equivalence.  Cheeseman Dep. 30:10-31:22.

102.    Even Windstream's second expert, Dr. Ozgur Kan, acknowledged that the exchange ratios used in the November Exchange included "sweeteners" of some undetermined amount, based on the results of negotiations with the Windstream bondholders in advance of the launch on October 18.  Kan Dep. 84:19-85:9; 290:12-20.  In fact, Dr. Kan's analysis reveals that, as of November 6, 2017—the date the Company incurred the new debt—the Old Notes and the New Notes were not "mathematically equivalent."  Rather, the value of the New Notes was appreciably greater than the value of the Old Notes.  *See* Sabry Aff. ¶ 82, Ex. 24; Kan. Ex. 5 (calculating net benefits between $2.84 and $4.96 per $100 in principal amount as of November 6, 2017).  Accordingly, even if Mr. McCarty's reading of "amount" were correct (and it is not), the conclusion he draws from that premise is incorrect.

### ii.    The Company Did Not Pay A "Premium" To Tendering Bondholders.

103.    As noted above, the Indenture provides that the "amount" of refinancing indebtedness may exceed the "amount" of refinanced indebtedness if, and only if, that incremental new debt is used to pay one of the costs listed in the parenthetical: (i) "accrued and unpaid interest thereon," (ii) "the amount of any reasonably determined premium necessary to accomplish such refinancing," or (iii) "such reasonable expenses incurred in connection therewith."  The indebtedness incurred by Windstream funded none of those expenses.

104.    For starters, none of the New Notes was issued to pay "accrued and unpaid interest" or "reasonable expenses" associated with the exchanges.  The Company paid those expenses in cash.  *See, e.g.*, AX-253 at 4; AX-67 at 4; AX-300 at 62, 102-103 (2/28/2018 WIN 10-K at F-47, F-7).  And the increased indebtedness incurred in the 2021 Exchange Offer and the 2022/2023 Exchange Offer was not used to raise that cash.  Indeed, those transactions raised no cash

whatsoever: they merely exchanged Old Notes for New Notes.[28] Thus, the increased indebtedness cannot be justified on the ground that it was necessary to pay interest or expenses—because it wasn't.

105.    Nor can the additional $40 million in indebtedness be justified on account of the payment of a "premium." The Company has conceded as much. When asked point blank—twice—Windstream acknowledged that it paid *no* "premium." First, in its interrogatories dated March 16, 2018, Aurelius asked Windstream whether it paid a "'premium' within the meaning of the definition of Permitted Refinancing Indebtedness." In response, Windstream expressly stated that "no premium was paid to Noteholders in connection with the Exchange Offers." AX-312 at 8, No. 7.[29] Then, when asked for further information about its initial interrogatory responses, Windstream reaffirmed that "there was not a premium incurred in connection with the issuance of the New Notes." AX-316 at 6-7; *accord* Gunderman Dep. 148:18-24, 219:1-13.

106.    That settles the matter. Contention interrogatories are designed to narrow and sharpen the focus of trial practice, and that goal would be ill served if parties could take a contrary position whenever it suits their litigation goals. For that reason, courts hold parties to the contention interrogatory answers they have provided. *See Wechsler v. Hunt Health Sys., Ltd.*, No. 94 CIV. 8294 (PKL), 1999 WL 397751, at *11 (S.D.N.Y. June 16, 1999) ("[T]h[e] failure to disclose a litigation theory in response to contention interrogatories has preclusive effect."); *accord Guadagno v. Wallack Ader Levithan Assocs.*, 950 F. Supp. 1258, 1261 (S.D.N.Y. 1997).

---

[28] In any event, the amounts of accrued and unpaid interest came nowhere close to $40 million. *See* AX-253 at 5.

[29] In its responses to two other interrogatories, Windstream reiterated that "no premium was paid to Noteholders." AX-312 at 9, Nos. 8-9.

107.    In any event, Windstream was correct to concede that it paid no premium. Although "premium" is not defined in the Indenture, it is used consistently throughout the Indenture to connote value that the Company must pay to redeem its bonds prior to maturity that is (i) paid in cash, and (ii) a value in excess of the principal amount of the bonds.   Thus, for example, the Indenture defines "Applicable Premium" (that is, the call premium) as "the premium thereon as set out in the table in Section 3.07," which, in turn, lists the cash amounts in excess of the principal amount that the Company is required to pay holders at various dates if it elects to redeem its bonds early.   AX-1 at 9 (Indenture § 1.01); *see id*. at 55 (§ 3.05) (call premium must be paid in cash).   This is consistent with the common meaning of the term.   *See* Garcia Aff. ¶ 17; *accord* BARRON'S DICTIONARY OF FINANCE AND INVESTMENT TERMS (9th ed.) ("Premium" means "amount by which the redemption price to the issuer exceeds the face value when a bond is called. *See also* 'Call Premium.'"); BLACK'S LAW DICTIONARY (9th ed.) at 205 ("Premium bond" means "a bond with a selling price above face or redemption value.").[30]

108.    The presumption under New York contract law is that the same words carry the same meaning wherever in the contract they appear.   *See Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*, 773 F.3d 110, 116 (2d Cir. 2014); *Maryland Cas. Co. v. W.R. Grace & Co.*, 128 F.3d 794, 799 (2d Cir. 1997) ("Terms in a document, especially terms of art,

---

[30] *See also* AX-1 at 59 (Indenture § 4.01) ("The Company shall **pay or cause to be paid the principal of, premium, if any**, and interest on the Notes on the dates and in the manner provided in the Notes."); *id*. at 84 (§ 6.07) ("[T]he right of any Holder of a Note to receive **payment of the principal of, premium or Additional Interest, if any**, or interest on, such Note . . . ."); *id*. at 82 (§ 6.02(c)) ("In the case of any Event of Default occurring by reason of any . . . intention of avoiding payment of the **premium that the Company would have had to pay** if the Company then had elected to redeem Notes pursuant to Section 3.07 . . . ."); *id*. at 96 (§ 8.06) ("Any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the **payment of the principal of, premium, if any**, interest, or Additional Interest, if any, on any Note . . . ."); *id*. at 101 (§ 10.01) ("[T]he principal of, **premium, if any**, and interest and Additional Interest, if any, on the Notes **will be promptly paid** in full when due . . . .") (emphases added).

normally have the same meaning throughout the document in the absence of a clear indication that different meanings were intended."); *accord* 2 WILLISTON ON CONTRACTS § 32.6 (4th ed. 2007). Given the Indenture's consistent and unwavering usage of the term "premium," the Court can fairly infer that the parties intended the term in the definition of Permitted Refinancing Indebtedness to mean what it meant elsewhere: that is, a cash amount above the principal amount that the Company must pay to redeem notes early.[31]

