UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

U.S. BANK NATIONAL ASSOCIATION,            :
solely in its capacity as indenture trustee of   :
Windstream Services, LLC's 6 3/8% Senior      :
Notes due 2023,                                          :
                                                                  :
                    Plaintiff-Counterclaim            :
                    Defendant,                             :
          vs.                                                    :
                                                                  :
WINDSTREAM SERVICES, LLC,                    :          No. 17 Civ. 7857 (JMF)
                                                                  :
                    Defendant-Counterclaimant-   :
                    Counterclaim Defendant,       :
          vs.                                                    :
                                                                  :
AURELIUS CAPITAL MASTER, LTD.,           :
                                                                  :
                    Counterclaim Defendant-       :
                    Counterclaimant.                   :

-----------------------------------------------------------x

## PLAINTIFF-COUNTERCLAIM DEFENDANT
## U.S. BANK NATIONAL ASSOCIATION'S
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW [CORRECTED]

FRIEDMAN KAPLAN SEILER
    & ADELMAN LLP
Edward A. Friedman
Daniel B. Rapport
Jeffrey C. Fourmaux
Christopher M. Colorado
Blair R. Albom
7 Times Square
New York, NY 10036-6516
(212) 833-1100

*Attorneys for Plaintiff-Counterclaim
Defendant U.S. Bank National Association,
solely in its capacity as indenture trustee of
Windstream Services, LLC's 6 3/8% Senior
Notes due 2023*

Dated:  June 15, 2018

3360555.1

# TABLE OF CONTENTS

**Page**

FINDINGS OF FACT ...................................................................................................1

    Introduction ............................................................................................................1

    The Notes and the Indenture ...................................................................................9

    The Planning of the Proposed Transaction
    and the Creation of Windstream Holdings, Inc. .....................................................11

    State Regulatory Proceedings Relating to the Proposed Transaction ......................15

    The Transaction .....................................................................................................24

        A.      The Separation Agreement ......................................................................24

        B.      The Transfer of Assets to CSL and the Spin-Off......................................25

        C.      The Master Lease .....................................................................................26

    The Transferor Subsidiaries' Ongoing
    Use and Control of the Leased Property .................................................................31

    The Transferor Subsidiaries' Funding of the Rent Payments,
    Capital Expenditures, and Payment of Maintenance, Taxes,
    Utilities, and Insurance on the Leased Property .....................................................36

    The Parties' Expert Testimony on Windstream's
    Financial Accounting and Reporting for the Transaction.........................................41

    The Transaction Violated the Conditions
    in Indenture Sections 4.19(i)-(iii). .........................................................................44

    The Default Notice..................................................................................................46

    The Notice of Acceleration......................................................................................47

    Services' First Counterclaim....................................................................................48

CONCLUSIONS OF LAW ............................................................................................49

    Summary .................................................................................................................49

        I.        SERVICES VIOLATED SECTION 4.19 BECAUSE
                THE TRANSFEROR SUBSIDIARIES LEASE
                THE ASSETS THEY TRANSFERRED TO CSL................................54

i

A.     Under the Master Lease ...................................................................57

B.     Under a Sublease from Holdings ..............................................67

C.     The Transferor Subsidiaries' Funding of the Rent Payments
       and Their Payment of Maintenance, Tax, and Other
       Obligations in Respect of the Leased Property Are
       Consideration for a Lease, Not Dividends ................................72

II.    SERVICES IS JUDICIALLY ESTOPPED FROM DENYING
       THAT  THE TRANSFEROR SUBSIDIARIES LEASE THE
       ASSETS THEY TRANSFERRED TO CSL. ........................................77

III.   SERVICES BREACHED THE OBLIGATION OF GOOD FAITH
       AND FAIR DEALING IMPLICIT IN SECTION 4.19.........................81

IV.    SERVICES ALSO VIOLATED SECTION 4.07(A)(A) BY
       PAYING  DIVIDENDS TO HOLDINGS WHILE THE
       DEFAULT UNDER SECTION 4.19 WAS CONTINUING................87

V.     SERVICES' DEFAULTS UNDER SECTIONS 4.19 AND 4.07
       HAVE NOT BEEN WAIVED BY THE PASSAGE OF TIME..........88

VI.    SERVICES' BREACH OF CONTRACT COUNTERCLAIM
       AGAINST THE TRUSTEE MUST BE DISMISSED AND IN
       ANY EVENT NO DAMAGES CAN BE AWARDED ON IT............89

CONCLUSION....................................................................................93

APPENDIX A:   List of Transferor Subsidiaries

APPENDIX B:   List of Agreements by Transferor Subsidiaries Subleasing
              or Otherwise Granting Rights in the Leased Property to
              Third Parties After the Execution of the Master Lease

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*28 Mott St. Co. v. Summit Import Corp.*,
   34 A.D.2d 144 (1st Dep't 1970), *aff'd*, 28 N.Y.2d 508 (1971) ..............................69

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
   98 N.Y.2d 144 (2002) ..........................................................................................82

*62 Spruce St. Realty Co. v. Murray*,
   62 Misc. 2d 973 (Dist. Ct. Nassau Cnty. 1970) ..............................................70, 76

*Alleco, Inc. v. IBJ Schroder Bank & Trust Co.*,
   745 F. Supp. 1467 (D. Minn. 1989) ............................................................61, 62, 66

*Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*,
   704 F. Supp. 2d 177 (E.D.N.Y. 2010) ............................................................77, 78

*Apex Oil Co. v. Vanguard Oil & Serv. Co.*,
   760 F.2d 417 (2d Cir. 1985)..............................................................................68

*Aspen Creek Estates, Inc. v. Kennedy*,
   32 A.D.3d 870 (2d Dep't 2006) ........................................................................69

*In re Associated Gas & Electric Co.*,
   61 F. Supp. 11 (S.D.N.Y. 1944), *aff'd*, 149 F.2d 996 (2d Cir. 1945) ..........61, 62, 67

*In re BankAtlantic Bancorp, Inc. Litig.*,
   39 A.3d 824 (Del. 2012) ..................................................................................62

*Bates v. Long Island R.R. Co.*,
   997 F.2d 1028 (2d Cir. 1993)...........................................................................77

*Becker v. Mfrs. Trust Co.*,
   262 A.D. 525 (1st Dep't 1941) .........................................................................54

*Berlin v. Yachnin*,
   128 Misc. 24 (App. Term 2d Dep't 1926) ........................................................56

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield*,
   448 F.3d 573 (2d Cir. 2006)............................................................................88

*Matter of Boice*,
   226 A.D.2d 908 (3d Dep't 1996) .....................................................................68

Page

*Bowers v. Interborough Rapid Transit Co.*,
121 Misc. 250 (Sup. Ct. 1923), *aff'd*, 208 A.D. 768 (1st Dep't 1924) ..............................73, 74

*Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc.*,
98 F.3d 13 (2d Cir. 1996) ...................................................................................................92

*Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*,
41 N.Y.2d 397 (1977) .........................................................................................................68

*Burr v. Stenton*,
43 N.Y. 462 (1871) .............................................................................................................56

*Carlo v. Koch-Matthews*,
53 Misc.3d 466 (City Ct. 2016) ..........................................................................................69

*Carlyle Record Warehouses Corp. v. Scherlo*,
94 Misc. 2d 226 (Civ. Ct. 1978) .........................................................................................69

*Chase Manhattan Bank, N A. v. Keystone Distribs., Inc.*
873 F. Supp. 808 (S.D.N.Y. 1994)......................................................................................82

*Conn. Mut. Life Ins. Co. v. Wolf*,
1997 WL 597064 (E.D.N.Y. Sept. 24, 1997) ................................................................88, 89

*Courtney–Clarke v. Rizzoli Int'l Publ'ns, Inc.*,
251 A.D.2d 13 (1st Dep't 1998) .........................................................................................88

*Dalton v. Educ. Testing Serv.*,
87 N.Y.2d 384 (1995) .........................................................................................................82

*Deseret Salt Co. v. Tarpey*,
142 U.S. 241 (1891)............................................................................................................56

*Dilbert Bros. v. Foreman*,
91 N.Y.S.2d 655 (Sup. Ct. Nassau Cnty. 1949)............................................................70, 76

*Duane Reade, Inc. v. Cardtronics, LP*,
54 A.D.3d 137 (1st Dep't 2008) .....................................................................................59, 60

*Echostar Satellite LLC v. ESPN, Inc.*,
79 A.D.3d 614 (1st Dep't 2010) .........................................................................................88

*Elliot Assocs. v. J. Henry Schroder Bank & Trust Co.*,
838 F.2d 66 (2d Cir. 1988)..................................................................................................62

*Empresas Cablevisión, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*,
680 F. Supp. 2d 625 (S.D.N.Y. 2010), *aff'd in relevant part*,
381 F. App'x 117 (2d Cir. 2010) ................................................................................ *passim*

iv

*Feder v. Caliguira*,
    8 N.Y.2d 400 (1960) ...................................................................................55

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*,
    7 N.Y.3d 96 (2006) .....................................................................................88

*Gerolemou v. Soliz*,
    184 Misc. 2d 579 (App. Term 2d Dep't 2000) .........................................69

*Estate of Ginor v. Landsberg*,
    1998 WL 514304 (2d Cir. June 16, 1998) ................................................78

*Greenwich Capital Fin. Prods., Inc. v. Negrin*,
    74 A.D.3d 413 (1st Dep't 2010) ...............................................................60

*Greenwich Fin. Servs. Distressed Mortg. Fund 3, LLC v. Countrywide Fin. Corp.*,
    654 F. Supp. 2d 192 (S.D.N.Y. 2009) .......................................................90

*Greimel v. O'Conor*,
    119 N.Y.S. 660 (Sup. Ct. N.Y. Cnty.), *aff'd as modified*,
    133 A.D. 887 (1st Dep't 1909) ...........................................................70, 76

*H.B.A. Realty Co. v. Miller*,
    14 A.D.2d 607 (3d Dep't 1961) ................................................................56

*Hooper Assocs. Ltd. v. AGS Computers, Inc.*,
    74 N.Y.2d 487 (1989) ...............................................................................92

*IBM Corp. v. Stevens & Co.*,
    300 A.D.2d 222 (1st Dep't 2002) .............................................................69

*InterDigital Commc'ns Corp. v. Nokia Corp.*,
    407 F. Supp. 2d 522 (S.D.N.Y. 2005) .......................................................84

*Jayne v. Talisman Energy USA, Inc.*,
    84 A.D.3d 1581 (3d Dep't 2011) ..............................................................73

*Jemzura v. Jemzura*,
    36 N.Y.2d 496 (1975) ..........................................................................68, 71

*Kirke La Shelle Co. v. Armstrong Co.*,
    263 N.Y. 79 (1933) ....................................................................................86

*In re LightSquared Inc.*,
    511 B.R. 253 (Bankr. S.D.N.Y. 2014).........................................82, 84, 85, 86

*In re Metromedia Fiber Network, Inc.*,
    416 F.3d 136 (2d Cir. 2005).......................................................................62

*Miller v. Schloss*,
    218 N.Y. 400 (1916) ..............................................................................................68

*Murphy v. Am. Home Prods. Corp.*,
    58 N.Y.2d 293 (1983) ...........................................................................................86

*Negron v. Weiss*,
    2006 WL 2792769 (E.D.N.Y. Sept. 27, 2006) .....................................................77

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)...............................................................................................77

*NML Capital v. Republic of Argentina*,
    621 F.3d 230 (2d Cir. 2010)..................................................................................62

*People ex rel. Botsford v. Darling*,
    47 N.Y. 666 (1872) ..........................................................................................71, 75

*Roedmann v. Hertel*,
    78 Misc. 55 (App. Term 2d Dep't 1912) .........................................................70, 76

*Sharon Steel Corp. v. Chase Manhattan Bank*,
    691 F.2d 1039 (2d. Cir. 1982).................................................................60, 61, 62, 67

*Simon v. Safelite Glass Corp.*,
    128 F.3d 68 (2d Cir. 1997)...............................................................................77, 80

*SR Int'l Bus. Ins. Co. v. Allianz Ins. Co.*,
    343 F. App'x 629 (2d Cir. 2009) .......................................................................60, 63

*Standard Chartered Bank v. AWB (USA) Ltd.*,
    2010 WL 532515 (S.D.N.Y. Feb. 16, 2010).........................................................84

*Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*,
    993 F. Supp. 2d 379 (S.D.N.Y. 2014)...................................................................54

*Tofel v. Hubbard*,
    2017 WL 2828699 (N.Y. Sup. Ct. June 30, 2017).................................................69

*In re TOUSA, Inc.*,
    598 F. Appx. 761 (11th Cir. 2015).........................................................................73

*Turner Broad. Sys., Inc. v. CBS, Inc.*,
    627 F. Supp. 901 (N.D. Ga. 1985) ........................................................................63

*Van Gemert v. Boeing Co.*,
    553 F.2d 812 (2d Cir. 1977), *aff'd*, 444 U.S. 472 (1980) .....................................86

**Page**

*Verizon Pa. Inc. v. Pa. Pub. Util. Comm'n,*
    484 F. App'x 735 (3d Cir. 2012) ...........................................................................34

*Virola v. XO Commnc'ns, Inc.,*
    2008 WL 1766601 (E.D.N.Y. Apr. 15, 2008) ......................................................35

*VTR, Inc. v. Goodyear Tire & Rubber Co.,*
    303 F. Supp. 773 (S.D.N.Y. 1969)........................................................................86

*Wolf v. Goodwin,*
    120 Misc. 540 (App. Term 1st Dep't 1923)....................................................71, 75

*Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.,*
    946 F.2d 1003 (2d Cir. 1991)................................................................................88

*Zemel v. Horowitz,*
    2006 WL 516798 (Sup. Ct. N.Y. Cnty. Mar. 2, 2006) .........................................78

**STATUTES**

28 U.S.C. § 2201 ...........................................................................................................93

28 U.S.C. § 2202 ......................................................................................................6, 94

47 U.S.C. § 153(11) ......................................................................................................31

47 U.S.C. § 214(a) & (e) ...............................................................................................31

47 U.S.C. § 251(c) .........................................................................................................32

47 U.S.C. § 251(h) ...........................................................................................................7

Ala. Code § 37-2A-9......................................................................................................15

Ga. Code § 46-5-163(a) .................................................................................................15

Ind. Code § 8-1-32.5-6...................................................................................................15

Ky. Rev. Stat. § 278.020 ................................................................................................15

N.C. Gen. Stat. § 62-110 ................................................................................................15

N.Y. U.C.C. § 2-A-103(1)(j)..........................................................................................55

Ohio Code § 4901:1-6-08 to -10....................................................................................15

W. Va. Code § 24-2-11 ..................................................................................................15

**Page**

**RULES**

Fed. R. Civ. P. 54(d) ....................................................................................................94

**REGULATIONS**

*The Adoption of a Standard Methodology for Establishing Rates for CATV Pole
    Attachments*, Admin. Case No. 251 (Ky. Pub. Serv. Comm'n Aug. 12, 1982)......................18

*In re Deployment of Wireline Servs. Offering Advanced Telecomms. Capability*,
    Fourth Report & Order, CC Docket No. 98-147, 16 FCC Rcd. 15435 (2001)*,
    pet. review denied sub nom. Verizon Tel. Cos. v. FCC*, 292 F.3d 903 (D.C.
    Cir. 2002) ..................................................................................................................33

*Regulation of Rates, Terms and Conditions for the Provision of Pole Attachment
    Space to Cable Television Systems*, Case Nos. 8040 & 8090 (Ky. Pub. Serv.
    Comm'n Aug. 26, 1981) ........................................................................................ 17-18

SEC Regulation S-X, Rule 4-01(a),
    17 C.F.R. § 210.4-01(a) .............................................................................................43

SEC Regulation S-X, Rule 4-03(a),
    17 C.F.R. § 210.4-03(a) .............................................................................................43

**OTHER AUTHORITIES**

1 Robert F. Dolan, *Rasch's N.Y. Landlord & Tenant* § 5.3 (5th ed. 2017) ...................56

22 N.Y. Jur. 2d *Contracts* § 110 .................................................................................76

74 N.Y. Jur. 2d *Landlord & Tenant* § 8.................................................................55, 73

74 N.Y. Jur. 2d *Landlord & Tenant* § 155..................................................................69

American Bar Foundation, *Commentaries on Model Debenture Indenture
    Provisions* (1971).................................................................................................62, 63

*Black's Law Dictionary* 907 (8th ed. 2004).................................................................73

*Black's Law Dictionary* (10th ed. 2014)........................................................54, 55, 58

D. Finkelstein & L. Ferrara, *Landlord & Tenant Practice in N.Y.*, Vol. F, § 2:47
    (2018).........................................................................................................................55

Financial Accounting Standards Board, *Accounting Standards Codification* 105-10-05-1 .................................................................................................................43

Financial Accounting Standards Board, *Statement of Financial Accounting Concepts No. 2* ....................................................................................................43

Financial Accounting Standards Board, *Statement of Financial Accounting Concepts No. 6* ............................................................................................40, 43, 44

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1996) ...................................54, 58

Restatement (Second) of Contracts § 205 cmt. d (1981) ............................................84

Richard E. Mendales, *The New Junkyard of Corporate Finance: The Treatment of Junk Bonds in Bankruptcy*, 69 Wash. U. L. Q. 1137, 1181 (1991) .........................................63

## FINDINGS OF FACT

**Introduction**

1.       Plaintiff U.S. Bank National Association—solely in its capacity as indenture trustee (in such capacity, the "**Trustee**") under the terms of that certain indenture dated as of January 23, 2013 (as amended from time to time, the "**Indenture**"[1]) between it as trustee and defendant Windstream Services, LLC ("**Services**" or the "**Company**") as issuer of 6 3/8% Senior Notes due 2023 (the "**Notes**")—commenced this action on October 12, 2017.

2.       The Trustee asserts that Services defaulted on its obligations under Indenture Section 4.19.  That Section prohibits Services from entering, or permitting any of its Restricted Subsidiaries to enter, into a "Sale and Leaseback Transaction"— unless each of three conditions is met.  Those conditions are designed to protect creditors when Services or its Restricted Subsidiaries transfer away assets and then incur financial obligations to lease those assets back.

---

[1] As used in the Trustee's Complaint and in these Proposed Findings of Fact and Conclusions of Law, the term "Indenture" refers to the Indenture as it existed prior to the amendments of November 2017, the validity of which have been challenged by counterclaim defendant-counterclaimant Aurelius Capital Master, Ltd. ("**Aurelius**").  The Trustee is not a party to the Aurelius counterclaims challenging the November 2017 amendments to the Indenture.  Further, as used herein and except as otherwise indicated, "Notes" refers to the Notes outstanding prior to the issuance of new 6 3/8% Notes in connection with the exchange offers completed in November 2017.  For the avoidance of doubt, however, nothing herein should be construed as the Trustee seeking to invalidate the Third Supplemental Indenture dated November 6, 2017 ("**Third Supplemental Indenture**") or the 6 3/8% Notes issued in connection therewith, and the Trustee takes no part in the arguments made by Aurelius and Services with respect thereto.  With the exception of those portions that relate to the Trustee's responses to Services' breach of contract counterclaim against the Trustee and the Trustee's demand for fees and expenses as provided in the Indenture, the Trustee recognizes that it would not be entitled to relief on its Complaint nor entry of these Findings of Fact and Conclusions of Law, in the event that the Court finds, with respect to the dispute between Aurelius and Services, that the Noteholder consents for amendments and waivers of the Defaults alleged in the Trustee's Complaint effected by or delivered in connection with the Third Supplemental Indenture were validly obtained in accordance with the Indenture and applicable law.

Services has conceded that not all of the three conditions were met in connection with the April 24, 2015 transaction at issue here and described below (the "**Transaction**").  Thus, there is no dispute that if the Transaction was a Sale and Leaseback Transaction, then Services breached the Indenture.

3.      On April 24, 2015, sixty-four of Services' Restricted Subsidiaries (the "**Transferor Subsidiaries**") transferred telecommunications network assets they owned with a fair market value of at least $7.45 billion (the "**Transferred Assets**") to Communications Sales & Leasing, Inc. (together, with its subsidiaries, "**CSL**"[2]).  CSL was formed as a subsidiary of Services specifically to acquire the Transferred Assets and, immediately after obtaining those assets, was spun-off to the public shareholders of Services' parent Windstream Holdings, Inc. ("**Holdings**"), another entity formed in anticipation of the Transaction.

4.      The Transferred Assets—including 300,000 miles of copper wires and fiber optic cables—are essential to the Transferor Subsidiaries' business of providing regulated telecommunications services to customers across the country.  Accordingly, on the same day as the transfers to and spin-off of CSL, Holdings signed a lease (the "**Master Lease**") with CSL, providing for the lease back of the Transferred Assets (defined in the Master Lease as the "**Leased Property**") for a lease term of 15 years at an annual rent starting at $650 million (and increasing in later years), with options to renew for an additional 20 years.  Because Holdings is a holding company with no business operations or revenues of its own, it was left to the Transferor Subsidiaries to fulfill all tenant obligations under the Master Lease and provide all funds for the rental payments.  Thus, as a result of the Transaction, the Transferor Subsidiaries

---

[2] CSL changed its name to Uniti Group Inc. on February 23, 2017.

were divested of $7.45 billion worth of business critical assets, and burdened with the liability to pay billions in rent and satisfy all the other obligations under the Master Lease.

5.     The shareholders of Holdings, who had been the shareholders of Services before Services formed Holdings, were the main beneficiaries of the Transaction.  They became the owners of CSL just as CSL became (i) the owner of $7.45 billion in assets transferred from the Transferor Subsidiaries and (ii) the lessor of those assets entitled to receive approximately $10 billion in rent payments during the initial 15-year lease term (PX-79 at F-68).  The benefits to Holdings' shareholders came at the expense of the Services' Noteholders for whom the Trustee is the Indenture Trustee.  The asset base of Services and its subsidiaries available to the Noteholders was substantially reduced *and* the Transferor Subsidiaries were burdened with the multi-billion-dollar lease obligations that must be paid ahead of other obligations of Services and its subsidiaries (such as the Notes), or else the Transferor Subsidiaries—which generate the vast majority (approximately 80%) of Services and Holdings' revenue—will be out of business.

6.     Many salient facts are not in dispute:  (i) the Transferor Subsidiaries transferred substantial assets to CSL—the assets referred to as the "Leased Property" in the Master Lease; (ii) concurrently with that transfer, the Transferor Subsidiaries obtained the right to use the Leased Property—because, says Services, they are "express beneficiaries" under the Master Lease, which provides that the Transferor Subsidiaries "shall have the right to use, occupy, and operate the Leased Property subject to and in accordance with the terms of this Master Lease"; (iii) the Master Lease also provides that Holdings may assign the Master Lease or sublease the Leased Property to the Transferor Subsidiaries without CSL's prior consent; (iv) after the transfer, the Transferor Subsidiaries have continued to use the Leased Property in their business

3360555.1

the same as they did before; (v) the Transferor Subsidiaries are the only Windstream[3] entities that have been using the Leased Property since Holdings signed the Master Lease with CSL, and are the only Windstream entities with the legal and regulatory authorization to use the Leased Property; (vi) the Transferor Subsidiaries have long-term, exclusive use and control of the Leased Property; (vii) the Transferor Subsidiaries are responsible for operating and maintaining the Leased Property and meeting all related regulatory obligations; (viii) the Transferor Subsidiaries have funded the rent payments due under the Master Lease (which Holdings could not otherwise pay); (ix) the Transferor Subsidiaries are responsible for, and have been paying, the maintenance, taxes and other operating expenses on the Leased Property; and (x) the Transferor Subsidiaries are also responsible for capital improvements to the Leased Property (and have already expended several hundred million dollars paying for capital improvements which are automatically transferred to CSL under the terms of the Master Lease).

7.      In order to transfer their assets and enter into the foregoing Transaction, the Transferor Subsidiaries required regulatory approval from public service commissions in many states where they provide telecommunications services.  To procure those approvals, the Transferor Subsidiaries (as well as Holdings) repeatedly represented to the regulators that after transferring their assets to CSL, *the Transferor Subsidiaries* would "*lease them back* on an exclusive, long-term basis" and would "continue to have long term access to and control over the facilities used to provide regulated services," including the right to "*sublease* access to the system" to third parties.  (*E.g.*, PX-6 at 3, 4, 12 (emphasis added).)  These representations were made in written submissions and sworn testimony from, among others, Windstream's General

_____

[3] The term "**Windstream**" is used herein to refer to the entire corporate family, including Holdings, Services, and all of Services' subsidiaries.

Counsel and its CFO. The Transferor Subsidiaries needed to be lessees of the Transferred Assets to carry out their regulatory obligations, such as subleasing the transferred telecom network to other carriers. So, they told the regulators they would be lessees. And the regulators believed them and approved the applications.

8.      Consistent with those representations, Services admits that, after the signing of the Master Lease, the Transferor Subsidiaries have continued to have the right to grant, and have granted, to third parties the right to use and occupy Leased Property—a power the subsidiaries would not have unless they themselves are lessees of the Leased Property.

9.      Further, Services' financial statements filed with the SEC reflect that the *Transferor Subsidiaries* have billions of dollars of "long-term lease obligations" with respect to the Leased Property, in an amount equal to the present value of the scheduled rent payments under the Master Lease as calculated by Services. Likewise, those financial statements report the *Transferor Subsidiaries* annually making hundreds of millions of dollars of rent payments, recorded as "payments under long-term lease obligations" and related interest expense, equal to the scheduled rental payments under the Master Lease.

10.      Notwithstanding these facts, Services contends that the Transferor Subsidiaries do not lease back the assets they transferred, that Holdings is the only tenant under the Master Lease, and that there is no other lease or sublease; thus, says Services, there was no "Sale and Leaseback Transaction" as defined in the Indenture.

11.      In this action, the Trustee seeks a declaratory judgment that:[4]

---

[4] The relief described in paragraphs 11 and 12 is sought by the Trustee only in the event that the Court finds that any amendment or waiver effected by or delivered in connection with the Third Supplemental Indenture was not validly obtained in accordance with the Indenture or applicable law, in which case, consistent with Section 2.09 of the Third Supplemental Indenture, such amendment or waiver shall not be deemed to have occurred. For the avoidance of doubt,

3360555.1

(a)   In effecting the Transaction and thereafter, Services failed to comply with the covenants set forth in Indenture Section 4.19 restricting Sale and Leaseback Transactions;

(b)   Services' breaches of Indenture Section 4.19 constitute a Default under Indenture Section 6.01(a)(v);

(c)   Services also breached Indenture Section 4.07(a)(A) by making distributions to its parent company Holdings while the foregoing Default was continuing, and such additional breaches are also Defaults under Indenture Section 6.01(a)(v);

(d)   the September 21, 2017 notice of default sent by Aurelius to Services with respect to the foregoing breaches was valid and effective to (and did) trigger commencement of the 60-day cure period provided in Indenture Section 6.01(a)(v);

(e)   any applicable cure period expired on December 6, 2017;

(f)   those breaches therefore ripened into Events of Default as defined in the Indenture on December 6, 2017; and

(g)   the December 7, 2017 notice of acceleration sent by Aurelius to Services with respect to those Events of Default was valid and effective, and all principal together with all accrued and unpaid interest on the Notes became immediately due and payable as of that date.

