UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
                                                                    :
U.S. BANK NATIONAL ASSOCIATION, solely in its                       :
capacity as indenture trustee of Windstream Services,               :
LLC's 6 3/8% Senior Notes due 2023,                                 :
                                                                    :
                          Plaintiff-Counterclaim Defendant,         :
                                                                    :
                  -v-                                               :
                                                                    :
WINDSTREAM SERVICES, LLC,                                           :
                                                                    :
                  Defendant-Counterclaimant-                        :            17-CV-7857 (JMF)
                  Counterclaim Defendant,                           :
                                                                    :        FINDINGS OF FACT AND
                  -v-                                               :        CONCLUSIONS OF LAW
                                                                    :
AURELIUS CAPITAL MASTER, LTD.,                                      :
                                                                    :
                  Counterclaim Defendant-                           :
                  Counterclaimant,                                  :
                                                                    :
--------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       This case arises out of an intricate set of legal and financial maneuvers by Windstream

Services, LLC ("Services"), a holding company for subsidiaries that provide telecommunications

services throughout the United States.  Counterclaim-Defendant and Counterclaimant Aurelius

Capital Master, Ltd. ("Aurelius") is a hedge fund that holds a large position in certain notes

issued by Services —  specifically, senior unsecured notes due 2023, bearing interest at an

annual rate of 6 3/8% (the "Notes").  The case began in October 2017 when Aurelius, exercising

authority by virtue of its controlling position in the Notes, directed U.S. Bank National

Association (the "Trustee") to file suit in its capacity as indenture trustee, alleging that Services

had breached a covenant in the governing bond indenture that restricts sale and leaseback

transactions.  The gravamen of the Trustee's claim was that a complex financial transaction —

pursuant to which certain subsidiaries of Services (the "Transferor Subsidiaries") transferred assets to a real estate investment trust, which then leased the assets to Services' parent holding company, Windstream Holdings, Inc. ("Holdings"), which in turn allowed the Transferor Subsidiaries to use and occupy the assets — constituted an impermissible "Sale and Leaseback Transaction" within the meaning of the Notes' indenture. That default, if uncured, would then trigger an acceleration provision in the indenture that would make the Notes' entire aggregate principal amount, plus any unpaid interest, due immediately.

Services responded to that claim in two ways. First, outside the courtroom, it announced an elaborate series of exchange offers and consent solicitations that, together, were designed, first, to dilute Aurelius's voting interests and, second, to obtain a waiver of any default arising from the alleged Sale and Leaseback Transaction from a new majority of Noteholders created through the exchange offers. In the process, Services increased its total indebtedness by about $40 million. Second, Services brought counterclaims against the Trustee and Aurelius, seeking (among other things) a judicial declaration that it did not breach the bond indenture through the an impermissible Sale and Leaseback Transaction as defined in the Indenture. In the wake of those moves, Aurelius brought counterclaims of its own, seeking, in essence, both a declaration that Services was in default — despite its efforts to secure a waiver — and a money judgment for the aggregate principal amount of its Notes plus interest.

The Court held a bench trial in July 2018, with direct testimony taken largely by affidavit. For the reasons that follow, the Court finds, by a preponderance of the evidence, that Services violated the Indenture by engaging in an impermissible Sale and Leaseback Transaction and that its subsequent maneuvers did not waive or cure the default arising from that breach. Aurelius is therefore entitled to the relief it seeks.

## FACTUAL FINDINGS

Many, if not most, of the facts relevant to resolving this case are not in dispute.  In any event, pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact based on the testimony and exhibits at trial.[1]

### A.  The Notes and the Indenture

On January 23, 2013, Services issued senior unsecured notes guaranteed by certain of its subsidiaries in an aggregate principal amount of $700 million.  PX-1 ("Indenture"); *see also* Docket No. 1 ("Compl.") ¶ 22; Docket No. 91 ("Am. Ans.") ¶ 22.[2]  The Notes, due August 1, 2023, bear interest at an annual rate of 6 3/8%.  They are governed by the Indenture, a lengthy and "complex document that resulted from arms-length negotiations between a number of sophisticated parties and their counsel."  DX-190 ("Fletcher Aff."), ¶ 44.  The Indenture, which is subject to New York law, *see* Indenture § 12.08, includes restrictive covenants, several of which are relevant to this case.  The most pertinent is Section 4.19, which prohibits Services and its "Restricted Subsidiaries" (a category that, all parties agree, includes the Transferor Subsidiaries) from engaging in a "Sale and Leaseback Transaction" unless three conditions, the details of which are not relevant here, are met.  Indenture § 4.19.  Section 1.01, in turn, provides that Sale and Leaseback Transaction "means, with respect to any Person" — a defined term that includes "any individual, corporation, partnership, . . . or other entity," *id.* § 1.01, at 22 — "any transaction involving any of the assets or properties of such Person whether now owned or

---

[1]      The Court ruled on most of the parties' objections to testimony and exhibits at trial.  To the extent that the Court cites in this Opinion to any evidence to which a party objected, the objection is overruled.  The Court need not and does not resolve the remaining objections.

[2]      "PX-[Number]" refers to a Plaintiff's (i.e., Trustee's) Exhibit; "DX-[Number]" refers to a Defendant's (i.e., Services') Exhibit;  "AX-[Number]" refers to an Aurelius Exhibit; "Tr. [Number]" refers to a page or pages of the trial transcript; "[Name] Aff." refers to trial testimony submitted by affidavit; and "[Name] Dep." refers to a deposition admitted into evidence in part.

3

hereafter acquired, whereby such Person sells or otherwise transfers such assets or properties and

then or thereafter leases such assets or properties or any part thereof or any other assets or

properties which such Person intends to use for substantially the same purpose or purposes as the

assets or properties sold or transferred." *Id.* § 1.01, at 24.

Several other provisions of the Indenture are highly relevant here as well.  First, Section

2.02 provides that Services "may, subject to Article Four of this Indenture and applicable law,

issue Additional Notes under this Indenture, including Exchange Notes." *Id.* § 2.02.  Second,

"Additional Notes" are defined, in turn, to mean "an unlimited maximum aggregate principal

amount of Notes (other than the Notes issued on the date hereof) issued under this Indenture in

accordance with Sections 2.02 and 4.09 and having the same terms in all respects as the Notes, or

similar in all respects to the Notes, except that interest will accrue on the Additional Notes from

their date of issuance." *Id.* § 1.01, at 1.  Third, Section 4.09 generally precludes Services and its

Restricted Subsidiaries from incurring "any Indebtedness" that would cause Services to exceed a

"Consolidated Leverage Ratio" of 4.5 to 1, unless it constitutes "Permitted Refinancing

Indebtedness." *Id.* § 4.09; *see also id.* § 1.01, at 7-8 (defining "Consolidated Leverage Ratio").

To the extent relevant here, Permitted Refinancing Indebtedness is then defined, in turn, to mean

> any Indebtedness of the Company or any of its Restricted Subsidiaries issued in
> exchange for, or the net proceeds of which are used to extend, refinance, renew,
> replace, defease or refund other Indebtedness of the Company or any of its
> Restricted Subsidiaries (other than intercompany Indebtedness); *provided* that . . .
> the amount of such Permitted Refinancing Indebtedness does not exceed the
> amount of the Indebtedness so extended, refinanced, renewed, replaced, defeased
> or refunded (plus all accrued and unpaid interest thereon and the amount of any
> reasonably determined premium necessary to accomplish such refinancing and
> such reasonable expenses incurred in connection therewith); . . . .

*Id.* § 1.01, at 22.  Finally, the definition of "Indebtedness" provides that "[t]he amount of any

Indebtedness outstanding as of any date . . . shall be . . . the principal amount" of all obligations,

"together with any interest thereon that is more than 30 days past due." *Id.* § 1.01, at 14.

**B.  The Origins of the 2015 Transaction**

The Trustee's claims stem from a set of transactions Services and affiliated entities

undertook in 2015 (the "2015 Transaction").  The roots of the 2015 Transaction, however, date

back to 2013.  On August 30th of that year, in order to provide "greater flexibility with respect to

future strategic actions," PX-37, at WIN_00012382, the Services Board approved the formation

of a new parent holding company, Windstream Holdings, Inc. ("Holdings"), *see* PX-74, at 33.

Holdings and Services shared the same address, the same officers, and the same directors;

indeed, Holdings had no other employees or operations of its own. *See id.* at 1, 33.  Around the

same time, the Services Board began to consider forming a real estate investment trust ("REIT")

to "hold and lease certain of Services' (and its subsidiaries') telecommunications properties,"

purportedly to improve the company's financial flexibility, attract investment, and improve tax

and cash flow efficiency.  Fletcher Aff. ¶¶ 13-14; *see* PX-35.  According to the plan, subsidiaries

of Services — the Transferor Subsidiaries — would transfer critical assets, including 300,000

miles of copper wires and fiber optic cables, to the REIT, which would then lease them back to

Holdings.  The Transferor Subsidiaries would continue to use and occupy the assets as before

and fulfill all obligations toward the assets, including maintenance and tax payments and capital

improvements. *See* Tr. 45-46, 251-53, 259.  The Transferor Subsidiaries — which, together,

account for approximately eighty percent of Windstream's total annual revenue, *see* PX-200

("LaRue Aff."), Ex. 1 — would also fund the rent owed on the lease by making payments to

Holdings, *see* Tr. 153-54, 170, 253.

Between July and December 2014, Services and the Transferor Subsidiaries sought and

obtained advanced approval for the transaction from various state utilities regulators. *See, e.g.*,

Fletcher Aff. ¶¶ 25, 33-34; DX-193 ("Gunderman Aff."), ¶¶ 18-22.  In particular, in applications

to at least nine state utilities regulators, the Transferor Subsidiaries (sometimes joined by Holdings) described the 2015 Transaction and sought approval for it (or a ruling that no approval was needed).  *See* PX-6; PX-8; PX-10; PX-11; PX-12; PX-15; PX-16; PX-17; PX-21; PX-23; PX-25; PX-27; PX-30; PX-31.  Windstream disclosed to the regulators that there would be a master lease signed by Holdings, but stressed that that was "*just for administrative ease* in terms of transacting — transacting the lease between the entities . . . for the benefit of the operating subsidiaries of Windstream."  PX-21 at WIN_00003706 (emphasis added); *see also* Tr. 248-49.  Windstream repeatedly assured the regulators that, after the Transferor Subsidiaries transferred the assets, the Transferor Subsidiaries would have "exclusive" and "long-term" "usage rights" and "control" over the same assets.  *See* PX-6, ¶ 28 (Alabama); PX-10, ¶ 31 (Georgia), PX-11, ¶ 13 (Indiana), PX-15, ¶ 21 (Kentucky); PX-27, at WIN_00004569 (Ohio); *see also* PX-17, at WIN_00003961 (Kentucky) ("Under the terms of the Master Lease, the [Transferor Subsidiaries] will have long term exclusive control of the assets . . . .").  Further, Windstream repeatedly represented that the Transferor Subsidiaries would have the same obligations with respect to the assets, including responsibility for operations, capital improvements, and maintenance.  *See* PX-15, ¶ 44 (Kentucky); *accord* PX-6, ¶ 3 (Alabama); PX-10, ¶ 29 (Georgia); PX-11, ¶ 5 (Indiana); PX-27 at WIN_00004570 (Ohio); PX-30 at WIN_00004763 (Pennsylvania).  In these and other ways, Windstream sought to reassure the regulators that the 2015 Transaction was expected to be "virtually invisible," PX-6, ¶ 2, and "seamless," PX-31, ¶ 4, to customers.

Most significant for present purposes, the Transferor Subsidiaries repeatedly stated to the state regulators that, after transferring the assets to the proposed REIT, they would then "lease" the assets back from the REIT.  *See, e.g.*, Tr. 15-16.  For example:

- "[The Transferor Subsidiaries] *seek to transfer ownership of certain assets* described in this Application to [the REIT] or one of its wholly owned direct or indirect subsidiaries *and lease them back on an exclusive, long-term basis*."  PX-6, ¶ 1 (Alabama) (emphasis added).

- "[T]he [Transferor Subsidiaries] seek to effect a transaction in which they would *transfer ownership of certain assets* described in this Application to [the REIT] or one of its wholly owned direct or indirect subsidiaries and *then lease them back on an exclusive, long-term basis . . . ."*  PX-25, ¶ 1 (North Carolina) (emphasis added).

- "[The REIT] will neither offer to provide service nor provide any service to the public . . . .  *Instead, it will simply lease the same assets back to a* [Transferor Subsidiary] . . . ."  *Id.* ¶ 5 (emphasis added).

- "[The Transferor Subsidiaries] seek to transfer ownership of certain assets described in this Application to [the REIT] or one of its wholly owned subsidiaries and *lease them back on an exclusive, long-term basis . . . ."*  PX-10, ¶ 3 (Georgia) (emphasis added).

- "[The REIT] will simply own the Subject Assets and *lease them exclusively to the* [*Transferor Subsidiaries*]."  *Id.* ¶ 25 (emphasis added).