109.    Granted, the Company may pay a "premium" in circumstances beyond exercising an early redemption option.   For example, the Indenture has a provision (Section 4.14) that requires the Company to redeem the 6-3/8% Notes at 101% of their principal amount in the event of a change-of-control transaction.  That additional 1% of cash required to be paid by the Company is consistent with the meaning of "premium" outlined above.  Further, in situations where the bonds at issue are not callable (or not yet callable), or if the Company is able to negotiate a redemption price between the principal amount and the call price, the Company could pay a "premium" that is not strictly a redemption premium.  *See* Garcia Aff. ¶ 18.  Indeed, "premium" might well accommodate a value in excess of the principal amount that is not paid in cash at all— such as new notes or other in-kind consideration with values exceeding the principal amount of the notes being refinanced.  The Court need not grapple with these hypotheticals, however, because whether "premium" means only a redemption premium, a cash payment in excess of the principal

---

[31] This reading is buttressed by the fact that the other two parenthetical exceptions— "accrued and unpaid interest," and "reasonable expenses"—are likewise in the nature of cash expenditures above and beyond the principal amount of the notes.  Applying the canon of *noscitur a sociis*, this Court will construe the word "premium" by "the company it keeps."  *See Rothstein v. Am. Int'l Grp., Inc.*, 837 F.3d 195, 210-11 (2d Cir. 2016), *quoting Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995).

amount, or *any* value in excess of the principal amount (including through an exchange), the Company paid none of them.

110.    Each of the Old Notes was callable at a modest premium to the principal amount,[32] but it is undisputed that the Company did not exercise the call option.  Nor did the Company deliver *any* value in excess of the principal amount of the Old Notes.  Why would it, after all?  Those bonds were trading at steep discounts (70%-80% of principal), and the Company therefore could refinance those bonds without paying anything close to 100% of the principal amount.  And that is precisely what it did.  As demonstrated by Dr. Sabry, Aurelius's expert, bondholders received values of around 80 cents on the dollar by accepting the New Notes.  *See* Sabry Aff. ¶¶ 42, 43-44 & Exs. 9, 10; ¶¶ 56-57, 60 & Exs. 14, 15.

111.    Accordingly, even if "premium" within the definition of Permitted Refinancing Indebtedness is construed broadly enough to accommodate *any* value in excess of the principal amount, it would be of no assistance to the Company.  The Company paid holders of the Old Notes roughly 80 cents on the dollar to tender their notes.  That is a far cry from a value premium to par.

112.    The Company did, however, increase its indebtedness by $40 million.  That increase in indebtedness did not qualify as Permitted Refinancing Indebtedness, and therefore violated Section 4.09(b)(v).  The Indenture does not permit the Company to pursue whatever refinancing it wishes without regard to its effect on existing creditors.  *Cf. Bank of New York Mellon v. Realogy, Corp.*, 979 A.2d 1113, 1128 (Del. Ch. 2008) (a company has "no right" to issue debt that falls outside the ambit of Permitted Refinancing Indebtedness).

---

[32] The 2021 Notes were callable at 102.58% of the principal amount, the 2022 Notes at 103.75%, and the April 2023 Notes at 102.50%.  *See* AX-326 at 55 (2021 Notes); AX-323 at 56 (2022 Notes); AX-324 at 55 (April 2023 Notes).

### iii.    Even If (Counterfactually) The Company Paid A "Premium," That Premium Was Not "Necessary."

113.    Although both sides agree that the Company did not pay a "premium" within the meaning of the Indenture, Aurelius has presented an additional ground to rule in its favor:  If the Company <u>did</u> pay a premium—that is, if the $40 million increase in the principal amount of indebtedness resulting from the exchange ratios selected by the Company was itself a "premium" within the meaning of Permitted Refinancing Indebtedness—any such premium was not "necessary to accomplish such refinancing" "of the Indebtedness so … refinanced."

114.    The Court need not reach this alternative ground given its holdings above.[33] However, it agrees with Aurelius that the $40 million increase in indebtedness resulting from the exchange ratios selected by the Company was not "necessary to accomplish such refinancing" within the meaning of the Indenture.  The relevant question under the Indenture is what amount of new indebtedness the Company must incur to pay a premium "necessary to accomplish such refinancing" "of the Indebtedness so … refinanced."  AX-1 at 29 (Indenture § 1.01).  The answer to that question is dictated by the attributes of the notes being *refinanced*, such as their market values and callability, not whatever attributes Windstream might select for the *refinancing* instrument (here, the New Notes).  Simply put, the $40 million increase in indebtedness was a product of the Company's choice to issue refinancing debt (the New Notes) bearing interest rates that were substantially below market.  That choice, in turn, required the Company to issue a greater amount of indebtedness to deliver a given value to the Old Notes.  For the reasons explained below,

---

[33] As noted above, the Company increased the amount of its Indebtedness through the exchanges.  As also noted above, that increase in Indebtedness was not the result of the Company's paying a "premium."  The question whether the increase in indebtedness was "necessary to accomplish such refinancing" is therefore legally irrelevant.  I nevertheless address that question out of an abundance of caution.

Windstream could have refinanced the Old Notes by issuing new debt with market-based coupons (or at least coupons greater than 6-3/8%), which would not have increased the Company's indebtedness at all—indeed, it likely would have decreased it.  Accordingly, the Court cannot conclude that the $40 million increase in indebtedness was "necessary to accomplish such refinancing" "of the Indebtedness so…refinanced."

115.   *First*, given that the Old Notes were trading at distressed prices (*i.e.*, 70%-80% of principal amount), no increase in indebtedness was "necessary" to refinance those notes.  The Company could have bought the Old Notes in the open market at prices well *south* of their principal amounts—as the Company had in the past when its bonds were trading at distressed prices.  *See supra* ¶ 20.  For like reason, economically rational bondholders would have been willing to part with those bonds at a modest profit to their then-trading prices.  And that is just what happened: Tendering bondholders exchanged the Old Notes for New Notes worth roughly 80% of their principal amount.  *See* Sabry Aff. ¶¶ 42, 43–44 & Exs. 9, 10; ¶¶ 56–57, 60, Exs. 14, 15; *see also* AX-329 (TRACE Bond Prices).  This fact, standing alone, proves that it was not "necessary" for the Company to issue debt exceeding the principal amount of the Old Notes.  Bondholders evidently were willing to accept new market-based debt equal to 80% of the principal amount of the Old Notes; had the Company issued such debt (rather than the New Notes it chose instead to issue) its indebtedness would have decreased, not increased.