12.    In addition, the Trustee reserves the right to seek an award of damages, as further relief pursuant to 28 U.S.C. § 2202, in an amount to be determined based on the declaratory relief awarded by the Court.

**The Parties**

13.    Plaintiff-Counterclaim Defendant U.S. Bank National Association is a national banking association formed under the laws of the United States with its main office in

---

however, nothing herein should be construed as the Trustee seeking to invalidate the Third Supplemental Indenture or the 6 3/8% Notes issued in connection therewith, and the Trustee takes no part in the arguments made by Aurelius and Services with respect thereto.  The Trustee reserves all rights and remedies with respect to any new 6 3/8% Notes issued in November 2017 determined by the Court not to have been validly issued.

3360555.1

Cincinnati, Ohio.  Plaintiff appears in this action solely in its capacity as Trustee under the Indenture.  (Compl. [PX-114] ¶ 11; Am. Ans. [PX-131] ¶ 11.)

14.     Defendant-Counterclaimant-Counterclaim Defendant Services is a Delaware limited liability company with its principal place of business in Little Rock, Arkansas.  (Compl. [PX-114] ¶ 12; Am. Ans. [PX-131] ¶ 12.)  Services does not provide telecommunications services in its own right, does not hold authorization or licensure from the Federal Communications Commission (the "**FCC**") or state regulators to do so, and serves only as a holding company for its direct or indirect subsidiaries that do have such authorization and licensure and do provide telecommunications services as regulated and licensed entities.[5]  (*Id.*; PX-15 at ¶ 11.)  At no time relevant to this action has Services owned or operated telecommunications network assets; rather, it is Services' direct and indirect subsidiaries that own and/or operate the assets comprising Windstream's telecommunications network.  (*Id.*; PX-129 at Resp. Requests for Admission Nos. 2 & 6.)  Services (as successor to Windstream Corporation[6]) is the issuer of the Notes.  (Compl. [PX-114] ¶ 12; Am. Ans. [PX-131] ¶ 12.)

15.     Non-party Holdings is a Delaware corporation with its principal place of business in Little Rock, Arkansas.  (Compl. [PX-114] ¶ 13; Am. Ans. [PX-131] ¶ 13.)  Holdings is the sole member of Services, and previously was the sole shareholder of Services' predecessor,

---

[5] Services' subsidiaries include both incumbent local exchange carriers ("**ILECs**") and competitive local exchange carriers ("**CLECs**").  ILECs are carriers that historically provided service in a given geographical area before local telephone service was de-monopolized in 1996, *see* 47 U.S.C. § 251(h), while CLECs are carriers that compete with ILECs to provide telephone exchange service, including by purchasing access to an ILEC's network at wholesale rates and/or by constructing their own network.  (Compl. [PX-114] ¶ 12; Am. Ans. [PX-131] ¶ 12.)

[6] Windstream Corporation converted into a limited liability company and renamed itself Windstream Services, LLC in February 2015.  (Compl. [PX-114] ¶ 12; Am. Ans. [PX-131] ¶ 12.)

7

Windstream Corporation.  (*Id.*)  Holdings does not provide telecommunications services in its own right, does not hold authorization or licensure from the FCC or state regulators to do so, and serves only as a holding company for its indirect subsidiaries (*i.e.*, the subsidiaries of Services) that do have such authorization and licensure and do provide telecommunications services as regulated and licensed entities.  (*See, e.g.*, PX-6 at ¶¶ 8-19; PX-10 at ¶¶ 17-19; PX-15 at ¶¶ 10, 12-14; PX-25 at 10, ¶¶ 8-10; PX-31 at ¶¶ 8-9 & n.2.)  At no time relevant to this action has Holdings owned or operated telecommunications network assets; rather, it is Services' direct and indirect subsidiaries that own and/or operate the assets comprising Windstream's telecommunications network.  (*Id.*; Compl. [PX-114] ¶ 12; Am. Ans. [PX-131] ¶ 12.)

16.     Non-party CSL is a corporation formed as a subsidiary of Services in February 2014 for the purpose of effecting the Transaction, and then spun-off in April 2015 to function as a publicly traded real estate investment trust ("**REIT**").  (Compl. [PX-114] ¶¶ 15, 42; Am. Ans. [PX-131] ¶¶ 15, 42; PX-101 at 5.)  On or about the time of the spin-off, the Transferor Subsidiaries transferred a large portion of their assets—the assets at issue in this action—to CSL, and since the spin-off, its reported principal source of revenue has been the rent paid under the Master Lease for the Transferor Subsidiaries' use of those assets.  (PX-102 at 3, 10.)  In early 2017, CSL changed its name to "Uniti Group Inc.," but is referred to herein by its original name.

17.     Counterclaim Defendant-Counterclaimant Aurelius Capital Master, Ltd. ("**Aurelius**") is a beneficial owner of more than 25% of the aggregate principal amount of the outstanding Notes, and issued to Services the notice of default that led to this action.  (Compl. [PX-114] ¶ 16; Services' Am. Countercls. [PX-130] ¶ 34.)

**The Notes and the Indenture**[7]

18.    On January 23, 2013, Services issued $700 million in aggregate principal amount of the Notes guaranteed by certain of Services' subsidiaries.  (PX-1; Compl. [PX-114] ¶ 22; Am. Ans. [PX-131] ¶ 22.)  Due to certain repurchases by Services, the outstanding principal amount was reduced to $585.7 million in 2016.  (Compl. [PX-114] ¶ 22; Am. Ans. [PX-131] ¶ 22.)  The Notes are due August 1, 2023 and bear interest at 6 3/8% per annum, payable semiannually.  (*Id*.)  The Notes are governed by the terms of the Indenture, which includes a New York choice of law provision.  (*Id*.)

19.    The Indenture includes restrictive covenants for the protection of the Noteholders.  Most pertinent here, the Indenture includes a covenant restricting Services and certain subsidiaries (including the Transferor Subsidiaries) from engaging in sale and leaseback transactions.  (PX-1 at § 4.19.)

20.    Under the Indenture, a "Sale and Leaseback Transaction" is defined as any transaction in which "any Person" that owns assets or properties

> sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred.

(PX-1 at 24.)  This definition does not require that the transferee be the same person as the lessor nor even that the assets or properties transferred be the same as those leased.

21.    Indenture Section 4.19 prohibits Services and its "Restricted Subsidiaries" from engaging in a Sale and Leaseback Transaction unless each of three conditions is met—

---

[7] As stated in footnote 1 above, the Indenture is described herein as it existed prior to the amendments of November 2017.

9

(i) the present value of all rent payments over the term of the lease (defined in the Indenture as "Attributable Debt," *see* PX-1 at 3), when combined with existing debt, does not cause Services' total indebtedness to exceed a specified limit; (ii) the gross cash proceeds received in the transaction are no less than the Fair Market Value of the property transferred; and (iii) those cash proceeds are used to purchase replacement assets or retire debt senior to the Notes in Services' capital structure:

> Section 4.19.  Sale and Leaseback Transactions.  The Company [*i.e.*, Services] shall not, and shall not permit any of its Restricted Subsidiaries to, enter into any Sale and Leaseback Transaction; provided that the Company or any Restricted Subsidiary thereof may enter into a Sale and Leaseback Transaction if:
>
> > (i)     the Company or such Restricted Subsidiary, as applicable, could have (A) Incurred Indebtedness in an amount equal to the Attributable Debt relating to such Sale and Leaseback Transaction pursuant to Section 4.09 and (B) incurred a Lien to secure such Indebtedness pursuant to Section 4.12 in which case such Indebtedness and Lien shall be deemed to have been so Incurred;
> >
> > (ii)    the gross cash proceeds of that Sale and Leaseback Transaction are at least equal to the Fair Market Value of the property that is the subject of that Sale and Leaseback Transaction; and
> >
> > (iii)   the transfer of assets in that Sale and Leaseback Transaction is permitted by, and the Company applies the proceeds of such transaction in compliance with, Section 4.10.

(PX-1 at 71.)

22.     In its discovery responses, Services has admitted that each Transferor Subsidiary that engaged in the Transaction was a Restricted Subsidiary (PX-129 at Response to Request for Admission No. 1; PX-137 at 1), and thus subject to Section 4.19.  Further, Services has admitted that, if the Transaction was or included a Sale and Leaseback Transaction, then at least one of the three requirements in Section 4.19(i)-(iii) was not met, though it refused to specify which.  (PX-129 at Response to Request for Admission No. 9; PX-128 at Responses to Interrog. Nos. 3-8.).

23.     Section 4.19(i) incorporates Section 4.09, which limits the total amount of debt, including Attributable Debt relating to Sale and Leaseback Transactions, that Services and its Restricted Subsidiaries can incur, to an amount that would keep Services' Consolidated Leverage Ratio under 4.50-to-1.  (PX-1, § 4.09(a), at 61.)  "Consolidated Leverage Ratio" is the ratio of total debt to a specified measure of adjusted EBITDA.  (*Id*., § 1.01, at 7.)

24.     Section 4.19(ii) prohibits Services and its Restricted Subsidiaries from engaging in a Sale and Leaseback Transaction if the "gross cash proceeds" of the transaction are less than the Fair Market Value of the transferred assets.  (PX-1 at 71.)  This protects Noteholders by ensuring that the assets supporting the Notes are not reduced without adequate consideration, and that the consideration is in a form that is readily measurable and available for payment of debts.

25.     Section 4.19(iii) prohibits Services and its Restricted Subsidiaries from engaging in a Sale and Leaseback Transaction if the proceeds received in the transaction are not used in compliance with Section 4.10, which permits use of those proceeds within one year of their receipt only to (a) repay Services' or its Restricted Subsidiaries' secured debt, Services' obligations under its credit agreement, or the debt of Restricted Subsidiaries that are not guarantors of the Notes; or (b) purchase replacement assets.  After one year, any remaining proceeds must be used to make an offer to repurchase the Notes.  (PX-1, § 4.10(b)-(c), at 64-65.) Thus, the proceeds are supposed to be used to be used to pay off other debt senior to the Notes, or to redeem the Notes—both of which would benefit the Noteholders.

**The Planning of the Proposed Transaction
and the Creation of Windstream Holdings, Inc.**

26.     In early 2013, Services was a holding company and the ultimate parent of all Windstream entities; Holdings did not then exist.  (PX-73F at 2; PX-74 at 33.)  In March 2013, Services' management proposed to its Board of Directors the idea of spinning off the telecom

network assets of Services' subsidiaries into a REIT and leasing them back (PX-34 at 1-3), while identifying "Compliance with covenants and indentures" as one of the "Critical Issues" raised by the proposed transaction (PX-35 at 31).

27.     In April 2013, Services' management requested that the Board approve the formation of a new parent holding company, "HoldCo," that would wholly own Services (PX-37 at WIN_00012382), despite Windstream already having a holding company at the top of its corporate structure, namely, Services.  Management stated that the rationale for forming a second, higher-level holding company was to provide "greater flexibility with respect to future strategic actions." (*Id.*)  A principal strategic action then under consideration was the spin-off/leaseback transaction, and although management's presentation to the Board was short on details about the nature of the "greater flexibility" it hoped to achieve (*see id.*), it is notable that using the new holding company to sign the lease for the Transferred Assets is the linchpin of Services' argument in this case that the sale and leaseback covenant has not been violated even though the Transferor Subsidiaries continue to use the assets as before and fulfill all obligations with respect to them.  On August 30, 2013, Services formed the new parent, Windstream Holdings, Inc., located at the same address as Services, with identical officers and directors as Services, and no other employees or operations of its own.  (PX-74 at 33.)

28.     At the time the spin-off/leaseback transaction was being planned, Services recognized that the obligations under any lease of the Transferred Assets would have to be satisfied by the Transferor Subsidiaries because neither Holdings nor Services had any operations or revenues, other than revenue generated by Services' subsidiaries (Gunderman Dep. at 57:9-15), whereas the Transferor Subsidiaries account for approximately 80% of Windstream's total annual revenue (LaRue Aff., Ex. 1).  Services' General Counsel John P.

Fletcher confirmed that, when Services' management planned the Transaction, they expected that Services' subsidiaries would fund the rent owed on the lease.  (Fletcher Dep. at 83:3-10.)

29.     In communicating with ratings agencies and prospective investors with regard to the debt that CSL would be issuing in connection with the Transaction, Services repeatedly stressed, and the ratings agencies acknowledged, that the obligations under the Master Lease would effectively have a "priority" over Services' other obligations, including the Notes, because the Transferor Subsidiaries could not operate and generate cash flows without the Leased Property.  For example:

(a)   In one ratings agency presentation, Services noted that the Master Lease payments would have an "implicit priority" over Services' debt obligations (such as the Notes) because "[c]ontinued viability of WIN requires timely payment of Master Lease before any other payments except requisite operating expenses."  (PX-58 at WIN_00020782.)

(b)   Along these same lines, Services' Head of Investor Relations Mary Michaels advised the Fitch Ratings credit ratings agency that "as a practical reality," the lease payment "is clearly a priority payment" for "Win Corp.," *i.e.*, Services.  (PX-60 at WIN_00020238.)

(c)   In a letter dated April 29, 2014 from the Moody's credit ratings agency to Services, addressed to Services' CFO Gunderman, Moody's stated that "the strategic importance of the lease will effectively make it one of the company's [*i.e.*, Services'] highest priority cash payments."  (PX-46 at WIN_00020112.)  At his deposition, Gunderman confirmed that Moody's

conclusion was correct—the rent due on the lease is one of Services'
"highest priority cash payments."  (Gunderman Dep. at 51:13-21.)

(d)   In a Q&A document prepared for investors, Services explained that "a
default on the lease would likely lead to bankruptcy process given the cross
default on WIN's credit documents, highlighting the importance of the lease
payment to WIN Services (Opco)" and, further, that "without making the
lease payment, there is no cash flow/value to the Opco [*i.e.*, Services]."
(PX-63 at WIN_00020420-21.)  Thus, "there is 'practical' seniority as this
payment [on the Master Lease] must be made for WIN Opco [*i.e.*, Services]
to have a business and to continue to generate cash flows."  (*Id.* at
WIN_00020422.)[8]

30.    Indeed, when Windstream engaged financial advisor Duff & Phelps to prepare a
solvency analysis required for final board approval of the Transaction, the Duff & Phelps report
recognized the full present value of the rent obligation under the Master Lease as a liability of
the Windstream subsidiaries.  (PX-64 at WIN_00014007.)  At his deposition, Services' CFO
Robert Gunderman testified that he saw nothing wrong with Duff & Phelps' methodology and
calculations.  (Gunderman Dep. at 155:18-156:2.)  Gunderman also testified that he had
reviewed the Duff & Phelps opinion at the time it was issued, did not conclude that anything in it
was incorrect, and recommended that the Board of Directors accept it.  (*Id.* at 156:15-23.)

---

[8] Although Services was referred to as "Opco" for short, the operating companies are
Services' subsidiaries, not Services itself.

**State Regulatory Proceedings Relating to the Proposed Transaction**

31.    The Transferor Subsidiaries operate in many states that require regulatory authorization to provide telecommunications services.  *See, e.g.*, Ala. Code § 37-2A-9 (certificate of public convenience and necessity required); Ga. Code § 46-5-163(a) (certificate of authority required for CLEC service); Ind. Code § 8-1-32.5-6 (certificate of territorial authority required); Ky. Rev. Stat. § 278.020 (certificate of public convenience and necessity required); N.C. Gen. Stat. § 62-110 (same); Ohio Code § 4901:1-6-08 to -10 (certification required for CLEC service); W. Va. Code § 24-2-11 (certificate of public convenience and necessity required).

32.    In the states where they operate, the Transferor Subsidiaries hold the necessary regulatory authorizations to use the Transferred Assets to provide telecommunications services to customers.  (Compl. [PX-114] ¶¶ 12, 52; Am. Ans. [PX-131] ¶¶ 12, 52; *see*, *e.g.*, PX-6 at ¶¶ 8-18 (identifying authorizations held by Transferor Subsidiaries); PX-10 at ¶¶ 18-19 (same); PX-15 at ¶¶ 12-14 (same); PX-25 at 10, ¶¶ 9-10 (same); PX-31 at ¶¶ 8-9 (same).)

33.    Holdings does not provide telecommunications services, does not have the regulatory authorization to do so, and has stated that it is not seeking such authorization.  (*See, e.g.*, PX-6 at ¶ 19; PX-10 at ¶ 17; PX-15 at ¶ 10; PX-25 at 10, ¶ 8; PX-31 at ¶ 8 & n.2.)  As a result, Holdings itself is not legally permitted to use the Transferred Assets to provide telecommunications services—which is the only permissible use of those assets under the Master Lease (*see* PX-68 at § 7.2(d) & p. 23 (definition of "Primary Intended Use")).

34.    In 2014, as the Transaction was being planned, Windstream recognized that there were multiple states in which the Transferor Subsidiaries were required to request and obtain approvals for the transfers of their telecommunications network assets to CSL before the Transaction could be effectuated.  (Fletcher Dep. at 88:13-89:14.)

35.     Between July and December 2014, various Transferor Subsidiaries (often joined by Holdings) filed applications with multiple state utilities regulators describing the Transaction and asking that the regulators grant approval, or inform them that no approval was needed. These applications were made to the public utilities commissions in Alabama (PX-6), Arizona (PX-8), Georgia (PX-10), Indiana (PX-12), Kentucky (PX-15), North Carolina (PX-25), Ohio (PX-27), Pennsylvania (PX-30), and West Virginia (PX-31).

36.     At the time of these applications, Services' General Counsel, John Fletcher, was responsible for legal affairs, corporate governance, and regulatory compliance and reporting. Fletcher supervised the drafting of the applications and reviewed each for accuracy before it was submitted.  (Fletcher Dep. at 87:6-24, 93:16-94:11.)  Fletcher himself submitted written verifications to multiple state regulatory authorities, swearing under oath to the truth of the applications' contents, and he provided live testimony under oath in the Kentucky regulatory proceedings.   (PX-6 at 21; PX-8 at WIN_00003293; PX-11 at WIN_00005582; PX-15 at WIN_00003628; PX-17 at WIN_00003956; PX-18 at WIN_00003630; PX-27 at WIN_00004596; PX-31 at WIN_00004971; PX-19 at WIN_00003646-59; PX-21 at 146:1-193:24.)

37.     Services' CFO Gunderman, who was responsible for finances, accounting, and capital planning for all Windstream entities, also submitted verified statements describing the Transaction in multiple state regulatory proceedings, and provided live testimony under oath. (PX-16 at WIN_00003927; PX-17 at WIN_00003957; PX-23 at WIN_00004287; PX-30 at WIN_00004784; PX-19 at WIN_00003660-79; PX-20; PX-21 at 9:1-145:12.)

38.     In these proceedings, Windstream advised the regulators that there would be a master lease signed by Holdings (and in some of the proceedings provided a term sheet for the master lease), but also repeatedly assured the regulators that, after the Transferor Subsidiaries

transferred their assets, the Transferor Subsidiaries would have "exclusive" and "long-term" "usage rights" and "control" over the Transferred Assets, *e.g.*:

- "The [Transferor Subsidiaries'] exclusive usage rights will include the right to provide communications services or sublease access to the system."[9]  (Alabama Application verified by Mr. Fletcher [PX-6] at 12.)  The same statement also appears, for example, in the applications in Georgia (PX-10 at ¶ 31), Indiana (PX-11 at WIN_00005555, ¶ 13), Kentucky (PX-15 at ¶ 21), and Ohio (PX-27 at 17).

- CSL will lease the Transferred Assets "exclusively to the [Transferor Subsidiaries] on a long term basis."  (Indiana Application [PX-11] at WIN_00005549, ¶ 2.)

- "Under the terms of the Master Lease, the [Transferor Subsidiaries] will have long term exclusive control of the assets, including poles. . . .  By having long term exclusive control of the assets, including poles, the [Transferor Subsidiaries] will be able to meet and comply with all regulatory obligations, including pole attachments."  (Verified Response of Mr. Fletcher to Ky. Cable Telecom. Ass'n's Request for Information [PX-17] at WIN_00003961.)[10]

---

[9] In all paragraphs herein relating to regulatory proceedings, the term "Transferor Subsidiaries" appears in brackets where the exact quote refers to the specific Transferor Subsidiaries that are named in the Application being discussed.

[10] The regulatory obligations of the Transferor Subsidiaries include, among others, (1) in the case of Transferor Subsidiaries that are ILECs, "carrier of last resort obligations" under which they are required to provide telephone service to all customers within their coverage area even if it is unprofitable for them to provide service to particular customers at prevailing rates (*see* ¶¶ 69-70 & n.15 below); (2) obligations to provide other carriers with access to their network elements for reasonable compensation, and to allow other carriers to interconnect with their network (*see* ¶ 74(a) below); (3) obligations to allow other carriers and public utilities to attach lines to their telephone poles for reasonable compensation (*see, e.g., Regulation of Rates, Terms and Conditions for the Provision of Pole Attachment Space to Cable Television Systems,*

39.     The Transferor Subsidiaries also assured the regulators that the same Transferor Subsidiaries would be using the assets after the transfer as before, so that the Transaction was expected to be "virtually invisible" (PX-6 at ¶ 2) and "seamless" (PX-31 at ¶ 4) to customers.

40.     Holdings and the Transferor Subsidiaries also repeatedly and expressly advised the state regulators that the Transaction would not disrupt the businesses of third parties that rely on access to the Transferor Subsidiaries' assets that would be transferred to CSL—in particular, the Transferor Subsidiaries' fiber optic and copper cables, telephone poles, land, and other equipment.  The reason:  after the Transaction as before, the Transferor Subsidiaries would continue to have the right to "sublease" and otherwise grant rights in the Leased Property to those third parties.  (PX-6 at ¶ 28; PX-16 at WIN_00003935; PX-17 at WIN_00003961-62.)

41.     In addition to assuring the regulators that they would continue to have the same exclusive *rights* to use and sublease access to the Leased Property following the Transaction, the Transferor Subsidiaries repeatedly represented that they would also continue to have all the same *obligations* with respect to the Leased Property—stating that, under the terms of the exclusive lease from CSL, the Transferor Subsidiaries will be "responsible for" capital improvements, maintenance, operation, and regulatory obligations with respect to the Transferred Assets:

> Following the Transaction the [Transferor Subsidiaries] will continue to be responsible for all capital improvements to the Subject Assets, along with their maintenance and operation.  The [Transferor Subsidiaries] will remain carriers of last resort in their service areas, and will retain their existing and future contractual and regulatory obligations as telecommunications utilities in the Commonwealth.  Under the terms of the exclusive lease from CSL,

Case Nos. 8040 & 8090 (Ky. Pub. Serv. Comm'n Aug. 26, 1981); *The Adoption of a Standard Methodology for Establishing Rates for CATV Pole Attachments*, Admin. Case No. 251 (Ky. Pub. Serv. Comm'n Aug. 12, 1982)); and (4) in some states, annual reporting obligations (*see, e.g.*, PX-33A (annual report of Transferor Subsidiary McLeodUSA Telecommunications Services LLC to Nev. Pub. Serv. Comm'n); PX-33B; PX-33C (annual reports of McLeodUSA Telecommunications Services LLC to W. Va. Pub. Serv. Comm'n)).

> the [Transferor Subsidiaries] will be responsible for the operation
> and maintenance of the Subject Assets and will continue to have
> responsibility for quality of service standards and fulfillment of all
> regulatory obligations.

(PX-15 at ¶ 44 (Ky. Appl.); *accord* PX-6 at ¶ 3 (Ala. Appl.); PX-10 at ¶ 29 (Ga. Appl.); PX-11

at WIN_00005550-5551, ¶ 5 (Ind. Appl.); PX-26 at 4 (N.C. Order); PX-27 at WIN_00004570

(Ohio Appl.); PX-30 at WIN_00004763 (Pa. Appl.).)

  42.  In most of the state regulatory proceedings, the Transferor Subsidiaries stated

explicitly that they (*i.e.*, the Transferor Subsidiaries) would "lease" the assets from CSL.  For

example, in their Alabama application, verified by Mr. Fletcher, the Transferor Subsidiaries

operating in Alabama described the transaction for which approval was sought as one in which:

> [The Transferor Subsidiaries] *seek to transfer ownership of certain
> assets* described in this Application to CSL or one of its wholly
> owned direct or indirect subsidiaries *and lease them back on an
> exclusive, long-term basis*.

(PX-6 at 3 (emphasis added).)

  43.  In their North Carolina application, Holdings and the Transferor Subsidiaries

operating in North Carolina similarly described the transaction for which approval was sought as

one where the Transferor Subsidiaries would transfer and lease back the assets:

> [The Transferor Subsidiaries] seek to effect a transaction in which
> they would *transfer ownership of certain assets* described in this
> Application to CSL or one of its wholly owned direct or indirect
> subsidiaries and *then lease them back on an exclusive, long-term
> basis* . . . .
>
> . . . CSL will neither offer to provide service nor provide any
> service to the public . . . .  *Instead, it will simply lease the same
> assets back to a [Transferor Subsidiary]* . . . .  As the Commission
> will know, ILECs and CL[EC]s routinely lease facilities used in
> their businesses, and the leasing of these facilities from CSL will
> be no different.

(PX-25 at 3, 8 (emphasis added).)

44.     In their Georgia application, Holdings and the Transferor Subsidiaries operating

in Georgia advised the Public Service Commission that:

> [The Transferor Subsidiaries] seek to transfer ownership of certain
> assets described in this Application to CSL or one of its wholly
> owned subsidiaries and *lease them back on an exclusive, long-term
> basis* . . . .
>
> . . . CSL will simply own the Subject Assets and *lease them
> exclusively to [the Transferor Subsidiaries]*. . . .
>
> [C]ertification of CSL is not required by Commission Utility Rule
> 515-6-1-.16.  CSL will not construct, acquire, lease or operate a
> 'telephone line, plant, or system.'  If this Rule has any application
> at all in the Transaction, it requires certification of the *[Transferor
> Subsidiaries] as Lessees*, not CSL, as Lessor.

(PX-10 at ¶¶ 3, 25, 28 (emphasis added).)

45.     In their West Virginia application, verified by Mr. Fletcher, Holdings and the

Transferor Subsidiaries operating in West Virginia described the transaction for which approval

was sought as follows:

> Windstream [defined as Holdings] is proposing an intra-corporate
> transaction (the 'Transaction') in which its business will be divided
> into two independent units:  an operating unit that will continue to
> provide telecommunications and related services, and a real estate
> investment trust unit that will hold title to certain distribution plant
> assets (the 'Subject Assets') and *will lease those assets exclusively
> to [the Transferor Subsidiaries]* on a long term basis. . . .
>
> CSL will merely own the Subject Assets and *lease them
> exclusively to the [Transferor Subsidiaries]* for use in providing
> services. . . .