- "[C]ertification of [the REIT] is not required by Commission Utility Rule 515-6-1-.16.  [The REIT] will not construct, acquire, lease or operate a 'telephone line, plant or system.'  If this Rule has any application at all in the Transaction, it requires certification of the [*Transferor Subsidiaries*] *as Lessees*, not [the REIT], as Lessor."  *Id.* ¶ 28 (emphasis added).

- "[Holdings] is proposing an intra-corporate transaction . . . in which its business will be divided into two independent units:  an operating unit that will continue to provide telecommunications and related services, and a real estate investment trust unit that will hold title to certain distribution plant assets . . . and *will lease those assets exclusively to [the Transferor Subsidiaries]* on a long term basis."  PX-31, ¶ 2 (West Virginia) (emphasis added).

- "[The REIT] will *lease* all of its right, title and interest in the subject assets *to* [*the Transferor Subsidiaries*] *for their long term exclusive use*."  PX-16, ¶ 1(a) (Responses to the Kentucky Public Service Commission's First Request for Information, verified by Windstream Senior Regulatory Counsel Cesar Cabellero) (emphasis added).

- "After the proposed transfer and pursuant to the terms of the Master Lease, [the REIT] *will have leased all of its rights in the subject assets to the* [*Transferor Subsidiaries*] *for their exclusive use* to transmit or convey messages by telephone or telegraph for the public for compensation."  *Id.* ¶ 1(c) (verified by Holdings Senior Vice President / Treasurer Robert Gunderman) (emphasis added).

- "[T]he [Transferor Subsidiaries] will have *an exclusive lease agreement* with the REIT." *Id.* ¶ 12 (verified by Gunderman) (emphasis added).

- "[*The REIT*] *will lease on a long term exclusive basis all if* [sic] *its real estate assets, including poles, to* [*the Transferor Subsidiaries*]." PX-17, ¶ 3 (Responses to the Kentucky Cable Telecommunication Association's Requests for Information, verified by Holdings Executive Vice President, Secretary and General Counsel John P. Fletcher) (emphasis added).

- "[T]he REIT . . . *will lease to* [*the Transferor Subsidiaries*] *on a long term exclusive basis* the real estate assets, including poles." *Id.* ¶ 22 (emphasis added).

- "The assets to be transferred *will be leased back to* [*the Transferor Subsidiaries*] . . . ." PX-23 at Request No. 6, WIN_00004453 (Responses to the Kentucky Public Service Commission's Post-Hearing Requests, verified by Robert E. Gunderman) (emphasis added).

Based on these and other representations, the regulators granted approval to the asset transfers. For example, in its Order granting the Transferor Subsidiaries' application, the Alabama Public Service Commission described the transaction as one in which the Transferor Subsidiaries "seek to transfer ownership of certain assets described in its Petition . . . to [the REIT] or one of its wholly owned direct or indirect subsidiaries and *lease them back on an exclusive, long-term basis*." PX-7, at WIN_00003272 (emphasis added). Similarly, in its approval Order, the North Carolina Utilities Commission stated that, "[u]nder the terms of the Master Lease," the Transferor Subsidiaries "will have exclusive rights to the transferred assets," PX-26, at 4, and noted that "the Applicants request that the Commission declare that . . . [the REIT] does not fit within the definition of a public utility . . . because it would neither construct nor operate facilities *leased to the* [*Transferor Subsidiaries*]," *id.* at 8 (emphasis added).

## C. The 2015 Transaction

On July 29, 2014 Services announced its plan to split the "business into two distinct publicly traded companies." Fletcher Aff. ¶ 25. And on March 25, 2015, Services' and Holdings' Boards each approved the creation and spin-off of a REIT. *Id.* ¶ 29; DX-49. The next

day, Holdings and Services entered into a Separation and Distribution Agreement, pursuant to which Services transferred to that REIT — a wholly owned subsidiary called Communications Sales & Leasing, Inc. and its subsidiaries (together, "CS&L")[3] — various telecommunications assets, including fiber optic and copper cable lines; office land and buildings; rights to certain permits, agreements, and easements; and a local exchange carrier business (the "Transferred Assets"). Fletcher Aff. ¶¶ 8-9; *see* DX-185. The Transferred Assets included substantial and critical parts of Windstream's network in thirty-seven states and the District of Columbia; indeed, in a document Windstream prepared shortly before the spin-off, it described them as "essential and the only means for [Windstream] to serve clients," and it noted that continued access to the Transferred Assets was essential for Windstream "to have a business and continue to generate cash flows." PX-63, at WIN_00020422. In return for the Transferred Assets, Services received all of CS&L's common stock, $1.035 billion in cash, and $2.5 billion in debt comprised of term loans and unsecured notes. Fletcher Aff. ¶ 10; *see* DX-185. The very same day, Services transferred 80.4% of CS&L's common stock to Holdings, and Holdings distributed those shares to Holdings' stockholders, at which time CSL's stock became publicly traded. Compl. ¶ 46; Am. Ans. ¶ 46.[4]

Pursuant to the Separation and Distribution Agreement, Holdings and a number of CS&L subsidiaries signed a master lease dated April 24, 2015. PX-68 (the "Master Lease"). The Master Lease defines the "Tenant" as Holdings "together with its permitted successors and assigns." *Id.* at 1. It gives Holdings the exclusive right to use the Transferred Assets (defined as

---

[3]     In 2017, CS&L was renamed Uniti Group, Inc. *See* DX-191 ("Eichler Aff."), ¶ 5; Fletcher Aff. ¶ 8. To avoid confusion, the Court refers to the entity throughout as CS&L.

[4]     Services retained the remaining 19.6% of CS&L's stock. PX-66, at 3. In June 2016, it used the stock to pay down $672 million owed under Services' revolving credit facility. PX-83, at 13. As of June 2016, therefore, CS&L was wholly owned by public shareholders.

the "Leased Property") for fifteen years, with options to extend the term up to a total of thirty-five years.  *Id.* § 1.3.  More specifically, Section 7.2(a) of the Master Lease — titled "Use of the Leased Property" — provides that, "[t]hroughout the Term of this Master Lease, Tenant shall have the exclusive right to use, or cause to be used, the Leased Property."  *Id.* § 7.2(a), at 36.  It further provides that "any of Tenant's Subsidiaries," including the Transferor Subsidiaries,

> shall have the right to use, occupy and operate the Leased Property subject to and in accordance with the terms of this Master Lease and such Subsidiaries shall have the right to discharge any or all of Tenant's obligations (maintenance or otherwise) hereunder on behalf of Tenant.

*Id.*  Section 22.2(ii) also provides that Holdings may assign the Master Lease or sublease the Transferred Assets, without CS&L's prior consent, to any of its subsidiaries.  *Id.* § 22(i), at 73.

To the extent relevant here, the Master Lease imposes a number of obligations on the "Tenant."  First, it requires the "Tenant" to "continuously operate each of the Facilities" comprising the Leased Property in accordance with their "Primary Intended Use."  *Id.* § 7(d).  "Primary Intended Use" is defined, in turn, to include "[t]he provision, routing and delivery of voice, data, video, data center, cloud computing and other communication services" — in essence, telecommunications services.  *Id.* § 2.1, at 23.  Second, Section 36.4 of the Master Lease provides that all "carrier of last resort" obligations — that is, obligations under federal and state law to provide certain telecommunications services to customers, *see* 47 U.S.C. §§ 214(a) & (e) — "shall remain obligations solely of the Tenant."  *Id.* § 36.4, at 96.  Similarly, Section 36.1(b) refers to the "Tenant" providing services to customers and to the Tenant's "customer relationship[s]."  *Id.* § 36.1(b), at 93.  Finally, the Master Lease requires the "Tenant" not only to pay fixed rent, but also to maintain, repair, and pay for taxes, utilities, and insurance, on the Leased Property.  *Id.* § 3, at 28 (rent); § 4.1, at 30-32 (taxes); § 4.2, at 32 (utilities); § 9, at 39-44 (maintenance and repair); § 13, at 51-57 (insurance).  Rent was initially set at $650 million per

year (and increased to $653.5 million during the first year of the lease), payable in monthly installments, with annual increases of 0.5% per year beginning with the fourth year of the term. *Id*. at 25; PX-83, at F-5.  The Master Lease provides that all capital improvements paid for by the "Tenant" to maintain, repair, overbuild, upgrade, or replace the Leased Property "shall automatically become part of the Leased Property" — that is, property of CS&L, the owner of the Leased Property.  *Id.* § 10.2(c), at 46.

Notably, although Holdings' counterparties on the Master Lease were the CS&L subsidiaries, the Master Lease was not negotiated at arm's length.  *See* Tr. 92-93.  Indeed, the parties to the Master Lease could not have negotiated the Master Lease at arm's length because CS&L did not even exist until the 2015 Transaction was implemented.  Thus, the Master Lease — like the rest of the 2015 Transaction — was designed and drafted within and by Windstream. *See* Tr. 92-93.  Windstream decided that Holdings would be the sole Windstream signatory on the Master Lease and that none of the Transferor Subsidiaries would sign the agreement.  At trial, Services' former General Counsel, John Fletcher, admitted that one reason that Holdings was the only Windstream entity to sign the Master Lease was to avoid "a clear violation" of the Indenture.  Tr. 123, 131-32, 269.  That is, Services understood and believed at the time that if the Transferor Subsidiaries signed the Master Lease and thus leased back the property they had transferred to CS&L, the 2015 Transaction would have indisputably constituted a Sale and Leaseback Transaction prohibited by Section 4.19 of the Indenture.

**D.  The Aftermath of the 2015 Transaction**

Since the closing of the 2015 Transaction, the Transferor Subsidiaries have continuously possessed and operated the Transferred Assets in carrying on their business as regulated telecommunications service providers.  Indeed, Services concedes that, since the Master Lease

was signed, *only* the Transferor Subsidiaries have used the Transferred Assets and that they have

used the property for its "Primary Intended Use," as defined in the Master Lease.  PX-129

("Services' Responses to RFAs"), at Nos. 2, 3.  In addition, the Transferor Subsidiaries have

continued to enter into agreements granting third parties various rights to use the Transferred

Assets in exchange for consideration, including "collocation agreements" (pursuant to which

competitors lease space for their equipment), *see, e.g.*, PX-109.59, Attach. 7, § 1.2, 1.15.1; PX-

109.55, Attach. 7, §§ 1.2, 1.15.1; PX-109.62, Attach. 7, §§ 1.2, 1.15.1; PX-109.72, Attach. 7,

§§ 1.2, 1.15.1; "fiber exchange agreements" (pursuant to which parties agree to swap access to

fiber optic cables owned or controlled by one another), *see, e.g.*, PX-109.52; "dark or dim fiber

agreements" (pursuant to which parties are granted the exclusive right to use fiber optic cables

that are un- or under-utilized), *see, e.g.*, PX-109.37; "pole attachment agreements" (pursuant to

which parties are granted rights to attach power lines or cable television lines to polls), *see, e.g.*,

109.135; and more conventional real estate subleases, *see, e.g.*, PX-109.4.  *See also* Am. Ans.

¶¶ 12, 60, Compl. ¶ 12 n.2.  Since the closing, the Transferor Subsidiaries have entered into more

than 120 such agreements, with terms as long as twenty-nine years.  *See* Docket No. 174

("Trustee PFFCL"), at B-1-B-9 (listing 125 such agreements).

Significantly, since the closing in April 2015, the Transferor Subsidiaries have incurred

substantial costs in connection with their use of the Transferred Assets.  First, the Transferor

Subsidiaries have borne all maintenance, insurance, utilities, and tax expenses owed on the

Transferred Assets.  *See* Tr. 156, 259.  Second, the Transferor Subsidiaries have made substantial

capital improvements to the Transferred Assets; as of mid-2017, they had spent more than $339

million to maintain, repair, overbuild, upgrade, and replace portions of the Transferred Assets.

PX-103, at 29; Eichler Dep. 130-35.  And third, because Holdings is a holding company with no

operations and, thus, no direct revenues, it does not independently have funds to pay CS&L rent; instead, the Transferor Subsidiaries have provided to Holdings the funds used to satisfy the monthly rent payments to CS&L under the Master Lease.  *See* Tr. 90-91; Fletcher Dep. 82-83. Notably, the Transferor Subsidiaries reflect all of these expenses in their publicly filed financial statements.  Services' Responses to RFAs No. 7.  Even more notably, their statements characterize the liabilities and payments associated with the monthly rent payments as "Long-term lease obligations" and "Payments under long-term lease obligations."  *See* PX-83 at F-67; Tr. 144-46; *see also* LaRue Aff. ¶¶ 47-51.  And in Holdings's own financial statements, the monthly payments from the Transferor Subsidiaries are characterized as "[l]easing income from subsidiaries."  PX-83 at 37.  In its Form 10-K for the year ended December 31, 2016, for example, Holdings reported "[l]easing income from subsidiaries" of $653.6 million — the exact amount that Holdings, in turn, paid as rent to CS&L under the Master Lease.  *See id.*; *see also* LaRue Aff. ¶ 54.