116.   *Second,* even if an increase in the Company's indebtedness had been "necessary" to redeem the Old Notes (which it was not), it *certainly* was not "necessary" for the Company to incur new debt exceeding the call prices of the Old Notes.  In November 2017, the Company had the absolute right to call the Old Notes at modest premiums to their principal amounts.  *Supra* n. 32.  Because the Company had the absolute right to redeem those bonds at their respective call

prices, it necessarily follows that no new indebtedness exceeding the call prices was "necessary" to redeem those bonds. Again, the Company could have issued new, market-based debt in an amount equal to the call prices of the Old Notes to refinance the Old Notes. Yet the Company incurred indebtedness ($40 million) materially greater than the incremental market-based-debt necessary to fund the call price on the Old Notes ($12 million)—because the New Notes (the Company's preferred refinancing instrument) carried below-market rates of interest. *See* Sabry Aff. ¶ 93.

117.    That the Company did not exercise the call option is of no moment. That does not alter the fact that the call price sets a ceiling on the "premium" that is "necessary" to refinance the notes. To hold otherwise would vest the Company with carte blanche to issue a limitless amount of new debt, under the guise of Permitted Refinancing Indebtedness, to the detriment of its existing creditors.

118.    This is easily understood in the context of the quintessential type of refinancing, where new debt is issued for cash, and the cash is then used to call old notes at a prescribed call price of, say, 103% of the principal amount. In this example, the premium would be 3% of the principal amount of the old notes—an attribute of the debt being refinanced—so the principal amount of the new Permitted Refinancing Indebtedness could exceed the principal amount of the old notes by, at most, 3%. The company could therefore incur Permitted Refinancing Indebtedness in an amount up to 103% that of the old notes. Suppose the company instead elected to raise the cash necessary to redeem the old notes at 103% of their principal amount by issuing new notes whose interest rates were so below-market that those new notes were worth only 50% of their principal amount, hence twice as many new notes would have to be issued to raise the cash necessary to pay 103% to the old notes. In this case, the principal amount of new notes would be

42

not 103% of the principal amount of the old notes, but *206*%.  Surely not all of that 206% qualifies as Permitted Refinancing Indebtedness.  After all, the company needed to incur only 103% of new indebtedness to call the old notes; the additional 103% was merely the result of the company's choice to raise the cash using new notes worth half of their principal amount on account of their below-market coupons.  The analysis should be the same regardless whether the new notes are issued for cash, which is then spent to redeem the old notes, or the new notes are issued in exchange for the old notes.

119.     The merits here are even worse for Windstream than in the example above, because the notes ostensibly being refinanced (the Old Notes) had market values 20-30% below their principal amount.  That market value is also an attribute (or a function of the attributes) of the Old Notes, allowing them to be purchased well below their principal amount.  To use the same analogy as above, if new market-based notes were issued for cash, and the cash was used to purchase the Old Notes at a discount to their principal amounts, the refinancing should *reduce* the Company's indebtedness, and surely not increase it.  If the Company's indebtedness nonetheless increased because the new debt was issued with a below-market interest rate, that increase would not be a "premium" for the old debt (let alone a necessary one), hence would not be Permitted Refinancing Indebtedness.  The same result should obtain if, as here, the new notes were issued in exchange for the Old Notes.

\*          \*          \*

120.     In sum, because the Company had no debt capacity available under Section 4.09(a), and because the New Notes did not qualify as Permitted Refinancing Indebtedness under Section 4.09(b)(v), the New Notes were issued in violation of Article Four of the Indenture.  They therefore do not qualify as "Additional Notes."

**B.      The New Notes Were Issued In Violation Of Section 4.17 Of The Indenture**

121.    Section 4.17 of the Indenture commands that if the Company wants to buy votes in a consent solicitation, it cannot do so discriminately—all bondholders must be paid the same amount in exchange for their votes.  In particular:

> The Company shall not, and shall not permit any of its Restricted Subsidiaries to, ***directly or indirectly, pay or cause to be paid any consideration*** to or for the benefit of any Holder of Notes ***for or as an inducement to any consent,*** waiver, or amendment of any of the terms or provisions of this Indenture or the Notes ***unless such consideration is offered to be paid and is paid to all Holders of the Notes that consent***, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.

AX-1 at 77 (emphases added) (Indenture § 4.17).

122.    Here, the Company paid a consent fee of 25 basis points to bondholders, across all series, who voted to waive the SLT Default.  *See* AX-115 at 3-4 (WIN 10/18 Press Release).  So far so good.  But the Company gave an *additional* inducement to some bondholders but not others: The value of the New Notes that the holders of the Old Notes received in the Exchange Offers exceeded the value of the Old Notes.  The Company did this to induce the holders of the Old Notes to exchange into the 6-3/8% Notes and, in turn, furnish consents on the New Notes.  This consideration—the value "cushion," to use Cheeseman's term—was not offered or paid to holders of *Existing* 6-3/8% Notes in return for their consents.  Consequently, bondholders who voted to consent on the New Notes received materially greater consideration than did bondholders of the Existing 6-3/8% Notes who voted to consent.[34]

---

[34] According to Citi's contemporaneous analysis, exchanging bondholders received a value "pickup" of between $6.30 and $7.05 for every $100 in bonds that they exchanged.  *See* AX-98 at 3.  Dr. Sabry's analysis is in accord.  *See* Sabry Aff. ¶ 78 Ex. 21 (using Citi's methodology and calculating net benefits of $6.04 – $7.90 for every $100 in bonds exchanged).

123.   This was especially true for holders of the 2021 Notes.  Not only did they receive material benefits in the form of New Notes (at a ratio of 110% to their tendered 2021 Notes)— yielding, as of November 6, 2017, $4.00 in net benefits for each $100 of principal amount, per Dr. Sabry—but they *also* had the option of exchanging into New Secured Notes, up to $50 million aggregate principal amount, at a ratio of 95% to their tendered 2021 Notes.  *See* AX-115 at 2 (10/18 Press Release); AX-97 at 285, 344-345.   The value of the New Secured Notes more than compensated for that modest discount:  As of November 6, 2017, the New Secured Notes were trading at 98.44% of principal amount; the 2021 Notes, by contrast, were trading at 74.78% of principal amount on November 6, 2017.  *See* AX-329 at 15 (TRACE Prices).  Holders of 2021 Notes therefore enjoyed value bumps of more than 25% on the bonds they exchanged for New Secured Notes, to say nothing of the net benefits they received in the unsecured portion of the exchange.[35]  Not surprisingly, holders of 2021 Notes were the ones who agitated for New Secured Notes in the first place.  Gunderman Dep. at 155:12-156:1; *see* Cheeseman Dep. at 188:2-189:24.