(PX-31 at 2, 7 (emphasis added).)

46.     In their application to the Kentucky Public Service Commission ("Kentucky

PSC"), verified by Mr. Fletcher, the Transferor Subsidiaries operating in Kentucky reiterated

statements made in numerous other states, including that the "[l]ease will provide the [Transferor

Subsidiaries] with exclusive rights to use" the Transferred Assets.  (PX-15 at ¶ 21.)  Moreover,

in addition to what was stated in their initial application, the Transferor Subsidiaries repeatedly assured the Kentucky regulators that CSL would lease all of its rights in the Transferred Assets to the Transferor Subsidiaries:

(a)     In response to the Kentucky PSC Staff's First Request for Information, the Transferor Subsidiaries doing business in Kentucky (the "Kentucky Transferor Subsidiaries") assured the regulator that "CSL will *lease* all of its right, title and interest in the subject assets *to the [Transferor Subsidiaries] for their long term exclusive use.*"  (PX-16 at WIN_00003928 (emphasis added).)  "After the proposed transfer and pursuant to the terms of the Master Lease, CSL *will have leased all of its rights in the subject assets to the [Transferor Subsidiaries] for their exclusive use* to transmit or convey messages by telephone or telegraph for the public for compensation."  (*Id.* at WIN_00003931 (emphasis added).)  "[U]nder the terms of the Master Lease, [the Transferor Subsidiaries] will continue to be responsible for the provision of pole attachments to third parties."  (*Id.* at WIN_00003935.)  "Under the terms of the Master Lease, [the Transferor Subsidiaries] will continue to provide service to all their customers and will continue to be subject to all existing regulatory obligations," (*id.* at WIN_00003944), and "*the [Transferor Subsidiaries] will have an exclusive lease agreement* with the REIT [i.e., CSL]," (*id.* at WIN_00003946 (emphasis added)).

(b)     In response to the Kentucky Cable Telecommunication Association's Request for Information No. 3, which asked the Kentucky Transferor Subsidiaries whether the Kentucky PSC would have jurisdiction over CSL and the assets transferred to CSL after the Transaction, Services' General Counsel Fletcher verified under oath that:

> [I]n [Transferor Subsidiaries'] view the Commission would not have jurisdiction over CSL because, as a Real Estate Investment Trust ('REIT'), it will not be providing any telecommunications services in Kentucky.  *CSL will lease on a long term exclusive*

21

> *basis all if* [sic] *its real estate assets, including poles, to [the Transferor Subsidiaries] . . . .* [T]he [Transferor Subsidiaries] will continue to have the obligation under existing Kentucky law to provide cable operators and third parties access to the poles and the Commission will continue to have full jurisdiction over the [Transferor Subsidiaries].

(PX-17 at WIN_00003962 (emphasis added).)

(c)　　In response to the Kentucky Cable Telecommunication Association's Request for Information No. 22, which asked the Kentucky Transferor Subsidiaries whether a REIT, like CSL, was permitted by the tax code to give third parties access to the Leased Property in exchange for compensation, Mr. Fletcher verified under oath that, "a REIT is only permitted to lease real estate and receive rental income and cannot operate the facilities.  Therefore, the REIT (CSL) will *lease to the [Transferor Subsidiaries] on a long term exclusive basis* the real estate assets, including poles."  (PX-17 at WIN_00003984 (emphasis added).)

(d)　　In sworn testimony, when asked by the Kentucky PSC whether there were or would be provisions in the Master Lease that would "ensure that the Kentucky [Transferor Subsidiaries] have the necessary assets to continue to provide adequate telecommunication service to Kentucky consumers," Mr. Fletcher assured the Kentucky PSC that "the Kentucky Windstream entities will have an exclusive long-term lease and right – exclusive right to use and occupy all the assets that are within their system today."  (PX-21 at 162:9-19.)

(e)　　In contrast to the dispositive significance that Services seeks to attach in this lawsuit to the identity of the party that signed the Master Lease, Windstream CFO Gunderman testified under oath to the Kentucky PSC that Holdings would be made the signatory on the Master Lease instead of the Transferor Subsidiaries "*just for administrative ease* in terms of transacting – transacting the lease between the entities . . . for the benefit of the operating subsidiaries of Windstream . . . ."  (PX-21 at 26:19-25 (emphasis added).)

(f)     In response to post-hearing data requests served by the Kentucky PSC, Gunderman verified under oath that "[t]he assets to be transferred *will be leased back to the [Transferor Subsidiaries]* . . . ."  (PX-23 at WIN_00004453 (emphasis added).)

47.     At his deposition in this action, Fletcher testified that when he told regulators the Transferor Subsidiaries would have "long term exclusive control" of the Transferred Assets, he meant "for up to 35 years.  I thought 35 years would be a long term."  (Fletcher Dep. at 112:18-113:4.)  The "35 years" referenced by Mr. Fletcher corresponds to the initial 15-year term of the Master Lease and the options thereunder to extend the lease term up to an additional 20 years.

48.     Fletcher also explained the context for repeated assurances to regulators that the Transferor Subsidiaries would have "long term exclusive control" over the Transferred Assets—namely, that it was "important" to the regulators to understand the Transferor Subsidiaries' "ability to continue to operate the business and discharge [their] regulatory requirements, and . . . how [they] would continue to use the assets."  (*Id*. at 114:11-116:5.)  Thus, Fletcher made clear that the sworn statements and testimony he and Gunderman provided—that the Transferor Subsidiaries would be leasing back the Transferred Assets from CSL—was precisely what the regulators considered important in deciding whether to approve the applications for the transfer of assets to CSL.

49.     At the time the Transaction was being planned, Holdings and the Transferor Subsidiaries recognized that to obtain the approvals they were seeking, the regulators would have to conclude that there was "no chance of disruption of service to customers" due to the Transaction.  (PX-63 at WIN_00020420.)  Windstream and its senior officers addressed the regulatory concern by repeatedly representing that the Transferor Subsidiaries would have long-term, exclusive control of the transferred assets, that the Transferor Subsidiaries would be

leasing back the assets they transferred, and that the Transferor Subsidiaries would continue to have the ability to grant rights in the Transferred Assets to third parties.

50.     The regulators accepted the above representations in granting approval of the asset transfers.  For example, in the Order granting the Transferor Subsidiaries' application in Alabama, the Alabama Public Service Commission described the Transaction it was approving as one in which "the WIN Companies[] [*i.e.*, the Transferor Subsidiaries] . . . seek to transfer ownership of certain assets described in its Petition (the 'Subject Assets') to CSL or one of its wholly owned direct or indirect subsidiaries and *lease them back on an exclusive, long-term basis*." (PX-7 at WIN_00003272 (emphasis added).)  Similarly, in the Order granting Holdings and the Transferor Subsidiaries' application in North Carolina, the North Carolina Utilities Commission stated that "[u]nder the terms of the Master Lease, the WIN Companies [*i.e.*, the Transferor Subsidiaries] will have exclusive rights to the transferred assets" (PX-26 at 4), and noted that "the Applicants request that the Commission declare that . . . CSL does not fit within the definition of a public utility . . . because it would neither construct nor operate facilities *leased to the WIN Companies [i.e., the Transferor Subsidiaries]*" (*id.* at 8 (emphasis added).)

51.     The statements by the Transferor Subsidiaries and Holdings thus clearly apprised the state regulators that the Transferor Subsidiaries would lease back the Transferred Assets.

**The Transaction**

    A.    <u>**The Separation Agreement**</u>

52.     Having obtained all required regulatory approvals for the Transaction on the strength of the sworn representations discussed above, on March 26, 2015, Holdings, Services, and CSL entered into a Separation and Distribution Agreement (the "Separation Agreement"). (PX-67.)  The Separation Agreement sets forth the terms of CSL's separation from Windstream and their relationship after the spin-off.  (*Id.*)  Among other things, the Separation Agreement

24

provides for which assets of the Transferor Subsidiaries would be transferred to CSL, how CSL's stock would be spun-off, and for the execution of the Master Lease. (*Id.*)

      **B.**     **The Transfer of Assets to CSL and the Spin-Off**

53.     Pursuant to the Separation Agreement, on April 24, 2015, Services caused the Transferor Subsidiaries to transfer to CSL substantial and critical parts of their network in 37 states and the District of Columbia, including, among other things, approximately 300,000 route miles of copper and fiber optic cables, telephone poles, underground conduits, and related central office buildings and land. (PX-67 at § 2.2(a); *id.* at Sch. 1.1(b); *see also* Services' Am. Countercls. [PX-130] ¶ 41; PX-23 at WIN_00004307.)[11]

54.     As noted in a pre-spin-off Q&A document that Windstream prepared for prospective investors in CSL, these assets comprise 87% of Windstream's fiber lines and 82% of its copper lines, and "constitute the last-mile connections into customer premises." (PX-63 at WIN_00020422.) They "are essential and the only means for WIN to serve clients," and consequently, access to them is necessary for Windstream's operating companies "to have a business and continue to generate cash flows." (*Id.*)

55.     The Transferred Assets had a Fair Market Value of at least $7.45 billion at the time of the Transaction, as determined by Ernst & Young ("**E&Y**"), an independent appraiser retained by Windstream to value the assets in connection with the Transaction. (PX-61 at WIN_00014443; Eichler Dep. at 97:19-97:23; Gunderman Dep. at 113:21-114:12.) Windstream has relied on E&Y's valuation repeatedly and in varied contexts, including in correspondence

---

[11] The transfers were effected through a series of 84 Assignment Agreements and related deeds dated as of April 24, 2015. (PX-73.1–PX-73.84; PX-68B.) A list of the Transferor Subsidiaries that executed the Assignment Agreements and deeds in favor of CSL is included in Appendix A hereto.

with the Securities and Exchange Commission ("**SEC**") staff (PX-59 at 7), in the sworn

testimony of its CFO to the Kentucky PSC (PX-21 at 24:5-7), in Officers' Certificates delivered

to the Trustee, and in allocating the rent liability under the Master Lease among the Transferor

Subsidiaries (*see* ¶ 81(a) below).

56.     In exchange for the Transferred Assets, pursuant to the Separation Agreement, on

April 24, 2015, CSL issued to Services (i) 149.8 million shares of CSL's common stock,

(ii) approximately $2.448 billion of debt instruments payable by CSL, and (iii) a cash payment of

$1.035 billion.  (Compl. [PX-114] ¶ 44; Am. Ans. [PX-131] ¶ 44.)[12]

57.     That same day, Services transferred 80.4% of CSL's common stock to Holdings,

and Holdings distributed those CSL shares to Holdings' stockholders, at which time CSL's stock

became publicly traded.  (Compl. [PX-114] ¶ 46; Am. Ans. [PX-131] ¶ 46.)  Services retained

the remaining 19.6% of CSL's stock.  (PX-66 at 3.)[13]

### C.     The Master Lease

58.     Pursuant to the Separation Agreement, CSL signed a Master Lease with Holdings

on April 24, 2015 (PX-68), providing for the leaseback of the Transferred Assets (which the

Master Lease defines as the "Leased Property").  On the CSL side, the Master Lease was signed

by all of CSL's subsidiaries that had received Transferred Assets.  (*Id*. at WIN_00002267.)  On

the Windstream side, only Holdings signed the Master Lease.  (*Id*. at WIN_00002268.)  The

Transferor Subsidiaries—*i.e.* the entities that would be using the Leased Property—did not sign.

---

[12] Prior to the exchange on April 24, 2015, CSL had one outstanding share, which was
owned by Services.  (*See* PX-101 at 1, 4.)

[13] Services held the 19.6% stock interest in CSL until June 2016, when it used that CSL
stock to pay down $672 million owed under Services' revolving credit facility.  (PX-83 at 13.)
Thus, starting on the date of the Transaction, CSL was 80.4% owned by public shareholders,
and, starting June 2016, 100%.

59.     The Master Lease has a minimum term of 15 years, with options for the Tenant to extend the term up to a total of 35 years.  (*Id*. at § 1.3.)

60.     The Master Lease is a "triple net lease," consideration for which includes obligations on the part of the Tenant to maintain, repair, and pay for taxes, utilities, and insurance, on the Leased Property, as well as to pay fixed rent.  (*Id*. at § 9 (maintenance and repair); § 4.1 (taxes); § 4.2 (utilities); § 13 (insurance); § 3 (rent).)  Rent was initially set at $650 million per annum (and increased to $653.5 million during the first year of the lease), payable in monthly installments, with the annual rent to escalate by 0.5% per year beginning with the fourth year of the term.  (*Id*. at 25; PX-83 at F-5.)  Further, the Master Lease provides that all capital improvements paid for by Tenant to maintain, repair, overbuild, upgrade, or replace the Leased Property, "shall automatically become part of the Leased Property" (PX-68 at § 10.2(c)) and thus transferred to CSL's ownership for no additional consideration.

61.     The Master Lease defines the "Tenant" as Holdings "together with its permitted successors and assigns."  (PX-68 at 1.)  Master Lease Section 7.2(a) ("Use of the Leased Property") provides that "[t]hroughout the Term of this Master Lease, Tenant shall have the exclusive right to use, or cause to be used, the Leased Property."  (*Id*. at 36.)  Section 7.2(a) further provides that it is

> agreed and acknowledged by Landlord that any of Tenant's Subsidiaries . . . shall have the right to use, occupy and operate the Leased Property subject to and in accordance with the terms of this Master Lease and such Subsidiaries shall have the right to discharge any or all of Tenant's obligations (maintenance or otherwise) hereunder on behalf of Tenant.

(*Id*.)  Section 22.2(a)(ii) provides that Tenant may assign the Master Lease or sublease the Leased Property, without Landlord's prior consent, to any of Tenant's subsidiaries.  (*Id*. at 73.)

62.     Master Lease Section 7.2(d) requires the "Tenant" to "continuously operate each of the Facilities" comprising the Leased Property in accordance with their "Primary Intended Use," defined, in essence, as providing telecommunications services.  To be precise, the Master Lease defines "**Primary Intended Use**" as:

> The provision, routing and delivery of voice, data, video, data center, cloud computing and other communication services to businesses, consumers and other users of communication services (including governmental entities, schools, libraries and non-profit entities), the colocation activities in the data center space, the provision of dark or dim fiber services to third parties and/or such other services and uses required to be or customarily performed or provided under the Communications Regulations in connection with the foregoing uses consistent, with respect to each Facility, with its current use as of the Commencement Date or with prevailing communications industry use at any time (including all ancillary uses consistent with communications industry practice).

(PX-68 at 23.)

63.     Holdings does not hold the required regulatory authorization to use the Leased Property for its Primary Intended Use; only the Transferor Subsidiaries have such authorization. (Am. Ans. [PX-131] ¶ 52; PX-6 at ¶¶ 8-19; PX-10 at ¶¶ 17-19; PX-15 at ¶¶ 10, 12-14; PX-25 at 10, ¶¶ 8-10; PX-31 at ¶¶ 8-9 & n.2.)  Thus, only the Transferor Subsidiaries can fulfill "Tenant's" obligations to use the Leased Property for its Primary Intended Use.

64.     Just as Holdings itself does not have the ability to use the Leased Property to provide regulated telecommunications services, Holdings itself does not have the ability to pay the $654 million per year of rent or other financial obligations on the Leased Property.  Prior to the spin-off, Holdings had no revenue at all.  (PX-74 at 30.)  As Windstream documented in an internal memorandum contemporaneous with the spin-off, Holdings "is a holding company with no operations," and therefore "the individual guarantor and non-guarantor subsidiaries of Win Services that contributed the assets [*i.e.*, the Transferor Subsidiaries] . . . will fund the lease

3360555.1

payment to CS&L." (PX-66 at 16.)  After the spin-off, as reported in its financial statements for the years 2015, 2016, and 2017, 100% of Holdings' revenue consists of "leasing income from subsidiaries"—amounts drawn from the Transferor Subsidiaries on account of the Leased Property—all of which Holdings then pays over to CSL to meet the rent due on the Master Lease.  (PX-79 at 36; PX-83 at 37; PX-87A at 38; LaRue Aff. ¶ 54.)

65.     If the Transferor Subsidiaries were to cease funding the rent due on the Master Lease or fulfilling the other obligations under the Master Lease, the results would be catastrophic for Windstream.  Under the terms of the Master Lease, a failure to pay rent to CSL (or failure to perform other obligations) would result in a default under the Master Lease, entitling CSL to terminate any right of the Transferor Subsidiaries to possess and use the Leased Property.  (PX-68 at §§ 16.1(a), 16.1(m), 16.2; *see also* Am. Ans. [PX-131] ¶ 56.)  Without the Leased Property, the Transferor Subsidiaries could not continue to operate their businesses (*see* Gunderman Dep. at 47:5-19), their connections to their customers would, literally, be severed and their businesses devastated, rendering Services unable to repay its debts, including the Notes.

66.     Indeed, Services acknowledges in its SEC filings that one of the "most significant" risk factors in its business is that it could lose access to much of its telecommunications network if the rent payments on the Master Lease are not made:

> We [defined as Holdings and its subsidiaries] currently lease a significant portion of our telecommunications network assets . . . under the master lease with CS&L.  Our failure to pay the rent . . . of the master lease would result in an event of default regarding the master lease . . . .  Upon an event of default, remedies available to CS&L include terminating the master lease . . ., *dispossessing us from the leased assets*, . . . and seeking any and all other rights and remedies available under law or in equity.  The exercise of such remedies could have a material adverse effect on our business, financial position, results of operations and liquidity.

(PX-79 at 18 (emphasis added); *accord* PX-83 at 19 (same).)

67.     Moreover, as CSL has noted to investors, Windstream has no viable alternative to continuing to make the payments under the Master Lease, because:

> ▪ Windstream is Substantially Dependent on Network Leased from Uniti for its Business Operations
>
>    • WIN is Dependent on Lease and Access to Uniti's Network to Serve Vast Majority of Customers
>
>    • WIN Replacement Cost to Overbuild the Uniti Leased Network would Exceed Several Billion Dollars
>
>    • Time to Replicate, if Possible, Would be Several Years
>
>    • No other Vendor Could Lease the Identical Network to WIN to Replace Uniti
>
> . . .
>
> ▪ WIN is Obligated as "Carrier of Last Resort" to Provide Service to Customers Under Regulatory Law and requires Access to Uniti's Network to Satisfy State PUC and FCC Obligations[.]

(PX-105 at 15.)[14]

68.     The Master Lease contains numerous references to "Tenant" that can apply only to the Transferor Subsidiaries, not to Holdings.

69.     For example, with respect to the "carrier of last resort" obligations referenced in CSL's statements above, Master Lease Section 36.4 provides that all "carrier of last resort" obligations "shall remain obligations solely of the Tenant."  (PX-68 at 96.)  Those obligations are federal and state requirements that phone companies that are ILECs (which includes many of

---

[14] Services has admitted the accuracy of CSL's statements with two modifications.  (*See* PX-129 at Response to Requests for Admission Nos. 10-15.)  As to the time it would take to build replacements for the Leased Property, Services admits only that it would take a "significant amount of time."  (*Id*. at Response to Request for Admission No. 13.)  And as to the cost of replicating the leased network, Services admits only that the cost would be "significant."  (*Id*. at Response to Request for Admission No. 12.)  Internally, however, Windstream management reported to its Board of Directors that the replacement cost was estimated to be $16.5 billion (PX-61 at WIN_00014443), consistent with CSL's statement.

the Transferor Subsidiaries) or that receive universal service fund subsidies must provide service to all customers in their coverage area, even if providing such service at prevailing rates to a particular customer is not economically viable. (*See* 47 U.S.C. § 214(a) & (e); PX-33 (Windstream internal memo listing applicable federal and state carrier of last resort obligations); Fletcher Dep. at 130:10-131:3.) The intent of these laws is to ensure that telephone service will always be available to all customers in a given area from at least one provider.

70.     Holdings is not a carrier and does not have "carrier of last resort" obligations. (PX-63 at WIN_00020421.)[15] On the other hand, many of the Transferor Subsidiaries are carriers and do have such "carrier of last resort" obligations. (PX-129 at Response to Request for Admission No. 15; PX-63 at WIN_00020421.)

71.     Similarly, Master Lease Section 36.1(b) refers to the "Tenant" providing services to customers and to Tenant's "customer relationship[s]," but Holdings is a holding company that does not provide services and has no customers; it is the Transferor Subsidiaries that provide services and have customer relationships. (PX-68 at 93.)

**The Transferor Subsidiaries' Ongoing Use and Control of the Leased Property**

72.     As set forth below, from the closing of the Transaction to the present, the Transferor Subsidiaries have continuously possessed and operated the Leased Property in carrying on their business as regulated telecommunications service providers, including both

---

[15] Federal "carrier of last resort" obligations under 47 U.S.C. § 214(a) & (e) are predicated on, among other things, a person's status as a "carrier." A "carrier" is "any person *engaged as a common carrier for hire*, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy." 47 U.S.C. § 153(11) (emphasis added). Because Holdings is merely a holding company that engages in no business operations of any kind, it is not a carrier.

serving customers and granting other carriers, utilities, and cable TV providers access to the Leased Property where required by applicable law.

73.     Services admits that, since the Master Lease was executed, only the Transferor Subsidiaries (not Holdings) have used the Leased Property and that they have used it for its Primary Intended Use, as the Master Lease requires the "Tenant" to do.  (PX-129 at Responses to Request for Admission Nos. 2, 3.)

74.     Since the closing of the Transaction, and consistent with their representations to regulators that the Transferor Subsidiaries' continuing "exclusive usage rights" would include "the right to . . . sublease access to the system," (*see, e.g.*, PX-6 at ¶ 28; PX-10 at ¶ 31; PX-11 at WIN_00005555, ¶ 13; PX-15 at ¶ 21), the Transferor Subsidiaries have continued to enter into agreements granting third parties various rights to use portions of the Leased Property in exchange for consideration.  (Am. Ans. [PX-131] ¶ 60.)  Since the closing of the Transaction on April 24, 2015, the Transferor Subsidiaries have entered into more than 120 such agreements, with terms as long as 29 years.[16]  These include:

(a)     ***Collocation agreements.***  Many of the Transferor Subsidiaries are ILECs. (Compl. [PX-114] ¶ 12 n.2; Am. Ans. [PX-131] ¶ 12.)  Under the Federal Communications Act, ILECs are required to allow other carriers to interconnect with their networks or give other carriers access to their unbundled network elements.  *See* 47 U.S.C. § 251(c).  To facilitate such interconnections or access, ILECs are required to enter into agreements allowing the "physical collocation of equipment necessary for interconnection or access . . . at the premises of the local exchange carrier" in exchange for reasonable compensation.  *Id*. § 251(c)(6).  "In a physical

---

[16] A list of these agreements is set forth on Appendix B hereto.

collocation arrangement, a competitor *leases* space at an incumbent LEC's premises for its equipment.  The competing provider has physical access to this space to install, maintain, and repair its equipment."  *In re Deployment of Wireline Servs. Offering Advanced Telecomms. Capability*, Fourth Report & Order, CC Docket No. 98-147, 16 FCC Rcd. 15435, 15439 n.14 (2001)*, pet. review denied sub nom. Verizon Tel. Cos. v. FCC*, 292 F.3d 903 (D.C. Cir. 2002) (emphasis added).  Master Lease Section 7.2(e) expressly recognizes such collocation agreements as a species of "sublease."  (PX-68 at 36.)  Since the closing of the Transaction, the Transferor Subsidiaries have entered into at least 27 collocation agreements.

        (b)      For example, as part of an Interconnection Agreement between the Transferor Subsidiary Windstream Florida, LLC and a third party, CenturyLink Communications LLC, dated June 8, 2015, the Transferor Subsidiary agreed to allow the third party "to obtain dedicated space . . . in Windstream's Wire Centers and to place equipment in such space to interconnect with Windstream's network."  (PX-109.59, Attachment 7, § 1.2, at WIN_00025174.)  The agreement allows the third party to do so through "caged" collocation, "a form of collocation which allows [the third party] *to lease* caged floorspace to house their equipment within Windstream Wire Centers . . . ."  (*Id*. § 1.15.1, at WIN_00025175 (emphasis added).)  Under the agreement, after construction of a "cage enclosure," "the *leased* floorspace will be available to [the third party] for installation of its collocated equipment."  (*Id*. § 2.5, at WIN_00025176 (emphasis added).)  Numerous other such agreements executed by the Transferor Subsidiaries contain identically worded provisions allowing a third party "to lease" caged floorspace within structures included in the Leased Property.  (*E.g*., PX-109.55, Attachment 7, §§ 1.2, 1.15.1; PX-109.62, Attachment 7, §§ 1.2, 1.15.1; PX-109.72, Attachment 7, §§ 1.2, 1.15.1.)

(c)     ***Fiber exchange agreements***.  Under such agreements, the Transferor

Subsidiaries and third parties agree to swap access to particular fiber optic cables owned or

controlled by the other.  Since the closing, the Transferor Subsidiaries have entered into at least 7

fiber exchange agreements with third parties.  For example, Windstream KDL, LLC, a

Transferor Subsidiary; CSL Realty, LLC, one of CSL subsidiaries that is defined as "Landlord"

in the Master Lease; and a third party, Fiberlight, LLC, entered into a Fiber Exchange

Agreement, dated as of May 16, 2016.  (PX-109.52.)  The agreement recites that "CS&L owns

certain real estate, rights of way, fiber optic cables and certain fixtures and equipment that it

*leases* to CSL Tenant [defined as Windstream KDL, LLC (a Transferor Subsidiary), not

Holdings] pursuant to a Master Lease dated April 24, 2015," and provides for the parties to the

agreement to exchange "specific fibers" included in the Leased Property for "specific fibers"

owned by the third party.  (*Id*. at WIN_00019539, Recitals B & C (emphasis added).)

(d)     ***Dark or dim fiber agreements***.  Under such agreements, the Transferor

Subsidiaries grant third parties an indefeasible and exclusive right to use specific fiber optic

cables that are part of Leased Property but are currently un-utilized or under-utilized.  Since the

closing, the Transferor Subsidiaries have entered into at least 21 such agreements.  (*See, e.g.*,

PX-109.37, IRU Agreement between Windstream KDL, LLC, a Transferor Subsidiary,

and Midwest Fiber Networks, LLC, a third party, dated May 23, 2016, at §§ 1.1, 5.1 (granting

10-year "exclusive, indefeasible right of use" as to certain dark fibers).)  Such agreements

granting an indefeasible right of use are recognized to be leases.  *See Verizon Pa. Inc. v. Pa. Pub.

Util. Comm'n*, 484 F. App'x 735, 738 n.7 (3d Cir. 2012) ("An indefeasible right of use is 'an

exclusive, long-term lease, granted by an entity holding legal title to a telecommunications cable

or network, of a specified portion of a telecommunications cable, such as specified fiber optic

strands within an optical fiber cable, or the telecommunications capacity of a cable or network, such as specific channels of a given bandwidth.'"); *Virola v. XO Commnc'ns, Inc.*, 2008 WL 1766601, at *1 n.7 (E.D.N.Y. Apr. 15, 2008) ("A lease of dark fiber typically takes the form of an Indefeasible Right of Use ('IRU'), which grants the holder a long-term right to unfettered access to dark fiber owned by another company.").