**E.  The Notice of Default and the Initiation of This Litigation**

Under Section 6.01(a)(v) of the Indenture, a Noteholder representing twenty-five percent or more of the aggregate principal amount of Notes then outstanding may give written notice of a failure of Services or any of its Restricted Subsidiaries to comply with Indenture Sections 4.07 or 4.19.  Indenture § 6.01(a)(v), at 74.  If Services or the Restricted Subsidiaries continue in their failure to comply for sixty days after such notice, an Event of Default will occur under Section 6.01(a)(v).  *Id.*

As of September 21, 2017, Aurelius was the beneficial owner of more than twenty-five percent of the aggregate principal amounts of the outstanding Notes.  Trustee PFFCL ¶ 99; *see* Docket No. 165 ("Services PFFCL"), ¶ 48; AX-311.  On that day, Aurelius gave written notice

to Services that Aurelius believed the 2015 Transaction breached the Indenture in multiple ways.
*See* PX-113 ("Notice of Default"); *see also* PX-112.  Most relevant here, Aurelius maintained
that the 2015 Transaction constituted a Sale and Leaseback Transaction in violation of Section
4.19 of the Indenture, which forbids Sale and Leaseback Transactions unless three enumerated
conditions are satisfied.  *See* PX-113, at 1-2.  Because the 2015 Transaction failed to satisfy
those conditions, Aurelius explained, Services was in default.  Four days later, Services publicly
disclosed its receipt of the Notice of Default in a filing with the Securities and Exchange
Commission.  AX-34, at 3.  That regulatory filing provided an overview of the scope of
Aurelius's allegations and their potential impact, including the prospect of Services' cross-
defaulting on debt obligations.  *Id.*  At the same time Services represented that the Aurelius's
allegations were "without merit" and "intended to manipulate the price of the Notes and other
securities."  *Id.*

Following Services' receipt of the Notice of Default, the company filed suit against the
Trustee in Delaware Chancery Court, which the Trustee removed to federal district court.  *See
Windstream Services, LLC v. U.S. Bank Nat'l Ass'n*, No. 1:17-CV-1389 (RGA) (D. Del. Oct. 4,
2019), ECF No. 1-1 at Ex. B.  When the Trustee filed a motion to dismiss on personal
jurisdiction grounds, however, Services dismissed the action.  *See id.* at ECF Nos. 4, 11.  As the
Delaware lawsuit proceeded to its speedy conclusion, Aurelius — acting in its capacity as
"Directing Holder" of the Notes — directed the Trustee to file the instant suit against Services on
the ground that the 2015 Transaction had violated the Indenture.  *See* AX-52, at 2-3; AX-89, at 1.
The Trustee did so on October 12, 2017.  The very next day, Services brought Aurelius into the
action in its own right by asserting counterclaims against both Aurelius and the Trustee.  *See*
Docket No. 10.  Among other things, Services sought injunctive relief to prevent both the

Trustee and Aurelius from declaring an Event of Default under the Indenture or "taking any action" based on any alleged default.  Docket No. 72 ("Services' Am. Countercls."), ¶ 114.

### F.  The 2017 Exchange Offer and Amendments

Perhaps skeptical of the strength of its legal position, Services began pursuing a business solution to the problems posed by Aurelius's Notice of Default even as it was seeking relief in court.  With the assistance of its bankers, the company began devising a plan "to neutralize Aurelius" by "quietly exchang[ing] investors out of other bond tranches (with exit consents) into 6.375% notes due 2023 (with entry consents)."  AX-39, at 6; *see* Gunderman Aff. ¶ 56; Cheeseman Aff. ¶ 25.  The plan was, essentially, to create a new majority of Noteholders in the 6 3/8% Notes that would outvote Aurelius and agree to waive any default triggered by the 2015 Transaction.  On October 5, 2017, "to address the allegations" in Aurelius's Notice of Default, the Services Board passed a formal resolution authorizing management to proceed with such a transaction.  AX-74, at 4.  On October 18, 2017, the company publicly announced offers to exchange notes from other series of unsecured notes — at the time, the company had several other outstanding series of notes, each governed by a separate indenture — for new 6 3/8% senior notes due August 2023 ("New Notes") and solicitations for consents to waive any default stemming from the 2015 Transaction.  AX-115; *see* Gunderman Aff. ¶ 80.  Critically, each piece of the transaction was dependent on the other.  Services needed enough friendly noteholders to exchange into the 6 3/8% Notes to dilute Aurelius; otherwise the consent solicitation was doomed to fail because the company would not have sufficient votes to waive any default.  *See* Thomas Dep. 103, 170-71.  At the same time, to entice enough noteholders into exchanging, Services needed to ensure that a sufficient number of noteholders would consent to waive any

default once they exchanged into the 6 3/8% Notes.  Thus, the exchange and consent solicitation needed to occur "concurrently."  *See* Thomas Dep. 95-96; Grumbos Dep. 76.

The terms of the Indenture made it hard to square this circle.  The Indenture would not permit holders of the New Notes to exercise voting rights unless the New Notes qualified as "Additional Notes" within the meaning of the Indenture, but before they could qualify as "Additional Notes," the New Notes had to be authenticated by the Trustee.  *See* Indenture § 6.04 (providing that holders of "Notes then outstanding" may vote to waive a default); *id*. § 2.09 ("The Notes outstanding at any time are all the Notes authenticated by the Trustee . . . ."); *id.* § 9.02 ("[A]ny existing Default . . . may be waived with the consent of the Holders of a majority in principal amount of the then outstanding Notes (including Additional Notes, if any) . . . .").  The company came up with a clever solution to this problem: a "Minimum Issuance Condition" designed to ensure that the transaction would settle only if Services would thereby obtain enough votes to waive the default.  The offering memorandum for the exchange offer involving Services' notes due in 2021 (the "2021 Offering Memorandum"), for example, provided that the offer was conditioned upon, among other things, the company's

> obtaining, on or prior to the applicable Settlement Date, *including substantially concurrently with or as a result of settlement on such date*, the requisite consents from holders representing a majority of the outstanding aggregate principal amount of the 6 3/8% Notes and the effectiveness of the Proposed Waivers and Amendments . . . .

AX-97 at 305 (emphasis added).  In other words, the exchange offer for the 2021 notes (the "2021 Exchange Offer") contemplated that Services could count votes for the New Notes in order to satisfy the Minimum Issuance Condition, so long as the New Notes were voted "substantially concurrently with or as a result of" the exchange transaction.  *Id.*

For reasons that are not clear, however, that language did not appear in the offering memorandum for one of the exchange offers — namely, the one for notes due in 2022 and April

2023 (the "2022/2023 Exchange Offer"). The offering memorandum for the 2022/2023 Exchange Offer (the "2022/2023 Offering Memorandum") also had a Minimum Issuance Condition, but, unlike its 2021 Exchange Offer counterpart, it did not permit the New Notes to issue first and be voted later. Instead, it required Services to obtain a majority vote in the 6 3/8% Notes *before* the exchange offer could settle: "The Exchange Offers are conditioned upon . . . obtaining the requisite consents from holders representing a majority of the *outstanding aggregate principal amount of the 6 3/8% Notes* and the effectiveness of the Proposed Waivers and Amendments . . . ." AX-97, at 520 (emphasis added). On October 31, 2017, one day before expiration of the 2022/2023 Exchange Offer, Services sought to rectify this problem by preparing a supplement to the 2022/2023 Offering Memorandum in which the terms of the Minimum Issuance Condition were modified to track the language of the 2021 Offering Memorandum. AX-175, at 25. But that supplement was never disseminated to bondholders. Nor did Services issue a press release describing the modification, as it had done when it changed or waived other terms of the Exchange Offer. Docket No. 202, at 2-3; Tr. 329-31.

On November 1, 2017, Aurelius issued a notice to prospective holders of the New Notes warning that, in its view, issuance of the New Notes would violate the Indenture in various ways. *See* AX-184. Aurelius advised the prospective holders that it had "urged the indenture trustee not to authenticate" the New Notes and that it planned to challenge the validity of the New Notes in the event the Trustee did ultimately authenticate them. *See id*. Two days later, however, Services advised the Court that it had received the requisite consents from the 6 3/8% Notes to close the transaction. *See* Docket No. 44, at 2. Aurelius promptly sent a direction to the Trustee asking it "to not authenticate the New 6 3/8% Notes unless and until [the Trustee] obtains a declaratory judgment with respect to various issues relating to the validity of the Consent

17

Solicitation and Exchange Offers."  Docket No. 52, at 4; *see also* AX-205, at 1-2.  Ultimately, on

November 6, 2017, the Trustee notified Services that it would authenticate the New Notes.  *See*

AX-235, at 2.  The Trustee explained that, in its view, it was required to authenticate them after

receiving an authentication order and certain additional documents from Services.  *See* AX-247,

at 1.  Significantly, however, the Trustee declined to take a position on whether the transaction

itself (the "2017 Transaction") violated the Indenture, noting that its failure to respond to various

positions and arguments made about the authentication of the New Notes should not be

interpreted "as an agreement or admission of any kind."  *Id*. at 2.  That same day, with its new

consents in hand, Services and the Trustee executed the Third Supplemental Indenture, which

purports to amend the Indenture to waive any default stemming from the 2015 Transaction.  *See*

DX-116, at 4; Gunderman Aff. ¶ 113.  Notably, the Third Supplemental Indenture also provides

that if "the requisite consents" of New Noteholders "are determined by a court order of

competent jurisdiction to have not been validly obtained in accordance with the Indenture or

applicable law," then "such amendment or Waiver shall not be deemed to have occurred."  DX-

116, at 4.

Ultimately (after one more round of exchanges, the details of which are not important

here), Services issued more than $560 million of new 6 3/8% Notes, increasing the principal

amount of its overall indebtedness by approximately $40 million.  *See* AX-300, at 134; AX-315

at 6, No. 18; Tr. 437.  Overall, approximately $699 million in principal amount of 6 3/8% Notes

— more than the majority Services needed — consented to waive the default.  *See* AX-229, at 1.

Significantly, more than seventy-five percent of those votes ($525,473,000 in principal amount)

came from purported holders of the New Notes; by contrast, fewer than thirty percent of the pre-

existing 6 3/8% Noteholders voted to waive the default.  *See id.*; AX-253, at 3.  In other words,

without the New Notes, Services did not achieve a majority of consents in the 6 3/8% Notes.  *See* AX-315, at 7, No. 23.  Additionally, as of November 6, 2017 (the purported settlement date), the 2022/2023 Exchange Offer was responsible for $413,857,000 in principal amount — or seventy-five percent — of the New Notes.  *See* AX-260, at 1-2.  Without the votes attributable to those Notes, Services obtained consents from only forty-three percent of 6 3/8% Noteholders.  Docket No. 167 ("Aurelius PFFCL"), ¶ 153 & n.49; AX-229, at 1-2.  In other words, without those particular New Notes, Services did not achieve a majority of consents in the 6 3/8% Notes, either.

## LEGAL STANDARDS

As noted, the Indenture includes a New York choice-of-law provision, the validity of which is unchallenged here.  Indenture § 12.08.  "Under New York law, a plaintiff bears the burden of proving a breach of contract by a preponderance of the evidence."  *Meda AB v. 3M Co.*, 969 F. Supp. 2d 360, 378 (S.D.N.Y. 2013).  To establish the breach of an indenture, the interpretation of which "is a matter of basic contract law," *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1049 (2d Cir. 1982), "a plaintiff must prove (1) the existence of a contract; (2) adequate performance of the contract by the plaintiff; (3) breach of the contract by the defendant; and (4) damages," *MBIA Ins. Corp. v. Patriarch Partner VII, LLC*, 950 F. Supp. 2d 568, 612 (S.D.N.Y. 2013) (internal quotation marks omitted).  "It is axiomatic under New York law . . . that the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties."  *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (alteration and internal quotation marks omitted).

The "best evidence" of the parties' intent, of course, "is the contract itself."  *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013)

(internal quotation marks omitted).  In interpreting a contract, "[w]ords and phrases are to be given their plain and ordinary meaning."  *Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 390 (S.D.N.Y. 2014).  Specifically, "the meaning of particular language . . . should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes."  *World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003) (internal quotation marks and citations omitted), *abrogated on other grounds by Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006).  A contract should not, however, be construed so as to "disregard[] common sense in favor of formalistic literalism."  *Duane Reade, Inc. v. Cardtronics, LP*, 863 N.Y.S.2d 14, 19 (N.Y. App. Div. 2008) (internal quotation marks and alterations omitted); *see also, e.g.*, *Greenwich Capital Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (N.Y. App. Div. 2010) ("[A] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." (internal quotation marks omitted)).

In a dispute over the meaning of a contract's terms, the threshold question — a question of law for the court — is whether the relevant contract terms are ambiguous.  *Lockheed Martin Corp.*, 639 F.3d at 69.  Under New York law, a contract term is ambiguous if it "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156-57 (2d Cir. 2016) (internal quotation marks omitted).  By contrast, a contract is unambiguous when it has "a definite and precise meaning . . . concerning which there is no reasonable basis for a difference

20

of opinion." *Id.* at 157 (internal quotation marks omitted).  "Faced with a wholly unambiguous contract, all that is left to the task of construction is to give operative effect to the legal relations described." *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv., Ltd.*, No. 86-CV-1313 (RLC), 1987 WL 16967, at *2 (S.D.N.Y. Sept. 10, 1987) (internal quotation marks omitted).