124.   These additional forms of consideration constitute "inducements" under Section 4.17.  An "inducement" is "[s]omething that helps bring about an action or a desire result; an incentive."  AMERICAN HERITAGE COLLEGE DICTIONARY 693 (3d. ed. 1993); *see* WEBSTER'S NEW INTERNATIONAL DICTIONARY 1269 (2d ed. 1934) ("a motive or consideration that leads one to action"); OXFORD ENGLISH DICTIONARY 1421 (Compact ed. 1971) ("something attractive by which a person is led or persuaded to action"); BLACK'S LAW DICTIONARY 845 (9th ed. 2009) ("The act or process of enticing or persuading another person to take a certain course of action," specifically "[t]he benefit or advantage that causes a promisor to enter into a contract.").  The record confirms that the values paid to exchanging bondholders "help[ed] to bring about" their

---

[35] $[(98.44 \times 0.95) \div 74.88] - 1 = 25.06\%$.

votes in the 6-3/8% Notes.  Indeed, the dominant (if not exclusive) purpose of the New Note

Exchange Offers was to dilute Aurelius's position and achieve majority consents in the 6-3/8%

Notes.  *See* Grumbos Dep. 76:7-17 ("We needed to do the exchange in order to dilute Aurelius in

the 6 3/8 in order to get the consent."); *see also* Grumbos Dep. 39:1-40:10, 43:19-44:15; Moody

Dep. 293:6–294:8 (stating that the Company would not have entered into the 2022/2023 exchange

had it not obtained sufficient tenders to dilute Aurelius).

125.    The Company's then-Treasurer, Christie Grumbos, openly admitted that the values

offered to exchanging bondholders were designed to induce their consents upon exchanging into

the 6-3/8% Notes:

> Q.  Were these exchange ratios [t]hat we're discussing also ***part of the consideration offered to persuade noteholders to consent to the waiver of the default***?
>
> [*Form Objection*]
>
> A.  ***Yes***.
>
> …
>
> Q.  Before we took a brief break, I asked the witness whether the exchange ratios that we've been discussing were ***part of the consideration offer to noteholders, to persuade them to consent to the waivers of the default***.  Ms. Grumbos, you answered yes; ***is that correct***?
>
> A.  ***Yes, correct***.

Grumbos Dep. 96:19-97:1, 97:7-15 (emphases added).

126.    That this consideration was embedded in the exchange offer, rather than in the

consent solicitation, is immaterial.  Section 4.17 uses the terms "any consideration" and "directly

or indirectly" for a reason:  it would be all too easy for a company to evade the rule if it applied

only to cash payments expressly labeled "consent fees" in transactions labeled "consent

solicitations."  Plainly, providing consideration through an exchange offer is a way to induce consents.  *See* AX-283 at 2; Cheeseman Dep. at 71:3-12, 303:17-22; Thomas Dep. at 194:2-195:9; Grumbos Dep. at 96:19-97:7, 97:7-15. Just ask the Willkie Group.  They withheld their consents in the 2021 and 2022 series, demanding, among other things, a higher consent fee (100 basis points) and $200 million in cash.  *See* AX-153 at 5; AX-271 at 3; AX-283 at 6; Cheeseman Dep. at 292:8-11, 298:9-24.  Ultimately, the Company gave the Willkie Group New 2024 Notes and a massive cash paydown.  The Willkie Group thereafter furnished their consents.  When they did, they were paid the same "de minimis" consent fee of 25 basis points they had been offered all along.  *See* Cheeseman Dep. at 63:12-64:3 (consent fee was "priced as [] de minimis").  But to say that the consent fee was *all* they received in exchange for their consents would be naïve.  The additional value they demanded was simply lumped into the exchange offer.  Cheeseman Dep. 301:4-302:21.

127.    Nor does it matter that exchanging bondholders were not *required* to consent upon entering the 6-3/8% Notes.  For one thing, everyone expected that exchanging bondholders would give their consent.  *See* Cheeseman Dep. at 63:12-64:3; Thomas Dep. 121:19-122:14; AX-60 at 3; AX-51 at 7 ($100 million in support plus $400 million in exchanges will garner a majority of the $586 million in 6-3/8% Notes).[36]  Securing consents from New Noteholders was the whole point of the transaction.  So, for example, when Citi calculated the "investor pickup" that exchanging bondholders would receive, it included 50 basis points worth of consent fees (taking for granted that exchanging bondholders would consent upon entering the 6-3/8% Notes).  *See* AX-101 at 3.

---

[36] There is always an exception to prove the rule, and, indeed, a small number of New Noteholders (~5%) did not consent after exchanging into the 6-3/8% series.  It is impossible to know why, but neither does it matter:  100% of New Noteholders who *did* consent received an inducement that holders of the Existing 6-3/8% Notes did not.

In fact, the New Note Exchange Offers were expressly *conditioned* upon the 6-3/8% Consent Solicitation being successful—if bondholders did not consent in sufficient numbers upon exchanging into the New Notes, then the exchange offer would have been cancelled and bondholders would forfeit the values they were paid for exchanging.  If that is not an "incentive" to consent, *supra* ¶ 124, it is hard to know what is.

128.    The New Note Exchange Offers and Consent Solicitations were part of a single, integrated transaction.  "Courts have 'collapsed' a series of transactions into one transaction when it appears that despite the formal structure erected and the labels attached, the segments, in reality, constitute a single, integrated scheme when evaluated focusing on the knowledge and intent of the parties involved in the transaction." *In re Sunbeam Corp.*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002); *see Orr v. Kinderhill Corp.*, 991 F.2d 31, 35-36 (2d Cir. 1993) (collecting cases); *In re Best Products, Co.*, 168 B.R. 35, 56-57 (Bankr. S.D.N.Y. 1994).

129.    That standard is amply satisfied here.  For one thing, the transaction documents confirm, time and again, that the New Note Exchange Offers were conditioned upon and tethered to the 6-3/8% Consent Solicitation. *See* AX-97 at 83 (2020 Exchange); *id*. at 305 (2021 Exchange); *id*. at 520-21 (2022/2023 Exchange).  "Because the deal documents themselves make clear that the entire transaction is linked, collapsing of the constituent elements is not an issue." *In re Waterford Wedgwood USA, Inc.*, 500 B.R. 371, 380 (Bankr. S.D.N.Y. 2013); *accord True v. United States*, 190 F.3d 1165, 1174 (10th Cir. 1999) ("[I]nterrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction.").