        (e)     ***Pole attachment agreements.***  The Transferor Subsidiaries grant rights to third parties to attach power lines and cable TV lines to poles included in the Leased Property. Since the closing, the Transferor Subsidiaries have entered into 37 such agreements.  (*E.g.*, PX-109.135, Pole Attachment License Agreement between Valor Telecommunications of Texas, LLC, a Transferor Subsidiary, and Kerrville Pub. Util. Bd., a third party, dated Jan. 1, 2017.)

        (f)     ***Sublease of real estate.***  A Transferor Subsidiary has also subleased real estate included in the Leased Property to a third party.  (PX-109.4, Sub-Lease Agreement between Windstream North Carolina, LLC, a Transferor Subsidiary, as sublessor, and the Town of Waxhaw, North Carolina, as sublessee, dated Apr. 13, 2017, for land bearing tax parcel number 05-115-022A.)  The "Sub-Lease Agreement" recites that the Transferor Subsidiary is the "Lessee" of a certain tract of land and grants the town a ten-year sublease on the property.  (*See id*. at 1; *see also* PX-144 at 1 (stating that "[t]he agreement pursuant to which Windstream North Carolina, LLC is the 'Lessee' of the property in Waxhaw, North Carolina . . . as recited in WIN_000107[5]7 is the Master Lease"); PX-68C (deed conveying the tract at issue, parcel number 05-115-022A, from Windstream North Carolina LLC to CSL North Carolina System, LP on April 24, 2015).)

        75.     While the Transferor Subsidiaries have thus entered into numerous agreements subleasing or otherwise granting access to the Leased Property since the closing of the

Transaction, Holdings is not a party to any of those agreements, nor has it otherwise entered into any agreements with third parties granting access to any part of the Leased Property.  (*See* PX-109.001-109.136; PX-107.)

**The Transferor Subsidiaries' Funding of the Rent Payments, Capital**
**Expenditures, and Payment of Maintenance, Taxes, Utilities, and**
**Insurance on the Leased Property**

76.     From the closing of the Transaction in April 2015 through the present, the Transferor Subsidiaries have borne all maintenance, insurance, utilities, and tax expenses owed on the Leased Property.  Services' CFO Gunderman acknowledged during his deposition that "the entities that actually make the payments for these expenses are the transferor subs primarily."  (Gunderman Dep. at 81:6-18.)  The Transferor Subsidiaries recognize these expenses in their financial statements.  (Eichler Dep. at 136:12-137:2; PX-129 at Response to Request for Admission No. 7.)

77.     From the closing of the Transaction through the present, the Transferor Subsidiaries have made capital improvements to the Leased Property, spending more than $339 million through the first half of 2017 to maintain, repair, overbuild, upgrade, and replace portions of the Leased Property (PX-103 at 29; Eichler Dep. at 130:16-133:22, 134:20-135:6; PX-106.1 to PX-106.28)—all of which capital improvements become property of CSL (PX-68 at § 10.2).  The Transferor Subsidiaries record these capital expenditures in their individual financial statements.  (PX-129 at Response to Request for Admission No. 7.)

78.     From the closing of the Transaction through the present, the Transferor Subsidiaries have funded all monthly rent payments to CSL under the Master Lease.  As noted in an intercompany memo prepared under the direction of Windstream's Controller John Eichler, Holdings "is a holding company with no operations" and, accordingly, Windstream's management recognized from the outset of the Transaction that "the individual guarantor and

36

non-guarantor subsidiaries of Win Services that contributed the assets [*i.e.*, the Transferor Subsidiaries] . . . *will fund the lease payment to CS&L*." (PX-66 at 16 (emphasis added); *see also* Fletcher Dep. at 82:19-83:10).) The Transferor Subsidiaries reflect the rent payments in their financial statements. (LaRue Aff. ¶¶ 51-52.)

79.     Although Services contends that the Transferor Subsidiaries are neither leasing property from CSL nor leasing or subleasing property from Holdings, Windstream's publicly-filed financial statements, as well as the individual Transferor Subsidiary financial statements, further reflect the fact that the Transferor Subsidiaries lease back the property they transferred.

80.     In Windstream's SEC-filed financial statements, Holdings recognizes the rent payments from the Transferor Subsidiaries to Holdings as "Leasing income from subsidiaries," and the Transferor Subsidiaries recognize corresponding liabilities for "Long-term lease obligations" and associated "Payments under long-term lease obligations." For example:

(a)     In its Annual Report on Form 10-K for the year ended December 31, 2016, Holdings reported "Leasing income from subsidiaries" of $653.6 million (PX-83 at 37)—the exact amount Holdings in turn paid to CSL (*see* LaRue Aff. ¶ 54 & citations therein).

(b)     Similarly, in the same Annual Report, Services' subsidiaries collectively reported "Long-term lease obligations" of $4,927.7 million related to Leased Property (including both the current and long-term portions of such obligations) (PX-83 at F-67, F-94), and corresponding "Payments under long-term lease obligations" (*id*. at F-96; *see* LaRue Aff. ¶¶ 49-51).[17]

---

[17] As set forth in greater detail in the LaRue Affidavit ¶¶ 47-48, these "long-term lease obligations" are recorded as liabilities on the Transferor Subsidiaries' individual balance sheets

81.     Windstream's internal accounting records, which include balance sheets and income statements for each individual Transferor Subsidiary (PX-91 to PX-96), reveal that the Transferor Subsidiaries bear liability for the entirety of the rent payments on the Master Lease:

> (a)     As shown in Windstream's internal accounting work papers and confirmed in deposition by Windstream's Controller Eichler, each individual Transferor Subsidiary is allocated a share of the total lease liability and a share of each monthly rent payment (including the interest and principal portions thereof) proportionate to the "relative fair value" of the assets it transferred to CSL and now continues to use in its operation.  (PX-66 at 16; Eichler Dep. at 92:23-93:17.[18])  For example, Windstream management calculated that Transferor Subsidiary Windstream North Carolina LLC transferred assets to CSL with a fair value equal to 5% of all assets transferred to CSL, and has allocated 5% of the total "long-term lease obligation" and 5% of the rent payments made in each accounting period to Windstream North Carolina LLC.[19]

---

in an amount equal to the discounted present value of all minimum rent payments due under the Master Lease through the end of its initial 15-year term.  (See PX-83 at F-66; PX-91; PX-93, PX-95; PX-66 at 11.)  At the inception of the Master Lease in April 2015, this "long-term lease obligation" was calculated to be $5,131.8 million by Windstream's management, which found that amount best "representative of its financing obligation."  (PX-66 at 11; PX-97; PX-76A at Exhibit 99.1, p. 8.)  By December 31, 2016, the "long-term lease obligation" was $4,927.7 million because the rent payments made from April 2015 to December 2016 had reduced the present value of the rent payments remaining of the initial 15-year term of the lease.

[18] See also PX-28 at 1 (advising the Ohio Public Utilities Commission that the Transferor Subsidiaries would recognize a "long-term lease obligation equal to the operating companies' proportionate share of the required future minimum lease payments due to the REIT on a discounted basis").

[19] See Eichler Dep. at 121:5-123:15; PX-66 at 16; PX-88 (identifying Windstream North Carolina LLC as company number 017); PX-99 (noting that "Company 017" is allocated 8.2416% × 60.7871663% = 5% of the total liability based on the value of the assets used by that company); PX-100 (supporting calculations for relative fair value by company number); PX-97

(b)     The "long-term lease obligations" thus allocated to each Transferor

Subsidiary on account of the Leased Property collectively equal the "long-term

lease obligation" owed to CSL and reported by Holdings.  (*Compare* PX-98 at tab

"FY 2016 Totals," cell G97, *with* PX-83 at 38; LaRue Aff. ¶ 56.)

(c)     The monthly rent payments thus allocated to each Transferor Subsidiary

collectively equal the "Leasing income from subsidiaries" reported by Holdings,

which in turn equals the rent payments made to CSL.  (*Compare* PX-98 at tab

"FY 2016 Totals," cell D97, *with* PX-83 at 37; LaRue Aff. ¶¶ 53-54.)

82.     In this lawsuit, Services characterizes the transfer of funds to Holdings for the

payment of rent as distributions or dividend payments from Services.  (*See* Am. Countercls. [PX-

130] ¶ 50.)  Such characterization is inconsistent with the financial statements of Holdings,

Services, and the Transferor Subsidiaries, none of which reflect any distributions or dividends

from Services to Holdings on account of the Master Lease or otherwise in the amount of the rent

payments owed to CSL.  (*See* LaRue Aff. ¶¶ 95-105; PX-83 at 39, F-96.)

83.     Instead of reflecting dividends on account of the Master Lease, Holdings'

financial statements record funds drawn from the Transferor Subsidiaries as "leasing income

from subsidiaries" in the operating revenue section of its income statement.  (PX-83 at 37.)  This

treatment is consistent with Holdings subleasing the Leased Property to the Transferor

Subsidiaries, and with the Transferor Subsidiaries ultimately bearing all liability for the rent due

on the Master Lease.  (LaRue Aff. ¶¶ 78-80, 103-105.)

_____

(allocations of payments and liabilities to each Transferor Subsidiary by company number).  *See
generally* LaRue Aff. ¶ 36 & n.44 (explaining Windstream's methodology for calculating
allocations).

84.     Services, nonetheless, contends that the Master Lease does not impose any obligations on the Transferor Subsidiaries (*see* Am. Countercls.[PX-130] ¶ 47), that the Transferor Subsidiaries are permitted to use the Leased Property for free, and that the Transferor Subsidiaries simply choose to fulfill all of Holdings' obligations under the Master Lease though they have no obligation to do so.

85.     In addition to being inconsistent with Windstream's statements to regulators, Services' contention that Holdings permits the Transferor Subsidiaries to use the Leased Property with no corresponding rent or other financial obligations is inconsistent with the Transferor Subsidiaries' financial statements, which recognize "long-term lease obligations" with respect to rent due under the Master Lease as liabilities on their balance sheets, and recognize amounts paid by the Transferor Subsidiaries for maintenance, utilities, insurance, and taxes on the Leased Property as expenses on their income statements.  (LaRue Aff. ¶¶ 47-53, 74-77, 81; PX-129 at Response to Request for Admission No. 7.)

86.     Services' contention is likewise inconsistent with Holdings' financial statements which report, as an item of revenue, "Leasing income from subsidiaries" in an amount equal to the rent due under the Master Lease.  (LaRue Aff. ¶¶ 54.)  Under GAAP, a company may report an amount received as "revenue" only if it is an "inflow[] or other enhancement[] of assets of an entity or settlements of its liabilities (or a combination of both) from delivering or producing goods, rendering services, or other activities that constitute the entity's ongoing major or central operations" (LaRue Aff. ¶ 79 (quoting Financial Accounting Standards Board, *Statement of Financial Accounting Concepts No. 6,* ¶ 78))—*i.e.*, only if the amount was received in exchange for something of value provided by the company.  Holdings' recognition of "Leasing income from subsidiaries" as an item of revenue is thus consistent with the Transferor Subsidiaries

40

paying consideration for the right to use the Leased Property provided to them by Holdings, and inconsistent with Services' characterization of the payments to Holdings as dividends or distributions from Services.  (LaRue Aff. ¶¶ 78-80, 95-105.)

**The Parties' Expert Testimony on Windstream's**
**Financial Accounting and Reporting for the Transaction**

87.     The parties offered divergent expert testimony concerning the meaning of Windstream's financial statements discussed above.

88.     The Trustee and Aurelius offered the testimony of Prof. David W. LaRue, who taught accounting for more than 30 years at the University of Virginia and elsewhere.  Prof. LaRue opined, in essence, that Windstream's financial statements filed with the SEC constitute representations that the Transferor Subsidiaries have financial obligations in connection with their use of the Leased Property, that the Transferor Subsidiaries have made payments on those obligations, and that Holdings receives funds generated by the Transferor Subsidiaries as consideration for Holdings' granting the Transferor Subsidiaries use of the Leased Property.

89.     In response, Services offered the testimony of Saul Solomon, who has worked as a CPA, litigation consultant, and expert witness for more than 40 years.  Mr. Solomon opined, in essence, that how Windstream describes the reported liabilities, payments, expenses, and revenues in its SEC-filed financial statements is "irrelevant," and that the Transferor Subsidiaries' reporting of "long-term lease obligations" does not mean that the Transferor Subsidiaries actually have any obligations in connection with the Leased Property, but rather is an artifact of certain GAAP rules on sale accounting that (supposedly) require an obligation to be reported even in absence of any actual obligation, lease, or other agreement to make payments.

90.     The Court credits Prof. LaRue's testimony, and does not credit Mr. Solomon's testimony, on the meaning of Windstream's financial statements.  Prof. LaRue supported his

41

testimony with citation of pertinent GAAP authorities and a cogent explanation of their meaning and application to the facts here.  Mr. Solomon, on the other hand, presented an essentially circular argument:  Mr. Solomon asserted that the Transferor Subsidiaries' reporting of "long-term lease obligations" does not mean that they actually have obligations under a lease because, he says, GAAP sometimes requires a company to report obligations when no obligations exist; then, as proof of that proposition, Mr. Solomon pointed to the Transferor Subsidiaries' reporting of "long-term lease obligations" as an example where GAAP requires a company to report an obligation that does not exist.  In other words, Mr. Solomon assumes his conclusion.

91.    Mr. Solomon's effort to provide a non-circular basis for his opinion in the GAAP rules was unconvincing, for the reasons pointed out by Prof. LaRue.  Among other things, contrary to Mr. Solomon's assertion, none of the GAAP rules cited by Mr. Solomon provides that a company that transfers assets but retains what GAAP calls "continuing involvement" with the assets (as the Transferor Subsidiaries did here) must record a "financing obligation" where one does not actually exist.  (LaRue Aff. ¶ 71.)  Mr. Solomon's opinion that the "long-term lease obligations" reported as liabilities by the Transferor Subsidiaries in their financial statements do not actually relate to any lease, is also inconsistent with Services' admission that "Transferor Subsidiaries recognize in their financial statements:  (a) *a liability for rent under the Master Lease*, and (ii) taxes, insurance, other operating expenses and capital expenditures for the Leased Properties."  (PX-129 at Response to Request for Admission No. 7 (emphasis added).)

92.    Based on Prof. LaRue's testimony, the Court finds that Windstream's financial statements filed with the SEC, which report billions of dollars of "long-term lease obligations" as liabilities on the balance sheets of the Transferor Subsidiaries, do constitute a representation and admission that the Transferor Subsidiaries have financial obligations in connection with the lease

of the Leased Property.  As Prof. LaRue explained, GAAP requires financial reporting to be "representationally faithful"—"a qualitative characteristic that refers to the correspondence or agreement between the accounting description and measure, and the economic resources, events, activities, or other phenomenon that those descriptions and measures purport to represent."[20] Moreover, for SEC registrants such as Windstream, GAAP includes SEC Regulation S-X Rule 4-01(a) and Rule 4-03(a).[21]  Those Rules respectively provide that an SEC registrant must describe amounts in financial statements using "such generally accepted terminology, as will best indicate their significance and character," 17 C.F.R. § 210.4-01(a), and that "No caption should be shown in any financial statement as to which the items and conditions are not present," 17 C.F.R. § 210.4-03(a).  In particular, GAAP defines "liabilities" as "probable future sacrifices of economic benefits arising from present obligations of a particular entity to transfer assets or provide services to other entities in the future as a result of past transactions or events,"[22] and GAAP does not permit a company to record an amount as a liability unless it actually has an obligation to pay the amount.  Thus, when the Transferor Subsidiaries report "long-term *lease* obligations" as *liabilities* in their financial statements filed with the SEC, that is a representation that the Transferor Subsidiaries have such obligations, that the description of that liability as a

---

[20] Financial Accounting Standards Board, *Statement of Financial Accounting Concepts No. 2*, ¶ 63.

[21] *See* Financial Accounting Standards Board, *Accounting Standards Codification* 105-10-05-1 ("Rules and interpretive releases of the Securities and Exchange Commission (SEC) under authority of federal securities laws are also sources of authoritative GAAP for SEC registrants.").

[22] Financial Accounting Standards Board, *Statement of Financial Accounting Concepts No. 6*, at ¶ 35.

43

"long-term lease obligation" best indicates the significance and character of the liability, and that the conditions for reporting a "lease" are present.  (LaRue Aff. ¶ 67.)

93.     Similarly, Windstream's financial statements filed with the SEC, which report Holdings' receipt of $654 million a year as an item of "operating revenue" described as "leasing income from subsidiaries," constitute a representation and admission that Holdings has received $654 million from the subsidiaries as consideration for a lease.  As previously noted, and as Prof. LaRue testified, under GAAP, "revenues" are defined as "inflows or other enhancements of assets of an entity or settlements of its liabilities (or a combination of both) from delivering or producing goods, rendering services, or other activities that constitute the entity's ongoing major or central operations."[23]  (LaRue Aff. ¶ 79.)  Thus, when Holdings reports "operating revenue" of $654 million a year and describes such revenue as "*leasing* income from subsidiaries," it is representing that it has received $654 million a year from the subsidiaries, that the $654 million a year was received in exchanged for some good or service provided by Holdings, and the nature of the good or service provided by Holdings was a lease.

**The Transaction Violated the Conditions in Indenture Sections 4.19(i)-(iii).**

94.     Services has admitted that, if the Transaction was or included a Sale and Leaseback Transaction, then not all of the conditions in Indenture Section 4.19(i)-(iii) were met. (PX-129 at Response to Request for Admission No. 9; *see also* PX-128 at Responses to Interrogatory Nos. 3-8.)  Failure to meet any one of three conditions in Section 4.19(i)-(iii) would suffice for a breach of the covenant, but here, in fact, the Transaction met none of them.

---

[23] *Statement of Financial Accounting Concepts No. 6*, at ¶ 78.

95.     First, the amount of Attributable Debt incurred in the Transaction caused Services and its Restricted Subsidiaries to far exceed the limit on total debt imposed by Section 4.19(i). The amount of Attributable Debt related to the Transaction, calculated in accordance with the Indenture's definition, was $6.530 billion at the inception of the Master Lease on April 24, 2015. (LaRue Aff., Ex. 2.)  As a result, Services' Consolidated Leverage Ratio was at least 5.76 on April 24, 2015 (LaRue Aff., Ex. 3)—far exceeding Section 4.19(i) and Section 4.09's limitation that the Consolidated Leverage Ratio must remain less than 4.50 upon Services or its Restricted Subsidiaries entering into a Sale and Leaseback Transaction.[24]  Translated into dollar terms, this means that entry into the Transaction caused Services and the Transferor Subsidiaries to exceed the Indenture's limit on debt by more than $2.6 billion.  (*See id*.)

96.     Second, the gross cash proceeds of the Transaction were not at least equal to the Fair Market Value of the Transferred Assets, as required by Section 4.19(ii).  Services estimated the Transferred Assets to have a Fair Market Value of $7.450 billion, based on E&Y's appraisal. (PX-61 at WIN_00014443.)  In exchange for the Transferred Assets, however, Services received cash consideration of only $1.035 billion—a shortfall of more than $6 billion.  (Compl. [PX-114] ¶ 44; Am. Ans. [PX-131] ¶ 44.)  The Transferor Subsidiaries themselves received nothing.  (PX-67 at § 2.1(a)(ii); PX-79 at F-94, F-96.)

---

[24] While the Attributable Debt will slowly amortize over the 15-year term of the lease, it has remained far in excess of the total debt limit at all times up to the present.  For example, as of November 6, 2017, the Attributable Debt was still $5.827 billion, and the Consolidated Leverage Ratio was still at least 5.73.  (*See* LaRue Aff., Exs. 2 & 4.)  Indeed, Services has admitted that, if the Transaction was or included a Sale and Leaseback Transaction, then on November 6, 2017, prior to consummation of exchange offers, its Consolidated Leverage Ratio was equal to or greater than 4.50.  (PX-145 at Response to Request for Admission No. 1(a).)

3360555.1

97.     Third, those cash proceeds were not applied in accordance with Section 4.19(iii), which incorporates the requirements of Section 4.10(b) (*see* ¶ 25 above).  In violation of Section 4.19(iii), on May 27, 2015, only a few weeks after the proceeds of the Transaction were received, Services used a portion of the $1.035 billion in cash proceeds to redeem all of Services' outstanding 8.125% senior unsecured notes due 2018 in an aggregate principal amount of $400 million.  (PX-79 at F-4.)  The unsecured notes due 2018 did not fall within the permitted categories of structurally senior debt repayments enumerated in Section 4.10(b)(i) but were instead *pari passu* with the Notes (*compare* PX-73D, Item 1.01, *with* PX-73E, Item 1.01), and no repurchase offer was ever made to holders of the Notes.

**The Default Notice**

98.     Under Indenture Section 6.01(a)(v), a Holder representing 25% or more of the aggregate principal amount of Notes then outstanding may give written notice of a failure of Services or any of its Restricted Subsidiaries to comply with Indenture Sections 4.07 or 4.19.  (PX-1 at 74.)  If Services or the Restricted Subsidiaries continue in their failure to comply for 60 days after such notice, an Event of Default will occur under Section 6.01(a)(v).  (*Id.*)

99.     Aurelius was the beneficial owner of more than 25% of the aggregate principal amount of the outstanding Notes when it gave the notice of default at issue.  (Compl. [PX-114] ¶ 16; Services' Am. Countercls. [PX-130] ¶ 34; AX-311 (broker statement reporting that Aurelius held Notes with a principal amount of $224,279,000, *i.e.*, 38% of the total $585,747,000 outstanding, as of September 21, 2017).)

100.     As defined in the Indenture, a "Holder" means a registered holder of Notes.  (PX-1, § 1.01, at 13.)  The registered holder of the Notes beneficially owned by Aurelius is Cede & Co. ("**Cede**").  (PX-110.)

101.     Under Indenture Sections 12.14(a) and (f), any notice or other action that could be given or taken by a Holder under the Indenture may be given or taken by the Holder through an agent duly appointed in writing, with regard to all or any part of the principal amount held by the Holder.  (PX-1 at 103-04.)

102.     By letter dated September 7, 2017, Cede duly appointed Aurelius's prime broker as its agent to exercise any right or remedy that Cede is entitled to take as a Holder under the Indenture (including the right to give notices of default) in respect of the Notes beneficially owned by Aurelius.  Having received such authorization from Cede, Aurelius's prime broker, by letter dated September 11, 2017, duly appointed Aurelius as its agent to exercise any right or remedy that Cede is entitled to take as a Holder under the Indenture (including the right to give notices of default) in respect of the Notes beneficially owned by Aurelius.  (PX-110; PX-111.)

103.     By letters dated September 21, 2017 (the "**Default Notice**"), Aurelius gave notice to Services of the Defaults alleged herein.  (PX-112; PX-113; *see also* PX-86, Item 7.01.)

104.     Although this Court issued an order staying the 60-day cure period for 16 days while the parties conducted expedited discovery in this action, the cure period, as so extended, ended no later than December 6, 2017 without Services effecting any cure.

**The Notice of Acceleration**

105.     Under Indenture Section 6.01(a)(v), the "failure by the Company or any of its Restricted Subsidiaries for 60 days after written notice by . . . Holders representing 25% or more of the aggregate principal amount of Notes then outstanding to comply with any of the other agreements in th[e] Indenture" constitutes an Event of Default.  (PX-1 at 74.)

106.     Under Indenture Section 6.02(a), if any Event of Default other than an Event of Default specified in Section 6.01(a)(ix) or (x) occurs and is continuing with respect to the Notes, "the Holders of at least 25% in principal amount of the then outstanding Notes may declare all

3360555.1

the Notes to be due and payable immediately by notice in writing to the Company." (PX-1 at 75.) "Upon such declaration, the Notes, together with accrued and unpaid interest (including Additional Interest), shall become due and payable immediately." (*Id*.)

107.    On December 7, 2017, Aurelius continued to hold at least 25% in principal amount of the outstanding Notes. (*See* AX-311.) On that date, Aurelius delivered to Services a written notice of acceleration, based on the previously served Default Notice, declaring all Notes to be due and payable (the "**Notice of Acceleration**"). (WIN Ex. 73.)

108.    As discussed above, upon a declaration of acceleration, all principal and accrued and unpaid interest on all Notes becomes immediately due and payable.

109.    Further, Section 1 of the Notes provides that Services shall pay interest at a rate that is 1% per annum in excess of the rate otherwise in effect—*i.e.*, at the rate of 6 3/8% + 1% = 7 3/8% per annum—on overdue principal, with interest calculated on the basis of a 360-day year of twelve 30-day months. (PX-1 at Ex. A (form of Reverse Side of Note) at § 1.)

110.    Accordingly, if the Notice of Acceleration was valid and effective, then for each day after December 7, 2017 that the principal due and payable on the Notes remains unpaid, additional daily interest has accrued and will continue to accrue on the principal at 7 3/8%.

**Services' First Counterclaim**

111.    In its First Counterclaim, Services alleges that the Trustee breached the Indenture because of the effect of the Third Supplemental Indenture. Services seeks an order compelling the Trustee to dismiss its action and, as damages, its attorneys' fees.

112.    The Trustee commenced this action pursuant to a direction from Aurelius, which at the time held more than 50% of the aggregate principal amount of the outstanding Notes.

113.    Services filed a motion for judgment on the pleadings against the Trustee's Complaint, which the Court denied without prejudice on December 14, 2017, finding that the

48

Trustee's claims remain a live controversy, in light of the counterclaims made by Services as to the existence of a default under the sale and leaseback covenant.  (ECF No. 97, 12/14/17 Tr. at 18-19.)  The Court also stated that there was no prejudice to Services from proceeding with the Trustee's claim as part of this action rather than as a separate, subsequent action.  (*Id.* at 19-20.)

114.    The Trustee has taken no position on Aurelius's challenge to the Third Supplemental Indenture.  The Trustee has preserved the claims asserted in its Complaint, consistent with the terms of the Third Supplemental Indenture, which provides that, in the event that the Court finds that any amendment or waiver effected by or delivered in connection with the Third Supplemental Indenture has not been validly obtained in accordance with the Indenture or applicable law, such amendment or waiver shall not be deemed to have occurred.  (*See* WIN Ex. 116 at § 1.04; *see also id.* §§ 2.09 (same).)

## CONCLUSIONS OF LAW

**Summary**

115.    The Trustee contends that under New York law the facts recited above establish that the Transferor Subsidiaries transferred and now lease back assets—under either the Master Lease or a sublease from Holdings—in violation of the Indenture's sale and leaseback covenant.

116.    Under the Indenture, a "Sale and Leaseback Transaction" means,

> with respect to any Person, any transaction involving any of the assets or properties of such Person whether now owned or hereafter acquired, whereby such Person sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred.

(PX-1, § 1.01, at 24.)