## DISCUSSION

Although technically distinct, the parties' disputes concerning the 2015 Transaction and the 2017 Transaction are interconnected in complicated ways.  Indeed, it is clear from the parties' briefing and advocacy at trial that Court's determinations regarding the validity of the 2015 Transaction inform — and, indeed, could render unecessary — the analysis of whether the 2017 Transaction was lawful, and vice versa.  *See, e.g.*, Tr. 660, 709-10.  It is therefore hard to know where to begin.  There are, however, two threshold issues that require brief discussion first.

### A.  Threshold Issues

First, Services argues that the Court lacks jurisdiction over each component part of the case — namely, the Trustee's claims concerning the 2015 Transaction and Aurelius's counterclaims concerning the 2017 Transaction — and that adjudicating those claims in a single action does not change that fact.  Tr. 660-61.  After all, the Trustee concedes that its claims, which relate solely to the 2015 Transaction, cannot prevail unless Aurelius succeeds with respect to its claims relating to the 2017 Transactions.  Tr. 660.  On the flip side, Aurelius concedes (for reasons that the Court need not go into here) that its counterclaims, which relate solely to the 2017 Transaction, depend on the Trustee's prevailing with respect to its claims relating to the 2015 Transaction.  Tr. 709-10.  The result, Services argues, are "two legally defective complaints, "which "cannot become valid by trying them together."  Tr. 685.

That argument has some superficial appeal, but it does not withstand deeper scrutiny. First and foremost, absent some jurisdictional barrier to the Court's adjudicating this dispute, the interdependent nature of Aurelius's and the Trustee's claims is not, by itself, remotely problematic. Courts routinely require the joinder of parties in an action precisely because, in their absence, the court could not "accord complete relief among existing parties," Fed. R. Civ. P. 19(a), and, once joined, "[n]either a plaintiff nor a defendant need be interested in obtaining or defending against all the relief demanded," Fed. R. Civ. P. 20(a)(3). Moreover, the Federal Rules of Civil Procedure expressly provide that "[a] party may join two claims even though one of them is contingent on the disposition of the other." Fed. R. Civ. P. 18(b). In other words, two claims that depend on each other's success and might fail if brought separately *can* "become valid by trying them together." Tr. 685. Granted, for idiosyncratic reasons relating to the respective roles of the Trustee and Aurelius under the terms of the Indenture, the claims with respect to the 2015 Transaction and the claims with respect to the 2017 Transaction are not (and cannot be) brought by a single party here. But it would elevate form over substance to conclude that, as a result, the Court may not resolve what is plainly a genuine controversy. And in any event, whatever joinder (or other) analysis might apply to the parties' claims if tried separately, they *were* tried together in this case. The Court's duty remains, as always, to grant judgment "for or against individual parties according to their respective rights and duties." *Nagler v. Admiral Corp.*, 248 F.2d 319, 327 (2d Cir. 1957) (Clark, J.); *see* Fed. R. Civ. P. 20(a)(3).

All of that is true, of course, only if the Court has jurisdiction to adjudicate the parties' disputes. Although the parties did not contest the Court's jurisdiction — in so many words — in their Joint Pretrial Order, *see* Docket No. 206, ¶ 8, or in their post-trial briefing, Services argued at trial that the Trustee suffers from a "fundamental lack of standing" now that it has signed the

Third Supplemental Indenture.  Tr. 682.  The precise nature of Services's jurisdictional objection, if any, is somewhat hazy.  *See id.*  But whether framed as an issue of standing or an issue of mootness, Services' argument fails.  When the Trustee signed the Third Supplemental Indenture, it explicitly reserved the very rights it asserts here, conditioning its acceptance of the New Noteholders' waivers on a court not subsequently finding those waivers invalid and expressly declining to endorse the statements in, and validity of, the Third Supplemental Indenture.  DX-116, at §§ 1.04, 2.09-11.  There is no way to read the Trustee's assent to the Third Supplemental Indenture — which appears to have been consciously and carefully designed to avoid mooting its claims in this litigation — as inadvertently doing just that.  To the contrary, both the Trustee's and Aurelius's claims in this lawsuit remain very much alive.

Further, and in any event, even if the Trustee's and Aurelius's claims were dismissed, Services' own counterclaims would remain.  By themselves, those counterclaims present all of the substantive issues raised by the Trustee's and Aurelius's pleadings.  That is, Services seeks declaratory and injunctive relief barring the Trustee *and* Aurelius from declaring that Services violated Sections 4.07 and 4.19 of the Indenture, declaring an Event of Default, or taking any action based on such a purported breach.  Services Am. Countercls. ¶¶ 96-114.  It contends that it is entitled to that relief both because the 2017 Transactions were permissible and the Third Supplemental Indenture is valid and, in any event, because the 2015 Transaction was permissible.  *See Id.* ¶¶ 71-89; Services PFFCL ¶¶ 176-225, 307-45.  In other words, Services' pleading is a mirror image of the other parties' pleadings, taken together; its own claims raise the very same issues raised by Trustee in its Complaint and by Aurelius in its Counterclaims.  And, in defending against Services' Counterclaims, Trustee and Aurelius are entitled to make each of the arguments that they make in support of their affirmative claims.  For that reason, the Court

need not even resolve whether the Trustee's and Aurelius's pleadings are the jurisdictional

equivalent of a two-legged stool; Services' counterclaims can stand entirely on their own.[5]

Second, Services contends that the Trustee's and Aurelius's arguments are barred by the

doctrine of laches.  *See* Services PFFCL ¶ 265.  In a similar vein, Services suggests that

Aurelius's request for relief should be rejected because Aurelius failed to seek emergency relief

to prevent the Third Supplemental Indenture from taking effect.  *Id.* ¶¶ 263-64.  That is, Services

argues that Aurelius undermined its means to cure any alleged default relating to the 2015

Transaction by waiting an excessive length of time before seeking to declare a default and that its

failure to seek injunctive relief in the first instance defeats Aurelius and Trustee's claims.  *See*

Tr. 742-43; *see also* Services Am. Countercls. ¶ 105.  Translated into more colorful terms,

Services contends that "the proverbial egg has not only been scrambled, but eaten and digested

by marketplace investors long ago," and, on that basis alone, the Court should deny the Trustee

and Aurelius equitable relief.  Docket No. 178 ("Services Opp'n"), at 43.[6]

---

[5]     For similar reasons, the Court need not resolve the parties' dispute over whether
Aurelius's counterclaims are barred by Section 6.06 of the Indenture — the "no action" clause,
which prohibits an individual Noteholder such as Aurelius from bringing suit without first taking
certain steps.  *Compare, e.g.*, Services PFFCL ¶¶ 226-255, *with* Aurelius Opp'n ¶¶ 72-96.  Even
if Services is correct that Aurelius's counterclaims are barred by the no action clause, the Court
would have to resolve the parties' disputes in connection with Services' own Counterclaims.

[6]     Services also argues — albeit only halfheartedly — that the Trustee's and Aruelius's
arguments are barred by the doctrine of unclean hands.  *See* Services PFFCL ¶ 266.  That
argument borders on frivolous, as Services falls well short of proving that Aurelius is guilty of
"immoral, unconscionable conduct"; that the immoral conduct was "directly related to the
subject matter in litigation"; and that Services "was injured by such conduct."  *MBIA Ins. Corp.
v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 712 (S.D.N.Y. 2012) (internal quotation
marks omitted).  Indeed, where, as here, a noteholder "seeks enforcement of its rights under the
[contract], but the misconduct . . . alleged stems from actions taken outside the bounds of that
contract," the unclean hands defense fails as a matter of law.  *See id.* at 712-13.

There is some irony to these arguments insofar as Services, in the same breath, faults Aurelius for violating the Indenture's no action clause by acting too hastily.  Services PFFCL ¶¶ 258-62.  But, regardless, Services' argument is without merit for several reasons.  First, "[t]he equitable doctrine of laches . . . does not apply to the delayed exercise of a contractual right." *DiStefano v. Maclay*, 102 F. App'x 188, 190 (2d Cir. 2004).  Second, Aurelius *did* promptly seek relief, raising the propriety of the 2017 Transactions in real time and filing its counterclaims only fifteen days after the Third Supplemental Indenture was signed.  *See* Docket No. 72.  Services cites — and the Court has found — no authority for the proposition that, in such circumstances, the failure to seek emergency injunctive relief is a bar on obtaining relief altogether.  Third, and in any event, Services' own counterclaims would defeat its argument, as Services puts at issue the very questions it asks the Court to ignore on the basis of Aurelius's and Trustee's supposed delay.  And finally, in this respect, what is good for the goose is good for the gander: Services was well aware of Aurelius's view that the 2017 Transaction was invalid when it directed the Trustee to sign the Third Supplemental Indenture.  *See, e.g.*, DX-155; DX-156; DX-157.  To the extent that Services desired peace of mind — for either its own sake or the sake of investors in the New Notes — it presumably could have sought immediate judicial relief itself.  Having failed to do so, it cannot now be heard to complain that it was prejudiced by the other parties' delay.

These compelling reasons aside, "[t]he determination of whether laches bars a [party] from equitable relief is entirely within the discretion of the trial court," *Tri-Star Pictures, Inc. v. Leisure Time Productions, B.V.*, 17 F.3d 38, 44 (2d Cir. 1994), and the Court concludes that there is no good reason to impose such a bar here.  To be sure, granting relief to the Trustee and Aurelius at this juncture would undoubtedly have a significant (albeit hard to assess) impact on Services, investors, and the market generally.  But that goes with the territory — and,

presumably, investors took the risk of such relief into account, as the parties' dispute was well known.  The fact is that this case was litigated in real time and, given the stakes, proceeded from initial complaint to trial quickly.  To accept Services' argument would, in effect, immunize large public companies from scrutiny for corporate transactions unless emergency relief is sought and obtained.  The law does not impose that burden on investors or the courts.

## B.  The Merits of the Parties' Disputes

With that, the Court will turn to the merits of the parties' disputes.  Recognizing that the decision of whether to begin with the 2015 Transaction or the 2017 Transaction has a certain chicken-or-egg quality to it, the Court will proceed chronologically and, thus, begins with the parties' disputes concerning the 2015 Transaction.

### 1.  The 2015 Transaction Was a Sale and Leaseback Transaction

The first question before the Court is whether the 2015 Transaction constituted a breach of Section 4.19 of the Indenture.  As noted above, that Section prohibits Services from entering, or permitting any of its Restricted Subsidiaries to enter, into a Sale and Leaseback Transaction, unless three conditions set forth in Section 4.19(i), (ii), and (iii) are met.  Indenture § 4.19.  "Sale and Leaseback Transaction" is defined, in turn, to mean,

> with respect to any Person, any transaction involving any of the assets or properties of such Person whether now owned or hereafter acquired, whereby such Person sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred.

Id. § 1.01, at 24.  And "Person" is defined, in turn, to mean "any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity."  Id. at 22.

Significantly, several matters relevant to whether the 2015 Transaction ran afoul of these provisions are not in dispute.  First, there is no dispute that the Transferor Subsidiaries are "Restricted Subsidiaries" within the meaning of Section 4.19.  *See* Services Responses to RFAs No. 1.  Second, Services concedes that one or more of the conditions set forth in Sections 4.19 (i), (ii) and (iii) of the Indenture were not met in connection with the 2015 Transaction.  *Id.* at No. 9.  And third, there is no dispute that the 2015 Transaction involved the sale or transfer by the Transferor Subsidiaries of the Transferred Assets to CS&L.  *Id.* at No. 1; PX-137, at 1.  Thus, the propriety of the 2015 Transaction depends in the first instance on whether it was a "Sale and Leaseback Transaction" within the meaning of the Indenture.  And that, in turn, depends on whether, after transferring the Transferred Assets to CS&L, the Transferor Subsidiaries "lease[d]" those assets, either directly from CS&L under the Master Lease or indirectly from Holdings under a lease or sublease.[7]

---

[7]      The parties spill considerable ink addressing whether the 2015 Transaction qualifies as a sale and leaseback transaction under Generally Accepted Accounting Principles ("GAAP"), *see* Eichler Aff. ¶¶ 5-13; LaRue Aff. ¶¶ 25-42; Solomon Aff. ¶¶ 11-17, 30-35; Trustee PFFCL ¶¶ 86-93, but that question is ultimately irrelevant because "Sale and Leaseback Transaction" is a defined term in the Indenture, *see* Indenture § 1.01, at 24.  The Indenture provides that "a term has the meaning assigned to it" and that "an accounting term *not otherwise defined* has the meaning assigned to it in accordance with GAAP."  *Id.* § 1.04 (emphasis added).  (That is not to say, however, that GAAP is irrelevant altogether; as discussed below, it has some bearing on the more particularized question of whether the Transferor Subsidiaries are using the Transferred Assets pursuant to a "lease," which is not a defined term in either the Indenture or the Master Lease.)  Along similar lines, the Court need not and does not address Services' efforts to demonstrate that it had valid business reasons — separate and apart from compliance with the terms of the Indenture — to structure the 2015 Transaction as it did.  Fletcher Aff. ¶ 13; Gunderman Aff. ¶ 21; Tr. 275-80.  The sole question is whether the 2015 Transaction qualified as a Sale and Leaseback Transaction within the meaning of the Indenture; Services' motivations for structuring the transaction in the way it did are not relevant to that question.