130.    Indeed, the New Notes quite literally could not issue unless the 6-3/8% Consent Solicitation was successful. *E.g.*, AX-97 at 520-21 (conditioning the 2022/2023 exchange on obtaining sufficient consents from holders of the 6-3/8% Notes to waive the alleged default).

Likewise, the 6-3/8% Consent Solicitation could not succeed unless and until the New Notes issued. *See, e.g.*, AX-51 at 7 (prior to exchange "support [did] not [] exist in the 6.375% tranche"); *see also* AX-227 at 1, 14 (only 30% of Existing 6-3/8% Notes voted to consent). Because "[e]ach portion of the transaction [] was dependent upon the occurrence of the other," the New Note Exchange Offers and the 6-3/8% Consent Solicitation were "in reality a single transaction." *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 212 (3d Cir. 1990).

131.   Not surprisingly, everyone understood these transactions to be part of an integrated whole. Windstream's witnesses testified that the New Note Exchange Offers and the Consent Solicitations were parts of a "unified" and "holistic" transaction. Thomas Dep. 162:15-24; King Dep. 117:14-118:20, 214:8-215:13; AX-212 at 1-2. For this Court now to disaggregate those transactions would be to blink reality. *See In re Best Products*, 168 B.R. at 56-57 ("[C]ollapsing transactions is little more than an effort on the part of the court to focus not on the formal structure of a transaction, but rather on the knowledge or intent of the parties involved in the transaction."); *see also True*, 190 F.3d at 1175 ("[I]f we find the series of closely related steps in a transaction are merely the means to reach a particular result, we will not separate those steps, but instead treat them as a single transaction.").

132.   For the reasons set forth above, the Company's violation of Section 4.17 renders the Consent Solicitations invalid. Because the New Notes were issued as part of a unified transaction that violated Section 4.17, it cannot be said that the New Notes were issued (as required) in compliance with Article 4 of the Indenture. Thus, the New Notes do not qualify as Additional Notes under Section 2.02 of the Indenture.

### C.    Because The November Transaction Breached Section 4.12 Of The Indenture, The New Notes Do Not Qualify As Additional Notes

133.    The November Transaction failed to comply with Section 4.12 of the Indenture.

Section 4.12 states, in relevant part, that the Company shall not—

> create, incur, assume or otherwise cause or suffer to exist or become effective *any Lien of any kind securing Indebtedness (other than Permitted Liens)* upon any of their property or assets, now owned or hereafter acquired, *unless all payments due under this Indenture and the Notes are secured on an equal and ratable basis* with the obligations so secured …

AX-1 at 74 (emphasis added) (Indenture § 4.12).

134.    In other words, the Company may not incur any "Lien" unless it qualifies as a "Permitted Lien"—otherwise the Company must secure *all* notes issued under the Indenture on an equal and ratable basis.  The Company disregarded that mandate.

135.    As part of the November Transaction, the Company issued $50 million in New Secured Notes to holders of the 2021 Notes.  *See* AX-260 at 1 (11/7 Press Release); AX-300 at 134 (2/28/2018 WIN 10-K at F-75).  That issuance constituted a "Lien" within the meaning of the Indenture,[37] but did not qualify as a "Permitted Lien."  At that time, the only category of Permitted Liens arguably available to the Company was subsection (1), which allows the Company to incur new secured debt up to a certain cap (based on the ratio of the Company's secured debt to a proxy for its operating cash flows).  *See* AX-1 Indenture § 1.01 at 27.[38]  Windstream's Permitted Lien capacity immediately prior to the November Transaction was approximately $5 billion.  *See* LaRue Aff. ¶ 144–147.  But the Company's total secured debt at that time, including the Attributable Debt

---

[37] AX-1 at 22-23 (Indenture § 1.01, "Lien").

[38] Subsection (7), "Liens securing Permitted Refinancing Indebtedness," is the next closest candidate, but that provision is unavailable because it permits the Company to issue new secured debt only to refinance *existing* secured debt.  Here, the New Secured Notes were used to refinance *unsecured* debt (the 2020 Notes and 2021 Notes).

associated with the 2015 Transaction,[39] was nearly $9 billion.  *See* LaRue Aff. ¶ 146.  Accordingly, the New Secured Notes do not qualify as Permitted Liens.

136.     Because the New Secured Notes are not Permitted Liens, Section 4.12 required the Company to provide equal and ratable security to all holders of the 6-3/8% Notes.  The Company did not do so.  Indeed, not only did it fail to secure the Existing 6-3/8% Notes as required, but it aggravated the breach by issuing *more* 6-3/8% Notes (the New Notes) without ratably securing them.  The November Transaction thus breached Article 4 of the Indenture.

137.     As explained above, the November Transaction must be evaluated as an integrated whole.  *See supra* ¶¶ 128-131.  The New Notes and New Secured Notes were issued at the same time, and indeed formed part of a package deal that was designed to persuade the holders of 2021 Notes to swap into the 6-3/8% Notes and dilute Aurelius.  *See supra* ¶ 48 ("Option 2A" and "Option 2B").  The Company's issuance of New Secured Notes in the 2021 Exchange Offer was expressly conditioned on the Company's issuing a minimum number of New Notes.  AX-97 at 305. ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ ; Moody Dep. at 180:23-181:9, 198:23-200:7.  As one Windstream witness testified, "the Secured Offer was part of the broader Exchange Process, and [] it was certainly our desire to have all of it come together and settle in one day [in one] transaction."  King Dep. 215:7-10; *accord* Thomas Dep. 162:19-24 (secured exchange, unsecured exchange, and consent solicitation were all part of "one unified holistic transaction").

---

[39] Attributable Debt plainly constitutes a "Lien" within the meaning of the Indenture. Windstream's sale to Uniti of substantially all its operating assets was an "encumbrance" of those assets, to say the very least.  *See* AX-1 at 22-23 (Indenture § 1.01).  That is why Section 4.19 of the Indenture expressly provides that a "Lien shall be deemed to have been [] Incurred" if the Company undertakes a Sale and Leaseback Transaction.  *Id.* at 78 (§ 4.19).

138.     Consequently, the New Notes cannot be evaluated in isolation from the Section 4.12 violation that pervaded the November Transaction.  It likewise is impossible to disaggregate the issuance of the New Secured Notes (which triggered the obligation to secure) with the issuance of the New Notes (which were not so secured).  Because 100% of the New Notes were issued as part of an integrated transaction that violated Article 4 of the Indenture, they do not qualify as Additional Notes for that reason as well.