117.    Indenture Section 4.19 prohibits Services from entering, or permitting any of its Restricted Subsidiaries to enter, into a Sale and Leaseback Transaction unless three conditions in Section 4.19(i)-(iii) are each met.  These provisions are quoted above at paragraph 21.

118.    There is no dispute that the Transferor Subsidiaries are Restricted Subsidiaries and that they transferred their assets and property.  (PX-129 at Response to Request for Admission No. 1; PX-137 at 1.)  There is also no dispute that "[n]ot all of the requirements of Sections 4.19 (i), (ii) and (iii) of the Indenture were met in connection with the Transaction at Issue."  (PX-129 at Response to Request for Admission No. 9.)  Thus, the Indenture prohibits the Transferor Subsidiaries from leasing back the assets and property they transferred—and if they do, the covenant in Section 4.19 is violated—regardless of whether the Transferor Subsidiaries lease the Transferred Assets back directly from CSL under the Master Lease or under a lease or sublease from Holdings.

119.    Services claims to have found a way to circumvent the Indenture's restrictions on Sale and Leaseback Transactions by enabling the Transferor Subsidiaries to continue their use of the Transferred Assets and have all the rights of Tenant under the Master Lease, and to pay and fulfill all the financial, operational, and regulatory obligations of Tenant under the Master Lease, without the Transferor Subsidiaries having leased or subleased the Leased Property.  Services

contends that because Holdings is the signatory to the Master Lease, and because there is no written sublease agreement between Holdings and the Transferor Subsidiaries, the Transferor Subsidiaries are not leasing back the property they transferred, and Section 4.19 has not been violated—even though under the arrangement structured by Services, the Transferor Subsidiaries enjoy all the rights and bear all the burdens of leasing back the property that they transferred.

120.    The Master Lease provides that all of Holdings' Subsidiaries "shall have the right to use, occupy and operate the Leased Property subject to and in accordance with the terms of this Master Lease and such Subsidiaries shall have the right to discharge any or all of Tenant's obligations (maintenance or otherwise) hereunder on behalf of Tenant."  (PX-68 at § 7.2(a).) Windstream repeatedly explained to state regulatory authorities that the Transferor Subsidiaries would be responsible for fulfilling the obligations imposed by the Master Lease to maintain and operate the Leased Property, including the funding of capital improvements—and the Transferor Subsidiaries have in fact borne all those costs and obligations.  (*See* ¶¶ 41, 76-77 above.).

121.    The Master Lease requires that the Leased Property shall be used for its "Primary Intended Use," a defined term in the Master Lease that requires the Leased Property be used to provide regulated telecommunications services (PX-68 at 23), as it had been used prior to the Transaction—a requirement that only the Transferor Subsidiaries could fulfill.  Holdings does not possess the regulatory authorization required to provide telecommunications services using the Leased Property, and Holdings has not used any of the Leased Property for its Primary Intended Use at any time since executing the Master Lease.  Instead, the Transferor Subsidiaries are the entities that hold the required authorization and licensure to use the Leased Property for its Primary Intended Use, and they have used the Leased Property for its Primary Intended Use continuously since the execution of the Master Lease.

122.     In addition to using the Leased Property in the manner required by the Master Lease, the Transferor Subsidiaries have been fulfilling all the financial obligations required in respect of the Leased Property under the Master Lease.  It is undisputed that they have been paying for the maintenance, taxes, utilities, insurance, and capital expenditures on the Leased Property, and the financial statements of Holdings and the Transferor Subsidiaries indicate that the Transferor Subsidiaries have been funding the monthly rent payments that Holdings is required to make to CSL under the Master Lease.  The Transferor Subsidiaries' financial statements report that the Transferor Subsidiaries have "long-term lease obligations" and make "payments under long-term lease obligations" and incur interest expenses in amounts equal to the rent due under the Master Lease, and Holdings' financial statements report the receipt of "leasing income from subsidiaries" in amounts equal to the rent due under the Master Lease.

123.     In describing the Transaction to state regulators, in order to obtain approvals for the Transferor Subsidiaries' transfer of assets to CSL, Windstream repeatedly assured the regulators that the Transferor Subsidiaries would lease back the assets they were transferring. Indeed, Windstream's General Counsel repeatedly described the Transaction as one in which the Transferor Subsidiaries would "lease" back the Transferred Assets.

124.     The Court agrees with the Trustee that Section 4.19 has been violated.  The Court rejects Services' contention that, through the expedient of having Holdings sign the Master Lease and by not having a written sublease between Holdings and the Transferor Subsidiaries, Services has complied with the Indenture—where the Transferor Subsidiaries in fact have all the rights and responsibilities of a lessee and where Windstream itself repeatedly described the Transaction to state regulators and in its financial statements as one in which the Transferor Subsidiaries "lease" back the Transferred Assets.  Three independent reasons lead to this conclusion:

(a)     First, Section 4.19 was violated because under the arrangement engineered by Services, the Transferor Subsidiaries lease the assets they transferred within the ordinary meaning of the word "lease"—namely, to hold property under a contract conveying the right to use the property in exchange for consideration.  In obtaining the continued right to use the Leased Property and bearing all financial, operational, and regulatory obligations in respect of the Leased Property with the understanding and agreement of CSL and/or Holdings, the Transferor Subsidiaries either "lease" the Transferred Assets under the Master Lease itself or they "lease" the assets from Holdings pursuant to a sublease implied in fact based on the circumstances and actions of the parties.  Either way, the legal consequence is the same—the Transferor Subsidiaries "lease" back assets they transferred in violation of Section 4.19. Services' position that the Transferor Subsidiaries do not "lease" the Transferred Assets because they did not sign the Master Lease or a sublease with Holdings would impose a formal requirement absent from the ordinary dictionary meaning of "lease," and would require the Court employ a literalistic construction that elevates form over substance.  Services' further defense that payments made by the Transferor Subsidiaries to fund the rent on the Leased Property are not payments under a lease, but simply voluntary distributions or dividends to Holdings is unsupported in law and fact, and inconsistent with Windstream's SEC financial statements, which report no such distributions or dividends.

(b)     Second, having obtained approval to transfer their assets to CSL in reliance on sworn representations to state regulators that the Transferor Subsidiaries would "lease" the assets back, Windstream is barred, under the doctrine of judicial estoppel, from now denying that the Transferor Subsidiaries "lease" the Transferred Assets.

(c)     Third, even if the Court were to find that the Transaction did not technically violate the sale and leaseback covenant and that the Transferor Subsidiaries do not technically lease back the assets they transferred, the arrangement put in place by Services would still breach Services' obligation of good faith and fair dealing implicit in Section 4.19—an obligation recognized by courts in this District as applicable to complex financial agreements.

## I.     SERVICES VIOLATED SECTION 4.19 BECAUSE THE TRANSFEROR SUBSIDIARIES LEASE THE ASSETS THEY TRANSFERRED TO CSL.

125.    The Transaction violates Section 4.19 because the Transferor Subsidiaries "lease" the assets they transferred to CSL within the meaning of the Indenture.

126.    New York law governs the construction of the Indenture (PX-1 at § 12.08), and hence whether the Transferor Subsidiaries "lease" the Transferred Assets within the meaning of the Indenture's definition of "Sale and Leaseback Transaction."  Under New York law, when interpreting a contract, "[w]ords and phrases are to be given their plain and ordinary meaning, and New York courts will commonly refer to dictionary definitions in order to determine that meaning."  *Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 390 (S.D.N.Y. 2014).

127.    Under its plain and ordinary meaning, "lease," as a verb, means simply "to hold under a lease," *Merriam-Webster's Collegiate Dictionary* (10th ed. 1996), or "to hold by a lease," *Black's Law Dictionary* (10th ed. 2014).  That definition thus turns on the meaning of "lease" as a noun.  As a noun, a "lease" is "a grant or devise of real property, usually for a term of years with a reversion to the grantor," *Becker v. Mfrs. Trust Co.*, 262 A.D. 525, 527 (1st Dep't 1941), "a contract by which one conveys real estate, equipment, or facilities for a specified term and for a specified rent" (*Merriam-Webster's*), or "[a] contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration,

54

usu[ally] rent" (*Black's*).  *See also* N.Y. U.C.C. § 2-A-103(1)(j) (defining a "lease" as "a transfer of the right to possession and use of goods for a term in return for consideration").

128.    Here, it is undisputed that the Transferor Subsidiaries *hold* the Transferred Assets.  Services has admitted that the Transferor Subsidiaries, and they alone within the Windstream corporate group, use the Transferred Assets.  (PX-129 at Responses to Requests for Admission Nos. 2-4.)  And the Transferor Subsidiaries hold those assets in a manner evincing all the incidents of a leasehold interest.

129.    It is blackletter law that "[t]he test for determining what constitutes a lease, as distinguished from other rights or interests, is not necessarily the descriptive language used, but whether . . . *exclusive* control and possession of specified space for a specified term have been granted, subject to reserved rights."  74 N.Y. Jur. 2d *Landlord & Tenant* § 8 (emphasis added).[25] Here, Holdings and the Transferor Subsidiaries repeatedly admitted in the state regulatory proceedings that the Transferor Subsidiaries would have "long term *exclusive* control of the assets" (emphasis added), and following the asset transfer, the Transferor Subsidiaries in fact have been the sole entities in the Windstream corporate family to use and operate the Leased Property.  (*See* ¶¶ 38-46 & 73 above.)

---

[25] *Accord* D. Finkelstein & L. Ferrara, *Landlord & Tenant Practice in N.Y.*, Vol. F, § 2:47 (2018) ("*Landlord & Tenant Practice in N.Y.*") ("The primary feature of [a] lease is the transfer of *exclusive* possession and absolute control." (emphasis added)); *id.* § 3:23 ("A 'lease' grants *exclusive* possession of designated space to a tenant, usually for a specified rental rate and term, subject to certain rights reserved by the lessor." (emphasis added)); *id.* § 4:12 ("The transfer of *exclusive* possession and control creates a lease rather than a license (or another lesser estate)." (emphasis added)); *Feder v. Caliguira,* 8 N.Y.2d 400, 404 (1960) ("It is the transfer of absolute control and possession of property at an agreed rental which differentiates a lease from other arrangements dealing with property rights.").

130.    It is also blackletter law that a person cannot lease property to a third party unless the person has an ownership or leasehold interest in the property.[26]  Here, Holdings and the Transferor Subsidiaries repeatedly admitted to state regulators that the Transferor Subsidiaries would retain the right to "sublease access to the system."  And following the asset transfers, the Transferor Subsidiaries have done exactly that—entering into more than 120 agreements subleasing and otherwise granting rights in the property to third parties.  (*See* ¶¶ 74(a)-74(f) above.)  The Transferor Subsidiaries would not have the ability to do so, and those third-party agreements would all be without effect, unless the Transferor Subsidiaries themselves held a leasehold interest in the Leased Property.

131.    As to the question—by or under what right the Transferor Subsidiaries enjoy the exclusive use and occupancy of Leased Property owned by CSL and (according to Services) leased by Holdings, and are able to sublease the Leased Property to third parties?—only two answers are possible.  The Transferor Subsidiaries hold the Leased Property by or under either (a) the Master Lease itself or (b) a sublease, *i.e.*, as a sublessee of Holdings as primary lessee.  The Court need not determine which, because the evidence and the law support either alternative.

---

[26] *See, e.g., Burr v. Stenton*, 43 N.Y. 462, 465 (1871) (holding that "to constitute . . . an estate in the lessee, the lessor must, at the time of giving the lease, have an estate out of which the term may be carved"); *H.B.A. Realty Co. v. Miller*, 14 A.D.2d 607, 607-608 (3d Dep't 1961) (plaintiff had no right to and could not enforce lease to defendant where property subject to the lease was owned by third party); *Berlin v. Yachnin*, 128 Misc. 24, 24 (App. Term 2d Dep't 1926) (holding that tenant with no leasehold interest in hallway and stairs within apartment building could not lease that portion of the property to another); 1 Robert F. Dolan, *Rasch's N.Y. Landlord & Tenant* § 5.3 (5th ed. 2017) ("One may be a lessor, although one is not the owner in fee of the leased premises.  For example, a tenant can sublet his leased premises, and thereupon become a lessor.  However, the lessor must, at the time of giving the lease, have an estate out of which the term may be carved."); *cf. Deseret Salt Co. v. Tarpey*, 142 U.S. 241, 245 (1891) ("The lessee can, of course, as against a stranger, have no greater right of possession than his lessor.").

56

A.    **Under the Master Lease**

132.    Services contends that the Transferor Subsidiaries use the Transferred Assets pursuant to rights granted to them in the Master Lease.  According to Services, the Transferor Subsidiaries are "express beneficiaries under the Master Lease"; Services grounds this assertion in Master Lease Section 7.2(a), which provides that "Tenant's Subsidiaries . . . shall have the right to use, occupy and operate the Leased Property subject to and in accordance with the terms of this Master Lease."[27]  The "subject to" clause necessarily means that the Transferor Subsidiaries will have certain obligations under the Master Lease, such as complying with all applicable regulatory obligations and using the Leased Property for its Primary Intended Purpose, obligations that only the Transferor Subsidiaries can fulfill.  (*See* ¶¶ 32-33, 63 above.) Moreover, Master Lease Section 7.2(a) further provides that "such Subsidiaries shall have the right to discharge any or all of Tenant's obligations (maintenance or otherwise) hereunder on behalf of Tenant."  (PX-68 at 36.)  And in fact, the Transferor Subsidiaries do fulfill all the Tenant's obligations under the Master Lease, including providing the funds for the rent, capital improvements, maintenance, taxes, and insurance for the Leased Property.  (*See* ¶¶ 76-81 above.)

133.    In addition, the Transferor Subsidiaries, as well as CSL, have represented to third parties that the Transferor Subsidiaries are lessees under the Master Lease.  (*See* PX-109.52 at WIN_00019539 (reciting that "CS&L owns certain real estate, rights of way, fiber optic cables

---

[27] PX-128 at Response to Interrogatory No. 1 ("Services' subsidiaries have use of the assets and property owned by Uniti because the Master Lease provides Holdings, the sole tenant under the Lease, with the right to allow certain of the subsidiaries to use the Leased Property. These subsidiaries are *'Tenant's Subsidiaries'* that *are express beneficiaries under the Master Lease*.  *Section 7.2 of the Master Lease specifically provides that 'Tenant's Subsidiaries . . . shall have the right to use, occupy and operate the Leased Property subject to and in accordance with the terms of this Master Lease.'"* (emphasis added)).

and certain fixtures and equipment that it *leases* to [Transferor Subsidiary Windstream KDL, LLC] pursuant to a Master Lease dated April 24, 2015" (emphasis added)); PX-144 at 1 (Services counsel stating, in response to discovery requests, that "The agreement pursuant to which [Transferor Subsidiary] Windstream North Carolina, LLC is the 'Lessee' of the property in Waxhaw, North Carolina . . . as recited in [PX-109.4 at] WIN_000107[5]7 is the Master Lease.").)

134.    Likewise, the Transferor Subsidiaries and Holdings repeatedly represented to state utilities regulators that "*CSL* will lease all of its right, title and interest in the subject assets to [the Transferor Subsidiaries]" (PX-16 at WIN_00003928 (emphasis added)) and that "*[t]he [Master] Lease* will provide the [Transferor Subsidiaries] with exclusive rights to use" the Transferred Assets" (PX-15 at ¶ 21 (emphasis added)).  (*Accord* PX-10 at ¶ 25; PX-16 at WIN_00003931; PX-17 at WIN_00003962, WIN_00003984; PX-25 at 3, 8; PX-31 at ¶ 12; ¶ 46(a) above.)  And, indeed, multiple references in the Master Lease to "Tenant" only make sense if the Transferor Subsidiaries are included.  (*See* ¶¶ 68-71 above.)

135.    It is undisputed that the Master Lease is a lease—*i.e.*, an agreement conveying the right to use and occupy property for a term in exchange for consideration.

136.    Because the Transferor Subsidiaries hold the Transferred Assets by or under a lease (namely, the Master Lease)—and pay substantial consideration for such use, they "lease" the transferred assets within the plain and ordinary meaning of the word.  *See Merriam-Webster's Collegiate Dictionary* (10th ed. 1996) (defining "to lease" as "to hold under a lease"); *Black's Law Dictionary* (10th ed. 2014) (defining "to lease" as "to hold by a lease").  No more is required to establish a "Sale and Leaseback Transaction" as defined in the Indenture.

58

137.    The fact that Holdings signed the Master Lease does not change the conclusion that the Transferor Subsidiaries hold the Transferred Assets by or under the Master Lease. Windstream CFO Robert Gunderman testified under oath in the Kentucky regulatory proceedings that Holdings would be signing the Master Lease "just for administrative ease . . . for the benefit of the operating subsidiaries of Windstream."  (PX-21 at WIN_00003706.) Windstream General Counsel John Fletcher verified under oath in the same proceeding that "[t]he [Master] Lease will provide the [Transferor Subsidiaries] with exclusive rights to use" the Transferred Assets, and that "[u]nder the terms of the exclusive lease from CSL, the [Transferor Subsidiaries] will be responsible for the operation and maintenance of the Subject Assets and will continue to have responsibility for . . . fulfillment of all regulatory obligations."  (PX-15 at ¶¶ 21, 44.)  In other words, Windstream itself made clear that the Transferor Subsidiaries were the real parties in interest that would exclusively use the Leased Property, and have all obligations (regulatory and otherwise), under the Master Lease.  Holdings signed as a nominee, "just for administrative ease."

138.    In insisting that the Transferor Subsidiaries do not "lease" the Transferred Assets because they did not sign the Master Lease, Services evidently interprets the word "lease" in the Indenture to mean "signed a document entitled 'Lease.'"  In urging such a self-serving interpretation of the word "lease," Services engrafts a formal requirement onto the ordinary meaning of the word that is absent from, and goes beyond, the legal and dictionary definitions, and asks the Court to interpret the word in a literalist fashion that ignores both the intent and purpose of Section 4.19 and the substance of the Transaction, in contravention of New York law.

139.    Under New York law, a contract should not be construed "disregarding common sense in favor of formalistic literalism." *Duane Reade, Inc. v. Cardtronics, LP*, 54 A.D.3d 137,

59

144 (1st Dep't 2008) (internal quotation marks and citations omitted).  "[T]he meaning of particular language . . . should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes."  *SR Int'l Bus. Ins. Co. v. Allianz Ins. Co.*, 343 F. App'x 629, 632 (2d Cir. 2009) (internal quotation marks and citations omitted).  "Put otherwise, a contract should not be interpreted to produce a result that is . . . commercially unreasonable or contrary to the reasonable expectations of the parties."  *Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415 (1st Dep't 2010) (internal quotation marks and citations omitted).

140.     Applying these principles, courts construing indentures governed by New York law look to the intent and purpose of indenture covenants, and in determining whether a challenged transaction complies, they consider not only its form but also its substance.

141.     For example, in *Sharon Steel Corp. v. Chase Manhattan Bank*, 691 F.2d 1039 (2d Cir. 1982), the question before the court was whether indenture "successor obligor" clauses allowing the issuer to assign its obligations under various bonds to a purchaser of "all or substantially all" of the issuer's assets, would apply to the party that made the last purchase in a pre-planned series of sales intended to liquidate all the issuer's assets.  *See id.* at 1044-46.  In deciding that question, the court found that the purpose of the successor obligor clauses was to protect lenders by ensuring that the issuer's principal operating assets remained available for satisfaction of the debt.  *See id.* at 1050.  Recognizing that an interpretation of "all or substantially all" that focused only on the last sale rather than considering the whole series of sales would effectively eviscerate the protection afforded to the noteholders by the indenture provisions, the Court rejected such a "literalist approach" as "a masterpiece of simplicity."  *Id.* at

60

1049.  The Second Circuit admonished that "a literal reading of the words 'all or substantially all' is not helpful apart from reference to the underlying purpose to be served."  *Id.*

142.    Similarly, in *In re Associated Gas & Electric Co.*, 61 F. Supp. 11, 28 (S.D.N.Y. 1944), *aff'd*, 149 F.2d 996 (2d Cir. 1945), the court rejected literalist indenture interpretations that ignored how the challenged transaction undermined the substance of bondholders' rights by causing the "very thing that the covenant was designed to prevent."  *Id.* at 28.  There, the indentures provided that the issuer would not "mortgage or pledge any of its property" unless the obligations under its bonds were secured ratably with the obligations secured by such mortgage or pledge.  *Id.*  The issuer (Ageco) had transferred substantially all its property to a subsidiary (Agecorp), which then issued new bonds without ratably securing the Ageco bonds.  Agecorp bondholders argued that these transactions did not violate the Ageco indenture because there had been no "actual mortgage or pledge of Ageco's properties."  *Id.*  The court noted that it had to "decide between form and substance," *id.*, and applying New York law, the court chose substance.  The court held that the transactions had violated the Ageco covenant because "the result achieved was practically the same as a mortgage or pledge of Ageco's properties"— namely, "impairment of the priority position of the Ageco [bonds]," when the holders of those bonds "were supposed to be protected against any such result by the negative pledge covenant of their indentures."  *Id.* at 29.

143.    Likewise, in *Alleco, Inc. v. IBJ Schroder Bank & Trust Co.*, 745 F. Supp. 1467 (D. Minn. 1989), the district court, applying New York law, found that an indenture provision prohibiting dividends and redemption payments to shareholders unless the issuer met certain financial requirements had been violated by a series of transactions, even though arguably none of them literally took the form of a dividend or redemption by the issuer.  *See id.* at 1474-75

61

& n.5.  The principal shareholder of the issuer (Alleco) had formed a new corporation, which

obtained a $65 million bridge loan and used it to purchase Alleco common stock through a

tender offer.  The new corporation was then merged into Alleco and, the next day, Alleco repaid

the bridge loan.  *See id*. at 1470.  The court found that the series of transactions breached the

indenture because the issuer had effectively distributed $65 million to shareholders without

satisfying the indenture's financial requirements, explaining that if such covenants "are to have

any meaning, the courts must consider the substance of the disputed transaction."  *Id*. at 1475.[28]

144.    Just as the courts in *Sharon Steel*, *Associated Gas*, and *Alleco* rejected literalist

interpretations by issuers that would have permitted transactions contravening the purpose of the

covenants at issue, the Court rejects Services' literalist reading of the term "lease" as applying

only to those who sign the document in question because it would contravene the purpose of the

sale and leaseback covenant here.

145.    The purpose of that covenant is described in the American Bar Foundation's

*Commentaries on Model Debenture Indenture Provisions* (1971), to which courts often look for

guidance on the interpretation of standard indenture provisions.[29]  The *Commentaries* explain

---

[28] To be clear, the holdings in *Sharon Steel*, *Associated Gas*, and *Alleco* were *not*
holdings that the implied covenant of good faith and fair dealing had been violated, but rather
were findings that the written covenants in the indentures were violated.

[29] The Second Circuit and the Delaware Supreme Court have recognized that the ABF's
*Commentaries*, "which New York courts have cited favorably," "provide helpful guidance in
construing indenture provisions," *NML Capital v. Republic of Argentina*, 621 F.3d 230, 241 (2d
Cir. 2010) (internal quotation marks and alteration omitted), and are "powerful evidence of the
established commercial expectations of practitioners and market participants," *In re BankAtlantic
Bancorp, Inc. Litig.*, 39 A.3d 824, 837 (Del. 2012) (internal quotation marks omitted).  *See, e.g.,
In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 139-40 (2d Cir. 2005) (relying on ABF
*Commentaries* to interpret indenture provision); *Elliot Assocs. v. J. Henry Schroder Bank &
Trust Co*., 838 F.2d 66, 71-72 (2d Cir. 1988) (same); *Sharon Steel*, 691 F.2d at 1048-50 (same).

that a covenant restricting sale and leaseback transactions, such as the one here, secures two

important protections for noteholders, namely, to

> (a) prevent property of the borrower needed to carry on its business from being subjected to possible loss through distraint or otherwise for nonpayment of rent, and (b) to prevent the borrower from incurring long-term rental liabilities which may weaken its financial position.

*Id*. at 434-35.[30]

146.    The Transaction here implicates both risks identified by the ABF *Commentaries*, each highly prejudicial to noteholders.  If the sale and leaseback covenant were construed, as Services suggests, not to apply to the Transferor Subsidiaries' long-term, exclusive use and control over the Leased Property, and the long-term rental, maintenance, and other financial obligations borne by the Transferor Subsidiaries to secure that use and control, simply because the Transferor Subsidiaries did not sign the Master Lease, the purpose of the covenant would be wholly undermined.  Such a reading runs directly against "the business purposes sought to be achieved by the parties" to the Indenture, *SR Int'l*, 343 F. App'x at 632, and must be rejected.

147.    First, the Transferred Assets are indisputably "needed to carry on [the Transferor Subsidiaries'] business" and are most certainly "subject[] to possible loss through distraint or otherwise for nonpayment of rent."  The Transferred Assets include the very wires that connect

---

[30] *See also Turner Broad. Sys., Inc. v. CBS, Inc.*, 627 F. Supp. 901, 906 (N.D. Ga. 1985) (in considering certain notes' and a credit agreement's "restrictions on such matters as liens, sales and leasebacks, additional debt, and sales of assets," the court found that "these provisions were to protect the noteholders by insuring that the corporation would have sufficient assets to turn to in the event of a default"); Richard E. Mendales, *The New Junkyard of Corporate Finance: The Treatment of Junk Bonds in Bankruptcy*, 69 Wash. U. L. Q. 1137, 1181 (1991) (restrictive covenants, including "covenants that limit the issuer's rights to engage in sale and leaseback transactions, which encumber property in ways that are often hard to distinguish from secured loans," are aimed at "preventing corporate management from demoting the securities that they protect to more subordinated status, and by generally making payment of the instruments that they protect more certain").

the Transferor Subsidiaries to their customers.  Without them the Transferor Subsidiaries could not provide telecommunications services.  Windstream admits in its SEC filings that one of the "primary risk factors" its business faces is that it could be dispossessed from the Leased Property if there is a default in payment of rent owed on the Master Lease.  (PX-79 at 18; PX-83 at 19.) At the time the Transaction was being planned, Services acknowledged that the lease obligations would be a high priority obligation of Services because the Leased Property is "essential and the only means for WIN to serve clients," and Services would not "have a business and [be able to] to continue to generate cash flows" without access to the Leased Property.[31]  In his deposition in this action, Mr. Gunderman confirmed that it remains the case today that the Transferor Subsidiaries need those assets to operate their businesses and therefore the lease obligations are "one of the company's highest priority cash payments." (Gunderman Dep. at 47:5-19, 51:13-21).

148.    Second, the Transferor Subsidiaries have also been burdened with new "long-term rental liabilities" of at least $5.1 billion that weaken their financial position.[32]  Prior to the Transaction, Services and its Restricted Subsidiaries had incurred $162.4 million in annual interest expense on debt retired in the Transaction, but the Transferor Subsidiaries now must pay more than four times that amount in rent—$654 million annually—in order to continue to use the

---

[31] PX-63 at WIN_00020422 (Q&A prepared by Windstream for prospective lenders to CSL); *see also id.* (admitting that the transferred assets include 87% of Windstream's fiber lines and 82% of its copper lines, which "constitute the last-mile connections into customer premises"); *id*. at WIN_00020421 (admitting that "without making the lease payment, there is no cash flow/value to the Opco").