For two independent reasons, the Court concludes that the Transferor Subsidiaries "lease[d]" back the Transferred Assets and, thus, that the 2015 Transaction qualified as a Sale and Leaseback Transaction within the meaning of the Indenture.

### a.   The Transferor Subsidiaries Lease the Transferred Assets as a Matter of Law

First, the Court concludes that the Transferor Subsidiaries lease the transferred assets as a matter of law.  Significantly, "lease" is not defined in the Indenture.  Under New York law, therefore, the Court is to give the word its "plain and ordinary meaning."  *Summit Health, Inc.*, 993 F. Supp. 2d at 390.  When used as a verb, as it is in Section 4.19 of the Indenture, "lease" means simply "to hold by a lease."  BLACK'S LAW DICTIONARY 972 (9th ed. 2009).  Thus, the definition turns on the meaning of "lease" as a noun.  When used as a noun, the word is defined as "a grant or devise of real property, usually for a term of years with a reversion to the grantor," *Becker v. Mfrs. Tr. Co.*, 30 N.Y.S.2d 542, 544 (App. Div. 1st Dep't 1941); or "[a] contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration, usu[ally] rent," BLACK'S LAW DICTIONARY 970 (9th ed. 2009); *see also* N.Y. U.C.C. § 2-A-103(1)(j) (defining a "lease" as "a transfer of the right to possession and use of goods for a term in return for consideration").  Thus, there are two critical components to a lease: first, transfer of the right to use or occupy property for a specified term; and second, consideration, usually rent.  Here, both components are present.

First, the Transferor Subsidiaries plainly *hold* the Transferred Assets in a manner consistent with a leasehold interest.  Significantly, "[t]he test for determining what constitutes a lease, as distinguished from other rights or interests, is not necessarily the descriptive language used, but whether . . . *exclusive* control and possession of specified space for a specified term have been granted, subject to reserved rights."  74 N.Y. Jur. 2d Landlord & Tenant § 8 (emphasis

added); *see, e.g.*, D. Finkelstein & L. Ferrara, Landlord & Tenant Practice in N.Y., Vol. F, § 2:47 (Westlaw 2019) ("*Landlord & Tenant Practice in N.Y.*") ("The primary feature of [a] lease is the transfer of *exclusive* possession and absolute control." (emphasis added)); *Feder v. Caliguira,* 171 N.E.2d 316, 318 (N.Y. 1960) ("It is the transfer of absolute control and possession of property at an agreed rental which differentiates a lease from other arrangements dealing with property rights.").  Here, as a matter of contract, Services has "the exclusive right to use . . . the Leased Property for its Primary Intended Use," while the Transferor Subsidiaries have the "[r]ight to use, occupy and operate the Leased Property subject to and in accordance with the terms of [the] Master Lease."  Master Lease § 7.2(a).  And as a matter of practical reality, the Transferor Subsidiaries have exclusive control over the Transferred Assets during the term of the Master Lease.  Indeed, since the asset transfer, the Transferor Subsidiaries are the only entities within the Windstream family that use and occupy the property.  *See* Services Responses to RFAs Nos. 2-4.

The conclusion that the Transferor Subsidiaries "hold" the Transferred Assets "by a lease" is further confirmed by the fact that they, in turn, have subleased the property to others.  It is well established that one party may not lease property to another unless the first party has either an ownership or leasehold interest in the property.  *See* 1 Robert F. Dolan, *Rasch's N.Y. Landlord & Tenant* § 5.3 (5th ed. 2017) ("One may be a lessor, although one is not the owner in fee of the leased premises.  For example, a tenant can sublet his leased premises, and thereupon become a lessor.  However, the lessor must, at the time of giving the lease, have an estate out of which the term may be carved."); *see also, e.g.*, *Burr v. Stenton*, 43 N.Y. 462, 465 (1871) ("[T]o constitute . . . an estate in the lessee, the lessor must, at the time of giving the lease, have an estate out of which the term may be carved."); *cf. Deseret Salt Co. v. Tarpey*, 142 U.S. 241, 245

(1891) ("The lessee can, of course, as against a stranger, have no greater right of possession than his lessor.").  Here, as noted, the Transferor Subsidiaries have entered into more than 120 agreements subleasing or otherwise granting rights in the Transferred Assets to third parties, including collocation agreements, fiber exchange agreements, dark or dim fiber agreements, pole attachment agreements, and more conventional real estate subleases.[8]  Moreover, in any number of these agreements, the Transferor Subsidiaries have explicitly represented that they are lessees under the Master Lease.  *See, e.g.*, PX-109.52, at 1 (noting in a fiber exchange agreement that Windstream KDL, LLC "leases" certain rights and property "pursuant to a Master Lease").  Put simply, the Transferor Subsidiaries would not have the right or ability to enter these agreements with third parties, and the agreements would all be without legal effect, if the Transferor Subsidiaries did not themselves hold a leasehold interest in the Transferred Assets.

Second, in substance, the Transferor Subsidiaries are paying consideration — and healthy consideration, at that — in exchange for their right to use and occupy the Transferred Assets. Most conspicuously, from the closing of the 2015 Transaction through the present (or at least through trial), the Transferor Subsidiaries have paid *every* monthly rent payment — $54.5

---

[8]     Notably, collocation agreements and dark or dim fiber agreements have explicitly been recognized to be "leases."  *See, e.g.*, *Verizon Pa. Inc. v. Pa. Pub. Util. Comm'n*, 484 F. App'x 735, 738 n.7 (3d Cir. 2012) ("An indefeasible right of use is 'an exclusive, long-term lease, granted by an entity holding legal title to a telecommunications cable or network, of a specified portion of a telecommunications cable, such as specified fiber optic strands within an optical fiber cable, or the telecommunications capacity of a cable or network, such as specific channels of a given bandwidth.'"); *Virola v. XO Commnc'ns, Inc.*, No. 05-CV-5056 (JG), 2008 WL 1766601, at *1 n.7 (E.D.N.Y. Apr. 15, 2008) ("A lease of dark fiber typically takes the form of an Indefeasible Right of Use ('IRU'), which grants the holder a long-term right to unfettered access to dark fiber owned by another company."); *In re Deployment of Wireline Servs. Offering Advanced Telecomms. Capability*, Fourth Report & Order, CC Docket No. 98-147, 16 FCC Rcd. 15435, 15439 n.14 (2001) ("In a physical collocation arrangement, a competitor *leases* space at an incumbent LEC's premises for its equipment.  The competing provider has physical access to this space to install, maintain, and repair its equipment." (emphasis added)).

million per month (or $654 million per year) — due to CS&L under the Master Lease.  The fact

that they make those payments indirectly through Holdings is of no moment.  Holdings is a

holding company with no operations and, thus, is incapable of making the payments on its own.

From the outset of the 2015 Transaction, therefore, Windstream management recognized and

acknowledged that the Transferor Subsidiaries "will fund the lease payment to CS&L."  PX-66

at 16.  And consistent with that understanding, the amount of the Transferor Subsidiaries'

monthly payments matches exactly what Holdings, in turn, has paid to CS&L.  *See* LaRue Aff.

¶ 54.  On top of all that, in internal documents and public filings, Holdings itself reflects the

payments from the Transferor Subsidiaries as a form of revenue — "[l]easing income from

subsidiaries" — and the Transferor Subsidiaries reflect their corresponding liabilities as "[l]ong-

term lease obligations" and associated "[p]ayments under long-term lease obligations."  LaRue

Aff. ¶¶ 53-56, 65-70; Tr. 144-46; Fletcher Dep. 82-83.[9]  In short, Holdings itself recognizes the

payments made by the Transferor Subsidiaries as consideration for the right to use the

Transferred Assets provided to them by Holdings.  *See* LaRue Aff. ¶¶ 78-80, 95-105.

Admittedly, there are documents in the record — most notably, "Officer Certificates"

delivered by Services to the Trustee and certain board resolutions — that identify the Transferor

Subsidiaries' monthly payments as "distributions" or "dividend payments."  *E.g.*, DX-26, at 1;

DX-51, at 12.  Those self-serving labels, however, are not controlling.  *See, e.g.*, 74 N.Y. Jur. 2d

Landlord & Tenant § 8 (noting that "[t]he test for determining what constitutes a lease . . . is not

---

[9]      That is particularly significant because, under GAAP, a company may report an item as
"revenue" only if it was received in exchange for something of value provided by the company.
*See* LaRue Aff. ¶ 79 (citing Financial Accounting Standards Board, *Statement of Financial
Accounting Concepts No. 6* ¶ 78).  Although, as discussed above, GAAP is irrelevant to the
proper interpretation of the defined term "Sale and Leaseback Transaction" in the Indenture, it is
relevant to whether the Transferor Subsidiaries' payments are rent payments and whether
Services itself recognized them as such in the relevant financial statements.

necessarily the descriptive language used," but the "substantive nature of the obligations it imposes and the rights it confers"); *Landlord & Tenant Practice in N.Y.*, § 4:12 ("The label used to describe the agreement will not define the nature of the parties' relationship."); *see also, e.g.*, *In re TOUSA, Inc.*, 598 Fed. App'x 761, 767 (11th Cir. 2015) (holding, in connection with a bond indenture's sale-and-leaseback provision, that the issuer's subsidiary had "leased" property "back" where the purchaser "conveyed the right to use and occupy the property" to the subsidiary "in exchange for consideration," even though the contract was styled an "Option Agreement" and the monthly consideration paid under the contract was described as "lot option extension fees" rather than "rent" or "lease payments" (internal quotation marks and brackets omitted)); *Bowers v. Interborough Rapid Transit Co.*, 201 N.Y.S. 198, 200-02 (Sup. Ct. 1923), (rejecting a characterization in a lease that payments for the use of property were "dividends" and holding that such payments were, in fact, rent). Additionally, the Officer Certificates themselves state that the monthly payments are made to "pay a lease payment to Communications Sales & Leasing," and the financial reports attached to the Officer Certificates note that the amounts paid "Represent[] payments made to Windstream Holdings ('Holdings') for the [CS&L] lease payments" for the specified month. *E.g.*, DX-26, at 1, 3.

In any event, even if the Transferor Subsidiaries' monthly payments were properly characterized as "dividend" payments rather than rent, the Court concludes that they pay, and have paid, consideration for their use and occupation of the Transferred Assets in the form of maintenance, taxes, utilities, insurance, and capital improvements. Most significantly, between the closing and mid-2017, the Transferor Subsidiaries spent more than $339 million on capital improvements to the Transferred Assets, *see* PX-103 at 29, all of which — under the terms of the Master Lease — became the property of CS&L, *see* Master Lease § 10.2. Notably, these

payments do not pass to or through Holdings.  *See* Gunderman Dep. 81.  Nor have they been reported as distributions or dividend payments to Holdings.  To the contrary, they are recognized as expenses on the Transferor Subsidiaries' financial statements.  *See* Eichler Dep. 136-37, Services Responses to RFAs 3.  Through these payments alone, the Transferor Subsidiaries have paid, and are paying, consideration for the use and occupation of the Transferred Assets.  *See, e.g.*, *Roedmann v. Hertel*, 138 N.Y.S. 375, 376 (App. Div. 2d Dep't 1912) (rejecting a landlord's attempt to evict a tenant despite the absence of a signed lease because the "defendant entered into possession and spent considerable money in permanent improvements"); *Greimel v. O'Conor*, 119 N.Y.S. 660, 660 (Sup. Ct. 1909) (prohibiting a landlord from ejecting a tenant because capital improvements by tenant supported the existence of unwritten lease).

In short, the Transferor Subsidiaries hold the Transferred Assets — that is, they have the right to use and occupy the property — for a fixed term in exchange for consideration.  Thus, the labels used by the parties to the 2015 Transaction aside, the Transferor Subsidiaries "lease[d]" the Transferred Assets within the ordinary meaning of the term "lease."

**b.  Services Is Judicially Estopped from Denying the Existence of a Lease**

Second, the economic realities of the 2015 Transaction aside, Services is judicially estopped from denying that the Transferor Subsidiaries "lease" the Transferred Assets.  "Judicial estoppel prevents a party in a legal proceeding from taking a position contrary to a position the party has taken in an earlier proceeding."  *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 71 (2d Cir. 1997); *accord New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  It may be invoked when (1) the party against whom it is asserted advanced an inconsistent position in a prior legal proceeding; and (2) the inconsistent position was adopted by the tribunal in that proceeding.  *See, e.g.*, *Peralta v. Vasquez*, 467 F.3d 98, 105 (2d Cir. 2006); *see Simon*, 128 F.3d at 72 (noting that

judicial estoppel applies where the prior inconsistent position was taken "in administrative or quasi-judicial proceedings"). The purpose of the doctrine "is not to look for, or punish, outright lies, but to protect the integrity of the judicial process," which is threatened "not only when [a party] knowingly lies but when it takes a position in the short term knowing that it may be on the verge of taking an inconsistent future action." *In re Adelphia Recovery Tr.*, 634 F.3d 678, 696 (2d Cir. 2011) (internal quotation marks omitted).