## II.     THE COMPANY FAILED TO COMPLY WITH THE CONDITIONS OF THE 2022/2023 EXCHANGE OFFER, THEREBY RENDERING THE 2022/2023 CONSENTS, AS WELL AS THE THIRD SUPPLEMENTAL INDENTURE (WHICH WAS DEPENDENT ON THOSE CONSENTS), INVALID

139.     Even assuming, *arguendo*, that the New Notes could otherwise qualify as Additional Notes within the meaning of the Indenture, the Third Supplemental Indenture (which purported to waive the SLT Default) would still be invalid.  That is because the Company failed to satisfy the conditions precedent to the 2022/2023 Exchange Offer.  If the conditions were not satisfied then the Old 2022/2023 Notes were not validly exchanged for New Notes.  Without counting the New Notes exchanged for Old 2022/2023 Notes, Windstream lacked a majority capable of waiving the SLT Default.  The Third Supplemental Indenture therefore is invalid.

140.     The terms of the 2022/2023 Exchange Offers created a chicken/egg problem for the Company.  Windstream knew it needed votes from New Noteholders to waive the SLT Default.  But the terms of the Indenture do not permit holders of the New Notes to vote them unless the New Notes qualify as Additional Notes, which must be issued by the Company and authenticated by the Trustee.[40]  The Company and holders of the Old Notes, however, did not want the New

---

[40] *See* AX-1 at 83 (Indenture § 6.04) (holders of "Notes then outstanding" may vote to waive a default); *id*. at 51 (§ 2.09) ("The Notes outstanding at any time are all the Notes authenticated by the Trustee . . . ."); *see also id*. at 36 (§ 2.02) ("A Note shall not be valid until authenticated by the manual signature of the Trustee.").

Notes to issue until they *first* knew that the New Noteholders would vote to waive the SLT Default.[41]  Yet that vote could not occur until *after* the New Notes issued.  Windstream found itself in an infinite loop:  It needed consents from the New Noteholders, but the Company and holders of the Old Notes did not want the New Notes to issue until the requisite consents were in hand.

141.    The Company hatched a solution, at least for the 2021 Exchange Offer.[42]   The offering memorandum for the 2021 Exchange Offer contained a "Minimum Issuance Condition," designed to ensure that the transaction would settle only if the Company received enough votes to waive the SLT Default.  It specified that the 2021 Exchange Offer was conditioned upon, among other things, the Company's

> obtaining, on or prior to the applicable Settlement Date, ***including substantially concurrently with or as a result of settlement on such date***, the requisite consents from holders representing a majority of the outstanding aggregate principal amount of the 6 3/8% Notes and the effectiveness of the Proposed Waivers and Amendments …

*See* AX-97 at 305 (emphasis added).

142.    The 2021 Exchange Offer therefore contemplated that the Company could count votes for the New Notes in order to satisfy the Minimum Issuance Condition, so long as the New Notes were voted "substantially concurrently with or as a result of" the exchange transaction.  *See ibid*.

---

[41] Among other things, bondholders knew that the New Notes would become far more valuable if and when the SLT Default was waived.  *See* AX-060 at 3; AX-59 at 1; AX-87 at 2; Sabry Aff. at ¶ 36 & n. 38; ¶ 44 & Ex. 10; ¶¶ 68–72 & Exs. 17, 18.

[42] The Company also assiduously avoided setting a record date for the 6-3/8% Consent Solicitation—despite having set record dates for each of the other consent solicitations—because the New Notes were not capable of being voted until *after* they were issued by the Company and authenticated by the Trustee.  AX-1 at 98 (Indenture § 9.02(b)); King Dep. at 96:15-25.  Had the Company set a record date for the 6-3/8% Consent Solicitation, then only holders of Existing 6-3/8% Notes would have been permitted to vote.

143.    Not so with the 2022/2023 Exchange Offer.  That transaction likewise had a Minimum Issuance Condition.  But, unlike the 2021 Exchange Offer, the 2022/2023 Exchange Offer did not permit the New Notes to issue first, and be voted later.  Instead, it required the Company to obtain a majority vote in the 6-3/8% Notes *before* the exchange offer could settle:

> The Exchange Offers are conditioned upon … obtaining the requisite consents from holders representing a majority of the ***outstanding aggregate principal amount of the 6 3/8% Notes*** and the effectiveness of the Proposed Waivers and Amendments … .

*See* AX-97 at 520 (emphasis added).

144.    The problem with that language is plain:  The only 6-3/8% Notes that were "outstanding" prior to settlement of the November Exchange Offers were the *Existing* 6-3/8% Notes; the New Notes had not yet issued (much less been authenticated).

145.    After launching the 2022/2023 Exchange Offer, the Company attempted to rectify this problem, but failed.  On October 31, 2017, one day before expiration of the 2022/2023 Exchange Offer, it prepared a second supplement to the 2022/2023 OM ("Second Supplement") in which the terms of the Minimum Issuance Condition were modified to track the language of the 2021 offering memorandum.  But, as Mr. Montano, the Global representative in charge of the deal, will testify, the Second Supplement was never in fact disseminated to bondholders.  Nor did Windstream issue a press release describing the modification to the terms of the 2022/2023 Exchange Offer, as it had done when it changed or waived other terms.

146.    The Company therefore did not satisfy the Minimum Issuance Condition.  The only 6-3/8% notes that were "outstanding"[43] before the 2022/2023 Exchange Offer settled were the

---

[43] The Indenture provides that a note is "outstanding" only once it is issued by the Company and authenticated by the Trustee.  AX-1 at 51 (Indenture § 2.09) ("The Notes outstanding at any time are all the Notes authenticated by the Trustee …").

*Existing* 6-3/8% Notes.  Of those, only 29.63% voted to waive the SLT Default.  *See* AX-229 at 1.  Accordingly, the Company failed to satisfy the Minimum Issuance Condition.

147.    The Company issued the New Notes anyway, and purported to count them toward the Minimum Issuance Condition (thus purporting to waive the SLT Default).  But nothing in the Offering Memorandum contemplates such a bootstrap.  The plain terms of the 2022/2023 Exchange Offer required the Company to obtain consents from a majority of then-outstanding 6-3/8% Notes before it could consummate the Exchange Offer.  The New Notes, in turn, could not issue until the 2022/2023 Exchange Offer settled.  *E.g.*, AX-97 at 548 (2022/2023 OM at 35) ("The Company will not be obligated to deliver New Notes unless the applicable Exchange Offer is consummated.").  Because the condition precedent to the Exchange Offer settling (*i.e.*, the consents) did not occur, the Exchange Offer could not close by its own terms.