[32] That is the present value of the Master Lease rent payments as reported in Windstream's financial statements, which use a 10.17% incremental borrowing rate to discount the future rent payments.  As discussed in the LaRue Affidavit, when the present value is calculated using the 6.30% interest rate implicit in lease, as prescribed in the Indenture's definition of "Attributable Debt," the resulting indebtedness is $6.5 billion.  *See* ¶ 95 above; LaRue Aff. ¶ 131 & Ex. 2.

same mission-critical properties they previously owned.[33]  The Transaction thus exposes Noteholders to exactly the risks that the sale and leaseback covenant was intended to protect against:  The Transferor Subsidiaries own fewer assets, they can use property that is their lifeblood only under a lease that may be terminated if payments are not made, and they have been saddled with even greater liabilities than before the Transaction.[34]

149.    Services nonetheless claims that the Transferor Subsidiaries (supposedly) bear no obligations under the Master Lease and have merely "chosen" to spend $654 million annually to fund the rent payments owed.  (Am. Countercls. [PX-130] ¶ 50.)  Nothing about the Transferor Subsidiaries' conduct, however, is voluntary.   Windstream has acknowledged internally and to investors that the subsidiaries are the only Windstream entities capable of meeting the rent obligations (since Holdings generates no revenue of its own), and if they fail to make the rent payments, they will lose access to the network they need to provide service to their customers.[35]

---

[33] *See* PX-76A, Ex. 99.1 at 9, note (N) (noting that annual interest expense related to the $3.5 billion of debt retired in the Transaction was $82.0 + $33.8 + $38.0 + $8.6 = $162.4 million); *see also* PX-83 at F-13 (reporting that total interest expense *increased* by almost $300 million annually, from $571.8 million in the last full year before the Transaction (2014), to $860.6 million in the first full year after the Transaction (2016)).

[34] The prejudice to Noteholders does not stop there.  In the Indenture, Services covenanted to abide by specific limits on the amount of unsecured debt and the amount of secured debt (*i.e.*, "Permitted Liens") it could incur.  (*See* PX-1 at §§ 1.01 (definition of "Permitted Liens"), 4.09, 4.12.)  Under Section 4.19(i)(A)-(B), Attributable Debt from a Sale and Leaseback Transaction counts against both of those limits.  Through the artifice constructed by Services here, Services claims that the $6.5 billion in Attributable Debt related to the Transaction can be excluded from the calculation of those limits, meaning that Services could incur additional secured and unsecured debt in amounts that would exceed the agreed limits by up to $6.5 billion.  Moreover, if allowed to stand, Services could engage in additional sale and leaseback transactions in the same form, thereby incurring arbitrarily high levels of indebtedness and wholly eviscerating the limits in the Indenture.

[35] *See* PX-66 at 16 ("Windstream [Holdings, Inc.] is a holding company with no operations. . . . [T]he individual . . . subsidiaries of WIN Services that contributed the assets . . . will fund the lease payment to CS&L . . . ."); PX-79 at 18 ("We currently lease a significant

As Windstream explained to investors, the lease payments therefore have a "'practical' seniority" over its other debt obligations (including the Notes) because the lease payments must be made in order for it to "have a business and continue to generate cash flows."  (PX-63 at WIN_00020422.)

150.    Nothing about the manner in which the transaction was structured mitigates the increased risk to Transferor Subsidiaries.  That an affiliate (Holdings), rather than the Transferor Subsidiaries, was made the signatory on the Master Lease (whether for "administrative ease" or other reasons) in no way reduces the risks to the Transferor Subsidiaries given that Holdings relies entirely on those entities to meet the obligations imposed by the Master Lease.  This arrangement creates the same risks for Noteholders and imposes the same burdens on the subsidiaries they would have if the Transferor Subsidiaries had signed the Master Lease.

151.    The Court will not construe the term "lease" in a manner that allows the issuer to circumvent the sale and leaseback covenant in Section 4.19 by interposing a holding company— with no operations, which does not and cannot use the Leased Property, and which is "completely dependent" on the Transferor Subsidiaries that do use the Leased Property to fulfill its financial and other obligations under the lease (PX-66 at 16)—as the nominal lessee.  To do so would both (i) impose a formal requirement of signature by the Transferor Subsidiaries that goes beyond the ordinary meaning of "lease" as evidenced by dictionary definitions and (ii) render the covenant ineffectual.  Like the offending transactions in *Sharon Steel*, *Alleco* and

---

portion of our telecommunications network assets . . . under the master lease with CS&L.  Our failure to pay the rent . . . of the master lease would result in an event of default . . . .  Upon an event of default, remedies available to CS&L include terminating the master lease . . ., *dispossessing us from the leased assets*, . . . .  The exercise of such remedies could have a material adverse effect on our business, financial position, results of operations and liquidity." (emphasis added)).

*Associated Gas*, the Transaction here accomplishes "[t]he very thing that the covenant was

designed to prevent," *Associated Gas*, 61 F. Supp. at 28.  Thus, the Court rejects Services

literalist interpretation of "lease," and finds that the Transferor Subsidiaries have leased the

Leased Property under the Master Lease and the Transaction therefore violates Section 4.19.

## B.    Under a Sublease from Holdings

152.    Even if the Court were to reject the Trustee's contention that the Transferor

Subsidiaries lease the Leased Property under the Master Lease and accept Services' contention

that the Transferor Subsidiaries have a right to use the Leased Property with no corresponding

obligations under the Master Lease, the Transferor Subsidiaries would still be found to hold the

Leased Property under a sublease with Holdings.  A sublease from Holdings is necessary for the

Transferor Subsidiaries to have the *exclusive* use and control rights that they represented to the

regulators they would have, and for the Transferor Subsidiaries to sublease access to the property

to third parties as they do.  (*See* ¶¶ 38-46, 74(a)-74(f) above.)  That Holdings and the Transferor

Subsidiaries may not have reduced that sublease to writing is irrelevant,[36] because a sublease is

implied in fact under the circumstances here.

153.    New York law recognizes that the parties' conduct and the surrounding

circumstances can imply in fact a lease between them, even if they never discussed or agreed to

---

[36] Nor is it surprising.  Because Holdings, Services, and the Transferor Subsidiaries are all related parties under common control, and because it is a practical necessity for the entire Windstream business enterprise that the Transferor Subsidiaries use the Leased Property and fulfill all the obligations in respect of the Leased Property, there was no need to reduce the agreement to writing in order to ensure that it would be followed.  Of course, if Holdings and the Transferor Subsidiaries had prepared a written sublease, it would only be even more plain that the Transferor Subsidiaries are leasing the Transferred Assets, and Services' attempt to circumvent the sale and leaseback covenant would never have gotten off the ground.  Services' gambit therefore depended on refraining from memorializing the agreement in writing.

67

such a contract orally or in writing.  As New York's highest court has explained, a "contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the 'presumed' intention of the parties as indicated by their conduct." *Jemzura v. Jemzura*, 36 N.Y.2d 496, 503-04 (1975) (citations omitted).  A contract implied in fact "is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct." *Id*. at 504; *see also Matter of Boice*, 226 A.D.2d 908, 910 (3d Dep't 1996) ("[A]n agreement by conduct does not differ from an express agreement except in the manner by which its existence is established.").

154.    In determining whether an implied-in-fact contract exists, the parties' subjective intent is not at issue; rather, courts must focus on "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399 (1977).  This may include "conduct of the parties recognizing the contract," *Apex Oil Co. v. Vanguard Oil & Serv. Co.*, 760 F.2d 417, 422 (2d Cir. 1985), or any other conduct from which the parties' "assent may fairly be inferred," *Miller v. Schloss*, 218 N.Y. 400, 407 (1916).  In assessing that conduct, "disproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Brown*, 41 N.Y.2d at 399-400.

155.    These tenets apply with equal force to lease contracts.  In the context of landlord and tenant law, implied-in-fact contracts are commonplace, with courts frequently finding leases to exist even though the parties did not agree to the terms of the lease orally or in writing.  In the absence of a written agreement, where an owner (or lessee) of property permits another party to

use or occupy the property and the other party periodically pays rent or assumes other obligations in respect of the property, courts will find an implied lease.[37]

156.    So too here, the evidence compels the conclusion that Holdings and the Transferor Subsidiaries have entered into an implied lease—a contract conveying the right to use property in return for consideration.

157.    The Master Lease expressly allowed Holdings to sublease the Leased Property to its subsidiaries (PX-68 at § 22.2(a)(ii)), and Mr. Fletcher testified that Holdings has given "permission" to the Transferor Subsidiaries to use the Leased Property (Fletcher Dep. 126:17-21) —*i.e.*, Holdings agreed to convey its right of use to the subsidiaries.  Indeed, Holdings knowingly permits the Transferor Subsidiaries not only to use the Leased Property, but to sublease access to the property to third parties.

---

[37] *See, e.g.*, *Carlyle Record Warehouses Corp. v. Scherlo*, 94 Misc. 2d 226, 228-29 (Civ. Ct. 1978) (finding implied five-year lease where "the cumulative performance of the parties including the payment of rent is exclusively referable to the unsigned [five-year] lease"); *Aspen Creek Estates, Inc. v. Kennedy*,  32 A.D.3d 870, 871 (2d Dep't 2006) (occupation of farm for 23 years and payment of rent annually evinced a periodic tenancy); *IBM Corp. v. Stevens & Co.*, 300 A.D.2d 222, 223 (1st Dep't 2002) ("Plaintiff's receipt and retention of defendant's January rent check was properly found to constitute 'acceptance' of rent sufficient to create a month-to-month tenancy[.]"); *Gerolemou v. Soliz*, 184 Misc. 2d 579, 580 (App. Term 2d Dep't 2000) ("In the absence of contravening proof, the law presumes that where there is a general letting with a monthly rent reserved, an indefinite month-to-month tenancy is created."); *28 Mott St. Co. v. Summit Import Corp.*, 34 A.D.2d 144, 146 (1st Dep't 1970) (holding that "the facts clearly imply a year-to-year tenancy" in view of existence of unexecuted 10-year lease, bimonthly payments, a fixed annual sum for certain services, occupation of premises for 6 years, and extensive improvements made by tenant), *aff'd*, 28 N.Y.2d 508 (1971); *Tofel v. Hubbard*, 2017 WL 2828699, at *11 (N.Y. Sup. Ct. June 30, 2017) (in action alleging sublease where monthly rent payments were made, court found "[t]he sublease between the parties was a month-to-month lease," noting that "where there is no writing at all, the lessee's occupancy is on a month to month basis"); *Carlo v. Koch-Matthews*, 53 Misc.3d 466, 471-72 (City Ct. 2016) ("A monthly tenancy is really an implied contract . . . and can continue indefinitely."); 74 N.Y. Jur. 2d *Landlord & Tenant* § 155 ("The general rule is that where a tenant enters into possession without any definite term agreed upon, and a periodic rent is reserved, a periodic tenancy corresponding to the periodic reservation of rent will be implied.").

158.     Further, at the outset of the Transaction, Holdings, Services, and the Transferor Subsidiaries acknowledged in writing that "the individual guarantor and non-guarantor subsidiaries of Win Services that contributed the assets [*i.e.*, the Transferor Subsidiaries] . . . will fund the lease payment to CS&L."  (PX-66 at 16.)  Consistent with that understanding, for the past three years Holdings has received cash generated by the Transferor Subsidiaries equal to the rent due under the Master Lease; the Transferor Subsidiaries' financial statements recognize corresponding "long-term lease obligations" and payments thereunder; and Holdings' financial statements reflect these amounts as "Leasing income from subsidiaries."  (*See* ¶¶ 78-81 above; LaRue Aff. ¶¶ 47-56, 77-80.)  The Transferor Subsidiaries have also spent hundreds of millions of dollars to maintain the Leased Property, to make capital improvements to the Leased Property, and to pay the taxes, utilities, and insurance associated with the Leased Property, as required by the Master Lease.  (*See* ¶¶ 76-77 above.)[38]  Holdings need not fulfill any of these obligations itself, since they are already met by the Transferor Subsidiaries.

159.     Similarly, just as the Holdings and the Transferor Subsidiaries represented to regulators would be the case before they entered into the Transaction, the Transferor Subsidiaries

---

[38] Making capital improvements to, or bearing the costs of maintenance, taxes, or other obligations associated with, the property would constitute consideration for a lease even if the Transferor Subsidiaries were not also funding the rent payments to CSL.  *See, e.g.*, *62 Spruce St. Realty Co. v. Murray*, 62 Misc. 2d 973, 974 (Dist. Ct. Nassau Cnty. 1970) (tenant's payment of taxes owed on the property was sole consideration for lease); *Dilbert Bros. v. Foreman*, 91 N.Y.S.2d 655, 658 (Sup. Ct. Nassau Cnty. 1949) (recognizing that a lifetime lease may exist, despite the absence of a writing, based upon "the improvements erected by the tenant"); *Roedmann v. Hertel*, 78 Misc. 55, 56 (App. Term 2d Dep't 1912) (rejecting landlord's attempt to eject tenant despite that no signed lease existed because "defendant entered into possession and spent considerable money in permanent improvements"); *Greimel v. O'Conor*, 119 N.Y.S. 660, 660 (Sup. Ct. N.Y. Cnty.) (issuing injunction prohibiting landlord from ejecting tenant because capital improvements by tenant supported that unwritten lease existed), *aff'd as modified*, 133 A.D. 887 (1st Dep't 1909).

are fulfilling Holdings' obligation under the Master Lease to cause the Leased Property to be used for its "Primary Intended Use" of providing regulated telecommunications services— something Holdings never could have done given its lack of operations and regulatory authorization.  (*See* ¶¶ 32-33, 63 above.)

160.    These facts—Holdings' permitting the Transferor Subsidiaries to have exclusive use of the Leased Property and their payment of consideration for that use by funding and discharging all of Holdings' obligations under the Master Lease—establish an agreement implied in fact between Holdings and the Transferor Subsidiaries for a sublease of the Leased Property, coterminous with the Master Lease.

161.    Under New York law, such an implied lease is in every sense a binding lease agreement, *see Jemzura*, 36 N.Y.2d at 503-04, thereby obligating the Transferor Subsidiaries to continue to make monthly rent payments as long as they continue to occupy the property, which the Transferor Subsidiaries intend to do as long as the Master Lease is in effect, as indicated to the regulators by Mr. Fletcher.  *See People ex rel. Botsford v. Darling*, 47 N.Y. 666, 666 (1872); *Wolf v. Goodwin*, 120 Misc. 540, 541 (App. Term 1st Dep't 1923) (holding that tenant under unwritten lease "cannot remain in possession and refuse to pay rent" and ordering payment of past due rents).

162.    Because the Transferor Subsidiaries hold the Transferred Assets under a sublease from Holdings, they "lease" the Transferred Assets under the plain and ordinary meaning of the term, and thus have entered into a "Sale and Leaseback Transaction" with respect to the assets they transferred to CSL, in violation of Section 4.19.

C.      **The Transferor Subsidiaries' Funding of the Rent Payments and Their Payment of Maintenance, Tax, and Other Obligations in Respect of the Leased Property Are Consideration for a Lease, Not Dividends**

163.    Services' position that the amounts paid by the Transferor Subsidiaries in respect of the Leased Property are simply dividends to Holdings is incorrect for two reasons.  First, the substance of the arrangement, not the labels that the Windstream entities put on the rent payments to Holdings, is dispositive.  And the substance is that the payments are being made as consideration for the use of the Transferred Assets.  Second, Services entirely ignores the hundreds of millions of dollars that the Transferor Subsidiaries expend on capital improvements, maintenance, taxes, utilities, and insurance for the Leased Property, none of which is paid to Services or Holdings, and all of which constitutes consideration for the Transferor Subsidiaries' exclusive right to use and control the Leased Property.

164.    *Fixed Rent.*  Services contends that the payments of $54.5 million per month (totaling $654 million per annum) provided by the Transferor Subsidiaries to Holdings for the rent due on the Master Lease are "distributions" on equity, not payments on a lease.  (Am. Countercls. [PX-130] ¶ 50.)  As support, Services relies on certain Officer Certificates' delivered by Services to the Trustee purportedly to comply reporting obligations under Indenture Section 4.07(c) and on certain board resolutions, in which Services refers to the amounts transferred to Holdings as "dividend payments" or "distributions."  (*E.g.*, WIN Ex. 26 at WIN_00014946; WIN Ex. 51 at WIN_00012295.)  Those self-serving characterizations are inconsistent with both Services' public admissions and the law.

165.    As a factual matter, no such distributions or dividends are reported in any of Holdings', Services', or the subsidiaries' financial statements.  Instead, Holdings reports the payments received as "leasing income from subsidiaries," and the payments made are charged to

the books of the individual Transferor Subsidiaries (not Services), all consistent with a sublease of the Leased Property from Holdings to the Transferor Subsidiaries.  (*See* LaRue Aff. ¶¶ 77-80.)

166.    In any event, under the law, the labels used by a party are not dispositive of whether an arrangement constitutes a lease.  *See* 74 N.Y. Jur. 2d *Landlord & Tenant* § 8 ("The test for determining what constitutes a lease . . . is not necessarily the descriptive language used" but the "substantive nature of the obligations it imposes and the rights it confers."); *Landlord & Tenant Practice in N.Y.*, *supra*, § 4:12 ("The label used to describe the agreement will not define the nature of the parties' relationship.").

167.    Thus, in interpreting a bond indenture's sale and leaseback definition under New York law, the Eleventh Circuit found that the issuer's subsidiary had "leased" property back from a purchaser of the property because the purchaser "convey[ed] the right to use and occupy the property to [the subsidiary] in exchange for consideration," *In re TOUSA, Inc.*, 598 F. Appx. 761, 767 (11th Cir. 2015) (quoting *Jayne v. Talisman Energy USA, Inc.*, 84 A.D.3d 1581, 1582-83 (3d Dep't 2011) (quoting *Black's Law Dictionary* 907 (8th ed. 2004))), even though the contract governing the transaction was titled "Option Agreement" and even though the monthly consideration paid under the contract was described as "lot option extension fees" rather than as "rent" or "lease payments," *id*.

168.    Similarly, here, the fact that in Officers' Certificates or board resolutions, Windstream labels the Transferor Subsidiaries' payments as "dividends" or "distributions" does not change the fact that the payments are for rent due on the Leased Property.  *See Bowers v. Interborough Rapid Transit Co.*, 121 Misc. 250, 254 (Sup. Ct. 1923), *aff'd*, 208 A.D. 768 (1st Dep't 1924) (rejecting characterization in lease that payments for use of property were "dividends" and holding that such payments were, in fact, rent because "rent is not dependent on

73

earnings"). Indeed, the Officers' Certificates expressly state that the monthly payments—which are exactly 1/12th of the annual rent on the Leased Property—are made to "pay a lease payment to Communications Sales & Leasing" and the financial reports attached to those Officer's Certificates note that the amounts thereby paid "Represent[] payments made to Windstream Holdings ('Holdings') for the Uniti lease payments for the month of ____." (*E.g.*, WIN Ex. 26 at WIN_00014946, WIN_00014948.) Thus, the entities that actually use the Leased Property—the Transferor Subsidiaries—are the entities paying the rent due on the property to Holdings.

169.    Services, nonetheless, suggests that the Court should view the arrangement as one in which Holdings—a holding company with no source of cash other than the subsidiaries— permits the Transferor Subsidiaries to use the Leased Property free of charge, but the Transferor Subsidiaries have simply "chosen" to distribute $654 million a year to Holdings. (Am. Countercls. [PX-130] ¶ 50.) Services has further stated that its subsidiaries have "*historically* made cash distributions to Holdings to fund [the rent] payments" (*id.* (emphasis added)), but that the subsidiaries have "no *obligation*" to do so (*id.* ¶ 47 (emphasis added)), as if to suggest that in the future the subsidiaries may "choose" not to pay the rent to Holdings.

170.    That characterization, especially when viewed against Windstream's corporate structure and its operations, blinks reality. To meet the obligations imposed by the Master Lease, to fulfill their representations to regulators, and to continue to exist as viable businesses, the Transferor Subsidiaries must make the rent payments. They have no choice. Absent rent payments by the subsidiaries, Holdings would have no funds to make those payments, a payment default under the Master Lease would occur, Windstream could be dispossessed of the wires necessary to reach its customers, and its business would collapse.

171.    Instead, as a Windstream internal memorandum concerning the Transaction makes clear, the payments by the Transferor Subsidiaries are not mere happenstance, but rather follow the parties' design and expectation from the inception of the Transaction:  "the individual guarantor and non-guarantor subsidiaries of Win Services that contributed the assets . . . will fund the lease payment to CS&L."  (PX-66 at 16.)

172.    Services is incorrect that the Transferor Subsidiaries that enjoy exclusive use of the Leased Property with the knowledge and consent of the nominal primary lessee Holdings, and that have "historically" (*i.e.*, for each of the last 38 months) remitted monthly rent payments to Holdings (which Holdings has knowingly accepted), have no "obligation" to make rent payments to Holdings.  Under New York law, those facts create a tenancy, and obligate the subsidiaries to continue to pay the rent as long as they continue to use, possess, and occupy the Leased Property.  *Botsford*, 47 N.Y. at 666; *Wolf*, 120 Misc. at 541.  And here, Windstream represented to the state regulators that the Transferor Subsidiaries would continue to use the Transferred Assets throughout the 15-year initial term of the Master Lease and any renewal periods.  (*See* ¶¶ 38, 42-47 above.)

173.    ***Maintenance, capital improvements, and other payments.***  In any event, even if the Court were to find that $654 million a year that the Transferor Subsidiaries provide to Holdings is not "rent" but a "dividend" as claimed by Services, the conclusion that the Transferor Subsidiaries are leasing from Holdings would not change, because it is undisputed that the Transferor Subsidiaries pay for all maintenance expenses, taxes, utilities, insurance, and capital improvements on the Leased Property (*see* ¶¶ 76-77 above), and such expenditures by the

Transferor Subsidiaries are consideration sufficient to support finding a lease.[39]  This is especially so if, as Services contends in this action, the Master Lease obligates only Holdings (and not the Transferor Subsidiaries) to pay these costs, because when a party discharges obligations owed by another, that is sufficient consideration for a contract.  *See* 22 N.Y. Jur. 2d *Contracts* § 110 ("The performance by the promisee of an act that he or she is not legally obligated to perform is sufficient consideration for a promise since it is a legal detriment, irrespective of whether it is an actual detriment or loss to him or her.").

174.    The monies spent by the Transferor Subsidiaries on maintenance and capital improvements do not pass to or through Holdings (*see* Gunderman Dep. 81:6-18); they have never been reported as dividends to Holdings; and Services does not attempt to characterize them as such.  Thus, even leaving the rent payments aside, by making capital improvements to the Leased Property, and discharging maintenance obligations on the Leased Property that Holdings is required to bear under the terms of the Master Lease (*see* ¶ 60 above), the Transferor Subsidiaries are paying consideration for its use, and thus "lease" the Leased Property.[40]

---

[39] *See, e.g.*, *62 Spruce St.*, 62 Misc. 2d at 974 (tenant's payment of taxes owed on property was sole consideration for lease); *Dilbert Bros.*, 91 N.Y.S.2d at 658 (lifetime lease may exist, despite the absence of a writing, based upon "the improvements erected by the tenant"); *Roedmann*, 78 Misc. at 56 (rejecting landlord's attempt to eject tenant despite absence of a signed lease because "defendant entered into possession and spent considerable money in permanent improvements"); *Greimel*, 119 N.Y.S. at 660 (prohibiting landlord from ejecting tenant because capital improvements by tenant supported existence of unwritten lease).

[40] In its pleadings, Services contends that the Transaction would only violate Section 4.19 if the definition of "Sale and Leaseback Transaction" had included the words "directly or indirectly" before the word "lease" or if that definition had provided that the Person leasing back the Transferred Assets includes an affiliate of the transferor.  (*See, e.g.*, Am. Countercls. [PX-130] ¶ 18.)  As stated by Services, that argument is predicated on the supposition that only Holdings, and not the Transferor Subsidiaries, "leases" the Transferred Assets.  (*See id.* ¶¶ 16-18.)  That supposition is incorrect, however, because the Transferor Subsidiaries themselves "lease" the Transferred Assets, as discussed above.

76

## II.   SERVICES IS JUDICIALLY ESTOPPED FROM DENYING THAT THE TRANSFEROR SUBSIDIARIES LEASE THE ASSETS THEY TRANSFERRED TO CSL.

175.     Services and the Transferor Subsidiaries are judicially estopped from denying that the Transferor Subsidiaries are leasing the assets they transferred in light of their sworn testimony and verifications in multiple state regulatory proceedings that, following the Transaction, the Transferor Subsidiaries would "lease" the Transferred Assets back.

176.     "Judicial estoppel prevents a party in a legal proceeding from taking a position contrary to a position the party has taken in an earlier proceeding." *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 71 (2d Cir. 1997) (citation omitted); *accord Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037 (2d Cir. 1993).  "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . ." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *accord Negron v. Weiss*, 2006 WL 2792769, at *3 (E.D.N.Y. Sept. 27, 2006).

177.     Judicial estoppel has two elements:  First, the party against whom the estoppel is asserted took an inconsistent position in a prior judicial or administrative proceeding, and second, that inconsistent position was accepted in some manner by the tribunal in the prior proceeding.  *See Bates*, 997 F.2d at 1038; *Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, 704 F. Supp. 2d 177, 192-93 (E.D.N.Y. 2010); *Negron*, 2006 WL 2792769, at *3.

178.     As the Second Circuit has observed, "[n]umerous decisions have approved the application of judicial estoppel where the prior statements were made in administrative or quasi-judicial proceedings." *Simon*, 128 F.3d at 72 (citations omitted).  The *Simon* case involved a prior proceeding which was administrative in nature, *i.e.*, an application for disability benefits from the Social Security Administration, and statements made in the application process that were inconsistent with later statements in a federal lawsuit.  *Id.* at 69-70; *see also Am. Mfrs.*, 704

F. Supp. at 193 n.17 (statements made to U.S. Department of Housing and Urban Development);

*Zemel v. Horowitz*, 2006 WL 516798, at *5 (Sup. Ct. N.Y. Cnty. Mar. 2, 2006) (statements made

in tax returns) (citing *Estate of Ginor v. Landsberg*, 1998 WL 514304 (2d Cir. June 16, 1998)).

179.    Here, both elements of estoppel are met by Windstream's statements to utilities

regulators in seeking and obtaining approval for the Transaction that the Transferor Subsidiaries

would "lease" the Transferred Assets.