Applying those standards here, judicial estoppel plainly bars Services from denying that the Transferor Subsidiaries "lease" the Transferred Assets. First, in seeking and obtaining approval for the 2015 Transaction, Windstream entities made explicit representations to nine state regulatory bodies that the Transferor Subsidiaries would transfer ownership of the Transfer Assets *and* then "lease them back on an exclusive, long-term basis." *See, e.g.*, PX-6, at WIN_00003226; PX-10, ¶ 3; PX-25, at 3, 8; PX-31, ¶ 2; PX-21, at WIN_00003842. In sworn testimony, for example, John Fletcher, General Counsel to both Services and Holdings, reassured the Kentucky Public Service Commission that the Transferor Subsidiaries would "have the necessary assets to continue to provide adequate telecommunication service to Kentucky consumers" because they "will have an exclusive long-term lease and right . . . to use and occupy all the assets that are within their system today." PX-21, at WIN_00003842. And second, the state regulators adopted these representations by relying on them to approve the transaction (or decide that it did not require their approval). In its order, for example, the Alabama Public Service Commission granted approval to the application of the Alabama Transferor Subsidiaries to "to transfer ownership of certain assets described to CSL or one of its wholly owned direct or indirect subsidiaries and lease them back on an exclusive long-term basis." PX-7, at 2. The

North Carolina Utilities Commission likewise found that the Transferred Assets would be "leased to the" Transferor Subsidiaries.  PX-26, at 7-8.

These representations, which were accepted by multiple state regulatory bodies, are flatly inconsistent with the position Services takes here — namely, that the Transferor Subsidiaries did not lease the Transferred Assets.  Fletcher's *post hoc* attempts to minimize the significance of the representations in his testimony at trial — by calling them "imprecise," "shorthand abbreviated statements," and "poorly constructed," Tr. 25, 58-60, 76, 104 — are unavailing, particularly in light of his admission that the previous statements were not inaccurate or misleading.  Tr. 20; *see also id.* at 41.  Nor, despite Services's argument to the contrary, does it matter that Windstream (accurately) disclosed to the state regulators that Holdings would be the sole signatory on the Master Lease.  *See* Tr.18, 663-64.  For one thing, Windstream told the state regulators that that was done "just for administrative ease."  PX-21 at 26; *see also* Tr. 248.  For another, as noted above, the relevant question for purposes of determining whether the 2015 Transaction constituted a Sale and Leaseback Transaction within the meaning of the Indenture is whether the Transferor Subsidiaries "leased" the Transferred Assets after transferring them to CS&L.  The fact that Holdings is the sole Windstream party to the Master Lease does not answer that question, as the Master Lease explicitly authorizes Holdings to sublease the Transferred Assets to the Transferor Subsidiaries without prior approval from CS&L.  Master Lease § 22.  In short, having benefited from repeated statements to state regulators that the Transferor Subsidiaries would lease back the Transferred Assets, Services is estopped from now denying that the Transferor Subsidiaries did in fact lease those assets — even if doing so would now serve its interests.  On that basis alone, the Court would, and does, find that the 2015 Transaction constituted a Sale and Leaseback Transaction.

### c.  Services' Other Arguments Are Without Merit

Services' remaining arguments that there was no lease and, thus, no Sale and Leaseback Transaction are without merit.  For one thing, none could or would alter the Court's conclusion that Services is judicially estopped from denying that the Transferor Subsidiaries lease the Transferred Assets.  But in any event, the arguments fall short on their own terms.

First, Services maintains that no Sale and Leaseback Transaction occurred because the Indenture does not prohibit the Transferor Subsidiaries from transferring assets and then have Holdings lease those assets back, as a Sale and Leaseback Transaction occurs only when the transferor and lessee are the same "Person."  Services PFFCL ¶¶ 315-323.  It is true, as Services notes, that the definition of a Sale and Leaseback Transaction requires a showing that the same "Person" sold (or transferred) property and then leased it back.  Indenture § 1.01, at 24.  It is also true that the definition of "Person" does not extend to "affiliates" or "subsidiaries," *see id.* § 1.01, at 22, and that the Sale and Leaseback provision does not include language barring Holdings from engaging in a Sale and Leaseback Transaction "directly or indirectly," Services PFFCL ¶ 320.  But these truisms miss the point.  The Trustee does not dispute that, under the plain terms of the Indenture, a Sale and Leaseback Transaction occurs only where the transferor and lessee are the same "Person."  *See* Docket No. 179 ("Trustee Opp'n"), ¶ 14.  But the Trustee's claim is not based on the contention that the Transferor Subsidiaries' transfer of assets followed by Holdings's lease of those assets qualifies as a Sale and Leaseback Transaction.  Instead, the Trustee contends — and the Court holds — that the Transferor Subsidiaries themselves "lease" the Transferred Assets.  *Cf.* Compl. ¶¶ 3-4.  That does not, as Services contends, constitute a rewriting of the Indenture; it constitutes enforcement of its plain terms.

36

Second, and relatedly, Services contends that the Transferor Subsidiaries do not "lease" the Transferred Assets because Holdings is the sole Windstream signatory on the Master Lease. *See, e.g.*, Services Opp'n 34.  But to conclude, on that basis, that the Transferor Subsidiaries do not also "hold" the Transferred Assets "by" or "under" the Master Lease would be to elevate form over substance, contrary to New York law.  *See, e.g.*, *Sharon Steel Corp.*, 691 F.2d at 1049 (holding, in reference to an indenture agreement, that "a literal reading of the words . . . is not helpful apart from reference to the underlying purpose to be served"); *accord In re Associated Gas & Electric Co.*, 61 F. Supp. 11, 28 (S.D.N.Y. 1944), *aff'd*, 149 F.2d 996 (2d Cir. 1945); *Alleco, Inc. v. IBJ Schroder Bank & Trust Co.*, 745 F. Supp. 1467, 1475 (D. Minn. 1989). Significantly, in light of provisions in the Master Lease explicitly acknowledging the Transferor Subsidiaries' "right to use, occupy and operate the Leased Property subject to and accordance with the terms of this Master Lease," Services itself admits that the Transferor Subsidiaries use and occupy the Transferred Assets pursuant to the Master Lease.  PX-128 at Interrog. Response No. 1 (citing Master Lease § 7.2); *see id.* at Interrog. Response No. 2 (stating that the "Master Lease . . . contemplated continued use by the subsidiaries as an express right").  Moreover, Holdings and the Transferor Subsidiaries have repeatedly represented — to regulators and third parties — that the Transferor Subsidiaries are lessees under the Master Lease.  *See supra*, at 6-8.

On top of that, any number of references to "Tenant" in the Master Lease make sense only if the term is construed to include the Transferor Subsidiaries.  For example, Section 36.4 of the Master Lease provides that all "carrier of last resort" obligations "shall remain obligations solely of Tenant."  Master Lease § 36.4, at 96.  "Carrier of last resort" obligations are obligations that certain phone companies have under federal and state law to provide service to all customers in their coverage area, even if providing such service at prevailing rates to a particular customer

is not economically viable.  *See* 47 U.S.C. §§ 214(a) & (e); *see also* PX-33; Fletcher Dep. 130-

31.  By law, such obligations apply only to a carrier, defined as "any person *engaged as a*

*common carrier for hire*, in interstate or foreign communication by wire or radio or interstate or

foreign radio transmission of energy."  47 U.S.C. § 153(11) (emphasis added).  Holdings is not a

carrier and, thus, has no "carrier of last resort" obligations.  *See* PX-63 at WIN_00020421.  By

contrast, many of the Transferor Subsidiaries are carriers and do have such "carrier of last resort"

obligations.  See Services' Responses to RFAs No. 15; PX-63 at WIN_00020421; Fletcher Dep.

133.  Along similar lines, Section 36.1(b) of the Master Lease refers to the "Tenant" providing

services to customers and to Tenant's "customer relationship[s]."  Master Lease § 36.1(b), at 93.

But again, Holdings is a holding company, provides no services, and has no customers; it is the

Transferor Subsidiaries that provide services and have customer relationships.

    In the alternative, the Transferor Subsidiaries could be said to "hold" the Transferred

Assets "by" or "under" an implied-in-fact sublease from Holdings.  *See, e.g.*, *Jemzura v.*

*Jemzura*, 330 N.E.2d 414, 420 (N.Y. 1975) ("[A] contract implied in fact may result as an

inference from the facts and circumstances of the case, although not formally stated in words,

and is derived from the 'presumed' intention of the parties as indicated by their conduct.").

Under New York law, the question of whether an implied-in-fact contract exists turns, not on

subjective intent, but on "the objective manifestations of the intent of parties as gathered by their

express words and deeds," *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 361

N.E.2d 999, 1001 (N.Y. 1977), including the "conduct of the parties recognizing the contract,"

*Apex Oil Co. v. Vanguard Oil & Serv. Co.*, 760 F.2d 417, 422 (2d Cir. 1985).  On that basis,

courts regularly find leases to exist where an owner (or lessee) of property permits another party

to use or occupy the premises and the other party periodically pays rent or assumes other

obligations with respect to the property.  *See, e.g.*, *IBM Corp. v. Joseph Stevens & Co., L.P.*, 754

N.Y.S.2d 233, 234 (App. Div. 1st Dep't 2002) (holding that acceptance of monthly rent is

sufficient to create a month-to-month tenancy); *28 Mott St. Co. v. Summit Import Corp.*, 310

N.Y.S.2d 93, 95 (App. Div.1st Dep't 1970) (holding that "the facts" — including an "unexecuted

ten-year lease, . . . bi-monthly payments, [an] annual sum fixed for certain services, . . .

occupation of the premises for six years, and the extensive improvements made by the tenant" —

"clearly imply a year-to-year tenancy"), *aff'd*, 267 N.E.2d 880 (N.Y. 1971); 74 N.Y. Jur. 2d

*Landlord & Tenant* § 155 ("The general rule is that where a tenant enters into possession without

any definite term agreed upon, and a periodic rent is reserved, a periodic tenancy corresponding

to the periodic reservation of rent will be implied.").

So too here, "the objective manifestations of the intent" of the parties supports a

conclusion that Holdings and the Transferor Subsidiaries entered into an implied lease with

respect to the Transferred Assets.  The Master Lease expressly allowed Holdings to sublease the

Transferred Assets to its subsidiaries, *see* Master Lease § 22.2(a)(ii), and Holdings did, in fact,

grant to the Transferor Subsidiaries the right to use — and, in turn, *sublease* — the premises, *see*

Fletcher Dep. 126-27; Services' Responses to RFAs Nos. 2, 4.  Moreover, as discussed above,

the financial statements of Holdings and the Transferor Subsidiaries reflect that the former

receives "[l]easing income" from the latter and that the latter has "long-term lease obligations" in

the exact amount of the rent due from Holdings to CS&L under the Master Lease, *see supra*, at

13, 31; the Transferor Subsidiaries have also furnished consideration to Holdings in the form of

discharging maintenance, capital improvement, and regulator obligations that would otherwise

fall on Holdings, *see supra*, at 5-6, 12, 32; and the Transferor Subsidiaries are fulfilling

Holdings' obligation under the Master Lease to cause the Transferred Assets to be used for their

"Primary Intended Use" of providing regulated telecommunications services, *see supra*, at 12.[10] In the final analysis, the Court need not pinpoint the font of the Transferor Subsidiaries' leasehold interests in the Transferred Assets — that is, whether the Transferor Subsidiaries "hold" the Transferred Assets under the Master Lease or under an implied sublease from Holdings.  In either case, they hold the property "by" or "under" a lease.

Finally, Services contends that the Court should not view the arrangement as a lease because the Transferor Subsidiaries have "no obligation" to fund the rent payments.  *See* Services' Am. Countercls. ¶¶ 47, 50.  But that contention is without merit for several reasons. First, it is, of course, inconsistent with Windstream's own statements — to regulators and in the financial statements of both Holdings and the Transferor Subsidiaries.  LaRue Aff. ¶¶ 47-53, 74-77, 81; Services' Responses to RFAs No. 7.  Second, it is inconsistent with economic reality.  To meet the obligations imposed by the Master Lease, to fulfill their representations to regulators, and indeed to continue to exist as viable businesses, the Transferor Subsidiaries *must* make the rent payments.  Absent those payments, Holdings would have no funds to satisfy its obligations to CS&L, a payment default would occur, Windstream could be dispossessed of the wires necessary to reach its customers, and its business would collapse.  *Cf.* Services' Responses to RFAs No. 5.  And finally, Services' contention is inconsistent with the law.  Under New York

---

[10]    Services argues that the statute of frauds precludes recognition of an implied-in-fact sublease, *see* Services PFFCL ¶ 333, but that argument borders on frivolous.  The statute of frauds may be invoked only by a party to an alleged contract as a defense to an action to enforce that contract, *see, e.g.*, *Shea v. Royal Enters., Inc.*, No. 09-CV-8709 (THK), 2011 WL 43460, at *3 (S.D.N.Y. Jan. 6, 2011), and Services is not a party to any lease at issue here, which would be between the Transferor Subsidiaries and CS&L.  Additionally, it is well established under New York Law that a tenant can lease real property even without a written agreement.  *See, e.g.*, *28 Mott St. Co.*, 310 N.Y.S.2d at 95.  And in any event, even if the statute of frauds did apply, it would "not mean that no contract" — and thus no lease — "exists."  *Nat'l City Golf Fin. v. Higher Ground Country Club Mgmt. Co., LLC*, 641 F. Supp. 2d 196, 207 (S.D.N.Y. 2009).

law, where a party enjoys exclusive use of property with the knowledge and consent of the nominal lessee, and the party provides regular payments to the nominal lessee that are knowingly accepted, the result is a tenancy, and the occupying party is required to continue paying rent as long as it continues to use, possess, and occupy the property. *See, e.g.*, *IBM Corp.*, 754 N.Y.S.2d at 234; *Wolf v. Goodwin*, 199 N.Y.S. 214, 215 (App. Term 1st Dep't 1923) (holding that a tenant under an unwritten lease "cannot remain in possession and refuse to pay rent" and ordering payment of past due rents). Moreover, even if CS&L could not sue the Transferor Subsidiaries for a past rent due, it could certainly bring suit to evict the Transferor Subsidiaries from the premises if the latter failed to satisfy the obligations in the Master Lease that they, and they alone, could satisfy.