148.    That document formed part of the contract between the Company and bondholders.  *See* AX-97 at 51 (Letter of Transmittal at 6) (incorporating by reference the "terms and conditions" of the offering memorandum into the "agreement between the tendering holder and the Company"); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) ("Under New York law, a paper referred to in a written instrument and sufficiently described may be made a part of the instrument as if incorporated into the body of it.") (internal quotation markets omitted); *see also Pujals v. Standard Chartered Bank*, 533 F. App'x 7, 9 (2d Cir. 2013) (offering memorandum expressly incorporated into purchase letter); 11 WILLISTON ON CONTRACTS § 30:25 (4th ed. 2007).

149.    Accordingly, this Court must give force and effect to the plain terms of the offering memoranda.  *See W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 641-642 (1990).  The plain terms of the 2022/2023 Offering Memorandum required the Company to obtain majority consents in the 6-3/8% Notes *before* settling the transaction.  *See* AX-97 at 520

(2022/2023 OM at 7).  That language stands in sharp contrast to the 2021 Offering Memorandum, which allowed the Company count votes obtained "substantially concurrently with or as a result of settlement" of the exchange.  *See* AX-97 at 305 (2021 OM at 7).[44]  Under the circumstances, this provision is "reasonably susceptible of only one meaning."  *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 570, 780 N.E.2d 166, 171 (2002).

150.     That Windstream might prefer this provision to have been worded differently does not alter its plain meaning.  "Ambiguity is determined by looking within the four corners of the document, not to outside sources."  *Kass v. Kass*, 91 N.Y.2d 554, 566, 696 N.E.2d 174, 185 (1998); *accord W.W.W. Assocs.*, 77 N.Y.2d at 162 (claims about what a party "really intended but unstated or misstated is generally inadmissible to add to or vary the writing"); *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012) ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation."); *Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd.*, 88 N.Y.2d 347, 352, 668 N.E.2d 404, 406 (1996).

151.     Nor could the Company unilaterally modify or waive the Minimum Issuance Condition without telling anyone.  When the Company waived conditions in the past, it told everyone.  *Infra* ¶¶ 61, 152 n.46.  For good reason:  Under New York law, at a bare minimum, investors must be notified of contractual changes before they may be bound by them.  *E.g.*, *See Roling v. E*Trade Sec.*, LLC, 756 F. Supp. 2d 1179, 1191 (N.D. Cal. 2010) ("[A] contractual provision that allows a party to unilaterally change the terms of the contract without notice is

---

[44] Although the terms of the 2022/2023 offering memorandum are unambiguous, the Court nevertheless may consider the 2021 offering memorandum because the latter is expressly referenced in the former.  *See* AX-97 at 519 (2022/2023 OM at 6); *PaineWebber Inc.*, 81 F.3d at 1201.

unenforceable."); *see also Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 159 (S.D.N.Y. 2014) ("To prove modification of a contract, all the elements of contract formation must be shown, including mutual assent[.]") (quoting *Bensen v. Am. Ultramar Ltd.*, No. 92-CV-4420, 1997 WL 66780, at *7 (S.D.N.Y. Feb. 14, 1997)).  Further, a party may not unilaterally waive a provision of a contract where the provision benefits both parties.  *Oak Bee Corp. v. N.E. Blankman & Co.*, 551 N.Y.S.2d 559, 561 (1990) ("[W]here the relevant circumstances reveal that the condition has been inserted for the benefit of both parties to the agreement, either party may validly cancel the contract upon failure of the condition, and the condition may be waived only by the mutual assent of both parties."); *Citadel Equity Fund Ltd. v. Aquila, Inc.*, 371 F. Supp. 2d 510 (S.D.N.Y. 2005), *aff'd*, 168 F. App'x 474 (2d Cir. 2006); *Praver v. Remsen Assocs.*, 541 N.Y.S.2d 440, 441 (1989) (holding the purchaser of a property could not unilaterally waive a provision that benefitted both parties, even though the contract stated the provision was "for the benefit of the purchaser").

152.    Here, notwithstanding the Company's unilateral assertion that the Minimum Issuance Condition was "for the Company's sole benefit,"[45] that condition plainly was material to and benefited bondholders.  It was that condition that assured bondholders that the SLT Default would be waived as part of the November Transaction.[46]  Without the Minimum Issuance Condition, tendering bondholders would have no way of knowing whether they were trading into a bond series with an extant default.[47]  *See, e.g.*, AX-97 at 531 (2022/2023 EOM at 18).  Indeed,

---

[45] AX-97 at 559 (2022/2023 OM at 46).

[46] Indeed, the Company recognized that the Minimum Issuance Condition was material to investors.  The Company twice reduced the amount of New Notes required to satisfy the Minimum Issuance Condition and, on each occasion, it issued a press release informing bondholders of the change.  *See* AX-139 at 1; AX-156 at 1.  Similarly, when the Company waived the Consent Condition, it likewise informed bondholders via press release.  AX-188 at 3.

[47] AX-97 at 559 (2022/2023 OM at 46).

the holders of the 2021 Notes were given the option—"Option 2B"—to accept New Notes *only to the extent* necessary to satisfy the Minimum Condition and dilute Aurelius. *Supra* ¶ 48. A great many holders chose this option ($53 million principal amount, or approximately 25% of tendering holders of 2021 Notes),[48] meaning they were willing to exchange into the 6-3/8% Notes only if it was necessary to fulfill the Minimum Issuance Condition. What is more, the Minimum Issuance Condition was central to bondholders' ability to value the trade: Curing the SLT Default was expected to have a significant effect on the Company's bond prices and yields, *see* AX-60 at 3; AX-87 at 2; AX-59 at 1; *see also* Sabry Aff. at ¶ 36 & n. 38; ¶ 44 & Ex. 10; ¶¶ 68–72 Exs. 17, 18, and therefore a significant value driver of the New Notes that tendering bondholders were agreeing to accept.

153. Because the Minimum Issuance Condition to the 2022/2023 Exchange Offer was never, in fact, satisfied, that Exchange Offer never closed and expired on its own terms. The New Notes issued in the 2022/2023 Exchange Offer therefore do not constitute Additional Notes under the Indenture. As of November 6, 2017 (the purported early settlement date), the 2022/2023 Exchange Offer was responsible for $413,857,000 principal amount (or 75%) of the New Notes. *See* AX-260 at 1 (11/7 Press Release). When those votes are disregarded, the Company obtained consents from only 43% of holders in the 6-3/8% Notes.[49] Accordingly, the Company did not achieve majority approval to waive the SLT Default.

---

[48] AX-274 at 43.