180.    First, contrary to Windstream's position in this litigation that the Transferor

Subsidiaries do not lease the Transferred Assets, Windstream stated explicitly and repeatedly in

the state regulatory proceedings that the Transferor Subsidiaries would "lease" the assets from

CSL after the transfers.  Such statements were directly responsive to the regulators' principal

question in the proceedings, *i.e.*, how could the regulators be assured that the Transferor

Subsidiaries—after transferring their assets—would be able to continue to serve their customers

and fulfill their regulatory obligations?  The answer—from the Transferor Subsidiaries and

Holdings, repeatedly testified to and verified under oath by Services' General Counsel John

Fletcher and CFO Robert Gunderman—included statements that the Transferor Subsidiaries

would "lease" back the assets they transferred.  For example:

- "[The Transferor Subsidiaries] *seek to transfer ownership of certain assets* described in this Application to CSL or one of its wholly owned direct or indirect subsidiaries *and lease them back on an exclusive, long-term basis*." (Application to Alabama Public Service Commission, verified by Windstream General Counsel Fletcher [PX-6] at 3 (emphasis added).)

- "[T]he [Transferor Subsidiaries] seek to effect a transaction in which they would *transfer ownership of certain assets* described in this Application to CSL or one of its wholly owned direct or indirect subsidiaries and *then lease them back on an exclusive, long-term basis* . . . ."  (Application to North Carolina Utilities Commission [PX-25] at 3 (emphasis added).)

- "CSL will neither offer to provide service nor provide any service to the public . . . .  *Instead, it will simply lease the same assets back to a* [Transferor Subsidiary] . . . ."  (*Id.* at 8 (emphasis added).)

78

- "[The Transferor Subsidiaries] seek to transfer ownership of certain assets described in this Application to CSL or one of its wholly owned subsidiaries and *lease them back on an exclusive, long-term basis . . . ."* (Application to Georgia Public Service Commission [PX-10] at ¶ 3 (emphasis added).)

- "CSL will simply own the Subject Assets and *lease them exclusively to the [Transferor Subsidiaries]*." (*Id.* at ¶ 25 (emphasis added).)

- "[C]ertification of CSL is not required by Commission Utility Rule 515-6-1-.16. CSL will not construct, acquire, lease or operate a 'telephone line, plant or system.' If this Rule has any application at all in the Transaction, it requires certification of the *[Transferor Subsidiaries] as Lessees*, not CSL, as Lessor." (*Id.* at ¶ 28 (emphasis added).)

- "Windstream [defined as Holdings] is proposing an intra-corporate transaction (the 'Transaction') in which its business will be divided into two independent units: an operating unit that will continue to provide telecommunications and related services, and a real estate investment trust unit that will hold title to certain distribution plant assets (the 'Subject Assets') and *will lease those assets exclusively to [the Transferor Subsidiaries]* on a long term basis." (Application to West Virginia Public Service Commission [PX-31] at ¶ 2 (emphasis added).)

- "CSL will *lease* all of its right, title and interest in the subject assets *to [the Transferor Subsidiaries] for their long term exclusive use*." (Responses to the Kentucky Public Service Commission's First Request for Information, verified by Windstream Senior Regulatory Counsel Cesar Cabellero [PX-16] at WIN_00003926, WIN_00003928, WIN_00003930 (emphasis added).)

- "After the proposed transfer and pursuant to the terms of the Master Lease, CSL *will have leased all of its rights in the subject assets to the [Transferor Subsidiaries] for their exclusive use* to transmit or convey messages by telephone or telegraph for the public for compensation." (*Id.* at WIN_00003927, WIN_00003931, verified by Gunderman (emphasis added).)

- "*[T]he [Transferor Subsidiaries] will have an exclusive lease agreement* with the REIT [i.e., CSL]." (*Id.* at WIN_00003946, verified by Gunderman (emphasis added).)

- "*CSL will lease on a long term exclusive basis all if [sic] its real estate assets, including poles, to [the Transferor Subsidiaries]*." (Responses to the Kentucky Cable Telecommunication Association's Requests for Information, verified by General Counsel Fletcher [PX-17] at WIN_00003962 (emphasis added).)

- "[T]he REIT (CSL) *will lease to [the Transferor Subsidiaries] on a long term exclusive basis* the real estate assets, including poles." (*Id.* at WIN_00003984, verified by Fletcher (emphasis added).)

- "The assets to be transferred *will be leased back to [the Transferor Subsidiaries]* . . . ." (Responses to the Kentucky Public Service Commission's Post-Hearing Requests, verified by CFO Gunderman [PX-23] at WIN_00004453 (emphasis added).)

181.     Indeed, in sworn testimony, responding to questions from the Kentucky Public Service Commission, Windstream's General Counsel, John Fletcher, assured the Public Service Commission that the Transferor Subsidiaries would "have the necessary assets to continue to provide adequate telecommunication service to Kentucky consumers," because the Transferor Subsidiaries "will have an exclusive long-term *lease* and right – exclusive right to use and occupy all the assets that are within their system today."  (PX-21 at 162:9-19 (emphasis added.)

182.     Second, such statements were accepted by the regulators, as reflected in decisions approving the transfers of the Transferred Assets from the Transferor Subsidiaries to CSL.  For example, the Alabama Public Service Commission explained in its approval order that the Alabama Transferor Subsidiaries "seek to transfer ownership of certain assets described to CSL or one of its wholly owned direct or indirect subsidiaries and *lease them back on an exclusive, long-term basis*."  (PX-7 at WIN_00003272 (emphasis added).)  Similarly, in its order, the North Carolina Utilities Commission stated its understanding, based on Windstream's representations, that the Transferred Assets would be "*leased to the WIN Companies* [*i.e.*, the Transferor Subsidiaries, not Holdings]."  (PX-26 at WIN_00004531 (emphasis added).)

183.     Judicial estoppel applies here because there is a true inconsistency between Windstream's statements made and accepted in the prior regulatory proceedings that the Transferor Subsidiaries would be leasing back the Transferred Assets, and the position taken by Windstream in this case, that the Transferor Subsidiaries are not leasing back the Transferred Assets.  *See Simon*, 128 F.3d at 72-73.  Services cannot reconcile these prior statements and sworn testimony with the statements it now makes to this Court.

Case 1:17-cv-07857-JMF-GWG   Document 174   Filed 06/28/18   Page 91 of 115

184.    In their depositions in this action, Messrs. Fletcher and Gunderman tried to minimize the significance of Windstream's statements and their own sworn testimony in the regulatory proceedings by pointing out that the regulators were also told that Holdings would be the signatory on a Master Lease (though Mr. Gunderman testified to regulators that would be done "just for administrative ease").  But nothing in the Master Lease precludes the conclusion that the Transferor Subsidiaries are leasing back the Transferred Assets, for example, by means of a lease or sublease with Holdings.

185.    Indeed, the Master Lease itself expressly authorizes Holdings to sublease the assets to the Transferor Subsidiaries without prior approval from CSL.  And the regulators were explicitly and repeatedly told that the Transferor Subsidiaries would be leasing back the Transferred Assets.  There is no ambiguity about that.

186.    Thus, having received the benefit of repeated statements and verifications that the Transferor Subsidiaries would be leasing back the Transferred Assets (*i.e.*, Windstream obtained the requested regulatory approvals for the transfers), Services is now estopped from denying that the Transferor Subsidiaries lease the Transferred Assets, even if that new and inconsistent position serves its interests in this lawsuit.

## III.    SERVICES BREACHED THE OBLIGATION OF GOOD FAITH AND FAIR DEALING IMPLICIT IN SECTION 4.19.

187.    Even if (counter to fact) Services was not breaching Section 4.19, Services' actions engineering and effecting the Transaction have breached the covenant of good faith and fair dealing implicit in the Indenture and Section 4.19 by imposing on the Transferor Subsidiaries all the obligations of lessees of the Leased Property.

188.    Under New York law, the Indenture, as a contract, imposes an implied covenant of good faith and fair dealing on Services.  *See Empresas Cablevisión, S.A.B. de C.V. v.*

81

*JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 631 (S.D.N.Y. 2010), *aff'd in relevant part*, 381 F. App'x 117 (2d Cir. 2010). Services may have breached this implied covenant even if it did not breach its express contractual obligations. *See Chase Manhattan Bank, N A. v. Keystone Distribs., Inc.* 873 F. Supp. 808, 815-16 (S.D.N.Y. 1994).

189. The covenant of good faith and fair dealing encompasses a pledge that Services will not take actions that "will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Empresas*, 680 F. Supp. 2d at 631 (internal quotation marks and citations omitted). The scope of the covenant is determined objectively by the expectations of the promisee and encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002) (internal quotation marks and citation omitted); *accord Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (same). When applying the covenant, the language of the contract must be read in the context of the agreement and the parties' intent so as to respect the reasonable expectations of the promisee. *In re LightSquared Inc.*, 511 B.R. 253, 335-36 (Bankr. S.D.N.Y. 2014).

190. Section 4.19 places restrictions on Sale and Leaseback Transactions for the benefit of the Noteholders. It limits the Attributable Debt from a Sale and Leaseback Transaction, requires that cash consideration be equal to the fair market value of the transferred assets, and mandates that sale proceeds be used in a specified manner. Noteholders reasonably expected that Services and its Restricted Subsidiaries (including the Transferor Subsidiaries) would respect the limitations in Section 4.19 and not engage in subterfuges to eviscerate the protections they provided to Noteholders.

82

191.    The Transaction here involved all the risks to Noteholders against which Section 4.19 was designed to protect.  The Transferor Subsidiaries assumed lease obligations creating an amount of Attributable Debt (namely, $6.5 billion) that puts Services far in excess of the Indenture's cap on leverage; they transferred assets with a fair market value (at least $7.45 billion) far in excess of the cash consideration received ($1.035 billion); and the sale proceeds were not applied in accordance with the terms of the Indenture.  (*See* ¶¶ 95-97 above.)  Rather than respect the limitations of Section 4.19, Services and the Transferor Subsidiaries have attempted to avoid its impact by hiding behind the artifice that only Holdings leases the Leased Property because only Holdings signed the Master Lease, even though the Transferor Subsidiaries have all the rights and obligations of a lessee.

192.    The undisputed facts conclusively demonstrate that the Transferor Subsidiaries for all practical purposes lease the Leased Property.  The Transferor Subsidiaries were and are the only members of the Windstream corporate family that can and do use the Leased Property for the purposes specified in the Master Lease.  Only the Transferor Subsidiaries had the regulatory authority and ability to fulfill mandatory tenant obligations under the Master Lease.  Consistent with their status as lessees, the Transferor Subsidiaries have granted rights to third-parties outside the Windstream corporate family to use the Leased Property.  And the Transferor Subsidiaries in fact do fulfill all of the tenant obligations under the Master Lease.  By creating a structure where the Transferor Subsidiaries have exclusive use and control of the Leased Property and discharge and fund all tenant financial and other obligations under the Master Lease, Services either breached the sale and leaseback covenant or deliberately evaded its restrictions so as to breach Services' obligation of good faith and fair dealing.

193.    "Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified . . . [where the actor evades] the spirit of the bargain . . . ."  Restatement (Second) of Contracts § 205 cmt. d (1981); *see also InterDigital Commc'ns Corp. v. Nokia Corp.*, 407 F. Supp. 2d 522, 536 (S.D.N.Y. 2005).  In particular, the implied covenant of good faith and fair dealing protects against Services employing "stratagems" to do through an affiliate what it cannot contractually do itself.  *Standard Chartered Bank v. AWB (USA) Ltd.*, 2010 WL 532515, at *12 (S.D.N.Y. Feb. 16, 2010).  "[T]hat which [defendant] was contractually unable to do itself, it could not accomplish by interposing a sister company . . .  It is not a matter of piercing corporate veils. . . .  It is a matter of requiring a party to a contract to honor the contract and its covenants and not attempt to defeat assigned rights by interjecting an affiliated company."  *Id*. at *14.

194.    Similarly here, where the Transferor Subsidiaries are contractually prohibited from engaging in a sale and leaseback, Services should not be allowed to defeat the Noteholders' contractual rights "by interjecting an affiliated company" (*id*.) (Holdings) to sign the Master Lease, but then imposing upon the Transferor Subsidiaries all the obligations of the lessee.

195.    This case is no different than those where courts have rejected attempted contrivances designed to avoid the substance of restrictions in other complex agreements negotiated by sophisticated parties.  For example, in *LightSquared*, the court found that provisions in a credit agreement prohibiting certain "Disqualified Companies" from buying the debt were intended to prevent the debtor's competitors from buying into the debtor's capital structure.  *See* 511 B.R. at 336.  To avoid this restriction, a principal of a competitor set up a new company to purchase the debt.  While technically compliant with the credit agreement, the court held that the purchase still violated the covenant of good faith and fair dealing.  The facts

84

demonstrated that the principal's newly created entity had not been purchasing the debt merely for the principal's personal account as he had claimed, and but had been doing so on behalf of the competitor. *See id*. at 336-38. The *LightSquared* court rejected the competitor's argument that "if the Credit Agreement does not explicitly prohibit a particular transfer by its express terms, any contrivance or subterfuge to avoid running afoul of those express terms is a-ok." *Id*. at 338. The court concluded "[t]his cannot be correct," *id.*, and held that the competitor and its principal could not use a "guise" to achieve an "end run" around the substance of the restrictions on "Disqualified Companies," *id.* at 339.

196.    Likewise, in *Empresas*, the court found a lender violated the covenant of good faith and fair dealing, and enjoined a transfer that, while in the "guise" of a transaction that was technically compliant with a credit agreement, undermined protections in the credit agreement for the benefit of the borrower. *See* 680 F. Supp. 2d at 631-32. The lender had sought to assign the debt to an affiliate of one of the borrower's competitors, but the credit agreement required the borrower's consent for assignments; the borrower rejected the proposed assignment because it would entitle the competitor to receive confidential information on the borrower and allow the competitor to exert control of over the borrower's business. *Id.* at 628-29. The lender and the competitor affiliate then attempted to achieve the same result through a participation agreement, which did not require the borrower's consent under the credit agreement. *Id.* at 629. While acknowledging that "[s]uperficially" the participation agreement may have been "technically consistent" with the credit agreement, the court held that the lender and competitor had violated the covenant of good faith and fair dealing. *Id.* at 631. Despite taking the form of a participation rather than an assignment, the agreement had "effectuate[d] what is in substance of a forbidden assignment" that undercut what the assignment veto was designed to prevent—competitor

interference with the borrower's business.  *Id*.  "Such an end-run, if not a downright sham, is not permissible if, as here, it does away with the 'fruits' of the contract."  *Id*. at 632.

197.    So too here, Services cannot employ a "guise" to achieve an "end run" around the Noteholder protections in Section 4.19.  Like the challenged transactions in *LightSquared* and *Empresas*, the Transaction undermines contractual provisions intended to protect the Noteholders.  As in *LightSquared*, Services has attempted to interpose an affiliated intermediary—Holdings—to disguise the true nature of the Transferor Subsidiaries' lease of the Leased Property.  And as in *Empresas*, the Court should be suspect of any claims by Services that the Transferor Subsidiaries are merely "beneficiaries" of the Master Lease with "permission" (at no cost) to use the Leased Property, when the arrangement has all the financial and operational consequences of a lease by the Transferor Subsidiaries.

198.    While the covenant of good faith and fair dealing may not be used to negate an express contractual provision permitting the conduct complained of, nothing in the Indenture permits what has happened here—the assumption by the Transferor Subsidiaries of all the obligations of a lessee.  *Compare Kirke La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79, 87 (1933) (implied covenant should apply where "[b]y the terms of the contract, [rights to motion pictures] were neither expressly granted nor expressly excluded"), *and Van Gemert v. Boeing Co.*, 553 F.2d 812, 815 (2d Cir. 1977), *aff'd*, 444 U.S. 472 (1980) (same, where "debentures did not explicitly set forth the type of notice which appellants could expect if Boeing decided to call the bonds"), *with Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983) (implied covenant may not be invoked to impose restrictions on employer's contractual right to terminate at-will employee), *and VTR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F. Supp. 773, 779 (S.D.N.Y. 1969) (same, where contract expressly authorized party to act "in its uncontrolled discretion").

199.    The substance of what Services has done is unmistakable.  It has caused the

Transferor Subsidiaries to transfer away billions of dollars of critical assets needed for their

operations for a fraction of their fair market value, and burdened them with long-term lease

obligations billions of dollars in excess of the limit on indebtedness that the Noteholders agreed

to permit.  In doing so, it has violated all the protections afforded to Noteholders in Section

4.19.  Services cannot hide behind the interposition of Holdings as nominal lessee to deprive

Noteholders of "the fruits of the contract."  *Empresas*, 680 F. Supp. 2d at 632.[41]

## IV.    SERVICES ALSO VIOLATED SECTION 4.07(A)(A) BY PAYING DIVIDENDS TO HOLDINGS WHILE THE DEFAULT UNDER SECTION 4.19 WAS CONTINUING.

200.    Under Indenture Section 4.07(a)(A), when Services is in Default, it is not

permitted to make Restricted Payments.  (PX-1 at 56.)

201.    Under Section 4.07(a)(i), Restricted Payments include distributions by Services or

its subsidiaries to Holdings.  (PX-1 at 55.)

202.    For the reasons set forth above, Services has continuously been in Default of

Section 4.19 since April 24, 2015 because of the Transaction.

203.    Despite the continuing Default under Section 4.19, Services made Restricted

Payments during that time.  Specifically, Services made Restricted Payments in the form of

---

[41] To be clear, the breach of the covenant of good faith and fair dealing here is *not* premised on an argument that having a related party other than the Transferor Subsidiaries lease the Transferred Assets violates the purposes of the sale and leaseback covenant.  The Court need not find that the covenant of good faith and fair dealing expands the scope of the sale and leaseback covenant to cover situations where the transferor and the lessee are not the same entity.  Rather, the breach of good faith and fair dealing derives from having a related party nominally lease the Transferred Assets while the Transferor Subsidiaries actually bear all the burdens of the lease.  In other words, an arrangement that is in substance (but not form) a prohibited lease *by the Transferor Subsidiaries* violates the covenant of good faith and fair dealing.

distributions to Holdings in each quarter since April 24, 2015 through the second quarter of 2017, as reported in Services' publicly filed financial statements.  (Compl. [PX-114] ¶ 89; Am. Ans. [PX-131] ¶ 89.)  Those distributions were made by Services to fund dividend payments and share repurchases by Holdings.  (*See* LaRue Aff. ¶ 99 & citations therein.)

204.     Such violations of Section 4.07(a)(A) constitute additional Defaults under the Indenture.

## V.     SERVICES' DEFAULTS UNDER SECTIONS 4.19 AND 4.07 HAVE NOT BEEN WAIVED BY THE PASSAGE OF TIME.

205.     In its Third Counterclaim, Services seeks a declaratory judgment that any breach of Section 4.19 or 4.07 has been waived by the passage of more than two years between the spin-off and the Default Notice.  (*See* Am. Countercls. [PX-130] ¶¶ 102-107.)  Mere passage of time, however, does not waive a breach of contract.

206.     Waiver is "an an intentional abandonment or relinquishment of a known right or advantage."  *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co*., 946 F.2d 1003, 1009 (2d Cir. 1991) (internal quotation marks and citation omitted).  It "should not be lightly presumed," *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P*., 7 N.Y.3d 96, 104 (2006), and "is not to be inferred from a doubtful or equivocal act," *Echostar Satellite LLC v. ESPN, Inc.*, 79 A.D.3d 614, 617 (1st Dep't 2010) (internal quotation marks and citations omitted).

207.     "Mere silence, oversight or thoughtlessness in failing to object" do not support an inference of waiver.  *Courtney–Clarke v. Rizzoli Int'l Publ'ns, Inc.,* 251 A.D.2d 13, 13 (1st Dep't 1998).  Nor does the passage of time.  *See, e.g.*, *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield*, 448 F.3d 573, 586 (2d Cir. 2006) (declining to find as a matter of law that hospitals claiming to have been underpaid by insurance plan waived those claims by receiving the payments without protest for eight years); *Conn. Mut. Life Ins. Co. v. Wolf*, 1997 WL 597064, at

*1, 3-4 (E.D.N.Y. Sept. 24, 1997) (where as many as four years passed between defendant's

breach of contract and plaintiff's bringing suit, delay did not evince an intentional waiver of

contractual rights).

208.     Services has not identified any intentional act abandoning rights under the

Indenture or acts inconsistent with rights under the Indenture.  What Services complains about is

the passage of time, and the law is clear that cannot sustain a claim of waiver.

## VI.   SERVICES' BREACH OF CONTRACT COUNTERCLAIM AGAINST THE TRUSTEE MUST BE DISMISSED AND IN ANY EVENT NO DAMAGES CAN BE AWARDED ON IT.

209.     In its First Counterclaim, Services asserts a purported cause of action against the

Trustee for breach of contract.  (Am. Countercls. [PX-130] ¶¶ 90-95.)

210.     Services relies on the Third Supplemental Indenture, which was executed on

November 6, 2017 based on what Services represented to be the consent of a majority of the

Noteholders and other documents delivered to the Trustee.  The Third Supplemental Indenture

amends the definitions of "Sale and Leaseback Transaction" and "Attributable Debt" to exclude

the Transaction and states that any Default or Event of Default relating to the Transaction has

been waived.  (*Id*. ¶¶ 82-83.)  The Third Supplemental Indenture arose out of an exchange offer

and consent solicitation conducted by Services following the commencement of this action.

Over objections by Aurelius as to its legality, Services invited holders of other series of notes

issued by Services to exchange those notes for newly issued Notes in the same series held by

Aurelius, on the condition that a majority of Noteholders, including holders of the new Notes,

consented to the Third Supplemental Indenture.  (*See id*. ¶¶ 71-81.)  Through this mechanism,

Services purported to dilute Aurelius's position in the Notes to less than a majority,[42] so as to prevent Aurelius from blocking the execution of the Third Supplemental Indenture or continuing to give directions to the Trustee.  (*See id.* ¶ 88.)

211.   Services asserts that, in light of the execution of the Third Supplemental Indenture and the purported amendments and waivers contained therein, the Trustee has breached the Indenture by not withdrawing its declaratory judgment action against Services.  (*Id.* ¶ 93.)  As relief, Services seeks specific performance in the form of an order compelling the Trustee to dismiss its action with prejudice and damages in the amount of Services' attorney's fees and costs relating to the alleged breach of contract by the Trustee.  (*See id.* ¶¶ 89, 94-95.)

212.   The Trustee has not breached the Indenture, and in any event no such damages could be awarded on Services' counterclaim, for three reasons.

213.   First, the Indenture is effectively a three-way contract among Services, the Trustee, and the Noteholders, defining their respective rights and/or obligations to one another. *See Greenwich Fin. Servs. Distressed Mortg. Fund 3, LLC v. Countrywide Fin. Corp.*, 654 F. Supp. 2d 192, 196-97 (S.D.N.Y. 2009).  The Trustee's discharge of its obligations under the Indenture is subject in some circumstances to demands and instructions from Services, and in some circumstances to demands and instructions from Noteholders.  (*See, e.g.*, PX-1 at § 2.02 (providing that Trustee shall authenticate additional Notes upon receipt of a written order of Services**)** and § 6.05 (providing that holders of a majority in principal amount of Notes shall have the right to direct the Trustee's exercise of its remedies with respect to the Notes).)

---

[42] As of November 6, 2017, immediately prior to the consummation of the exchange offers, Aurelius held $299,459,000 in principal amount of the Notes, 51% of the total $585,747,000 then outstanding.  *See* AX-311.

214.     When the Trustee commenced this action, it did so pursuant to a direction from Aurelius, which at that time held more than 50% of the outstanding Notes, consistent with the terms of the Indenture.

215.     Following the events of November 6, 2017, the Trustee received conflicting demands and instructions from Services and from Noteholder Aurelius.  Services maintains that the Third Supplemental Indenture waives any Default that may have occurred as a result of the Transaction, and it has demanded that the Trustee withdraw its action seeking a declaratory judgment that Services defaulted.  In contrast, Aurelius maintains that the Third Supplemental Indenture and the exchange offer that led to it are invalid and do not waive any Default resulting from the Transaction, and it has demanded that the Trustee continue to maintain and prosecute the Trustee's declaratory judgment action.

216.     Through their respective Counterclaims, Services and Aurelius have put their dispute over the validity and effect of the Third Supplemental Indenture to the Court for its decision.  (*See* Services' Am. Countercls. [PX-130] ¶¶ 82-89; Aurelius' Am. Countercls. [PX-129A] ¶¶ 76-79.)  Indeed, the Third Supplemental Indenture itself expressly acknowledges the possibility of such a legal challenge to its validity, and provides that no waiver of defaults will be deemed to have occurred if a court determines that the consents are invalid.  (*See* WIN Ex. 116 at § 1.04; *see also id*. §§ 2.09 (same), 2.10 (Trustee makes no representations as to validity or sufficiency of consents or supplemental indenture); 2.11 (supplemental indenture does not preclude non-consenting noteholders from challenging validity of consents, waiver or supplemental indenture).)

217.     The Trustee is not required, nor is it in a position, to be the arbiter of the legal dispute between Services and Aurelius over the validity of the consents.  When Services moved

for judgment on the pleadings with respect to the Trustee's claims in reliance on the Third

Supplemental Indenture, the Court denied that motion.  The Trustee is not in breach of its

obligations under the Indenture for awaiting the Court's determination of the dispute between

Services and Aurelius over whether the Third Supplemental Indenture is valid and

effective.  Indenture Section 7.01(c)(iii) provides that the Trustee shall not be liable for any

action it takes or omits to take in good faith in accordance with a direction received by it

pursuant to the Indenture (*see* PX-1 at 80), and there is no basis for concluding, in these

circumstances here, that the Trustee has acted other than in good faith.

218.    Second, under Indenture Section 7.07(b), Services has broadly indemnified the

Trustee (*see* PX-1 at 83), and that indemnity applies to the actions taken by the Trustee that are

the subject of Services' First Counterclaim.  The Trustee's conduct in preserving the Default

claims does not constitute negligence, bad faith, or willful misconduct on the part of the Trustee.

219.    Third, even if the Trustee were in breach of contract (which it is not), the

"damages" sought by Services—its attorney's fees and costs related to the alleged breach—

cannot be awarded.  New York law follows the "American rule," which precludes a prevailing

litigant from recouping legal fees from the losing party "unless an award is authorized by

agreement between the parties, statute or court rule."  *Hooper Assocs. Ltd. v. AGS Computers,*

*Inc.*, 74 N.Y.2d 487, 491 (1989).  For a prevailing party to recover attorney's fees as damages for

breach of contract, the "intent to provide for counsel fees . . . must be 'unmistakably clear' in the

language of the contract."  *Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d

13, 20-21 (2d Cir. 1996) (citations omitted).  Neither the Indenture nor the Third Supplemental

Indenture contains any fee-shifting provision in favor of Services against the Trustee.

Accordingly, no damages in the amount of attorney's fees and costs could be awarded to

Services even if it were to prevail on its breach of contract counterclaim against the Trustee.