### d. Conclusion

In sum, the Transferor Subsidiaries' use and enjoyment of the Transferred Assets walks like a lease and talks like a lease. That is because it is a lease. And, regardless, Services cannot be heard to argue otherwise in these proceedings because it previously took a contrary position in the legal proceedings before state regulators and that position was adopted by the regulators. Accordingly, the Court holds that the 2015 Transaction constitutes a Sale and Leaseback Transaction within the meaning of the Indenture. It follows that, unless excused or cured by the 2017 Transaction, the 2015 Transaction constitutes a breach of Section 4.19 of the Indenture.[11]

### 2. The 2017 Transaction

Thus, the Court turns to whether Services successfully "cured" its breach of the Indenture and corresponding default through the 2017 Transaction. As discussed above, the design and

---

[11]     In light of that conclusion, the Court need not and does not reach the Trustee's alternative arguments that Services breached the duty of good faith and fair dealing and breached Section 4.07 of the Indenture.

purpose of the 2017 Transaction was for Services to issue a sufficient quantity of "Additional Notes" in the 6 3/8% 2023 series to dilute Aurelius's ownership interest in the series and secure a majority vote of Noteholders to waive any default relating to the 2015 Transaction.  As Services concedes, the success of that plan — that is, the validity of the Third Supplemental Indenture (and its waiver of any Default or Event of Default stemming from the 2015 Transaction) — turns on whether the company validly issued "Additional Notes" within the meaning of Section 1.01 of the Indenture.  *See* Indenture § 1.01; AX-315 at 7, Nos. 23, 25.  That is, the holders of the New Notes had rights under the Indenture, including the right to vote on waivers and amendments, if — and only if — the New Notes qualified as "Additional Notes" within the meaning of the Indenture.  *See* Indenture § 1.01 (providing that Additional Notes have "the same terms in all respects as the [originally issued] Notes, or similar in all respects to the Notes"); *id.* § 2.02 ("The Notes issued on the Issue Date and any Additional Notes subsequently issued shall be treated as a single class for all purposes under this Indenture.").

Aurelius contends that Services did not validly issue Additional Notes within the meaning of the Indenture for two independent reasons.  First, relying on Section 2.02 of the Indenture — which provides that Services "may, *subject to Article Four of this Indenture* and applicable law, issue Additional Notes," Indenture § 2.02 (emphasis added) — Aurelius argues that the New Notes did not (and do not) constitute Additional Notes because they were issued in violation of Article Four of the Indenture.  Aurelius PFFCL ¶¶ 84-138.  Second, Aurelius contends that Services failed to comply with conditions of the 2022/2023 Exchange Offer, thereby rendering the corresponding consents — and, by extension, the Third Supplemental Indenture — invalid.  *See id.* ¶¶ 139-53.  The Court agrees.

42

### a.   The New Notes Were Issued in Violation of Section 4.09

First, the Court concludes that the New Notes do not qualify as Additional Notes within the meaning of the Indenture because they were issued in violation of Section 4.09 of the Indenture, which provides protections to Noteholders by limiting the amount of additional indebtedness that Services may incur.  *See, e.g.*, *Citibank N.A. v. Norske Skogindustrier ASA*, No. 16-CV-850 (RJS), 2016 WL 1052888, at *3 (S.D.N.Y. Mar. 8, 2016).  Subject to exceptions enumerated in Section 4.09(b), Section 4.09(a) provides that Services may not incur "any Indebtedness" if its "Consolidated Leverage Ratio" — in essence, the ratio of debt to the company's cash flows, *see* LaRue Aff. ¶¶ 132-38; Indenture § 1.01, at 7-8 — is 4.5 to 1 or greater.  Indenture § 4.09(a).  Services concedes that if the 2015 Transaction constituted a Sale and Leaseback Transaction within the meaning of the Indenture, as the Court holds that it does, then its Consolidated Leverage Ratio before the 2017 Transaction exceeded the 4.5 to 1 threshold.  *See* AX-308, at 2, No. 1; *see also* LaRue Aff. ¶ 140.  It follows that Services did not have the capacity under Section 4.09(a) of the Indenture to issue the New Notes unless the additional debt fell within one of the enumerated exceptions in Section 4.09(b) and, thus, qualified as "Permitted Debt."

Significantly, Services invokes only one of the enumerated exceptions: Section 4.09(b)(v), which allows the company to incur "Permitted Refinancing Indebtedness" under certain circumstances not relevant here.  *See* AX-316, at 6-7; Services PFFCL ¶¶ 267-72.  As noted above, Permitted Refinancing Indebtedness is defined under the Indenture as "any Indebtedness of the Company or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund other Indebtedness of the Company or any of its Restricted Subsidiaries."  Indenture § 1.01, at 22.  To

the extent relevant here, however, the Indenture provides an important qualification: The amount of Permitted Refinancing Indebtedness may "not exceed the amount of the Indebtedness so extended, refinanced, renewed, replaced, defeased or refunded (plus all accrued and unpaid interest thereon and the amount of any reasonably determined premium necessary to accomplish such refinancing and such reasonable expenses incurred in connection therewith)." *Id.* Thus, the "amount" of any Permitted Refinancing Indebtedness may not exceed the "amount" of indebtedness being refinanced unless the incremental difference is used to pay (1) "accrued and unpaid interest thereon," (2) "the amount of any reasonably determined premium necessary to accomplish such refinancing," or (3) "such reasonable expenses incurred in connection therewith."

Thus, whether the New Notes were issued in accordance with Section 4.09 of the Indenture turns, first, on whether the 2017 Transaction increased the "amount" of Services' indebtedness.  It plainly did.  The Indenture defines "Indebtedness" to mean, "in respect of borrowed money," the amount of debt reflected "as a liability upon a balance sheet . . . prepared in accordance with GAAP."  *Id.* § 1.01, at 13-14.  And to the extent relevant here, it provides that the "amount of any Indebtedness outstanding as of any date shall be . . . the principal amount thereof, together with any interest thereon that is more than 30 days past due."  *Id.* § 1.01, at 14. In light of those definitions, Services plainly increased its indebtedness through the 2017 Transaction, as the principal amount of the refinancing debt (that is, the New Notes) exceeded the principal amount of the refinanced debt (that is, the original Notes) by $40 million and Services' balance sheet reflects $40 million more in liabilities.  *See* AX-253 at 4; *see also* Sabry Aff. ¶ 84 & Ex. 25.  And indeed, Services conceded as much in advance of trial.  *See* AX-315 at 6, No. 18; *see also* Services PFFCL ¶ 142; AX-253, at 4 (noting, in a summary of the 2017

Transaction, an "[i]ncrease in debt"); Gunderman Dep. at 17-18; Grumbos Dep. at 59; Thomas Dep. at 143-44.

Admittedly, Services called an expert at trial, Michiel C. McCarty, who testified otherwise.  Specifically, McCarty opined that Services did not increase the "amount" of its indebtedness because "amount" involves a determination of economic or mathematical "equivalence."  *See, e.g.*, McCarty Aff. ¶¶ 64, 85-91; Tr. 591-602, 610-15.  In light of Services' pretrial concession, that opinion is curious; moreover, it is not entirely clear whether Services even adopts it, as the word "equivalent" appears only once in its lengthy Proposed Findings of Fact and Conclusions of Law, *see* Services PFFCL ¶ 196, and counsel was somewhat coy on the matter, *see* Tr. 749-55.  But regardless, McCarty's proposed definition of "amount of Indebtedness" is without merit.  First and foremost, it cannot be squared with the plain terms of the Indenture, which, as noted, define "amount of Indebtedness" in relation to "the principal amount thereof," without regard to "value" at a given time.  Indenture § 1.01, at 13-14.  Second, defining "amount of Indebtedness" in such a subjective and vague manner, *see* Tr. 610-15 (describing the inherently subjective judgments upon which a determination of equivalence depends), would create uncertainty to the detriment of both Services and its creditors.  Given, for example, that the Consolidated Leverage Ratio is based on "aggregate outstanding amount of Indebtedness," Indenture § 1.01, at 7, neither the company nor its creditors would be able to ascertain the company's leverage ratio without first determining the value of outstanding debt.  Even more perversely, as Aurelius explains, if McCarty's view were adopted, Services' leverage ratio would actually *decrease* as the company became more distressed (because the values of its bonds would presumably decrease), giving it a *greater* capacity to issue more debt under Section 4.09.  *See* Aurelius PFFCL ¶ 99.  Such an absurd result would turn Section 4.09, which exists to

protect creditors, on its head.  *See, e.g.*, *AAR Allen Servs. Inc. v. Feil 747 Zeckendorf Blvd LLC*, No. 13-CV-3241 (JMF), 2014 WL 1807098, at *4 (S.D.N.Y. May 6, 2014) ("[I]t is a well-established principle of New York contract law that a contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." (alterations and internal quotation marks omitted)).

Given that the 2017 Transaction caused the "amount of Indebtedness" to increase, the Court's determination of whether the 2017 Transaction was consistent with Section 4.09 comes down to whether the incremental increase of approximately $40 million was used to pay (1) "accrued and unpaid interest thereon," (2) "the amount of any reasonably determined premium necessary to accomplish [the] refinancing," or (3) "such reasonable expenses incurred in connection therewith."  Indenture § 1.01, at 22.  In other circumstances, answering that question might have been a thorny task.  After all, the parties, and their dueling experts, spill considerable ink debating whether Services had to pay, and did pay, a reasonably determined premium.  Aurelius PFFCL ¶¶ 103-119; Services PFFCL ¶¶ 197, 200, 207; Sabry Aff. ¶ 12; Tr. 619-20.  (By contrast, Services does not even try to argue that any increase in indebtedness was used to pay "accrued and unpaid interest" or "reasonable expenses incurred.")  But the Court need not delve into that thicket for the simple reason that Services admitted that it paid no premium at all.  That is, in binding interrogatories, Services admitted that "no premium was paid to Noteholders in connection with the [2017] Exchange Offers."  AX-312, at 8-9.  Services subsequently reaffirmed that response in a supplemental response.  AX-316, at 6-7.[12]  These

---

[12]    In addition, Bob Gunderman, Services' Chief Financial Officer and Treasurer, testified that "there was no premium paid" in the 2017 Transaction, Tr. 313-16; *see also* Gunderman Aff. ¶ 86; John Cheeseman, who led the team of bankers advising Services on the 2017 Transaction, testified that "the proportion of the exchange ratio" that was "a premium" was "'close to nothing, if anything,'" Tr. 446-47; *see also id.* at 472-73, 497; and McCarty, Services' expert, testified

admissions are binding and preclude Services from arguing that a premium was paid.  *See, e.g.*, *Med. Educ. Dev. Servs., Inc. v. Reed Elsevier Grp., PLC,* No. 05-CV-8665, 2008 WL 4449412, at *11 (S.D.N.Y. Sept. 30, 2008) ("[I]n this Circuit, contention interrogatories are treated as judicial admissions that generally stop the answering party from later seeking to assert positions omitted from, or otherwise at variance with, those responses." (internal quotation marks omitted)); *see also, e.g.*, *Zeigler v. Marriott Int'l, Inc.,* No. 03-CV-7688, 2005 WL 1022431, at *11 (S.D.N.Y. May 2, 2005) (holding that the plaintiff's complaint and interrogatory responses "constitute[d] admissions and limit[ed] his potential claims"); *Guadagno v. Wallack Ader Levithan Assocs.,* 950 F. Supp. 1258, 1261 (S.D.N.Y. 1997) (observing that interrogatory responses are generally treated as judicial admissions, and that "[a] judicial admission is conclusive, unless a court allows it to be withdrawn" (internal citations and quotation marks omitted)), *aff'd*, 125 F.3d 844 (2d Cir.1997) (unpublished table decision).  Services' post hoc attempts to rewrite its admissions are unpersuasive.  Services Opp'n 15 n.7.

In short, the New Notes issued in connection with the 2017 Transaction were not valid "Additional Notes" within the meaning of the Indenture because their issuance violated Section 4.09.[13]  It follows that the Third Supplemental Indenture, which purported to waive any Default or Event of Default arising from the 2015 Transaction, was and is invalid.

---

that Services "provided no premium" in the November 2017 Transaction, Tr. 592-93, 596, 646; *see also* McCarty Aff. ¶¶ 8, 59.