[49] [$173,532,000 (existing consenting noteholders (AX-229 at 1)) + $139,843,000 (New Notes issued in 2021 Exchange Offer on Nov. 6 (AX-260 at 1))] ÷ [$584,747,000 (outstanding Existing 6-3/8% Notes) + $139,843,000 (2021 Notes issued, per above)] = 43%.

This conservatively assumes (counterfactually) that 100% of the New Noteholders who did not consent came from the 2022 series and 2023 series, and none came from the 2021 series.

### III. BECAUSE THE NEW NOTES DID NOT QUALIFY AS ADDITIONAL NOTES, THE SEPTEMBER 21 NOTICE OF DEFAULT RIPENED INTO AN EVENT OF DEFAULT

154. The SLT Default noticed in the September 21 Notice of Default ripened into an Event of Default under the Indenture.[50]

155. An "Event of Default" includes "failure by the Company or any of its Restricted Subsidiaries for 60 days after written notice by the Trustee or Holders representing 25% or more of the aggregate principal amount of Notes then outstanding to comply with any of the other agreements in this Indenture."  AX-1 at 81 (Indenture § 6.01(v)).

156. Aurelius issued its Notice of Default on September 21, 2017.  This Court extended Section 6.01(v)'s sixty-day cure period by an additional sixteen days under *Metropolitan Life Insurance Co. v. RJR Nabisco, Inc.*, 906 F.2d 884 (2d Cir. 1990).  Scheduling Order (Dkt. 36).  Accordingly, the Company's cure period expired on December 6, 2017 (seventy-six days after the September 21 Notice of Default).  *See* (Dkt. 36).

157. The Company failed to cure the SLT Default within the cure period.  Accordingly, the Defaults noticed in the September 21 Notice of Default ripened into Events of Default on December 7, 2017.

### IV. AURELIUS IS ENTITLED TO A MONEY JUDGMENT FOR THE AGGREGATE PRINCIPAL AMOUNT OF THE NOTES HELD BY AURELIUS PLUS INTEREST (COUNTERCLAIM TWO)

158. Where, as here, an Event of Default has occurred and is continuing, the Indenture provides that:

> the Trustee or the Holders of at least 25% in principal amount of the
> then outstanding Notes may declare all the Notes to be due and

---

[50] The September 21 Notice of Default also asserted defaults relating to missing restricted payments certificates.  Neither Aurelius nor the Trustee advances claims relating to that portion of the September 21 Notice of Default.

> payable immediately by notice in writing to the Company specifying
> the Event of Default.  Upon such declaration, the Notes, together
> with accrued and unpaid interest (including Additional Interest),
> shall become due and payable immediately.

AX-1 at 82 (Indenture § 6.02(a)).

159.    On December 7, 2017, Aurelius, as holder of more than 25% in principal amount

of the 6-3/8% Notes, sent Windstream a Notice of Acceleration declaring that, because an Event

of Default had occurred and was continuing, the principal amount of its Notes (together with

accrued and unpaid interest) was due and payable immediately.   AX-292 (12/7 Notice of

Acceleration).

160.    The December 7 Notice of Acceleration remains extant, yet the Company has not

paid the principal and interest due on the Existing 6-3/8% Notes.  Therefore, the principal amount

of the Existing 6-3/8% Notes, plus accrued interest, is now past due.  The Court will award a

money judgment accordingly.

## V.    WINDSTREAM'S COUNTERCLAIMS AGAINST AURELIUS ARE DISMISSED

### A.    The Defaults Under Sections 4.07 And 4.19 Have Not Been Waived By The Passage Of Time (Counterclaim Three)

161.    The Company urges that Aurelius and/or the Trustee waived the right to challenge

the 2015 Transaction based on the passage of time.  That argument is incorrect for the reasons set

forth in the Trustee's proposed conclusions of law.  *See* Plaintiff-Counterclaim Defendant U.S.

Bank National Association's Proposed Findings of Fact and Conclusions of Law (Dkt. 156), ¶¶

205-208.  This counterclaim is dismissed.

### B.    The Company's Claim For Injunctive Relief Is Meritless (Counterclaim Four)

162.    The Company's claim for an injunction preventing the Trustee and Aurelius from

declaring an Event of Default and "taking any action" based on the Company's breach of the

Indenture also is dismissed.  "The party requesting permanent injunctive relief must demonstrate

60

(1) irreparable harm . . . and (2) actual success on the merits." *Ognibene v. Parkes,* 671 F.3d 174, 182 (2d Cir. 2012).[51]

163.   The Company cannot demonstrate actual success on the merits.   Windstream's claim for injunctive relief is based on the erroneous allegation that the September 21 Notice of Default was "incorrect and improper."   *See* (Dkt. 72 ¶ 114).   As discussed above, the September 21 Notice of Default correctly noticed a default.   Indeed, the Defaults noticed in the September 21 Notice of Default ripened into Events of Default that are continuing.   The Company's claim for injunctive relief is dismissed.

## CONCLUSION

164.   For the foregoing reasons, Aurelius is entitled to a judgment granting it the following relief:

a.   Declaring that the New Notes (or, at a minimum, the New Notes issued in the 2022/2023 Exchange Offer) do not constitute Additional Notes under the Indenture;

b.   Entering a permanent injunction barring the Company from taking any further action to issue New Notes in contravention of, or otherwise violate, the Indenture;

c.   Declaring that all Existing 6-3/8% Notes, including those held by Aurelius, were validly accelerated on December 7, 2017, and have been due and payable since that time;

d.   Awarding to Aurelius a money judgment in an amount to be determined at trial;

---

[51] In addition, a plaintiff seeking a permanent injunction must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."   *GE Transp. (Shenyang) Co. v. A-Power Energy Generation Sys.*, Ltd., No. 15 CIV. 6194 (PAE), 2016 WL 3525358, at *9 (S.D.N.Y. June 22, 2016).

e.     Dismissing Windstream's claims for declaratory judgment and injunctive relief against Aurelius; and

f.     Such other further relief as the Court deems just and proper.

ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP

By:  /s/  William J. Trunk
Lawrence S. Robbins
William J. Trunk
Daniel N. Lerman (*pro hac vice*)
Brandon L. Arnold (*pro hac vice*)
Wendy Liu
Jeffrey W. Kane (*pro hac vice*)
1801 K St. N.W. Suite 411L, Washington, DC 20006
Tel: (202) 775-4517
Fax: (202) 775-4510

*Attorneys for Counterclaim*
*Defendant and Counterclaim Plaintiff,*
*Aurelius Capital Master, Ltd.*

Dated: June 15, 2018
New York, NY