## CONCLUSION

220.    For the foregoing reasons, the Trustee is entitled to judgment in its favor:[43]

    A.    Declaring pursuant to 28 U.S.C. § 2201 that

        (1)    in effecting the Transaction and thereafter, Services failed to comply with the covenants set forth in Indenture Section 4.19 restricting Sale and Leaseback Transactions;

        (2)    Services' breaches of Indenture Section 4.19 constitute a Default under Indenture Section 6.01(a)(v);

        (3)    Services also breached Indenture Section 4.07(a)(A) by making distributions to its parent company Holdings while the foregoing Default was continuing, and such additional breaches are also Defaults under Indenture Section 6.01(a)(v);

        (4)    the September 21, 2017 notice of default sent by Aurelius to Services with respect to the foregoing breaches was valid and effective to (and did) trigger commencement of the 60-day cure period provided in Indenture Section 6.01(a)(v);

        (5)    any applicable cure period expired on December 6, 2017;

        (6)    those breaches ripened into Events of Default as defined in the Indenture on December 6, 2017; and

---

[43] With the exception of the Trustee's responses to Services' breach of contract counterclaim against the Trustee and the Trustee's demand for fees and expenses as provided in the Indenture, the Trustee recognizes that it is only entitled to the relief on its Complaint in the event that the Court finds, with respect to the dispute between Aurelius and Services (a dispute in which the Trustee takes no part) that any amendment or waiver effected by or delivered in connection with the Third Supplemental Indenture was not validly obtained in accordance with the Indenture or applicable law, in which case, consistent with Sections 1.04 and 2.09 of the Third Supplemental Indenture, such amendment or waiver shall not be deemed to have occurred. For the avoidance of doubt, however, nothing herein should be construed as the Trustee seeking to invalidate the Third Supplemental Indenture or the 6 3/8% Notes issued in connection therewith.  The Trustee reserves all rights and remedies with respect to any new 6 3/8% Notes issued in November 2017 determined by the Court not to have been validly issued.

(7)   the December 7, 2017 notice of acceleration sent by Aurelius to Services with respect to those Events of Default was valid and effective, and all principal together with all accrued and unpaid interest on the Notes became immediately due and payable as of that date;

B.   As further proper relief pursuant to 28 U.S.C. § 2202, the Trustee is entitled to seek an award of damages in this proceeding based on the declaratory relief awarded, the Indenture, and applicable law;

C.   Dismissing Services' counterclaims against the Trustee with prejudice;

D.   Awarding the Trustee its fees and costs, payable by Services, in accordance with Indenture Section 7.07(b) (the amount of which will be set forth in a post-judgment motion pursuant to Fed. R. Civ. P. 54(d)); and

E.   Granting such other and further relief as the Court deems proper.

Dated: New York, New York
       June 15, 2018

## APPENDIX A

### List of Transferor Subsidiaries

1.  Cavalier Telephone Mid-Atlantic, L.L.C.
2.  Cavalier Telephone, LLC
3.  D&E Communications, LLC
4.  Georgia Windstream, LLC
5.  Intellifiber Networks, LLC
6.  Iowa Telecom Technologies, LLC
7.  IWA Services, LLC
8.  LDMI Telecommunications, LLC
9.  McLeodUSA Information Services, LLC
10. McLeodUSA Purchasing, L.L.C.
11. McLeodUSA Telecommunications Services, L.L.C.
12. Network Telephone, LLC
13. Oklahoma Windstream, LLC
14. PaeTec Communications, LLC
15. PAETEC iTEL, L.L.C.
16. Talk America, LLC
17. Texas Windstream, LLC
18. The Other Phone Company, LLC
19. Trinet, LLC
20. US LEC Communications LLC
21. US LEC of Alabama LLC
22. US LEC of North Carolina LLC
23. US LEC of Pennsylvania LLC
24. Valor Telecommunications of Texas, LLC
25. Windstream Accucomm Telecommunications, LLC
26. Windstream Alabama, LLC
27. Windstream Arkansas, LLC
28. Windstream Cavalier, LLC
29. Windstream Communications, LLC
30. Windstream Communications Kerrville, LLC
31. Windstream Communications Telecom, LLC
32. Windstream Concord Telephone, LLC
33. Windstream D&E Systems, LLC
34. Windstream Florida, LLC
35. Windstream Georgia, LLC
36. Windstream Georgia Communications, LLC
37. Windstream Georgia Telephone, LLC
38. Windstream Iowa Communications, LLC
39. Windstream Iowa-Comm, LLC
40. Windstream IT-Comm, LLC
41. Windstream KDL, LLC
42. Windstream Kentucky East, LLC
43. Windstream Kentucky West, LLC

A-1

44. Windstream Kerrville Long Distance, LLC
45. Windstream Lexcom Communications, LLC
46. Windstream Mississippi, LLC
47. Windstream Missouri, LLC
48. Windstream Montezuma, LLC
49. Windstream Norlight, LLC
50. Windstream North Carolina, LLC
51. Windstream NTI, LLC
52. Windstream NuVox, LLC
53. Windstream NuVox Arkansas, LLC
54. Windstream NuVox Illinois, LLC
55. Windstream NuVox Indiana, LLC
56. Windstream NuVox Kansas, LLC
57. Windstream NuVox Missouri, LLC
58. Windstream NuVox Ohio, LLC
59. Windstream NuVox Oklahoma, LLC
60. Windstream Ohio, LLC
61. Windstream Oklahoma, LLC
62. Windstream Standard, LLC
63. Windstream Sugar Land, LLC
64. Windstream Western Reserve, LLC

A-2

**APPENDIX B**

**List of Agreements by Transferor Subsidiaries**
**Subleasing or Otherwise Granting Rights in the Leased Property**
**to Third Parties After the Execution of the Master Lease**

1.     PX-109.1:  Conduit Occupancy License Agreement between Windstream Alabama, LLC and Crown Castle NG East LLC, dated September 28, 2015

2.     PX-109.3:  Conduit Occupancy License Agreement between Windstream Kentucky East, LLC and Commonwealth of Kentucky, Kentucky Communications Network Authority and the Finance and Administration Cabinet, dated October 13, 2016

3.     PX-109.4:  Sublease Agreement between Windstream North Carolina, LLC and Town of Waxhaw, dated April 13, 2017

4.     PX-109.5:  Conduit License Agreement between Windstream KDL, LLC and Sunesys, LLC, dated November 18, 2015

5.     PX-109.6:  License Agreement No. A-2 to Master Collocation License Agreement between Windstream KDL, Inc. and BCE Nexxia Corporation, dated June 2, 2016

6.     PX-109.8:  Colocation License Order TX-2 between McLeod USA Telecommunications, LLC and Transtelco Inc., dated April 13, 2015

7.     PX-109.8A:  Collocation Agreement between McLeod USA Telecommunications, LLC and Transtelco Inc., dated May 11, 2016

8.     PX-109.9:  Colocation License Order TX-3 between McLeod USA Telecommunications, LLC and Transtelco Inc., dated April 13, 2015

9.     PX-109.10:  Colocation License Order TX-4 between McLeod USA Telecommunications, LLC and Transtelco Inc., dated April 13, 2015

10.    PX-109.11:  Colocation License Order TX-5 between McLeod USA Telecommunications, LLC and Transtelco Inc., dated April 13, 2015

11.    PX-109.12:  License Agreement No. TX-6 between Pactec Business Services and Transtelco Inc., dated May 5, 2015, to the Addendum For Collocation Services

12.    PX-109.14:  License Agreement No. TX-8 between Pactec Business Services and Transtelco Inc., dated May 5, 2015, to the Addendum For Collocation Services

13.    PX-109.15:  License Agreement No. TX-15 between Paetec Business Services and Transtelco Inc., dated November 12, 2015, to the Addendum for Collocation Services

14.    PX-109.16:  License Agreement No. TX-14 between Paetec Business Services and Transtelco Inc., dated November 12, 2015, to the Addendum for Collocation Services

15.    PX-109.17:  Cross Connection License between Windstream KDL, LLC and Transtelco Inc., executed December 16, 2015, Exhibit A-2 to Cross Connection Agreement

16.    PX-109.17A:  Cross Connection Agreement between Windstream KDL, LLC and Transtelco Inc., dated September 23, 2015

17.    PX-109.18:  Cross Connection License between Windstream KDL, LLC and Transtelco Inc., executed December 16, 2015, Exhibit A-3 to Cross Connection Agreement

18.    PX-109.18A:  Memorandum of Understanding between McLeodUSA Telecommunications Services, LLC and Transtelco, Inc., dated August 12, 2016

19.    PX-109.19:  Fiber Exchange Agreement between Windstream KDL, LLC and CenturyLink Communications, LLC, dated January 22, 2016

20.    PX-109.26:  Amendment III to the Reciprocal Indefeasible Right of Use Agreement between McLeodUSA Telecommunications Services, LLC and US Signal Company, LLC, dated June 15, 2016

21.    PX-109.27:  Dark Fiber Lease Agreement between Windstream KDL, LLC and Switch, Ltd., dated May 2, 2016

22.    PX-109.28:  IRU Agreement between Windstream KDL, LLC and MCNC, dated February 5, 2016

23.    PX-109.30:  Exhibit B-1 between Windstream KDL, LLC and Nextra Fibernet, LLC, dated April 4, 2016, to Dark Fiber Lease Agreement

24.    PX-109.30A:  Dark Fiber Lease Agreement between Windstream KDL, LLC and NextEra Fibernet, LLC, dated May 11, 2016

25.    PX-109.31:  Fiber Exchange Agreement between Windstream KDL, LLC and Cincinnati Bell Telephone Company, dated August 3, 2015

26.    PX-109.32:  Dark Fiber Lease Agreement between Windstream KDL, LLC and Cox Communications Inc., dated December 21, 2016

27.    PX-109.33:  First Amendment to the Indefeasible Right of Use Agreement between McLeodUSA Telecommunications Services, LLC and Texas Lone Star Network, dated April 27, 2016

28.    PX-109.34:  Memorandum of Understanding between McLeodUSA Telecommunications Services, LLC and Transtelco, Inc., dated August 12, 2016

29.    PX-109.35:  Exhibit A-2 to the Indefeasible Right of Use Agreement between McLeodUSA Telecommunications Services, LLC and Bestel USA, Inc., dated February 9, 2017

30.    PX-109.36:  Fiber Exchange Agreement between Windstream KDL, LLC and Citynet, LLC, dated August 19, 2015

31.    PX-109.37:  IRU Agreement between Windstream KDL, LLC and Midwest Fiber Networks, LLC, dated May 23, 2016

32.    PX-109.39:  Exhibit A-3 to IRU Agreement between Windstream KDL, LLC and Midwest Fiber Networks, LLC, dated May, 23, 2016

33.    PX-109.41:  Exhibit A-4 to IRU Agreement between Windstream KDL, LLC and Midwest Fiber Networks, LLC, dated May, 23, 2016

34.    PX-109.42:  Exhibit A-5 to IRU Agreement between Windstream KDL, LLC and Midwest Fiber Networks, LLC, dated May, 23, 2016

35.    PX-109.44:  Exhibit A-6 to IRU Agreement between Windstream KDL, LLC and Midwest Fiber Networks, LLC, dated May, 23, 2016

36.    PX-109.45:  Exhibit A-9 to IRU Agreement between Windstream KDL, LLC and Midwest Fiber Networks, LLC, dated May, 23, 2016

37.    PX-109.46:  Exhibit A-10 to IRU Agreement between Windstream KDL, LLC and Midwest Fiber Networks, LLC, dated May, 23, 2016

38.    PX-109.47:  Exhibit A-11 to IRU Agreement between Windstream KDL, LLC and Midwest Fiber Networks, LLC, dated May, 23, 2016

39.    PX-109.48:  Exhibit A-12 to IRU Agreement between Windstream KDL, LLC and Midwest Fiber Networks, LLC, dated May, 23, 2016

40.    PX-109.49:  Exhibit A-13 to IRU Agreement between Windstream KDL, LLC and Midwest Fiber Networks, LLC, dated May, 23, 2016

41.    PX-109.50:  First Amendment to Exhibit A-3 to the IRU Agreement between McLeodUSA Telecommunications Services, LLC and Wisconsin Independent Network, LLC, dated October 17, 2016

42.    PX-109.52:  Fiber Exchange Agreement among Windstream KDL, LLC, CSL Realty, LLC, and Fiberlight, LLC, dated May 16, 2016

43.    PX-109.54:  Interconnection Agreement between Windstream Alabama, LLC and Bandwidth.com CLEC, LLC, dated October 23, 2015

44.    PX-109.55:  Interconnection Agreement between Windstream Alabama, LLC and CenturyLink Communications, LLC, dated April 1, 2016

45.    PX-109.56:  Interconnection Agreement between Windstream Arkansas, LLC and Bandwidth.com CLEC, LLC, dated October 23, 2015

46.     PX-109.57:  Letter Agreement between Valor Telecommunications of Texas,
        Windstream Arkansas, LLC, and Red River Cellular Telephone Corporation, final
        counterpart executed June 5, 2017, adopting Interconnection Agreement

47.     PX-109.58:  Interconnection Agreement between Windstream Florida, Inc. and
        Bandwidth.com CLEC, LLC, dated October 23, 2015

48.     PX-109.59:  Interconnection Agreement between Windstream Florida, LLC &
        CenturyLink Communications, LLC, dated April 14, 2016

49.     PX-109.60:  Letter Agreement between Windstream Florida, Inc. and Sonic Systems,
        Inc., final counterpart executed on July 11, 2016, adopting Interconnection Agreement

50.     PX-109.61:  Interconnection Agreement between Windstream Georgia Communications,
        LLC, Georgia Windstream, LLC, Windstream Georgia, LLC, Windstream Georgia
        Telephone, LLC, Windstream Standard, LLC, Windstream Accucomm
        Telecommunications, LLC, and Bandwidth.com CLEC, LLC, dated October 23, 2015

51.     PX-109.62:  Interconnection Agreement between Windstream Georgia, LLC,
        Windstream Georgia Communications, LLC, Windstream Georgia Telephone, LLC,
        Windstream Standard, LLC, Georgia Windstream, LLC, Windstream Accucomm
        Telecommunications, LLC, and CenturyLink Communications, LLC, dated April 14,
        2016

52.     PX-109.63:  Interconnection Agreement between Windstream Iowa Communications,
        Inc., Windstream Montezuma, Inc., and Integrated Path Communications, LLC, dated
        October 5, 2015

53.     PX-109.64:  Interconnection Agreement between Windstream Iowa Communications,
        Inc., Windstream Montezuma, Inc., and Bandwidth.com CLEC, LLC, dated October 23,
        2015

54.     PX-109.65:  Interconnection Agreement between Windstream Iowa Communications,
        LLC, Windstream Montezuma, LLC, and CenturyLink Communications, LLC, dated
        April 1, 2016

55.     PX-109.66:  Interconnection Agreement between Windstream Iowa Communications,
        LLC Windstream Montezuma, LLC, and MCImetro Access Transmission Services, LLC,
        dated May 9, 2016

56.     PX-109.67:  Interconnection Agreement between Windstream Iowa Communications,
        LLC Windstream Montezuma, LLC, and Teleport Communications America, LLC, dated
        October 12, 2016

57.     PX-109.68:  Interconnection Agreement between Windstream Iowa Communications,
        LLC and Kalona Cooperative Telephone Company, dated December 1, 2016

58.     PX-109.69:  Interconnection Agreement between Windstream Iowa Communications, LLC and Hospers Telephone Exchange, Inc., dated March 1, 2017

59.     PX-109.70:  Interconnection Agreement between Windstream Iowa Communications and Mahaska Communication Group, LLC, dated May 1, 2017

60.     PX-109.71:  Interconnection Agreement between Windstream Kentucky East, LLC, Windstream Kentucky West, LLC, and Bandwidth.com CLEC, LLC, dated October 23, 2015

61.     PX-109.72:  Interconnection Agreement between Windstream Kentucky West, LLC and CenturyLink Communications, LLC, dated April 1, 2016

62.     PX-109.73:  Letter Agreement between Windstream Kentucky West, LLC and Sonic Systems, Inc., final counterpart executed on July 11, 2016, adopting Interconnection Agreement

63.     PX-109.74:  Interconnection Agreement between Windstream Kentucky East, LLC and Integrated Path Communications-Kentucky, LLC, dated August 8, 2016

64.     PX-109.75:  Letter Agreement between Windstream Kentucky East, LLC and Peoples Telecom, LLC, final counterpart executed on August 5, 2016, adopting Interconnection Agreement

65.     PX-109.76:  Interconnection Agreement between Windstream Kentucky East, LLC and Sonic Systems, Inc., dated August 23, 2016

66.     PX-109.77:  Interconnection Agreement between Windstream Mississippi, LLC and Bandwidth.com CLEC, LLC, dated October 23, 2015

67.     PX-109.78:  Interconnection Agreement between Windstream Mississippi, LLC and CenturyLink Communications, LLC, dated April 1, 2016

68.     PX-109.79:  Interconnection Agreement between Windstream Missouri, Inc. and Big River Telephone Company, LLC, dated July 30, 2015

69.     PX-109.80:  Interconnection Agreement between Windstream Missouri, Inc. and Bandwidth.com CLEC, LLC, dated October 23, 2015

70.     PX-109.81:  Letter Agreement between Windstream North Carolina, LLC, Windstream Concord Telephone, LLC, Windstream Lexcom Communications, Inc., and ALEC, LLC, final counterpart executed on July 28, 2015, adopting Interconnection Agreement

71.     PX-109.82:  Interconnection Agreement between Windstream North Carolina, LLC, Windstream Concord Telephone, LLC, Windstream LexCom Communications, LLC, and Bandwidth.com CLEC, LLC, dated October 23, 2015

72.    PX-109.83:  Interconnection Agreement between Windstream Lexcom Communications, LLC and Broadvox-CLEC, LLC, dated April 5, 2017

73.    PX-109.84:  Letter Agreement between Windstream Ohio, LLC, Windstream Western Reserve, LLC, and TSC Communications, Inc., final counterpart executed on February 26, 2016, adopting Interconnection Agreement

74.    PX-109.85:  Interconnection Agreement between Windstream Ohio, LLC and Sigecom, LLC, dated February 9, 2017

75.    PX-109.86:  Letter Agreement between Windstream Oklahoma, LLC and Oklahoma, LLC, and Dobson Technologies – Transport and Telecom Solutions, LLC, final counterpart executed on June 29, 2015, adopting Interconnection Agreement

76.    PX-109.87:  Interconnection Agreement between Valor Telecommunications of Texas, LLC, Windstream Oklahoma, LLC, Oklahoma Windstream, LLC, and Bandwidth.com CLEC, LLC, dated October 23, 2015

77.    PX-109.88:  Interconnection Agreement between Windstream Oklahoma, LLC, Oklahoma Windstream, LLC, and Peerless Network, LLC, dated January 13, 2016

78.    PX-109.89:  Interconnection Agreement between Valor Telecommunications of Texas, LLC, Windstream Oklahoma, LLC, Oklahoma Windstream, LLC, and CenturyLink Communications, LLC, dated April 1, 2016

79.    PX-109.90:  Letter Agreement between Valor Telecommunications of Texas, Windstream Communications Kerrville, LLC, Windstream Sugar Land, LLC, Texas Windstream, Inc., and Grande Communications Networks, LLC, final counterpart executed on April 29, 2015, adopting Interconnection Agreement

80.    PX-109.91:  Letter Agreement between Windstream Communications Southwest, Windstream Sugar Land, LLC, Texas Windstream, LLC and Integrated Path Communications, LLC, final counterpart executed on August 18, 2015, adopting Interconnection Agreement

81.    PX-109.92:  Interconnection Agreement between Valor Telecommunications of Texas and CenturyLink Communications, LLC, dated April 1, 2016

82.    PX-109.93:  Interconnection Agreement between Valor Telecommunications of Texas, LLC and ETEX Communications, LLC, dated July 11, 2016

83.    PX-109.94:  Interconnection Agreement between Texas Windstream, Inc., Valor Telecommunications of Texas, LLC-TX, Windstream Communications Kerrville, LLC, Windstream Sugar Land, Inc. and Sonic Systems, Inc, dated September 19, 2016

84.    PX-109.95:  Letter Agreement between Texas Windstream, Inc., Windstream Sugar Land, Inc., Windstream Communications Kerrville, LLC, and Valor Telecommunications

B-6

of Texas, LLC-TX, and Charter Fiberlink TX-CC, LLC, adopting Interconnection Agreement, final counterpart executed on March 31, 2017

85.    PX-109.96:  Letter Agreement between Valor Telecommunications of Texas, LLC and Mid-Plains Rural Telephone Cooperative Inc., final counterpart executed April 3, 2017, adopting Interconnection Agreement

86.    PX-109.97:  Interconnection Agreement between Valor Telecommunications of Texas and Tularosa Communications, Inc., dated April 24, 2017

87.    PX-109.98:  Interconnection Agreement between Valor Telecommunications of Texas and Broadvox-CLEC, LLC, dated May 26, 2017

88.    PX-109.99:  Pole Attachment License Agreement between Windstream Alabama, LLC and Crown Castle NG East LLC, dated September 28, 2015

89.    PX-109.100:  Wireless Attachment Pole Attachment License Agreement between Windstream Alabama, LLC and Crown Castle NG East LLC, dated July 11, 2016

90.    PX-109.101:  Pole Attachment License Agreement between Windstream Arkansas, LLC and E. Ritter Communications, Inc., dated September 20, 2016

91.    PX-109.102:  Pole Attachment License Agreement between Windstream Arkansas, LLC and Entergy Arkansas, Inc., dated January 6, 2017

92.    PX-109.103:  Pole Attachment License Agreement between Windstream KDL, LLC and Teleport Communications America, LLC, dated January 31, 2017

93.    PX-109.104:  Pole Attachment License Agreement between McLeodUSA Telecommunications Services, LLC and Unite Private Networks, LLC, dated April 29, 2015

94.    PX-109.105:  Pole Attachment License Agreement between McLeodUSA Telecommunications Services and Iowa Network Services, Inc., dated August 6, 2015

95.    PX-109.106:  Pole Attachment License Agreement between Windstream Iowa Communications, Inc. and New London Municipal Utilities, dated October 24, 2016

96.    PX-109.107:  Pole Attachment License Agreement between Windstream KDL, LLC and [REDACTED] LLC, dated May 1, 2017

97.    PX-109.108:  Pole Attachment License Agreement between McLeodUSA Telecommunications Services, LLC and MCC Iowa, LLC, dated May 5, 2017

98.    PX-109.109:  Wireless Attachment Pole Attachment License Agreement between Windstream Iowa Communications, LLC and Network Technology IA, LLC, dated June 5, 2017

99.     PX-109.110:  Pole Attachment License Agreement between Windstream Kentucky East, LLC and Fiber Technologies Networks, L.L.C., dated December 15, 2015

100.    PX-109.111:  Pole Attachment License Agreement between Windstream Kentucky West, LLC and B&B Communications, dated February 10, 2016

101.    PX-109.12:  First Amendment to Pole Attachment License Agreement between Windstream Kentucky East, LLC, the Commonwealth of Kentucky, Kentucky Communications Network Authority and the Finance and Administration Cabinet, dated July 7, 2016

102.    PX-109.113:  Pole Attachment License Agreement between Windstream Kentucky East, LLC, the Commonwealth of Kentucky, Kentucky Communications Network Authority and the Finance and Administration Cabinet, dated July 12, 2016

103.    PX-109.114:  Pole Attachment License Agreement between Windstream Kentucky East, LLC and Fibre One I, LLC, dated October 3, 2016

104.    PX-109.115:  Pole Attachment License Agreement between Windstream Kentucky West, LLC and Extenet Systems, Inc., dated October 11, 2016

105.    PX-109.116:  Wireless Pole Attachment License Agreement between Windstream Kentucky East, LLC and Fiber Technologies Networks, LLC, dated October 31, 2016

106.    PX-109.117:  Pole Attachment License Agreement between Windstream Kentucky East, LLC and East Kentucky Network, LLC, dated February 14, 2017

107.    PX-109.118:  Pole Attachment License Agreement between Windstream Kentucky East, LLC and Bluegrass Network LLC, dated February 22, 2017

108.    PX-109.119:  Wireless Attachment Pole Attachment License Agreement between Windstream Kentucky East, LLC and KY Backhaul Transmission Networks, LLC, dated July 7, 2017

109.    PX-109.120:  Wireless Attachment Pole Attachment License Agreement between Windstream Kentucky East, LLC and New Cingular Wireless PCS, LLC, dated September 15, 2017

110.    PX-109.121:  Pole Attachment License Agreement between Windstream Concord Telephone Inc. and Level 3 Communications, LLC, dated July 9, 2015

111.    PX-109.122:  Pole Attachment License Agreement between Windstream North Carolina, LLC and BellSouth Communications, LLC, dated November 9, 2015

112.    PX-109.123:  Pole Attachment License Agreement between Windstream North Carolina, LLC and Fiber Technologies Networks, LLC, dated February 17, 2016

113.   PX-109.124:  Wireless Attachments Pole Attachment License Agreement between Windstream North Carolina, LLC and Fiber Technologies Networks, LLC, dated July 21, 2016

114.   PX-109.125:  Wireless Attachment Pole Attachment License Agreement between Windstream North Carolina, LLC and Mobilitie, LLC, dated July 26, 2017

115.   PX-109.126:  Wireless Attachment Pole Attachment License Agreement between Windstream Concord Telephone, LLC and Mobilitie, LLC, dated July 26, 2017

116.   PX-109.127:  Pole Attachment License Agreement between Windstream Western Reserve, Inc. and Keps Technologies, dated July 2, 2015

117.   PX-109.128:  Pole Attachment License Agreement between Windstream Western Reserve, Inc. and Level 3 Communications, LLC, dated March 2, 2016

118.   PX-109.129:  Pole Attachment License Agreement between Windstream Western Reserve, Inc. and Jefferson Co. Cable, Inc., dated March 30, 2016

119.   PX-109.130:  Joint Pole Attachment Agreement between Windstream Ohio, LLC and Paulding Putnam Electric Cooperative, Inc., dated May 23, 2016

120.   PX-109.131:  Wireless Attachment Pole Attachment License Agreement between Windstream Ohio, LLC and OH Exchange Facilities Networks, LLC, dated September 5, 2017

121.   PX-109.132:  Pole Attachment License Agreement between Oklahoma Windstream, LLC and Dobson Technologies – Transport and Telecom Solutions, LLC, dated January 6, 2016

122.   PX-109.133:  Pole Attachment License Agreement between Valor Telecommunications of Texas, LLC and Grande Communications Networks, LLC, dated July 1, 2015

123.   PX-109.134:  Pole Attachment License Agreement between Valor Telecommunications of Texas, LLC and Mountain Zone Cable TV, dated April 25, 2016

124.   PX-109.135:  Pole Attachment License Agreement between Valor Telecommunications of Texas, LLC and Kerrville Public Utility Board, dated January 1, 2017

125.   PX-109.136:  Pole Attachment License Agreement between Valor Telecommunications of Texas and TDS Broadband Services LLC, dated March 23, 2017