[13]    In light of that conclusion, the Court need not and does not reach Aurelius's alternative arguments that issuance of the New Notes violated Sections 4.12 and 4.17 of the Indenture.  *See* Aurelius PFFCL 44-52.

**b.  Services Failed to Satisfy a Condition Precedent to a Necessary Exchange Offer**

In any event, the Third Supplemental Indenture is invalid for a second, independent reason: Services failed to comply with a condition precedent to the 2022/2023 Exchange Offer — namely, the Minimum Issuance Condition in the 2022/2023 Offering Memorandum.  As noted above, that offering memorandum included a Minimum Issuance Condition.  But, unlike its counterpart for the 2021 Exchange Offer, the 2022/2023 Offering Memorandum did not permit the New Notes to issue first and be voted later.  Instead, it unambiguously required Services to obtain a majority vote in the 6 3/8% Notes *before* the exchange offer could settle. *See* AX-97, at 520 ("The Exchange Offers are conditioned upon . . . obtaining the requisite consents from holders representing a majority of the *outstanding aggregate principal amount of the 6 3/8% Notes* and the effectiveness of the Proposed Waivers and Amendments . . . . " (emphasis added)); *see also id.* at 548 ("The Company will not be obligated to deliver New Notes unless the applicable Exchange Offer is consummated.").  It is undisputed that only about thirty percent of the pre-existing Notes voted to waive any default from the 2015 Transaction. *See* AX-229, at 1.  By its plain terms, therefore, the Minimum Issuance Condition in the 2022/2023 Offering Memorandum was not satisfied.

Nor did Services' attempt to fix the problem before the expiration of the 2022/2023 Exchange Offer succeed.  The company issued a supplement to the 2022/2023 Offering Memorandum purporting to change the language to allow, as the 2021 Offering Memorandum did, consents to be obtained "substantially concurrently with or as a result of settlement." *See* Aurelius PFFCL ¶ 145; AX-97, at 305; AX-175, at 25.  But, as Services concedes, the supplement was never delivered to Noteholders. *See* Services PFFCL ¶ 132; Docket No. 202; Tr. 329-30.  And while Services publicized two modifications of the condition — reductions in

the amount of the Minimum Issuance Condition, first from $587 million to $282 million, and then to $247 million — through press releases, *see* DX-125, at 1; AX-156, at 1, there is no evidence that Services' attempt to incorporate the "substantially concurrently" language was made publicly available, through a press release or otherwise, *see* Tr. 333-35, 346-47.  As a matter of both New York law and contract, therefore, Services' attempt at modification fell short. *See, e.g.*, *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 159 (S.D.N.Y. 2014) ("To prove modification of a contract, all the elements of contract formation must be shown, including mutual assent . . . ." (internal quotation marks omitted)); AX-97, at 548 (providing that Services could not "amend, modify, or waive in part or whole" the terms of the 2022/2023 Exchange Offer, including the Minimum Issuance Condition, without "written notice thereof").

        Services does not really argue otherwise, let alone dispute that the 2022/2023 Offering Memorandum formed part of the binding contract between the company and bondholders.  *See* AX-97, at 51 (incorporating by reference the "terms and conditions" of the 2022/2023 Offering Memorandum into the "agreement between the tendering holder and the Company"); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) ("Under New York law, a paper referred to in a written instrument and sufficiently described may be made a part of the instrument as if incorporated into the body of it." (internal quotation markets omitted)).  Instead, it contends, first, that Aurelius "has no standing to complain about any alleged breach of the terms of the 2022/2023 Exchange Offer" because it did not exchange any 2022 or April 2023 Notes and, thus, is "a stranger to the 2022/2023 Exchange Offer."  Services Opp'n 21-22.  That argument is undoubtedly correct, *see, e.g.*, *In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 522 (Bankr. E.D.N.Y. 1994), but it also misses the point.  Aurelius is not seeking to undo the 2022/2023 Exchange Offer per se.  Instead, it is arguing that the New Notes issued in

connection with the 2022/2023 Exchange Offer do not qualify as "Additional Notes" within the meaning of the Indenture because they were not validly issued as Additional Notes under the terms of the Indenture.  As a holder of the Notes, and thus a party to the Indenture, Aurelius has standing to make that claim.

In the alternative, Services argues that it had the right to unilaterally waive the Minimum Issuance Condition.  Services Opp'n 23-24.  In making that argument, it relies on language in the 2022/2023 Offering Memorandum, *see id.* at 23 (quoting AX-97, at 521), and New York law providing that "a condition precedent may be waived where it operates for the sole benefit of the waiving party," *id.* at 24 (citing cases).  But there are reasons to doubt that the contract language upon which Services relies is enforceable.  *See, e.g.*, *Roling v. E\*Trade Secs., LLC*, 756 F. Supp. 2d 1179, 1191 (N.D. Cal. 2010) ("[A] contractual provision that allows a party to unilaterally change the terms of the contract without notice is unenforceable.").  And there is no basis to Services' assertion that the Minimum Issuance Condition was for its sole benefit; to the contrary, the condition was plainly material to and benefited investors, as it assured them that the default stemming from the 2015 Transaction would be waived as part of the 2017 Transaction and, thus, was central to investors' evaluation of the trade.  *See* AX-60, at 3; AX-87, at 2; AX-59, at 1.  In any event, whether Services had the *right* to waive the Minimum Issuance Condition is ultimately beside the point; it is undisputed that the company did not, in fact, waive the condition.

In short, giving effect to the plain terms of the 2022/2023 Offering Memorandum, the Court concludes that the Minimum Issuance Condition to the 2022/2023 Exchange Offer was not satisfied.  That, in turn, means that the 2022/2023 Exchange Offer never closed and expired on its own terms.  It follows that the New Notes issued in connection with the 2022/2023 Exchange

Offer do not constitute "Additional Notes" under the Indenture and that their consents must be disregarded. And it is undisputed that, without those votes, Services obtained consents from only forty-three percent of the 6 3/8% Notes. Accordingly, the company failed to achieve the majority necessary to ratify the Third Supplemental Indenture and waive the default.

### c.   Conclusion

For the foregoing reasons, the Court holds that some or all of the New Notes issued in connection with the 2017 Transaction — enough, in any event, to deprive the consenting Noteholders of a majority — did not qualify as "Additional Notes" under the Indenture and, thus, the 2017 Transaction did not succeed in waiving or "curing" the default caused by the 2015 Transaction. To be clear, the Court does not hold that the New Notes issued in connection with the 2017 Transaction are invalid. (Aurelius is clear that it does not seek such a ruling. Docket No. 184 ("Aurelius's Opp'n"), ¶ 99; Tr. 712.) Instead, the Court merely holds that the New Notes do not constitute "Additional Notes" within the meaning of the Indenture. It follows that there were insufficient consents for the Third Supplemental Indenture and that it is therefore invalid. *See also* AX-315, at 7, No. 25 (admitting that if the New Notes do not constitute Additional Notes, then the Third Supplemental Indenture is invalid). That, in turn, means that Services did not obtain a waiver of its breach relating to the 2015 Transaction and that Aurelius's Notice of Default ripened into an Event of Default on December 7, 2017. And given that, Aurelius is entitled to a money judgment in the amount of the Notes it holds plus interest. That figure, about which there is no dispute, is $310,459,959.10, with an additional $61,347.50 per day in interest after July 23, 2018. Aurelius's Opp'n ¶ 104.

### 3. Services' Breach-of-Contract Claim Against the Trustee

That leaves one remaining claim: Services' breach-of-contract counterclaim against the Trustee for maintaining this suit after it executed the Third Supplemental Indenture. *See* Services Am. Countercls. ¶¶ 90-95.  Given the Court's holdings above, it follows that Services' breach-of-contract claim fails.  But the claim would have failed even if the Trustee had not prevailed on its claims with respect to the 2015 Transaction.  The Trustee's discharge of its obligations under the Indenture is subject, in some circumstances, to the demands and instructions of Services, *see, e.g.*, Indenture § 2.02 (providing that the Trustee shall authenticate additional Notes "upon receipt of a written order" from Services), and, in some circumstances, to the demands and instructions of Noteholders, *see id.* § 6.05 (providing that holders of a majority in principal amount of then-outstanding Notes shall have the right to direct the Trustee's exercise of its remedies with respect to the Notes).  Following the 2017 Transaction, the Trustee found itself between a rock and a hard place, subject to the conflicting demands of Services and Aurelius (not to mention the Court, which denied a motion by Services to dismiss the Trustee's complaint in light of the Third Supplemental Indenture, *see* Docket Nos. 69, 89, and exercised its discretion to try the two pieces of this case together rather than deferring the Trustee's claims until Aurelius's attacks on the 2017 Transaction were resolved).  It would be absurd to conclude, under those circumstances, that the Trustee breached its obligations to Services by submitting the parties' complicated and intertwined disputes to the Court for resolution — particularly since the Third Supplemental Indenture itself explicitly acknowledges, and accounts for, the possibility of a legal challenge to its validity.  *See* DX-116, §§ 1.04, 2.09-.11.  It would be even more absurd to suggest that the Trustee proceeded in anything other than good faith, which in itself means that it cannot be held liable for its actions at Aurelius's direction.  *See* Indenture § 7.01(c)(iii) ("[T]he

Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05.").

Additionally, even if the Trustee had breached its contractual obligations, it would not be liable for attorney's fees — the primary, if not sole, damages that Services could claim.  Under Section 7.07(b) of the Indenture, Services has broadly indemnified the Trustee

> against any and all losses, liabilities or expenses incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture, including the costs and expenses of enforcing this Indenture against the Company . . . , except to the extent any such loss, liability or expense may be attributable to its negligence, bad faith or willful misconduct.

*Id.* § 7.07(b).  That plainly extends to the actions taken by the Trustee that are the subject of Services' counterclaim and there is no basis to allege that those actions qualify as "negligence, bad faith or willful misconduct."  *Id.*  Second, and in any event, any request for damages in the form of attorney's fees is barred by the "American Rule," which precludes a prevailing party from recouping its legal fees from another party "unless an award is authorized by agreement between the parties, statute or court rule."  *Hooper Assocs. Ltd. v. AGS Computers, Inc.*, 74 N.Y. 2d 487, 491 (1989).  Neither the Indenture nor the Third Supplemental Indenture contains any fee-shifting provision in favor of Services against the Trustee.  *See, e.g.*, *Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20-21 (2d Cir. 1996) (finding that for a prevailing party to recover attorney's fees in a breach of contract claim, the "intent to provide [such] fees . . . must be 'unmistakably clear' in the language of the contract").

**CONCLUSION**

This Court's task is not to opine on the financial wisdom of Services' decisions.  Instead, its sole task is to enforce the Indenture's plain terms.  *See, e.g.*, *HOP Energy, LLC v. Local 553 Pension Fund*, 678 F.3d 158, 162 (2d Cir. 2012) (citing *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170-71 (N.Y. 2002)); *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990).  Doing so here, the Court concludes that Services' financial maneuvers — and many of its arguments here — are too cute by half.  That is, the 2015 Transaction qualifies as a Sale and Leaseback Transaction because, in substance, the Transferor Subsidiaries sold the Transferred Assets and then, either directly or indirectly, leased them back; making Holdings the sole signatory on the Master Lease did not change those facts.  And whether or not Services could have waived or cured that breach through a combination of exchange offers and consent solicitations, it failed to do so through the 2017 Transaction for multiple reasons.

Accordingly, the Trustee and/or Aurelius are entitled to a judgment:

1. declaring that, in effecting the 2015 Transaction, Services failed to comply with the covenants set forth in Indenture Section 4.19 restricting Sale and Leaseback Transactions;

2. declaring that Services' breaches of Section 4.19 constitute a Default under Indenture Section 6.01(a)(v);

3. declaring that the New Notes do not constitute Additional Notes under the Indenture;

4. declaring that the September 21, 2017 Notice of Default sent by Aurelius to Services with respect to the foregoing breaches was valid and effective;

5. declaring that those breaches ripened into Events of Default as defined in the Indenture on December 6, 2017;

6. declaring that the December 7, 2017 Notice of Acceleration sent by Aurelius to Services with respect to those Events of Default was valid and effective, and all principal together with all accrued and unpaid interest on the Notes became immediately due and payable as of that date;

7. enjoining Services from taking any further action to issue New Notes in contravention of, or to otherwise violate, the Indenture;

8. awarding to Aurelius a money judgment in an amount of $310,459,959.10, plus interest from and after July 23, 2018; and

9. dismissing Services' counterclaims with prejudice.

Aurelius shall confer with the other parties and draft a proposed judgment consistent with the foregoing, and shall file it on ECF for the Court's approval no later than **February 25, 2019**.[14]

SO ORDERED.

Dated: February 15, 2019
New York, New York

_____
JESSE M. FURMAN
United States District Judge

---

[14] In their respective pleadings, the Trustee and Aurelius also seek fees and costs. Compl. 37; Docket No. 104, at 84. The parties have not briefed those issues, and the Court does not address them here. Moreover, given the high likelihood of an appeal from this Court's judgment, it would make sense to defer any such decision until the litigation fully runs its course. Accordingly, unless and until the Court orders otherwise, the Trustee and Aurelius shall file any application for attorney's fees and costs within thirty days of the judgment in this case becoming final and not appealable.